TJS:FJN
F. #2018R01809

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MUSTAFA GOKLU
       also known as "MUSTANGY,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

C O M P L A I N T

(18 U.S.C. § 1956(a)(3))

No. 19-MJ-419

EASTERN DISTRICT OF NEW YORK, SS:

        PATRICK W. O'KAIN, being duly sworn, deposes and states that he/she is a Special Agent with the Drug Enforcement Administration, duly appointed according to law and acting as such.

        From in or about and between August 28, 2018 and April 30, 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MUSTAFA GOKLU, also known as "Mustangy," did knowingly and intentionally conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented by a law enforcement officer and by a federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity and property used to conduct and facilitate specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846, with the intent to

conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of such specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(3))

The source of your deponent's information and the grounds for his/her belief are as follows:

1.   I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been a DEA Special Agent for approximately 6 years and am currently assigned to the New York Division. During my tenure with the DEA, I have participated in numerous investigations of money laundering and drug trafficking organizations during which I have conducted physical and electronic surveillance, executed court-authorized search warrants, debriefed cooperating witnesses and victims, reviewed and analyzed numerous taped conversations of those engaged in illegal activity, monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors. Through my training, education and experience, I have become familiar with the manner in which money laundering and drug trafficking schemes are carried out and the efforts of persons involved in each activity to avoid detection by law enforcement

2.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations

of others are reported herein, they are reported in substance and in part, except where otherwise indicated

## I.   Background Regarding Digital Currency and the Dark Web

3.     Digital currency (also known as cryptocurrency) is as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e. currency created and regulated by a government).   Digital currency exists entirely on the internet and is not stored in any physical form.   Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.   Digital currency is legal in the United States and may be used for legitimate financial transactions.   However, criminals often use digital currency for conducting illegal transactions, such as the sale of controlled substances.

4.     Bitcoin ("BTC") is a type of digital currency.   BTC payments are recorded in a public ledger called a blockchain that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity.   Individuals can acquire BTC either by "mining" or by purchasing BTC from other individuals.   An individual can "mine" for BTC by allowing his/her computing power to verify and record the BTC payments on the blockchain. Individuals are rewarded for this by being given newly created BTC.

5.     An individual can send and receive BTC through peer-to-peer digital transactions or by using a third-party broker.   Such transactions can be done on any type of computer, including laptop computers, tablets, and cellular telephones.

6.     BTC can be stored in "wallets".   A digital wallet essentially stores the access code that allows an individual to conduct BTC transactions on the public ledger.   To access BTC on the public ledger, an individual must use a public address (or "public key") and a

private address (or "private key").    The public address can be analogized to an account number while the private key is like the password to access that account.

       7.     Even though the public addresses of those engaging in BTC transactions are recorded on the blockchain, the true identities of the individuals or entities behind the public addresses are not recorded.    If, however, a real individual or entity is linked to a public address, it is possible to determine what transactions were conducted by that individual or entity.

       8.     Through the dark web or darknet – websites accessible only through encrypted means – individuals have established online marketplaces, such as Silk Road, AlphaBay, DreamMarket, Wall Street Market, Point/Tochka, and Berlusconi, for narcotics and other illegal items.    These markets often only accept payment through digital currencies, such as BTC.    Accordingly, individuals intending to purchase illegal items on the dark web need to obtain BTC.    Conversely, individuals who have received BTC as proceeds of illegal sales on the dark web need to sell their BTC or convert them to fiat currency in order to spend the proceeds outside of the dark web.    Peer-to-peer BTC exchangers, who advertise their services on website designed to facilitate such transactions, often facilitate such sales or exchanges of BTC.

## II.    The DEA Investigates GOKLU For Illegal Digital Currency Transactions

       9.     In or about July 2018, the DEA identified an individual who advertised on a website called localbitcoins.com.    The individual claimed that he could convert BTC into U.S. currency.    In the localbitcoins.com advertisement, the money exchanger identified his/her username as "MUSTANGY" and claimed that he/she could purchase up to $99,999 worth of BTC and convert them into U.S. currency for a fee.    MUSTANGY claimed that he/she could be contacted through encrypted messaging applications that are routinely accessed via a cellular telephone.

### A. Undercover BTC Transaction with GOKLU on August 28, 2018

10.     Beginning on or about July 11, 2018, a DEA Special Agent acting in an undercover capacity, exchanged several messages with MUSTANGY via an encrypted messaging application to set up an exchange of BTC for U.S. currency.   On or about August 27, 2018, the UC sent a message to MUSTANGY requesting to exchange approximately $5,000 worth of BTC for an equivalent amount of U.S. currency, to which MUSTANGY agreed.   The UC and MUSTANGY arranged to meet the next day in Midtown Manhattan to complete the transaction.

11.     On August 28, 2018, at approximately 3:30 pm, the UC met MUSTANGY in Midtown Manhattan.   MUSTANGY introduced himself as "Michael" and shook hands with the UC.   MUSTANGY then directed the UC to his car, which was parked nearby.

12.     MUSTANGY told the UC that the money was in the car and asked the UC to get in to count it.   The UC then sat in the front passenger seat of MUSTANGY's car and left the door open.   MUSTANGY sat in the driver's seat, opened the center console, and told the UC that the money was inside.   The UC observed multiple bundles of U.S. currency in the center console.   When the UC reached into the center console and retrieved a bundle of currency, MUSTANGY said that not all of the bundles were for the UC.   The UC then retrieved a different bundle and MUSTANGY again stated that that bundle was not for the UC. MUSTANGY then searched through the multiple bundles of U.S. currency to find a white plastic shopping bag that he handed to the UC.   Inside the white plastic bag were five bundles of U.S. currency separated by small black rubber bands. The five bundles were secured together with a larger rubber band.

13.    MUSTANGY then asked the UC to shut the front passenger door so as to not draw the attention of the police.   MUSTANGY then stated that the UC and he were not drug dealers, but simply buying BTC.

14.    The UC shut the door to the car and began to count the U.S. currency. MUSTANGY offered to help and stated that if it was too much he had a money counter available.   MUSTANGY and the UC then counted the money together, which totaled $5,000.

15.    When the UC finished counting the currency, MUSTANGY opened a Mycelium cryptocurrency wallet on his cellular telephone and asked the UC to send him the BTC, plus MUSTANGY's eight percent commission.[1]   The UC told MUSTANGY that he did not have enough BTC to cover the commission. MUSTANGY then asked the UC to send all of the BTC and then he would take his commission out of the U.S. currency being returned to the UC.

16.    The UC then sent 0.70453034 BTC from his cryptocurrency wallet to MUSTANGY's Mycelium wallet.   GOKLU used his Mycelium wallet to determine the BTC to U.S. currency exchange rate at the time of the transaction and then subtracted that amount and returned it to the UC in U.S. currency.

17.    Following the transaction, MUSTANGY and the UC engaged in conversation about future transactions.   MUSTANGY indicated that he could exchange more than $5,000 and said that he could do a transaction every two or three days.   MUSTANGY also stated that he did not like going to Manhattan because there were too many cameras and police. MUSTANGY said that he would meet the UC in Manhattan only for transactions of $20,000 or

---

[1]    Mycelium is a cellular telephone application that allows users to send and receive BTC.

more.   MUSTANGY said that he could bring a money counter, but that it was risky to do so, because it was evidence of being a drug dealer.

18.     The UC told MUSTANGY that he would have approximately $50,000 worth of BTC to exchange during the next transaction. MUSTANGY stated that he could do it on the following day.

### B. The DEA Identifies MUSTANGY as GOKLU

19.     During the August 28, 2018, meeting the DEA obtained the license plate and description of MUSTANGY's car.   A review of motor vehicle records revealed that the car is registered to GOKLU and that GOKLU holds a New York driver license.   I have reviewed the photograph associated with GOKLU's driver license and it appears to be the individual who introduced himself as Michael on August 28, 2018, and who responded to my messages to MUSTANGY.

### C. Undercover BTC Transaction with GOKLU on September 21, 2018

20.     On or about September 17, 2018, the UC contacted GOKLU via an encrypted messaging application to arrange another BTC/U.S. currency exchange.   GOKLU and the UC agreed to meet at a location in Queens, New York on September 21, 2018.

21.     On or about September 21, 2018, the UC met GOKLU in Queens, New York.   GOKLU arrived in his car and the UC got into the front passenger seat.   The UC told GOKLU that he had approximately $7,300 in BTC.   GOKLU asked how much that was in BTC and the UC replied 1.09687.

22.     GOKLU then retrieved a small black backpack from the rear seat of the SUBJECT VEHICLE, and retrieved a small orange envelope from one of the pockets.   GOKLU then pulled out U.S. currency from the orange envelope.   Together, GOKLU and the UC

reviewed the BTC to U.S. currency exchange rate and calculated GOKLU's eight percent commission.   They agreed that the UC would exchange 1.09687 BTC for $6,760 in U.S. currency.

23.    GOKLU and the UC then counted the U.S. currency at the same time that the UC sent the BTC to GOKLU's cryptocurrency wallet.   GOKLU then handed the UC $6,750, all of which came from the orange envelope, with the exception of $50, which GOKLU stated came from his tips.   GOKLU told the UC that he was $10 short, but that he would make it up to the UC in their next transaction.

**D.  Undercover BTC Transaction with GOKLU on November 27, 2018**

24.    On or about November 26, 2018, the UC contacted GOKLU via an encrypted messaging application to arrange another BTC/U.S. currency exchange.   The UC told GOKLU that he wanted to exchange approximately $60,000 worth of BTC for U.S. currency. GOKLU stated that he would be able to exchange approximately $40,000 on the following day and an additional $20,000 the day after.   The UC and GOKLU agreed to meet in Queens, New York on November 27, 2018.

25.    On or about November 27, 2018, the UC met GOKLU in Queens, New York.   GOKLU arrived in his car and the UC and GOKLU got into the back seat.   While in the back of the vehicle, GOKLU removed four bank envelopes containing U.S. currency from a plastic bag and asked the UC if he wanted to count it.   GOKLU then produced a money counter from a plastic bag on the floor of the rear driver's side of the vehicle.   GOKLU then plugged the money counter into the power outlet and began running the U.S. currency through the counter. Each of the four envelopes contained $10,000 in one hundred dollar denominations.

26.     After the money was counted, GOKLU and the UC reviewed the BTC/U.S. currency exchange rate and negotiated GOKLU's commission, which was ultimately agreed upon as approximately seven percent, or $3,400 based on the exchange rate at the time. GOKLU then removed the $3,400 from the $40,000 and handed the UC the remaining $36,600. The UC then sent the BTC to GOKLU's cryptocurrency wallet.

27.     While waiting for the transaction to confirm on the blockchain, GOKLU and the UC discussed how the UC obtained BTC.   The UC told GOKLU that he ran an online business that accepted payment in BTC.   Later in the conversation, GOKLU stated that he recently exchanged U.S. currency for BTC with an unidentified marijuana dealer from California.   The UC then told GOKLU that selling marijuana was part of his business. GOKLU also stated that his business partner was previously arrested for conducting a transaction with a drug dealer.

**E.  Undercover BTC Transaction with GOKLU on December 11, 2018**

28.     On or about December 10, 2018 the UC and GOKLU arranged a meeting via an encrypted messaging application to exchange approximately $20,000 worth of BTC for U.S. currency, which was the remainder of the $60,000 that they had previously agreed to exchange.

29.     On or about December 11, 2018, the UC met GOKLU at a location in Queens, New York.   GOKLU arrived in his car, and the UC and GOKLU got into the back seat. GOKLU asked the UC how much he wanted to exchange, and the UC replied that he had approximately $19,500 worth of BTC.   GOKLU and the UC then reviewed the U.S. currency/BTC exchange rate and agreed on the commission and terms.   GOKLU then removed

four bundles of U.S. currency from a small black bag, and plugged in a money counter that was on the rear driver's side floor.

30.    After the money was counted, the UC took the cash and sent the BTC to GOKLU's wallet.   While waiting for the transaction to confirm on the blockchain, the UC told GOKLU that he was going to have $100,000 to exchange after the new year and asked GOKLU if he could exchange that much.   GOKLU replied that he could, but would need one or two days advance notice.   GOKLU then stated that he could do $100,000 every ten days.

31.    Once the transaction confirmed on the blockchain, the UC was about to leave, but GOKLU said that he had an additional $20,000 if the UC wanted to exchange it.   At this moment, GOKLU saw an individual walking through the parking lot and said that the New York City Police Department ("NYPD") use people like the individual.   GOKLU said that the NYPD use homeless people too and that is why he does not like going to Manhattan.   Based on my training and experience, I believe that GOKLU was stating that the NYPD uses undercover officers or informants to conduct surveillance on criminal activities and that GOKLU knew that his money transactions with the UC were illegal.

32.    The UC then placed a telephone call to his purported business partner (in reality, another undercover DEA Special Agent) in GOKLU's presence.   During this call, the UC stated that they would wait to do another BTC/U.S. currency exchange until "we sell the other three keys."   Based on my training and experience, individuals involved in money laundering and narcotics trafficking understand "keys" to be short for "kilograms" of narcotics.

**F.  Undercover BTC Transaction with GOKLU on January 24, 2019**

33.    On or about January 17, 2019, the UC contacted GOKLU via an encrypted messaging application to arrange for a BTC/U.S. currency exchange in the amount of $100,000.

GOKLU replied that he may be able to do the exchange the following week.   On or about January 23, 2019, GOKLU told the UC that he could not do the $100,000 exchange, but that he could do a $25,000 exchange.   The UC and GOKLU then agreed to meet the following day.

34.   On or about January 24, 2019, the UC met GOKLU at a location in Queens, New York.   GOKLU arrived in his car and the UC entered it and sat in the front passenger seat.   The UC and GOKLU then reviewed the BTC/U.S. dollar exchange rate and agreed on the commission and terms.   The UC and GOKLU then completed the transaction. While they were waiting for the transaction to post to the blockchain, GOKLU asked whether the UC had brought him marijuana (likely in reference to the UC's prior statement to GOKLU that he sold marijuana).   During this conversation, the UC told GOKLU that part of his business (in addition to selling marijuana) was to sell pills.   Specifically, the UC told GOKLU that he sold Adderall and "Oxy" to college students.

### G.  Undercover BTC Transaction with GOKLU on January 30, 2019

35.   On or about January 28, 2019, the UC contacted GOKLU via an encrypted messaging application to check on the status of the remaining $75,000 in BTC that the UC wished to exchange.   On or about January 30, 2019, GOKLU told the UC that he was in Manhattan with $45,000.   The UC and GOKLU agreed to meet at a location in Midtown Manhattan.

36.   Later that day, the UC met GOKLU in Midtown Manhattan and got into the back seat of GOKLU's car.   GOKLU got in the back seat with a black plastic bag that contained multiple stacks of U.S. currency.   GOKLU and the UC then ran the money through a money counter, which revealed a total amount of $43,500.   The UC and GOKLU then reviewed

the BTC/U.S. currency exchange rate, and agreed on the commission and terms of sale. The UC and GOKLU then consummated the transaction.

### H. Attempted Undercover BTC Transaction with GOKLU on April 30, 2019

37. On or about April 22, 2019, the UC contacted GOKLU via an encrypted messaging application to arrange for a BTC/U.S. currency exchange in the amount of $100,000. GOKLU replied he would only be able to exchange $49,999.

38. On or about April 30, 2019, the UC met GOKLU at a location in Queens, New York. GOKLU arrived in his car and the UC entered it and sat in the back seat. The UC observed a black plastic bag and a blue plastic bag on the rear driver's side floor. GOKLU removed a money counter from the blue bag and U.S. currency from the black bag. GOKLU indicated that there was $50,000 in the bag and asked if the UC wanted it counted. The UC responded affirmatively. While GOKLU was counting the money, GOKLU asked the UC how his business was doing. The UC replied that business was thriving and GOKLU asked if the UC was referring to the cannabis business they had previously discussed. The UC told GOKLU that the marijuana part of the business was fine, and but his partner was recently arrested by federal agents, because marijuana is illegal on the federal level. The UC told GOKLU that he makes most of his money by selling Adderall and pills.

39. Moments later, GOKLU finished counting the $50,000 and gave it to the UC. GOKLU then asked the UC if he wanted more money and told him he had an additional $25,000 and retrieved a bundle of U.S. currency from behind the backseat middle armrest. The UC told GOKLU that he would ask his partner to send more BTC to cover the additional money. The UC then placed a call to his partner (in reality an undercover DEA Special

Agent).  During this conversation, the UC told the other agent to send more BTC to cover the

additional money

40.    Following the phone call, GOKLU asked the UC if he wanted another

$10,000, and retrieved another bundle of U.S. currency from behind the armrest. The UC said

that he would wait to see how much BTC his partner sent before taking the extra $10,000.

GOKLU then placed the bundle behind the armrest.

41.    WHEREFORE, your deponent requests that the defendant MUSTAFA

GOKLU, also known as "Mustangy," be dealt with according to law.

PATRICK W. O'KAIN
Special Agent, Drug Enforcement Administration

Sworn to before me this
5 day of May, 2019

s/ Gold

THE HONORABLE
UNITED STATES N
EASTERN DISTRIC