FJN:GK/MED
F. #2018R01809

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

        - against -                Docket. No. 19-CR-386 (PKC)

MUSTAFA GOKLU,
   also known as "Mustangy"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Gillian A. Kassner
Marietou E. Diouf
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

I.      The Court Should Permit the Government to Introduce Certain Evidence as Direct
        Evidence of the Charged Crimes, or in the Alternative, Pursuant to Rule 404(b)............... 4

        A.      The Evidence is Admissible Direct Evidence of the Offenses on Trial ...................... 5

        B.      The Defendant's Text Messages, Records and Evidence Relating to the Defendant's
                Other Digital Currency Activities Admissible Pursuant to Federal Rule of Evidence 404(b)
                12

II.     The Government Intends to Introduce Certified Public Records at Trial Pursuant to
        Federal Rules of Evidence 803 and 902 ........................................................................... 15

III.    The Court Should Preclude Evidence and Argument Concerning Defendant's Possible
        Punishment and Collateral Consequences ....................................................................... 18

IV.     The Court Should Permit the Government to Introduce Properly Authenticated
        Communications with the Defendant ............................................................................... 20

V.      The Court Should Preclude Defendant from Introducing His Own Self-Serving and False
        Exculpatory Hearsay Statements ..................................................................................... 22

CONCLUSION........................................................................................................................ 24

## TABLE OF AUTHORITIES

Cases

Davis v. Alaska, 415 U.S. 308 (1974) ....................................................................... 21

Huddleston v. United States, 485 U.S. 681 (1988) ..................................................... 13

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) ......................................... 18, 19

Old Chief v. United States, 519 U.S. 172 (1997) ......................................................... 7

Shannon v. United States, 512 U.S. 573 (1994) ......................................................... 20

United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2008) .......................................... 5

United States v. Aminy, 15 F.3d 258 (2d Cir. 1994) ................................................... 13

United States v. Barone, 913 F.2d 46 (2d Cir. 1990) ................................................. 23

United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014) ..... 24

United States v. Blume, 967 F.2d 45 (2d Cir. 1992) ................................................... 20

United States v. Camara, 485 F. App'x 457 (2d Cir. 2012) ........................................ 15

United States v. Carboni, 204 F.3d 39 (2d Cir. 2000) ................................................. 6

United States v. Chalarca, 95 F.3d 239 (2d Cir. 1996) ............................................... 24

United States v. Conception, 983 F.2d 369 (2d Cir.1992) ............................................ 6

United States v. Davidson, 308 F. Supp. 2d 461 (S.D.N.Y. 2004) ............................... 24

United States v. Dhinsa, 243 F.3d 635 (2d Cir. 2001) ............................................... 22

United States v. DiMarzo, 80 F.3d 656 (1st Cir. 1996) ............................................... 21

United States v. Downing, 297 F.3d 52 (2d Cir. 2002) ............................................... 13

United States v. Dupree, 870 F.3d 62 (2d Cir. 2017) ................................................. 12

United States v. Edwards, 631 F.2d 1049 (2d Cir. 1980) ............................................ 19

United States v. Fawwaz, 691 F. App'x 676 (2d Cir. June 2, 2017) ............................. 25

United States v. Flom, 256 F. Supp. 3d 253 (E.D.N.Y. 2017) ..................................................... 15

United States v. Flores, 945 F.3d 687 (2d Cir. 2019) .................................................................. 15

United States v. Gagliardi, 506 F.3d 140 (2d Cir. 2007) ....................................................... 22, 23

United States v. Gentile, 104 F.3d 356 (2d Cir. 1996) ................................................................ 16

United States v. Gonzalez, 110 F.3d 936 (2d Cir. 1997) ............................................................... 6

United States v. Hemmings, 482 F. App'x 640 (2d Cir. 2012) .................................................... 23

United States v. Hill, 658 F. App'x 600 (2d Cir. 2016)................................................................ 25

United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) .. 6

United States v. Johnson, 507 F.3d 793 (2d Cir. 2007) ............................................................... 25

United States v. Lewis, 110 F.3d 417 (7th Cir. 1997) ................................................................. 20

United States v. Lopez-Moreno, 420 F.3d 420 (5th Cir. 2005) ................................................... 17

United States v. Marin, 669 F.2d 73 (2d Cir. 1982) .................................................................... 24

United States v. Michel, 879 F. Supp. 2d 291 (E.D.N.Y. 2012)................................................... 18

United States v. Paulino, 445 F.3d 211 (2d Cir. 2006)......................................................... 13, 23

United States v. Perez, No. 05-CR-441 (PKL), 2005 WL 2709160  (S.D.N.Y. Oct. 20, 2005)... 24

United States v. Pitre, 960 F.2d 1112 (2d. Cir. 1992)................................................................. 12

United States v. Pluta, 176 F.3d 43 (2d Cir. 1999)..................................................................... 22

United States v. Qualls, 613 F. App'x. 25 (2d Cir. 2015) ........................................................... 18

United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006) ............................................................. 5

United States v. Roberts, No. 07-CR-425 (DLI), 2009 WL 1706043 (E.D.N.Y. June 16, 2009) 26

United States v. Robinson, 702 F.3d 22 (2d Cir. 2012).................................................................. 6

United States v. Rom, 528 F. App'x 24 (2d Cir. 2013) ................................................................ 18

United States v. Ruggiero, 928 F.2d 1289 (2d Cir. 1991) ........................................................... 22

<u>United States v. Tarricone</u>, 996 F.2d 1414 (2d Cir. 1993)........................................................... 13

<u>United States v. Thomas</u>, 116 F.3d 606 (2d Cir. 1997) ..................................................... 21

<u>United States v. Towne</u>, 870 F.2d 880 (2d Cir. 1989) ......................................... 6, 7, 11

<u>United States v. Watts</u>, 934 F. Supp. 2d 451 (E.D.N.Y. 2013)..................................... 20

<u>United States v. Williams</u>, 205 F.3d 23 (2d Cir. 2000) ................................................. 15

<u>United States v. Yakobov</u>, 712 F.2d 20 (2d Cir. 1983) ................................................. 19

<u>Rules</u>

Fed. R. Evid. 401 ................................................................................................................ 5

Fed. R. Evid. 402 ......................................................................................................... 5, 18

Fed. R. Evid. 403 .............................................................................................................. 14

Fed. R. Evid. 404(b) ......................................................................................................... 12

Fed. R. Evid. 801 .............................................................................................................. 21

Fed. R. Evid. 802 .............................................................................................................. 21

Fed. R. Evid. 803(10)........................................................................................................ 15

Fed. R. Evid. 803(6).................................................................................................... 16, 17

Fed. R. Evid. 803(8).......................................................................................................... 16

Fed. R. Evid. 901 .............................................................................................................. 20

Fed. R. Evid. 902(11)........................................................................................................ 17

Fed. R. Evid. 902(4).......................................................................................................... 16

<u>Treatises</u>

5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008) ............................................. 17

Sand, et al., <u>Modern Federal Jury Instructions</u>, Instruction 9-1...................................... 19

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motions <u>in limine</u> in advance of the jury trial in this matter.  The defendant Mustafa Goklu, also known as "Mustangy," is charged in a two-count Superseding Indictment with money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B), and operation of an unlicensed money transmitting business, in violation of 18 18 U.S.C. § 1960(a).  The government requests that the Court:

1) permit the government to introduce certain evidence as direct evidence of the crimes charged, or, in the alternative, pursuant to Rule 404(b);

2) permit the government to introduce certain certifications pursuant to Federal Rules of Evidence 803 and 902;

3) preclude the defendant from mentioning at any point during the trial, including during jury addresses and in cross-examination of government witnesses, any consequences the defendant may face upon conviction;

4) permit the government to introduce properly authenticated recorded communications; and

5) preclude the defendant from introducing his own self-serving and false exculpatory out-of-court hearsay statements.

For the reasons set forth herein, the government's motions <u>in limine</u> should be granted.

<u>BACKGROUND</u>

The government expects to establish the following facts at trial:

In July 2018, Drug Enforcement Administration ("DEA") special agents identified an advertisement posted on localbitcoins.com where an individual using the username "MUSTANGY" offered to purchase up to $99,999 worth of bitcoins ("BTC")[1] and convert them

---

[1] Bitcoin is a digital currency (also known as cryptocurrency) that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government).

1

into U.S. currency for a fee.  The advertisement directed customers to contact MUSTANGY through an encrypted text messaging application routinely accessed via a cellular telephone. Law enforcement agents later identified the defendant as the individual using the username MUSTANGY.

On July 11, 2018, a DEA Special Agent acting in an undercover capacity (the "UC") began exchanging encrypted text messages with the defendant to arrange in-person exchanges of BTC to U.S. currency.  The UC and the defendant subsequently met and engaged in seven transactions or attempted exchanges of BTC to cash over a nine-month period, culminating in the defendant's arrest on April 30, 2019.  The transactions all occurred in the defendant's parked Mercedes-Benz at various locations in New York City, including at a coffee shop in Sunnyside, Queens and in Manhattan.  The amounts exchanged at each transaction ranged from approximately $5,000 to $50,000.  During each transaction, the UC transferred BTC to the defendant's cryptocurrency wallet, after which the defendant retained a seven or eight percent commission fee and provided the UC with the remaining amount in cash.  The UC audio recorded each of the transactions.[2]

The UC indicated to the defendant on multiple occasions that the source of the BTC the defendant was exchanging was narcotics trafficking; that the UC, together with others, conducted business in California and New York; and that as part of the UC's business he sold oxycodone, Adderall, and marijuana.  Notwithstanding the UC's statements about the illegal source of the BTC, the defendant continued to exchange the UC's BTC to U.S. currency.

---

[2] As a result of technical issues, the audio recording for the September 21, 2018 transaction ended prematurely after the UC and the defendant exchanged greetings.

2

On April 30, 2019, after a final undercover transaction, DEA Special Agents arrested the defendant pursuant to a criminal complaint.  After advising the defendant of his Miranda rights, which the defendant waived, DEA agents interviewed the defendant.  Among other things, the agents asked the defendant about the identity of the other person he had been with at the time of his arrest (the UC[3]), and the defendant responded, in sum and substance, that he had met with the UC three or four times to exchange money for BTC.  When asked about the source of the money, the defendant stated that the UC obtained it from a legal marijuana company in California.  When asked if the money came from any other types of drugs, such as cocaine or pills, the defendant responded, in sum and substance, that the money only came from a legal marijuana business.  The defendant additionally identified other people for whom he had exchanged BTC for U.S. currency in the past.

Contemporaneous with the defendant's arrest, law enforcement executed a search warrant of the defendant's residence and car in Long Island City, New York.  During the search, law enforcement recovered, among other things, a variety of electronic devices.  A recovered laptop computer contained photographs, screenshots, mailing labels, financial statements, and records relating to Mustangy Corp. USA, a New York business incorporated and controlled by the defendant.  One of the recovered cellular telephones contained, among other things, photographs, screenshots, financial statements, and records relating to Mustangy Corp. USA and the defendant's business activities, including car transportation services, BTC mining equipment[4]

---

[3] DEA agents staged the arrest of the UC to make it appear that both the UC and the defendant were arrested at the same time.  The agents later revealed to the defendant that the UC was an undercover DEA Special Agent.

[4] BTC mining is the process in which BTC transactions are verified on the public ledger, or blockchain.  An individual can "mine" BTC using sophisticated hardware, or mining equipment, that solves a mathematical problem to verify and record a transaction on the

importation and sales, and cryptocurrency exchange and money remitting services.  The recovered cellular phone also contained numerous encrypted messages between the defendant and other individuals discussing the exchange of BTC to U.S. currency, which reflect that the defendant met multiple individuals at the same coffee shop in Sunnyside, Queens to conduct BTC transactions.  The messages on the recovered cellular telephone also indicate that the defendant was surveillance-conscious and weary of attracting the attention of law enforcement.  For example, on several occasions, the defendant arrived at the coffee shop parking lot and directed customers to meet him inside his parked car, telling other customers, in sum and substance, that he would not count money in a public place.

<u>ARGUMENT</u>

I.      <u>The Court Should Permit the Government to Introduce Certain Evidence as Direct Evidence of the Charged Crimes, or in the Alternative, Pursuant to Rule 404(b)</u>

The government expects to offer evidence concerning the scope of the defendant's digital currency exchange business and how his business dealings and transactions with other people relate to his knowledge that the BTC that he exchanged for the UC were derived from narcotics trafficking proceeds.  In particular, the government seeks to introduce into evidence: (1) the defendant's communications with other digital currency exchange customers and post-arrest statements; (2) communications and records relating to the defendant's business activities and his registered business, Mustangy Corp. USA; and (3) evidence that the defendant exchanged BTC for U.S. currency on other dates near and during the time of the offense conduct.  The government submits that this evidence directly proves both charged counts.  Specifically, the evidence directly establishes that the defendant knowingly controlled

---

blockchain.  The miner that solves the problem first receives a miner fee, which is amounts of newly created BTC.

and conducted a "money transmitting business"—i.e., a business that, for a fee, accepted currency for transfer within or outside the United States—rather than engaged in a handful of isolated money transmissions, and that his business was unlicensed.  Moreover, this evidence demonstrates the defendant's knowledge and state of mind when exchanging BTC for U.S. currency.  Alternatively, this evidence is also admissible pursuant to Rule 404(b) as probative of the defendant's knowledge, intent, motive, or lack of mistake in committing the offenses on trial.

      A.    The Evidence is Admissible Direct Evidence of the Offenses on Trial

Federal Rule of Evidence 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed. R. Evid. 401. Relevant evidence generally is admissible, see Fed. R. Evid. 402, and there is a "very low standard for relevance."  United States v. Al-Moayad, 545 F.3d 139, 176 (2d Cir. 2008); see also, e.g., United States v. Quattrone, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

It is well-established that evidence of uncharged acts is admissible direct evidence of crimes charged in an indictment, and not as other crimes evidence under Federal Rule of Evidence 404(b), when the event "arose out of the same transaction or series of transactions as the charged offense, is inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime on trial."  United States v. Robinson, 702 F.3d 22, 37 (2d Cir. 2012); United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (same); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (same).  In such circumstances, the

uncharged acts evidence is appropriately treated as "part of the very act charged." United States v. Conception, 983 F.2d 369, 392 (2d Cir.1992).

A "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." United States v. Gonzalez, 110 F.3d 936, 941–42 (2d Cir. 1997) (uncharged burglary admissible in trial where defendants were charged with illegal possession of firearms because, among other things, it provided "crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" of the defendants' arrest) (citation omitted).  Background evidence may be admitted to show, for example, the "circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." Id. at 941; see also United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *4 (E.D.N.Y. Dec. 20, 2019) (same).  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

    i.    The Defendant's Communications and Transactions with Other Digital Currency Exchange Customers and Post-Arrest Statements

At trial, the government intends to introduce the defendant's messages with individuals regarding his digital currency exchange services, surveillance evidence showing that the defendant met customers and exchanged BTC for U.S. currency before and during the time period charged in the superseding indictment, and the defendant's post-arrest statements admitting to engaging in BTC exchange services on prior occasions as direct evidence of the charged offenses.  Such evidence "complete[s] the story of the crime [on] trial" and makes clear that the defendant was engaged in a full-fledged commercial enterprise that extended beyond his

transactions with the UC—a requirement to establish that the defendant operated an unlicensed money transmitting business as charged in Count Two of the superseding indictment. See Towne, 870 F.2d at 886 (citation omitted).

With respect to Count One, the money laundering charge, the above-described evidence is direct evidence that completes the story of the crimes on trial, as the defendant's messages show that he was transacting with numerous individuals who opted to meet a stranger in suspicious locations and pay a premium for currency exchange instead of using a regulated, low-fee exchange like Coinbase. For example, in one exchange the defendant told a repeat customer, in sum and substance, that he did not have enough BTC to conduct a transaction. The customer responded that it was an "emergency" and that he/she would "really appreciate" if the defendant could transact with them despite the ready availability of legitimate Bitcoin exchanging businesses.

The defendant's conversations with prospective customers also demonstrate the defendant's knowledge about the benefits of conducting off-exchange transactions—including a lack of "know your customer" controls and anonymity. For example, in one exchange with a prospective customer, the customer stated, in sum and substance, that the defendant's eight percent commission fee was too high, and that legitimate BTC exchangers charge less to transact. The defendant responded, "[legitimate BTC exchangers] use KYC and usually trouble after 3k." In another transaction, a prospective customer sought to exchange $300. When the defendant responded that that amount was too low and suggested using a legitimate BTC exchanger, the customer replied that he/she was having problems verifying his/her ID at the legitimate exchanger.

The defendant's encrypted messages further reflect a wariness of law enforcement and knowledge that the source of some of his customers' money came from specified unlawful activities.  In several messages, the defendant told customers that he would not count cash in public places and expressed concern over the possibility of being observed by law enforcement. In other messages with a repeat customer, the defendant stated, in sum and substance, that he did not remember if the customer was buying or selling BTC because he deletes his message history for security reasons.  In another exchange, the defendant expressed a willingness to transact with a prospective customer who, after the deal fell apart, the defendant later referred to as a drug dealer.  The customer, in turn, informed the defendant the had had $29,000 to "wash," or launder.  Finally, the messages also reflect that the defendant would only transact for an amount of money that made it worth the risk.  For example, in multiple exchanges with prospective customers, the defendant stated, in sum and substance, that his minimum transaction amount was $10,000; in other exchanges, the defendant did not reply to messages seeking to transact for amounts under $2,000.

With respect to Count Two, the money transmitting count, the above-described evidence is direct evidence that shows the scope of the defendant's business.  Further, many of the customers with whom the defendant exchanged messages responded to the same localbitcoins.com advertisement as the UC around the same general timeframe charged in the superseding indictment.  Moreover, the evidence shows that, as with the UC, the defendant typically charged the other customers a seven or eight percent commission fee and directed them to meet him at the same coffee shop in Sunnyside, Queens.  In addition, because some of the customers exchanged U.S. currency for BTC, the messages establish a source of supply of some of the cash that the defendant provided to the UC.

8

Finally, as some of the customers appear to have come from outside the New York City region, the messages and records provide evidence that the defendant's activities affected interstate commerce, which is an element of the unlicensed money transmitting charge. See 18 U.S.C. § 1960(a)(b)(1).  For example, the defendant's encrypted messages reflect that one customer traveled from New Jersey and met the defendant at the coffee shop in Sunnyside, Queens for a transaction with an eight percent commission, which is significantly above the rate charged by legitimate BTC exchange businesses.

ii.    Evidence of the Defendant's Other Business Activities Using Mustangy Corp. USA

The government also expects to offer evidence regarding the role played by the defendant's business, Mustangy Corp. USA.  Records received from the New York Secretary of State show that the defendant incorporated Mustangy Corp. USA as a for-profit company in 2012.  The evidence shows that the defendant then used Mustangy Corp. USA to conduct his digital currency exchange business.[5]  This evidence consists of the following materials obtained from a laptop and a cellular telephone recovered from the defendant's residence: (1) bank statements for Mustangy Corp. USA, which show that the defendant conducted multiple lines of business through the same corporation; (2) records relating to the defendant's importation and sale of BTC mining machines, including commercial invoices, eBay screenshots, order forms, and shipping labels; and (3) evidence of the defendant's driving business, including an equipment financing agreement and licensing information for the car that the defendant used to conduct transactions with the UC.

---

[5] Mustangy Corp. USA was officially dissolved in 2016.  However, the defendant continued to use it, as described herein, after that date to conduct illicit activities.

As with the encrypted text messages described above, evidence regarding other aspects of the defendant's commercial enterprise is direct evidence that the defendant personally controlled, conducted, managed, supervised, directed, and/or owned all or part of a money transmitting business—a required element of Count Two of the superseding indictment.  For example, shipping labels for the defendant's BTC mining machine sales interchangeably identify the sender as "mustangy cyrpto," "mustangy corp" and "Michael Goklu"[6] and list the defendant's residence in Long Island City as the return address.  Commercial invoices relating to BTC mining machine sales are addressed to the defendant at the same address.  Furthermore, documents including a white paper analyzing large-scale BTC mining operations, an installation guide for BTC mining machines, and a BTC anonymity guide are probative evidence of the scope of the defendant's involvement in the digital currency industry and are direct evidence that the defendant was operating a money transmission business.

Likewise, records relating to the defendant's car transportation business identify the defendant as the operator of Mustangy Corp. USA.  For example, a title instructions document from Advantage Funding lists Mustangy Corp. USA as the "account name," but lists the defendant's name and residence as the forwarding address.  Another document lists Mustangy Corp. USA as the licensee for a "For Hire Vehicle - Non SHL" license and lists the defendant's residence—the same address the defendant used to order the cryptocurrency mining machines—as the licensee address.

Like the encrypted text messages, evidence of the defendant's other business ventures is also "necessary to complete the story of the crime [on] trial" and "inextricably

---

[6] The defendant legally changed his name from Mustafa Goklu to Michael Goklu in 2014.

intertwined with the evidence regarding the charged offense," because the defendant operated his car transportation service, his bitcoin mining machine sales, and his digital currency transaction services all through the same business—Mustangy Corp. USA.  See Towne, 870 F.2d at 886 (citation omitted).  Bank statements for Mustangy Corp. USA show transactions for Coinbase, a digital currency exchange, alongside payments for car repair and washing services, and Bitmain, a source of crypto mining products, establishing that the defendant's digital currency exchange service was only one aspect of a larger enterprise.  Indeed, the defendant's text messages with digital currency exchange customers and recordings of his meetings with the UC show that he used his car transportation service to further his digital currency exchange activities by alternatively offering and meeting with customers for both services in his car at various locations throughout New York City.

Accordingly, the government should be permitted to introduce evidence regarding the full scope of Mustangy Corp. USA's business activities as direct evidence of the crimes charged.

### iii.  Evidence of the Defendant's Digital Currency Records Recovered from the Defendant's Residence

The government further intends to introduce evidence of the defendant's digital currency records, including records pertaining to the defendant's exchange of cryptocurrency on various exchanges; documents pertaining to BTC, including various articles about cryptocurrency and BTC anonymity on the defendant's computer as direct evidence of the charged offenses.  Such evidence is direct evidence of the charged crimes and completes the story of the crimes on trial as it shows the defendant's cryptocurrency sophistication and further demonstrates that he was operating a money transmitting business.

B.       The Defendant's Text Messages, Records and Evidence Relating to the
         Defendant's Other Digital Currency Activities Admissible Pursuant to Federal
         Rule of Evidence 404(b)

In the alternative, evidence of the defendant's text messages, records, evidence and statements relating to his other digital currency activities are admissible under Federal Rule of Evidence 404(b).  Rule 404(b) permits the introduction of a "crime, wrong, or other act" for purposes such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b).  The Second Circuit has long adopted an inclusionary approach to Rule 404(b), allowing the admission of other act evidence "for any purpose other than to show a defendant's criminal propensity."  United States v. Pitre, 960 F.2d 1112, 1118 (2d. Cir. 1992).  A court can admit this evidence of "prior acts as probative of knowledge and intent if the evidence is relevant to the charged offense, i.e., if there is a similarity or connection between the charged and uncharged acts."  United States v. Dupree, 870 F.3d 62, 76 (2d Cir. 2017).  Such evidence is correctly admitted if it is: "(1) offered for a proper purpose; (2) relevant, and (3) substantially more probative than prejudicial.  In addition, (4) at the defendant's request, the district court should give the jury an appropriate limiting instruction."  United States v. Downing, 297 F.3d 52, 58 (2d Cir. 2002) (citing Huddleston v. United States, 485 U.S. 681, 691–92 (1988)).

The government expects that the main issue in dispute at trial regarding the money laundering charge will be the defendant's knowledge as to the source of the money in the BTC transactions with the UC.  Where a defendant's knowledge may be at issue during trial, evidence of involvement in crimes or acts other than those charged is often admissible under Rule 404(b).  See, e.g., United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994) ("Where, for example, the defendant does not deny that he was present during a narcotics transaction but simply denies wrongdoing, evidence of other arguably similar narcotics involvement may, in

appropriate circumstances, be admitted to show knowledge or intent."); United States v. Tarricone, 996 F.2d 1414, 1421 (2d Cir. 1993) (finding that evidence demonstrating defendant's intent or knowledge is admissible where issues of intent or knowledge may be disputed by defendant at trial).  Evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice under Rule 403 where the evidence does not "involve conduct more inflammatory than the charged crime."  United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006).

Here, evidence of the defendant's text messages, BTC exchange and mining businesses, digital currency records, and statements regarding his BTC exchanges are admissible under Rule 404(b) because they are evidence of the defendant's knowledge, intent, and absence of mistake.  This evidence, among other things, underscores the defendant's experience and sophistication regarding digital currency transactions and are probative of his intent and lack of mistake with respect to the charged transactions with the UC.  Specifically, the text messages demonstrate that the defendant acted to conceal or disguise the nature, location, source, ownership, and/or control of the BTC he exchanged for the UC—which is probative of the defendant's knowledge that the money he was converting for the UC was proceeds from illegal activity.  In his messages, the defendant repeatedly directed his other customers to meet at the same coffee shop parking lot in Sunnyside, Queens where he met the UC, and refused to conduct transactions indoors, where he would be more likely to be observed by law enforcement.  In one message, for example, the defendant stated: "You cant count 10k in a bar" and "Come front this is next to un thsounds cops around lol."  In another exchange on April 10, 2019, the defendant refused to conduct a transaction inside the coffee shop rather than his car, and stated, "[l]ook like someone will take cash and run or like a cop looking fir evidence lol," and "Reallly

arevyouvworks for nyod [NYPD] or what?"  The defendant's emphasis on conducting transactions in secrecy and his wariness of encountering law enforcement demonstrates that he was aware of the illegality of his transactions with the UC, as with other customers, but nevertheless continued his illicit activities.  See, e.g., United States v. Stewart, 112 F.3d 507 (2d Cir. 1996) ("Evidence of consciousness of guilt is admissible under Fed. R. Evid. 404(b).").

    The evidence also satisfies Rule 403, as its probative value is not "substantially outweighed" by any prejudicial effect.  Fed. R. Evid. 403.  Indeed, the evidence is minimally prejudicial because it neither involves a prior conviction nor is it more inflammatory than the charged conduct.  See, e.g., United States v. Williams, 205 F.3d 23, 33–34 (2d Cir. 2000).  In this case, the probative value of the above-described evidence is clear; it proves, among other things, the existence and scope of the defendant's unlicensed money transmitting business, how the defendant operated, context for the relationships between the defendant and the UC and the defendant's knowledge regarding the illegal source of the BTC he converted.  On the other hand, the risk of unfair prejudice arising from such evidence is minimal, given that the other acts are "no 'more sensational or disturbing than the crime[] with which [the defendant] was charged.'" United States v. Flom, 256 F. Supp. 3d 253, 268–69 (E.D.N.Y. 2017) (citations omitted) (alterations in original).  Further, any limited prejudice of the evidence can be cured by the Court's standard limiting instruction on the permissible uses of Rule 404(b) evidence.  See United States v. Camara, 485 F. App'x 457, 460 (2d Cir. 2012) ("[W]hen a district court gives a careful limiting instruction [on other acts evidence], as did the court in this case, any prejudicial effect is limited by the careful parameters set by the district court on the jury's consideration of that evidence.").

Accordingly, the government moves to admit the above-described evidence as direct evidence or, in the alternative, as evidence pursuant to Rule 404(b).[7]

II.   The Government Intends to Introduce Certified Public Records at Trial Pursuant to Federal Rules of Evidence 803 and 902

At trial, the government intends to introduce certifications obtained from the New York State Department of Financial Services ("DFS") and the United States Department of Treasure, Financial Crimes Enforcement Network ("FinCEN") reflecting that neither the defendant nor Mustangy Corp. USA have ever been licensed in New York State or registered with FinCEN as a money transmitting business, as required by law.  The government also intends to introduce certified business records from the New York Secretary of State reflecting the defendant's incorporation and ownership of Mustangy Corp. USA.  The government has obtained certifications, attached hereto as Exhibits A, B and C, and which have already been provided to the defendant in discovery.

Under Federal Rules of Evidence 803(10), the absence of a public record is not considered hearsay if (1) a "diligent search" is performed, (2) the evidence is entered to prove that "the record or statement does not exist," and (3) the government gives proper and timely notice of its intent to offer the certification prior to trial.  Fed. R. Evid. 803(10).  Such a negative certification is self-authenticating if it meets the requirements of Rule 902.  Id.

Each of these requirements will be established with respect to the certifications indicating that neither the defendant nor his company ever registered as a money transmitter with DFS or FinCEN, as required by law.  The certifications that the government seeks to introduce

---

[7] If the defendant raises an entrapment defense, the government will additionally seek to admit the above-described evidence in its case-in-chief as evidence of the defendant's predisposition to commit the charged crimes.  See United States v. Flores, 945 F.3d 687, 717 (2d Cir. 2019); United States v. Gentile, 104 F.3d 356, 356 (2d Cir. 1996).

were made following the performance of diligent searches for records under both the defendant's

name and Mustangy Corp. USA, which resulted in determinations by DFS and FinCEN that no

such records existed.  The attached certifications further meet the requirements of Rule 902(4).

Fed. R. Evid. 902(4).  As noted, the government provided the defendant the certifications in

discovery, and the defendant is aware of the government's intention to offer them as evidence at

trial.

With respect to the New York State certificate of incorporation for Mustangy

Corp. USA, the government will seek to introduce it pursuant to Federal Rules of Evidence

803(6) and 803(8).  Pursuant to Rule 803(8), a "record or statement of a public office" that sets

out "the office's activities [] . . . [or] a matter observed while under a legal duty to report" is

excluded from the hearsay rule.  Fed. R. Evid. 803(8)–803(8)(B).  See, e.g., United States v.

Lopez-Moreno, 420 F.3d 420, 436 (5th Cir. 2005) ("Under Rule 803(8), records, including

computer records, made by a public agency are admissible, regardless of whether they would

otherwise be excluded as hearsay.") (collecting cases).  Such a record is self-authenticating if it

meets the requirements of Rule 902(4)(A).  Fed. R. Evid. 902(4).

Rule 803(6) creates the same exception for business records "kept in the course of

a regularly conducted business activity."  Fed. R. Evid. 803(6).  Under Rule 902(11) of the

Federal Rules of Evidence, the original or a copy of a domestic record of a regularly conducted

activity is self-authenticating if it meets the requirements of Rule 803(6)(A)–(C),[8] "as shown by

---

[8] Rule 803(6)(A)–(C) provide that records of an act or event are not excluded as hearsay if: "(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; and (C) making the record was a regular practice of that activity."  Fed. R. Evid. 803(6).

a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court."  Fed. R. Evid. 902(11).

Rule 803(6)(D) provides that a document may be qualified as a record of a regularly conducted activity "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification."  Fed. R. Evid. 803(6)(D); see also United States v. Michel, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficient laid foundation for admission of bank records).  Thus, "Rule 902(11) extends Rule 803(6) 'by allowing a written foundation in lieu of an oral one.'"  United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013) (summary order) (citing 5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008)).

If a party seeks to certify a business record pursuant to Rule 902(11) rather than by providing live testimony pursuant to Rule 803(6)(D), it "must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them."  Rom, 528 F. App'x at 27 (quoting Fed. R. Evid. 902(11)).

Admission of the certifications would not violate the defendant's Confrontation Clause rights because self-authenticating certifications authenticating records are not testimonial.  Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009); see also United States v. Qualls, 613 F. App'x. 25, 28 (2d Cir. 2015).  As the Supreme Court has noted, "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."  Melendez-Diaz, 557 U.S. at 324.  This general rule holds particularly true for

public records.  As the Second Circuit has explained, as long as a diligent search has been conducted to satisfy Rule 803(10), "there is not the same need to cross-examine the maker of the statement [under Rule 803(10)]" as there might be for one making a business record certification because "evidence admitted under [Rule 803(10)] is in its nature highly reliable, i.e., the 'yes or no' of whether a license has been issued."  United States v. Yakobov, 712 F.2d 20, 26–27 (2d Cir. 1983) (citations omitted).

Accordingly, the certifications should be admitted at trial.

III.    The Court Should Preclude Evidence and Argument Concerning Defendant's Possible Punishment and Collateral Consequences

The court should preclude the defendant from referencing at trial any consequences of his conviction because they are not relevant.

Pursuant to Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Generally, relevant evidence is admissible and "[i]rrelevant evidence is not admissible."  See Fed. R. Evid. 402 ("[T]he district court has broad discretion to exclude evidence that is irrelevant"); United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid. 403.  The defendant's punishment is not a fact "of consequence" to be determined at trial.  Therefore, any evidence of those issues is not relevant.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."  Id.  Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt.  See generally Sand, et al., Modern

18

Federal Jury Instructions, Instruction 9-1; see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464–65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result.").

Courts have repeatedly precluded evidence of the potential sentence defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury.  See, e.g., United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"); United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury").  In short, guilt should determine punishment, not the other way around.  See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . .  We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent.").  Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct."  Id. at 616.  Therefore, the

Court should preclude the defendant from referencing potential punishment and collateral consequences at trial.[9]

IV.    The Court Should Permit the Government to Introduce Properly Authenticated Communications with the Defendant

At trial, the government will seek to admit audio recorded and text message communications between the defendant and the UC, as well as provide associated transcripts of the audio recordings to the jury to aid their review of the evidence.  Such evidence satisfies Federal Rule of Evidence 901, does not contain inadmissible hearsay, and the use of the associated transcripts as jury aids is proper.

Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  A trial court has "broad discretion to determine whether [evidence] has been properly authenticated."  United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999) "Rule 901(a) . . . is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 1991) (internal quotation marks and citation omitted).  "[T]he burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  Pluta, 176 F.3d at 49

---

[9] Nevertheless, to the extent that the defendant exercises his right to testify, the government should be permitted to cross-examine him regarding the potential consequences of conviction that he faces because, under those circumstances, it is relevant to the defendant's credibility as a witness. See Davis v. Alaska, 415 U.S. 308, 316 (1974) (discussing use of cross-examination to reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues . . . in the case at hand.  The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." (internal quotation omitted)).

(internal quotation marks and citation omitted).  Rule 901 "does not erect a particularly high

hurdle." United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001) (internal quotation marks and

citation omitted).

In general, the Second Circuit has "stated that the standard for authentication is

one of reasonable likelihood, and is minimal." United States v. Gagliardi, 506 F.3d 140, 151 (2d

Cir. 2007) (internal quotation marks and parenthetical omitted).  With respect to audio

recordings, however, the court has required the government to prove "by clear and convincing

evidence that sound recordings are what they purport to be." United States v. Hemmings, 482 F.

App'x 640, 643 (2d Cir. 2012) (summary order) (internal quotation marks omitted) (citing

Ruggiero, 928 F.3d at 1303).  The government can meet that burden through the testimony of a

participant to the conversation that the recording, including recordings of electronic written

communications, such as instant messages or emails, is an accurate record of the conversation.

See Gagliardi, 506 F.3d at 151 ("The testimony of a witness with knowledge that a matter is

what it is claimed to be is sufficient to satisfy this standard.") (citing Fed. R. Evid. 901(b)(1)).

Here, the UC is expected to testify as to his participation in the above-described communications

with the defendant and their accuracy.

The UC's statements in the recordings are also admissible non-hearsay statements

because the government is not seeking their admission "to prove the truth of the matter asserted."

Fed. R. Evid. 801(c), 802.  Rather, the government seeks to admit the UC's statements to provide

background context for the defendant's own statements. See, e.g., Paulino, 445 F.3d at 216

(observing longstanding rule that "[s]o long as . . . statements are not presented for the truth of

the matter asserted, but only to establish a context . . . the defendant's Sixth Amendment rights

are not transgressed"); United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990) (the district court

properly admitted evidence of an informant's recorded statements during a conversation with the defendant where they were presented not for the truth of the matter asserted, but to establish a context to assist the jury with understanding the defendant's admissions); United States v. Perez, No. 05-CR-441 (PKL), 2005 WL 2709160, at *2 (S.D.N.Y. Oct. 20, 2005) (admitting third-party informant statements in recorded conversations with co-conspirator where government offers statements to place the co-conspirator's own statements in context).

Finally, the use of transcripts of the defendant's audio-recorded communications is permissible to aid the jury in their review of the evidence. See United States v. Chalarca, 95 F.3d 239, 246 (2d Cir. 1996). Accordingly, the government submits that the above-described recorded communications with the defendant are admissible at trial.

V.    The Court Should Preclude Defendant from Introducing His Own Self-Serving and False Exculpatory Hearsay Statements

The Court should preclude the defendant from entering evidence of his own self-serving exculpatory statements, which are inadmissible hearsay.

"When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982); United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067, at *2 (E.D.N.Y. Nov. 5, 2014) ("[T]he defendant's self-serving, exculpatory statements are inadmissible hearsay . . . ."). In general, a defendant may not "attempt to get his side of the . . . story in front of the jury without himself testifying and opening himself up to cross-examination." See United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

This prohibition applies, with limited exception, even where a defendant seeks to offer other parts of the same conversation or message offered by the government. See United States v. Hill, 658 F. App'x 600, 605 (2d Cir. 2016) (affirming the district court's parsing of a

22

defendant's recorded statement to admit the discrete inculpatory statements and exclude the other self-serving statements that he was "innocent"); United States v. Johnson, 507 F.3d 793, 796–97 (2d Cir. 2007) (holding that the court properly bifurcated a defendant's post-arrest statement and precluded the defense from introducing a self-serving portion of the defendant's post-arrest statement). As a result, courts often parse a defendant's statements to admit the inculpatory statements offered by the government and exclude the self-serving statements offered by the defendant. See United States v. Fawwaz, 691 F. App'x 676, 678 (2d Cir. June 2, 2017) (affirming district court's refusal to admit statements under rule of completeness noting that "admitted statements [were] independent of the omitted statements").

Here, the government will seek to introduce certain excerpts of the defendant's encrypted text messages and post-arrest statement and will provide notice to the defendant of the specific messages and statements that the government plans to introduce in its case-in-chief (reserving the right to offer some or all of this testimony to impeach defense witnesses or as rebuttal evidence). The defendant should be precluded from entering any other self-serving exculpatory statements not included in those excerpts that are "neither explanatory of nor relevant to the admitted passages" as required by the completeness doctrine because such statements, if offered by the defendant, are inadmissible hearsay. See Johnson, 507 F.3d at 796 (Rule 106 does not extend to requiring admission of portions of statements that are "neither explanatory of nor relevant to the admitted passages."); United States v. Roberts, No. 07-CR-425 (DLI), 2009 WL 1706043, at *2 (E.D.N.Y. June 16, 2009) (Rule 106 does not allow courts "to admit otherwise inadmissible, self-serving and exculpatory hearsay statements.").

In sum, where the defendant's statements have no separate basis for admission, they should not be permitted to bypass the Court's prohibition on hearsay.

<u>CONCLUSION</u>

For foregoing reasons, the government respectfully requests that the Court grant the government's motions <u>in</u> <u>limine</u>.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     _____/s/_____
        Gillian A. Kassner
        Marietou E. Diouf
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Clerk of Court (PKC) (by ECF)
        Counsel of Record (by ECF)

24