1

```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 19CR386(PKC)
                               :
          Plaintiff,           :
                               :
          -against-            : United States Courthouse
                               : Brooklyn, New York
MUSTAFA GOKLU,                 :
                               :
          Defendant.           : Monday, October 3, 2022
                               : 9:00 a.m.
                               :
                               :
                               :

- - - - - - - - - - - - - X

    TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
         BEFORE THE HONORABLE PAMELA K. CHEN
            UNITED STATES DISTRICT JUDGE

              A P P E A R A N C E S:

For the Government: United States ATTORNEY'S OFFICE
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
               BY:  GILLIAN KASSNER, ESQ.
                    MARIETOU E. DIOUF, ESQ.
                    FRANCISCO NAVARRO, ESQ.
                    Assistant United States Attorneys

For the Defendant:  MURRAY E. SINGER, ESQ.
                    14 Vanderventer Avenue, Suite 147
                    Port Washington, New York 11050
                 SAHLI LAW PLLC
                    195 Broadway, 4th Floor
                    New York, New York  11211
                 BY:EMILEE SAHLI, ESQ.


Court Reporter:   SOPHIE NOLAN
                  225 Cadman Plaza East/Brooklyn, NY 11201
                  NolanEDNY@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription
```

Proceedings                          2

1          (In open court.)

2          (The Hon. PAMELA K. CHEN, presiding.)

3          (Defendant present.)

4          THE COURTROOM DEPUTY:  Criminal cause for jury

5    selection and trial, *United States versus Goklu*, docket

6    19-cr-386.

7          Will the parties please state their appearances for

8    the record, starting with the Government.

9          MS. KASSNER:  Good morning, Your Honor.  Gillian

10   Kassner for the United States.

11         MS. DIOUF:  Good morning, Your Honor.  Marietou E.

12   Diouf for the Government.

13         MR. NAVARRO:  Good morning, Your Honor, Francisco

14   Navarro and we're joined by Bridget Donovan, who is a

15   paralegal specialist in our office.

16         THE COURT:  Good morning to all of you.

17         MR. SINGER:  For Mr. Goklu, Murray Singer.  Good

18   morning, Your Honor.

19         MS. SAHLI:  Emilee Sahli also for defendant.  Good

20   morning, Your Honor.

21         Special Agent Julian Herb from the Drug Enforcement

22   Agency.

23         THE COURT:  Good morning to you all.

24         So, folks, a couple of things before we get started.

25   As you can see, I have a mask.  I'm going to require the jury

Proceedings                                                      3

1    and the entire venire to wear a mask.  I want you folks to be

2    masked unless you are speaking.  We are in a closed, confined

3    environment for hours on end with a lot more people in our

4    room than for usual proceedings.  I want to be sure that we

5    don't get any infections in the middle of the trial or losing

6    any jurors because of needing to quarantine.  Since this is a

7    smaller group you can take them off, but I want to be sure

8    that everyone has one and if you don't, we should have extras.

9         The jurors are all going to have masks given to them

10   and they'll be told by the Jury Department that they will be

11   required to wear them during the trial and I will tell them

12   that as well and tell them why.  I will also say that the

13   lawyers will be able to unmask while they're speaking during

14   the trial.  I am also concerned about the number of people

15   we're going to have in here.

16        Mr. Singer, did you want to say something?

17        MR. SINGER:  Just in terms of when we're speaking I

18   noticed the small podium in front of the jury box.  Have a

19   preference or a direction as to where we should be?

20        THE COURT:  That is for opening statements, the

21   smaller one, and the larger one is to do your questioning as

22   before.  It's pretty much the same as pre-COVID.

23        So, there are a few preliminary matters I want to

24   address.  A couple relate to voir dire.  The Government's

25   proposed voir dire questions 12 G and H are about the dark

Proceedings                                                    4

1    web.  The defense has objected to those questions because they

2    maintain that this case doesn't involve any transactions on

3    the dark web.  But I don't know if there are any

4    communications via the dark web or if there's any relevance to

5    that.

6              So let me ask the Government, why do you want me to

7    ask questions about the dark web?

8              MS. KASSNER:  Your Honor, I don't expect the dark

9    web to come up very much during the course of the trial.  I do

10   think the Government and the defense have a bit of a dispute

11   about whether it should be mentioned as all.  There are no

12   communications that were made through any avenue associated

13   with the dark web, but what the Government does plan to ask is

14   the undercover agent, if asked, what was your cover story when

15   you were dealing with the defendant, will answer, I was posing

16   as a dark web narcotics dealer and there would only be one or

17   two questions after that.  They would be along the lines of

18   why did you -- what is a dark web narcotics dealer and why did

19   you decide to be a dark web dealer versus a street dealer.

20             And the reason for that is the undercover agent was

21   taking Bitcoin and exchanging it into cash.  I don't think the

22   jury will understand why a drug dealer would be paid in

23   Bitcoin without that additional context because street dealers

24   are paid in cash.  Dark web dealers are almost always paid in

25   crypto currency and they need it converted into cash to pay

Proceedings                                                5

1    their suppliers and other people associated with the business.

2           THE COURT:  And will that be part of the narrative

3    told by the Government?  In other words, his cover to the

4    defense was I operate on the dark web, I get paid in Bitcoin

5    or, therefore, I get paid in Bitcoin.

6           MS. KASSNER:  So, in the recording he never uses the

7    word dark web, but he says, I have an online business.  He

8    says I get paid in Bitcoin and convert it into cash as soon as

9    possible.  What I think the Government is expected to ask is

10   really no more than that particular question, but just to

11   explain that it's outside a layman's understanding of how

12   narcotics are sold.

13          THE COURT:  If someone says, yes, I know about the

14   dark web, what exactly would be either disqualifying or

15   relevant to you folks?  I mean, it doesn't seem to me to be

16   particularly relevant to the case and I don't want to suggest

17   that the defendant was operating on the dark web even through

18   the questioning.

19          Mr. Singer?

20          MR. SINGER:  Can I weigh in?

21          THE COURT:  Absolutely.  Before you do.  The person

22   sitting up with me is our newest judge, Nina Morrison, and she

23   wanted to observe a trial.  So she will be here with us part

24   of today and at some other parts of the trial in case you see

25   her.

Proceedings                                                        6

1          Mr. Singer.

2          MR. SINGER:  Welcome.

3          JUDGE MORRISON:  Thank you.

4          MR. SINGER:  There is no evidence of any

5   communication by Mr. Goklu on the dark web.  There's no

6   evidence of any kind that Mr. Goklu knows what the dark web is

7   or has dealt with it in any way.  It is not a relevant

8   consideration here and it is used to dirty up this whole

9   transaction or there's no any evidence to suggest that

10  Mr. Goklu knows what to make of the dark web or that he

11  understands what it means that the undercover is saying I

12  operated an online business.

13          How is this at all relevant to anything in the case?

14          THE COURT:  Consider this:  If the Government asked

15  a couple of questions of the undercover about what his cover

16  story was and he said I said I was selling drugs via the dark

17  web online.

18          MR. SINGER:  He didn't.

19          THE COURT:  He never said that to Mr. Goklu?

20          MR. SINGER:  No, there's no communication with

21  Mr. Goklu about it.

22          THE COURT:  It's part of the setup regarding the

23  investigation.

24          Was he actually operating on the dark web?  Has the

25  undercover ever gone to the dark web to try to purportedly

Proceedings                                        7

1   sell drugs?

2          MS. KASSNER:  So I think there are two separate

3   questions.  This agent has experience with the dark web, but

4   for the purposes of this case there are no real drugs.  So,

5   no, he never purchased drugs on the dark web in connection

6   with his dealings with Mr. Goklu, but what he -- what he would

7   say is that his cover story was that he sold drugs online and

8   was paid in Bitcoin and had to convert it to cash.  That's

9   what he told the defendant.

10          THE COURT:  I thought you were going to ask him

11   something about the dark web.

12          MS. KASSNER:  I would ask what was your cover story

13   when you were dealing with the defendant, what role were you

14   playing and he will say I was a dark web narcotics dealer, but

15   he didn't say the word dark web.  What he said was I sell my

16   product online and I'm paid in Bitcoin and convert it to cash.

17          So I think the point here is for voir dire, we don't

18   need to ask about it.  I don't think there's a dispute that

19   striking those questions is fine, but while we're on the

20   subject I wanted to make sure that Your Honor would allow the

21   Government to ask those very few probing questions just to

22   give the jury background about what the undercover agent's

23   role was when dealing with the defendant.

24          THE COURT:  I'm glad you asked that because that was

25   my concern is that you raised a different issue.

Proceedings                                          8

1          What I was going to say to you Mr. Singer, if there

2    is a reference to the dark web it's in your interest to ferret

3    out anyone who has negative connotations about the dark web

4    because it suggests illegality or nefariousness or wanting to

5    conceal one's identity.

6          MR. SINGER:  Exactly, which is why it has no place

7    in voir dire or any testimony.

8          THE COURT:  Well, now we're on a different issue.

9          MR. SINGER:  That's an issue that I wanted to raise

10   with Your Honor this morning because there is -- if the

11   undercover is, I guess, intending to say that his cover story

12   is that he was operating on the dark web, gee, that's nice,

13   but he never communicated that to Mr. Goklu and so it's not

14   part of the case.

15         THE COURT:  I do not think the Government should be

16   referencing it unless it was actually said to Mr. Goklu.  It

17   does create this aura of illegality or trying to operate

18   without being depicted.  That wasn't communicated to

19   Mr. Goklu.

20         What's relevant here is his knowledge or intent to

21   conceal the source or the location of the funds for purposes

22   of the money laundering.  So I'm glad this came up, albeit I

23   wish it had come up in a motion in limine, but I'm glad it

24   came up before trial.  The Government shouldn't elicit that if

25   it wasn't said to the defendant.  You can say, yes, I told him

Proceedings                                                9

1   I was doing online drug dealing, but just avoid any references

2   to this the dark web unless it was specifically said to him.

3           MS. KASSNER:  I understand your ruling.  I just want

4   to clarify one thing; without using the term dark web, I think

5   our first witness is going to be a cryptocurrency expert and

6   we plan to ask her questions -- she's a DEA agent -- in your

7   training and experience are you familiar with instances where

8   a narcotics dealer is paid in Bitcoin and needs to convert it

9   into cash.  We can -- we can instruct her she should not use

10  the word dark web, but is she permitted to say it happens when

11  they sell online because that word does show up in the

12  recordings where he said my business is online.

13          THE COURT:  No, I think that's all fine.

14          MS. KASSNER:  Okay.

15          THE COURT:  And I would again avoid using the word

16  dark web.

17          MS. KASSNER:  Understood, Your Honor.

18          THE COURT:  Since that never was communicated to

19  Mr. Goklu.

20          MS. KASSNER:  Yes, Your Honor.

21          THE COURT:  Drug dealing no matter how you do it is

22  still illegal, so it doesn't seem necessary to guild that

23  lilly.

24          So we've resolved the issue about voir dire.  I will

25  not ask proposed questions 12 G and H about the dark web.  I

Proceedings                                    10

1   want to confirm for purposes of advising the venire about the

2   length of the trial.  Is four days enough?  Because that would

3   take us to Friday, so the question comes up should I say

4   potentially five which would take us to Monday.

5               MR. SINGER:  Tuesday.  Monday is a holiday.

6               THE COURT:  Tuesday.

7               MS. KASSNER:  I'm always hesitant to promise but I

8   expect we'll be done on Friday.

9               THE COURT:  When you say done --

10              MS. KASSNER:  So the Government will certainly rest

11  by Friday.

12              THE COURT:  That's a different story.

13              MS. KASSNER:  Okay.

14              THE COURT:  Because obviously they have to

15  deliberate.  I want to overestimate because you never want a

16  jury to think the trial will be over.  I will say four or five

17  days potentially to Tuesday because we're not sitting on

18  Wednesday.

19              MR. SINGER:  Wednesday or Monday.

20              THE COURT:  Right.  Exactly.  I'm confirming that

21  the Government now has decided not to redact portions of

22  Government Exhibits 801, 804, 806 and 807 and 809.  That's

23  correct, right?

24              MR. SINGER:  Judge, I think what you're referring to

25  is portions from hello to goodbye that the Government had

Proceedings                                              11

1   indicated that they may seek to redact and they had indicated

2   that they are not seeking to redact any of the portions within

3   from hello to goodbye.

4          THE COURT:  That was much longer an explanation than

5   necessary.  I was just confirming the Government's letter.

6          MS. KASSNER:  Yes, Your Honor.  There will be no

7   redactions in the communication between the undercover agent

8   and the defendant.

9          THE COURT:  And obviously some of the side

10  conversations will be redacted as we previously discussed.

11         MS. KASSNER:  Yes, Your Honor.

12         THE COURT:  That is what you mean by hello to

13  goodbye, Mr. Singer?

14         MR. SINGER:  Yes.

15         THE COURT:  One last thing is this limiting

16  instruction.  So we can deal with this after we pick the jury,

17  but I did want to let you know that I believe the defense is

18  correct on this, unless you're going to tell me that these

19  other conversations, meaning conversations with people other

20  than the undercover with the defendant did specifically

21  reference or suggest concealment or an intent to conceal the

22  source, location, et cetera, of the proceeds.

23         MS. KASSNER:  Yes, Your Honor.  We do believe that

24  some of these other communications do reference detection by

25  the NYPD, you know, washing money, things that we believe are

Proceedings                                        12

1   properly considered for the money laundering count as well.

2            THE COURT:  Let's take this up after we pick the

3   jury, so I can hear more specifics.

4            MR. SINGER:  Judge I have other issues I want to

5   raise and we can do it after jury selection.

6            THE COURT:  Give me some idea of what they are while

7   he's calling for them.

8            MR. SINGER:  There is a portion of the statement

9   that Mr. Goklu is said to have made on the day that he was

10  arrested.  The Government indicated that there are portions

11  from the 302 of the interview of Mr. Goklu after he was

12  arrested on April 30th and there is one particular comment or

13  statement by Mr. Goklu in there that I think should not be

14  included that has to do with him -- the agents asking if they

15  can go into his phone and Mr. Goklu saying no and taking the

16  phone back.  I think that's an exercise of his right to remain

17  silent and not to be subject to a search and should not be

18  used by the Government as suggesting anything about Mr. Goklu.

19           THE COURT:  You mean consciousness of guilt?  Is the

20  Government intending to offer that statement where he says no,

21  don't look into my phone?

22           MS. KASSNER:  Not -- we spoke with defense counsel

23  about this.  We will not elicit that he consented to have a

24  portion of his phone reviewed by law enforcement and did not

25  offer such consent for the rest of his phone.  We're not going

Proceedings                                           13

1    to elicit that.

2             THE COURT:  Didn't you say the opposite; that

3    Mr. Goklu initially said no to letting them look into his

4    phone and that's the part that they don't want to have

5    introduced?

6             MR. SINGER:  Judge, there's one line in the 302,

7    Special Agent Liefke asked if he could look through the app of

8    the other conversations that Goklu was having with other

9    people.  Goklu said no and took the phone back.

10            MS. KASSNER:  We won't --

11            MR. SINGER:  I believe that's a portion that was not

12   properly elicited from the agent.

13            MS. KASSNER:  We will not elicit that, Your Honor.

14            THE COURT:  So this is a nonissue.  Next?

15            MS. KASSNER:  We have a stipulation and waiver of

16   jury trial as to forfeiture, which has been signed by all the

17   parties.  Whenever Your Honor would like it, it's ready.

18            THE COURT:  He's stipulating to forfeit even

19   before --

20            MR. SINGER:  No.  If there is a determination of

21   guilt, that the issue of forfeiture would be left to the Court

22   and not for the jury to decide.

23            THE COURT:  That is a sentencing issue.  It's not

24   decided by the jury.  Has it ever been decided by the jury?

25            MS. KASSNER:  Your Honor, it almost never is, but it

Proceedings                                                    14

1   is a right of the defendant to have, in certain circumstances,

2   forfeiture heard before the jury.  So he would be waiving that

3   right.

4              THE COURT:  And he did?

5              MS. KASSNER:  I have the signed stipulation which I

6   can hand up to Your Honor.

7              (Counsel approaches.)

8              THE COURT:  What are the circumstances where a

9   defendant has the right to have a jury decide forfeiture?

10             MS. KASSNER:  Your Honor, I think under most

11  statutes, it's a right of a defendant to have the issue heard

12  by a jury.  It's just almost always that it's stipulated but I

13  believe in almost -- it's certainly for the charges here.

14             MR. NAVARRO:  Your Honor, this was surprising to me

15  as well.  I am happy to talk to our forfeiture people and get

16  details on it, but this is unusual for us as well.  But this

17  is what we're being told is the procedure from our forfeiture

18  folks.

19             THE COURT:  You learn something new every day.  I'm

20  thinking back to all of the other cases that involved

21  financial crimes and wondering if there's something defective

22  with them.  But that's for another day.

23             Anything else, Mr. Singer?

24             MR. SINGER:  There's an issue concerning the form in

25  which the redacted recordings are being introduced.  The Court

Proceedings                                          15

1   had indicated and certainly the Government agrees that the

2   recordings, both before the undercover officer met with

3   Mr. Goklu and after he left Mr. Goklu are to be redacted.

4           What the Government has done with those recordings

5   is they left the recording intact and simply created empty

6   space on the recording.  So, one recording may be blank for

7   ten minutes and then the conversation starts.  It's the

8   equivalent of putting in a document with just a bunch of

9   things blacked out and we think that that simply opens up the

10  issue for speculation by the jury.  It's something that can

11  easily be done by simply creating a recording from start to

12  finish without the dead space.  We would request that it be

13  done that way so it doesn't open up this question for the

14  jury.

15          THE COURT:  I think that's fair.  Why didn't you

16  folks do that?

17          MS. KASSNER:  Your Honor, this is really for

18  practical reasons.  We expect if we are moving quickly, we

19  would be putting on Special Agent O'Kain today.  All of our

20  timestamps that we are going to be referencing are with

21  respect to the exhibits as they existed when we first reviewed

22  them with him.  And so, we just suggest that in order for the

23  timestamps -- there are quite a few timestamps.  It's just

24  easier to do it this way.  I don't think there's really any

25  prejudice.

Proceedings                                    16

1        THE COURT:  I am happy to give a cautionary

2   instruction that there are portions where redactions are made

3   based on rulings that I made and don't infer anything from

4   those gaps.  You're going to have that issue come up anyway,

5   Mr. Singer, just in terms of the jumps in the time and the

6   time should be accurate for purposes of the record.

7        MR. SINGER:  Could you add to that that they are

8   portions that did not involve any communications with

9   Mr. Goklu?

10        THE COURT:  Or I could just say I decided were not

11   relevant to the case.

12        Does that satisfy everybody?

13        MS. KASSNER:  Either way, Your Honor.

14        MR. SINGER:  We understand that, but the jurors

15   don't.

16        THE COURT:  Is it accurate to say that it didn't

17   involve conversations with Mr. Goklu?

18        MS. KASSNER:  Yes, Your Honor.

19        THE COURT:  I can say that as well.  That's fine.

20   When we get to that point perhaps I'll discuss the exact

21   language -- I will have my law clerk draft something quickly

22   so we can all literally be on the same page.

23        Anything else?

24        MR. SINGER:  Another matter that I think is simply

25   confusing or creating a potential for confusion with the jury.

Proceedings                                    17

1   As I've made clear in our pretrial conference, the entirety of

2   the recording viewed all together is important to understand

3   Mr. Goklu's knowledge or intention and the Government -- we

4   have agreed with the Government to the transcripts to be given

5   to the jury to follow along with the recordings.

6            And I believe what the Government is going to seek

7   to do, and it's certainly their right, is to play certain

8   limited portions of the recordings with the agent on the

9   stand, but what we're doing is creating a separate, I

10  believe -- I haven't received them, but I believe they're

11  creating a second binder with a transcript of only those

12  portions that they're playing.  So then we end up with two

13  different transcripts where it's really just a portion of the

14  entire transcript that is easier and less confusing for the

15  jury if the Government simply says, we're playing this

16  portion, it starts on page nine and goes to page 11 and you

17  can follow along in your binder; rather than creating a

18  separate binder that they're giving to the jury because then

19  if I'm going to cross-examine and try and expand upon what

20  they put in, then it's a matter of providing them with a

21  separate binder and they may not know that it's the same

22  thing.

23            THE COURT:  Go ahead.

24            MS. KASSNER:  Yes, Your Honor.  We tried our best to

25  think ahead of all of these potential inconveniences what the

Proceedings                                                18

1   Government's concern is if you give a full transcript, the

2   jury is going to read in between the lines and read it

3   through.  What we have done -- we have provided a copy of the

4   shorter, condensed transcripts.  We provided it yesterday so

5   they could see everything we plan to play with our undercover

6   agent.

7          We have a binder.  The first part is the condensed

8   transcripts that we plan to play and the second half of the

9   binder is the full transcript and it's very clear that they

10  have the same numbers and so if on cross the defense wants to

11  say, well, this is the part you didn't play.  I think it will

12  be quite clear and convenient look at the full transcript in

13  your binder, this is what you didn't play.

14         THE COURT:  It sounds pretty reasonable to me.

15  Mr. Singer, I think the Government quite rightly has the

16  excerpts, if you will, in the first part of the binder because

17  that's all the jury should be focusing on.  These are just

18  aids to the jury and I don't want them reading other things

19  while the audio is being played.  So it's quite reasonable and

20  I think it's clearer to have them focus and get only those

21  portions of the audio that are being played at that time.

22         But the Government, it sounds like, has provided a

23  second half of the binder that you can use to refer them to

24  other portions that you intend to play.  Nobody should be

25  using the binders unless audio is being played.  Let's confine

Proceedings                                    19

1   the transcripts to the audio being played.  You can figure it

2   out but it seems the Government has come up with a perfectly

3   reasonable solution.

4           MR. SINGER:  One other issue, Your Honor, when we

5   were here for the pretrial conference, there was a discussion

6   about whether the agent who took Mr. Goklu's phone and

7   questioned him had prepared any -- had gotten a written

8   consent to search --

9           THE COURT:  Can we table this for the moment?  We

10  have our jury here.  You're all going to be getting a list of

11  the jurors -- potential jurors names.

12          One other note, Mr. Goklu has not used our

13  interpreter.  We will need to get our interpreter sworn in so

14  we will take care of that.

15          THE COURTROOM DEPUTY:  Raise your right hand.

16          (Interpreter sworn.)

17          THE COURTROOM DEPUTY:  Please state your names.

18          THE INTERPRETER:  Seyhan Sirtalan

19          THE INTERPRETER:  George Esayan.

20          THE COURT:  Thank you.  Have a seat everyone.  I

21  want to observe for the record that thus far, Mr. Goklu has

22  not been, as far as I can tell, been using the interpreters.

23  Have you been interpreting all of this time.

24          MS. SIRTALAN:  We were instructed to be on standby

25  and whenever he needs he puts the ear piece on.

```
                    Jury Selection                    20
```

1         THE COURT:  I want to confirm that that is correct,

2   Mr. Singer.

3         Mr. Goklu has opted to use the translators on a

4   standby basis?

5         MR. SINGER:  That's true.

6         THE COURT:  And we have two standby interpreters for

7   that purpose.

8         (Potential jurors enter.)

9         THE COURT:  Have a seat, everyone.  Good morning

10  ladies and gentlemen, my name is Pamela Chen and I am the

11  judge who will be presiding over trial for which you have been

12  summoned.  I would also like to introduce Nina Morrison.  She

13  is our newest district court judge and she will be here today

14  observing.

15         You are here today because we are about to

16  select a jury to serve in a criminal case.  Thank you for your

17  presence here today.  The contribution that each of you makes

18  of your time and effort is important to the success of the

19  judicial system.  Your service as jurors is appreciated by the

20  court and the individuals who are litigating this case here

21  today.

22         One note before we begin, as we transition out of

23  the pandemic, the courthouse has eliminated certain

24  COVID-related requirements, such as mask-wearing and social

25  distancing.  So, while you are in the public areas in the

1  courthouse, such as the lobby, hallways, and bathrooms, you

2  are not required to wear a mask or maintain a particular

3  distance from others.  But judges still retain the authority

4  to require these precautions in our courtrooms and during

5  proceedings such as trial and jury selection.  Because this

6  jury selection will take some time, during which we will all

7  be confined to this courtroom in close proximity to one

8  another, I am requiring everyone to wear a mask, so as to

9  minimize the risk of COVID infection.  Masks will be required

10  during the trial as well, except that the lawyers and

11  witnesses will be permitted to unmask when speaking or

12  presenting evidence.

13      so you will see some of the lawyers unmask today

14  especially during continuity deductions when I introduce each

15  of them and ask if any of you know them.  It's easier to

16  recognize someone if they remove their mask.

17          Now, turning to the trial in this case.  *The trial

18  is expected to about four or five days, so the rest of this

19  week, but we will not be sitting this Wednesday, because of

20  Yom Kippur.*  Although this may be a burden, it is important

21  that you make every effort to accept and perform the

22  responsibility of a juror.  It is both a responsibility and an

23  honor to participate in the judicial system.  All of us who

24  participate are keenly aware of the importance of an

25  impartial, fair and just trial.

Jury Selection                              22

1           As part of the voir dire process, you will be asked

2      questions to determine whether you can render a fair and

3      impartial verdict.  Please accept the questioning process in

4      the spirit of its objective.  The purpose of voir dire is not

5      to embarrass any of you but rather to ensure fairness and

6      impartiality to both sides.  At times this will be tedious.  I

7      ask you to bear with me.  As I'm sure you can all appreciate

8      our task today is an important one.  If in the course of the

9      questioning process you think that because of some experience

10     you've had in your life or because of something you've read or

11     heard, you cannot be fair and impartial; that is, you would be

12     inclined towards one side or the other, you must tell me.  It

13     is your duty to do so.  This is not unusual and there is no

14     reason to be upset that you cannot serve on any particular

15     jury.  There may be another matter for which you can serve on

16     the jury and we can send you back to the Jury Department and

17     see if you can is it on another trial.

18           On the other hand, again, as I'm sure you all

19     appreciate our system of justice only works if all citizens

20     are prepared to perform jury duty when they can do so fairly

21     and impartially.

22           I would not expect any of you to avoid this duty but

23     for the most important reasons.  Now, quite apart from whether

24     I excuse some or all of you, the lawyers for both sides are

25     entitled to exercise a certain number of peremptory challenges

1   which means that they may strike some of you for no reason

2   whatsoever.  If that happens, no affront is intended and you

3   should not be offended in any way.  Again, you will be excused

4   and sent back to the jury room to see if there's another trial

5   that you can serve on the jury for.

6            Let me close by thanking you again for your presence

7   here today and your willingness to serve as jurors and by

8   assuring you that all of us in the courthouse are taking and

9   will continue to take every precaution to ensure your safety

10  during your service.  Your safety as well as moving the trial

11  along expeditiously are my highest priorities.

12           A final reminder that you must wear your face mask

13  at all times while in the courtroom.  All of us who work in

14  the courthouse or at least in this courtroom have to do the

15  same.  I know this can be difficult but I believe that this

16  precaution is necessary for all of our safety and your

17  cooperation is greatly appreciated.  Because the answers you

18  must give have to be under oath, our deputy will administer

19  the oath to all of you so please rise and raise your right

20  hand.

21           (Potential jurors sworn.)

22           THE COURT:  Have a seat, everyone.  So the first

23  question I ask or the first thing we need to do rather is to

24  have 32 called up.  So the first 32 individuals whose names

25  and numbers are called we're going to ask you to start filling

1   in this jury box to my left and we'll move to the front row

2   there.  We'll need to have those folks move to chairs over

3   here.

4          I was just advised by the deputy that we have the

5   first 32 seated on what is my left over here.  So, the

6   important thing is that even though I'm focusing on these

7   first 32 individuals, it is possible that during the course of

8   questioning some of you will be required to fill in or replace

9   those who are excused.  So everyone should pay attention to

10  all the questions that I ask and if one of you is called to

11  fill in, the first question I will ask you is whether you had

12  a positive response to anything that I've asked you so far.

13  So I need you all to focus on the questions even though we're

14  going to focus first on the 32 individuals on this said.

15         THE COURTROOM DEPUTY:  Juror No. 1, Marcia Donaldson

16  Juror 2, Kathleen Fischer.  Juror 3, Yashika Dawkins.  Juror

17  4, Amy Durante.  Juror 5, Michael Okane.  Juror 6, Melissa

18  Osorio Chimal.  Juror 7, Gerard Discala.  I apologize if I

19  mispronounce any name.  Juror No. 8, Lloyd Price.  Juror No.

20  9, Veronica Ramos.  Juror 10, Joseph Hess.  Juror 11, Karen

21  Ferrer.  Juror 12, Neil Roopnauth.  Juror No. 13, Francis

22  Dean.  Juror No. 14, Dana Nzirubusa.  Juror No. 15, Alynn

23  Parola.  Juror No. 16, Loren Mattina.  Juror 17, Evelyn Yepez.

24  Juror No. 18, Maria Cipriano.  Juror No. 19, Joseph Duran.

25  Juror No. 20, Sonnja Williams.  Juror No. 21, Vanessa

1  Nardulli.  Juror 22, Amena Faison.  Juror 23, Arthur Thomas.

2  Juror 24, Ethan Ries.  Juror 25, Walter Chesaniuk.  Juror No.

3  26, Elizabeth Chang.  Juror 27, Valerie James.  Juror 28, Adam

4  Chu.  Juror No. 29, Joann Kirk.  Juror 30, Kevin Donovan.

5  Juror 31, Harold Gonzalez.  Juror No. 32, Kevin Cheng.

6          THE COURT:  Thank you very much, Ryan.

7          So, ladies and gentlemen, this case comes before the

8  Court by way of an indictment.  The indictment is captioned

9  *United States against Mustafa Goklu* and it charges the

10  defendant, Mr. Goklu, with engaging in money laundering and

11  operating an and unlicensed money-transmitting business.  The

12  defendant has pleaded not guilty to these charges and has thus

13  raised issues of fact to be determined by the jury.

14          The indictment merely contains allegations.  The

15  indictment is not evidence itself and you may not consider it

16  as evidence.  It simply contains the charges that the

17  Government is required to prove to the satisfaction of the

18  jury beyond a reasonable doubt.  You must not think of the

19  indictment as any evidence of the guilt of the defendant or

20  draw any conclusions about the guilt of the defendant just

21  because he's been indicted.

22          Before we begin the questioning process, let me

23  advise you that if there is any answer that you would prefer

24  not to give in open court you merely need to indicate private

25  please or request a sidebar.

1              First question:  Has anyone heard or read anything

2      about this case, again focusing on the first 32 here?

3              Seeing no show of hands, let me introduce the

4      parties and their attorneys in this case.  The Government is

5      represented by Assistant United States Attorneys Gillian

6      Kassner, Marietou Diouf, Francisco J. Navarro and they are

7      being assisted by paralegal specialist Bridget Donovan of the

8      U.S. Attorney's Office and Special Agent Julian Herr, from the

9      Drug Enforcement Agency, or DEA.

10             The defendant, Mustafa Goklu, is represented by

11     attorneys Murray Singer and Emilee Sahli.

12             You may be seated.

13             Does anyone recognize any of these individuals, the

14     lawyers or the defendant or the agent or the paralegal?  All

15     right.  Is there anyone who knows me, my staff, or at least

16     the staff who are here today or anyone else who works in the

17     courthouse?

18

19             (Continued on the following page.)

20

21

22

23

24

25

Preliminary Instructions                    27

1   (Continuing.)

2          THE COURT:  Is anyone familiar with any of the

3   following individuals who maybe referenced or called as

4   witnesses during the trial or any of the places or entities

5   that maybe mentioned during the trial?

6          Patrick O'Kain, K-A-I-N, former DEA; Allan Liefke,

7   L-I-E-F-K-E, former DEA; Special Agent Koffidige Degbe,

8   K-O-F-F-I-D-I-G-E.  D-E-G-B-E with the DEA, Special Agent

9   Lilita Infante, L-I-L-I-T-A, Infante, with the DEA; Theodore

10  Vlahakis, V-L-A-H-A-K-I-S, Compliance Officer with FinCEN,

11  F-I-N-C-E-N; Robert Tarwacki, T-A-R-W-A-C-K-I, New York

12  Department of Financial Services.  And finally, in terms of

13  people, Forensic IT Specialist Anthony Mosher, M-O-S-H-E-R,

14  with the DEA.

15         Now, let me know if you're familiar with any of the

16  locations that I'm about to list.  46-09 Queens Boulevard,

17  Sunnyside, New York, 44-16 Queens Boulevard, Sunnyside, New

18  York, 7th Avenue and 54th Street, New York, New York.  And

19  when I say, familiar, other than passing through there.  Any

20  particular familiarity.

21         THE PROSPECTIVE JUROR:  No.

22         THE COURT:  And then, finally, 5th Avenue and 33rd

23  Street, New York, New York.

24         Anyone spend a lot of time there?

25         THE PROSPECTIVE JUROR:  No.

1           THE COURT:  Now, let me remind you that it is the

2    Government who has the burden of proof in any criminal case to

3    establish the defendant's guilt beyond a reasonable doubt.

4    Mr. Goklu is presumed to be innocent and is not required to

5    prove that he is innocent.  He need not call witnesses and

6    need not take the stand.

7           If a defendant elects not to present any evidence,

8    the jury cannot draw any adverse inference against the

9    defendant based on that decision.  This is a basic principle

10   of our criminal justice system.

11          Would any of you have difficulty following my

12   instruction in that regard?

13          So I see no show of hands.

14          Your role, if you are selected as a juror in this

15   criminal case is to hear evidence and decide the facts.  That

16   is, to decide what happened.  I do not have any role to play

17   in your determination of the facts.  My role will be to

18   instruct you on the applicable law.  You will apply the facts

19   as you find them to the law as I instruct you and your

20   conclusion will be your verdict.  You must apply the law as I

21   state it regardless of any opinion you may have personally to

22   what the law is or what the law should be.

23          Would anyone have any difficulty following those

24   instructions?

25          THE PROSPECTIVE JUROR:  No.

Preliminary Instructions                    29

1          THE COURT:  Okay.  If you're selected as a juror,

2    you will not be permitted to read or listen to any news or do

3    any internet research about this case or about the defendant

4    or anyone else mentioned in the case while serving as a juror.

5          Is there anyone who would be unable to follow that

6    instruction?

7          THE PROSPECTIVE JUROR:  No.

8          THE COURT:  The right to a jury trial is critically

9    important to both the accused and the Government.  If selected

10   as a juror for this trial, is there anyone who would either

11   favor -- either blame the Government or the defendant for

12   having to sit on a jury during the COVID pandemic?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Blame the Government or the defendant

15   for having to sit through the pandemic and wear these masks?

16         It is important that jurors take their obligations

17   seriously and do not rush for a verdict for one side or the

18   other.

19         Is there anyone who would feel pressure to return a

20   verdict quickly and not fully deliberate due to the COVID

21   pandemic?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Okay.  This case is a result of an

24   investigation by the Drug Enforcement Administration or DEA

25   and the United States Attorney's Office for the Eastern

1  District of New York, which is part of the United States

2  Department of Justice.

3          Does anyone have any basis, prejudice, or other

4  feelings for or against the United States Department of

5  Justice, the United States Attorney's Office, the Drug

6  Enforcement Administration or DEA, the New York City Police

7  Department or any other law enforcement agency; positive or

8  negative?

9          Juror Number 4, Ms. Durante, right?

10         THE PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Do you have feelings for or against any

12  of those entities?

13         THE PROSPECTIVE JUROR:  For.

14         THE COURT:  Okay.  Let's have a sidebar with you.

15  We're going to go over here.

16                    (Sidebar)

17         THE COURT:  So you said for.

18         THE PROSPECTIVE JUROR:  My husband is an NYPD

19  Detective.

20         THE COURT:  Where is he --

21         THE PROSPECTIVE JUROR:  He's in the 62 Squad in

22  Brooklyn.

23         THE COURT:  How long?

24         THE PROSPECTIVE JUROR:  He's been a Detective for

25  about two years now and he is six or seven years on.

Preliminary Instructions                    31

1          THE COURT:  Okay.  Because of his job, you have

2     positive feelings about?

3          THE PROSPECTIVE JUROR:  The law enforcement and all

4     of that part.

5          THE COURT:  Okay.  Can you still be objective and

6     fair and impartial with respect to a criminal matter that is

7     investigated and brought by law enforcement?

8          THE PROSPECTIVE JUROR:  Yes.  Yes.

9          THE COURT:  Okay.  You hesitated a bit.

10         THE PROSPECTIVE JUROR:  Yeah.  I mean, because of

11    what he does and what I see every day, it is a little bit

12    difficult, so...

13         THE COURT:  You'll be instructed, if you are picked

14    as a juror, that you must judge the testimony of any law

15    enforcement agent the same you would as any other witness and

16    weigh the credibility just as would any other witness?

17         Could you follow that instruction?

18         THE PROSPECTIVE JUROR:  It would be difficult.

19         THE COURT:  It would be difficult for you to find

20    that a law enforcement agent wasn't testifying credibly?

21         THE PROSPECTIVE JUROR:  No.  I can understand that

22    would be.  I don't know.  I'm way towards more than what they

23    say.

24         THE COURT:  Meaning law enforcement?

25         Just stand over there on the side.

```
                    Preliminary Instructions              32
```

1          THE PROSPECTIVE JUROR:  I'm sorry.

2          THE COURT:  So do I have a motion?

3          MR. SINGER:  To excuse her for cause.

4          THE COURT:  Any objection?

5          MR. NAVARRO:  No objection.

6                    (Sidebar ended)

7          THE COURT:  So we are going to have you go back to

8    the jury department and tell them that you are excused from

9    this case, but there could be another trial that you could sit

10   for.

11         Thank you.

12         Replacing Juror Number 4.

13         THE COURTROOM DEPUTY:  Juror 33, Simiao Chen.

14         THE COURT:  Okay.  So Ms. Chen, if you could

15   approach the jury box.

16         Did you have any positive responses?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  No.  Okay.  Come forward.

19         Juror Number 5, you had your hand up.  Hold on.

20   Let's wait until Juror Number 4 gets in place.

21         Okay.  So Juror Number 5, do you have any feelings

22   about any of those law enforcement entities or any law

23   enforcement agency?

24         THE PROSPECTIVE JUROR:  I do.

25         THE COURT:  Okay.  Positive, negative?

```
                   Preliminary Instructions                 33
```

1       THE PROSPECTIVE JUROR:  Positive.

2       THE COURT:  All right.  Why don't we have you come

3   to the sidebar as well.

4                       (Sidebar)

5       THE COURT:  So tell me, Mr. Okane.

6       THE PROSPECTIVE JUROR:  Yes.  My son is a police

7   officer.  So I'm bias in favor of --

8       THE COURT:  Now, could you be objective though about

9   the testimony of law enforcement officers and weigh them just

10  like you would any other witness?

11      THE PROSPECTIVE JUROR:  I think honestly I'd lean

12  towards law enforcement.

13      THE COURT:  What's your --

14      THE PROSPECTIVE JUROR:  Depending on how it is

15  presented.  But I want to bring another thing to your

16  attention if I could.

17      THE COURT:  Go ahead.

18      THE PROSPECTIVE JUROR:  I take care of my mother

19  every day, an elderly mother.  A block away from my house, to

20  make sure she takes her pills, put her patch on the arm after

21  she takes a bath, because, you know, dementia.  I just wanted

22  to bring that up.

23      THE COURT:  Do you work normally?

24      THE PROSPECTIVE JUROR:  I work from home.  I'm a

25  project manager.  I work from home.

1           THE COURT:  Who's taking care of your mother now?

2           THE PROSPECTIVE JUROR:  My sister, but it would be

3      difficult on a daily basis.

4           THE COURT:  So let's go back to your son.

5           How long has he been with the NYPD?

6           THE PROSPECTIVE JUROR:  He was with the correction

7      officer about two years and with NYPD going about four or

8      five.

9           THE COURT:  And going back, again, do you think you

10     cannot be fair and impartial with respect to this case simply

11     because it's brought by law enforcement?

12          THE PROSPECTIVE JUROR:  I don't know.  I think the

13     matter depends on the evidence.

14          THE COURT:  It would depend on the evidence,

15     correct.

16          THE PROSPECTIVE JUROR:  I guess you could say that.

17          THE COURT:  Okay.  If you were told you have to

18     consider all the evidence, weigh it objectively.

19          Could you do that?

20          THE PROSPECTIVE JUROR:  I don't know.  Again, I

21     really don't know.

22          THE COURT:  If law enforcement officers were

23     testifying, do you think you would go into believing them

24     automatically?

25          THE PROSPECTIVE JUROR:  I don't know.

1      THE COURT:  Do you think --

2      THE PROSPECTIVE JUROR:  I think it comes down to,

3  you know, the way it's presented or I don't know how better to

4  answer that.

5      THE COURT:  Okay.  So when you say the way it's

6  presented, you would look at their testimony and decide if you

7  believed it or not depending on their demeanor and all the

8  other evidence.?

9      THE PROSPECTIVE JUROR:  Sure.

10      THE COURT:  You could do that?

11      THE PROSPECTIVE JUROR:  I guess I could do that.

12      THE COURT:  All right.  With respect to your mother,

13  do you have to be there all day or just in the morning to help

14  her?

15      THE PROSPECTIVE JUROR:  I have to be there between

16  10:00 and 11:00.

17      THE COURT:  Okay.  And do you think your sister

18  could handle that for this week, except for no Monday, and

19  possibly next Tuesday?

20      THE PROSPECTIVE JUROR:  I would have to check.  I

21  don't know.

22      THE COURT:  Can I have you stand over there for one

23  second.

24      THE PROSPECTIVE JUROR:  Sure.

25      THE COURT:  Any motions?

Preliminary Instructions                    36

1        MR. SINGER:  I would like to excuse him for cause.

2        MR. NAVARRO:  Your Honor, I think that it's very

3    clear that he does not want to serve for multiple reasons.

4    I'm not sure how much credence the Government places in the

5    answers about law enforcement, but under the circumstances, we

6    are early in the process.  We would not impose the motion.

7        THE COURT:  I'm going to let him go.  He didn't

8    really want to be here.  On the other hand, he did suggest,

9    although somewhat equivocally, he could be fair despite his

10   son being with law enforcement.  I'm going to let him go.

11                        (Sidebar ends)

12       THE COURT:  I'm sorry.  We'll let you go back to the

13   jury department as well.  Let them know that you are excused

14   for this trial, but there could be another one you can sit on

15   instead.  So go back to the same office where you came from.

16       THE PROSPECTIVE JUROR:  Thank you.

17       THE COURT:  Thank you very much.

18       Yeah.  Let's go ahead and call the next one.

19       THE COURTROOM DEPUTY:  Juror Number 34, Patrick

20   Corbet.

21       THE COURT:  So Mr. Corbet, as you approach the box,

22   did you have any positive responses?

23       THE PROSPECTIVE JUROR:  No.

24       THE COURT:  All right.  Please have a seat.

25       And Ladies and Gentlemen, it was pointed out to me

1    that when the defendant rose in response to my identification

2    of all the parties, he didn't remove his mask.  I think that

3    would be helpful to the jury to make sure that no one knows

4    him.

5              So Mr. Goklu, if you will stand again and just

6    remove your mask this time.  Okay.  So that's the defendant,

7    Mr. Goklu.

8              All right.  Thank you very much.  I appreciate that.

9    He was following my instructions very strictly about the mask.

10   So now that he has been unmasked, so to speak or you could see

11   his full face, is there anyone who recognizes Mr. Goklu --

12             THE PROSPECTIVE JUROR:  No.

13             THE COURT:  Or believes that they know him?

14             PROSPECTIVE JURORS: No.

15             THE COURT:  Okay.  No.

16             Any other positive or negative responses?

17             THE PROSPECTIVE JUROR:  Positive.

18             THE COURT:  Yes.  Why don't we have you come over to

19   the sidebar as well.

20                          (Sidebar)

21             THE COURT:  Yes.  Why do you have positive --

22             THE PROSPECTIVE JUROR:  I'm positive towards law

23   enforcement.  I have multiple, five or six, family members

24   that are police officers right now and one retired FBI agent.

25   So when you said can you be fair, I don't think I can be fair.

1    I'm always going to side with the law enforcement.

2              THE COURT:  Even if you have to view the testimony

3    of a law enforcement agent or officer just like you would any

4    other witness, you don't think you could do that?

5              THE PROSPECTIVE JUROR:  I don't think I could be

6    that fair, no.

7              THE COURT:  You don't think you could look at it

8    objective?

9              THE PROSPECTIVE JUROR:  I don't think I would be

10   objective.  Not speaking every day with my cousins who are

11   police officer and hearing the stories that they tell.  I

12   just --

13             THE COURT:  Okay.  Thank you.

14             We're going to send you back to the jury department.

15             MR. SINGER:  Yes.  I would move to excuse him for

16   cause.

17             And Judge, you didn't introduce or identify the

18   interpreter.  So I don't know if that was intentional or not.

19             THE COURT:  Do you think that matters?

20             MR. SINGER:  So the jury knows who these other

21   people are sitting at the table.

22             THE COURT:  Fair enough.  I could that.

23             MR. SINGER:  Okay.  Thank you.

24                    (Sidebar ends)

25             THE COURT:  That was Juror Number 7, Mr. Discala.

Preliminary Instructions                    39

1          THE COURTROOM DEPUTY:  Juror 35, Zhen Chen.

2          THE COURT:  So wait a second.  There are two Chens

3     in the jury and then there's me.  This never happened to me

4     before and we are not related just in case anyone is

5     wondering.

6          So folks, there are two other individuals that I

7     failed to identify sitting at the defense table and they are

8     interpreters in the Turkish language.  We have Interpreter

9     Sirtalan.

10          And then, I don't have your name, sir.

11          THE INTERPRETER:  George Esayan.

12          THE COURT:  So they are interpreters who are here

13     interpreting.  Okay.  Have a seat.

14          Dos anyone think they know either of them?

15          THE PROSPECTIVE JUROR:  No.

16          THE COURT:  Okay.  Thank you very much.

17          All right.  Any other positive responses to the

18     questions about feelings about law enforcement?

19          Okay.  So Juror Number -- what number are you, 28?

20          THE PROSPECTIVE JUROR:  28.

21          THE COURT:  Juror Number 28, Mr. Chu.

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  What feelings do you have?

24          THE PROSPECTIVE JUROR:  Positive.

25          THE COURT:  All right.  Do you want to come up here?

Preliminary Instructions                    40

1          THE PROSPECTIVE JUROR:  Sure.

2                    (Sidebar)

3          THE COURT:  Why do you have positive views?

4          THE PROSPECTIVE JUROR:  Well, a very good friend of

5   mine is a NYPD officer or actually a captain that focuses on

6   financial crimes.

7          THE COURT:  And how long has he been there?

8          THE PROSPECTIVE JUROR:  I think almost 20 years --

9   18 or so.

10         THE COURT:  Okay.

11         THE PROSPECTIVE JUROR:  We've been friends since

12  growing up.

13         THE COURT:  So this case is brought primarily by the

14  DEA.

15         THE PROSPECTIVE JUROR:  Okay.

16         THE COURT:  Does that -- do you think that you can

17  be fair and impartial in this case even though you have a

18  friend that works in law enforcement?

19         THE PROSPECTIVE JUROR:  I think so.  I don't know.

20  I just want to bring it out there.

21         THE COURT:  No.  I appreciate that.

22         So you are going to be instructed that if law

23  enforcement officers testify that you have to view their

24  evidence just like any other witness and judge their

25  credibility the same you would any other witness.

Preliminary Instructions                       41

1          Can you do that?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Okay.  Can you -- even though your

4    friend's a law enforcement officer, could you find that a law

5    enforcement officer might not be telling the truth.

6          Do you think you can find that?

7          THE PROSPECTIVE JUROR:  I think so.  Yeah.

8          THE COURT:  You're hesitating a little.  Tell me.

9          THE PROSPECTIVE JUROR:  A little bit.  So there's

10   some other ties to law enforcement that I think are positive.

11   I'm just positive.  I'm not sure how deep they run.  That is

12   what we are instructed to do.

13         THE COURT:  Right.

14         THE PROSPECTIVE JUROR:  My sister-in-law, my wife's

15   sister was a victim of a homicide.  And so, she was working

16   for the NYPD at the time as well in the coroner's office, but

17   you know, the NYPD basically, you know, took over our lives

18   for a couple of weeks.

19         THE COURT:  In a positive --

20         THE PROSPECTIVE JUROR:  In a positive way.  Helping

21   her and the family.  So I just have very, I think, strong

22   ties.  I'm not clear how deep they may run.

23         THE COURT:  I understand.

24         THE PROSPECTIVE JUROR:  But --

25         THE COURT:  Does it make a difference its NYPD

Preliminary Instructions                    42

1   versus a federal agency in terms of your ability to be

2   objective in this case?

3               THE PROSPECTIVE JUROR:  That, I'm not sure.  I

4   wasn't, you know -- I think they're in many respects I view

5   them performing the same tasks.

6               THE COURT:  So you view them as interchangeable?

7               THE PROSPECTIVE JUROR:  I understand that there are

8   differences, but in many ways in terms of, you know, their

9   members and their family.

10              THE COURT:  All right.  Let me have you just take

11  one second and stand over by that wall.

12              THE PROSPECTIVE JUROR:  Sure.

13              THE COURT:  First of all, any other follow-up you

14  want me to ask him?

15              It's a rare unusual set of circumstances.

16              MR. SINGER:  If he said his friend, who is the

17  captain works in financial crimes, whether there is any

18  discussions?

19              THE COURT:  Fair enough.

20              MS. KASSNER:  I think the real and important

21  question is, would he be able to set aside everything and view

22  the law enforcement agents testimony and evaluate it one way

23  or the other based on if the person --

24              THE COURT:  Sir, if you can come back.

25              THE PROSPECTIVE JUROR:  Sure.

```
                    Preliminary Instructions                43
```

1            THE COURT:  Mr. Chu.

2            THE PROSPECTIVE JUROR:  Sure.

3            THE COURT:  You mentioned that you have a close

4    friend that does financial crimes, right?

5            THE PROSPECTIVE JUROR:  Yes.

6            THE COURT:  What exactly does he do?

7            THE PROSPECTIVE JUROR:  He's a captain of a unit

8    that works in Queens that works across the city and I think a

9    lot of it is fraud.

10           THE COURT:  Do you talk to him about his work?

11           THE PROSPECTIVE JUROR:  Not in any great details.

12   Any articles and things he might be in the paper, so only

13   those.

14           THE COURT:  Do you remember which ones you read and

15   don't worry if you don't because I won't tell him?

16           THE PROSPECTIVE JUROR:  No.

17           Most of them are pictures of him on the scene, not

18   necessarily -- I think there was a Wells Fargo ATM thing

19   something like that.

20           THE COURT:  Do you feel that you acquired any

21   knowledge about fraud or the kinds of crimes he investigated

22   based on your conversations with him?

23           THE PROSPECTIVE JUROR:  No.

24           THE COURT:  Do you think you can be fair and

25   impartial in this case and put aside feelings that you have

1    about law enforcement, which are largely positive --

2              THE PROSPECTIVE JUROR:  Yeah.

3              THE COURT:  -- in weighing objectively the evidence

4    in this case and whether you find as a juror it proves the

5    defendant's guilt or not beyond a reasonable doubt?

6              THE PROSPECTIVE JUROR:  Yeah.  I think I can try

7    that yeah.

8              THE COURT:  Okay.  Do you feel pretty confident that

9    you can do that?

10             THE PROSPECTIVE JUROR:  I think I could.  I'm not a

11   terribly confident individual generally.

12             THE COURT:  Okay.  Maybe that was the wrong --

13             THE PROSPECTIVE JUROR:  Yeah.  Yeah.  You know --

14             THE COURT:  But you are going to hear testimony from

15   law enforcement agents who get up there to swear to tell the

16   truth.

17             Do you feel like you can be objective and fair and

18   impartial about their testimony?

19             THE PROSPECTIVE JUROR:  Sure.

20             THE COURT:  These individuals, agents or officers,

21   you can do that?

22             THE PROSPECTIVE JUROR:  I think so.

23             THE COURT:  Thank you very much.

24             Have a seat.

25             Okay.  Any motion?

Preliminary Instructions                    45

1          MR. SINGER:  No.

2          MS. KASSNER:  No.

3          THE COURT:  Okay.  Thank you.

4                       (Sidebar ends)

5          THE COURT:  I think Juror Number 30, you also had a

6     positive response.

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Why don't I have you come up here.

9                       (Sidebar)

10         THE PROSPECTIVE JUROR:  I work for New York City

11    Parks.  So most of my friends and people who I work with are

12    Parks Police on a daily basis.  My co-worker is a Sergeant.

13    She got injured on the job.  So right now she's doing a desk

14    job.  I interact with her.

15         THE COURT:  Slow down a little bit.

16         THE PROSPECTIVE JUROR:  I interact with her a lot.

17         THE COURT:  You interact with her a lot?

18         THE PROSPECTIVE JUROR:  Every day.

19         THE COURT:  All right.

20         THE PROSPECTIVE JUROR:  And I just generally have

21    positive outlook towards police.  They do a lot of like

22    troublesome stuff and I feel for them.

23         THE COURT:  Okay.  So despite your positive feelings

24    about the Park Police and the people you work with, could you

25    be fair and objective in this case, which is obviously brought

Preliminary Instructions                46

1    by law enforcement officers?

2              THE PROSPECTIVE JUROR:  Well, I don't know honestly.

3    But I do remember stuff about like when Bernie Madoff scandals

4    and stuff like that.  I had a friend that was affected by

5    that, so I don't really know --

6              THE COURT:  Right.

7              But remember as a juror, you'd be asked to consider

8    just the evidence that's presented during that trial and the

9    testimony you hear, some of it from law enforcement, and

10   decide whether or not you think the Government has proved its

11   case beyond a reasonable doubt.

12             Do you think you can do that?

13             THE PROSPECTIVE JUROR:  I'm not sure.

14             THE COURT:  Why do you say that?

15             THE PROSPECTIVE JUROR:  Because I feel like my

16   judgment might be affected by my life experiences.  My

17   interactions are mostly with law enforcement.  Interactions

18   with my friends that were affected by matters related to

19   money.

20             THE COURT:  So --

21             THE PROSPECTIVE JUROR:  And I feel injustice about

22   that.  But I guess I will try my best, like I said.

23             THE COURT:  Okay.  You're certainly willing to try

24   you're best, right?

25             THE PROSPECTIVE JUROR:  Yes.

Preliminary Instructions                          47

1          THE COURT:  So there will be law enforcement

2    witnesses who take the stand and you are going to be told that

3    you have to view their testimony just like you would any other

4    witness and weigh its credibility like you would any other

5    witness.

6          Can you do that?  And put out of your mind any

7    positive feelings you have had about law enforcement in

8    general?

9          THE PROSPECTIVE JUROR:  I mean, I don't know

10   anything about this case, so I guess, like --

11         THE COURT:  Okay.  And that's something you think

12   you can do?

13         THE PROSPECTIVE JUROR:  Possibly.

14         THE COURT:  And can you view their testimony against

15   all the other evidence that's submitted during the trial and

16   decide whether to believe it or not?

17         THE PROSPECTIVE JUROR:  If it's presented in a

18   neutral manner.  Okay.

19         THE COURT:  And can you put aside any feelings that

20   you might have about your friends who lost money and just

21   decide the facts in this case based on the evidence presented

22   to you?

23         THE PROSPECTIVE JUROR:  Well --

24         THE COURT:  This is obviously not a Madoff scheme,

25   right?

1    THE PROSPECTIVE JUROR:  Okay.

2    THE COURT:  So can you put that out of your mind?

3    THE PROSPECTIVE JUROR:  I believe so.

4    THE COURT:  Okay.  Do you feel confident about that?

5    THE PROSPECTIVE JUROR:  Like I said, I'll try my

6    best.

7    THE COURT:  All right.  Take a moment back there.

8    MR. SINGER:  I would move to dismiss him for cause.

9    MR. NAVARRO:  Your Honor, what is the grounds for

10   the cause?

11   MR. SINGER:  I don't believe that the Court has been

12   given an unequivocal assurance that this witness would not be

13   affected by his personal beliefs coming in.

14   THE COURT:  Okay.  I'm not going to strike him for

15   cause.  I'm going to let him sit.

16   Just for the record, he said he would try his best

17   and seems sincere about that.  And honestly, I'm a little

18   concerned more about not serving and not.  That's why I don't

19   want to strike him.  I think he can be objective at the end of

20   the day.  And this case is nothing like a Madoff scam, so I

21   don't think that's even going to raise any issues to the

22   extent that he generally feels aggrieved for them.  Okay.

23   Have a seat Mr. Chu.

24   (Sidebar ends)

25   THE COURT:  Okay.  All right.  Next question, have

1    you, a family member, or anyone close to you ever been the

2    victim of a crime?

3                And just remember, of course you have the private

4    option.  Victim of a crime.  Okay.  So Juror Number -- first

5    Juror Number 8, do you want answer this in open court?

6                THE PROSPECTIVE JUROR:  I don't mind.

7                THE COURT:  Okay.  So let's give you the microphone.

8    My only requirement is no singing unless you're really good,

9    then you can sing.

10                Yes.  Hold it close to your mask.  There we go.

11                Okay.  So tell me what happened.

12                THE PROSPECTIVE JUROR:  I was shot.

13                THE COURT:  You were shot and what?

14                THE PROSPECTIVE JUROR:  Two summers in a row.  Two

15    incidents where I was shot.

16                THE COURT:  You were shot on two separate occasions?

17                THE PROSPECTIVE JUROR:  Yes.

18                THE COURT:  Oh, my.  Okay.  When was the first time?

19                THE PROSPECTIVE JUROR:  The Summer of '94.

20                THE COURT:  Okay.  And where did that happen?

21                THE PROSPECTIVE JUROR:  That was at White Castle on

22    Berriman and Atlantic in Brooklyn.

23                THE COURT:  What was the first street?

24                THE PROSPECTIVE JUROR:  Berriman.

25                THE COURT:  Berriman and Atlantic.  So here in

1    Brooklyn.

2              THE PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Okay.  And the second time?

4              THE PROSPECTIVE JUROR:  The second time was on

5    South Oxford Street off of Atlantic.

6              THE COURT:  Okay.  And as a result of you being

7    shot, was there any law enforcement response?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Okay.

10             THE PROSPECTIVE JUROR:  Both times.

11             THE COURT:  And was it the NYPD that responded?

12             THE PROSPECTIVE JUROR:  Correct.

13             THE COURT:  Okay.  And how did you feel about the

14   response?

15             THE PROSPECTIVE JUROR:  I mean, they were doing

16   their job.  So I mean, there wasn't much they could do for me

17   at the time but to help me get to the hospital.

18             THE COURT:  And was there any prosecution that

19   resulted?

20             THE PROSPECTIVE JUROR:  No.

21             THE COURT:  Now, do you have any feelings positive

22   or negative from that in terms of how law enforcement

23   responded?

24             THE PROSPECTIVE JUROR:  Not at all.

25             THE COURT:  All right. And then, the second time.

1    And I'm sorry there was a second time.

2           What happened that time?  Was there a response?

3           THE PROSPECTIVE JUROR:  What do you mean?  As far as

4    the police coming to the scene?

5           THE COURT:  Yes.

6           THE PROSPECTIVE JUROR:  Yes, they responded.

7           THE COURT:  Okay.  And that time, was there a

8    prosecution that resulted?

9           THE PROSPECTIVE JUROR:  No.

10          THE COURT:  And again, did you feel negatively or

11   positively about how law enforcement responded?

12          THE PROSPECTIVE JUROR:  No.

13          THE COURT:  So you are neither satisfied or

14   dissatisfied?

15          THE PROSPECTIVE JUROR:  Yeah.  I'm just neutral.

16          THE COURT:  Okay.  All right.  I'm glad you seemed

17   to have recovered.

18          THE PROSPECTIVE JUROR:  Yeah.  I'm back.

19          THE COURT:  Okay.  All right.  Anything else?  I'm

20   afraid to ask.

21          THE PROSPECTIVE JUROR:  No, that's it.

22          THE COURT:  That certainly seems enough.

23          Thank you very much.

24          THE PROSPECTIVE JUROR:  Thank you.

25          THE COURT:  All right.  We had some hands back

```
                    Preliminary Instructions              52
```

1    there, so we will grab the microphone.  We only use the

2    microphone, folks, because it is difficult to hear in a room

3    this big with masks on especially.  So I think it was in the

4    last row.

5              THE COURTROOM DEPUTY:  21.

6              THE COURT:  Okay.

7              THE PROSPECTIVE JUROR:  I'm sorry.  Can you please

8    repeat the question?

9              THE COURT:  Yes.

10              Have you, a family member, or someone close to you

11   been a victim of a crime?

12              And you're Juror Number 21.

13              THE COURTROOM DEPUTY:  Yes.

14              THE PROSPECTIVE JUROR:  My mother's apartment was

15   robbed.

16              THE COURT:  And when did that happen?

17              THE PROSPECTIVE JUROR:  Probably like ten years ago.

18              THE COURT:  And where in the city or somewhere else?

19              THE PROSPECTIVE JUROR:  In Brooklyn.  She lives in

20   Brooklyn.

21              THE COURT:  Okay.  And do you know if there was any

22   law enforcement response?

23              THE PROSPECTIVE JUROR:  Yes.  She did file a report.

24   A lot of missing jewelry, but nothing was recovered.

25              THE COURT:  And no prosecution?

Preliminary Instructions                    53

1          THE PROSPECTIVE JUROR:  No prosecution.

2          THE COURT:  Do have any feelings about the law

3     enforcement response in anyway?

4          THE PROSPECTIVE JUROR:  Honestly, no.  I was just

5     upset that nothing ever got solved.  And to this day, she

6     feels it was a third floor tenant that robbed her, but they no

7     longer live there.  They were evicted, but they could never

8     prove anything.

9          THE COURT:  Okay.  Is there anything about your

10    mother's experience that would make it difficult for you to be

11    fair and impartial in this case, which obviously involves a

12    fair amount of law enforcement work presence?

13         THE PROSPECTIVE JUROR:  I'm honestly not sure.  This

14    is my first time dealing with something like that.  I

15    honestly, I'm not sure.

16         THE COURT:  Let's have you come up to the sidebar.

17    And if you will hand the microphone to your next door neighbor

18    there, that would be great.

19                        (Sidebar)

20         THE COURT:  So you expressed some reservations.  How

21    come?

22         THE PROSPECTIVE JUROR:  I guess, it's just the way I

23    was brought up.  I'm very negative and I just -- I feel like

24    more could have been done for my mother and it wasn't.

25         THE COURT:  Okay.

Preliminary Instructions                    54

1          THE PROSPECTIVE JUROR:  I have nothing more to say
2   on it.
3          THE COURT:  Okay.  But as a result of this, do you
4   have sort of more global or bigger impression either positive
5   or negative about law enforcement?
6          THE PROSPECTIVE JUROR:  I feel law enforcement -- I
7   feel like everyone -- there's going to have good people and
8   bad people.
9          THE COURT:  Okay.
10         THE PROSPECTIVE JUROR:  No matter, there's always
11  going to be people in the system not doing the right thing and
12  you just don't know.
13         THE COURT:  Okay.
14         THE PROSPECTIVE JUROR:  It's -- I'm not very
15  trusting. I don't like to trust people.
16         THE COURT:  Understood.
17         THE PROSPECTIVE JUROR:  That's all.
18         THE COURT:  But does that apply to people whether
19  they're law enforcement or regular people?
20         THE PROSPECTIVE JUROR:  Everybody.
21         THE COURT:  So you are a little skeptical of
22  everyone?
23         THE PROSPECTIVE JUROR:  Yeah, I am.
24         THE COURT:  You're going to be instructed that if
25  there is a law enforcement witness, you have to judge that

1   person's credibility just like you would any other person.

2          Do you think you can do that?

3          THE PROSPECTIVE JUROR:  I can try.

4          THE COURT:  But importantly, would you go into this

5   assuming that somehow the law enforcement didn't do the right

6   thing or isn't telling you the truth?

7          THE PROSPECTIVE JUROR:  It's always that

8   possibility.  Yeah.  I always have that little inkling, you

9   know.  Just it's not always 100 percent.

10         THE COURT:  Will you feel that way about any witness

11  whether it's a civilian or law enforcement person?

12         THE PROSPECTIVE JUROR:  Yeah, I would.

13         THE COURT:  So you go in sort of skeptical to begin

14  with?

15         THE PROSPECTIVE JUROR:  I do.

16         THE COURT:  In that regard, you treat law

17  enforcement just like other people?

18         THE PROSPECTIVE JUROR:  I do.

19         THE COURT:  Sort of until they earn your trust?

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  You're skeptical.

22         THE PROSPECTIVE JUROR:  Yes.

23         THE COURT:  But again, do you think you can be fair

24  and impartial, at least, as to all the people?

25         THE PROSPECTIVE JUROR:  I can try my best.

1      THE COURT:  And can you weigh their testimony

2  against all the other evidence?

3      THE PROSPECTIVE JUROR:  I can try.  If it's given in

4  a good positive way that I can agree with it, yes.

5      THE COURT:  All right.  Can you take a step right

6  over there for one moment.

7      Okay.  Folks, I'm not inclined to strike her.  She

8  has a lot of skepticism about people.

9      MR. SINGER:  I'm not making a motion.

10      MS. KASSNER:  No motion, Your Honor.

11      THE COURT:  Have a seat.

12                    (Sidebar ends)

13      THE COURT:  Thank you very much.  Thank you very

14  much, Juror Number 21.  We have another hand there in the

15  back.  Thank you so much, Juror Number 20.

16      You're Juror Number 26.  Okay.

17      Ms. Chen.  Yes.  Just turn it on.

18      THE PROSPECTIVE JUROR:  Can I just approach?

19      THE COURT:  Yes, you may approach.

20                    (Sidebar)

21      THE COURT:  If you will stand with your back to this

22  wall.

23      THE PROSPECTIVE JUROR:  Yep.

24      THE COURT:  Tell us what happened.

25      THE PROSPECTIVE JUROR:  About a month ago my

1   significant other was attacked in a hate crime and punched in

2   the face and his teeth were basically displaced.  And it's

3   been very frustrating because, like, this for the past month

4   we haven't had any progress on the case and it happened just a

5   block from our apartment.  Every time we leave the apartment,

6   it's been really scary.  With the recent bail laws that the

7   attacker has just been released even though there has been two

8   previous incidents.

9           THE COURT:  I'm so sorry.

10          THE PROSPECTIVE JUROR:  So it's been kind of

11  frustrating dealing with it.

12          THE COURT:  As a result of what happened to your

13  significant other, do you have feelings about law enforcement

14  in general or in particular towards the NYPD?

15          THE PROSPECTIVE JUROR:  Yeah.  I would think very

16  negative reaction to this because I felt very frustrated and

17  mismanaged.

18          THE COURT:  Okay.

19          THE PROSPECTIVE JUROR:  Just like talking with other

20  people who have been part of this, all of their interactions

21  have been very negative and just really have not like had much

22  support there.

23          THE COURT:  Do you feel like -- and I know it's a

24  very recent terrible event, do you feel like you can put aside

25  what happened to your partner and the response from law

Preliminary Instructions                    58

1  enforcement in judging this case objectively?

2         THE PROSPECTIVE JUROR:  I'm not too sure about that.

3         THE COURT:  Okay.  Well, though there will be law

4  enforcement officers or agents testifying, do you think you

5  could view their testimony just like you would any other

6  witness and not either assume that they are not telling the

7  truth or assuming they are telling the truth?

8         THE PROSPECTIVE JUROR:  I don't think so.

9         THE COURT:  Why do you say this?  And I mean just

10 explain a little bit.

11        THE PROSPECTIVE JUROR:  It's because in the past

12 month I had to talk to numerous law enforcement officials and

13 its just been -- just not a positive experience where they

14 were very dismissive and not cooperative.

15        THE COURT:  Okay.  All right.  I'm going to excuse

16 you and I'm very sorry about your partner's situation.

17        Thanks.

18        THE PROSPECTIVE JUROR:  Thank you.

19        THE COURT:  Go back to the jury room and tell them

20 that you can't sit for this.

21        THE PROSPECTIVE JUROR:  Thank you.

22        THE COURT:  Folks, I didn't bother to solicit.  I

23 think it's just a recent and traumatic experience and she

24 clearly had an emotional response.  I don't think she could be

25 fair given her negative feelings about law enforcement.

1          MR. NAVARRO:  I just want to put on the record that

2     I spoke with Mr. Singer.  He is waiving his client's

3     appearance.

4          THE COURT:  The defendant doesn't have a right to be

5     at sidebar, but I appreciate that.

6          MR. SINGER:  And it would be for him to waive.  I

7     have not discussed it with him, but yes.

8          THE COURT:  Okay.  All right.  So the defendant has

9     waived his --

10         MR. SINGER:  I've not discussed it with him.  As I

11    understand it.  As the Court has indicated, he doesn't have a

12    legal right to be here, so there is nothing to worry.

13         THE COURT:  Okay.  Thank you.

14                     (Sidebar ends)

15         Do we have anyone else?

16         Okay.  Do we have anyone else that had a positive

17    response?

18         First we have to call someone else to replace Juror

19    Number 20.  What was she?

20         MR. SINGER:  Twenty-six.

21         THE COURT:  Yes.  Thank you, Ms. Chen.

22         So let's first replace Ms. Chen.

23         MR. SINGER:  Judge, this juror would be new number

24    26?

25         THE COURT:  Correct.

1          (Continued on the following page.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Jury Selection                    61
```

1  (Continuing.)

2          THE COURT:  Ms. Gordon, as you take your seat, do

3  you have any positive responses?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  So nothing, all right.

6          Now raise your hand again, juror number 17,

7  Ms. Yepez, do you want to answer in private?

8          PROSPECTIVE JUROR:  No, it's okay, I even forgot

9  about it.  Twenty-six years ago my family was robbed in our

10  bakery.

11          THE COURT:  At gun point?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Where was that located?

14          PROSPECTIVE JUROR:  In the Bronx.

15          THE COURT:  Was there any law enforcement response?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Was there any prosecution that resulted?

18          PROSPECTIVE JUROR:  No, I don't think so.

19          THE COURT:  Do you have any feelings positive or

20  negative about that interaction with law enforcement.

21          PROSPECTIVE JUROR:  No, I kind of forgot about it.

22          THE COURT:  Would that experience make it difficult

23  for you to be fair and impartial in this case?

24          PROSPECTIVE JUROR:  No, I don't think so.

25          THE COURT:  Thank you very much, Ms. Yepez.

1            Any other hand up?

2            PROSPECTIVE JUROR:  Just regarding what we spoke

3     about, do you have any follow-up?

4            THE COURT:  No, I don't.  Let's go back for a

5     minute -- I think we're fine.  I remember your response now.

6            Anybody else?  Juror number --

7            PROSPECTIVE JUROR:  Thirty-four.

8            THE COURT:  You're five, believe it or not, we

9     renumbered you.

10           PROSPECTIVE JUROR:  Again, I had forgotten it, it

11    was many years ago.  My sister was the victim of several

12    violent crimes.

13           THE COURT:  I'm sorry to hear about that.  How long

14    ago was that?

15           PROSPECTIVE JUROR:  The last about 15 years ago.

16           THE COURT:  Was that here in New York?

17           PROSPECTIVE JUROR:  No, it wasn't.

18           THE COURT:  Do you know if there was any law

19    enforcement response?

20           PROSPECTIVE JUROR:  In the one case, because I

21    called them; it was a Pennsylvania state police.

22           THE COURT:  Is there anything about that experience

23    that would make it difficult for you to be fair and impartial

24    in this case?

25           PROSPECTIVE JUROR:  Not at all, just letting you

Jury Selection                                                63

1   know out of the interest of full disclosure.

2          THE COURT:  Much appreciated.  As a result of your

3   sister's feeling, did you develop any feelings about law

4   enforcement positive or negative?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Thank you.

7          Anyone else?

8          Have you, a family member, or anyone close to you

9   ever been a witness in a Grand Jury investigation or been

10  questioned in any manner by law enforcement agents or

11  officers?  Grand Jury witness or any questioning by law

12  enforcement.  Okay.

13         Have you, a family member, or someone close to you

14  ever been a witness or a complainant in a prosecution whether

15  federal, state, or local?  A witness or a complainant in a

16  prosecution.

17         Juror number 16, I believe Ms. Mattina; is that

18  right?

19         PROSPECTIVE JUROR:  Yes.  I was a claimant against

20  an attorney who took care of an accident claim for me, but he

21  was also real estate attorney and he embezzled client's money.

22  So I was interviewed by the Brooklyn DA's office and he was

23  successfully prosecuted.

24         THE COURT:  As a result of that, or would that

25  experience affect your ability to be fair and impartial in

1    this case?

2              PROSPECTIVE JUROR:  No, not at all.

3              THE COURT:  Okay.  And did you develop any

4    particularly positive or negative feelings about law

5    enforcement or prosecutors as a result of that?

6              PROSPECTIVE JUROR:  No, not at all.

7              THE COURT:  Thank you very much, juror number 16.

8              Anyone else?  Witness or claimant in a criminal

9    case?  Sir, hold that thought.

10             Have you, a family member, or close friend ever been

11   employed by law enforcement?  Now those of who you previously

12   responded you don't need to respond again.

13             So juror number two -- maybe we should start in the

14   back, with juror number 25. Mr. Chesaniuk.

15             PROSPECTIVE JUROR:  I have a couple of nephews who

16   are police officers, a brother who was in corrections, deputy

17   warden for a couple of years.

18             THE COURT:  All here in New York City?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  As a result of -- or let me go back.  Do

21   you talk to them about their work?

22             PROSPECTIVE JUROR:  Oh, yes.

23             THE COURT:  The two who were NYPD, what do they do?

24             PROSPECTIVE JUROR:  One is Richmond Hill patrol, the

25   other one formerly auto theft and now I think train or

1   somewhere in Queens.

2           THE COURT:  Can you be fair and impartial in this

3   case and put out of your mind anything you may have heard

4   about your relative's jobs in deciding what happened in this

5   case?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  Can you be fair and impartial to law

8   enforcement witnesses if they take the stand and judge their

9   credibility just like anyone else's?

10          PROSPECTIVE JUROR:  Just like anybody else's, yes.

11          THE COURT:  And decide if they are telling the truth

12  or not telling the truth just like you would with any other

13  witnesses?

14          PROSPECTIVE JUROR:  Yep.

15          THE COURT:  You wouldn't give them more benefit of

16  the doubt because you have relatives who are in the NYPD?

17          PROSPECTIVE JUROR:  No, they wouldn't get more of a

18  benefit of a doubt, no.

19          THE COURT:  Thank you very much.

20          Any other folks in the cheap seats over there?

21  Sorry.  Let's bring the microphone up this way.

22          Juror number two, Ms. Fischer.

23          PROSPECTIVE JUROR:  My cousin and my uncle are in

24  the NYPD.  My uncle retired, but my cousin is currently

25  working for NYPD in Manhattan.

1          THE COURT:  Do you know what he does?

2          PROSPECTIVE JUROR:  Patrol, I don't know much of

3     what he does.  He doesn't talk about it, but he does work

4     there.

5          THE COURT:  Could you be fair and impartial in this

6     case?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Even though it's brought by law

9     enforcement?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Thank you very much.

12          Next, juror number three Ms. Dawkins.

13          PROSPECTIVE JUROR:  My current employer is

14     considered a law enforcement department.

15          THE COURT:  Who is your current employer.

16          PROSPECTIVE JUROR:  The New York City Department of

17     Investigation.

18          THE COURT:  DOI?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  How long have you been there?

21          PROSPECTIVE JUROR:  Six months.

22          THE COURT:  What do you do?

23          PROSPECTIVE JUROR:  Investigator.

24          THE COURT:  You do investigations yourself?

25          PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Can you be fair and impartial in this

2   case even though there may will be law enforcement officer

3   testimony?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Could you judge their credibility just

6   like anybody else's?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Thank you very much, Ms. Dawkins.

9          Anyone else?

10          Have you, a family member, or a someone close to you

11   had negative experiences with law enforcement agents?  Again,

12   if you gave a previous response you don't need to respond

13   again.

14          Would any of you have difficulty in finding the

15   defendant guilty if the Government proves its case beyond a

16   reasonable doubt based solely on the testimony of law

17   enforcement officers?

18          Is there anyone who feels predisposed for any reason

19   to either believe or disbelieve a law enforcement agent's

20   testimony?  I appreciate some of these questions are now

21   redundant.

22          This case involves a law enforcement agent who

23   worked in an undercover capacity, is there anyone who has

24   strong feelings concerning the use of sting operations, as

25   they are called, or undercover agents, or who believe that law

Sidebar                                          68

1    enforcement should not be permitted to use undercover agents?

2    Anyone with strong feelings?

3            As I mentioned earlier, in this case the defendant

4    is charged with money laundering in connection with property

5    that was allegedly represented to the defendant as being the

6    proceeds of narcotic trafficking.  Do you any of you have any

7    strong feelings concerning with the distribution or sale of

8    illegal drugs in general?

9            Juror number 25, Mr. Chesaniuk.  Maybe we should

10   have you come up to the sidebar.

11           (Sidebar.)

12           THE COURT:  Tell me, what is your feelings?

13           PROSPECTIVE JUROR:  I have real strong feelings

14   about people who distribute, sell, and in any way support the

15   drug industry, the illegal drug industry.  I have a personal

16   friend who overdosed and died.  Relatives have gotten AIDS as

17   a result of heroin addictions.  Personally I know people,

18   addicts -- when I was growing up heroin was a big thing; I

19   personally saw people dying.

20           THE COURT:  This case isn't about drug dealing

21   directly.

22           PROSPECTIVE JUROR:  I understand.  If you are

23   supporting it in any way, you're part of the problem.

24           THE COURT:  This is just an accusation, though.  The

25   question becomes, can you fair and impartial and view the

1   evidence to determine whether or not the Government has proved

2   its case beyond a reasonable doubt as to this defendant?  Can

3   you put your feelings about drugs, drug use, drug sale, drug

4   industry?

5           PROSPECTIVE JUROR:  No.  I've seen people die.

6           THE COURT:  Thank you very much.

7           PROSPECTIVE JUROR:  There is no way.

8           THE COURT:  Go back to the jury room.  Thank you

9   very much.  I'm sorry about your loss.

10          (Juror exits sidebar.)

11          THE COURT:  He was so emphatic, I don't think he

12  could be fair to the defendant in this case.

13          (In open court.)

14          THE COURTROOM DEPUTY:  Juror 37 replacing number 25,

15  Kathleen St. Jeanos.

16          THE COURT:  Did you have any positive responses to

17  anything I asked before?

18          PROSPECTIVE JUROR:  An early one, I'm not sure it's

19  a yes, but my son is interning in for a judge in the Southern

20  District of New York.

21          THE COURT:  Who is that?

22          PROSPECTIVE JUROR:  I don't know the judge's name,

23  sorry.

24          THE COURT:  I'm not going to tell your son that.

25  Have a seat.  Let me ask you, Ms. St. Jeanos, is there

Jury Selection                                70

1   anything about the fact that your son is interning for an

2   anonymous judge would that affect your ability to be fair and

3   impartial in this case?

4          PROSPECTIVE JUROR:  No, it would not.

5          THE COURT:  Thank you very much.  Very nice for your

6   son.

7          Did we get everyone with respect to drug sales in

8   general, the drug trade in general?  Okay.

9          Is there anyone who has strong feelings concerning

10  the distribution or sale of marijuana, Adderall, or Oxycodone

11  known as Oxy, in particular?

12         Have you, a family member, or anyone close to you

13  ever been arrested or convicted of a drug crime?  Glad to hear

14  that.

15         Have you or someone close to you been affected in

16  any way by illegal drugs or the sale of illegal drugs?

17         Did you want to answer in private?

18         PROSPECTIVE JUROR:  No, that's okay.  My brother was

19  arrested and did serve time.

20         THE COURT:  It was for drug dealing?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  How long ago was that?

23         PROSPECTIVE JUROR:  Quite a bit, 20 years.

24         THE COURT:  Here in this city?

25         PROSPECTIVE JUROR:  Yes.

```
                          Jury Selection                    71

 1          THE COURT:  Do you remember which law enforcement
 2   agency was involved in that?
 3          PROSPECTIVE JUROR:  No, I don't.
 4          THE COURT:  Do you know much about his case?
 5          PROSPECTIVE JUROR:  No.  Actually I came to find out
 6   he was arrested after he came down with HIV, he had to notify
 7   the family member; so I didn't know he was arrested until that
 8   time.
 9          THE COURT:  Sorry to hear that.  Do you know how
10   long he was in prison for?
11          PROSPECTIVE JUROR:  I think 18 months.
12          THE COURT:  Do you have any feelings about what
13   happened to your brother and whether or not he was treated
14   fairly or not?
15          PROSPECTIVE JUROR:  I don't know the details, but I
16   don't have any feeling.  If you do something wrong, you're
17   going to get charged.
18          THE COURT:  You don't have any feelings positive or
19   negative about the law enforcement or the prosecutors who
20   handled that case?
21          PROSPECTIVE JUROR:  No.
22          THE COURT:  Do you think you can be fair and
23   impartial in this case?
24          PROSPECTIVE JUROR:  Of course.
25          THE COURT:  To the extent there might be some
```

Jury Selection                               72

1   suggestion about drugs being peripherally involved?

2           PROSPECTIVE JUROR:  Of course I can.

3           THE COURT:  Thank you juror, number one.

4           Anyone else who had someone close to them affected

5   by drugs?  Juror number five, Mr. Corbet.

6           PROSPECTIVE JUROR:  What I referred to earlier about

7   my sister, it was resulting from her boyfriend who was

8   cultivating and distributing marijuana.

9           THE COURT:  The violent crime you mean?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Was it a robbery of some sort?

12          PROSPECTIVE JUROR:  No, he assaulted her.  I believe

13  he was convicted of cultivation.

14          THE COURT:  As a result of your sister's experience,

15  do you have any feelings that would affect your ability to be

16  fair and impartial in this case if there is some suggestion --

17          PROSPECTIVE JUROR:  Not at all.  Towards him, yes,

18  and her yes; but the situation in general, no.

19          THE COURT:  The drug trade in general.

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Or marijuana selling.

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Thank you.

24          Is there anyone who has strong feelings concerning

25  money laundering in general?

```
                          Sidebar                      73
```

1          Have you, a family member, or anyone close to you

2     ever been arrested or convicted of a financial crime?

3          Is there anyone who has prior or specialized

4     knowledge of digital currency, also known as crypto currency?

5          Is there anyone who is familiar with Bitcoin or

6     other crypto currency?  When I say familiar, not if you've

7     heard of Bitcoin but have some particular knowledge about

8     Bitcoin or crypto currency?

9          Yes, Mr. Corbet.

10          PROSPECTIVE JUROR:  Small-time investor in crypto

11     currency, generally familiar with the basics of block chain

12     and so on.

13          THE COURT:  So you're actually an investor.

14          PROSPECTIVE JUROR:  No longer.

15          THE COURT:  Let's have you come to sidebar.

16          (Sidebar.)

17          THE COURT:  When did you invest in Bitcoin?

18          PROSPECTIVE JUROR:  Over the past 12 months.  It

19     wasn't Bitcoin, it was several others.  I have a few residual,

20     maybe $50 worth.

21          THE COURT:  Which one?

22          PROSPECTIVE JUROR:  ADA Coin and Cardano.  Beyond

23     that, only in the value of say $20, $30.

24          THE COURT:  Why did you invest in them?

25          PROSPECTIVE JUROR:  It was just speculation.  I was

Sidebar                                              74

1  curious, and an easy way to learn is to participate.

2          THE COURT:  Okay.  It sounds like it was a

3  short-lived experiment, why is that?

4          PROSPECTIVE JUROR:  The market spiked and I realized

5  that I was either going to exit with a profit or I was going

6  to be in it for the long-term.

7          THE COURT:  As a result of your experience, do you

8  know a fair amount about how crypto currencies work?

9          PROSPECTIVE JUROR:  I know a fair amount about

10 markets in general, I have a degree in economics and am an

11 investor; but I have no specialized knowledge.

12         THE COURT:  As a result of your experience or

13 otherwise, do you have any feelings positive or negative about

14 crypto currency.

15         PROSPECTIVE JUROR:  I think it's a good way to lose

16 money, for the casual investor.

17         THE COURT:  You may hear testimony in this case

18 about the use of crypto currency, in particular Bitcoin -- I

19 should say use transactions involving that.  Would that affect

20 your ability to be fair and impartial in this case?

21         PROSPECTIVE JUROR:  No, not at all.

22         THE COURT:  Most importantly, you may hear testimony

23 about how Bitcoin or crypto currencies work.  Could you rely

24 just on what you hear today here in the trial about that

25 subject and put out of your mind whatever else you might know

Sidebar                                    75

1   about Bitcoin, crypto currency, block chain, et cetera?

2          PROSPECTIVE JUROR:  Right.

3          THE COURT:  Can you do that?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Rely solely on the evidence put before

6   you?

7          PROSPECTIVE JUROR:  Absolutely.

8          THE COURT:  Not import anything that you believe to

9   be true about any of those subjects.

10         PROSPECTIVE JUROR:  I'm not signing up for this job,

11  but I can fulfill that obligation.

12         THE COURT:  Thank you.

13         (In open court.)

14         THE COURT:  Juror number ten, go ahead.

15         PROSPECTIVE JUROR:  Same scenario as the previous

16  juror, small-time kind of investing in crypto.

17         THE COURT:  Come join us at sidebar.

18         (Sidebar.)

19         THE COURT:  Tell us what is your experience?

20         PROSPECTIVE JUROR:  I was given Bitcoin as a gift

21  from my brother-in-law for Christmas one year.  Then basically

22  I kind of started investing in a theory and some other smaller

23  ones, this is probably like five or six years ago.  Then my

24  brother-in-law's father he told me to switch to Bitcoin Cash,

25  because I trusted him, I lost a lot of money out of that.  I

Sidebar                                          76

1   don't hold a grudge or anything like that.

2           THE COURT:  You do not.

3           PROSPECTIVE JUROR:  I do not.

4           THE COURT:  As a result of that, I have to ask you

5   more globally, do you have negative or positive feelings about

6   crypto currency in general?

7           PROSPECTIVE JUROR:  I'm a little skeptical, but I

8   look as it another option for my portfolio, put money away and

9   not think about it.  I'm not actively trading it, just added

10  it to the list.

11          THE COURT:  You're likely to hear testimony in this

12  trial about crypto currency and about Bitcoin how it works.

13  Can you put out of your mind anything you know about all these

14  crypto currencies and just rely on the evidence that is

15  presented before you in trial about that subject?

16          PROSPECTIVE JUROR:  I think many more people know

17  more than I do, so yes.

18          THE COURT:  Even if someone is said at trial and you

19  think, I don't know if that's right, can you put that out of

20  your mind and rely on the testimony and evidence?

21          PROSPECTIVE JUROR:  To the best of my ability, yes.

22          THE COURT:  Do you have any doubt?

23          PROSPECTIVE JUROR:  I'm a little skeptical about the

24  concept of it.  Again, I don't know enough, like compared to

25  other people who are specialists, but I probably have some

Jury Selection                          77

1   scepticism about the crypto currency in general and what it is

2   based off of, from my knowledge.

3           THE COURT:  Remember, I'm going to instruct all the

4   jurors that you have to rely just on the evidence presented

5   and put everything else out of your mind.

6           PROSPECTIVE JUROR:  I can do that.

7           THE COURT:  You can do that.  Thank you, juror

8   number ten.

9           (In open court.)

10          THE COURT:  Anyone else?  I think this is already

11  covered, have you, a family member, or close friend ever

12  purchased or sold Bitcoin or any other crypto currency?

13  Obviously if you've responded before you don't need to respond

14  again.  Okay.

15          Similarly, does anyone have experience with block

16  chain technology?

17          Does anyone have any views about the existence or

18  use of crypto currency that would interfere with your ability

19  to be fair and impartial in this case, which will involve

20  Bitcoin?  And again, if you responded before you don't have to

21  respond again.

22          Is there anyone who believes that transactions

23  involving Bitcoin or other crypto currencies should not be

24  regulated in any way by the Government?  Anyone have that

25  view?

1          Have you, a family member, or close friend ever had

2   any experience or otherwise participated in foreign financial

3   transactions?  For example, sending money to or receiving

4   money from a person or business in another country?

5          Juror number 14, Ms. Nzirubusa.  What is your

6   experience?

7          PROSPECTIVE JUROR:  Just sending money to my

8   country.

9          THE COURT:  What vehicle do you use to do that.

10          PROSPECTIVE JUROR:  Ria money transfer.

11          THE COURT:  You do that from here in New York?

12          PROSPECTIVE JUROR:  Yes, New York.

13          THE COURT:  I don't know if any testimony about

14   those kinds of services will come up, but if some evidence

15   comes up about money transmission via a service like Ria,

16   could you put out of your mind anything that you know based on

17   your own experience and judge this case based on the

18   experience put before you.

19          PROSPECTIVE JUROR:  Yes, I can do that.

20          THE COURT:  Thank you very much.  Anyone else?

21          Is there anyone who has difficulty reading or

22   understanding English?  Juror number 17, I think Ms. Yepez,

23   17.

24          PROSPECTIVE JUROR:  When I read I get the letters

25   mixed up.

1          THE COURT:  Like dyslexia?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  But you understand English perfectly?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Obviously, if you need more time to look

6    at written documents you'll have as much time you need to

7    address any concern you have.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Thank you.  Let me go back for one

10   minute, Ms. Yepez.  Is it a question of needing more time

11   or --

12         PROSPECTIVE JUROR:  More time.

13         THE COURT:  Not times when you cannot simply read

14   something.

15         PROSPECTIVE JUROR:  More time.  I go really quick

16   and it gets mixed up.

17         THE COURT:  I understand that.  I have that also.

18         Is there anyone who has a physical disability or

19   problem that would make serving as a member of the jury

20   difficult or impossible?  Physical ailment or condition, other

21   than sitting on hard wooden cases?

22         This case will likely involve listening to audio

23   recordings, looking at television monitors, looking at

24   typewritten exhibits in the English language, any medical

25   issues like eyesight, hearing, or language difficulties that

1   would make it difficult for you to serve as a juror in this

2   case given that fact?  Ms. Yepez, you don't need to respond

3   again.  All right.

4           As mentioned earlier, the trial is expected to last

5   through the rest of this week and possibly until next Tuesday.

6   We won't be sitting on Wednesday because of the Jewish holiday

7   or Monday because of Columbus Day.  Is there anyone for whom

8   the length of the trial is a genuine hardship?  Juror number

9   six.

10          PROSPECTIVE JUROR:  I just got hired to a new job.

11  I start tomorrow.

12          THE COURT:  Do you they know you've been called to

13  jury service?

14          PROSPECTIVE JUROR:  No.  I just got my schedule this

15  Saturday, I couldn't tell them that I have jury duty.

16          THE COURT:  They are expecting you to show up?

17          PROSPECTIVE JUROR:  Tomorrow.

18          THE COURT:  Where is your employment?

19          PROSPECTIVE JUROR:  In Manhattan, Fifth Avenue.

20          THE COURT:  Is it a company?

21          PROSPECTIVE JUROR:  No, it's a retail store.

22          THE COURT:  They are supposed to give you time off

23  if you have jury service.

24          PROSPECTIVE JUROR:  I would have told them, but I

25  didn't know the date that I was going to come.

```
                    Sidebar                    81
```

1          THE COURT:  Let me talk to the lawyers at sidebar.

2          (Sidebar.)

3          THE COURT:  I just want to solicit your views.  My

4    inclination is to let her go.  She's just starting a job.

5          MR. SINGER:  I agree.

6          THE COURT:  Normally I would say your job has to

7    excuse you -- all right, we're all in agreement?

8          MS. KASSNER:  Yes.

9          (In open court.)

10         THE COURT:  Juror number six, Ms. Osorio, I'm going

11   to let you go.  I don't want you to get in trouble on your

12   first day of work.

13         PROSPECTIVE JUROR:  Thank you.

14         THE COURT:  It would have different if you'd already

15   been there for a while.  Juror number six be replaced by --

16         THE COURTROOM DEPUTY:  Juror 38, Kenneth Kresowaty.

17         PROSPECTIVE JUROR:  Do you have a moment?

18         THE COURT:  Yes, come to sidebar.

19         (Sidebar.)

20         PROSPECTIVE JUROR:  I'm retired from New York State

21   Department of Health Office of Professional Medical Conduct.

22   I was a senior medical conductor investigator.  I did

23   interaction with DEA on a limited basis, would it be

24   inappropriate prescribing issues on one case.

25         THE COURT:  Do you believe your experience as law

Sidebar                                           82

1   enforcement or quasi-law enforcement as an investigator to

2   affect your ability to be fair and impartial in this case?

3              PROSPECTIVE JUROR:  I have a positive outlook.  The

4   case went forward that I presented to our committee.  It was

5   prosecuted by the DEA.  It was a positive experience.

6              THE COURT:  It was a positive experience with the

7   DEA.

8              PROSPECTIVE JUROR:  Oh, yes.

9              THE COURT:  Let me ask you, as an investigator you

10  know that evidence has to be brought and relied upon when

11  doing anything in your line of work.

12             PROSPECTIVE JUROR:  That's correct.

13             THE COURT:  Do you feel you can weigh the evidence

14  in this case and decide whether or not the prosecutors and the

15  DEA have done their job and brought enough evidence to satisfy

16  you of guilt beyond a reasonable doubt?

17             PROSPECTIVE JUROR:  So long as it's obtained

18  correctly.

19             THE COURT:  So you would evaluate it to determine

20  whether or not it was obtained correctly.

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  And whether or not it convinces you of

23  the defendant's guilt beyond a reasonable doubt.

24             PROSPECTIVE JUROR:  Yes.  It has to be beyond a

25  reasonable doubt, that's correct.

```
                        Jury Selection                        83
```

1            THE COURT:  You think you can be fair and impartial

2    in this case?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Despite your positive experiences with

5    DEA.

6            PROSPECTIVE JUROR:  I feel comfortable with that.

7            THE COURT:  Fair to both sides?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Thank you very much.

10           (In open court.)

11           THE COURT:  Come up here in the box next to juror

12   number five.

13           Anyone else a genuine hardship?  Juror number 25,

14   Ms. St. Jeanos.

15           PROSPECTIVE JUROR:  I think it should be fine, it's

16   not a hardship.  I have a family trip, departing Saturday the

17   15th, so we would be fine.

18           THE COURT:  If you're not fine, then we're all not

19   fine.  I might have to go with you at that point.

20           Yes, sir, number 23, Mr. Thomas.

21           PROSPECTIVE JUROR:  I have a court date October 5.

22           THE COURT:  Okay.  Where is it you are appearing in

23   court?

24           PROSPECTIVE JUROR:  Supreme Court.

25           THE COURT:  Here in Brooklyn?

```
                       Sidebar                          84
```

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Is it a civil case or a criminal case?

3           PROSPECTIVE JUROR:  Criminal.

4           THE COURT:  And are you a witness or a party.

5           PROSPECTIVE JUROR:  Party.

6           THE COURT:  What time is it on October 5.

7           PROSPECTIVE JUROR:  526.

8           THE COURT:  Could we have you come up to sidebar.

9           (Sidebar.)

10          THE COURT:  We're not sitting on Wednesday.  We

11   won't have court on Wednesday, that's why I wanted to ask you

12   a little more about your situation.  So you would be free to

13   go there to court on Wednesday.

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  What kind of case is it?

16          PROSPECTIVE JUROR:  DWI.

17          THE COURT:  So you got arrested for a DWI?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  That's pending right now?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Is this your first interaction with law

22   enforcement?  Is this your first arrest?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Was it the NYPD who arrested you?

25          PROSPECTIVE JUROR:  Yes.

```
                        Sidebar                      85
```

1          THE COURT:  How many other arrests have you had?

2          PROSPECTIVE JUROR:  Two.

3          THE COURT:  Were they also by the NYPD?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  What kind of crimes were they?

6          PROSPECTIVE JUROR:  Possession of marijuana.

7          THE COURT:  Mr. Thomas, I'm going to let you go back

8    to the jury room.  Thank you very much.

9          PROSPECTIVE JUROR:  Thank you.

10         (Prospective juror exits sidebar.)

11         THE COURT:  I know I did that sua sponte?  My

12   feeling was he wasn't comprehending what I said.  He clearly

13   missed all the questions about knowledge about involvement in,

14   arrested for drugs, and everything else.  So I was quite

15   concerned that he wouldn't necessarily be all there for this

16   trial.  He seemed to me possibly to be under the influence of

17   something at this exact moment.  His eyes were a bit glazed.

18   And given he was appearing for a DUI, and he didn't respond as

19   he should have to all the questions that should have elicited

20   his prior arrest and involvement in the criminal justice

21   system.

22         You may have an objection, you can lodge it if you

23   like.

24         MR. SINGER:  I'm not sure that the record was

25   sufficiently developed.  I understand the concerns that you

1   have, but we have concerns with lots of jurors and we

2   developed them a bit more.  I didn't think that was done.

3            THE COURT:  Let me make clear, it's not about him

4   having been arrested before.  It's about the fact that he

5   didn't respond to any questions at all prior to this about his

6   arrests.  So it was more a concern of comprehension of his

7   mental status.  But your objection is noted.

8            (In open court.)

9            THE COURT:  We'll replace juror number 23.

10           THE COURTROOM DEPUTY:  Juror 39 replacing 23,

11   Gabriel, Glasgow.

12           THE COURT:  Mr. Gabriel, you can take your seat.

13   Did you have any positive responses about anything I asked you

14   so far?

15           PROSPECTIVE JUROR:  No, Your Honor.

16           THE COURT:  Thank you very much.

17           Juror number 18, you were standing up?

18           PROSPECTIVE JUROR:  I was going to go to the

19   bathroom.

20           THE COURT:  If you hold on one second we're very

21   close to a breaking point.

22           PROSPECTIVE JUROR:  Sure, no problem.

23           THE COURT:  Thank you.  Any other genuine hardship?

24           Is there anyone who has any biases or prejudices

25   against members of any racial, ethnic, national or religious

1    group that would make it difficult for you to be fair and

2    impartial in this case?

3            Is there anyone who feels that even if the evidence

4    establishes the defendant's guilt beyond a reasonable doubt

5    you might not be able to render a guilty verdict for reasons

6    unrelated to the law and the evidence?

7            If you're selected as a juror, you'll be instructed

8    that you must follow and apply the law as I instruct you, even

9    if you disagree with the law.  Is there anyone who would have

10   difficulty following that instruction?

11           If you're selected as a juror you'll be instructed

12   that the question of punishment is for the Court alone to

13   decide.  And that you must not let that enter into your

14   deliberations, the possibility of punishment, in any way.  Is

15   there anyone who would have difficulty following that

16   instruction?

17           Last question, is there anyone who believes they

18   cannot be fair and impartial in rendering a verdict in this

19   case for any reason that we haven't discussed?  Terrific.

20           I'm going to let all of you take a 15-minute break,

21   being realistic about restrooms and how many we have.  You can

22   go to other floors if you need to use a restroom.  Be ready to

23   go again at 20 of 12, and back in your seats.  Thank you

24   everyone.

25           (Prospective jury panel exits.)

```
                        Jury Selection                      88
```

1              (Sidebar.)

2              THE COURT:  Mr. Goklu, I know you're heading to use

3      the restroom as well.  Since we have so many potential jurors

4      out there in the hallway, I want to make sure you understand

5      you cannot speak to any of the potential jurors at all, just

6      don't speak to anybody to make sure you don't run afoul of

7      that.  Thank you.

8              (Defendant exits sidebar.)

9              THE COURT:  Any other follow-up questions for

10     anyone?

11             MS. KASSNER:  No.

12             MR. SINGER:  No.

13             THE COURT:  Okay, then you guys are free to go as

14     well.  Be back at 20 of and we'll start with peremptory.

15             MR. SINGER:  You'll be asking further questions

16     individual questions?

17             THE COURT:  Yes.

18             (Brief recess.)

19

20

21

22

23

24

25

Jury Selection                    89

1   (Continuing.)

2          THE COURT:  Ladies and gentlemen, as you can see,

3   the first 32 of you have received a paper questionnaire.

4   Sorry about the right side here.  You might be having FOMO

5   right now.  We're going to go through these questions one by

6   one.  Each juror will be required to answer each question and

7   you don't have to repeat the question and if you get very

8   good, you can just say the number and give an answer.

9          So we're going to go one by one as soon as we get a

10  microphone back.  Let's start with Juror No. 1.

11         PROSPECTIVE JUROR NO. 1:  I reside in Cambria

12  Heights, Queens, New York.  I've been living there for 30

13  years.  Before that, I lived in Corona.

14         THE COURT:  Formal education?

15         PROSPECTIVE JUROR NO. 1:  I have a Bachelor's degree

16  in the science of nursing.  Employment, currently employed by

17  Northwell Health Long Island Jewish Medical Center.  I've

18  worked for them for 29 years.

19         THE COURT:  What is your position there?

20         PROSPECTIVE JUROR NO. 1:  I'm a nurse care manager.

21         THE COURT:  Spouse or partner?

22         PROSPECTIVE JUROR NO. 1:  No, I'm divorced.  I have

23  two children --

24         THE COURT:  Could we go back for a minute.  Your

25  former spouse, did that person work outside the home?

Jury Selection                    90

1          PROSPECTIVE JUROR NO. 1:  I'm sorry?

2          THE COURT:  Did your former spouse work outside the

3    home?

4          PROSPECTIVE JUROR NO. 1:  Yes.

5          THE COURT:  What did he do?

6          PROSPECTIVE JUROR NO. 1:  He was a contractor.  He

7    owned his own business construction.

8          THE COURT:  Children?

9          PROSPECTIVE JUROR NO. 1:  I have two children, 33

10   and 31 and they do work outside the home.

11         THE COURT:  And what do they do?

12         PROSPECTIVE JUROR NO. 1:  My daughter works for

13   Toyota and my son works for Google.

14         THE COURT:  What does your son do at Google?

15         PROSPECTIVE JUROR NO. 1:  I'm not sure honestly.

16         THE COURT:  How about your daughter, what does she

17   do at Toyota?

18         PROSPECTIVE JUROR NO. 1:  She's in cars sales.

19         THE COURT:  Any other adult you live with?

20         PROSPECTIVE JUROR NO. 1:  No, I live alone.  Legal

21   knowledge, not so much.

22         THE COURT:  Ever practiced or studied it?

23         PROSPECTIVE JUROR NO. 1:  Not at all.

24         THE COURT:  Any friends or family members?

25         PROSPECTIVE JUROR NO. 1:  No.

```
                        Jury Selection                    91

 1              THE COURT:  How about jury service?

 2              PROSPECTIVE JUROR NO. 1:  I have done it before and

 3     it was a criminal case.

 4              THE COURT:  Was it state or federal?

 5              PROSPECTIVE JUROR NO. 1:  State.

 6              THE COURT:  Was it here in Brooklyn?

 7              PROSPECTIVE JUROR NO. 1:  No, in Queens.

 8              THE COURT:  Without telling us the verdict were you

 9     and the other jurors able to reach a verdict?

10              PROSPECTIVE JUROR NO. 1:  Of course.  We were

11     anonymous.

12              THE COURT:  11?

13              PROSPECTIVE JUROR NO. 1:  Involvement in litigation,

14     no, not at all.

15              THE COURT:  Not as a party or as a witness?

16              PROSPECTIVE JUROR NO. 1:  No.  I was subpoenaed to

17     go but it never came to fruition.

18              THE COURT:  Subpoenaed as a witness?

19              PROSPECTIVE JUROR NO. 1:  As a witness, yes, for my

20     job.

21              THE COURT:  As a nurse?

22              PROSPECTIVE JUROR NO. 1:  Yes.

23              THE COURT:  All right.

24              PROSPECTIVE JUROR NO. 1:  I do watch MSNBC, Channel

25     7, Channel 2.
```

```
              Jury Selection                      92
```

1            THE COURT:  These are your news sources?

2            PROSPECTIVE JUROR NO. 1:  Yes.  And cable television

3    I do Netflix and Hulu.  NCIS.

4            THE COURT:  So you watch NCIS?

5            PROSPECTIVE JUROR NO. 1:  I watch NCIS, I watch

6    Chicago Fire, I watch Chicago PD.  It's just entertainment.

7    Social media, I only barely do Facebook.

8            THE COURT:  What do you use Facebook for?

9            PROSPECTIVE JUROR NO. 1:  Just to keep up, I follow

10   closely and if I have a comment, I give one but that's it.  On

11   organization membership, I belong to the American Nurses

12   Association.

13           THE COURT:  Thank you very much, Juror No. 1.  If

14   you will pass the mic to Juror No. 2.

15           Ms. Fischer, take it away.

16           PROSPECTIVE JUROR NO. 2:  I live in Nassau County

17   for 38 years.  I have a Bachelor's degree.  I have not done

18   any military service.  I am currently employed with a

19   nonprofit agency doing quality enhancement.

20           THE COURT:  What is the agency?

21           PROSPECTIVE JUROR NO. 2:  YAI.

22           THE COURT:  What does that stand for if you know.

23           PROSPECTIVE JUROR NO. 2:  It stands for Young Adult

24   Institute, but we've been around for a while.

25           THE COURT:  Formerly young.  We all feel that way.

Jury Selection                                93

1          PROSPECTIVE JUROR NO. 2:  I've been there for 16

2    years.  I do not have a spouse.  I do not have any children.

3    My mother is in my household and she is a nurse.  I have no

4    legal knowledge.  My brother-in-law is a lawyer.  He is an

5    attorney.  He works for the Department of State, for New York

6    State.

7          THE COURT:  And do you know what he does there?

8          PROSPECTIVE JUROR NO. 2:  He seems to do a little

9    bit of everything.  Like, he has -- sometimes with the

10   Athletic Commission doing stuff with the boxing, but, yeah,

11   his hands seem to be in a bunch of things but the most I know

12   about it is the Athletic Commission.

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR NO. 2:  I have done jury service

15   before.  I served on a case about four years ago.  It wasn't

16   criminal.  It was I think it was -- I'm not sure what to call

17   it, but we reached a verdict.

18         THE COURT:  Okay.

19         PROSPECTIVE JUROR NO. 2:  I haven't had any

20   involvement in litigation.  Mostly Channel 7, ABC News for my

21   news resources.  I usually just watch them all.  Netflix,

22   Hulu.  All of them pretty much.

23         THE COURT:  Are there particular shows you watch?

24         PROSPECTIVE JUROR NO. 2:  I'm more of a Bridgerton

25   person, not the crime shows.

1          THE COURT:  All right.

2          PROSPECTIVE JUROR NO. 2:  Social media mostly

3   Facebook and Instagram.  I'm not sure how the other ones work.

4   And I'm not in any organized membership.

5          THE COURT:  Do you do any blogging on social media?

6          PROSPECTIVE JUROR NO. 2:  No.

7          THE COURT:  To go back to the prior jury service do

8   you remember if it was federal or state?

9          PROSPECTIVE JUROR NO. 2:  It was federal in Central

10  Islip.

11         THE COURT:  You think it was a civil matter because

12  it wasn't criminal?

13         PROSPECTIVE JUROR NO. 2:  Correct.

14         THE COURT:  Thank you very much Juror No. 3

15  Ms. Dawkins?

16         PROSPECTIVE JUROR NO. 3:  The place I currently live

17  is in Brooklyn.  I've been living there for twelve years.  I

18  have an Associate's in criminal justice.  No military service.

19  I'm employed by the DOI, New York City DOI.

20         THE COURT:  What is your title again?

21         PROSPECTIVE JUROR NO. 3:  Confidential investigator.

22         THE COURT:  How long have you been there?

23         PROSPECTIVE JUROR NO. 3:  Six months.

24         THE COURT:  And before that, did you work anywhere

25  else?

1          PROSPECTIVE JUROR NO. 3:  The New York City Human

2     Resources Administration, HRA.

3          THE COURT:  And what did you do there?

4          PROSPECTIVE JUROR NO. 3:  I would say a clerk.

5          THE COURT:  And how long were you there?

6          PROSPECTIVE JUROR NO. 3:  Six years.

7          THE COURT:  Okay.  All right.  Spouse or partner?

8          PROSPECTIVE JUROR NO. 3:  My husband is an

9     electrician.  I have an 11 year-old.

10          THE COURT:  Not working yet, right?

11          PROSPECTIVE JUROR NO. 3:  No.

12          THE COURT:  Okay.

13          PROSPECTIVE JUROR NO. 3:  And my mom lives with us

14     and she's a home health aide.  The legal knowledge is just

15     based on my schooling.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR NO. 3:  The only relationship with

18     lawyers is my supervisor is a lawyer.

19          THE COURT:  Your current supervisor?

20          PROSPECTIVE JUROR NO. 3:  Yeah.

21          THE COURT:  That is the only person you know who's a

22     lawyer?

23          PROSPECTIVE JUROR NO. 3:  And that's another lawyer

24     in the office.

25          THE COURT:  Okay.  Could we go back one minute about

Jury Selection                                    96

1   your education, did you have a particular focus when you were

2   studying criminal justice?  I'm just wondering if there's a

3   specialty or some subcategory or subject you specialized in?

4          PROSPECTIVE JUROR NO. 3:  No.

5          THE COURT:  All right.

6          PROSPECTIVE JUROR NO. 3:  The jury service about six

7   years ago I was excused to be a juror.

8          THE COURT:  Where were you called for jury service?

9          PROSPECTIVE JUROR NO. 3:  The state.

10         THE COURT:  All right.

11         PROSPECTIVE JUROR NO. 3:  No involvement in

12  litigation and I really don't watch the news.  I try not to

13  watch news in regards to television.  I mostly watch YouTube

14  and watching people travel the world and eat food.  I'm not

15  really active on social media.  I have an Instagram and it's

16  probably three posts up.  Around I'm not related to any

17  organization or any memberships.

18         THE COURT:  Okay.  Thank you very much, Ms. Dawkins.

19  Next Juror No. 4, Ms. Chang?

20         PROSPECTIVE JUROR NO. 4:  For number one, I live in

21  Flushing, Queens for about twelve years.  Number 2, I have a

22  Bachelor/s degree in accounting.

23         THE COURT:  Okay.

24         PROSPECTIVE JUROR NO. 4:  Number three, no.  Number

25  four, I'm working at a shipping company for about nine years.

```
                        Jury Selection                    97

 1          THE COURT:  And what's the name of the company?
 2          PROSPECTIVE JUROR NO. 4:  It's called Future
 3   Maritime Group.
 4          THE COURT:  Future Maritime Group?
 5          PROSPECTIVE JUROR NO. 4:  Yes.
 6          THE COURT:  And so the record is clear, number three
 7   is no military service, right?
 8          PROSPECTIVE JUROR NO. 4:  Yes.
 9          THE COURT:  How long have you been at your current
10   job?
11          PROSPECTIVE JUROR NO. 4:  Nine years.
12          THE COURT:  Are you an accountant there?
13          PROSPECTIVE JUROR NO. 4:  No.
14          THE COURT:  What do you do?
15          PROSPECTIVE JUROR NO. 4:  Operator.
16          THE COURT:  So you help run the business?
17          PROSPECTIVE JUROR NO. 4:  A little bit.
18          THE COURT:  Do you operate a machine?
19          PROSPECTIVE JUROR NO. 4:  No, it's just deal with
20   the customers and the -- like, another company.
21          THE COURT:  Got it, okay.
22          PROSPECTIVE JUROR NO. 4:  Number five, yes, my
23   husband working in liquor store as a cashier.
24          THE COURT:  Go ahead.
25          PROSPECTIVE JUROR NO. 4:  I have one child.  He is
```

Jury Selection                                98

1   now seven years old.

2            THE COURT:  Definitely not working.  All right.

3            PROSPECTIVE JUROR NO. 4:  Also, my mom-in-law live

4   with us.

5            THE COURT:  Okay.  And does she work outside the

6   home?

7            PROSPECTIVE JUROR NO. 4:  No.  Number eight, no.

8            THE COURT:  I imagine your mother is babysitting

9   your seven year-old.  That's a real job.

10           PROSPECTIVE JUROR NO. 4:  Number nine, no, we didn't

11  have any family member who is a lawyer.

12           THE COURT:  Or any friends who are lawyers?

13           PROSPECTIVE JUROR NO. 4:  No.   Number ten, I think

14  it's about six years ago I served as a juror in the state.

15           THE COURT:  Criminal or civil?

16           PROSPECTIVE JUROR NO. 4:  It's civil.

17           THE COURT:  And were you and the other jurors able

18  to reach a verdict, without telling us what it was?

19           PROSPECTIVE JUROR NO. 4:  No.

20           THE COURT:  Do you know if it was declared a hung

21  jury or undecided, or did it settle before you were asked to

22  reach a verdict?  Do you remember?

23           PROSPECTIVE JUROR NO. 4:  No.

24           THE COURT:  But you don't recall reaching a verdict?

25           PROSPECTIVE JUROR NO. 4:  No.

1          THE COURT:  Okay.  Have you ever been involved in

2   litigation yourself?

3          PROSPECTIVE JUROR NO. 4:  No.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR NO. 4:  Number 12, news sources --

6   I don't watch any news.

7          THE COURT:  Do you watch any news?

8          PROSPECTIVE JUROR NO. 4:  No.

9          THE COURT:  Do you listen to anything or read

10  anything for news?

11         PROSPECTIVE JUROR NO. 4:  Just sometimes on the work

12  site.

13         THE COURT:  At the work site?

14         PROSPECTIVE JUROR NO. 4:  Yes.

15         THE COURT:  Do you have any particular source of

16  news that you use?

17         PROSPECTIVE JUROR NO. 4:  No.

18         THE COURT:  Okay.  All right.  Shows that you watch?

19         PROSPECTIVE JUROR NO. 4:  No.

20         THE COURT:  Nothing in particular?

21         PROSPECTIVE JUROR NO. 4:  No.

22         THE COURT:  Social media?

23         PROSPECTIVE JUROR NO. 4:  I just use the Facebook

24  sometimes.

25         THE COURT:  And what do you use it for?  Do you post

Jury Selection                                        100

1    any comments or do you just --

2              PROSPECTIVE JUROR NO. 4:  I just look at the

3    comments from my other friends.  I don't post anything.

4              THE COURT:  Organizational memberships?

5              PROSPECTIVE JUROR NO. 4:  I'm not a member of any

6    organization.

7              THE COURT:  Thank you very much, Ms. Chang.

8              Mr. Corbet, No. 5.

9              PROSPECTIVE JUROR NO. 5:  I live in Brooklyn, New

10   York for nine years.  Previous to that to that I was in the

11   State of Pennsylvania.  I have a Bachelor's degree in

12   economics, a master's degree in English and a Ph.D. in

13   rhetoric.  No military service.  I'm currently employed at the

14   City University of New York as a professor.  I have a domestic

15   partner.  They do not work outside of the home.

16             THE COURT:  Go back for a minute.  You're a

17   professor teaching what?

18             PROSPECTIVE JUROR NO. 5:  Writing.

19             THE COURT:  All right.

20             PROSPECTIVE JUROR NO. 5:  I have two children, 15

21   and 8, both in New York City public schools.  No other

22   employed adults in the household.  I have never practiced law

23   or anything like that.

24             THE COURT:  You never studied it along the way with

25   all of those degrees?

1          PROSPECTIVE JUROR NO. 5:  I did case studies, but

2     not doing the legal framework.

3          THE COURT:  Just criticizing the writing?

4          PROSPECTIVE JUROR NO. 5:  The rhetoric of law at

5     times, you know, the argumentation.

6          THE COURT:  It can be a little turgid, right?

7          PROSPECTIVE JUROR NO. 5:  A professor of rhetoric

8     and a lawyer have a bit in common.

9          THE COURT:  Sometimes.  Okay.  Go ahead.

10          PROSPECTIVE JUROR NO. 5:  Well, my most recent

11     ex-girlfriend was a lawyer, but other than that just a lot of

12     peripheral relationships.

13          THE COURT:  What kind of law did the ex practice, if

14     you remember?

15          PROSPECTIVE JUROR NO. 5:  IP law.

16          THE COURT:  Intellectual property?

17          PROSPECTIVE JUROR NO. 5:  Yes.

18          THE COURT:  The other lawyers?

19          PROSPECTIVE JUROR NO. 5:  Also IP and judges, but

20     that's in the periphery not in New York.  I have actually

21     never served on a jury.

22          THE COURT:  Or a grand jury?

23          PROSPECTIVE JUROR NO. 5:  Or a grand jury although I

24     was excused from grand jury service about four years ago in

25     Kings County.  I have a lot of class action lawsuit

Jury Selection                         102

1  participation; hey, you ate tainted tuna, do you want two free

2  cans, that kind of thing.

3           THE COURT:  Okay.

4           PROSPECTIVE JUROR NO. 5:  News.  I subscribe to the

5  Wall Street Journal and the New York Times.  The Washington

6  Post I cancelled that.  CNN, Fox News, MSNBC.  I'm embarrassed

7  but also the New York Post and the New York Daily News.  TV

8  shows I try to avoid but my partner is a vast consumer.  So I

9  do watch by periphery.  No radio.  Just, you know, occasional

10 online magazines that show up in my news feed websites.  I

11 guess Reddit, community blogs.  Television -- you know,

12 whatever series, you know, Bridgerton or she wants to line up,

13 I will sit in with.

14          THE COURT:  Okay.

15          PROSPECTIVE JUROR NO. 5:  I find actually courtroom

16 and law procedurals to be really insufferable, but I'm

17 familiar with the Law and Order universe.

18          THE COURT:  The mega universe?

19          PROSPECTIVE JUROR NO. 5:  Yes, mega universe.

20          Social media, I guess Facebook, Instagram, LinkedIn,

21 Discord, and Reddit.  As far as organizational memberships,

22 just a few professional organizations that I have to be a part

23 of.

24          THE COURT:  Do you do any posting on social media?

25          PROSPECTIVE JUROR NO. 5:  Rarely, but I am working

1  with Brick Media to develop a podcast.

2            THE COURT:  About?

3            PROSPECTIVE JUROR NO. 5:  Essentially helping my

4  students a few years later advance their careers, wrangle

5  through complex decisionmaking processes.

6            THE COURT:  And then one question for you about

7  grand jury.  You said you were excused from it?

8            PROSPECTIVE JUROR NO. 5:  Yes.

9            THE COURT:  Why was it, if you know, that you were

10  excused from it?

11            PROSPECTIVE JUROR NO. 5:  I was going through a

12  difficult marital separation at the time.

13            THE COURT:  Thank you very much.

14            Juror No. 6, Mr. Kresowaty.

15            PROSPECTIVE JUROR NO. 6:  Yes, that's correct.

16            Residency is in Queens.  I've been there all of my

17  life.  Education, I have a Master's of Art in urban studies.

18  Military service I served in the United States Navy along with

19  the Reserves for six years.  Employment, I'm retired, but I

20  worked for the New York State Department of Health, the Office

21  of Professional Medical Conduct as a senior medical conduct

22  investigator.  Spouse/partner, I don't have any.  Children,

23  none.  There are employed adults in the household, none.

24  Legal knowledge, just from studies and that's it.

25            THE COURT:  When you say studies, was there a

1   particular area that you studied?

2           PROSPECTIVE JUROR NO. 6:  Basically introductory to

3   law in college.

4           THE COURT:  Okay.

5           PROSPECTIVE JUROR NO. 6:  Relationships with

6   lawyers, my brother was an administrative judge with the New

7   York State Department of Social Services.  He's retired also.

8           THE COURT:  All right.

9           PROSPECTIVE JUROR NO. 6:  Jury service, I was

10  involved with a civil case.  I was going to be a juror, but

11  they settled before the trial.

12          THE COURT:  All right.

13          PROSPECTIVE JUROR NO. 6:  Involvement in litigation,

14  none.  My news sources are from New York 1, watching YouTube

15  and Channel 7, et cetera.  Television cable streaming

16  services, basically YouTube.  That's it.  I don't watch

17  courtroom drama or anything like that.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR NO. 6:  Social media, Facebook.

20  My family members are on there so occasionally I comment.

21  That's it.  Organizational memberships, none.

22          THE COURT:  Thank you, Mr. Kresowaty.

23          PROSPECTIVE JUROR NO. 6:  Thank you.

24          THE COURT:  Next, Juror No. 7, Mr. Chen.

25          PROSPECTIVE JUROR NO. 7:  I recently moved from

Jury Selection                                105

1   Nassau County and I do have a two-year college Associate

2   Degree and I'm working with CPI doing mobile engineering and

3   my wife is a house maker and I have one son, four years old.

4            THE COURT:  So you have a wife, but she does not

5   work outside the home?

6            PROSPECTIVE JUROR NO. 7:  Yes.

7            THE COURT:  And she takes care of your four year-old

8   son?

9            PROSPECTIVE JUROR NO. 7:  Yes.

10           THE COURT:  Other adults you live with?

11           PROSPECTIVE JUROR NO. 7:  No.

12           THE COURT:  Go ahead.

13           PROSPECTIVE JUROR NO. 7:  I don't practice any law

14  or class and I don't have any member or friends that is

15  lawyer.  And I don't do jury service in the past.

16           THE COURT:  No grand jury either?

17           PROSPECTIVE JUROR NO. 7:  No.  I do have a lawsuit

18  about a car accident.

19           THE COURT:  Were you --

20           PROSPECTIVE JUROR NO. 7:  I'm one of the parties.

21           THE COURT:  Are you a plaintiff or defendant?

22           PROSPECTIVE JUROR NO. 7:  Plaintiff.

23           THE COURT:  Have you had to go to court for that?

24           PROSPECTIVE JUROR NO. 7:  Not yet.

25           THE COURT:  Do you have a lawyer that's representing

SN      OCR      RPR

1    you in that car accident case?

2              PROSPECTIVE JUROR NO. 7:  Yes.

3              THE COURT:  One last question, do you know if that's

4    happening in --

5              PROSPECTIVE JUROR NO. 7:  Two months ago.

6              THE COURT:  But in Brooklyn or --

7              PROSPECTIVE JUROR NO. 7:  In Garden City.

8              THE COURT:  All right.

9              PROSPECTIVE JUROR NO. 7:  I don't watch much TV and

10   I listen to the radio on the road and not much television and

11   I do use WeChat a Chinese app for news and I don't have any

12   organizational membership.

13             THE COURT:  All right.  Thank you very much

14   Mr. Chen.  Pass the microphone to the back row to Juror No. 8,

15   Mr. Price.

16             PROSPECTIVE JUROR NO. 8:  Yes, I live in Brooklyn

17   all of my life.  59 years.  Education, I have an Associate's

18   degree in computer science and local area networking.  No

19   military service.  Currently employed with New York City

20   Transit as a train operator for nine years.  No spouse.  I

21   have three children.  My oldest December is 24, my son.  He

22   works at Costco doing stock and I have two younger daughters

23   as well, 13 and -- 15 and 9, sorry.

24             THE COURT:  Could we go back for one minute to your

25   employment?  Before Transit did you work somewhere else?

1          PROSPECTIVE JUROR NO. 8:  Before Transit I worked

2     for the New York City Veteran's Home in St. Albans.

3          THE COURT:  What did you do there?

4          PROSPECTIVE JUROR NO. 8:  I was a supervisor for the

5     supply clerks.

6          THE COURT:  All right.  Do you live with any other

7     assaults, number seven?

8          PROSPECTIVE JUROR NO. 8:  No.

9          THE COURT:  Okay.

10         PROSPECTIVE JUROR NO. 8:  My legal knowledge is just

11    Law and Order on TV.  No relationship with lawyers.  I did

12    jury duty seven or eight years ago, but it was a civil case

13    and they settled out of court so we didn't get to do anything.

14    No involvement in litigation.  News, I watch the news

15    sometimes, Channel 7, Channel 4.  Television, every now and

16    then, you know, a good movie.  Beats was pretty good.  I just

17    watched that the other day.

18         THE COURT:  You can get that online?

19         PROSPECTIVE JUROR NO. 8:  Yes, Fire Stick.

20         THE COURT:  Okay.

21         PROSPECTIVE JUROR NO. 8:  Social media, I do

22    Facebook and Instagram now and then.  I don't post too much

23    unless it's somebody's birthday and I'm not a member of any

24    organizational membership.

25         THE COURT:  Thank you, Mr. Price.

1          Juror No. 9, Ms. Ramos.

2          PROSPECTIVE JUROR NO. 9:  I live in Sunnyside

3   Queens.  I've lived there my whole life.  I have my

4   Associate's in business administration.  No military service.

5   I have been working for my father's company for about ten

6   years.  I'm a secretary.

7          THE COURT:  What kind of a company is it?

8          PROSPECTIVE JUROR NO. 9:  It's a moving company.

9          THE COURT:  All right.

10          PROSPECTIVE JUROR NO. 9:  No spouse, no children.  I

11   live with my parents.  My mother doesn't work outside the

12   home.  My father obviously works for his own company.  No

13   legal knowledge.  No relationship to lawyers and I have not

14   served on a jury nor grand jury.  No litigations.  I watch the

15   news sometimes, Channel 7, and sometimes -- if I watch

16   anything it's mostly true crime documentaries.  For social

17   media, it's Twitter or Instagram but I don't post.  I just

18   browse and I'm not part of any organizations.

19          THE COURT:  Thank you very much.  Efficiently done,

20   Ms. Ramos.

21          Number 10, Mr. Hess?

22          PROSPECTIVE JUROR NO. 10:  I live in Woodside,

23   Queens for three years.  Before that Brooklyn for three years

24   and before that Manhattan for six years.  Education, I have a

25   business and politics bachelor degrees.  No military service

1  although my girlfriend is a military widow.  Employment, I run

2  a small retail business as well as a coaching business as

3  well.

4          THE COURT:  What kind of retail business?

5          PROSPECTIVE JUROR NO. 10:  Hockey and figure stating

6  equipment.

7          THE COURT:  And the coaching?

8          PROSPECTIVE JUROR NO. 10:  Also hockey and figure

9  skating.  No children, no spouse, although I do live with my

10  girlfriend.

11          THE COURT:  Back to your employment how long have

12  you been in the retail and coaching business?

13          PROSPECTIVE JUROR NO. 10:  I've been doing the

14  retail for about twelve years now.  Coaching I've been doing

15  since I was 18, somewhere around there.  No children.

16  Obviously live with the girlfriend at home.  Legal knowledge,

17  I took the LSAT a few times when I was younger but decided

18  against law school.  I did not want the loans.

19          THE COURT:  Understandable.

20          PROSPECTIVE JUROR NO. 10:  The relationship to

21  lawyers, I do have a couple of friends who are lawyers.  One

22  is in patent law.  The other one just started so he's a paper

23  pusher.  I don't know what he does specifically.

24          THE COURT:  What paper does he push?

25          PROSPECTIVE JUROR NO. 10:  I don't know.  He doesn't

1   go into detail.  More often they complain about what they're

2   doing more than anything.  Jury service I have not.  Involved

3   in litigation, no.  News sources, I try not to keep it to one

4   particular -- it's you know, the BBC, CNN, Fox, usually try to

5   get as many different sides of things as possible.  Television

6   and streaming services, you know, Netflix.  My girlfriend

7   loves Asian dramas, so lots of those.  Just got done watching

8   Better Call Saul which is also good.

9           Social media, not a whole lot outside of just

10  business aspects.  Facebook, you know, Instagram and that type

11  of thing, but not really personal usually and the only

12  organizational memberships are usually coaching-involved

13  organizations.

14          THE COURT:  To go back for a minute, you may have

15  said this does your girlfriend work outside of the home?

16          PROSPECTIVE JUROR NO. 10:  She's basically a figure

17  coach as well.  She handled the figure side and I handle the

18  hockey side.

19          THE COURT:  Okay.  Juror No. 11 Ms. Ferrer?

20          PROSPECTIVE JUROR NO. 11:  I live in Staten Island

21  for 25 years.  A high school graduate.  No military service.

22  I am currently employed for a dialysis clinic in Staten

23  Island.  No spouse.

24          THE COURT:  Go back for a minute.  How long have you

25  been at the dialysis clinic?

1          PROSPECTIVE JUROR NO. 11:  Almost a year.  About to

2    be a year in a few days.

3          THE COURT:  What do you do there?

4          PROSPECTIVE JUROR NO. 11:  Admissions coordinator.

5          THE COURT:  Before that?

6          PROSPECTIVE JUROR NO. 11:  I worked at LabQuest as a

7    lab tech.

8          THE COURT:  Spouse or partner?

9          PROSPECTIVE JUROR NO. 11:  No spouse or children.  I

10   live with my mother and aunt.  They're both retired.

11         THE COURT:  What did they do before they retired

12   if --

13         PROSPECTIVE JUROR NO. 11:  My aunt was a nurse and

14   my mother was a dialysis technician.  I have no legal

15   knowledge.  No relationships with lawyers.  I never served on

16   a jury or grand jury.  No involvement in litigation.  I don't

17   really watch the news.  I don't have cable.  I have Netflix,

18   Hulu, the same as everybody else.  Social media, Facebook,

19   Instagram, mostly keep in touch with family in the Philippines

20   and no organizational membership.

21         THE COURT:  Go back for a minute to Netflix or Hulu.

22   Do you watch any particular shows?

23         PROSPECTIVE JUROR NO. 11:  Whatever is trending.

24   Right now Dahmer.

25         THE COURT:  Dahmer?

Jury Selection                    112

1        PROSPECTIVE JUROR NO. 11:  Yes.

2        THE COURT:  Thank you very much, Juror No. 11.

3        Juror No. 12, Mr. Roopnauth.

4        Just in case you're wondering about the timeline in

5   general.  We need to get this set of questions with everyone

6   else on that side of the room and we'll be close to being done

7   after that.

8        PROSPECTIVE JUROR NO. 12:  I live in Nassau for two

9   years.

10       THE COURT:  We have a court reporter who is

11   transcribing every word that's being said.  So go slower and

12   speak louder.

13       PROSPECTIVE JUROR NO. 12:  Hempstead, Nassau.

14   Before that Queens, Queens, New York.  Richmond Hill for 17

15   years.  Education go ahead, no military.  Employment, New York

16   Presbyterian for 11 years.

17       THE COURT:  What do you do?

18       PROSPECTIVE JUROR NO. 12:  I work in the linen

19   department.

20       THE COURT:  The linen -- got it.

21       PROSPECTIVE JUROR NO. 12:  My spouse works at Mount

22   Sinai for eight years as a tech in the CAT lab.

23       THE COURT:  C-A-T?

24       PROSPECTIVE JUROR NO. 12:  Yes.  Children, three

25   kids, two sons, one daughter, 18, 26, 27.

Jury Selection                          113

1          THE COURT:  Do they work outside the home?

2          PROSPECTIVE JUROR NO. 12:  Yes, my daughter also

3    works at New York Presbyterian in the OR department admitting

4    and discharge.  My son works at Mount Sinai also.  He's an

5    electrical engineer there.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR NO. 12:  Number seven, no other

8    employ, no.  No other adults who work outside the home.  No

9    jury service for number ten.  Number eleven, no involvement in

10   legal.  Number 12, I don't watch news.  I don't like the news.

11   13, television, I have Netflix and Prime.

12         THE COURT:  Are there shows you watch regularly?

13         PROSPECTIVE JUROR NO. 12:  Just basically movies.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR NO. 12:  No social media, just

16   Facebook basically just to keep in touch with family and

17   friends.  No organization membership;

18         THE COURT:  Thank you very much Mr. Roopnauth.

19         Number 13, Mr. Dean.

20         PROSPECTIVE JUROR NO. 13:  I live in Nassau County

21   for the last 30 years.  Education, BS in economics.  No

22   military service.  Currently self-employed, real estate

23   broker.

24         THE COURT:  How long have you been doing that?

25         PROSPECTIVE JUROR NO. 13:  The last 20 years.

SN      OCR      RPR

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR NO. 13:  Married.  My wife does

3     not work outside of the house.  Three children; 28, 24 and 23.

4     They all -- one works from the house, but they all work

5     outside of the house.

6          THE COURT:  And what do they do?

7          PROSPECTIVE JUROR NO. 13:  One works for Deloitte on

8     the consulting side and the other is an accountant and the

9     other works in the travel business, the travel industry.

10          THE COURT:  All right.

11          PROSPECTIVE JUROR NO. 13:  No other employed adults

12     in the household.  No legal knowledge.  My father was an

13     attorney, but he's long since passed.

14          THE COURT:  What kind of law did he practice?

15          PROSPECTIVE JUROR NO. 13:  Corporate.  Jury service,

16     twelve years ago, state criminal case and we did reach a

17     verdict.  Not involved in any litigation.  News, Fox, network

18     news.  Television, I don't watch too much shows, occasionally

19     Blue Bloods.  I am not on social media and I'm a member of a

20     CIBS, Commercial Industrial Brokerage Society.

21          THE COURT:  Thank you very much, Mr. Dean.

22          Juror No. 14, Ms. Nzirubusa?

23          PROSPECTIVE JUROR NO. 14:  I live in Queens for the

24     last twelve years.  I have a Bachelor's degree in nursing.  No

25     military service.  I'm employed by the Department of Health of

1   New York City for the last five years.  Previous to that, I

2   was at New York Presbyterian and previous to that was the

3   Department of Health again.

4           THE COURT:  And what do you do for the Department of

5   Health?

6           PROSPECTIVE JUROR NO. 14:  I'm a supervisor for a

7   program that the Department of Health runs.

8           THE COURT:  And what does the program do?

9           PROSPECTIVE JUROR NO. 14:  We work with first time

10  moms, pregnant moms, to give them support through the

11  pregnancy until the baby turns two.

12          THE COURT:  Spouse or partner?

13          PROSPECTIVE JUROR NO. 14:  My husband is employed.

14  He's an economist.  He works for a major financial institution

15  as a manager.

16          THE COURT:  Which one?

17          PROSPECTIVE JUROR NO. 14:  J.P. Morgan.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR NO. 14:  Children, I have two,

20  both of them in college.  One is studying history and labor

21  law and the other one is undecided on what he wants to do.  He

22  just started first year.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR NO. 14:  No one else in my

25  household and no legal knowledge.  Relationship with lawyers,

1   my brother is a lawyer that doesn't practice, but he lives

2   overseas.

3            THE COURT:  I see, okay.

4            PROSPECTIVE JUROR NO. 14:  Never have a chance to do

5   jury service.  No involvement in litigation.  News, NPR and

6   network news.  That's basically it.  Streaming services, I

7   think we have all of them at home.  I don't watch it, but my

8   kids do.

9            THE COURT:  No shows?

10           PROSPECTIVE JUROR NO. 14:  Just like Bachelorette.

11  Nothing good.  Social media, I have Facebook, Twitter and

12  Instagram, but they're inactive.  My kids they handle that.

13  Organizational membership, none.

14           THE COURT:  Okay.  Thank you very much

15  Ms. Nzirubusa.

16           Let's go now to 15, Ms. Parola?

17           PROSPECTIVE JUROR NO. 15:  I currently live in

18  Brooklyn.  I've been living in Brooklyn for about four years.

19  Previously I was in Queens for two years.  I have a BFA in

20  dance.  No military service.  I am currently a freelance

21  dancer and I also work at a climbing gym and at a brewery.  My

22  partner is a climbing coach and a personal trainer.  We have

23  no children and no other employed adults in the home.  No

24  legal knowledge or formal training there.  No relationships

25  with lawyers.  No jury service of any kind or involvement in

1   litigation.  News, I predominantly consume that through NPR

2   and Crooked Media podcasts as well as New York Times.  I watch

3   very little television.  Social media, Instagram for the most

4   part and no organizational membership.

5           THE COURT:  Thank you very much Ms. Parola.  Very

6   efficient as well.

7           Ms. Mattina, 16?

8           PROSPECTIVE JUROR NO. 16:  I currently live in

9   Queens for the last six years.  Prior to that, I lived in

10  Brooklyn for 30 years.  I have a high school diploma.  No

11  military service.  I'm currently employed by a grocery chain

12  for the last three and a half years.  Prior to that, I worked

13  40 years at various brokerage firms.

14          THE COURT:  And what do you do now for the grocery

15  store?

16          PROSPECTIVE JUROR NO. 16:  Stock shelves and

17  register basically.

18          THE COURT:  And, before, what did you do for

19  brokerage firms?

20          PROSPECTIVE JUROR NO. 16:  I dealt with dividends

21  and income disbursement and corporate actions.

22          THE COURT:  All right.  Spouse or partner?

23          PROSPECTIVE JUROR NO. 16:  Excuse me?

24          THE COURT:  Do you have a spouse or partner?

25          PROSPECTIVE JUROR NO. 16:  Legally I have a partner

1    but we haven't lived to go for eight years, but he's currently

2    retired.

3              THE COURT:  What did he do before retirement?

4              PROSPECTIVE JUROR NO. 16:  He worked for Accounts

5    receivable for a law firm.

6              THE COURT:  Which one?

7              PROSPECTIVE JUROR NO. 16:  Milbank, Tweed.

8              THE COURT:  I've heard of it.

9              PROSPECTIVE JUROR NO. 16:  We have a child.  He's

10   33.  He's currently an adjunct with SUNY.

11             THE COURT:  What does he teach?

12             PROSPECTIVE JUROR NO. 16:  Classic literature and

13   writing.  No other employed adults.  No legal knowledge.  My

14   first cousin's husband is a lawyer.  He's retired right now

15   and last I knew he worked for the commodity exchange and an

16   ex-brother-in-law, he's also retired.  He was a defense

17   attorney.

18             THE COURT:  And where was he a defense attorney?

19             PROSPECTIVE JUROR NO. 16:  Up in Peakskill, New

20   York.

21             THE COURT:  All right.

22             PROSPECTIVE JUROR NO. 16:  Jury service, I was

23   second alternate in a federal case in this building about 30

24   years ago.

25             THE COURT:  Wow.

Jury Selection                          119

1         PROSPECTIVE JUROR NO. 16:  I wasn't involved in

2    deliberations.  I was excused.  As I mentioned prior, there

3    was two litigations one I mentioned where the attorney

4    embezzled the funds.

5         THE COURT:  Right.

6         PROSPECTIVE JUROR NO. 16:  And currently I'm in

7    litigation for a car accident in January.

8         THE COURT:  Where is that being litigated?

9         PROSPECTIVE JUROR NO. 16:  Nassau County, I believe.

10        THE COURT:  You were the plaintiff or the defendant?

11        PROSPECTIVE JUROR NO. 16:  I was the victim.

12        THE COURT:  Okay.

13        PROSPECTIVE JUROR NO. 16:  News, I just peruse,

14   like, the New York Post, just for breaking news.  That's

15   basically it.  Television, I prefer British shows, mysteries

16   and comedies.  I have Facebook.  I don't participate too much.

17   It's more of a watchdog, stay in touch.  I belong to a

18   wonderful Golden Age Club at my neighborhood church.

19        THE COURT:  Terrific.  Thank you very much

20   Ms. Mattina.

21        Next we have Ms. Yepez.

22        PROSPECTIVE JUROR NO. 17:  I live in Astoria, Queens

23   for more than 20 years.  Education, high school.  No military.

24   I'm employed by the DOE.  I'm a school lunch helper a/k/a

25   lunch lady.

SN        OCR        RPR

1          THE COURT:  And DOE, Department of Education?

2          PROSPECTIVE JUROR NO. 17:  Yes.

3          THE COURT:  How long have you been doing that?

4          PROSPECTIVE JUROR NO. 17:  Eight years.  I'm not

5     married.  I don't have children.  I live with my mother who is

6     not employed and I don't really know much about legal stuff.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR NO. 17:  No relationships with a

9     lawyer or anything like that.  I have done jury duty, but I've

10    never been picked as a juror.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR NO. 17:  Litigation, when I was

13    small, seven or eight, there was a car accident my parents

14    sued and they got money and that's about it that I remember.

15         THE COURT:  Okay.

16         PROSPECTIVE JUROR NO. 17:  News, I watch New York 1

17    that's about it.  Television, Netflix, Google, Hulu and I

18    watch It's Always Sunny, Witcher and the Goblin.  Social

19    media, I have a Facebook but I haven't used it in years.

20    Instagram, I like to look at the travel posts and I do not

21    belong to any organizations.

22         THE COURT:  Thank you Ms. Yepez.

23         Juror 18, Ms. Cipriano.

24         PROSPECTIVE JUROR NO. 18:  I've lived in Staten

25    Island, New York for over 25 years.  I went to business school

Jury Selection                          121

1    for about ten months.  I have no military service.  I

2    currently work for Skadden Arps.

3             THE COURT:  What do you do there?

4             PROSPECTIVE JUROR NO. 18:  I work for -- I'm

5    administrative assistant.

6             THE COURT:  How long?

7             PROSPECTIVE JUROR NO. 18:  20 years.

8             THE COURT:  You said that.  Go ahead.

9             PROSPECTIVE JUROR NO. 18:  My husband, he works for

10   Mercedes Benz in Brooklyn as an auto mechanic.  I have three

11   children, a set of twins, 14, boys, and a nine year-old little

12   girl.  Okay.  No other adults in the household.  Legal

13   knowledge I just work with lawyers.  Relationship to lawyers,

14   my bosses.

15            THE COURT:  And, so, are you in a particular section

16   or department?

17            PROSPECTIVE JUROR NO. 18:  I work for the white

18   collar crime in the office of general counsel.

19            THE COURT:  Are there particular lawyers you work

20   with regularly?

21            PROSPECTIVE JUROR NO. 18:  Both.

22            THE COURT:  What are their names?

23            PROSPECTIVE JUROR NO. 18:  I have for office of

24   general counsel I work for Larry Spiegel.  He's a partner in

25   white collar and also for Office of General Counsel, I work

Jury Selection                                    122

1   for counsels -- I work for counsels -- for white collar I work

2   for Chad Silverman and a few others.

3             THE COURT:  Do you get involved much in the

4   substance of what they're doing or what do you do exactly for

5   them?

6             PROSPECTIVE JUROR NO. 18:  More administrative, you

7   know.

8             THE COURT:  So what would be an example of something

9   you would handle?

10            PROSPECTIVE JUROR NO. 18:  Travel, expenses,

11  sometimes document work.  It depends on the day.

12            THE COURT:  Do you talk to them much about the kinds

13  of cases they're working on?

14            PROSPECTIVE JUROR NO. 18:  There are days that we

15  talk, there are days that= -- you know, they're always so

16  busy -- yeah.

17            THE COURT:  Something that I mentioned to others

18  before, but I'm going to instruct the jurors on the law.

19  Would you have any difficulty following the law as I instruct

20  you and put out of your mind anything you might have heard

21  about at your job?

22            PROSPECTIVE JUROR NO. 18:  I don't think so.

23            THE COURT:  Can you --

24            PROSPECTIVE JUROR NO. 18:  Can I speak to you in

25  private for one second?

1          THE COURT:  Sure, come on up.

2          (Sidebar held outside of the hearing of the jury.)

3          (Continued on next page.)

Jury Selection                           124

1           (The following sidebar took place outside the

2    hearing of the jury.)

3           PROSPECTIVE JUROR NO. 18:  I'm sorry, I didn't

4    mention it before, but my white collar crime was involved in

5    the Michael Nowak versus the US Government in Chicago.  So it

6    was about a month ago.

7           THE COURT:  Okay.

8           PROSPECTIVE JUROR NO. 18:  So I'm not sure if it has

9    any --

10          THE COURT:  Anything to do with this?

11          PROSPECTIVE JUROR NO. 18:  Right.

12          THE COURT:  No, but more importantly since you work

13   in a white collar unit it's important that you feel you can

14   put out of your mind any of the stuff you know about the law,

15   this area of the law, in assessing the facts of this case and

16   applying the law as I instruct you.  Do you think you could do

17   that?

18          PROSPECTIVE JUROR NO. 18:  That should be okay.

19          THE COURT:  And there's no connection to that Nowak

20   case?

21          PROSPECTIVE JUROR NO. 18:  And also I just lost my

22   dad seven days ago so I don't know if I would be handling

23   things very well.  We just buried him on Thursday, so I don't

24   know if I'm fully --

25          THE COURT:  Do you have concerns about your ability

SN        OCR        RPR

1    to focus right now?

2           PROSPECTIVE JUROR NO. 18:  Right now it's all

3    emotional right now, between my kids and my mom who's by

4    herself right now.  My apologies for not saying it before.

5           THE COURT:  I am so sorry, but I want to be sure

6    that you feel you can be here and focused on this case because

7    it does require your attention while you're here do you feel

8    you can do that?

9           PROSPECTIVE JUROR NO. 18:  I don't know that.  Every

10   day is a different story right now.

11          THE COURT:  Step away for one sec.

12          (Juror leaves sidebar.)

13          MS. KASSNER:  The Government would move to strike

14   her for cause.  I think there's a concern she might not be

15   able to focus on the trial given everything that she's going

16   through.

17          MR. SINGER:  I'm not sure it's a cause challenge,

18   but on a human basis I would say let her go.

19          THE COURT:  I am going to let her go.  She does seem

20   to be upset, understandably.

21          (Juror approaches.)

22          THE COURT:  So just go down to the Jury Department.

23          I am sorry for your loss.

24          (Continued on the following page.)

25

1          THE COURTROOM DEPUTY:  Juror 40 replacing Juror 18,

2     Eugenia Stapor.

3          THE COURT:  So Ms. Stapor, before you take a seat is

4     there anything that you want to talk about?

5          THE PROSPECTIVE JUROR:  Can I talk to you for a

6     second?

7          THE COURT:  Yeah.  Come up to the sidebar.

8                    (Sidebar)

9          THE PROSPECTIVE JUROR:  Okay.  My English isn't

10    perfect enough to take any decisions.  I don't want to be

11    confused because of the language is like not for me.

12         THE COURT:  Okay.  Have you understood everything

13    that's been said so far?

14         THE PROSPECTIVE JUROR:  Not much.

15         THE COURT:  Okay.  What's your country of origin?

16         THE PROSPECTIVE JUROR:  I am from Poland.

17         THE COURT:  How long have you lived here?

18         THE PROSPECTIVE JUROR:  Fifteen years.

19         THE COURT:  Have you worked outside?

20         THE PROSPECTIVE JUROR:  No, I am in house.

21         THE COURT:  Do you have much occasion to use English

22    during the day?

23         THE PROSPECTIVE JUROR:  Not much.  So I am not sure

24    what it do because I don't want to be confused and I don't

25    want to make decisions without knowing what's going on.

1           THE COURT:  Do you remember what I said when I
2   described this case?  What it's about?
3           THE PROSPECTIVE JUROR:  Yes, I remember.
4           THE COURT:  What do you recall me saying?
5           THE PROSPECTIVE JUROR:  Something about financial
6   stuff.
7           THE COURT:  Okay.
8           THE PROSPECTIVE JUROR:  About crypto stuff.
9           THE COURT:  And have you understood some of the
10  answers that people have been giving?
11          THE PROSPECTIVE JUROR:  Some of them, but not all of
12  them.
13          THE COURT:  Okay.  Before you came here, did you
14  study English?
15          THE PROSPECTIVE JUROR:  No, never.
16          THE COURT:  Okay.  So you learned once you got here?
17          THE PROSPECTIVE JUROR:  Yes.
18          THE COURT:  And are you married?
19          THE PROSPECTIVE JUROR:  Yes, I am married.
20          THE COURT:  To an American citizen?
21          THE PROSPECTIVE JUROR:  No.  My husband is Polish.
22          THE COURT:  I see.
23          THE COURT:  Does he speak English?
24          THE PROSPECTIVE JUROR:  Not at all.
25          THE COURT:  So you don't use English in the house?

```
                         Jury Selection                    128
```

 1          THE PROSPECTIVE JUROR:  No.  Only my children speak

 2  English.

 3          THE COURT:  How old is your children?

 4          THE PROSPECTIVE JUROR:  My daughter is 23 and my son

 5  is 20.

 6          THE COURT:  They've been here for 17 years also?

 7          THE PROSPECTIVE JUROR:  Yes.

 8          THE COURT:  And they are fluent in English?

 9          THE PROSPECTIVE JUROR:  Of course.

10          THE COURT:  Let me have you take a step to the side

11  for a moment.

12          THE PROSPECTIVE JUROR:  Yeah.  Sure.

13          THE COURT:  I mean, it's hard for me to say, folks,

14  she seemed to have no problem understanding me right now and

15  she has two children who she raised here, who she's been

16  speaking English with, but her husband doesn't speak English

17  and doesn't work outside of the home.

18          MR. SINGER:  My concern is that she doesn't feel

19  she's understanding.

20          THE COURT:  And is a somewhat complicated case in

21  certain ways, so I'm inclined to let her go.

22          MR. SINGER:  I agree.

23          MS. KASSNER:  Thank you.

24          THE COURT:  Thank you.

25          Just go to the jury department and explain to them

1    that you have some language issue.

2              THE PROSPECTIVE JUROR:  Okay.

3              THE COURT:  All right.  Thank you.

4              THE PROSPECTIVE JUROR:  Thank you.

5                        (Sidebar ends)

6              THE COURTROOM DEPUTY:  Juror 41, Mohamed Ameela

7    replacing Juror 18.

8              THE COURT:  Do you have any positive responses to

9    anything that was asked during the first round of questions?

10             THE PROSPECTIVE JUROR:  No, Your Honor.

11             Your Honor, I am currently employed by the New

12   York State Unified System and I work with the Deputy Chief

13   Administrative Judge.

14             THE COURT:  Okay.  Let's have you come up to the

15   sidebar for one second.

16                        (Sidebar)

17             THE COURT:  So you work for the administrative law

18   judges?

19             THE PROSPECTIVE JUROR:  She's the Deputy Chief

20   Administrative Judge for New York State for Access of Justice.

21             THE COURT:  How interesting.

22             THE PROSPECTIVE JUROR:  Yeah.

23             THE COURT:  I must confess, I don't know that much

24   about the State structure.

25             What is your job?

1          THE PROSPECTIVE JUROR:  I am an admin assistant and
2    I work directly with one of the attorneys.  We train newly
3    admitted attorneys, consumer debt training.  We have a
4    consumer debt, family law --
5          THE COURT:  So what subjects do your courts cover?
6          THE PROSPECTIVE JUROR:  Well, the department that we
7    are in, they cover family.  Right now, because it's COVID,
8    some of the programs are suspended.  Family law, housing,
9    consumer debt, and then we have consumer debt lawyers for the
10   day training.  They represent litigants who just -- they
11   represent litigants just for the day.  Just for that program.
12         THE COURT:  Okay.  Now, you obviously have extensive
13   knowledge about the court system in general, right?
14         THE PROSPECTIVE JUROR:  Yes, some.  Yeah.
15         THE COURT:  Bottom line, can you be fair and
16   impartial in this case despite the fact that you have a lot of
17   familiarity with courts and administrative proceedings?
18         THE PROSPECTIVE JUROR:  Yes, I can.
19         THE COURT:  It's okay, that you especially, and I
20   hope you appreciate this, have to judge this case based solely
21   on the evidence that's put forth during the trial and nothing
22   else.
23         THE PROSPECTIVE JUROR:  Yes.
24         THE COURT:  And the law, as I instruct it to you --
25         THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Can you do that as well.

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And you can put out of your mind

4    whatever else you may see in your normal work life and base

5    your verdict solely on what happens here?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  You can do that?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Terrific.

10          Any other responsibilities?

11          THE PROSPECTIVE JUROR:  No.

12          THE COURT:  Thank you.

13          THE PROSPECTIVE JUROR:  Thank you.

14          THE COURT:  So Juror Number 18, you get to answer

15    the question that the others have, as well.

16          So Ms. Mohammed, I know you haven't had a chance to

17    look at the questionnaire yet, so take you're time.

18          Starting with question number one, what borough or

19    town do you live in currently?

20          THE PROSPECTIVE JUROR:  I live in Queens, New York.

21          THE COURT:  How long?

22          THE PROSPECTIVE JUROR:  For 18 years.

23          THE COURT:  Okay.  Formal education.

24          THE PROSPECTIVE JUROR:  Associate's degree in

25    computer science.  No military service.  I'm currently

1   employed with the New York State Unified Court System for

2   18 years.  I have a spouse.  He is a sales associate.

3              THE COURT:  Go a little slower.

4              Do you have the microphone there?  Just make sure

5   you get close to it.

6              And as you know, we have a court reporter here

7   transcribing everything, so go a tad slower.

8              Your spouse works as a sale associates?

9              THE PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Where?

11             THE PROSPECTIVE JUROR:  P.C. Richards.

12             THE COURT:  How long?

13             THE PROSPECTIVE JUROR:  Six years.

14             THE COURT:  Okay.  Children?

15             THE PROSPECTIVE JUROR:  Yes.  I do have a

16   23-year-old son, 18-year-old daughter, and a 13-year-old

17   daughter.

18             My son works for Jet Blue as a aircraft technician.

19   My 18 year old is at Pace University, and the 13 year old is

20   in middle school.

21             THE COURT:  Do you have live with any other adults

22   besides --

23             THE PROSPECTIVE JUROR:  No.

24             Legal knowledge, I have some because I work for the

25   courts.

1          THE COURT:  Okay.  Did you ever study it independent

2  of your work?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  Relationships with lawyers?

5          THE PROSPECTIVE JUROR:  I have some lawyer friends,

6  yes.

7          THE COURT:  Okay.  Outside of your work, do you have

8  any other friends or family who are lawyers?

9          THE PROSPECTIVE JUROR:  I have an ex-judge.

10          THE COURT:  Okay.  Where did that judge sit?

11          THE PROSPECTIVE JUROR:  She's no longer a judge at

12  the court, but she's a -- she works at Hofstra.

13          THE COURT:  Does she teach?

14          THE PROSPECTIVE JUROR:  She teaches law.

15          THE COURT:  What kind of law?

16          THE PROSPECTIVE JUROR:  I'm not sure.

17          THE COURT:  Okay.  All right.  Jury service?

18          THE PROSPECTIVE JUROR:  I've served at the state

19  court I think about ten years ago, but I wasn't -- I was just

20  waiting in the pool.

21          THE COURT:  Okay.

22          THE PROSPECTIVE JUROR:  Involved in litigation, no.

23          News, Channel 7, Channel 1.  Television, I watch

24  20/20, Lifetime.

25          Social media, Facebook, just for friends and family.

1          THE COURT:  All right.

2          THE PROSPECTIVE JUROR:  And I am in no

3    organizations, no membership.

4          THE COURT:  All right.  Thank you very much,

5    Ms. Mohammed.

6          Juror Number 19, Mr. Duran.

7          THE PROSPECTIVE JUROR:  I live in Queens, New York

8    for all my 22 years.

9          Education, I graduated high school, but one class

10   away from my associate's and then after that I'm going to work

11   on my bachelor's.

12         THE COURT:  And what will your associate's be in?

13         THE PROSPECTIVE JUROR:  Math and science.

14         THE COURT:  Okay.

15         THE PROSPECTIVE JUROR:  No military service.

16         Employment, I work for Dick's Sporting Goods.

17         THE COURT:  You work for?

18         THE PROSPECTIVE JUROR:  Dick's Sporting Goods.

19         THE COURT:  Oh, Dick's Sporting Goods.  As a sale

20   associates.  Okay.

21         THE PROSPECTIVE JUROR:  For a year and a half.

22         THE COURT:  And anything before that?

23         THE PROSPECTIVE JUROR:  No.

24         THE COURT:  Okay.

25         THE PROSPECTIVE JUROR:  No spouse or partner.

1   Definitely no children.  I live with my parents.  My dad is a

2   truck driver who delivers shipments of fruit, and then my mom

3   works with the kids on the school bus.

4              THE COURT:  Okay.

5              THE PROSPECTIVE JUROR:  Any legal knowledge, I never

6   practiced law or anything like that.

7              THE COURT:  Okay.  No   legal studies?

8              THE PROSPECTIVE JUROR:  No.

9              All right.  Relationship with lawyers, I have a

10  friend who wants to be a lawyer.  He just started today at his

11  new job at a firm.  I don't know the name of it.  I got to ask

12  him later.

13             THE COURT:  You don't have to ask him.

14             Do you know what kind of law he is going to

15  practice?

16             THE PROSPECTIVE JUROR:  No.  I didn't ask that.

17             THE COURT:  Okay.  Go ahead.

18             THE PROSPECTIVE JUROR:  Jury service, this is my

19  first time ever to reporting for jury duty.

20             THE COURT:  You're having fun, too.  I can tell.

21             THE PROSPECTIVE JUROR:  No involvement in

22  litigation.

23             News, I don't watch any news or anything like that.

24             THE COURT:  Okay.

25             THE PROSPECTIVE JUROR:  Services, I just watch

1   YouTube.  I watch video games and all that.

2            THE COURT:  All right.

3            THE PROSPECTIVE JUROR:  Social media, I use Twitter

4   most of the time.  I like -- it's funny watching people argue

5   about stupid things and then as well as I collect --

6            THE COURT:  You collect what?

7            THE PROSPECTIVE JUROR:  I collect shoes, as well as

8   resale.  It's a hobby.  It is not a job.

9            THE COURT:  Hang on.

10            Do you ever get involved in the stupid commentary?

11            THE PROSPECTIVE JUROR:  No, no, no.  I just like

12   watching them.  I just like getting a good laugh at it.

13            THE COURT:  Okay.

14            THE PROSPECTIVE JUROR:  And as for any

15   organizational membership, no.  No membership or anything like

16   that.

17            THE COURT:  Okay.  Great.  Thank you very much,

18   Juror Number 19.

19            Juror Number 20, Ms. Williams.

20            THE PROSPECTIVE JUROR:  I resided in Brooklyn for

21   28 years.

22            THE COURT:  28, okay.

23            THE PROSPECTIVE JUROR:  Yes.

24            And I have a MSN degree in nursing.  And another

25   seven months, I'll add doctorate nursing practice to my name.

1          THE COURT:  Oh, good.  So say it again, you're about

2     to add doctor to my name?

3          THE PROSPECTIVE JUROR:  Yes.  Doctor of nursing

4     practice.

5          THE COURT:  Great.  Okay.

6          THE PROSPECTIVE JUROR:  And it's funny that you said

7     this because earlier you said about researching.  I do

8     extensive research in racial and social justice, because as

9     part of our studies and --

10         THE COURT:  Hold on one second.  I think you're

11    losing our court reporter.  And she can't actually see you

12    either.

13         Let's go back.  You do a lot of research about race

14    and social justice issues?

15         THE PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Not as part of your job, but just on

17    your own?

18         THE PROSPECTIVE JUROR:  No, as part of my school.

19    It's a requirement.  Because as a nurse leader, you have to

20    know how to deal with people of different -- of diverse race.

21         THE COURT:  Okay.  So that's part of your current

22    education?

23         THE PROSPECTIVE JUROR:  Correct.

24         THE COURT:  All right.  Thank you.

25         THE PROSPECTIVE JUROR:  Yes.  So I have no military

1   background.  I'm currently employed by New York City Health

2   and Hospitals Services in Queens for the last few years.

3   Prior to that, I was at Bronx Lebanon Hospital Systems.

4            THE COURT:  Could you say that again.  Prior to

5   that, you were --

6            THE PROSPECTIVE JUROR:  At Bronx Lebanon.

7            THE COURT:  Oh, Bronx Lebanon?

8            THE PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Okay.

10           THE PROSPECTIVE JUROR:  But currently, I'm now at

11  New York Health and Hospitals in Queens.  I'm an assistant

12  nursing director.  I actually just got promoted last week to

13  associate nursing director, and my orientation started today,

14  but I was excused for jury duty.

15           THE COURT:  Very good.

16           THE PROSPECTIVE JUROR:  So hopefully I get to go

17  tomorrow.

18           THE COURT:  I don't control that, but okay.

19           THE PROSPECTIVE JUROR:  I know.

20           And my spouse is retired last year.  He worked at

21  Metropolitan Transit Authority System.  He was a bus operator.

22           THE COURT:  Okay.

23           THE PROSPECTIVE JUROR:  But he moved back home.  He

24  comes, like, about every three months, six months, just to

25  visit.  And my kids are grown, 34, and 30.  My daughter, she's

1   a teacher with a charter school in Brooklyn.  And my son, he's

2   a manager at Capsule Pharmacy.

3           THE COURT:  A manager?

4           THE PROSPECTIVE JUROR:  At Capsule Pharmacy.

5           THE COURT:  Capsules Pharmacy, okay.  I never heard

6   of it.  Okay.

7           THE PROSPECTIVE JUROR:  And I don't have any other

8   adults in the household.  No -- not much in legal practice or

9   knowledge.  Just probably a little from school from when I was

10  in school doing my bachelor's.  We did probably, you know, a

11  little talking about legal stuff.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  And my cousin husband

14  actually is an immigration lawyer.  He works out of

15  Pennsylvania.

16          THE COURT:  Your cousin is an immigration lawyer?

17          THE PROSPECTIVE JUROR:  Her husband.

18          THE COURT:  Oh, cousin's husband?

19          THE PROSPECTIVE JUROR:  Mm hm.

20          THE COURT:  Okay.  And he works here in New York?

21          THE PROSPECTIVE JUROR:  No, in Pennsylvania.

22          THE COURT:  Pennsylvania, alrighty.

23          THE PROSPECTIVE JUROR:  And I work closely with a

24  risk manager that's actually -- she is a lawyer also.  She

25  does corporate law and any risk management stuff at my job.

1    And we have to communicate because of different people might

2    be suing the organization, and we have to give, you know, our

3    input as nurses.

4              THE COURT:  Okay.

5              THE PROSPECTIVE JUROR:  And RCAs.

6              I was here in 2014 for jury service.  I wasn't

7    chosen.  I have no involvement in litigation.

8              For news, I like to get different perspective of

9    news.  I look any kind of news, CNN, Channel 4, NBC, Fox News,

10   ABC, Channel 12 in New York.  Any news.  I look at any news

11   station.  I'm not bias.  I just like to get different

12   perspective.  And I listen to the morning show with Steve

13   Harvey when I going to work.  When I'm coming home I listen to

14   1010 WINS to know what the weather will be in the next day.

15             THE COURT:  The weather, that is?

16             THE PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Okay.

18             THE PROSPECTIVE JUROR:  And I read different

19   magazines.  You know, I just like reading a lot of magazines.

20   I am in a book club, actually, a national book club.  So I do

21   a lot of reading.  I visit a lot of websites because of my

22   job, again.  Mostly like CDC, World Health Organization.  You

23   know, anything regarding healthcare.

24             THE COURT:  Okay.

25             THE PROSPECTIVE JUROR:  And I listen to any type of

1    music.  So television, I watch -- I have a Fire Stick, so I

2    look at a lot of movies when I have the time.  I'm not big on

3    the legal shows, like, the Law and Order stuff.  I like mostly

4    game shows like Family Feud, Jeopardy, Wheel of Fortune,

5    Pictionary.  Anything with game, I will look at it just to get

6    my mind off of regular work.

7              Social media, of course I'm not Facebook, Instagram,

8    and I really look at Facebook just to follow up, you know, see

9    how friends and family are doing.  Not making much comments,

10   just saying, hi, hello, happy birthday.

11             THE COURT:  Okay.  Pause.

12             THE PROSPECTIVE JUROR:  Sorry.

13             THE COURT:  Go ahead.

14             THE PROSPECTIVE JUROR:  Yes.  And organizational

15   membership, I am a member of the Association of Women's Health

16   and Obstetrics Nursing, A1.  I'm also a member of the

17   Association On Nurse leadership, AONL.  And I'm also a member

18   of the AMA Nursing Association.  And actually, I play a part

19   in the New York State Birth Equity Improvement Project.  It's

20   a project that's been going on since 2020.

21             THE COURT:  Is the word birth?

22             THE PROSPECTIVE JUROR:  Birth.

23             THE COURT:  Birth, I'm so sorry.  It's the mask, I

24   think.

25             THE PROSPECTIVE JUROR:  Yes, it is.

1          THE COURT:  I got it.  Birth equity --

2          THE PROSPECTIVE JUROR:  -- improvement project.

3          THE COURT:  Got it.  Thank you.

4          THE PROSPECTIVE JUROR:  And I'm actually am a member

5     of a church -- of my church.

6          THE COURT:  Which church?

7          THE PROSPECTIVE JUROR:  Mount Sinai Church of God

8     and Christ.

9          THE COURT:  Mount Sinai Church of God and Christ.

10    Okay.

11         THE PROSPECTIVE JUROR:  I think that's about it.

12         THE COURT:  All right.  Thank you very much.

13         THE PROSPECTIVE JUROR:  You're welcome.

14         THE COURT:  Juror Number 19, Ms. William.  Now --

15    sorry, that was 20.

16         And 21 is Ms. Nardulli.

17         THE PROSPECTIVE JUROR:  Hi.  Let's see, I've lived

18    in Nassau County for 17 years.  I have a Bachelor's in

19    computer science.  No military service.  I am working at CUNY

20    Brooklyn College.  I've been there for 22 years.

21         THE COURT:  What do you do there?

22         THE PROSPECTIVE JUROR:  Helpdesk technician.  I have

23    a husband who is a project accountant at Turner Construction.

24         THE COURT:  Okay.

25         THE PROSPECTIVE JUROR:  I have one child,

Jury Selection                          143

1   fourteen-years-old.

2            THE COURT:  All right.

3            THE PROSPECTIVE JUROR:  No other adults live with

4   us.  I know nothing about legal practice or studies.  No law

5   school classes.  I don't know any lawyers.  No relationships.

6   I've never served on a jury or Grand Jury.

7            THE COURT:  All right.

8            THE PROSPECTIVE JUROR:  No involvement with

9   litigation.

10           News, I like to watch a lot of news.  I watch them

11   all, CBS, NBC, ABC, News 12.

12           THE COURT:  Like your neighbor.

13           THE PROSPECTIVE JUROR:  I also have a lot of

14   streaming channels.  I like a little bit of everything.  I do

15   enjoy Law and Order.  I like Food Network, as well.  Survivor,

16   Amazing Race, that type of thing.

17           Facebook and Instagram for social.  I enjoy being in

18   touch with friends and family.  I am not a member of any

19   organizations.

20           THE COURT:  Okay.  Thank you very much,

21   Ms. Nardulli.

22           Twenty-two, Ms. Faison; is that right?

23           THE PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Okay.

25           THE PROSPECTIVE JUROR:  I currently live in

1   Brooklyn.  I've been there for -- well, been here for about

2   33 years.  I have an associate's degree in nursing.  I have no

3   military background.  I currently work for DaVita Dialysis.

4              THE COURT:  You work for what dialysis?

5              THE PROSPECTIVE JUROR:  DaVita.

6              THE COURT:  DaVita, okay.

7              THE PROSPECTIVE JUROR:  I have no spouse.  I have no

8   children.  My dad -- I live with my dad.  He doesn't work

9   right now.

10             THE COURT:  Did he work before?

11             THE PROSPECTIVE JUROR:  Well, with the family

12  business.

13             THE COURT:  What's that?

14             THE PROSPECTIVE JUROR:  They have a -- well, he had

15  a grocery store and a couple of apartment buildings.

16             THE COURT:  Okay.

17             THE PROSPECTIVE JUROR:  No legal knowledge.  No

18  relationship with lawyers.  I've never served on a jury.  I

19  was involved in a lawsuit before.

20             I don't watch anything involving the news.  I don't

21  really watch TV like that, but I do have subscriptions.  I do

22  have social media; Instagram, Facebook, Twitter.  And no

23  organization.

24             THE COURT:  Thank you very much, Juror Number 22.

25             Juror Number 23, Mr. Gabriel or Ms.-- Mr. Gabriel.

1    Yep.

2              THE PROSPECTIVE JUROR:  Residence, I'm living --

3    currently living in Brooklyn.  I lived here all my life.

4    Education, high school.  Military service, none.  Employment,

5    not currently.  I am currently retired.  Spouse, yes.  She

6    currently lives in the same house as me.

7              THE COURT:  Does she work outside of the home?

8              THE PROSPECTIVE JUROR:  Yes.  She have her own

9    business in end of life care.

10             THE COURT:  Okay.

11             THE PROSPECTIVE JUROR:  At many nursing homes.

12             THE COURT:  All right.

13             THE PROSPECTIVE JUROR:  Children, I got two.  My son

14   is a structural engineer for New York City.  My daughter is an

15   investment banker for Chase.  Other adults, no.  Legal

16   knowledge, no.  Relationship with lawyers, don't have any.

17             Jury service, I did two cases, state court of --

18             THE COURT:  Criminal or civil?

19             THE PROSPECTIVE JUROR:  Civil.

20             THE COURT:  Okay.  Were you --

21             THE PROSPECTIVE JUROR:  Before it was over, it was

22   settled.

23             THE COURT:  Okay.

24             THE PROSPECTIVE JUROR:  I never get to try any.

25             THE COURT:  In both cases?

Jury Selection                                146

1          THE PROSPECTIVE JUROR:  In both cases.

2          THE COURT:  Okay.

3          THE PROSPECTIVE JUROR:  Involvement in legal

4   litigation, no.

5          News, I like CNN, 60 Minutes.

6          Television, cable, streaming, none.

7          Social media.  I don't like any social media.

8          THE COURT:  Okay.

9          THE PROSPECTIVE JUROR:  Organizational membership,

10  none.

11         THE COURT:  Okay.  I may have missed this.

12         Did you say that you are currently employed?

13         THE PROSPECTIVE JUROR:  No.  I'm currently retired.

14         THE COURT:  Okay.  What did you do before

15  retirement?

16         THE PROSPECTIVE JUROR:  Drive New York City Transit.

17         THE COURT:  Okay.  All right.  Thank you very much,

18  Juror Number 23.

19         And just to pause for a moment, folks.  Ordinarily,

20  we break for lunch at 1:00, but because we are pretty close to

21  getting to a point where I can let you all go for a bit of

22  time, we're going to push through, so that we can get, at

23  least, a part of you out of here soon for the rest of the day,

24  and then some of you a little bit later than that.  But

25  assuredly, we'll have some decision relatively soon, so the

1    day will not be that long for everyone.  I would like to push

2    through past 1:00 o'clock right now.

3              Juror Number 24, Mr. Ries.

4              THE PROSPECTIVE JUROR:  I live in Brooklyn.  I moved

5    here about 30 years I, guess.  I have a BS in psychology.  No

6    military service.  I am self-employed.  I have a S Corp. That

7    does --

8              THE COURT:  Commercial art?

9              THE PROSPECTIVE JUROR:  What's that?

10             THE COURT:  What do you do?

11             THE PROSPECTIVE JUROR:  Commercial art, graphics and

12   music.

13             THE COURT:  Okay.

14             THE PROSPECTIVE JUROR:  My wife is a clinical social

15   worker.  They work on Zoom now.  I don't know if you call it

16   outside of the home or not.

17             THE COURT:  Okay.

18             THE PROSPECTIVE JUROR:  I have two children.  Son

19   34, daughter 28.  They don't live at home.

20             THE COURT:  Do they work outside of the house?

21             THE PROSPECTIVE JUROR:  Yeah.  Well, my son is a

22   coder for an internet startup.

23             THE COURT:  Hold the microphone.

24             Your son is a coder for?

25             THE PROSPECTIVE JUROR:  I'm sorry?

Jury Selection                          148

1           THE COURT:  Just hold the mic up.

2           Your son is a coder for?

3           THE PROSPECTIVE JUROR:  Yeah.  He writes codes,

4     computer code.

5           THE COURT:  Right.  Okay.  Just a reminder to keep

6     the microphone close up.

7           Go ahead.

8           THE PROSPECTIVE JUROR:  Okay.

9           THE COURT:  And your daughter?

10          THE PROSPECTIVE JUROR:  My daughter just gave birth

11    to a boy who is four months old.  She's at home now.

12          THE COURT:  Congratulations.

13          Okay.  So she's home for now.

14          THE PROSPECTIVE JUROR:  Let me see, legal knowledge,

15    nothing directly.  Okay.  I know a fair amount of lawyers and

16    my family has lawyers.

17          THE COURT:  What do they practice in?

18          THE PROSPECTIVE JUROR:  I have like cousins, inlaws,

19    but they're all in the west coast.  I'm not really that close.

20    I had a neighbor who was a class action guy for a number of

21    years.  And I know a couple of guys who pass the Bar, but they

22    work as accountants basically.

23          THE COURT:  All right.

24          THE PROSPECTIVE JUROR:  Jury service, I've been on

25    two juries.  I was impanelled once and then they settled.  And

 1   the second time they reached a verdict.  Both cases were

 2   civil.

 3              THE COURT:  All right.

 4              THE PROSPECTIVE JUROR:  Let's see.  Okay.  I've been

 5   in litigation.

 6              THE COURT:  In what capacity?

 7              THE PROSPECTIVE JUROR:  Going back to lawyers, I've

 8   actually -- in my business, I've worked for a number of

 9   campaigns, like, civilian circuit court judge doing, you know,

10   campaign materials.

11              THE COURT:  All right.

12              THE PROSPECTIVE JUROR:  I used to do that sort of

13   thing.  I was involved in litigation.  I was sued by somebody

14   who claimed they fell down the stairs of my building.  And let

15   me see --

16              THE COURT:  How was that resolved?

17              THE PROSPECTIVE JUROR:  You know, I don't really

18   know.  The insurance company for the house handled it.  I was

19   deposed.  The guy was deposed.  He claimed that he was running

20   down the stairs.  I don't know.  So the insurance company

21   dropped me.  I got a new insurance company after the

22   deposition and so on.  I never heard about it again so.

23              THE COURT:  All right.

24              THE PROSPECTIVE JUROR:  I assume it was settled.

25              THE COURT:  Any news sources?

Jury Selection                    150

1          THE PROSPECTIVE JUROR:   Yeah.   I read the Times

2    online.   That sort of thing.   You know, just TV shows.   I

3    don't watch a lot of legal shows or anything like that.   I'm

4    on all the social media, but not very actively.

5          THE COURT:   Okay.

6          THE PROSPECTIVE JUROR:   I'm not really a member of

7    any organizations.

8          THE COURT:   All right.   Thank you very much,

9    Mr. Ries.

10          Next Juror Number 25, Ms. St. Jeanos; is that right?

11          THE PROSPECTIVE JUROR:   St. Jeanos.

12          THE COURT:   Sorry.

13          THE PROSPECTIVE JUROR:   I live in Nassau County my

14    entire life.   I have a Bachelors degree in business and an MBA

15    in finance.   Never apart of the military.   I stopped working

16    when my first son was born and I haven't been back.   I was

17    married two years ago -- up to two years ago.   My husband

18    passed away.

19          THE COURT:   I'm sorry.

20          THE PROSPECTIVE JUROR:   I have three children.   One

21    is a CPA.   He's 29.   My daughter is 28 and she works for the

22    Discovery network in the marketing area.   And as I said

23    earlier, I have a son who is in law school, in Brooklyn law

24    school.   And I don't personally have any legal knowledge

25    unlike my family.   Lawyers, my husband was actually a lawyer.

1    He was a partner at Herr and Feinstein and he was in real

2    estate, commercial real estate.  Mainly the lending end.

3    Mostly worked for banks.  Represented banks I should say.

4              THE COURT:  Very sorry about your loss.

5              THE PROSPECTIVE JUROR:  Thank you.  Thank you.

6              Again, my son is in law school.  And also my

7    brother-in-law is an attorney.  He's a partner at Willkie

8    Farr.

9              THE COURT:  Okay.

10             THE PROSPECTIVE JUROR:  And he worked mainly in the

11   insurance industry.  Not health insurance, just general

12   insurance.

13             THE COURT:  Do you know if he is a litigator?

14             THE PROSPECTIVE JUROR:  He is a litigator actually.

15             THE COURT:  All right.

16             THE PROSPECTIVE JUROR:  I never sat on a Grand Jury.

17             Involved in litigation, I almost forgot about this,

18   but my children encouraged me to make one of those phone calls

19   against Zantac, which we took off the market.  Which we feel

20   like that had something to do with my husband's passing.  I

21   had contacted them about six months ago.  Nothing has

22   happened.  I know that the case is being decided in

23   California.  I'm not really following up on it.

24             THE COURT:  Okay.

25             THE PROSPECTIVE JUROR:  But I am, I guess, involved

1    with that.

2              THE COURT:  That's a class action lawsuit?

3              THE PROSPECTIVE JUROR:  It's not considered class

4    action.  There's another name for it.  I forget what it's

5    called because class action everybody would share, but I guess

6    you're represented as an individual.

7              THE COURT:  Okay.

8              THE PROSPECTIVE JUROR:  But part of a part class

9    action.  I don't really understand exactly.

10             THE COURT:  All right.

11             THE PROSPECTIVE JUROR:  News, I watch all sources

12   ABC, NBC, CBS, Fox News.

13             TV, I have cable.  I like to laugh at sitcom.  Like,

14   young Sheldon came back on, I like it.  I like HGTV, House

15   Hunters, Food Network.  I do like 20/20.  Nothing over the

16   top, you know, for law related shows.

17             Social media, I just have Instagram mainly to follow

18   friends and mainly golden retriever videos.  That's what I

19   watch all the time.  That's my feed.  And I'm not a member of

20   any organization.

21             THE COURT:  All right.  Thank you very much.

22             Next we have Juror Number 26, Ms. Gorton.

23             THE PROSPECTIVE JUROR:  Okay.  Residence, I've been

24   in Brooklyn always.  Education, high school, grad, no

25   military, employment.  I work at St. Ephrem Catholic Academy.

Jury Selection                              153

1         THE COURT:  Yep.  Okay.

2         THE PROSPECTIVE JUROR:  Yeah.  Lunchroom duty.  I've

3    been there 18 years.

4         THE COURT:  One of you have the same job.

5         THE PROSPECTIVE JUROR:  Yeah.  It's part-time.  It's

6    easy.

7         THE COURT:  Okay.

8         THE PROSPECTIVE JUROR:  My husband is a program

9    manager for the computers in MTA.  Children, two grown

10   children still living with me.  My son is 28.  He works for a

11   nonprofit organization, but he worked in their computer

12   department.  MY daughter is 26.  She works for a publicist.  I

13   don't know the names of their companies.  Sorry.

14        THE COURT:  It's all right.

15        THE PROSPECTIVE JUROR:  No other adults.  No legal

16   knowledge.  Not really.

17        THE COURT:  All right.

18        THE PROSPECTIVE JUROR:  Let's see, no lawyers.  I

19   served on a civil case once and in the middle of the trial

20   they settled.  Let's see, no litigation.

21        News, I do like NY1.  Sometimes Channel 2 or 7, but

22   I mostly like NY1.  Oh, here.  Courtroom, Law and Order, of

23   course.  And I do like old Matlock repeats.

24        Social media, no.  No organization either.

25        THE COURT:  All right.  Thank you very much, Juror

1   Number 26.

2          Juror Number 27, Ms. James?

3          THE PROSPECTIVE JUROR:  I live in Brooklyn for over

4   20 years.  High school diploma.  No military service.  I work

5   for the Center for Family Support over 20 years now.  No

6   spouse.  I have three children.  Two boys in the military.  My

7   daughter is a nurse.  No other person in the household.  No

8   legal knowledge.

9          THE COURT:  Okay.

10          THE PROSPECTIVE JUROR:  No relationship to the

11   lawyers.  Never served as a juror or Grand Jury.  No

12   litigation.  News, Channel 1, Channel 7.  TV, I have Hulu and

13   Netflix.

14          Social media, Facebook, just to browse.  And no

15   organization membership.

16          THE COURT:  Okay.  Going back to Hulu and Netflix,

17   do you watch anything in particular?

18          THE PROSPECTIVE JUROR:  Just a lot of movies.

19          THE COURT:  All right.  No shows?  No particular

20   shows.?

21          THE PROSPECTIVE JUROR:  Oh, no.  No.

22          THE COURT:  All right.  So Juror Number 28 Mr. Chu.

23          THE PROSPECTIVE JUROR:  Yes.  I've been in Queens

24   all my life.  I have a Bachelors in business.  No military

25   service.  I am currently self-employed.  I am trading equities

1    with my own money.

2              THE COURT:  For himself in his own account.  Okay.

3              THE PROSPECTIVE JUROR:  Yeah.  My wife is a product

4    manager at an investment bank.  We have two children, ten and

5    nine.  No other adults in the house.  No legal knowledge.  My

6    aunt is a lawyer with Legal Aid, Albany.

7              THE COURT:  Does she do criminal or civil?

8              THE PROSPECTIVE JUROR:  I believe, civil.  Mostly

9    family related cases.

10             THE COURT:  Okay.

11             THE PROSPECTIVE JUROR:  And my cousin is a lawyer

12   that works for the DOJ.  She's in D.C. right now.

13             THE COURT:  Do you know what she does?

14             THE PROSPECTIVE JUROR:  Not specifically, no.

15             THE COURT:  Okay.

16             THE PROSPECTIVE JUROR:  Jury service, I've never

17   served on a jury or Grand Jury before.

18             THE COURT:  Okay.

19             THE PROSPECTIVE JUROR:  Not involved in litigation.

20   News, mostly, you know, finance related.  Bloomberg, CNBC,

21   Wall Street Journal and the Economist.  Streaming services, I

22   do subscribe to them all.  I basically watch whatever is

23   trending with my wife or kid.

24             Social media, mostly Twitter for headlines to see

25   what people are talking about.  Organizational membership,

Jury Selection                          156

1    I've launched a CFA Institute, which stand for Charter

2    Financial Analysis.

3                THE COURT:  Stanford Charter.

4                THE PROSPECTIVE JUROR:  Just Charter Financial

5    Analysis.

6                     (Continued on the following page.)

Jury Selection                                    157

1    (Continuing.)

2            THE COURT:  Juror number 29, Ms. Kirk.

3            PROSPECTIVE JUROR:  I live in Long Beach 12 years.

4    I have BA in philosophy.  No military service.  I am currently

5    employed in market research.

6            THE COURT:  Keep your microphone close to your

7    mouth.

8            PROSPECTIVE JUROR:  I'm a widow.  I have one

9    daughter who is 33, she's autistic and a ward of the state.  I

10   have two other adults that live in the house.  My sister is a

11   retired school librarian, and her daughter is in early

12   childhood education.  I have no legal knowledge.  I have no

13   relationships with lawyers.  I have never served on a jury or

14   a Grand Jury.  I have been a plaintiff in a lawsuit that was

15   settled out of court.  And I listen to NPR and I read the New

16   York Times feed.  And I watch MSNBC.  I don't watch any TV

17   besides that.  I don't go on social media.  And I'm not a

18   member of any organization.

19           THE COURT:  Go back for one minute to you're a

20   widow.  Did your husband work outside the home before he

21   passed?

22           PROSPECTIVE JUROR:  Yes, he also worked in market

23   research.

24           THE COURT:  Thank you very much, juror 29.

25           Juror 30, Mr. Donovan.

Jury Selection                               158

1        PROSPECTIVE JUROR:  I currently live in Astoria,

2   been there for four years.  Before that in White Plains for

3   two years.  Before that outside of Albany.  Education, a

4   Bachelor's in business economics with a finance concentration.

5   No military service.  Employment, I'm a senior

6   biller/collector recorder for a law firm in the city,

7   Proskauer Rose, before that it was Carvath.

8        THE COURT:  How long have you been there?

9        PROSPECTIVE JUROR:  Proskauer, four years, four

10  and-a-half years; and Carvath two years.

11       I have a fiancée, she's a six grade English teacher

12  in Rigo Beach, Long Island.  No children.  No other adults in

13  the household.  Legal knowledge, I think I took business law

14  in college and just reading time entries -- I don't know what

15  they are talking about.  Relationship with lawyers, I work

16  with a bunch of partners. I have not served on a jury or Grand

17  Jury before.  I've not been involved in litigation.  News, I

18  prefer ABC7, but I read a little bit of everything, CNN, Fox

19  News to get a broader perspective.  Television cable, House of

20  the Dragon I'm watching now; other than that, just sports.

21  Social media, Facebook, Twitter, Instagram a little bit of

22  everything.  I don't post, but keep up with friends and

23  family.  And no organizations.

24       THE COURT:  Thank you very much.

25       Juror number 31, Mr. Gonzalez.

Jury Selection                          159

1          PROSPECTIVE JUROR:  I lived in Hollis, Queens, about

2     20 years.  I'm currently in college, second year, pursuing

3     Bachelor's degree.  Number three is no.  Four, no.  Five, no.

4     Six, no.  Seven, my mother and father.  My mother is an IT

5     administrator, my father a construction worker.  Eight no.

6     Nine, no.  Ten, also no.  Eleven, no.  Twelve, no newspapers

7     or TV shows or radio shows or magazines or blogs.  In terms of

8     websites, YouTube.  Thirteen, I do not watch any regularly.

9     Fourteen, Instagram.  And 15 is no.

10          THE COURT:  Very economical and efficient, thank you

11     very much.

12          Last, but not least, we have Mr. Cheng.

13          PROSPECTIVE JUROR:  I lived in Queens, New York, for

14     over 33 years.  Education, I started with pharmacy doctor but

15     ended with accounting Bachelor's.  I have not done military

16     service.  My employment is at New York City Parks, I'm doing

17     permits.  I'm not married, no children.  My mom and dad.  My

18     father is a waiter, my mom is an interpreter.  Legal knowledge

19     is Business Law one, two, three from accounting.  I have a

20     friend that is a lawyer, I don't know what he practices.  I

21     have not been picked for jury service.  My girlfriend got hit

22     by a car, but I think it was settled.  I don't really read

23     news too much.  Nothing specific for 13.  Fourteen I only use

24     Facebook for messaging.  I read Reddit.  And no organization.

25          THE COURT:  Thank you very much, Mr. Cheng.  I'm

1   going to have a word with the lawyers at sidebar.

2          (Sidebar.)

3          THE COURT:  Any follow-up questions.  Defense?

4          MR. SINGER:  I don't think so.

5          MS. KASSNER:  No.

6          THE COURT:  Okay.  My plan is to basically let

7   people go who are not in the 32 -- you know what, to err on

8   the safe side, I'll let everybody go for about 20 minutes,

9   you'll exercise your peremptories, then we'll call everybody

10  back.  Then we'll release those and the rest of the venire

11  after that, just in case we have any unexpected crisis okay.

12  I can't imagine at this point because unless somebody does

13  something, unless we lose someone during lunch, suppose

14  somebody doesn't come back.

15         I'll let them go for 20 minutes.  You guys assemble

16  at five before the 20, so you get 15 minutes to put together

17  your selections.  We'll do it, then we'll bring them all back.

18         MR. SINGER:  And then?

19         THE COURT:  Then take a break for lunch and opening

20  after.

21         MR. NAVARRO:  Your Honor, just because we have a

22  couple witnesses lined up, is the expectation that the first

23  witness will go in the morning at this point?

24         THE COURT:  No.  How long are your openings?  It

25  can't be that long.

1          (In open court.)

2          THE COURT:  We'll take 20 minutes.  Everybody will

3    leave so the parties can do the peremptories.  We'll let you

4    know the good news of who is in the jury and who is not.  I'll

5    ask that everybody return in case we have unexpected glitches

6    and need to fill-in the first 32.  Come back at quarter of

7    two.

8          I know it's not long enough for you to get lunch.

9    There is a snack concession downstairs on the first floor if

10   you need to get something to eat, but be back here.  For many

11   of you, you'll be completely done -- for everyone but the

12   people on the jury, you'll be done by the time you return at

13   quarter of.  Those papers leave here, all the questions leave

14   here.  If you want to get outside, although it's not nice

15   weather, you can do that.  But we have to have everyone leave

16   the courtroom.

17          (Prospective jury panel exits.)

18              (Brief recess.)

19          THE COURT:  We're going to start with the peremptory

20   challenges.  The Government gets one, and then back to the

21   defense for four.

22          MS. KASSNER:  Yes, Your Honor.  The Government would

23   strike juror number four.

24          THE COURT:  That is Ms. Chen.

25          MS. KASSNER:  That's correct.

1          THE COURT:  Okay.  Back to the defense for four.

2          MR. SINGER:  The defense will challenge number one,

3    Ms. Donaldson; six, Mr. Kresowaty; number 13, Mr. Dean; number

4    17, Ms. Yepez.

5          THE COURT:  Back to the Government for two.

6          MS. KASSNER:  The Government would strike number 20.

7          THE COURT:  Ms. Williams.

8          MS. KASSNER:  That's correct.

9          And the Government would additionally strike number

10   21.

11         THE COURT:  Ms. Nardulli.

12         Back to the defense for four.

13         MR. SINGER:  Defense would challenge number three,

14   Ms. Dawkins.

15         THE COURT:  Just remember for the regular jury you

16   can only go up to juror number 28.

17         MR. SINGER:  Yes.

18         THE COURT:  Three more.

19         MR. SINGER:  Number nine, Ms. Ramos.  Number 25,

20   Ms. St. Jeanos; number 26, Ms. Gorton.

21         THE COURT:  Back to the Government for two.

22         MS. KASSNER:  Number five, Mr. Corbet; and number

23   eight, Mr. Price.

24         THE COURT:  Back to the defense for two.

25         MR. SINGER:  Number 11, Ms. Ferrer.

1           THE COURT:  One more.

2           MR. SINGER:  And number 27, Ms. James.  That's my

3    tenth, right?

4           THE COURT:  Yes.  Last strike for the Government.

5           MS. KASSNER:  Number ten, Mr. Hess.

6           THE COURT:  Okay.  Let's go to the alternates and

7    then after we're done I'll recapitulate the final list of

8    jurors.

9           First to the Government for the one strike for the

10   alternate.

11          MR. NAVARRO:  Just to clarify we're going from 28

12   up --

13          THE COURT:  Twenty-nine.

14          MR. NAVARRO:  Twenty-nine to 32.

15          THE COURT:  Correct.

16          MR. NAVARRO:  Could we have one moment to confer?

17          THE COURT:  Yes.

18          MS. KASSNER:  Number 31.  And I'm confirming the

19   name --

20          THE COURT:  Gonzalez.

21          MS. KASSNER:  That's correct.

22          THE COURT:  And then strike for the defense.

23          MR. SINGER:  Defendants challenge number 29,

24   Ms. Kirk.

25          THE COURT:  All right.  So with respect to the

1   regular jury, juror one is Ms. Fisher.  Juror two should be, I

2   think it's Simiao Chen, who was juror number 33.

3           MR. NAVARRO:  I believe --

4           THE COURT:  It's Zhen Chen.  Correct.

5           MS. KASSNER:  Yes.

6           THE COURT:  That's number two.

7           MR. SINGER:  Sorry.  That is?

8           THE COURT:  Formerly 35.  Zhen Chen is now number

9   two.  Juror three is Mr. Roopnauth, formerly 12.

10          MR. NAVARRO:  Yes.

11          THE COURT:  Juror four is Ms. Nzirubusa, formerly

12  14.  Five is formerly 15, Ms. Parola.  Six is formally 16,

13  Ms. Mattina.  Seven is formerly 18, Ms. Mohammed --

14          MR. SINGER:  I'm sorry?

15          THE COURT:  Formerly 18 is now seven, Ms. Mohammed,

16  and she was 31 before.  Formerly 19 is now number eight,

17  that's Mr. Duran.  Ms. Faison, formerly 22, is now nine.

18  Formerly 23, Mr. Thomas, is now ten.

19          MR. SINGER:  I'm sorry.

20          MR. NAVARRO:  Your Honor --

21          THE COURT:  I'm sorry.  Gabriel, last name, that's

22  formerly 39, then he became 23, and now he's ten, that's

23  Mr. Gabriel Glasgow, as in the city.  Number 11 is Ethan Ries,

24  formerly 24.  And number 12, last regular juror, is Mr. Chu,

25  formerly 28.

1         Do I have that right Government?

2         MR. NAVARRO:  Yes, Your Honor.

3         THE COURT:  And defense?

4         MR. SINGER:  One moment, Judge.  Yes.

5         THE COURT:  Then the two alternates will be number

6    one, Mr. Donovan, formerly 30.  And Mr. Cheng, formerly 32,

7    he's alternate two.

8         Correct, Government?

9         MR. NAVARRO:  That's correct.

10        THE COURT:  And defense?

11        MR. SINGER:  Yes.

12        THE COURT:  We'll bring everybody back in here and

13   Ryan will excuse everyone who is excused.

14        We'll let everyone else go and take a break for

15   lunch before opening, and I'll give them a full hour.  So

16   we'll start up around three.

17        THE COURT:  Once we seat the jury I'll ask if you're

18   both -- if you consent to the jury, or is the jury acceptable.

19        (Prospective jury panel enters.)

20        THE COURT:  Please be seated everyone.  I know this

21   is the moment you've all been waiting for.  Our deputy will

22   announce the jurors.  Amongst those who are excused, don't get

23   up and leave yet because everyone who has been excused,

24   including everyone on this side of the room, can all leave at

25   once with our thanks.  So go ahead, Ryan.

Jury Selection                                166

1        THE COURTROOM DEPUTY:  First juror excused Marcia

2   Donaldson, Yashika Dawkins, Simiao Chen, Patrick Corbet,

3   Kenneth Kresowaty, Lloyd Price, Veronica Ramos, Joseph Hess,

4   Karen Ferrer, Francis Dean, Evelyn Yepez, Sonnja Williams,

5   Vanessa Nardulli, Kathleen St. Jeanos, Ann Gorton, Valerie

6   James, Joann Kirk, Harold Gonzalez.

7        THE COURT:  So again, thank you everyone for your

8   patience this morning and you're willingness to serve as

9   jurors.  I especially appreciate how punctual you've all been.

10  With our thanks, you are free to go.  As are all of the other

11  individuals who have not yet participated in the selection.

12  Thank you everyone.

13                 (Excused juror exit.)

14       If you were not struck, remain here.  For those of

15  you who are here, we'll have you re-arranged.

16       Juror number two can move to juror number one.

17       Addressing the jurors, thank you very much again for

18  your patience throughout this process.  As you can see one of

19  the jurors who was selected isn't here at the moment.  What

20  we're going to do is break for lunch and you guys have an hour

21  for lunch.

22       And then the plan is to start the trial after the

23  lunch break with opening statements.  I'll give you some other

24  instructions about how the trial will proceed.  We will swear

25  you in after the lunch break.  I need to talk to the lawyers a

Jury Selection                                    167

1   little bit about what to do about our one missing juror.  At

2   any rate, it's my anticipation or expectation that we'll go

3   forward this afternoon in any event.

4           For now the only instructions I want to give you is

5   henceforth:  You should not talk at all about this case with

6   anyone.  Don't let anyone talk to you about the case.  And I'm

7   instructing the lawyers, the parties, the trial teams, the

8   translators even, not to speak to you at all, for the purpose

9   of avoiding any appearance that they are talking to you about

10  the case.  So if you see them in the hallway and they

11  completely disregard you, they are not being rude; they are

12  following my instruction not to speak you to at all.  I am, on

13  the other hand, able to say hello to you of course and we can

14  chat about anything but the case, the weather or something

15  like that.

16          Don't do any research, don't blog or chat with

17  anybody about the fact that you've even been chosen for this

18  jury.  For now basically no communications at all with anyone

19  about the case, about the lawyers, or anyone else involved in

20  this case.  That will be true from now until when you finish

21  your jury service.  And even amongst yourselves, you should

22  not talk about the case.  Because until you reach your

23  deliberations, the point that you're actually in that room

24  deliberating, you're not to talk about the case with anyone

25  including each other.

1            So at some point when you go home this afternoon you

2    can't talk to anybody about the case other than you can say:

3    I got picked for a jury.  But avoid any conversation at all

4    about the substance of the case.  If anyone tries to speak you

5    to about the case, let our deputy Ryan know immediately.

6            Okay.  Go and have a good lunch.  Be ready to go at

7    five after three, we'll start the trial then.

8            (Jury exits the courtroom.)

9            THE COURT:  I've never had this happen before.  He

10   didn't understand my directions, or I guess the exercise of

11   calling out those people who were excused.  We have a couple

12   of options.  I will ask Ryan to talk to the jury department

13   about seeing if they can contact Mr. Ries on his cellphone.

14           MR. SINGER:  Why not call the Marshals, ask them to

15   call out his name.

16           THE COURT:  Assuming he has a cellphone.

17           MR. SINGER:  Everybody's got a cellphone.

18           THE COURT:  Or if he checked it.  Let's do that.  I

19   don't have the number for downstairs.

20           MR. NAVARRO:  I'm happy to walk down.

21           THE COURT:  Mr. Navarro is going to see if he can

22   find Mr. Ries and his phone.  If that fails and if we can't

23   contact him to get him back here by three, the question is

24   whether or not we should proceed with the jurors we have; and

25   my suggestion is yes.  Because we'll have still one alternate

1   for a relatively short trial.  I'll hear from the parties.

2          MS. KASSNER:  Your Honor, the Government would be

3   fine with proceeding with one alternate given the brevity of

4   the trial.

5          THE COURT:  Mr. Singer.

6          MR. SINGER:  That's fine.

7          THE COURT:  All right.  Let's hope we can reel

8   Mr. Ries back in.  I think between maybe the phone option,

9   let's hope for a long line, or get in touch during the lunch

10  break and we'll be able to have the full 14 back here.

11         I'll wait until the jury comes back to swear them

12  in, and then ask you if they are satisfactory to you before.

13  I didn't want to do that now since we're missing the one.

14  Then start with the opening at 3:00 o'clock.

15         There was one issue that was unresolved that you

16  raised, Mr. Singer.  I don't know if it's going to effect

17  openings, but let's try to resolve now.

18         MR. SINGER:  It does not effect openings.

19             (Juror enters courtroom.)

20         THE COURT:  Are you Mr. Ries?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Perhaps you misunderstood, you're part

23  of the jury now.  You weren't excused.  You just need to hold

24  here for one moment.  I'm going to send my law clerk back,

25  we'll give you instructions and a pass card.  What will happen

1   next, after the deputy orients you to where the jury room is

2   and all that, we'll take a break for lunch until about

3   3:05 p.m.  You'll be free to go for about an hour but come

4   back because we're starting the trial after that.

5          Have a seat.  You're part of the jury now.  Did they

6   find you in the lobby?

7          PROSPECTIVE JUROR:  No.  I was in the assembly room.

8          THE COURT:  Here is Mr. Ries.

9          THE COURTROOM DEPUTY:  Great.

10          THE COURT:  Thank you, Mr. Ries.

11          (Juror exits the courtroom.)

12          THE COURT:  If you can text Mr. Navarro, tell him to

13   come back.  Crisis averted.  We found our prodigal juror.

14          Mr. Singer, what was the last issue?  Let's tee it

15   off.

16          MR. SINGER:  It's simply that when the questions

17   came up about the use of the phone of Mr. Goklu's phone after

18   he was arrested, the Government had spoken to one of the two

19   agents and provided a report of their conversation.  And that

20   Agent Liefke had indicated that there were, that he was

21   unaware of or there were no signed consents of any kind --

22          THE COURT:  Okay.

23          MR. SINGER:  -- with regard to the phone.

24          On Friday according to the notes -- we received

25   notes of a conversation with the undercover officer, we

1   received those on Saturday, two days ago -- I believe it was a

2   conversation that the notes indicated had taken place on

3   Friday.  In the conversation with the undercover officer, he

4   had indicated that in his experience, four years of experience

5   with Agent Liefke, that he always obtained a signed Miranda

6   form.  And O'Kain also indicated that his belief was that

7   Liefke did get a signed consent to use the phone.

8           I suspect he might be mistaken about that, but I

9   wanted to clarify.  Because we never received either a signed

10  Miranda form or other consent to review the phone.  And the

11  undercover seems to indicate that one or both of those forms

12  may have been prepared and signed.  So I just wanted to

13  clarify them.

14          MS. KASSNER:  Yes, Your Honor.  I'm sorry I would

15  have clarified this with defense counsel earlier, but as far

16  as -- I guess, I'll clarify two things.

17          There is no, as far as we're aware, we've done a

18  diligent search of the case file and there is no written

19  Miranda waiver in this case.  None has been produced because

20  it doesn't exist.  There is also no written form that was

21  signed by the defendant giving written consent to use his

22  cellphone after his arrest.

23          I will note that while we produced the notes of our

24  conversation with the undercover agent as 3500, that doesn't

25  mean his account, his recollection, is accurate.  He actually

Jury Selection                                172

1   wasn't in the room when the interview began.  And so with

2   respect to the Miranda form, he wouldn't have been there if

3   one had been signed.

4          So I'm not sure what -- I guess that's the

5   clarification, I'm not sure if there is more information the

6   Government can provide.

7          THE COURT:  So that resolves what seemed to be an

8   inconsistent.  There is no written Miranda or consent form

9   still.  The undercover, to the extent that he thought one

10  might have been or would have been created, was presumably

11  mistaken.

12         MR. SINGER:  Judge, that's fine.  It's just there

13  was that rather glaring inconsistency.  I just wanted it on

14  the record, how that had been resolved.  That's fine.

15         THE COURT:  Okay.  Is there going to be any

16  testimony, though, about any oral consent by Mr. Goklu to

17  allow the agents to use his phone to reach out to other

18  individuals?  No.

19         MS. KASSNER:  No, Your Honor.

20         THE COURT:  So nothing else I assume before we have

21  openings?

22         MS. KASSNER:  Very briefly, your Honor.  I just, and

23  this has to do with the limiting instruction that the parties

24  drafted.  It is the Government's position that some of the

25  defendant's signal messages with other customers do discuss

Jury Selection                              173

1    washing money, detection by the NYPD, reporting people to the

2    NYPD, and other things that fall under the category of

3    attempting to conceal the nature, source, location of the

4    funds being exchanged.  We just want to make sure that our

5    opening statement won't run afoul of your Honor's ruling.

6              THE COURT:  I think the defense's counter proposal

7    is the way to go.  Because the defense basically says, you

8    should be allowed to argue that these conversations with other

9    people that suggest law enforcement sensitivity or trying to

10   avoid law enforcement detection can give rise to an inference

11   about trying to conceal the identity, location, or source of

12   the funds or the property.  So you can still argue that.

13             The question, though, is whether or not I instruct

14   the jury or characterize really for the jury, that these

15   communications relate to an intent to conceal or disguise the

16   nature, location, et cetera.  To me, I think the defense is

17   right, because it's one thing for me to say yes you heard a

18   conversation where the defendant said oh, watch out for

19   police; or, I always try to avoid the police, than saying the

20   intent was to conceal or disguise.  So the defense is only

21   asking that I not specifically say that those are

22   communications, relating to the intent to do all of those

23   things.

24             It doesn't mean the Government cannot argue that.

25   So all we would be doing is excising that reference where I'm

1   characterizing the communication.  But you would be free to

2   argue that that's what they should infer from those law

3   enforcement related conversations.

4           MS. KASSNER:  Thank you, your Honor, that clarifies

5   it.

6           THE COURT:  I've given the alternative instruction

7   that the defense is asking for.

8           Okay, we'll see you folks at five at after three

9   ready to go.  We'll swear in the jury and start from there.

10

11          (Lunch recess.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    175

1          A F T E R N O O N   S E S S I O N

2          (Time noted: 3:05 p.m.)

3          THE COURT:  Ryan brought to my attention that Juror

4     No. 5 told him that she just contacted her workplace and

5     understands that she might lose pay later this week if she is

6     on jury duty and doesn't go to work.  Now, I don't know what

7     later this week means but let's assume Thursday and Friday,

8     for example.  She wasn't aware of this before and she feels

9     badly for not bringing it up.  Juror No. 5 I believe is Alynn

10    Parola who was previously number 15.  I don't know what she

11    said she did, but it sounds like she might be in the physical

12    therapy area --

13         MR. SINGER:  She was a dancer.  A freelance dancer.

14    She works at a gym and at a brewery.

15         THE COURT:  What do you folks want to do?  We can

16    bring her out to ask more details about this and the question

17    is whether or not if she says she's going to literally lose

18    salary over this, which does happen; unfortunately we do tell

19    people who are independent contractors that they still have to

20    stay here for jury service.  Would you like me to bring her

21    out here to ask her more about her situation?

22         MS. KASSNER:  Yes, please.

23         MR. SINGER:  Yes, to get a sense of how she

24    responds.

25         THE COURT:  And then you will have a better sense of

Proceedings                                    176

1   if you want to excuse her or not.

2           Ryan, tell her we need to speak to her before we

3   start.

4           THE COURT:  Off the record.

5           (Discussion off the record.)

6           (Juror No. 5 enters.)

7           THE COURT:  Have a seat Ms. Parola.  Ryan advised us

8   that you just learned that there might be some issue with your

9   work as the week progresses.  So, can you tell us what the

10  situation is?

11          PROSPECTIVE JUROR NO. 5:  Sorry to make your life

12  hard.  I'm a hand-to-mouth worker so I have a lot of jobs and

13  if I don't work I don't get paid and I'm starting a new job

14  this week and it's a dance job which are really hard to get

15  right now.  So there's a lot of concern that if I don't make

16  it to work, that I might lose that job.

17          THE COURT:  Are you okay?  This is obviously very

18  upsetting to you.

19          PROSPECTIVE JUROR NO. 5:  I've got a lot of doctor's

20  appointments lined up this week, too, because I have a lot of

21  health stuff, too.  I apologize.

22          THE COURT:  No need to apologize.  It's good that

23  you were willing to serve and didn't raise this until now.

24  When you say a dance job, is that something you need to be

25  there for this week?

Proceedings                    177

1           PROSPECTIVE JUROR NO. 5:  Yes.

2           THE COURT:  When does that start?

3           PROSPECTIVE JUROR NO. 5:  Thursday morning.

4           THE COURT:  And then if you don't show up on

5     Thursday morning is there a chance that you won't be able to

6     keep that?

7             PROSPECTIVE JUROR NO. NO. 5:  Correct, yes.

8           THE COURT:  Where is that at, if you don't mind me

9     asking?

10          PROSPECTIVE JUROR NO. 5:  We are usually in Brooklyn

11    but occasionally we're in Manhattan.

12          THE COURT:  And then you also have doctor's

13    appointments?

14          PROSPECTIVE JUROR NO. 5:  Yes.

15          THE COURT:  When do those start?

16          PROSPECTIVE JUROR NO. 5:  Tomorrow.

17          THE COURT:  And those are not appointments that you

18    can move or want to movie I'm guessing?

19          PROSPECTIVE JUROR NO. 5:  They've been a little hard

20    to get.

21          THE COURT:  How many appointments do you have?

22          PROSPECTIVE JUROR NO. 5:  I think it might just be

23    one for this week.

24          THE COURT:  Now, is there anything else besides the

25    new dance position and the doctor's appointment that would

Proceedings                                   178

1   cause problems for you?

2          PROSPECTIVE JUROR NO. 5:  I also probably wouldn't

3   get paid from the brewery that I work at or from the climbing

4   gym, which means I might not be able to pay rent this month.

5   It's a little stressful.

6          THE COURT:  Okay.  I'm going to have you go back to

7   the jury room.  Ryan will take you back.  Just give us a

8   second so I can talk with the lawyers.

9          PROSPECTIVE JUROR NO. 5:  Sorry about that.

10          THE COURT:  I am sorry this has caused so much

11   stress.

12          (Prospective juror exits.)

13          THE COURT:  Folks, it's a bit of see-saw.  We lost a

14   juror and we found a juror and now it appears we might lose

15   another one.  How do the parties want to proceed?

16          MS. KASSNER:  Your Honor, I think that it makes

17   sense to proceed with just one alternate given -- I think it's

18   readily apparent how much stress and -- frankly, it seems like

19   she really can't sit for this trial.

20          THE COURT:  Mr. Singer?

21          MR. SINGER:  I'm a little annoyed because she had

22   lots of opportunities to tell us this, but it seems pretty

23   clear that she's -- ordinarily if a juror came in and said

24   these things, I'm one of the first people to say let them go.

25   We're not trying to destroy their lives and have them lose

Proceedings                               179

1   income.

2            THE COURT:  Well, annoyance --

3            MR. SINGER:  I don't think we have any choice now.

4   We have to let her go.

5            THE COURT:  On the other hand, I think she was

6   perhaps trying to do her duty but she should have raised this

7   before.  I'm going to let her go.  I do feel it would be

8   unduly stressful especially the last part about not being able

9   to pay rent.  Everything she raises are legitimate concerns

10  and obstacles to her serving.  We'll let her go and proceed

11  with the 13 jurors, 12 regular and one alternate.  I will tell

12  the jurors not to speculate at all as to why she's not with

13  them.  Let's just bring in everyone but her and then you can

14  go back and let her --

15           MS. KASSNER:  While that is happening, Your Honor,

16  could I place one thing on the record?

17           THE COURT:  Sure.

18           MS. KASSNER:  I spoke earlier with one of the

19  Government's anticipated witnesses, Mr. Patrick O'Kain,

20  formerly Special Agent Patrick O'Kain, and he alerted me that

21  he when he was in the restroom he ran into somebody who did

22  have a juror sticker on and there was a very brief exchange

23  where that individual held the door for him and he said thank

24  you.  That, as far as I'm aware, is the entirety of the

25  conversation, but just inn an extreme abundance of caution, I

Proceedings                                    180

1    wanted to put that on the record.

2          THE COURT:  It's seemed innocent.  Do you want to

3    say anything, Mr. Singer, about that?

4          MR. SINGER:  Ms. Kassner informed me of that and I

5    agree, that's noneventful.

6          THE COURT:  For what it's worth, Mr. Singer, I could

7    have lectured her but it seemed like she was perhaps

8    misguidedly trying to do her duty, but not really realizing

9    that she could let us know the hardship it would have caused

10   her.

11         MR. SINGER:  I agree.  And she understands that it

12   was an inconvenience for all of us.

13         THE COURT:  Understood.  We're in a less-than-ideal

14   position, but certainly not fatal.

15         (Pause in proceedings.)

16         (Jury enters.)

17         THE COURT:  Please be seated everyone.  Ladies and

18   gentlemen of the jury, you may have noticed that we have one

19   less juror amongst you, but you are not to speculate at all as

20   to why it is that Juror No. 5 is no longer seated with you.

21         First, let me ask the Government, is the jury

22   satisfactory to the Government?

23         MS. KASSNER:  Yes, Your Honor.

24         THE COURT:  And to the defense?

25         MR. SINGER:  Yes.

Proceedings                                        181

1          THE COURT:  So we're now going to swear you in so if

2     you will rise and raise your right hand.  I promise you it's

3     the last time today you will have to be sworn in.

4          (Jury sworn.)

5          THE COURT:  Ladies and gentlemen, we are about to

6     begin the trial of this criminal case about which you heard

7     some during the process of jury selection.  Now that you have

8     been sworn in, I would like to give you some preliminary

9     instructions to guide you in your participation in this trial.

10          To begin with, you are here to administer justice in

11    this case according to the law and evidence.  You are to

12    perform this task with complete fairness and impartiality and

13    without bias, prejudice or sympathy for or against the

14    Government or the defendant.  This is important to the

15    defendant who is charged with two crimes and has a

16    Constitutional right to receive a fair trial.  The case is

17    also important to the Government, since the enforcement of

18    criminal law is important.

19          The case is based on an indictment, which I

20    discussed with you briefly during jury selection, which

21    charges the defendant with money laundering and unlicensed

22    money transmitting.  As I have already advised you, the

23    indictment is the document by which a criminal action is

24    commenced.  It is merely an accusation, a charge.  It is not

25    evidence of the defendant's guilt.  It will be your duty to

SN        OCR        RPR

Proceedings                                                        182

1    find from the evidence what the facts are.  You and you alone

2    are the judges of the facts.  You will then have to apply

3    those facts to the law as I instruct you at the conclusion of

4    the trial.

5           You must follow the law whether you agree with it or

6    not.  Now, from time to time, legal issues may arise which are

7    of no concern to you.  You decide the facts, but I decide the

8    law.  These issues may make it necessary for me to confer with

9    the counsel at sidebar, as you have already seen, or to excuse

10   you from the room so that we can have a longer discussion and

11   you can be more comfortable during that brief break.  You are

12   not to be speculating as to what we're talking about and

13   please do not take any offense that we're talking about

14   something out of your presence.

15          Now, nothing I say or do during the course of the

16   trial is intended to indicate or should be taken by you as

17   indicating what your verdict should be.  At times I may ask

18   questions.  If so, it's only for the purpose of clarification.

19   It is not in any way intended to indicate an opinion about the

20   facts or indicate the weight that you should give the

21   testimony of any witness.

22          Now let's talk about the burden of proof and certain

23   rules relating to criminal cases.  There are three basic rules

24   about a criminal case that you must keep in mind.  First, the

25   defendant is presumed innocent until found guilty.  The

Proceedings                                                    183

1    indictment brought by the Government against the defendant is

2    only an accusation, nothing more.  It is not proof of guilt or

3    anything else.  The defendant, therefore, starts out with a

4    clean slate.  Second, the burden of proof is on the Government

5    until the very end of the case.  The defendant has no burden

6    to prove his innocence or to prove -- or to present any

7    evidence or to testify at the trial.  Since the defendant has

8    a right to remain silent, the law prohibits you from arriving

9    at your verdict by considering that the defendant may not have

10   testified or put on any evidence.  Third, the Government must

11   prove the defendant's guilt beyond a reasonable doubt.

12         I will give you further instructions on this point

13   later, but bear in mind that in this respect a criminal case

14   is different than a civil case which has a different burden of

15   proof.  The evidence from which you will find the facts will

16   consist of the testimony of witnesses on direct and

17   cross-examination, documents and other evidence received into

18   the record as exhibits and any facts that the lawyers agree or

19   stipulate to.

20         Certain things are not evidence and must not be

21   considered by you.  I will list them for you now:  Statements,

22   arguments and questions by the lawyers are not evidence.

23   Objections to questions are not evidence.  Lawyers have an

24   obligation to their clients to make objections when they

25   believe evidence is being offered for an improper purpose

Proceedings                                    184

1   under the rules of evidence.  You should not hold it against

2   the lawyers if they make objections.  You should not be

3   influenced by the objection or my ruling on it.  If the

4   objection is sustained, ignore the question.  If it is

5   overruled, treat the answer like any other.  So remember,

6   sustained, ignore the question and the answer; overruled,

7   treat it like any other answer.

8           If you are instructed that some item of evidence is

9   received for a limited purpose, you must follow that

10  instruction.  Testimony that I have excluded or told you to

11  disregard is not evidence and should not be considered.  And

12  anything you may have seen or heard outside the courtroom is

13  not evidence and must be disregarded.  You are to decide the

14  case solely on the evidence presented in this courtroom.  If

15  there is any publicity about this case, not that I expect it,

16  you must completely disregard it and not be influenced by it.

17  If something pops up on your phone or something happens that

18  suggests something about this case, you should avoid listening

19  or hearing that -- listening or seeing that.  Finally, you are

20  instructed once again not to read, listen or watch any news

21  reports on this case should there be any.

22          Now, there are two types of evidence, direct and

23  circumstantial.  Direct evidence is direct proof of a fact

24  such as testimony from an eyewitness.  Circumstantial evidence

25  is proof of facts from which you may infer or conclude that

Proceedings                                        185

1   other facts exist.  I will give you further instructions on

2   these as well as other matters at the end of the case.  But

3   keep in mind that you can consider both types of evidence,

4   direct and circumstantial.  It will be up to you to decide

5   which witnesses to believe, which witnesses not to believe and

6   how much of any witness's testimony to believe or not.  I will

7   give you some guidelines at the end of the trial again about

8   determining the credibility of witnesses when you get closer

9   to your deliberation.

10              Now, a few words about your conduct as jurors.  As I

11  said before, you must decide this case based solely on the

12  evidence presented within the four walls of this courtroom.

13  This means that during the trial you must not conduct any

14  independent research about this case, the matters in the case

15  or the individuals or entities involved in this case.

16              In other words, don't consult any dictionaries or

17  reference materials, search the internet, websites or blogs or

18  use any other electronic tools to obtain information about

19  this case or to help you decide this case.  Please do not try

20  to find out any information from any source outside the

21  confines of this courtroom.  Similarly you are not to send any

22  information out about this case.  So you cannot Twitter, blog,

23  text, or Google the people in the case or about your

24  experience as a juror until after you are excused from jury

25  service.

Proceedings                              186

1              Now, let me reiterate again that you are not to

2    discuss the case with anyone or let anyone talk to you about

3    the case during the entire time that you are a juror in this

4    case and that includes amongst yourselves.

5              So when you are taking breaks you cannot talk about

6    this case until you retire for your deliberations.  And,

7    lastly, keep an open mind, wait until you hear all of the

8    evidence before forming opinions about your verdict in this

9    case.  One last note about note taking.  If you want to take

10   notes during the course of the trial, you may do so.  However,

11   if you do take notes, be sure that your note taking doesn't

12   interfere with your listening to and considering the evidence.

13             Now, if this informs your decision about whether to

14   take notes or not, you should note that during your

15   deliberations you can have any part of the transcript sent

16   back to you in the jury room in case you forget about

17   someone's testimony or about some piece of evidence.  So for

18   those of you that are worried that you have to write down

19   everything that happened, you do not.  There will be a

20   transcript that will be available to you during your

21   deliberations.

22             If you do take notes, do not discuss them with

23   anyone before you begin deliberations and do not take your

24   notes home with you at the end of the day but leave them in

25   the jury room.  If you choose not to take notes, remember that

Proceedings                              187

1    it's still your individual responsibility to listen to and

2    receive the evidence in the case.  You cannot delegate that to

3    someone else who is taking notes.  We depend on the judgment

4    of all the members of the jury.  You all must remember the

5    evidence in this case as I said before.  However, if your

6    memories fail, you can ask to have the transcript sent back to

7    you.

8              Let me explain how the trial will proceed.  First,

9    the Government will make an opening statement which is simply

10   an outline to help you understand the evidence as it comes in.

11   It's not evidence itself.  It's not even argument.  It's

12   simply an outline or a preview of what the Government expects

13   the evidence to be.  Next, the defense attorney may but does

14   not have to make an opening statement.  Again, opening

15   statements are neither argument nor evidence.

16             The Government will then present its witnesses and

17   the counsel for the defendant cross-examine those witnesses.

18   Following the Government's case, the defendant may, if he

19   wishes present witnesses for the Government to cross-examine.

20             After all the evidence has been submitted the

21   attorneys will present their closing arguments to you to

22   summarize and interpret the evidence for you.  And then I will

23   instruct you on the law.  After that, you will retire for your

24   deliberations.  Now, specifically I want to address our one

25   alternate juror on the end there.  You should listen just as

Proceedings                                   188

1   carefully and conscientiously as the other jurors.  You may

2   well be called upon prior to the end of the case to take the

3   place of one of the other jurors and you will have to render a

4   verdict along with the other jurors.  So please pay strict

5   attention at all times.

6           As I am sure you have noticed -- we obviously are

7   wearing masks in the courtroom.  What you choose to do in the

8   jury room is really up to you individually.  I'm not going to

9   require you to wear a mask in the jury room itself, but for

10  those of you who feeling uncomfortable being unmasked, you

11  should keep it on.  I'm not going to dictate what happens in

12  the jury room, but you should all abide by whatever

13  precautions you feel are necessary and that you are most

14  comfortable with.

15          If there is any issue about that, you can raise it

16  with the deputy, Ryan, and then tomorrow the other deputy who

17  will be here named Fida.  One last thing about our schedule.

18  I ask that every day you be ready to go here in the jury room

19  by 9:30 a.m. and each day should run until about 5:30 p.m.  I

20  ask that you all be on time as a courtesy to each other and

21  the parties because we cannot start until all of you are here

22  and ready to go.  We will typically take a 15-minute break in

23  the morning and in the afternoon and then we will break for

24  such for an hour at 1 p.m. or thereabout, depending on where

25  we are in the presentation of evidence.  And that will be our

1   schedule throughout.

2          As I said before, we're not sitting on Wednesday

3   because of the Jewish holiday and then Monday, next Monday

4   which is Columbus Day.  In addition and I forgot to mention

5   this during jury selection, tomorrow we're going to break

6   early at 1 p.m. also because of observance of the Jewish

7   holiday.  Tomorrow we're going to have a short day from 9:30

8   to 1.  I appreciate your patience in terms of coming in, but

9   we're going to try to move this case along as expeditiously as

10  possible.

11          As I said to you during jury selection, not wasting

12  your time is one of my top priorities and I will do everything

13  I can to move this trial along as efficiently as possible.

14  All right.  So I think with that, Ms. Kassner -- Ms. Diouf,

15  are you making the opening?  Let's have you mic up.  You will

16  be heard better.

17          MS. DIOUF:  That man, the defendant, Mustafa Goklu

18  is a money launderer.  He ran an illegal business converting

19  Bitcoin, a type of digital currency, to cash.  Through that

20  business, the defendant met repeatedly with a man who he

21  thought was a drug dealer.  In exchange for hefty fees, the

22  defendant took the drug dealer's money and converted it from

23  Bitcoin into cash; concealing what it was, who owned it and

24  where it came from.

25          The defendant met the drug dealer seven times and

1  converted more than $130,000 worth of the drug dealer's money

2  from Bitcoin to cash.  What the defendant didn't know is that

3  the drug dealer was an undercover agent with the Drug

4  Enforcement Administration.  The defendant also didn't know

5  that the undercover agent recorded their meetings.  That is

6  why we are here today.

7           Members of the jury, my name is Marietou Diouf and

8  I'm an assistant United States attorney here in the Eastern

9  District of New York.  I am joined by my colleagues, Assistant

10  United States Attorneys, Gillian Kassner and Francisco

11  Navarro, paralegal specialist Bridget Donovan and DEA Special

12  Agent Julian Herr.  Together we represent the United States of

13  America.

14           Let's talk about Bitcoin.  Bitcoin is a type of

15  digital currency that can be used like cash.  There are two

16  main ways to change Bitcoin into cash.  The first is by using

17  a commercial exchange a platform similar to a bank.  One exam

18  of that is Coinbase.  Commercial exchanges require names and

19  identifications.  They are quick and relatively cheap to use.

20  The second way is through a peer-to-peer exchange.  And

21  peer-to-peer exchange.  People meet up directly, one person

22  transfers Bitcoin and the other in turn hands over cash.

23  Typically, peer-to-peer exchanges do not require

24  identification.

25           The defendant ran a peer-to-peer money exchange

1   business; meeting his customers in person in his parked car

2   where he exchanged their Bitcoin or cash for a fee and the

3   defendant's service was expensive.  Three to four times what

4   Coinbase charged for the same transaction.  But in exchange

5   for that cost, what the defendant offered his customers was

6   the ability to remain anonymous; to conceal where their money

7   was coming from and avoid detection by law enforcement so they

8   can continue to engage in illegal activities like drug

9   dealing.

10          In July 2018, an undercover DEA agent posing as a

11  drug dealer reached out to the defendant on an instant

12  messaging application, after seeing the defendants

13  peer-to-peer exchange advertisement online.  The agent asked

14  the defendant if he could meet to exchange $5,000 is worth of

15  Bitcoin into cash.  Within three minutes, sight unseen, the

16  defendant agreed to meet.

17          Over the next several months the defendant and the

18  undercover agent met seven times to convert Bitcoin to cash

19  and each time the undercover agent told the defendant more and

20  more about his business.  He told the defendant that he got

21  his money from selling pills to college kids, like oxycodone

22  and Adderall and that he sold marijuana.  The defendant was

23  undeterred.  He continued to exchange Bitcoin for the

24  undercover agent in greater and greater amounts, starting at

25  $5,000 at a time and progressing to more than $40,000 at a

Opening Statement - Diouf                    192

1    time.  Finally, the defendant was arrested while in the middle

2    of exchanging approximately $50,000 worth of Bitcoin.

3           THE COURT:  Sorry, folks.  We need you to be a

4    little quieter with the translation.  If you can move back a

5    little bit farther.  It would be helpful to the Court

6    reporter.  My apologies.  Why don't you restart wherever you

7    left off.  The last sentence was $50,000 of Bitcoin.

8           MS. KASSNER:  Finally, the defendant was arrested in

9    the middle of exchanging approximately $50,000 worth of

10   Bitcoin.  For moving money and hiding where it came from, the

11   defendant is charged with money laundering.  For running a

12   business converting money from one form to another without a

13   license as required by law, the defendant is charged with

14   operating an unlicensed money transmitting business.

15          The Government will prove these charges to you

16   beyond a reasonable doubt through three main types of

17   evidence.  First, the defendant's statements.  The defendant's

18   exchanges with the undercover agent were audio recorded and we

19   will play those recordings for you.  You will hear the

20   defendant's own words, instructing the undercover agent to be

21   careful and discussing his fear of being caught by the NYPD.

22          Agreeing to exchange money for the undercover agent

23   after being told that the source of the money he's converting

24   are illegal drugs.  We'll show you the defendant's encrypted

25   text messages with the undercover agent as well as with his

1    other customers.  In these messages you will see the defendant

2    consistently agreed to meet customers sight unseen without

3    ever asking for a name, address or a form of ID.

4            Second, physical evidence.  You will learn that on

5    the day of the defendant's arrest law enforcement searched his

6    apartment and car.  You will see some of the items found

7    during that search; a money counter used to count cash for the

8    defendant's business; a cell phone the defendant used to

9    communicate with the undercover agent and his other customers;

10   a laptop containing documents relating to the defendant's

11   business.

12           Third, witness testimony.  You will hear from the

13   undercover agent about the transactions with the defendant.

14   He will tell you that he told the defendant that his Bitcoin

15   came from the sale of illegal drugs.  You will hear about the

16   precautions that the defendant took to avoid detection by law

17   enforcement.  You will also hear from an expert who will

18   explain the different ways that Bitcoin can be exchanged for

19   cash and how peer-to-peer exchanges facilitate a market for

20   drug dealers to use their profits to further their illegal

21   businesses.

22           You will hear from representatives from the New York

23   State Department of Financial Services, the United States

24   Department of Treasury, who will confirm that the defendant

25   did not have a license to operate a money transmitting

Opening Statement - Diouf                    194

1   business as required by law.

2         Members of the jury, after you have seen and heard

3   all of the evidence we will come back to you and ask you to

4   return the only verdict consistent with that evidence, guilty.

5         THE COURT:  Thank you very much Ms. Diouf.

6         Mr. Singer, do you wish to make an opening

7   statement?

8         MR. SINGER:  Yes, Your Honor.

9         THE COURT:  All right.

10        MR. SINGER:  Good afternoon, ladies and gentlemen.

11  Again, my name is Murray Singer.  Along with Emilee Sahli.  We

12  represent Mustafa or Michael Goklu.  We call him Michael

13  Goklu.  Mr. Goklu is referred to throughout these proceedings

14  as the defendant.  His name is Michael Goklu.  He's an

15  individual and he's the person who is being accused and has

16  entered a plea of not guilty to these charges.  So, okay, we

17  just heard the Government's opening, this is what the evidence

18  is going to show and it's my opportunity to come before you

19  and say not so fast.

20        There are two charges in this indictment as you have

21  heard; a charge called money laundering and a charge called

22  operation of an unlicensed money transmitting business.

23  There's a number of pieces, or elements, in the definition of

24  these charges and what the Government is required to prove.  I

25  want to highlight some of the evidence that you're going to

1    hear as it relates to those elements or pieces.

2           One of the things that the Government is going to

3    have to prove and that is in dispute here is whether Mr. Goklu

4    believes that what this undercover officer was coming to him

5    with, the Bitcoin that he was coming to him with, was, in

6    fact, the proceeds of illegal, unlawful drug transactions,

7    okay?  Not what the undercover officer may have said, not what

8    the prosecutors may believe or infer from that, but what

9    Mr. Goklu understood, processed, believed.

10          So they have to prove that he believed that what was

11   being brought to him were the proceeds of unlawful drug

12   transactions and our contention is that the evidence is not

13   going to support that.  I will talk about that in a second.

14          If he believed -- if, in fact, he believed that what

15   we're talking about is unlawful -- the proceeds of unlawful

16   drug transactions, the Government also has to prove that

17   Mr. Goklu's intention or purposes in conducting these

18   exchanges was to hide the source of the money; to help the

19   person who was supposedly a drug dealer to help him hide,

20   launder, clean up, the source of the money that is not -- not

21   that it might have facilitated that, but then Mr. Goklu's

22   intention and purpose was to do so.

23          So the transactions start with and you can hear it

24   in the recordings.  Mr. Goklu is heard counting out the money

25   because they start with how much cash is there going to be.

Opening Statement - Diouf                    196

1    I'm going to give you 3,000, 5,000, 20,000, whatever the

2    amount was in each of the transactions and they count it out

3    and you can hear the money machines.  You may be familiar with

4    them from the bank.  When you go to the bank and take out

5    $1,000, the teller will run it through a machine and it zips

6    right through and it counts the bills.  So he was getting a

7    fee to figure out the money.  I'm going to give you $5,000, my

8    fee is X percent, and, so we take that out.

9              And then the second part of the transaction was the

10   Bitcoin transfer.  And for those of you folks that don't deal

11   with and don't understand Bitcoin, nobody is ever going to

12   make you understand it, why it exists, but you're going to

13   learn about how it works; that when a transfer takes place and

14   you don't need to know every detail, but essentially, when you

15   are transferring out of your -- what's called your wallet or

16   the app on your phone, you initiate the transfer and it

17   takes -- it can take a little bit of time to get confirmation

18   that the transfer is taking place.  It's referred to as adding

19   to the block chain and you will hear about -- you will learn

20   about all of these terms, but essentially, the two of them are

21   sitting in the car.

22             First, they count out the cash and then the

23   undercover initiates the transfer and then they're sitting

24   there waiting for the transaction to clear.  And it could be

25   ten minutes or 20 minutes or 30 minutes and while they're

1    sitting there, they're just chatting, people that are sitting

2    there waiting for something just start talking about stuff.

3    And that's what you will hear on these tapes and then once the

4    transaction clears, they say goodbye and go their separate

5    ways.  Each one of the transactions is that.

6             Now, the Government alleges that each one of these

7    seven transactions was done by Mr. Goklu where he knew that

8    these were proceeds of unlawful drug transactions and that his

9    purpose was to help the undercover hide the source of the

10   money.  What you're going to hear -- the first time they met

11   was in August 2018.  And they met again -- these transactions

12   were between August of 2018 and April of 2019.

13            So there's one in August, one in September, one in

14   November, one in December, so these first four meetings, there

15   is not a single mention of where this money was coming from,

16   of where the Bitcoin was coming from.  And you will hear, you

17   know, Mr. Goklu they're exchanging large amounts of cash in

18   the street or in a car, and you know, you don't want to draw

19   law enforcement attention to yourself because they will sees

20   your money and ask questions later.  And only later after they

21   realize that there wasn't anything going on, you night get

22   your money back, but you don't want to get the police

23   involved.  It's none of their business but they're going to

24   look at it and Mr. Goklu expresses on several occasions that,

25   you know, if the police see a money changing machine, they're

1    going to think we're drug dealers.

2          The undercover officer never says to him, well, I

3    am.  That's the money I'm bringing to you.  He never says

4    anything like that.  He doesn't indicate either the text

5    messages leading up to the meeting or in the meeting itself

6    where the money is coming from or what his business is.  You

7    know, he dances around it.  I'm operating an online business.

8

9          (Continued to the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

1    (Continuing.)

2            MR. SINGER:  That his -- not just that it might have

3    facilitated that, but that Mr. Goklu's intention and purpose

4    was to do so and we submit the evidence is going to fail in

5    that regard as well.

6            So let's consider what you are going to hear in the

7    evidence here.  The prosecutor's opening statements just

8    indicated that there were a number of transactions.  There

9    were seven meetings between Mr. Goklu and the undercover

10   officer.  A person who turned out to be a undercover police

11   officer that Mr. Goklu was not aware of that until he was

12   arrested.  Each one of the seven meetings essentially were

13   conducted in the same way.

14           The undercover officer brought Bitcoin to the

15   meeting.  And you'll learn about Bitcoin.  It's essentially an

16   electronic or digital currency or something that is akin to an

17   app on your phone that you can access it and you can transfer

18   it from your phone to another person.  So the undercover

19   officer brought the Bitcoin essentially in his phone and

20   Mr. Goklu brought cash.  And each transaction was meant to be,

21   you're going to give me Bitcoin and I'm going to give you

22   cash.

23           And each one of the transactions, each of the seven

24   times, that's essentially what happened.  And we're talking

25   about thousands of dollars.  And Mr. -- the evidence will show

1   Mr. Goklu had -- and you'll even hear it on the recordings of

2   each one of these transactions, six of the seven were fully

3   recorded.  And you will have them as evidence and you'll be

4   able to listen to them.  And believe me, I'm going to

5   encourage you to listen to them.  Every last second of it.

6           Because each one of these meetings counting out the

7   money and Mr. Goklu charged a fee.  Part of what he was doing,

8   he was making a percentage off of the transfer.  Welcome.

9   That's the money I'm bringing to you.  He never says anything

10  like that.

11          August, September, November, December, there's not a

12  single mention by the undercover officer where this Bitcoin is

13  coming from.  And ycet, the Government is here alleging that

14  Mr. Goklu knew that it was drug money.  And Mr. Goklu's

15  purpose in doing the transactions was not to earn his fee,

16  because he's making hundreds of dollars.  Not that's what his

17  purpose was, but that his purpose was to hide the source of

18  the money.  He didn't even know the source of the money.

19          Okay.  He didn't intend to hide it.  He doesn't even

20  know where it's coming from or that it needs to be hidden

21  because.  The undercover never said to him, Hey, I got to hide

22  this stuff.  I want to change it from Bitcoin to cash because

23  I need to launder this and hide it.  He never said that.  You

24  got two meetings in January, the fifth and sixth meetings.

25  And then a seventh meeting in April where at the end of the

1   meeting the arrest takes place.

2          Well, the undercover finally starts to open up a

3   little bit and start to say things about the source of some of

4   his business.  Part of it, there's some discussion, and

5   Mr. Goklu indicates that he knows somebody that does this as

6   well, operates a legal marijuana business in California, where

7   the state law in California, they legalized marijuana.  Like

8   New York is doing now and in the process of doing now,

9   California has done that for a number of years.

10         And individuals can legally grow marijuana on a

11  farm, cannabis farm.  They can sell it to a dispensary, a

12  lawful dispensary.  You pay taxes on it.  It's all legal.  So

13  there's discussion about a legal marijuana business.  And,

14  again, the charge requires that it be unlawful drug money.

15         But in the first of the two January meetings, the

16  undercover starts mentioning, oh, I sell pills.  And he

17  says -- you'll hear this on the tapes.  It's all there.  There

18  is no dispute about what the undercover officer said to

19  Mr. Goklu.

20         But again, the dispute is about what he heard or

21  processed or understood from it.  Because the undercover

22  officer says, So I can get you Oxy's.  And Mr. Goklu.  This

23  sophisticated money launderer says to the undercover, What's

24  Oxy's?  He doesn't even know what they are.  That's there

25  evidence.

1        And then the undercover mentions something about

2   Adderall.  When you listen to these conversations, Mr. Goklu

3   doesn't respond.  He doesn't indicate in any way that he

4   understands what this guy is talking about, but he continues

5   to do the transactions like he did the first four because he

6   was making money off of it.  And then, what clearly -- what

7   the evidence will clearly demonstrate to you about what

8   Mr. Goklu knew and believed, happens at the beginning of the

9   April 30th of the 2019, a seventh meeting.  At the sixth

10  meeting, there was nothing about where the money was coming

11  from.

12       But in the final meeting on April 30th, you know,

13  while they're sitting there waiting for some of the

14  transactions to go through -- actually, this was at the

15  beginning before they did the transactions.  They're just, you

16  know -- it's the seventh time they've met.  They kind of know

17  each other by now.  And Mr. Goklu asked the undercover, how's

18  business?  Just your basic greeting when you met with somebody

19  that you had some dealings with.  How's business?  And the

20  undercover says, Booming.

21       And Mr. Goklu gives what I submit to you as the kind

22  of response that people kind of half jokingly make, half

23  meaning it, will give in that situations.  He says to the

24  undercover officer, Hey, may be I should get in on that

25  business.  Hey, your business is booming.  May be I should get

1   in on that.  And the undercover says, You want, you want in?

2   And what Mr. Goklu says in response to that, he wants to know

3   how much it costs to get into a cannabis farm.  That's it.  He

4   wants to know how much is a cannabis farm.  The cannabis farms

5   that the undercover officers indicated that he operates or

6   connected with in California, a legal cannabis farm.  Nothing

7   about pills, or Oxy, or Adderall.  That's what the evidence is

8   going to show you.

9          Now, the reason we need you folks.  The reason you

10  are here spending your week with us, is because the

11  prosecution and the defense don't agree on what this means and

12  what this shows.  The Government has the obligation to

13  convince you beyond a reasonable doubt that Mr. Goklu knew and

14  believed that these were the proceeds of illegal drug

15  transactions and that his intention and purpose was to conceal

16  and disguise the source of the money, where it came from.

17         So folks, listen carefully to the evidence.  I

18  suspect that the prosecution's witnesses are going to get on

19  and they are going to highlight those portions of their

20  meetings where Mr. Goklu doesn't want the police around.  It's

21  like spooky and scary and why would somebody do that?  Why

22  would somebody want to do a private transaction rather than,

23  you know, a public one through some -- essentially a bank.

24  Why would somebody not want the police around.

25         In summations, I'll be able to talk to you a little

1  bit more about that and answer some of those questions, but

2  the Government is going to put in little bits and pieces of

3  this and rye to make it all spooky and scary and somehow

4  underhanded.  And I am urging you folks to keep an open mind.

5  There's another way of viewing this evidence.  There are other

6  inferences to be drawn from the evidence that will be

7  presented to you.

8           And I'm going to be going through them in my closing

9  arguments to you.  After I've asked you and begged you to

10 listen carefully to the recordings of these transactions.  So

11 folks, keep an open mind.  Don't just jump to the conclusions

12 that the prosecutors and the undercover agents jumped to right

13 from the get-go.  Keep an open mind, listen to all the

14 evidence, I will have a chance to speak to you at the end of

15 the case.

16          Thank you very much.

17          THE COURT:  Thank you very much, Mr. Singer.

18          MS. KASSNER:  Your Honor, before our first witness,

19 AUSA Francisco Navarro is going to read stipulation into the

20 record.

21          THE COURT:  All right.

22          MR. NAVARRO:  Your Honor, can I just get the Elmo?

23 It would be easier for the jury to follow.

24          THE COURT:  Yes.

25          You can publish it.

1          (Exhibit published.)

2          MR. NAVARRO:  I'll do my best to read it slowly.

3          United States of America against Mustafa Goklu, also

4   known as Mustangy.  It is hereby stipulated and agreed by and

5   between by the United States of American, by Assistant United

6   States attorneys Gillian A. Kassner and Marietou E. Diouf, and

7   the defendant, Mr. Mustafa Goklu, by his attorneys Murray

8   Singer and Emilee Sahli that:

9          Government's Exhibit 1001, is a cellular telephone.

10  And I'm going to hold it up to the jury.  Government's

11  Exhibit 1001, is a cellular telephone Samsung Galaxy S9 plus,

12  IMEI:  353522096665860, which was recovered from the defendant

13  on April 30, 2019.

14         Government's Exhibits 201 through 228 consist of

15  true and accurate copies of a subset of images extracted from

16  Government's Exhibit 1001.  Images in 228 contain screenshots

17  of messages from Government's Exhibit 1,001.

18         Government's Exhibit 1002, which I'm holding up to

19  the jury, consist of a laptop computer, Apple MacBook Pro

20  Retina Serial Number C02L58C1DR53, which is recovered from a

21  search of the defendant's residence, located at 50-30 39th

22  Place, Floor 2, Long Island City, New York on April 30, 2019,

23  and that's Exhibit 1002.

24         Government's Exhibit 701 through 765, consist of

25  true and accurate copies of a subset of images and documents

1  extracted from Government's Exhibit 1002, which is the laptop

2  I was just holding.

3          Government's Exhibit 1003, consist of a G-star

4  Technologies money counter, which was recovered from a search

5  of the defendant's black 2013 Mercedes Benz sedan bearing

6  vehicle identification number WDDNG8DB2DA515230, and New York

7  license plate JER-4428 on April 30, 2019.  And that's

8  Government's Exhibit 1003.

9          Government's Exhibit 201 through 238, 701 through

10 765, and 1001, and 1003, and this stipulation, which has been

11 marked for identification as Government's Exhibit 1102 are

12 admissible in evidence.

13         So stipulated, Brooklyn, New York, September 28,

14 2022.  And I'm putting it on the screen so you can see that

15 it's signed by both parties.

16         That's it, Your Honor.  Thank you.

17         THE COURT:  Thank you.

18         Call your first witness.

19         MS. KASSNER:  The Government calls DEA Special Agent

20 Lilita Infante.

21         THE COURT:  So Ladies and Gentlemen, since we got a

22 late start in the afternoon session, I'm going to dispense of

23 our 15-minute break, but if anyone needs a nature break,

24 please raise your hand.  So we can get in more presentation

25 today.

1          Agent, if you will approach the witness stand and

2   remain standing for a moment so you can be sworn in.

3          THE COURTROOM DEPUTY:  Do you solemnly swear or

4   affirm that the testimony you are about to give in this case

5   now before the Court, will be the truth, the whole truth and

6   nothing but the truth.

7          THE WITNESS:  I do.

8          THE COURTROOM DEPUTY:  Please state and spell your

9   name for the record, please.

10          THE WITNESS:  Lilita Infante; L-I-L-I-T-A.

11   I-N-F-A-N-T-E.

12          THE COURT:  You may have a seat.

13                        .

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1  **LILITA INFANTE**,

2       having been first duly sworn, was examined and

3       testified as follows:

4  DIRECT EXAMINATION

5  BY MS. DIOUF:

6  Q    Good afternoon, Special Agent Infante.

7       I'm here in the back at the podium a few feet away

8  from you.

9  A    Good afternoon.

10 Q    Special Agent Infante, are you employed?

11 A    Yes.

12 Q    Where do you work?

13 A    I work at the Drug Enforcement Administration.

14 Q    Is the drug information administration --

15       MS. KASSNER:  Special Agent Infante, if you could

16 remove your mask while you're testifying.  Thank you.

17 Q    Is the Drug Enforcement Administration also known as the

18 DEA?

19 A    Yes, it is.

20 Q    And you mentioned you are a special agent.

21       What is the special agent at the DEA?

22 A    Special agent at the DEA is -- investigates narcotics and

23 money laundering crimes.  Common duties will include writing

24 affidavits, issuing subpoenas, doing physical surveillance,

25 financial investigations as well, tracing elicit funds,

Infante - direct - Diouf                    209

1    writing affidavits for wiretaps, executing search warrants and

2    arrest warrants, et cetera.

3    Q    How long have you been a special agent at the DEA?

4    A    Approximately nine years.

5    Q    What is your current assignment?

6    A    I currently work at the cyber -- Counter Narcotics Cyber

7    Investigation Task Force in the Miami field division.

8    Q    And prior to serving as a special agent at the DEA for

9    nine years, where did you attend college?

10   A    I attended Columbia University where I studied economics

11   and Harvard University where I studied general management.

12   Q    What are your duties and responsibilities in the Miami

13   office that you currently work at?

14   A    I investigate specifically cryptocurrency related crimes

15   that relate to narcotics and money laundering.

16   Q    What are cryptocurrency related crimes?

17   A    Anything that has to do with utilizing cryptocurrency in

18   furtherance of a crime.  Such as taking cryptocurrency as a

19   payment for elicit goods and services or using cryptocurrency

20   to launder money or hide the proceeds of an elicit illegal

21   activity.

22   Q    Approximately how many cryptocurrency enabled money

23   laundering and narcotics cases have you investigated?

24   A    Probably over 20 at this point.

25   Q    And approximately how many of those investigations

1    involved cryptocurrency?

2    A    All of them.

3    Q    Have you ever arrested an individual for money laundering

4    in connection with cryptocurrency?

5    A    Yes, on multiple occasions.

6    Q    Have you received any formal training in this area that

7    you investigate?

8    A    Yes.  I received training in tracing cryptocurrency,

9    Blockchain analysis, general financial investigations when it

10   comes to cryptocurrency, and narcotic sales on the internet as

11   well.

12   Q    Have you lead any trainings on cryptocurrency enabled

13   money laundering and narcotics trafficking offenses?

14   A    Yes.  I have lead several trainings all over the world

15   that include cyber investigations that have touched

16   cryptocurrency and narcotics trafficking on internet.

17   Q    Are you familiar with how cryptocurrency is accessed,

18   bought, exchanged and stored?

19   A    Yes, I am.

20   Q    And how are you familiar with that?

21   A    I have personally bought, exchanged, and stored

22   cryptocurrency in an undercover capacity in my cases and also

23   on a personal level as well.

24   Q    How many times have you bought, accessed, or stored

25   cryptocurrency through your work with the DEA?

Infante - direct - Diouf                    211

1  A    Through my work with the DEA probably around 30, 40
2  times.
3  Q    And have you been involved in exchanging cash into
4  cryptocurrency through your work with the DEA?
5  A    Yes, I have.
6  Q    And approximately how many times?
7  A    Probably anywhere from 30 to 40 times as well.
8  Q    And through your work with the DEA, have you opened
9  accounts on Bitcoin exchanges?
10 A    Yes.  I have on multiple occasions.
11 Q    Have you purchased Bitcoin on exchanges?
12 A    Yes, I have.
13 Q    And approximately how many times?
14 A    Probably around 20 to 30 times.
15 Q    Have you purchased Bitcoin through peer-to-peer
16 transactions?
17 A    Yes, I have as well.
18 Q    How many times have you testified either before a Grand
19 Jury or at trial?
20 A    Over a dozen times.
21 Q    Were you involved in the investigation of this case?
22 A    No, I was not involved.
23 Q    Did you conduct any interviews of participants in this
24 case?
25 A    No.

1   Q     Have you had any contact with the defendant?

2   A     No.

3              MS. DIOUF:  At this time the Government moves

4   pursuant to Federal Rule of Evidence 702 to qualify Special

5   Agent Lilita Infante as an expert in the areas of crypto

6   currency and the methods by which crypto currency are

7   typically stored, accessed, transferred and exchanged.

8              THE COURT:  Do you want to voir dire, Mr. Singer?

9              MR. SINGER:  No, Your Honor.  No objection.

10             THE COURT:  Then she will be so qualified.

11             MS. DIOUF:  Thank you.

12  BY MS. DIOUF:

13  Q     Special Agent Infante, what is digital currency?

14  A     Digital currency is essentially like Internet money.  It

15  is transacted on a peer-to-peer basis, which is one of the

16  main differences between digital currency and regular

17  currency, such as the U.S. dollar.  On a peer-to-peer basis

18  means there is no intermediary, such as a bank for example, or

19  a credit card company.  It is governed by a code, as opposed

20  to a Government printing money.  It is governed by basically

21  computing power and code.  Individuals can also buy sell and

22  exchange digital currency on centralized exchanges.

23  Q     Is digital currency another term for crypto currency?

24  A     Yes.

25  Q     How would digital currency compare to a 20-dollar bill I

1   might have in my wallet?

2   A    When you have a -- first of all, a 20-dollar bill would

3   be considered fiat currency which is governed by for example

4   the U.S. Government.  Also in order to spend that 20-dollar

5   bill in your wallet would you have to physically be present

6   with whoever you are with you who you are transacting with;

7   while with crypto currency you can transfer value or make

8   payments across borders globally without having had to have

9   any kind of intermediary peer-to-peer, and without having to

10  be physically present with the individual.

11  Q    What can digital currency be used for?

12  A    Digital currency can be used to store value, to transfer

13  value across borders, to make payments for goods and services,

14  to make profits via trading, for example by buying low and

15  selling high because digital currency fluctuates in price as

16  well.

17  Q    Can you explain what you mean by store value?

18  A    So it can be used as a commodity, for example, kind of

19  like digital gold.  So because the price of the digital

20  currency a lot of time goes up over many years, you can use it

21  as a store value or an investment over time.

22  Q    Can you give us some examples of digital currency?

23  A    Like Bitcoin, Ethereum or Litecoin.

24  Q    What is Bitcoin?

25  A    Bitcoin is the first-ever crypto currency that was ever

Infante - direct - Diouf                     214

1   invented.  It was first invented in January of 2009 by an

2   anonymous individual that went by the moniker of Satoshi

3   Nakamoto.  It was the first ever peer-to-peer decentralized

4   currency based on code.

5   Q     Is Bitcoin also known as BTC?

6   A     Yes, it is.

7   Q     Does Bitcoin exist in physical form?

8   A     No, it only exists in digital form.

9   Q     What does it look like?

10  A     The Bitcoin logo looks like an orange B with a line going

11  through it.

12  Q     How is Bitcoin priced?

13  A     Bitcoin is priced by the market.  So usually a

14  centralized exchange, such as for example, Coinbase or Binance

15  will set the price based on supply and demand.

16  Q     What is the price of one Bitcoin currently?

17  A     Currently it's approximately $19,000.

18  Q     What about in 2018?

19  A     In 2018 it fluctuated, averaged about $6,000.

20  Q     How do people store their Bitcoin?

21  A     One can store Bitcoin in a variety of ways.  One way is

22  to use a hosted wallet or a wallet on a centralized exchange,

23  such as Coinbase, for example, or Binance.  In this case the

24  centralized exchange will actually hold your Bitcoin for you,

25  and will allow you to buy and sell Bitcoin for fiat currency.

1   So you can connect your bank account and transact in that way

2   via the centralized exchange.

3           Another way you can store is it using an unhosted

4   wallet.  An Unhosted wallet is basically, it can be a software

5   that you can download to your computer or mobile device.  An

6   example of that would be Electrum on the computer or Mycelium,

7   a wallet on a mobile device.  And this kind of wallet would

8   allow you to store Bitcoin and transact in Bitcoin without

9   having to go through an intermediary such as an exchange.

10  Q    You mentioned Mycelium wallet, what is Mycelium?

11  A    Mycelium is a software wallet that can be used on a

12  mobile device such as iPhone or an android device.

13  Q    Special Agent Infante, I'd like to show you and the jury

14  what is in evidence as Government Exhibit 717, which was

15  recovered from the defendant's computer.  Can you see this

16  document?

17  A    Yes.

18  Q    What is this?

19  A    This is a back up of the Mycelium wallet.  So it has a

20  key pair, I think there is a key pair missing here, which are

21  two key codes.  So it would be a public key and private key.

22  Also a password that one can set to decrypt the private key

23  for the wallet.

24  Q    Let's go to the second page of the wallet.  Special Agent

25  Infante, what is this?

1   A     This is the private and public key pair for the, looks

2   like, a Bitcoin wallet from Mycelium.  What this means is

3   because this Bitcoin is based on encryption, every wallet will

4   have a public key, which is the key that you will give to

5   other people to send you money, so it looks like an

6   alphanumeric string of characters.  Then it also has a private

7   key, which you keep to yourself, which you could use to

8   recover your balance.

9           So let's say if you lost your phone and you need to

10  get a new phone, you have to download a new Mycelium wallet,

11  you would need that private key in order to recover the

12  balance of your wallet.

13  Q     Thank you.  You can take that exhibit down.

14          Special Agent Infante, how do people access their

15  Bitcoin to sell or exchange it using an unhosted wallet?

16  A     Using an unhosted wallet, one can do a peer-to-peer

17  exchange.  Which means that you would basically meet up with

18  whoever it is that you're transacting with, or you could agree

19  to use credit card payment or bank transfer.  And you would

20  trade directly with them using your unhosted wallet.

21  Q     How would someone access their Bitcoin to sell or

22  exchange using a commercial exchange?

23  A     With the commercial exchange, one would have to create an

24  account on the commercial exchange.  It's very similar to

25  creating a bank account, for example.  So you would create a

1    log in with a password.  You would have to provide identity

2    verification, like would you with a bank account.  Then you

3    would link your bank account or your credit card to your

4    centralized exchange account, that way the exchange will allow

5    you to buy or sell digital currency through the exchange.

6    Q    You mentioned that people can use Bitcoin to purchase

7    things and conduct other financial transactions.  Are all

8    Bitcoin payments recorded somewhere?

9    A    Yes.  Every Bitcoin transaction is recorded on a public

10   ledger called the blockchain.  This is a public ledger that

11   can be accessed by anybody with an Internet connection.  So

12   you can go on a website and actually see every single

13   transaction that ever transpired on the Bitcoin blockchain.

14   Q    So is it fair to say that Bitcoin blockchain exists

15   throughout the world?

16   A    Yes.

17   Q    Does every Bitcoin transaction impact the global

18   blockchain?

19   A    Yes, absolutely.

20   Q    Can you conduct a Bitcoin transaction without using the

21   Internet?

22   A    No.

23   Q    Why not?

24   A    Because in order to send funds via Bitcoin, you would

25   have to connect to the blockchain.  And in order to connect to

1   the blockchain, you would need to connect to the Internet.

2   Q    How does the one access information stored in the Bitcoin

3   blockchain?

4   A    It's very simple.  You can go online to various, they are

5   called block explorers, and you can check the date or

6   transaction number or even a wallet address, and the

7   blockchain will give you information about those transactions.

8   So for example if you have conducted a transaction, you can

9   put in a transaction number, called a hash.  It will give you

10  who sent it or the actual Bitcoin address of the alphanumeric

11  string of characters of the sender.  It will give you the

12  alphanumeric of the address of the receiver.  It will give you

13  the exact date and time and the amount that it was sent as

14  well.

15  Q    Are the identities of individuals or entities behind

16  wallet addresses recorded on the public ledger?

17  A    No.  The only thing that is recorded would be the

18  alphanumeric characters of the address wallets.

19  Q    How do people acquire Bitcoin?

20  A    There are multiple ways to acquire Bitcoin.  One would be

21  to use one of the centralized exchanges, such as Coinbase for

22  example.  Set up an account, verify your identity, then you're

23  able to link your bank account or credit card and purchase

24  Bitcoin that way.

25          Another way will be to use a peer-to-peer exchange.

1    This is basically an exchange that brings buyers and sellers

2    of Bitcoin together.  An example of that would be

3    LocalBitcoins.  So it's basically a middle-man between the

4    buyer and the seller.

5             Or you can always do a direct transaction with

6    somebody.  So if I know somebody that wants to sell me

7    Bitcoin, I can go and pay them cash in-person or by credit

8    card and do it directly with that individual.

9    Q    You mentioned Coinbase as an example a centralized

10   exchange.  Can you give us other examples?

11   A    Sure.  Binance, is a popular one.  Kraken is a popular

12   one.  And on peer-to-peer, LocalBitcoins would be, or Paxful.

13   Q    If I wanted to buy Bitcoin on Coinbase, what would I do?

14   A    You would have to first create an account.  And then go

15   through identity verification process, like you would with a

16   regular bank.  Then you have to basically provide your

17   driver's license, social security number, date of birth, real

18   name, usually you also have to provide proof of address with

19   utility bill.  After that process, you would link your bank

20   account to your Coinbase account, then you're able to buy

21   crypto currency.

22   Q    Is any special equipment required to access Coinbase?

23   A    Just an Internet connection.

24   Q    Do commercial exchanges charge fees?

25   A    Yes, they do.

1    Q     How is the fee assessed?

2    A     The fee is generally set by the exchange.

3    Q     What was Coinbase's transaction fee in 2018?

4    A     In 2018 it was about 1.49 percent for bank transfers and

5    3.99 percent for credit card transactions.

6    Q     Are commercial exchanges regulated?

7    A     Yes, they are regulated.

8    Q     Who regulates them?

9    A     The Government in which they operate.  Generally it has

10   to do with where the customers are, if any of the customers

11   are in the United States, for example, then they would have to

12   abide by regulation set by the United States.

13   Q     Can Coinbase be used anonymously?

14   A     It would be very difficult, unless the individual stole

15   someone else's identity.  It would be very difficult to use it

16   anonymously.

17   Q     Why is that?

18   A     Because you have to go through a rigorous identity

19   verification process in order to transact on Coinbase.

20   Q     Turning to what you referred to as peer-to-peer

21   exchanges.  What does peer-to-peer mean?

22   A     It means that unlike Coinbase where you're actually

23   buying crypto currency from the exchange, you would be buying

24   on a peer-to-peer basis from another individual.  So a

25   peer-to-peer exchange would act as an arbitrator or a

Infante - direct - Diouf                221

1    middle-man between you and another individual that would like

2    to transact in crypto.

3    Q    Can peer-to-peer exchanges happen over the Internet?

4    A    Yes.

5    Q    Can they happen in person?

6    A    Yes, absolutely, they can also happen in person.

7    Q    How would that work?

8    A    Many times if you want to conduct a peer-to-peer

9    transaction, many times you would first go to a peer-to-peer

10   exchange, see who is actually selling or buying crypto.  Then

11   you would find a listing for whatever it is that you want to

12   buy.  And then the exchange would facilitate that transaction.

13        Many people will actually then go off of the

14   exchange and conduct subsequent deals directly with that

15   individual that they found on the exchange.  So that can be

16   either in person, so they can meet in-person.  I'll sell them

17   the Bitcoin, I'll send it to their wallet that they give me.

18   Then they'll give me cash in-person, or if they have a credit

19   card reader we can also do that, or bank transfer or wire

20   transfer as well.

21   Q    Special Agent Infante, are you familiar with the ways in

22   which individuals who conduct off-exchange peer-to-peer

23   transactions communicate?

24   A    Yes.  They usually communicate via messaging platforms or

25   apps such as Signal, Wickr, WhatsApp.

1    Q    What is Signal?

2    A    Signal is an encrypted messaging app that is used to

3    communicate.  It uses end-to-end encryption, which means that

4    the individuals that operate Signal can't see the content of

5    the messages that are being transmitted.

6    Q    And how would I use Signal?

7    A    You would have to download it to your phone, and it's

8    fairly simple.

9    Q    What is Telegram?

10   A    Telegram is also a similar app that allows peer-to-peer

11   communication.

12   Q    Do peer-to-peer exchanges charge transaction fees?

13   A    Yes, they do.

14   Q    In general, how do those fees compare as commercial

15   exchanges like Coinbase?

16   A    Usually the fees are, the fee itself set by the

17   peer-to-peer exchange are similar.  But the spread or the

18   price of the actual asset is higher, so it actually may be

19   more expensive for you to transact on a peer-to-peer exchange

20   than it would be on a centralized exchange such as Coinbase.

21   Q    Why would someone use a peer-to-peer exchange over a

22   commercial exchange if it's more expensive?

23   A    One reason would be avoid having to provide identifying

24   information.  So, many peer-to-peer exchanges don't require

25   identifying information to be provided, especially if they are

Infante - direct - Diouf                        223

1  located in other countries that don't have those regulations.

2  So that would be, I think, one of the main reasons that

3  somebody wouldn't want to use, for example Coinbase, and have

4  to pay more money to use a peer-to-peer exchange.

5  Q    In your experience, can you buy illegal drugs online?

6  A    Yes.

7  Q    How are they paid for?

8  A    Usually the most common way would be in crypto currency.

9  Q    If I'm an online drug dealer and I have crypto currency

10 that comes from drug sales, how I would change it into cash?

11 A    Many times you would use either brokers that you already

12 know, so in a peer-to-peer manner.  Or if you don't know any

13 brokers that would exchange your crypto currency for cash, you

14 could use one of those peer-to-peer exchanges that will

15 connect you with other individuals that are buying crypto.

16 Q    In your experience, have you investigated peer-to-peer

17 exchanges?

18 A    I have, yes.

19 Q    And are you familiar with the types of crimes that might

20 occur on peer-to-peer exchanges?

21 A    Yes.

22 Q    What are those?

23 A    Generally money laundering, money laundering of crypto

24 currencies that spring from different types of crimes, such as

25 the sales of drugs online, for example.

Rivka Teich

Infante - direct - Diouf                    224

1   Q      You mentioned LocalBitcoins.com earlier what is that?

2   A      LocalBitcoins.com is an example of a peer-to-peer crypto

3   currency exchange.

4   Q      Is LocalBitcoins.com still operating?

5   A      Yes, it is.

6   Q      Was it operating in 2018?

7   A      Yes.

8   Q      Have you worked on any investigations involving

9   LocalBitcoins.com?

10  A      Yes, on multiple occasions.

11  Q      What sorts of investigations were these?

12          MR. SINGER:  Objection, your Honor.

13          THE COURT:  Overruled.

14  Q      You can answer.

15  A      Usually they were money laundering and drug trafficking

16  investigations involving crypto currencies.

17  Q      Where is LocalBitcoins.com based?

18  A      In Finland.

19  Q      And in 2018 if someone wanted to use LocalBitcoins.com,

20  what would they do?

21  A      They would have to create an account with a username and

22  password, usually they wouldn't have to provide a name or any

23  kind of identifying information, and they could trade crypto

24  currency without having to provide identity basically.

25          MS. DIOUF:  Just a moment, your Honor.

Rivka Teich

1            Nothing further.  Thank you.

2            THE COURT:  How are we doing?  Could we start

3  cross-examination without a break?  Okay.

4            Let's go, Mr. Singer.

5  CROSS-EXAMINATION

6  BY MR. SINGER:

7  Q    Good afternoon, Special Agent Infante.

8  A    Good afternoon.

9  Q    We have not met before, correct?

10  A    That's correct.

11  Q    It's a pleasure to meet you.

12  A    Likewise.

13  Q    You described digital currency as a means of exchange; is

14  that right?

15  A    That's correct.

16  Q    I just find it easier to refer to it as Bitcoin.  Is it

17  okay if I just speak of it as Bitcoin, understanding that

18  we're speaking generally about digital currency, okay?

19  A    Sure.

20  Q    So digital currency is a form of property, it's not money

21  like it's a 20-dollar bill, right?

22  A    It could be considered money.

23  Q    It's used like money.

24  A    It is used like money, yes.

25  Q    Okay.  And but essentially it's a form of property that

1    exists in a digital form on the blockchain, correct?

2    A    It could be considered as property, yes.

3    Q    The U.S. Treasury Department doesn't consider it currency

4    like U.S. currency for tax purposes, does it?

5    A    I'm not sure.  I'm not a tax expert, so I'm not sure for

6    taxes.

7    Q    You indicated that any digital currency the value is

8    determined by the market?

9    A    Yes.

10   Q    And it's determined, therefore, by just what somebody

11   will pay for it, correct?

12   A    Yes.

13   Q    And so the fluctuations in the value of a Bitcoin can

14   change significantly over time, right?

15   A    That's correct.

16   Q    I think you indicated that today one Bitcoin is worth

17   approximately $19,000?

18   A    Yes.

19   Q    And you said four years ago in 2018, that a Bitcoin was

20   worth an average of about $6,000?

21   A    That's correct.

22   Q    Maybe a little below, maybe a little above, but in that

23   general range, correct?

24   A    Correct.

25   Q    The value of Bitcoin, in your experience, has been known

1   to vary quickly and wildly?

2   A    Yes.

3   Q    That would be fair to say, correct?

4   A    Yes.

5   Q    You talked about different ways that a person may acquire

6   a Bitcoin -- let me step back for a second.

7          When a person -- Bitcoin can be owned in fractional

8   units as well, correct?

9   A    Yes.

10  Q    So you don't own one or two or three Bitcoins, you can

11  own 1.276 Bitcoin, correct?

12  A    Yes, correct.

13  Q    So it's actually broken down by, I'm not sure by how

14  many, but past a number of decimal points?

15  A    Correct.

16  Q    The market value is simply the value of one Bitcoin, then

17  you have to calculate the value to get to the fractional part,

18  correct?

19  A    Yes.

20  Q    You said that a Bitcoin can be purchased in several ways.

21  You indicated a person can go to an exchange and buy Bitcoin,

22  correct?

23  A    Yes.

24  Q    That was the Coinbase?

25  A    Right.

1  Q    And again, Coinbase operates like a bank.  It's a company

2  that operates like a bank where you have an account with them?

3  A    Yes.

4  Q    It's more of an electronic bank that operates only with

5  digital currencies?

6  A    Yes.

7  Q    There isn't a Coinbase branch on my corner where I can

8  get a passbook and put some savings in, right?

9  A    Right.

10 Q    Showing my age with a passbook reference.

11        You said a person can also obtain Bitcoin through a

12 peer-to-peer transaction, correct?

13 A    Right.

14 Q    Or through a direct transaction with an individual?

15 A    Right.

16 Q    Peer-to-peer, if it's LocalBitcoins.com or some other

17 peer-to-peer exchange, essentially acts as a way of

18 introducing people to each other?

19 A    Right.

20 Q    Like Craigslist.  If you have a sofa you want to sell,

21 you can advertise it on Craigslist and someone will find it

22 and say, yes, I'm interested in buying it and it puts people

23 together, correct?

24 A    Very similar, but LocalBitcoins also has an escrow system

25 as well.

1  Q    It's more sophisticated for digital currencies, but it's

2  the manner in which people are put together, right?

3  A    Right.

4  Q    There is another way that individuals can obtain Bitcoin

5  and that's referred to as mining; is that right?

6  A    Yes.

7  Q    You're familiar with mining Bitcoin?

8  A    Yes.

9  Q    I'll try to put my question to you, then you can correct

10 me.  Okay?  The mining, what is referred to as mining of

11 Bitcoin, is essentially a very complicated series of

12 mathematical equations that are done by computer; is that

13 fair?

14 A    Yes.

15 Q    Okay.  The computer equipment can be expensive to obtain,

16 correct?

17 A    Correct.

18 Q    And they are known to take or use enormous amounts of

19 electricity, correct?

20 A    Yes.

21 Q    Because of the number of transactions, the amount of data

22 that is going through the computer, and the amount of time

23 that it takes, all of those things are using large amounts of

24 electricity, correct?

25 A    Yes.

1    Q    A person who is successful -- is mining considered a

2    difficult way of obtaining Bitcoin?

3    A    Very difficult.  And for a regular person, probably

4    almost impossible nowadays.

5    Q    Nowadays?

6    A    Right.

7    Q    You said that Bitcoin was first created in 2009?

8    A    Yes.

9    Q    And so in the early years of the existence of Bitcoin,

10   would it be fair to say that mining was -- there was more

11   activity in mining because of a greater opportunity to

12   actually obtain Bitcoin that way?

13   A    I wouldn't say more activity.  But there may have been

14   more opportunity for an individual with a regular computer to

15   be able to mine, yes.

16   Q    Would you say that in 2018 it would have been easier to

17   mine than it is today?

18   A    Not really, no.  2018 would probably be similar

19   difficulty.

20   Q    Are you familiar with a company called Bitmain?

21   A    Yes.

22   Q    Bitmain is a Chinese company?

23   A    Yes.

24   Q    A company that exists in China?

25   A    I'm not sure if they still do.  I think they may have

1    left China recently.

2    Q    Recently.  Back in 2018, 2019 Bitmain was a Chinese

3    company, yes?

4    A    Yes.

5    Q    Bitmain manufactured machines that individuals could buy

6    that are called mining machines; is that right?

7    A    Right.

8    Q    An individual who wanted to buy a mining machine, do you

9    recall approximately how much that costs back then, 2018?

10   A    No, I can't recall.  There is also different tiers of

11   them, depending on the structure of the machine.

12   Q    So different types of machines depends on their size,

13   sophistication, whatever it might be with varying costs?

14   A    Yes.

15   Q    But any individual, as far as you understand, could go to

16   Bitmain's website and purchase one or multiple machines if

17   they were available; is that correct?

18   A    I'm not sure if Bitmain had a way of purchasing through

19   their website; but I do know that Bitmain machines could be

20   purchased, yes.

21   Q    If I were able to purchase a Bitmain mining machine here

22   in New York, I would purchase it from Bitmain and they would

23   ship it to me, correct?

24   A    I really can't -- I really don't know if Bitmain would

25   ship it or it would have to be a third-party to ship it.  But

Infante - cross - Singer                              232

1  you can obtain a mining machine, yes.

2  Q    Obtaining a mining machine from Bitmain, or any other

3  company that would make them, is and was legal in the United

4  States, correct?

5  A    Yes.

6  Q    Once I obtain a mining machine, I could resell it to

7  somebody else, correct?

8  A    Sure.

9  Q    If I were to purchase a machine from Bitmain, have it

10  sent either directly or through a third-party to me here in

11  New York, I could then advertise that on any kind of website

12  if someone wanted to purchase it, I could sell it to them?

13  A    Sure.

14  Q    That would be legal, correct?

15  A    Yes.

16  Q    Not illegal in the United States and it wasn't in 2018 to

17  buy, or sell, or resell a mining machine; is that correct?

18  A    That's correct.

19  Q    You've indicated some reasons why a person may seek to

20  use a peer-to-peer exchange or a direct meeting, personal

21  meeting, with a person to exchange Bitcoin, any digital

22  currency but here Bitcoin, for cash; is that correct?

23  A    Yes.

24  Q    One of them, I think you indicated was perhaps the most

25  common reason, was essentially to have some privacy in the

1  transaction; is that fair to say?

2  A    Sure, yes.

3  Q    A peer-to-peer exchange is legal in the United States?

4  A    It's depends.  As long as -- it depends on the quantity

5  of the exchanges and how the exchanges are being operated.  So

6  in some instances you would need a license to operate an

7  exchange; without a license it would be illegal.

8  Q    The peer-to-peer exchange would need a license or the

9  individuals using the peer-to-peer exchange?

10  A    Both.  In some instances both would need a license.

11  Q    You referenced specifically LocalBitcoins.com?

12  A    Yes.

13  Q    You said that is a company that is based in Finland?

14  A    Yes.

15  Q    And that it's on the Internet so it's accessible here in

16  the United States, correct?

17  A    Yes.

18  Q    LocalBitcoins was a place where individuals could go to

19  advertise either I want to buy or sell Bitcoin or any other

20  digital exchange, right?

21  A    Yes.

22  Q    Digital currency, I'm sorry.  In 2018 it existed and was

23  legal?

24  A    Yes.  It was legal, yes.  As long as licenses were

25  obtained where they are needed.

1   Q    LocalBitcoins.com is still in business, isn't it?

2   A    It is, yes.

3   Q    It's still accessible on the Internet?

4   A    It is.

5   Q    Is the U.S. Government, to your knowledge, presently

6   attempting to shut it down as being an illegal operation?

7   A    I'm not sure if I'm allowed to talk about existing cases.

8         THE COURT:  Sustained.  Move on, Mr. Singer.

9   Q    But it still exists?

10  A    It still exists, yes.

11  Q    If I want go onto LocalBitcoins and find somebody who is

12  selling Bitcoin and I want to buy some Bitcoin, I can arrange

13  through LocalBitcoins to meet with them and do the exchange?

14        MS. DIOUF:  Objection, your Honor.

15        THE COURT:  Overruled.

16  BY MR. SINGER:

17  Q    I can give them a credit card or cash or wire them money

18  and they can transmit the Bitcoin to me, correct?

19  A    So as far as I know, nowadays they don't do in-person

20  meetings any more.  But you can use bank transfers, credit

21  cards, and PayPal, things like that.

22  Q    If you find a person -- I think you indicated these

23  personal exchange, not peer-to-peer but direct transaction

24  within an individual, if I find an individual or I know an

25  individual that has Bitcoin and I want to purchase it for

1   cash, I can meet with that person and do the exchange,

2   correct?

3   A    Yes.

4   Q    And that's legal, is it not?

5   A    It depends.

6   Q    It's standing alone.  Obviously, if I'm doing it for some

7   illegal purpose it might not be.  But the exchange itself, of

8   cash for Bitcoin, is legal, is it not?

9   A    It depends.

10  Q    It depends.

11  A    Yes.

12  Q    Okay.  Well --

13  A    If you're doing it that one time, then it would be legal,

14  yes.  But if you're doing it continuously without a license,

15  it wouldn't be legal.

16  Q    That is your understanding of the law, correct?

17  A    If you're acting as a money transmitter, which is

18  continuously doing exchanges back and forth, then you're

19  acting as a money transmitter and you would have to get a

20  license.  If you're doing without a license --

21  Q    If you're accepting money for a fee and transmitting it,

22  then you might be a money transmitter, correct?

23  A    Sure.

24  Q    If I do an exchange, an individual exchange like that, it

25  may take 15, 20 minutes, half hour, an hour for the blockchain

1   to complete its work.  But if I meet with someone and pay cash

2   for Bitcoin, that transaction is complete in that meeting; is

3   that correct?

4   A    It depends if you're using LocalBitcoins as an escrow

5   service.

6   Q    Let's keep LocalBitcoins out of it.

7        If I'm doing an individual exchange.  I have

8   Mycelium wallet on my phone, and I meet with someone.  I meet

9   with you and you have a Mycelium wallet with Bitcoin on your

10  phone.  I give you X dollars in exchange for a certain amount

11  of Bitcoin.  I give you the money, you've got the cash, you

12  transfer the Bitcoin to my wallet and the exchange is done; is

13  that right?

14  A    Yes.

15  Q    Nothing else that needs to be done?

16  A    Right.

17  Q    It can be completed within that meeting that we have?

18  A    Yes.

19  Q    You indicated Coinbase, again, as an example of one of

20  the commercial exchanges that exists?

21  A    Right.

22  Q    And you said that it was quick and easy, I think you

23  referenced; is that right?  I hear you correctly that using

24  Coinbase could be quick and easy?

25  A    It would be cheaper than using a peer-to-peer exchange.

1   Q    Cheaper?

2   A    Yes.

3   Q    Quicker?

4   A    Maybe, sometimes, it depends.

5   Q    So if I have Bitcoin and I want to sell it and get cash

6   for it so I can make use of that cash quickly, I would set up

7   an account with -- I wanted to use the commercial exchange --

8   I would set up an account with Coinbase, correct?

9   A    Sure.

10  Q    And whatever time period that might be, if it's a matter

11  of hours or days for the various verifications to take place,

12  then I have a Coinbase account, right?

13  A    Yes.

14  Q    Then if I say, for instance, that what I'm linking to my

15  Bitcoin account with Coinbase is my checking account?

16  A    Yes.

17  Q    Regular commercial bank.

18  A    Yes.

19  Q    Citibank, Chase, whatever it is.  I go on Coinbase and I

20  indicate I want to exchange 1.5 Bitcoin for whatever the

21  market value is that day.  Okay.  $30,000?

22  A    Sure.

23  Q    How soon is that $30,000 going to be in my bank account?

24  A matter of days, isn't it?

25  A    It could be, yes.

Infante - cross - Singer                    238

1    Q    It's the electronic transfer system that commercial banks

2    use to transmit money; is that correct?

3    A    Right.  And they could also use wire transfers, which

4    could be faster, and credit card transaction would be

5    immediate as well.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SINGER: (Continuing.)

2    Q    I'm talking about cash because if it's on a credit card

3    and I need the cash for something, I'm still slowed up because

4    I don't have the cash available to me.  If I'm going to do the

5    exchange and put it in my bank account so I can withdraw cash,

6    I can go to a teller and withdraw the cash from the bank

7    account, that may take several days if I use Coinbase; is that

8    fair to say?

9    A    It's possible, yes.

10   Q    And, so, a peer-to-peer or a direct meeting with an

11   individual may be quicker than that?

12   A    It may be, yes.

13   Q    Okay.  And might I pay a premium to do it quicker, pay a

14   little more?

15   A    Maybe.

16   Q    I might?

17   A    Maybe, yes.

18   Q    Okay.  Now, you've -- as part of your training and

19   experience and I guess work, you attend various conventions

20   related to cryptocurrencies?

21   A    Yes.

22   Q    In the U.S. or around the world?

23   A    Yes.

24   Q    Let's keep it in the United States.  Now, have you been

25   to any conventions in, say, the last year?

1   A    Yes, I have.

2   Q    Now, sometimes as a speaker, sometimes simply to observe

3   and go to different talks about things?

4   A    Yes.

5   Q    And perhaps as part of your work and I'm not asking you

6   any questions about that, okay?

7           Have you seen at any of these conventions what I

8   guess could be called an ATM for Bitcoin?

9   A    I can't recall.

10  Q    Are you familiar with ATMs, special machines that appear

11  and operate like a regular ATM, but that's used for Bitcoin?

12  A    I am familiar with an ATM, but I can't recall if I ever

13  saw one at conference or a convention.

14  Q    Have you seen one out on the streets in Miami or New

15  York?

16  A    I have, yes.

17  Q    And they look like a regular ATM, correct, approximately

18  the same size?

19  A    You're.

20  Q    And have you ever used one of them, just to see what they

21  are and how they operate?

22  A    Yes, I have.

23  Q    And the way you use one of those Bitcoin ATMs and it may

24  be for other digital currencies, but I'm using Bitcoin

25  generically, okay?

1    A     Sure.

2    Q     The way you would use those ATMs is I would open whatever

3    I have on my phone and put it up to a screen and it would read

4    my code.  Is that right?

5    A     Depending on what kind of transaction you would like to

6    effectuate, if it's a buy or a sell.

7    Q     If I want to sell Bitcoin at one of those machines and

8    get cash for it, how would I do that?

9    A     The machine will usually give you a Bitcoin wallet to

10   send the Bitcoin to and then you would use your -- if it's

11   Mycelium, if it's Mycelium, you would use Mycelium Wallet to

12   send the currency to -- the cryptocurrency to the machine and

13   then the machine would give you cash.

14   Q     And are those becoming more prevalent in your experience,

15   the existence of Bitcoin ATMs?

16   A     They're becoming more prevalent in terms of quantity.

17   There's more of them.

18   Q     And are they legal?

19   A     If they are operating with a license, then, yes, they're

20   legal.

21   Q     That's a suit.  If you're doing things properly with

22   whatever licenses, whatever are needed, the ability to use it

23   is legal, it's not illegal in all circumstances; right?

24   A     Sure.

25   Q     Okay.  And --

1   A     As long as you're not exchanging, as long as your

2   cryptocurrency is not from illicit proceeds, yes it's legal.

3   Q     Do the ATMs charge fees?

4   A     Yes.

5   Q     And are you familiar with the approximate fees that are

6   charged by these machines?

7   A     It can be anywhere from two to 10 percent.

8   Q     To 10 percent, even more in some instances?

9   A     Could be, yes.

10  Q     And these are available for people to use because it's --

11  well, withdrawn.

12          So, individuals may be using these machines and

13  paying as much as 10 percent to exchange their Bitcoin for

14  cash.

15  A     Yes, sometimes, yes.

16          MR. SINGER:  Judge, can I have one minute, please?

17          THE COURT:  Yes, you may.

18          (Pause in proceedings.)

19          MR. SINGER:  I'm sorry, just one or a few brief

20  questions to follow up.

21  BY MR. SINGER:

22  Q     When I go to a regular commercial bank Citibank, Chase,

23  whatever, the money that I have in that bank is insured by the

24  FDIC?

25  A     Yes.

Infante - cross - Singer                    243

1   Q    So the FDIC is a government agency that insures up to a

2   certain limit the money that I have in the bank so that in

3   case the bank goes under its protection for the deposit; is

4   that right?

5   A    Yes.

6   Q    To your knowledge are the commercial exchanges like

7   Coinbase and other similar commercial exchanges, are they

8   insured by the federal government?

9   A    To my knowledge, no.

10          MR. SINGER:  Thank you, very much.  I have nothing

11  else.

12          THE COURT:  Thank you, Mr. Singer.

13          Any redirect?

14          MS. DIOUF:  No redirect, Your Honor.

15          (Witness excused.)

16          THE COURT:  Government, call your next witness.

17          MR. NAVARRO:  Your Honor, I have another stip to

18  read.  Can I confer with Mr. Singer?

19          THE COURT:  Yes.

20          (Counsel confer.)

21          MR. NAVARRO:  May I have the ELMO again, Your Honor?

22          THE COURT:  You may.

23          MR. NAVARRO:  If I can have the lights, I think it

24  might help a little bit.

25          Ladies and gentlemen I have another stipulation to

Infante - cross - Singer                    244

1    read to you.  It is hereby stipulated and agreed by and

2    between the United States of America by Assistant United

3    States attorneys Gillian Kassner, Marietou Diouf, and the

4    defendant Mustafa Goklu, by his attorneys Murray Singer,

5    Esquire and Emilee Sahli, Esquire that -- I'm going to read

6    the first one and then summarize it for you because it gets

7    repetitive.

8             The document marked Jury Aid 801 is a fair and

9    accurate transcript of an audio recording of the defendant's

10   interaction with a law enforcement agent captured on August

11   28, 2018.

12            Similar language in paragraphs two, three and four,

13   for Jury Aids 802, 803, and 804 and they have dates that will

14   be on the transcripts that are going to be handed out to you

15   shortly.  The same thing on the next page.  You see there

16   paragraphs five, six and seven.  Documents marked Jury Aids

17   806, 807 and 809 are fair and accurate transcripts of the

18   audio recordings of the defendant's interactions with the law

19   enforcement agent captured on the date in the paragraph which

20   is on transcripts that you're going to receive.

21            Finally, the documents marked as Jury Aids 801, 802,

22   803, 804, 806 and 809 can be used to aid the jury during this

23   the trial dated Brooklyn, New York September 28, 2022 and it's

24   been signed by both parties.

25            THE COURT:  Thank you very much Mr. Navarro.

SN        OCR        RPR

Infante - cross - Singer                    245

1        Ladies and gentlemen, you are now receiving binders

2   of those transcripts that were just spoken about in the

3   stipulation.  Just keep them closed until you are told to

4   refer to a particular transcript by the assistant U.S.

5   Attorney.

6                MS. KASSNER:  Thank you, Your Honor.

7                The Government calls Mr. Patrick O'Kain to the

8   stand.

9                THE COURT:  Okay.  Let's have Agent O'Kain up here.

10               (Witness takes the stand.)

11               THE COURT:  Remain standing for one moment so you

12  can be sworn in.

13               THE COURTROOM DEPUTY:  Raise your right hand.

14               (Witness sworn/affirmed.)

15               THE COURTROOM DEPUTY:  Have a seat.  Please state

16  and spell your name for the record.

17               THE WITNESS:  Patrick O'Kain, P-A-T-R-I-C-K

18  O-'-K-A-I-N.

19               (Continued on the next page.)

20

21

22

23

24

25

O'Kain - direct - Kassnerr                246

1   **PATRICK O'KAIN,**

2            having been first duly sworn, was examined and

3            testified as follows:

4   DIRECT EXAMINATION

5   BY MS. KASSNER:

6   Q    Good afternoon, Mr. O'Kain.

7   A    Good afternoon.

8   Q    Mr. O'Kain, if you could remove your mask, please.  Thank

9   you.

10           From approximately September 2012 through January

11  2021, what were you doing for a living?

12  A    I worked as a special agent for the Drug Enforcement

13  Administration.

14  Q    Is the Drug Enforcement Administration also known as the

15  DEA?

16  A    That's correct.

17  Q    What does a special agent at the DEA do?

18  A    We're responsible for investigating drug crimes and money

19  laundering crimes surrounding drug dealing.

20  Q    Can you tell us a little bit about your educational and

21  professional background from before you joined the DEA?

22  A    I got my undergraduate degree at a school called Mercy

23  Hurst University.  I majored in intelligence studies.  After I

24  graduate dead from Mercy Hurst I went to work in the

25  intelligence field.  So I went to work for a few different

1  companies that were responsible for working with the

2  Government in the United States intelligence community.

3  Q    While you were working at the DEA were you assigned to

4  work at any particular offices?

5  A    Yes, I started at the DEA in California in San Francisco.

6  I worked there for several years and then I transferred to the

7  New York division.  And in the New York division I worked in

8  various enforcement groups and that's the -- an enforcement

9  group is what they -- the DEA calls a team of agents that

10 investigates crimes.  And I also worked with New York's cyber

11 division as well.

12 Q    And were you working with New York's cyber division or

13 working on cyber cases in July 2018?

14 A    Yes, I was working on cyber-related cases.  I cannot

15 recall exactly when we started up the cyber unit, but I was

16 working cyber investigations and at some point we created the

17 officially designated cyber unit.

18 Q    And while you were in the cyber unit did you ever work on

19 investigations involving cryptocurrency?

20 A    I did, yes.

21 Q    What is cryptocurrency?

22 A    Cryptocurrency, also known as digital currency, is

23 essentially an all-online currency.  There's no physical form

24 and it's -- the currency is essentially computer code that is

25 transferred to -- from one individual to another or one entity

O'Kain - direct - Kassnerr                    248

1   to another on what is called the block chain.  And the block

2   chain is essentially an online accounting ledger that keeps

3   track of all of the transactions with a specific

4   cryptocurrency.

5   Q    And did you work on any investigations involving Bitcoin?

6   A    Yes.

7   Q    What is Bitcoin?

8   A    Bitcoin is a type of cryptocurrency or digital currency.

9   Q    Is the use of Bitcoin illegal in the United States?

10  A    No.

11  Q    Is it always legal or always illegal?

12  A    Well, I think it depends but it's generally legal.

13  Q    And while at the DEA did you work -- what was the nature

14  of your investigations that involved Bitcoin?

15            MR. SINGER:  Objection, Your Honor.  Relevance.

16            THE COURT:  Overruled?

17            PROSPECTIVE JUROR:  We would investigate Bitcoin as

18  it pertained to suspected money laundering involving drug

19  crimes.

20  Q    While at the DEA did you ever work undercover?

21  A    I did.

22  Q    In general terms, what does it mean to work undercover?

23  A    When an agent is working undercover they essentially

24  assume a different persona that is not a special agent for the

25  Government and the purpose of that is to investigate suspected

1  crimes and, you know, there's a lot of different types of

2  undercover operations but generally speaking you play a role

3  and you investigate a crime as an agent, but you're not

4  letting the target of the investigation or the suspect know

5  that you're with the Government.

6  Q     And, generally speaking, when you're working undercover,

7  do you wear any particular clothing or do anything differently

8  than you otherwise normally would?

9  A     I think you generally try to dress and act and speak the

10  part of the role that you're trying to play.  So that could

11  mean anything.  If you just try to play the part that you

12  think would best fit the role that you're trying to play, so

13  you dress in accordance to what you think.

14  Q     Breaking it down step-by-step can you please explain to

15  the jury from beginning to end what happens during a typical

16  undercover operation?

17            MR. SINGER:  Objection, Your Honor.  If it's not

18  related to his dealings with Mr. Goklu.  I don't know how it's

19  relevant.

20            THE COURT:  Overruled.

21  A     A typical undercover operation, you know, you start out

22  with the target of the investigation, the individual or entity

23  that you suspect is comitting the crime.  Then you start

24  communicating with that suspect in a certain capacity to set

25  up a meeting and then you also have a team of other agents or

1  law enforcement officers that you coordinate with internally

2  and -- so, let's say we're setting up an undercover meeting

3  with a suspect.  You would set up that meeting with the

4  suspect, you know, relatively when and where that's going to

5  take place, and then you coordinate with a team of Special

6  Agents and other law enforcement officers.

7          You have a team of surveillance agents that will be

8  available on the field to observe what's happening during that

9  undercover meeting and also to protect the undercover agent

10 that will be going out there.

11         Prior to the undercover meeting, the undercover

12 agent typically puts on various listening devices and then

13 goes out to meet the suspect and then you have your team out

14 there to make sure that everything is -- the conversation --

15 the undercover is protected.

16 Q    Are you familiar with an investigation into an individual

17 named Mustafa Goklu?

18 A    Yes, I am.

19 Q    Was what your role in that investigation?

20 A    I was the undercover agent.

21 Q    Do you see Mustafa Goklu in the courtroom today?

22         THE COURT:  You can stand up.

23         MS. KASSNER:  If it's possible for everyone at

24 defendant's able to remove masks.

25         THE COURT:  That is fine.  If you will all unmask so

1   we don't have any issue about --

2   BY MS. KASSNER:

3   Q    You mentioned that you could see Mustafa Goklu.  Can you

4   identify an item of clothing?

5   A    He's agent two from the left said with the red tie.  From

6   my orientation.

7           THE COURT:  All right.  And a red tie.  There are

8   two individuals with red ties.

9           THE WITNESS:  Brighter red tie and a full head of

10  gray hair.

11          MR. SINGER:  Judge, we stipulate he's indicating

12  Mr. Goklu.

13          THE COURT:  He is the third individual from the

14  left?

15          THE WITNESS:  Yeah, third.

16          THE COURT:  So the record is clear, the witness did

17  identify the defendant, Mr. Goklu.

18          Proceed.

19  BY MS. KASSNER:

20  Q    To your knowledge, did Mustafa Goklu go by any other

21  names?

22  A    Michael.

23  Q    Generally speaking, how did you first become familiar

24  with the defendant?

25  A    Become familiar?  The first time we met was during an

O'Kain - direct - Kassnerr                    252

1    undercover operation, but I began communicating with him prior

2    to physically meeting him.

3                (Continued on the following page.)

O'Kain - direct - Kassner                253

1    BY MS. KASSNER:   (Continuing.)

2    Q     And why did you begin communicating with him?

3    A     We, I say we, so me and the co-case agent that was

4    working on this investigation, we identified a profile for an

5    individual that went by the street name Mustangy on a website

6    called localbitcoins.com.

7    Q     What is -- continue.

8    A     I think the question is, what is localbitcoins.com?

9    Localbitcoins.com was a website that matched up individuals

10   that wanted to buy cryptocurrency with individuals who wanted

11   to sell cryptocurrency.  So I guess it was sort of like an

12   eBay style website but for cryptocurrency.

13   Q     In your work as a DEA special agent, did you learn how

14   people can purchase Bitcoin?

15   A     Yes.

16   Q     Are you familiar with the term commercial exchange?

17   A     Yes.

18   Q     Can you give the jury an example of a commercial

19   exchange?

20   A     I think the most relevant, sort of, company would be

21   Coinbase.  So it's a licensed commercial financial institution

22   that exchanges various cryptocurrencies with one another or

23   cryptocurrencies with cash.

24   Q     And are commercial exchanges typically available on a

25   cellphone or laptop?

1   A    Yes.

2   Q    And generally speaking, to use a commercial exchange, are

3   you required to provide any forms of identification?

4   A    To use a commercial exchange?

5   Q    Yes.

6   A    Yes.  So you have to provide typically a social security

7   number, address, usually a driver's license.

8   Q    Are you familiar with any other ways in addition to

9   commercial exchanges to purchase Bitcoin?

10  A    Yeah.  You can purchase through websites like

11  localbitcoins.com or directly with other individuals on a

12  peer-to-peer basis.

13  Q    And this peer-to-peer basis, does it typically involve a

14  physical exchange?

15  A    It can, yes.

16       So one thing localbitcoins.com facilitated was the

17  option for people that wanted to buy and sell Bitcoin to meet

18  up with the counter-party in person for a physical Bitcoin for

19  cash transactions.

20  Q    Now, you mentioned earlier that you first -- you're first

21  interaction with the defendant began after seeing a page on

22  localbitcoins.com.

23       Were why were you and other members of the DEA

24  looking into users of localbitcoins.com?

25  A    I remember -- I recall that we had information from other

1  non-related DEA investigations that website was used by

2  individuals to facilitate money laundering.  So that was one

3  reason we turned to localbitcoins.com.  And also, what we

4  noticed when we were looking through some of the

5  advertisements, they would -- the fees that individuals would

6  charge to make that transaction were significantly higher than

7  what you would have to do on commercial exchange.  And, you

8  know, it just didn't make sense why somebody would use --

9          MR. SINGER:  Objection, Your Honor, to this

10  speculative question.

11          THE COURT:  Overruled.

12          You're answer is complete.  Ask you're next

13  question.

14          MS. KASSNER:  If we could pull up just for the

15  witness what has been previously marked for identification as

16  Government's Exhibit 401.

17  A    I can see it.

18          THE COURT:  Yes.  The agent can see it.

19          MS. KASSNER:  Okay.

20  Q    Do you recognize Government's Exhibit 401?

21  A    Yes.  This is a screen capture of the defendant's

22  localbitcoins.com profile.

23  Q    And how do you recognize it?

24  A    I've seen it before.  I was there when it was captured.

25          MS. KASSNER:  At this time, the Government would

O'Kain - direct - Kassner                    256

1   move to admit Exhibit 401 into evidence and publish it to the

2   jury.

3                (Government Exhibit 401, was received in evidence.)

4                THE COURT:  Any objection?

5                MR. SINGER:  No.

6                THE COURT:  Exhibit 401 is admitted and you may

7   publish.

8                          (Exhibit published.)

9   Q    When you were going through localbitcoins.com, what, if

10  anything, about the defendant's profile stood out to you?

11  A    Well, a couple of things.  So we were -- I was located in

12  the New York area.  So we were looking at people located in

13  New York, so that was one thing that stood out.  The other

14  thing that stood out at the time, from what I recall, was the

15  amounts that were listed that the defendant could exchange

16  were relatively high.  From what I recall, they were

17  significantly higher than some of the other advertisements

18  that we saw from the New York area.

19  Q    At the top of Government's Exhibit 401 it says, Mustangy.

20          What is Mustangy?

21  A    I believe that is the screen name that the defendant

22  chose to use for this website.

23  Q    When does the profile say that the account was created?

24  A    The account was created one year prior to when this

25  screen capture was created.

1   Q     When was the first purchased?

2   A     Seven months and one week prior to the screen capture.

3   Q     And according to Government's Exhibit 401, when was the

4   last time the user Mustangy was last seen on the website?

5   A     23 hours and 21 minutes prior to the screen capture.

6   Q     Is there anywhere on the localbitcoins.com page that

7   lists Mustangy name or provides any identifying information

8   for him?

9   A     No.

10  Q     And is there anywhere on the localbitcoins.com page that

11  indicates whether or not Mustangy was licensed to transmit

12  money in the State of New York or the U.S. government?

13  A     No.

14  Q     At the bottom of the second page of Government's

15  Exhibit 401, there's a section that says, buy Bitcoins with

16  cash fromMustangy.

17        What do you understand the list that followed to

18  include?

19  A     I can't see the list that follows.

20        MS. KASSNER:  If we could turn to Page 3.

21  Q     Do you see the list at the very top of the page?

22  A     Yes.  So I understood each of those rows to be separate

23  listings for the defendant's ability to exchange

24  cryptocurrency for cash.  So at the very top you can see

25  Midtown New York, so that was the location that he was willing

1   to make the exchange.  I believe the 727,445.

2           THE COURT:  Hold on.  A little too fast.

3           727,445.  Go ahead.

4   A    Was the price of the Bitcoin at the time.  And then 100

5   to 20,000 USD was the range on the amounts that he was able to

6   transact.

7           MS. KASSNER:  And if we can focus on the list right

8   under that where it says, sell Bitcoins for cash to Mustangy.

9   And if we can blow that section up, please.

10  Q    So there's a similar list of rows here.  What do you

11  understand each row so correspond to?

12  A    Different like similar to the above.  Different listings

13  for the services that Mustangy could provide.  So the location

14  that he could operate in for that specific listing and then

15  the price of Bitcoin.  And then on the far right, it's the

16  limit of the amounts that he was able to transact at that

17  specific time.

18          THE COURT:  Can you pull the microphone closer to

19  you.

20          THE WITNESS:  Sorry.

21          THE COURT:  Keep you're voice up.

22  Q    So there's an entry here for Manhattan, New York.  How

23  much according to this page was the defendant -- what was his

24  limit to transact to sell Bitcoin for cash in Manhattan?

25  A    $9,999.

1    Q    And there are other locations that have higher amounts.

2         Which locations had the highest amount he was

3    willing to exchange?

4    A    Could we zoom out, please.

5         So Jersey City, New Jersey.  The listed amount is

6    $99,999.  And then in Sheepshead Bay, Brooklyn $99,999.

7    Q    And at the very bottom of the page, there's a section

8    that says feedback.

9         Can you read what it says under feedback?

10   A    Feedback left by users with noticeable trade volume on

11   May 24, 2018 at 12:52 a.m. It looks like a review was

12   submitted saying fast paying transaction.  Pleasure to do

13   business with.

14        MS. KASSNER:  And Your Honor, it is 5:29.  This

15   might be a good place to pause.

16        THE COURT:  Perfect.  So we'll do that.

17        Ladies and Gentlemen, we are going to stop for

18   today.  And I'll ask the witnesses to remain seated for a

19   moment.

20        Just a quick reminder, when you go home, don't talk

21   to anybody about the case.  Your experience here today other

22   than saying that you were picked for a jury.  You can say

23   that.  And don't do any research.  Don't post anything at all

24   about what's happening.  Keep an open mind.  And remember,

25   don't talk to each other about the case.

1          So have a good night, everybody.  We'll see you here

2   tomorrow morning ready to go by 9:30.  We'll break at 1:00

3   p.m. tomorrow.

4          Yes.

5          MS. KASSNER:  Your Honor, the binders.

6          THE COURT:  Please leave your binders on the chairs.

7   Remember to leave you're notes in the jury room.

8          Thank you, everyone.  Have a great night.

9          All rise.

10         You can step down.  Thank you.

11         Have a seat, everyone.

12         So just to confirm so everyone remembers, we are

13   doing a half day tomorrow until 1:00 p.m.  And then we are off

14   on Wednesday.

15         How much longer do you anticipate with this witness?

16   I'm guessing that he'll consume all of tomorrow's half day.

17         MS. KASSNER:  Your Honor, it's possible that we

18   could get to our next witness.  It really will depend on the

19   length of cross.  I think we probably have at least two hours

20   just to get through all the recordings.  So it could be a

21   little bit more than that depending on friction with putting

22   up exhibits, but it'll be at least two hours of direct.

23         THE COURT:  All right. And imagine cross would be

24   lengthy as well, since obviously that is the heart of the case

25   it seems.  The other witnesses, I imagine, will be relatively

1     short.   These seem to be records folks mostly.

2               MS. KASSNER:  Yes, Your Honor.

3               I think the other witnesses are probably under an

4     hour each.

5               THE COURT:  Okay.  All right.  Good.

6               So there's some possibility we'll see that the jury

7     might get the case by Friday.  Obviously, I haven't asked the

8     Defense yet whether or not Mr. Goklu intends to testify, but I

9     don't know if there's going to be a defense case, but at any

10    rate, we're moving at least fairly quickly.

11              MR. SINGER:  Judge, I indicated to the Government

12    the other day that, if there was a defense case, it would be

13    Mr. Goklu.  We do not have any other witnesses that we would

14    be calling.

15              THE COURT:  Okay.  All right.  Thank you very much.

16              Anything we need to discuss before I let you all go?

17              We will hopefully have a copy of the jury

18    instructions for you to review by tomorrow.  And then, you'll

19    obviously have half of tomorrow and Wednesday, although not so

20    much for you Mr. Singer, but to review them and then we can

21    have a charge conference, may be, Thursday after at the end of

22    the trial date.  Okay.

23              MR. SINGER:  That's fine.

24              THE COURT:  All right.  Thank you, everyone.

25              Have a good holiday.  No. I'll see you tomorrow.

1          MS. KASSNER:  Thank you, Judge.

2          MR. NAVARRO:  Thank you, Judge.

3                    *     *     *     *     *

4

5   (Matter adjourned until Tuesday, October 4, 2022, 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

**<u>WITNESS</u>**                                              **<u>PAGE</u>**


   **LILITA INFANTE**

      DIRECT EXAMINATION BY MS. DIOUF             208

      CROSS-EXAMINATION BY MR. SINGER             225

   **PATRICK O'KAIN**

      DIRECT EXAMINATION BY MS. KASSNER           246


**<u>E X H I B I T S</u>**


   **Government Exhibit 401                           256**