264

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,           : 19CR386(PKC)
                                    :
          Plaintiff,                :
                                    :
          -against-                 : United States Courthouse
                                    : Brooklyn, New York
MUSTAFA GOKLU,                      :
                                    :
          Defendant.                : Tuesday, October 4, 2022
                                    : 9:00 a.m.
                                    :
                                    :
                                    :

- - - - - - - - - - - - - - X

        TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
             BEFORE THE HONORABLE PAMELA K. CHEN
                 UNITED STATES DISTRICT JUDGE

                    A P P E A R A N C E S:

For the Government: UNITED STATES ATTORNEY'S OFFICE
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY:  GILLIAN KASSNER, ESQ.
                     MARIETOU E. DIOUF, ESQ.
                     FRANCISCO NAVARRO, ESQ.
                     Assistant United States Attorneys

For the Defendant:   MURRAY E. SINGER, ESQ.
                     14 Vanderventer Avenue, Suite 147
                     Port Washington, New York 11050
                   SAHLI LAW PLLC
                     195 Broadway, 4th Floor
                     New York, New York  11211
                   BY:EMILEE SAHLI, ESQ.


Court Reporter:   **SOPHIE NOLAN**
                  225 Cadman Plaza East/Brooklyn, NY 11201
                  NolanEDNY@aol.com
*Proceedings recorded by mechanical stenography, transcript*
*produced by Computer-Aided Transcription*

Proceedings                                           265

1              (In open court.)

2              (The Hon. PAMELA K. CHEN, presiding.)

3              (Defendant present.)

4         THE COURT:  Let me mention, the reason we're delayed

5    is because at least one juror, Alternate 1, had a real issue

6    with the 7 subway.  Apparently it was smoking.  So we told him

7    to take an Uber here which we will hopefully pay for.  I will

8    pay for it if it comes down to it because we needed to get him

9    here today and I think another juror had a delay related to

10   the subway.

11             (Pause in proceedings.)

12        THE COURT:  They're all here now.  So I would say

13   Alternate No. 1 made a heroic effort to get here and called us

14   far in advance to let us know what the situation was.  So,

15   that's a good sign.  Nonetheless, we're a little bit delayed

16   today.  We'll move expeditiously.  The one thing I want to

17   address is I intend, before you play any audio recordings, to

18   give the cautionary instruction.

19             I do intend to give the cautionary instruction about

20   the edited recordings and this is what it will say in

21   substance:  Members of the jury you are about to hear certain

22   audio are recordings that have been edited to eliminate

23   portions that are irrelevant to this case.  Those portions do

24   not include conversations with Mr. Goklu.  The fact that the

25   recording has been edited should not be of concern you in any

Proceedings                                      266

1    way.

2              Any objection to that?

3              MS. KASSNER:  No objection.

4              MR. SINGER:  No objection.

5              THE COURT:  Just cue me whenever it is that you're

6    about to play the audio.  I can do it before we resume today.

7    Does that make the most sense?

8              MS. KASSNER:  Let's do that, Your Honor.

9              THE COURT:  Okay.

10             (Jury enters.)

11             THE COURT:  So, good morning, ladies and gentlemen.

12   Thank you for your heroic efforts of some of you to get here

13   today and my apologies to those who had to wait, but I know at

14   least one of our jurors experienced some real subway craziness

15   and -- and for those of us that have taken the subway, we all

16   know that that happens.  And, so, Alternate No. 1, we thank

17   you because I know it was quite a hassle for you to get here

18   this morning and I'm glad you're safe because it sounds like

19   it was a bit of a somewhat hazardous-sounding situation.

20   We're glad you're safe.

21             And thank you everyone else for getting here on

22   time.  We are going to resume with the testimony of

23   Mr. O'Kain.

24             MS. KASSNER:  He's just outside the courtroom, Your

25   Honor.

1          THE COURT:  And as he's approaching.  I did want to
2     tell you, ladies and gentlemen, that you're going to hear
3     today certain audio recordings that have been edited to
4     eliminate portions that are irrelevant to this case.  Those
5     portions do not include conversations with Mr. Goklu so the
6     fact that the recordings have been edited in this way should
7     not concern you in any way, all right?
8          I will remind you Mr. O'Kain you are still under
9     oath.
10          (Witness resumes the stand.)
11          THE COURT:  Please have a seat.
12     **PATRICK O'KAIN**, having been previously duly sworn/affirmed,
13          testified as follows:
14     CONTINUED DIRECT EXAMINATION
15     BY MS. KASSNER:
16     Q    When we left off yesterday, you were explaining that you
17     saw the user Mustangy on LocalBitcoins.com; is that right?
18     A    Yes.
19     Q    After you discovered Mustangy on LocalBitcoins.com what
20     if anything did you do next?
21     A    Myself and the other special agent that was working the
22     case with me, started to communicate with Mustangy through an
23     application -- a telephone application called Signal.
24     Q    What is Signal?
25     A    Signal is an encrypted chat application for smartphones.

1  Q    And how is Signal different, if at all, from a regular

2  text message?

3  A    To the best of my knowledge, it is -- it just has

4  enhanced security and end-to-end encryption.  I recall that

5  they did not have any -- the company or the entity that runs

6  Signal did not keep any records.  So if the Government were to

7  subpoena them they wouldn't have any information to return.

8  Q    And I believe earlier you mentioned that you were working

9  with another special agent at the DEA; is that right?

10 A    That's correct.

11 Q    Who is that person?

12 A    Former Special Agent Allan Liefke.

13 Q    And is it fair to say that you were working together on

14 your investigation of Mustangy?

15 A    That's correct.

16 Q    At this point did you know Mustangy's true identity?

17 A    No.

18 Q    When you reached out to Mustangy on Signal were you

19 operating undercover?

20 A    Yes, I was.

21 Q    And in dealing with the defendant generally, did you

22 assume a cover story?

23 A    Yes.

24 Q    What was your cover story?

25 A    The cover story that I was operating under was that I was

O'Kain - direct - Kassner                    269

1    an online drug dealer getting drug proceeds in the form of

2    Bitcoin that I needed to turn into cash.

3    Q    Why did you assume the role of a narcotics dealer selling

4    drugs or buying drugs on the internet as opposed to a

5    street-level dealer?

6    A    When you sell.  --

7         THE COURT:  We're going to pause for a moment --

8    thank you very much -- so that the young child could be

9    removed.

10        Start your answer again.

11   A    When individuals sell drugs online, typically they

12   receive payment in some form of cryptocurrency and not cash;

13   versus if somebody is selling drugs on the street, typically

14   the payment is received in cash.

15        MS. KASSNER:  Now, if we could please pull up just

16   for the witness what has been previously marked for

17   identification as Government Exhibits 501 through 507.

18   A    I can see it.

19   Q    It's a collection of exhibits.

20        (Exhibit published to witness only.)

21   Q    Do you recognize Government Exhibits 501 through 507?

22   And I believe we're going through each exhibit one by one.

23   A    That's correct.

24   Q    Do you recognize these exhibits?

25   A    I do.

O'Kain - direct - Kassner                    270

1   Q     What are they?

2   A     These are photographs of the undercover phone that I was

3   using in the conversations with the defendant on the chat app

4   Signal.

5   Q     Are Government Exhibits 501 through 507 a fair and

6   accurate depictions of screenshots of all the messages you

7   exchanged with the defendant on Signal from July 28 -- sorry,

8   from July 2018 through April 2019?

9   A     I believe so, yes.

10          MS. KASSNER:  Your Honor, at this time the

11  Government would move to admit Government Exhibits 501 through

12  507 and public 501 for the jury.

13          THE COURT:  Any objection?

14          MR. SINGER:  No, Your Honor.

15          THE COURT:  501 through 507 are admitted and you may

16  publish them.

17          (Government Exhibits 501 through 507 received in

18  evidence.)

19          (Exhibit published.)

20  BY MS. KASSNER:

21  Q     So there are messages in light gray to the right.  Who

22  sent those messages?

23  A     I sent those messages.

24  Q     And there are messages in dark gray to the left.  Who

25  sent those messages?

SN        OCR        RPR

O'Kain - direct - Kassner                 271

1    A    The defendant.

2    Q    Beginning on July 11, 2018, can you read your messages

3    into the record from the top and I'll, in turn, read the

4    messages from the defendant?

5    A    "Hey, Mustangy want to sell about 10K BTC?  What's your

6    availability?

7    Q    I'll be Queens tomorrow.  What is your location?

8    A    Manhattan.  I'm out of town until next week though.  Just

9    didn't know how much advance notice you wanted.

10   Q    Text me when coming, mostly will cover.

11   A    Okay, thanks.

12   Q    You are welcome."

13        So, very briefly, what is BTC?

14   A    BTC is the shorthand for Bitcoin.

15   Q    What is 10K?

16   A    10K is 10,000.  So that is saying I want to sell $10,000

17   worth of Bitcoin.

18   Q    And at a high level what's going on in this back and

19   forth?

20   A    This is the beginning of setting up a meeting between

21   myself and the defendant to exchange $10,000 worth of Bitcoin

22   for cash.

23   Q    Turning to page two of Government Exhibit 501, beginning

24   on August 27, 2018 at 12:34 p.m. can you read your messages

25   and I'll read the defendant's messages?

O'Kain - direct - Kassner                    272

1   A    "Hi.  Are you still available?  I have to sell 5-K BTC

2   tomorrow.

3   Q    If sharp, I might be around midtown.  Let me know.

4   A    I can do midtown.  What time?  Are we good for tomorrow?

5   I'll be in midtown around 1."

6   Q    What does 5K mean here?

7   A    $5,000 worth of Bitcoin.

8   Q    Turning to page three, can you continue reading your

9   messages, beginning after Mustangy says:

10          "Yes after 8 a.m. to maybe noon, how much you want?

11  A    Okay.  Let's do noon.  Can you do just 5K tomorrow?

12  Q    Yes, okay.

13  A    Cool."

14  Q    And turning to page four, just jumping ahead.

15  A    Four?

16  Q    Yes.  On August 28th at 11:01 a.m. you write:

17          "Hello.  Are we still on for today?"

18          How does the defendant respond?

19  A    The defendant writes:

20          "Yes, I am at midtown, 55, 55 Street and Seventh."

21  Q    And skipping ahead to page eight?

22          THE COURT:  I think you said 11:01.  Didn't it say

23  10:01?  You didn't say that she said that.  I want to be sure

24  you're looking at the same messages.

25          MS. KASSNER:  Apologies, 10:01 a.m.  That's correct,

1    Your Honor.

2              THE COURT:  Go ahead.

3    BY MS. KASSNER:

4    Q    And if we could skip ahead to page eight.  The defendant

5    writes at four -- it's hard -- the defendant writes on this

6    date:

7              "Can we meet at 54th and Seventh at 4:10 because I

8    have to be at London Hotel at 4:30.  Can you read your

9    messages?

10   A    Yeah.  Where do you want to meet?

11   Q    54th and Seventh Avenue northeast corner?

12   A    Heading there now.

13   Q    Okay.  Let me when here.

14   A    Here."

15   Q    What, if anything, happened after you wrote "here" at

16   4:16 p.m. on August 28, 2018?

17   A    So, at that time I was in a government unmarked vehicle

18   and when I wrote "here" I was in the area and I got out of the

19   vehicle across the street and met with the defendant at the

20   54th Street/Seventh Avenue location.

21   Q    Prior to that date had you ever encountered the defendant

22   in person?

23   A    No.

24             MS. KASSNER:  And if we could pull up just for the

25   witness Government Exhibit 302.  Do you recognize the area

1  shown in Government Exhibit 302?

2          (Exhibit published to witness only.)

3  A    Yes.

4  Q    What is that area?

5  A    This is an aerial image of Manhattan and the area in

6  which me and the defendant met.

7          MS. KASSNER:  At this time the Government would move

8  to admit Government Exhibit 302 into evidence and publish it.

9          THE COURT:  Any objection?

10          MR. SINGER:  No, Your Honor.

11          THE COURT:  All right.  Government Exhibit 302 is

12  admitted.

13          (Government Exhibit 302 received in evidence.)

14          THE COURT:  And you may publish.

15          (Exhibit published.)

16  BY MS. KASSNER:

17  Q    For the record, can you point out for the jury where you

18  met the defendant on August 28, 2018?

19  A    Right at the red dot.  I'm not sure the jury can see that

20  from there, but there's a red dot in the middle of the map

21  there.

22  Q    Are you generally familiar with the neighborhood around

23  54th Street and Seventh Avenue in Manhattan?

24  A    I am, yes.

25  Q    How would you describe that neighborhood?

O'Kain - direct - Kassner                    275

1   A    It's very commercial, lots of highrises, busy, a lot of

2   shops on the street corners, a lot of people and this was

3   summertime so it was a sunny day.

4   Q    Were any other members of the DEA present on the day when

5   you met the defendant?

6   A    Yes.  There were several members of the DEA in the area.

7   Q    What were they doing?

8   A    They were on surveillance.  They were on the surveillance

9   team.  I kind of referenced that yesterday.  They were there

10  to observe the meeting and make sure that I was safe.

11  Q    Was your transaction with the defendant recorded?

12  A    It was recorded through audio.

13  Q    Why wasn't it recorded by video?

14  A    It's -- it was often challenging to record things through

15  video and when you're in an undercover capacity especially

16  you're not controlling the environment.  So oftentimes you

17  have to have some sort of camera on your person.  I already

18  had two cellphones and a listening device and this being the

19  first time that I was meeting the defendant, I had no idea who

20  he was and I didn't know if there was any safety concerns.  So

21  having more devices seemed outside of my comfort zone.

22           MS. KASSNER:  If I could just approach very briefly,

23  Your Honor?

24           THE COURT:  Yes, you may.

25           (Counsel approaches.)

1   BY MS. KASSNER:

2   Q    I just handed you a CD that's been marked Government

3   Exhibit 801 through 809.  Are you familiar with these

4   exhibits?

5   A    Yes.

6   Q    What are they?

7   A    These are audio recordings of the meetings that I had

8   with the defendant.

9   Q    How do you recognize them?

10  A    I listen to the CD and after confirming that the audio

11  recordings were on this disk, I signed it and dated it.

12            MS. KASSNER:  Your Honor, the Government would move

13  to admit Government Exhibits 801 through 809 into evidence.

14            THE COURT:  Any objection?

15            MR. SINGER:  No, Your Honor.

16            THE COURT:  Government Exhibits 801 through 809 are

17  admitted.

18            (Government Exhibits 801 through 809 received in

19  evidence.)

20            THE COURT:  And you may publish them to the jury.

21            (Exhibit published.)

22  BY MS. KASSNER:

23  Q    Okay.  Beginning with Government Exhibit 801, so,

24  everyone should that I have transcripts in the binders that

25  they have in front of them.  And, so, the transcripts are

1   going to be marked 801R which is where we're going to begin.

2   It's, I believe, the first tab in everyone's binders.

3            MR. SINGER:  Your Honor, could we explain to the

4   jury that R is simply a portion of --

5            THE COURT:  I thought I did that already, but --

6            MR. SINGER:  On the transcripts, not about the

7   recordings.

8            THE COURT:  All right.  I think the transcripts

9   reflect the edited recordings and furthermore, as I understand

10  it, the Government is only going to play a portion of the

11  entire recording.  Even as to the edited portion, I think the

12  Government is still playing a smaller portion of that edited

13  recording.  Obviously the parties and you will have available

14  to you the full recording, but for now the Government wants to

15  focus on certain portions.

16           Am I correct?

17           MS. KASSNER:  That's correct, Your Honor.  Thank

18  you.

19           THE COURT:  All right.

20           MS. KASSNER:  If we could play from timestamp 1:45

21  to timestamp 2:47.

22           (Audio played; audio paused.)

23  Q    How does the defendant introduce himself to you?

24  A    As Michael.

25  Q    How do you introduce yourself?

1    A    As Pat.

2    Q    Where are you during this portion of the conversation

3    with the defendant?

4    A    We are on the street corner, the northeast corner of 54th

5    and Seventh outside of a black Mercedes sedan.

6    Q    And at some point do you get into the car?

7    A    Yes.  After we introduce each other, we both get into the

8    car.

9    Q    You ask here -- you ask here, "Where is it" and then the

10   defendant responds "this one," and you respond "you got too

11   much of that lying around.  Is this it?"

12        What are you and the defendant talking about here?

13   A    So, when I got into the vehicle, the defendant opened the

14   center console and inside of the console there were multiple

15   bundles of cash.  And that discussion is me trying to identify

16   which one is destined for me and so I picked up one and the

17   defendant said that that's not the right one so I went to

18   another one and he said that wasn't it either and then

19   identified the right one for me.

20   Q    The defendant instructs you -- the defendant says, "Close

21   the door, man.  We're not drug dealers.  We're buying

22   Bitcoin."

23        What did you understand that to mean?

24        MR. SINGER:  Objection, Your Honor.  It's irrelevant

25   to what he believed.

1       THE COURT:  Overruled.

2   A    I opened the door because I didn't know who the defendant

3   was and if there were any safety concerns.  Then the defendant

4   asked me to close the door and said, close the door, man, the

5   cops, we're not drug dealers.  We're buying Bitcoin.  So I

6   think what was interesting to me --

7           MR. SINGER:  Objection, what was interesting, Judge.

8           THE COURT:  Overruled, overruled.

9   A    -- was that on our first encounter the defendant was

10  concerned about being identified by the cops.  That stood out

11  as something notable, something that was notable to me at the

12  time.

13          MS. KASSNER:  If we could play from 2:47 to 3:23.

14          (Audio played/audio paused.)

15  Q    The defendant here says, "If it too much, I have

16  machine."  What did you understand that to mean?

17  A    I understood the machine to be a reference to the money

18  counter.

19  Q    And what is going on during this section of the

20  recording?

21  A    I recall that we're getting ready to count the currency

22  or in the early stages of counting the currency from the

23  bundle of cash that we were going to transact with.

24          MS. KASSNER:  Moving ahead, if we could play from

25  4:30 to 5:35.

1          (Audio played/audio paused.)

2   Q    What are you and the defendant discussing here?

3   A    So, initially, again, so we're starting to coordinate how

4   much Bitcoin for cash the -- we're going to exchange, less the

5   fees that the defendant was charging.  So, when the -- I asked

6   the defendant what do you charge and he said 8, and 8 was a

7   reference to the percent of the total transaction that he was

8   charging for the service that he was providing.

9   Q    You respond, "You charge at 8 percent, all right.  That's

10  high."  Why did you say that?

11  A    A couple of reasons.  One, 8 percent is quite high --

12          MR. SINGER:  Judge, I object to this.  Again,

13  relevance.  His thinking not relevant.

14          THE COURT:  Overruled.

15  A    8 percent is quite high considering you can go to a

16  commercial exchange for significantly less, most often under 2

17  percent and then also in my experience doing undercover work,

18  it's very rare that there's not a negotiation of the fees.

19  Q    Can you explain to the jury how you actually transferred

20  your Bitcoin to the defendant?

21  A    Sure.  In this instance and often if you're doing a

22  peer-to-peer Bitcoin transaction, you have an application on

23  your cellphone, a cryptocurrency wallet.  When you want to

24  send cryptocurrency to somebody else, you can use a QR code.

25  You can scan a QR code.  A QR code are those little square

1    codes often found on restaurant tables now for menus.

2          So I would open up my cryptocurrency wallet.  The

3    defendant would open up his cryptocurrency wallet and his QR

4    code.  I would pull up the amount I wanted to send to this to

5    his QR code and that would populate the recipient's address in

6    my phone.  I would hit Bitcoin send and that would to his

7    Bitcoin address through the block chain.

8          MS. KASSNER:  If we could play from 8:30 to 9:33.

9          (Audio played/audio paused.)

10   Q    At the very beginning of this segment, when you ask, "How

11   much can you do at one time," the defendant answers "50."

12   What did you understand 50 to mean?

13   A    50,000.

14   Q    And then the defendant later says -- you asked, "Are you

15   in Manhattan here," and the defendant says, "I don't want to

16   come here.  You know these fucking malls all have the

17   cameras."  And then he says, "That's the other one -- that's

18   the other one that has cameras 2, 3, 5.  They call me, hey,

19   are you a drug dealer, no."

20         What did you understand that to mean?

21   A    I understood that the defendant was concerned about the

22   cameras seeing what he was doing and I interpreted that that

23   he was aware that there was something not aboveboard that he

24   was doing --

25         MR. SINGER:  Objection, Judge.  Again, he's not in a

1   position --

2          THE COURT:  Overruled, overruled.  Mr. Singer,

3   overruled.

4   A    And he indicated that they had called him before so that

5   indicated to me that this was not the first time that he's

6   done a transaction like this.

7   Q    And later the defendant says, "But it's Manhattan but I

8   bring the machine.  It's another risk, the machine."  And then

9   later he says, "The fucking thing is evidence that you're a

10  drug dealer."

11         What did you understand him to be talking about

12  here?

13  A    I understood that he was referencing the money counter

14  again and then him -- the possibility of him being caught with

15  the money counter by law enforcement -- they would assume he

16  was a drug dealer if law enforcement saw him driving around

17  with a money counter in his car.

18         MS. KASSNER:  If we could play from timestamp from

19  9:43 to 10:12.

20         (Audio played/audio paused.)

21  Q    You asked for a bag here.  What did you do that?

22  A    I wanted somewhere where I could put the bundles of money

23  he gave to me after the transaction because I had to walk

24  through Manhattan back to the undercover -- well, the agent

25  that was going to pick me up and take me out of the area and I

O'Kain - direct - Kassner                    283

1    didn't want to walk around with just a bunch of cash

2    throughout Manhattan.

3              MS. KASSNER:  If we could play from 10:57 to 11:23.

4              (Audio played/audio paused.)

5    Q    The defendant here talks about making sure, using the

6    machine -- "So I make sure because I'm getting -- I'm getting

7    money from somewhere, something bad.  Who knows."

8              What did you understand that to mean?

9              MR. SINGER:  Can I have a continuing objection?

10             THE COURT:  Yes.  You may note the continuing

11   objection.  Overruled.

12             MR. SINGER:  Thank you.

13   A    The defendant was telling me how the money counter works

14   and when he was -- when he stated that he's getting money from

15   somewhere, something bad, I understood that to mean that he

16   does this frequently and he is aware of him interacting with

17   potentially bad people doing bad things.  That's how I

18   understood it.

19             MS. KASSNER:  If we could play from 11:24 to 12:30.

20             (Audio played; audio paused.)

21   Q    At the end you say, "Okay out of the car walking

22   northbound on Seventh."  Who are you speaking to then?

23   A    I was speaking to the agents that were on surveillance.

24   So not only did my listening device record, but it also

25   transmitted live.  So I was talking to the other agents that I

SN        OCR       RPR

O'Kain - direct - Kassner                    284

1    knew could hear me.

2    Q    What's going on during the segment of the recording that

3    we just listened to?

4    A    We were starting to set up a potential next meet

5    together.

6    Q    For how much -- how much Bitcoin?

7    A    So, $50,000 worth of Bitcoin.

8    Q    You mentioned during the segment -- you say, "I have an

9    online business so I'm getting money in."

10                Why do you say that?

11   A    Because my undercover story was to be an online drug

12   dealer.  That was the first part of me setting the stage to

13   unfold that story as the defendant and I continued our

14   meetings and transactions.

15   Q    During your first meeting with the defendant, do you

16   mention drugs?

17   A    No.

18   Q    Why not?

19   A    It would be completely out of character for two

20   individuals to meet and if one of them is a drug dealer to

21   divulge the fact that they're a drug dealer during a first

22   encounter.  In my experience in the DEA that never happened.

23   In fact, drugs are -- the real names for drugs are rarely, if

24   ever, used when you're selling drugs.

25   Q    Did you keep a record of the Bitcoin you transferred to

O'Kain - direct - Kassner                    285

1    the defendant?

2    A    Yes.

3         MS. KASSNER:  If we could show just the witness

4    Government Exhibits 1 through 5 and Government Exhibit 7 and

5    we'll show them to you one by one on your screen.

6         (Exhibit published to witness only.)

7    Q    Do you recognize Government Exhibits 1 through 5 and 7?

8    A    Right now we're just scrolling through the exhibits.

9         Yes, I recognize these.

10   Q    What are Government Exhibits 1 through 5 and Government

11   Exhibit 7?

12   A    These are photographs of the transaction receipts from

13   our undercover cryptocurrency wallet.

14        MS. KASSNER:  At this time the Government would move

15   to admit Government Exhibits 1 through 5 and 7 into evidence.

16        THE COURT:  Any objection?

17        MR. SINGER:  No, Your Honor.

18        THE COURT:  All right.  1 through 5 and 7 are

19   admitted.

20        (Government Exhibits Exhibit 1 through 5 and 7

21   received in evidence.)

22        THE COURT:  And you may publish them to the jury.

23        MS. KASSNER:  If we could publish Government Exhibit

24   7, please.

25        (Exhibit published.)

SN        OCR        RPR

1   Q    So if you could just repeat what this is, Government

2   Exhibit 7?

3   A    This is a photograph of the receipt that the

4   cryptocurrency wallet that we were using offers after you make

5   a transaction with cryptocurrency.

6   Q    There's a section that says to -- well, I'll ask how much

7   Bitcoin did you actually exchange?

8   A    So, the top series of numbers .70453034 BTC.  That is the

9   amount of Bitcoin that I sent to the defendant.

10  Q    And there's a section that says "To" and a string of

11  letters and numbers.  What is that?

12  A    That is called a public address and that is essentially

13  the identifier to somebody's wallet, so almost like a bank

14  account number, I guess, but it's a series of letters and

15  numbers and that's tied to, in this case, the defendant's

16  wallet address.

17          MS. KASSNER:  If we could just show the witness

18  Government Exhibits 602 and 607 through 614.

19  Q    And we'll show them to you one at a time and then I will

20  ask you if you recognize them.  So just let us know when

21  you're finished looking at them.

22          (Exhibit published to witness only.)

23  A    (Reviewing.)

24  Q    Do you recognize Government Exhibits 602 and 607 through

25  614?

1    A     I do.

2    Q     What are they?

3    A     They are photographs of the cash that I received from my

4    transactions with the defendant.

5          MS. KASSNER:  At this time the Government would move

6    to admit Government Exhibits 602 and 607 through 614 into

7    evidence.

8          THE COURT:  Any objection?

9          MR. SINGER:  No.

10         THE COURT:  They're admitted.

11         (Government Exhibits 602 and 607 through 614

12   received in evidence.)

13         THE COURT:  You may publish.

14         MS. KASSNER:  614.

15         (Exhibit published.)

16   Q     What is Government Exhibit 614?

17   A     This is a photograph of the cash that I received from the

18   defendant I believe on that first -- following that first

19   transaction.

20   Q     What did you do with the cash after you received it from

21   the defendant?

22   A     After we took photographs, and scanned it in to record

23   the serial numbers, we would give all of the currency to the

24   DEA's high-value custodians and then that unit of the DEA

25   handles it according to their procedures but as agents that

O'Kain - direct - Kassner                    288

1   seized money off of -- during an investigation, that's the

2   process where we give it to the DEA's high-value team.

3   Q    Is that consistent with the DEA's normal practices and

4   procedures?

5   A    Yes.

6   Q    After your interaction on August 28, 2018, did you

7   ultimately determine Michael's legal name?

8   A    Yes, we did.

9   Q    How did you do that?

10  A    I believe it was through his license plate on his car

11  which was GOKLU.  We ran the license plate into DMV records to

12  identify his true identify.

13              MS. KASSNER:  If we could pull up a photograph

14  marked as Government Exhibit 601, just for the witness.

15              (Exhibit published to witness only.)

16  Q    Do you recognize Government Exhibit 601?

17  A    Yes, I do.

18  Q    What is it?

19  A    This is the photo of the defendant that I believe was on

20  file with the DMV.

21              MS. KASSNER:  The Government would move to admit

22  Government Exhibit 601 into evidence.

23              THE COURT:  Any objection?

24              MR. SINGER:  No.

25              THE COURT:  All right.  601 is admitted.

O'Kain - direct - Kassner                    289

```
1              (Government Exhibit 601 received in evidence.)
2              THE COURT:  And you may publish it.
3              (Exhibit published.)
4    BY MS. KASSNER:
5    Q    Is this photo consistent with how the defendant appeared
6    when you met him in 2018?
7    A    Yes.
8              MS. KASSNER:  If we could pull up for the witness
9    Government Exhibit 604.
10             (Exhibit published to witness only.)
11   BY MS. KASSNER:
12   Q    Do you recognize Government Exhibit 604?
13   A    I do.
14   Q    What is it?
15   A    This is a surveillance photo of the defendant standing
16   outside of his vehicle, the black Mercedes sedan that I
17   referenced.
18             MS. KASSNER:  The Government moves to admit
19   Government Exhibit 604 and to publish it to the jury.
20             THE COURT:  You may.  Did you want to establish a
21   date or did he say?
22   BY MS. KASSNER:
23   Q    Is this a fair and accurate depiction of the car the
24   defendant was driving and the defendant as he appeared in
25   2018?
```

O'Kain - direct - Kassner                    290

1   A    Yes.

2          THE COURT:  Just the year 2018?

3   Q    In August 2018?

4   A    Yes.

5          THE COURT:  All right.  Any objection?

6          MR. SINGER:  No, Your Honor.

7          THE COURT:  604 is admitted.

8          (Government Exhibit 604 received in evidence.)

9          THE COURT:  And you may publish it.

10         (Exhibit published.)

11  BY MS. KASSNER:

12  Q    Is this same car where you met the defendant in 2018 and

13  2019?

14  A    Yes, that appears to be the same car.

15         MS. KASSNER:  At this time may I approach, Your

16  Honor?

17         THE COURT:  Yes, you may.

18         (Counsel approaches.)

19  Q    I just handed you a box within which is Government

20  Exhibit 1003, which has already been admitted into evidence.

21  If you could just open the box and take out the item inside

22  the box.  Do you recognize Government Exhibit 1003?

23  A    I do.

24  Q    What is it?

25  A    This is a money counter and the money counter that was in

                    O'Kain - direct - Kassner                    291

1   the defendant's car.

2          MS. KASSNER:  May I approach again?

3          THE COURT:  Yes, of course.

4          (Counsel approaches.)

5          MS. KASSNER:  Your Honor, would it be possible to

6   just allow the jurors to see the money counter?

7          MR. NAVARRO:  I will hand it to Juror 1 --

8          And if you can pass it down.

9          THE COURT:  All right.

10         (Counsel approaches.)

11         MS. KASSNER:  Your Honor, I can continue questioning

12  or I can pause.

13         THE COURT:  I would pause just to make sure you have

14  all the jurors' attention.

15         MS. KASSNER:  Thank you, Your Honor.

16         THE COURT:  Go ahead.

17  BY MS. KASSNER:

18  Q    Did you have any further interactions with the defendant

19  after August 28, 2018?

20  A    Yes, I did.

21  Q    How did you communicate with the defendant?

22  A    Through the Signal app.

23         MS. KASSNER:  If we could pull up what's previously

24  been admitted as Government Exhibit 502 for the jury.

25         THE COURT:  You may.

```
                      O'Kain - direct - Kassner                292
```

1          (Exhibit published.)

2    BY MS. KASSNER:

3    Q    So, turning to page -- the first page of Government

4    Exhibit 502, can you read your messages with the defendant

5    that occurred on September 17, 2018 starting at 5:47 p.m. and

6    I'll read the messages from the defendant.

7    A    "Hey you around this week?

8    Q    Wednesday.

9    A    Okay.  What time works for you?  And we have about

10   7,500?"

11   Q    We can pause there.  If we can turn to page two.  And I

12   will start by reading the messages from the defendant in the

13   second half of the page on Thursday, September 20th.

14        "Hi.  At Queens now.  If early is better I can meet

15   you at Queens tonight, Star" -- and then there's an address

16   for Starbucks at 46 Queens Boulevard in Sunnyside, Queens, New

17   York.  And if we could turn to page three to see your

18   response.

19        THE COURT:  Just so the record is clear, visually

20   the dark messages sort of shaded in black are the defendant's.

21        Correct?

22        MS. KASSNER:  Yes, Your Honor.

23        THE COURT:  Because as you read them, it's helpful

24   to point that out so people know where you're reading from.

25        MS. KASSNER:  Yes, Your Honor.

O'Kain - direct - Kassner                    293

1          THE COURT:  Okay, go ahead.

2    BY MS. KASSNER:

3    Q    So after the defendant at the top sends that Starbucks

4    address, how do you respond at 5:21 p.m.?

5    A    I write:

6          "I don't know if I can make it out there tonight.

7    Can you do tomorrow morning like 11?"

8    Q    If we can keep scrolling to the next page, page four of

9    Government Exhibit 502.  In the middle of the page on Friday

10   September 21, 2018, can you read your message starting at

11   12:02 p.m.?

12   A    "Hi.  I'm heading over now should be there around 12:30."

13   Q    "Okay" says the defendant.  And how do you respond?

14   A    "Here."

15   Q    And then the defendant responds "five min."  Here

16   outside.  And how do you respond?

17   A    "K."

18   Q    What, if anything, happened after you wrote K at 12:34

19   p.m. on September 21, 2018?

20   A    I met with the defendant outside of the Starbucks that

21   was referenced in those messages.

22          MS. KASSNER:  If we could show just the witness

23   what's been previously marked at Government Exhibit 305.

24          (Exhibit published to witness only.)

25   Q    Do you recognize the area shown in Government Exhibit

SN        OCR        RPR

O'Kain - direct - Kassner                    294

1   305?

2   A     I do.

3   Q     What is that area?

4   A     That's an aerial view of the area where the Starbucks is

5   that was referenced in that chat.

6             MS. KASSNER:  Your Honor, the Government would move

7   to admit Government Exhibit 305 into evidence and publish it

8   to the jury.

9             THE COURT:  Any objection?

10            MR. SINGER:  No, Your Honor.

11            THE COURT:  305 is admitted.

12            (Government Exhibit 305 received in evidence.)

13            THE COURT:  And you may publish.

14            (Exhibit published.)

15  BY MS. KASSNER:

16  Q     Using Government Exhibit 305 can you note for the jury

17  where you met the defendant on September 21, 2018?

18  A     On the street directly in front of where that red pin is.

19  Q     Are you generally familiar with the neighborhood around

20  the Starbucks at 4609 Queens Boulevard in Sunnyside, Queens?

21  A     I am, yes.

22  Q     Can you describe the area for the jury?

23  A     Yeah, it's a neighborhood in Queens so a lot of -- a lot

24  of vehicle traffic, no skyscrapers like there are in

25  Manhattan.  There are a lot of shops lining the streets,

1   relatively busy.

2   Q    Were any other DEA agents present during that transaction

3   in the vicinity?

4   A    Yes, there were agents, surveillance agents, around just

5   like the previous time.

6   Q    Was the transaction recorded?

7   A    This one it was not.  We attempted to but the recording

8   cut out immediately as I got to the defendant's vehicle.

9            MS. KASSNER:  Permission, Your Honor, to play

10  Government Exhibit 802 from timestamp 11 to the finish for the

11  jury?

12           THE COURT:  Yes, you may.  Are you going to refer

13  them to the --

14           MS. KASSNER:  Yes, Your Honor.

15  BY MS. KASSNER:

16  Q    There's another tab in the binder which is marked 802

17  with an R at the top.

18           THE COURT:  Before you start the video --

19           Ladies and gentlemen, I also wanted to advise you

20  that the transcripts that you're reviewing along with

21  listening to the audio are merely aids to your listening.  In

22  other words, it's your hearing of what happens on the audio

23  what governs here, not what's transcribed.

24  A    If there's some difference between them, remember it's

25  your hearing of the audio that matters; not so much the

O'Kain - direct - Kassner                    296

1  transcript.  Along the same lines, I want you to know that the

2  transcripts themselves, because they're only aids to your

3  listening and not evidence, will not be sent back with you to

4  the jury room for your deliberations, but the audio will be

5  available to you.  So just keep that in mind.  Go ahead.

6            (Audio played/audio paused.)

7  BY MS. KASSNER:

8  Q    So, you mentioned earlier that the audio equipment

9  failed.  Can you explain -- is that something that's happened

10 in your experience at the DEA?

11 A    Yeah.  I mean, it doesn't happen all the time but it does

12 happen.  So that it wasn't too abnormal.  It was unfortunate,

13 but that has happened before.

14 Q    Can you explain to the jury what, if anything, happened

15 during your meeting with the defendant on September 21, 2018

16 right after the recording cut out?

17 A    Yes, the defendant and I -- we negotiated or conducted a

18 Bitcoin-for-cash exchange that was very similar to the process

19 that I described before from the first one.  So, I exchanged

20 Bitcoin and received cash.

21            MS. KASSNER:  Permission to publish what's been

22 previously admitted as Government Exhibit 1 for the jury.

23            THE COURT:  Yes, you may.

24            (Exhibit published.)

25 Q    What is Government Exhibit 1?

O'Kain - direct - Kassner                    297

1    A    This is a photograph of the receipt regarding that

2    transaction from our cryptocurrency wallet.

3    Q    How much Bitcoin did you transfer to the defendant on

4    September 21, 2018?

5    A    1.096872021 Bitcoin.

6              MS. KASSNER:  Permission to publish what's been

7    previously admitted as Government Exhibit 602 for the jury?

8              THE COURT:  Yes.

9              (Exhibit published.)

10   BY MS. KASSNER:

11   Q    What is Government Exhibit 602?

12   A    I believe that's the cash that I received from that

13   transaction.

14   Q    What did you do with the cash after you received it from

15   the defendant?

16   A    We took it to the DEA's high-value custodian team.  I

17   cannot recall what that unit actually is called, but it's the

18   entity at the DEA that handles the seized money and the

19   high-value items.

20   Q    And is that what you did with all of the cash that you

21   received from the defendant in 2018 and 2019?

22   A    That's correct.

23   Q    Did you have any further dealings with the defendant

24   after this date?

25   A    I did.

O'Kain - direct - Kassner                    298

1          MS. KASSNER:  If we could pull up what's been

2    previously admitted as Government Exhibit 503.

3          (Exhibit published.)

4    Q    Beginning with the messages on Monday, November 26, 2018

5    at 1:03 p.m. can you read your messages into the record which

6    are the light gray messages on the right and then I will read

7    the defendant's messages into the record which are the dark

8    gray bubbles to the left.

9    A    "Hey man.  It's been a while are you around this week?

10   Q    Hi, yes, how much you selling?

11   A    About 60K.

12   Q    When?

13   A    Tomorrow.

14   Q    Let me try and make fund ready.

15   A    Okay.  When will you know?"

16   Q    What does 60K refer to here?

17   A    That's $60,000.

18   Q    If we can continue on to page two and I'll continue

19   reading the defendant's messages.

20          (Exhibit published.)

21   Q    "Will text you.  Cash from bank started to be a problem

22   but I can get.

23   A    Okay. "

24   Q    And if we can continue on to page three, in the middle of

25   the page on Tuesday November 27, 2018, you write:  "Hey, you

1   still good today?"

2          What are you referring to there?

3   A    The -- meaning that, the meeting that we were starting to

4   establish.

5   Q    And turning to the next page, page four.  In the middle

6   of the page you say:  "Hey, I'm here.  I'm at the Wendy's near

7   where we met last time."

8          Where were you when you wrote this message?

9   A    I was somewhere near, if not in the parking lot of the

10  Wendy's.  I believe I was in the parking lot in another

11  agent's vehicle.  And the -- it was across the street and

12  adjacent from the Starbucks where we met the previous time.

13  Q    What, if anything, happened after you wrote -- you wrote

14  this message and then later at 1:45 p.m. said, "Yeah," on

15  November 27th?

16  A    Well, I met up with the defendant in the parking lot of

17  the Wendy's.

18          MS. KASSNER:  If we can pull up what's previously

19  been admitted into evidence as Government Exhibit 305 for the

20  jury.

21          (Exhibit published.)

22  Q    Using Government Exhibit 305, can you note for the jury

23  where you met the defendant on November 27, 2018?

24  A    If you can see that blue pin, that's the Wendy's and I

25  was in the parking lot near the Wendy's -- the parking lot of

1    the Wendy's.  That's where we met.

2    Q    Were any other members of the DEA present for the

3    transaction?

4    A    Yes, I had the DEA surveillance team out.

5    Q    Was the transaction recorded?

6    A    Yes.

7    Q    So I'm going to turn in the binder to the next tab

8    labeled 803R.

9          MS. KASSNER:  And permission to play portions of

10   Government Exhibit 803 to the jury starting at 11 -- timestamp

11   11 to 11:20?

12         THE COURT:  All right.

13         (Audio played/audio paused.)

14   Q    The defendant here says --

15         First of all, where were you during the portion of

16   the recording that we just listened to?

17   A    I just got out of the vehicle that I arrived at the

18   parking lot in and we were sitting outside in the parking lot.

19   Q    The defendant here says, "The black -- the black window

20   scares me."  What did you understand him to be talking about

21   there?

22   A    I understood that he was referring the window tint from

23   the vehicle that I got out of and that was an unmarked

24   government vehicle.  It had very dark tints on the windows.

25   Q    Generally speaking, do law enforcement agents -- do their

1   cars typically have black tinted windows?

2   A    Yeah.

3        MS. KASSNER:  And if we can continue listening

4   beginning at timestamp 13:52 until timestamp 14:25.

5        (Audio played/audio paused.)

6   Q    So here the defendant says, "I can give you some more

7   tomorrow because bank is getting pissed.  When you withdraw

8   too much they get pissed."  What do you understand him to be

9   talking about there?

10  A    I understood that he wasn't buying that he was taking the

11  money out of the bank and he was withdrawing more than the

12  bank would allow him.

13  Q    And there's a sound at the end of the recording.  What is

14  that sound?

15  A    That was the money counter.  So the kind of shuffling of

16  paper there's beeping and shuffling of paper.  That's the

17  money counter.

18  Q    What's happening when you're having this conversation

19  with the defendant?

20  A    The defendant is putting money into the money counter and

21  running it through in an attempt to count the money.

22  Q    And where are you and the defendant both situated at this

23  time?

24  A    I believe we're in the back of his black Mercedes sedan.

25  Q    Are the doors open or closed?

1   A     Closed.

2         MS. KASSNER:  If we can continue playing at

3   timestamp 18:53 until 21:42.

4         (Audio played/audio paused.)

5   Q     Could you explain to the jury what's going on during the

6   section of the audio we just listened to?

7   A     So, the defendant and I are at the beginning of that

8   segment of the recording trying to determine how much cash

9   he's going to give me for the amount of Bitcoin that I have.

10  So, then we move into discussing the fee again and I tried to

11  negotiate a smaller fee and we ultimately land on a 7 percent

12  fee for that transaction.

13        MS. KASSNER:  If we can continue playing from

14  timestamp 23:45 to timestamp 25:45.

15        (Audio played/audio paused.)

16  Q     So, in this section, you say, "I have Bitcoin coming in

17  and I turn it into cash as soon as possible."  And you also

18  mentioned that your business, quote, is picking up again.  Why

19  do you say these things?

20        MR. SINGER:  Objection, Your Honor.

21  A     The point of me saying that was --

22        THE COURT:  Overruled.

23  A     -- to get the conversation going about where the money is

24  coming from to get the defendant start asking more questions

25  and also to -- you know, steps to unfold the story, my cover

1   story, of being an online drug dealer.

2   Q    You also say, "I have to pay people.  They want it in

3   cash."  Why do you say that?

4   A    In my experience when I was a DEA agent oftentimes when

5   people would sell drugs, they had people to pay for those

6   drugs.  So oftentimes they would get them on consignment and

7   once they sold their share, they would have to pay their

8   suppliers back and that's with cash.  So it's part of the

9   cover story that I was using.

10  Q    You also say, "In a week or two, you will have 100 to

11  do."  What do you mean by that?

12  A    I was letting the defendant know I would have $100,000 of

13  Bitcoin to exchange.

14          MS. KASSNER:  If we could continue playing from

15  timestamp 27:45 to 29:25.

16          (Audio played; audio paused.)

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

                    SN        OCR        RPR

1  BY MS. KASSNER: (Continuing.)

2

3  Q    So in the beginning, the defendant says, Okay.  Now, I

4  trust you.  The first, I came, I said how the hell do you know

5  if the cops come out of fucking black.  I said, Ops.

6            What did you understand him to be talking about

7  there?

8  A    I understood that he was referencing the tinted windows

9  again where he said that he was scared because of the black

10  tints.  So when he says, he didn't -- you don't know if the

11  cops come out.  It suggested to me that he was aware that

12  there could be potential cops.  That I might have been a cop

13  or undercover or there are undercovers in the area.

14  Q    The defendant also says, My partner is in judgment.  They

15  caught him 50K.

16            What did you understand that to mean?

17  A    I understood that he was telling me that his partner --

18  and I understood "partner" to mean somebody else he's doing

19  this with that also transacts Bitcoin or cryptocurrency for

20  cash got caught doing a transaction.  And 50K, $50,000 worth.

21  Q    Then the defendant says, Because they follow these guys

22  almost always.  And one of the idiots sold their bot from him.

23  So when they tracked him, the drug guy, the cop said, bingo we

24  caught somebody else.

25            What did you understand that to mean?

1  A    So the defendant said that -- before that, they said they

2  weren't tracking for Bitcoins, they were tracking some idiot

3  guy who buys and sells drugs.  So it is a continuation of the

4  story he's telling me about his partner.  The story goes that

5  the law enforcement was following a drug dealer and his

6  partner conducted a transaction with that drug dealer.  And

7  moving forward, while the cops weren't looking at his partner,

8  they came across his partner during that transaction that he

9  was doing with the drug dealer and the defendant said, Bingo.

10 We caught somebody else.  I believe that was in refence to,

11 not only did the law enforcement catch the drug dealer, but

12 they also caught the individual that was laundering that

13 money.

14 Q    You don't think they're looking at you; do you?

15      And the defendant responds, No.  I don't think

16 its -- I mean, it's not a crazy big amount.

17      What did you understand that to mean?

18 A    I understood that the defendant believed that if he was

19 not transacting large amounts then law enforcement would not

20 be looking at him.

21 Q    You say, Either way, I don't want them around.

22      Why did he say that?

23 A    That's just part of my cover story and letting him know

24 that I don't want cops around.  You know, because my cover

25 story is I'm a drug dealer.  Just another thing I can say to

Patrick O'Kain - Direct - Ms. Kassner          306

1   let him know that my side of what we're doing in this was not

2   legitimate.

3          MS. KASSNER:  If we can continue playing from 40:30

4   to 49:42.

5                      (Audio recording played.)

6

7                      (Audio recording stopped.)

8   Q    The defendant tells you in this segment of the recording,

9   but just -- I don't want to count money in Manhattan.

10  Manhattan sucks man.

11         What did you understand that to mean?

12  A    Well, the defendant mentioned to me before that he didn't

13  like Manhattan because of the camera and then he referenced

14  the -- so that was the end part of, I think, the first

15  interaction.  And then, again, he said there's a camera on

16  top.  So he references the cameras again.  So at that time, I

17  understood that the defendant was very concerned about getting

18  caught.  And at that time, you know, as I'm conducting this

19  investigation, I took that to mean that he was aware that what

20  he was doing was not -- not legal because otherwise he

21  wouldn't be concerned about cameras seeing him.

22  Q    And then, you again say or you say, I hope they're not

23  looking at you.

24         Why do you say that?

25  A    Again, just to facilitate my cover story.

Patrick O'Kain - Direct - Ms. Kassner          307

1          MS. KASSNER:  If we can pull up what was been

2    previously admitted into evidence as Government's Exhibit 2

3    and publish to the jury.

4                    (Exhibit published.)

5    Q    Do you recognize Government's Exhibit 2?

6    A    I do.

7    Q    What is it?

8    A    That's is photograph of the cryptocurrency wallet

9    transaction receipt from November 27th.

10         THE COURT:  Pull the microphone a little lower and

11   speak a little slower.

12         Go ahead.

13   Q    How much Bitcoin did you exchange to the defendant or did

14   you transfer to the defendant on November 27, 2018?

15   A    10.65127282.

16         MS. KASSNER:  If we could pull up, one at a time,

17   for the jury, what's been previously admitted as Government's

18   Exhibit 607 through 610.  So starting with 607 -- actually,

19   starting with 610.  My apologies.  Right.

20         And then 608, and then 609, finally 607.

21   Q    What are Government Exhibit's 607 through 610?

22   A    Those are photographs of the cash that the defendant gave

23   during our transactions.

24         MS. KASSNER:  And I'm going to pause here.

25         Your Honor, I'm not sure if we are doing a break

1    today.

2              THE COURT:  Actually, why don't we take a break now.

3              We are going to go to 1:00 today, but let's take a

4    10-minute break.  Roughly a quarter of.  So we can make up

5    some of the lost time.  So at a quarter of, let's start again.

6              THE COURTROOM DEPUTY:  All rise.

7              THE COURT:  And leave your binders on the chair.

8    Don't talk about the case.  Just keep an open mind.  Let's

9    take a break.

10             (Jury exits the courtroom.)

11             THE COURT:  All right.  Did you want to break for a

12   particular reason or you are keeping track of the time?

13             MS. KASSNER:  I'm keeping track of the time, so I

14   thought this was a good place to stop here.

15             THE COURT:  Thank you for reminding me.  You have

16   about ten minutes.

17                  (A recess was taken.)

18             THE COURT:  Back on the record for a quick second

19   here.

20             So Mr. Singer, I know you have a standing objection

21   to the questions and answers of the witness relating to how he

22   interpreted statements by Mr. Goklu during their encounters.

23   I did want to, sort of, explain a little bit more.  I do find

24   that it is appropriate for the agent to give his

25   interpretation or view of the conversations because I believe

Patrick O'Kain - Direct - Ms. Kassner          309

1   it provides necessary context to the agent actions to the

2   progress of the investigation to explain what the agent was

3   thinking when he was interacting with the defendant.  Because

4   it obviously explains the next steps that were taken and why

5   they continued investigations.  Especially, because on the

6   face of it, some of the statements may sound innocuous or

7   maybe even deny any involvement in some forms of illegal

8   activities.  In particular, drug trafficking or even

9   interacting with drug traffickers or doing transactions with

10  drug traffickers.

11          So I think it is appropriate for the agent to say

12  this is what I thought he meant because it obviously explains

13  why the agent said some of what he said and did what he did

14  next and certainly why he continued to set up more

15  transactions with the defendant.

16          I also think it's appropriate that this agent gets

17  to testify because he does have some training as an undercover

18  and in particular dealing with individuals who might be

19  engaging in similar conduct since this seem to be his

20  specialty at the time.

21          So those are my reasons, sort of, more fully

22  explained, but you have your objection and a standing

23  objection at that, Mr. Singer, to questions of that sort of.

24          MR. SINGER:  All right.  Thank you.

25          I do respectfully disagree with the Court's

1   conclusion there.  And so, yes, I do ask to maintain the

2   standing objection so I don't have to keep objecting

3   repeatedly.

4          THE COURT:  And I also want to caution both sides

5   and you didn't do this too much.  But to avoid speaking

6   objections, to some extent, if there is something that you

7   really want to argue in more detail, let's have a sidebar.  So

8   far, I think, Mr. Singer, I think its been fine.  Just be

9   mindful of it.  Both sides have their arguments about what

10  Mr. Goklu meant.  And so, I think it is -- there's minimal

11  harm from allowing the -- or prejudice for allowing the agent

12  to testify about his understanding.

13         THE COURTROOM DEPUTY:  All rise.

14                (Jury enters the courtroom.)

15         THE COURT:  Please be seated, everyone.  Welcome

16  back, Ladies and Gentlemen.

17         We are going to resume with the Agent's testimony.

18         You may inquire.

19         MS. KASSNER:  Thank you, Your Honor.

20  BY MS. KASSNER

21  Q    Before the break I was asking you about -- questions

22  about a transaction in November 2018.

23         Did you have any further transactions with the

24  defendant after November 2018?

25  A    Yes.

1       MS. KASSNER:  If we could pull up and publish to the

2   jury what has been previously admitted as Government's

3   Exhibit 504.

4       THE COURT:  All right.

5       (Exhibit published.)

6       MS. KASSNER:  And if we can turn to Page 4 of

7   Government's Exhibit 504.

8   Q    If you could read your messages on the right-hand side in

9   light gray beginning at 11:25 a.m. and I'll read the messages

10  that the defendant sent on the left-hand side.

11  A    Hey, what's your schedule today?

12  Q    Until 3:30, Queens.  How much you want?

13  A    What about tomorrow morning?  Where are you going to be

14  after 3:30?  I need 20K now.

15  Q    Will be in Manhattan after 5:00 p.m.?

16  A    Can you do tomorrow morning for like 12:00.

17  Q    Okay.  Text tomorrow, please.

18       MS. KASSNER:  And if you can turn to Page 6 of

19  Government's Exhibit 504.

20  Q    At 12:36 p.m., you write, Okay.  I'll head to Wendys.

21  And then, at 12:53 p.m. you write, Here.

22       What, if anything, happened after you wrote here at

23  12:53 p.m. on December 11, 2018?

24  A    I, again, I met with the defendant.

25  Q    And earlier there were messages where you discussed

1    meeting in Manhattan.

2         Did you end up meeting in Manhattan?

3    A    I don't believe so.

4         MS. KASSNER:  If we can pull up Government's

5    Exhibit 305, which has been previously admitted to the jury.

6    Q    Using Government's Exhibit 305, can you point out to the

7    jury where you met the defendant on December 11, 2018?

8    A    We met in the parking lot of the Wendys.  And the Wendys

9    is the blue pin.

10   Q    Were any of the members of the DEA present for that

11   transaction?

12   A    Yes, the DEA surveillance team was up.

13   Q    Was the transactions recorded?

14   A    Yes.

15        MS. KASSNER:  Permission to play portions of what

16   has been previously admitted as Government's Exhibit 804 to

17   the jury and I'm also going to turn in the binder to the

18   section marked 804 Exhibit R on top of the transcript.

19        And if you can start at timestamp 10:00 and play

20   until 11:06.

21        (Audio recording played.)

22        (Audio recording stopped.)

23   Q    Where are you and the defendant situated during this

24   portion of the recording?

25   A    We're in the defendant's vehicle, the black Mercedes.

1   Q    And what's going on here?

2   A    We're getting ready to make a Bitcoin for cash

3   transaction.

4   Q    You say, I've got about 19,600, so 5.16.

5        What does that mean?

6   A    19,600 is the approximate dollar amount of the Bitcoin

7   that I had, which was 5.16, et cetera.

8        MS. KASSNER:  And if we can play starting at

9   timestamp 12:10 to timestamp 13:26.

10       (Audio recording played.)

11       (Audio recording stopped.)

12  Q    What is going on while you and the defendant is having

13  the conversation?

14  A    The defendant is trying to calculate the amount of cash

15  to give me for the amount of Bitcoin that I have less the fee

16  he's taking out.  There was a little confusion on the -- how

17  much Bitcoin I had, so that's why we had -- there was a little

18  confusion over the exact amount of Bitcoin that I had at the

19  time.  So that's why we went back and forth several times.

20       THE COURT:  Again, remember to pull the microphone

21  close to you.

22       Go ahead.

23       MS. KASSNER:  If we can continue playing starting at

24  14:05 to timestamp 14:50.

25       (Audio recording played.)

1          (Audio recording stopped.)

2   Q    So you say here, The last week I needed to get the rest

3   of the 20.  I had to go out to California to explain why I

4   didn't have their 20 grand?

5          THE COURT:  You have to read a little slower.

6          MS. KASSNER:  Understood, Your Honor.

7          So I'll pause here.

8   Q    Why did you say that?

9   A    That was part of my cover story.  I was opening up on,

10  you know, where the money that I was getting and where the

11  money needed to go to.  Starting to plant seeds for that

12  hoping that the defendant would kind of ask more questions

13  about why I needed to take cash to California, et cetera.

14  Q    Did the defendant ask more questions?

15  A    No.

16          MS. KASSNER:  If we could continue playing at times

17  tamp 19:30 to timestamp 21:24.

18          (Audio recording played.)

19          (Audio recording stopped.)

20  Q    So in this segment, you say -- you talk about having "A

21  lot of people to say pay."  You say, they are not great

22  people.  But I'm going to have a lot of money coming in after

23  the New Year.  A hundred grand, can you do that?

24          What are you saying here essentially.

25  A    I mean, talking more about what I'm doing, where the

Patrick O'Kain - Direct - Ms. Kassner          315

1   money is going and coming from, and I tell him directly that

2   the people I have to pay are not good people.  Letting him

3   know that the -- my attempt was letting him know that the

4   money was -- that I was involved in something not good.

5   Something that was concerning.  So, you know, a lot of that

6   was to, you know, unfold the cover story about me being a

7   online drug dealer.  And also, a large part of this was

8   hinting at that this was -- I'm not doing something legitimate

9   and he is transacting with someone that is not doing something

10  legitimate and getting him to start asking, but those

11  questions -- he never really asked any questions about it.

12  And moving onto a hundred grand, I told him that business was

13  going great and I should have $100,000 worth of Bitcoin in the

14  New Years -- after the New Years.

15  Q    Did the defendant also mention Bitfinex.

16       Are you familiar with Bitfinex?

17  A    My --

18            THE COURT:  Can I stop you for one second.

19            First of all, B-I-T --

20            THE WITNESS:  F-I-N-E-X.

21            THE COURT:  -- F-I-N-E-X.  Okay.

22            Go back to what you just said a moment ago.

23  A    Yeah.  So Bitfinex, I'm familiar that it is a

24  cryptocurrency exchange, but beyond that, I'm not sure where

25  it's domiciled, but it is a cryptocurrency exchange.

Patrick O'Kain - Direct - Ms. Kassner          316

1        MS. KASSNER:  If we can continue playing starting at

2   timestamp 24:40 to timestamp 25:45.

3            (Audio recording played.)

4            (Audio recording stopped.)

5        MS. KASSNER:  We can actually keep playing.

6            (Audio playing).

7            Audio stopped).

8   Q    So earlier in the segment you say, That you will be

9   getting a hundred either next week or the week after.  And

10  then you explain, It's like depending on how much we sell, you

11  know.

12           What do you mean by that?

13  A    Well, first I told the defendant that I have $100,000

14  worth of Bitcoin to exchange with him shortly.  And then, when

15  I said, it depends on how much we sell.  Again, that's the

16  trying to get the defendant to say, well, what are you selling

17  to have $100,000?

18  Q    And then, the defendant later says, If you want, I have

19  another 50.  And then, he says, no.  No.  No.  Hold on.

20  Another 20, 25.

21           What did you understand that to mean?

22  A    The defendant had an extra $25,000 cash at that moment

23  that he could exchange with me in addition to what we already

24  agreed upon.

25  Q    And then, the defendant says, NYPD use people like this.

                  Patrick O'Kain - Direct - Ms. Kassner        317

1    In Manhattan that, this is the way, I don't go fucking

2    Manhattan.  Even a homeless, I saw.  He's working for NYPD.

3              Can you explain what's --

4              THE COURT:  Yeah.  Pause.

5              Go ahead.

6    Q    Can you explain what's going on when the defendant makes

7    that statement?

8    A    Yes.  At that time, there were two individuals -- I

9    believe there were two individuals that walked through the

10   parking lot behind the defendant's vehicle and I guess they

11   were wearing raggedy clothes and appeared to be homeless.  And

12   the defendant noticed them and then told me a story saying,

13   the NYPD, New York Police Department, uses people like that.

14   Uses homeless people.  And I understood that to mean, he

15   believes that the law enforcement will used homeless people to

16   conduct surveillance or try to identify people doing illegal

17   things.  So my -- I guess to -- my frame of mind at the time

18   when he's saying that, it's again, referencing police,

19   referencing -- implying that he doesn't want to be caught.

20   The way I interrupted that, that the defendant understood we

21   were doing was warranted potential law enforcement attention.

22             MS. KASSNER:  If we can continue playing from

23   timestamp 26:30 to 27:40.

24             (Audio recording played.)

25             (Audio recording stopped.)

1   Q    So during the first portion of this recorded segment, who

2   are you speaking to?

3   A    So that was right after the defendant asked if I wanted

4   another 20, 25 grand.  So I made an actual call to special

5   agent -- former Special Agent Liefke, so we spoke.  While

6   Allan was not typically acting in an undercover capacity for

7   this case, during that specific call he was.  So in that

8   moment, I was pretending as if Allan was my business partner

9   in this online drug business.  So I made this phone call to

10  him and asked him if we wanted the other money that the

11  defendant was offering us.

12  Q    Where is the defendant during your call with Special

13  Agent Liefke?

14  A    Right beside me in the vehicle.

15  Q    Was the call made so that he could hear and understand

16  what you were saying?

17  A    I made the call so he could hear at least what I was

18  saying to Allan.

19  Q    During your call to Special Agent Liefke, you

20  referenced -- you say, I don't know if it make sense or we

21  just do it when we sell the other three keys.

22       What does keys mean?

23  A    So keys, that's a short for kilogram and that's very

24  common terminology for when you're selling drugs.  A kilogram

25  for cocaine or heroin, what -- you call that a key.  You

1   wouldn't necessarily reference the drug, but you would say,

2   Hey, I have a key.  I want to sell a key.  So that's why I

3   specifically said keys in front of the defendant.  And yeah,

4   keys are just -- like I said earlier, drug dealers don't

5   typically ever mention the actual name of the drug when

6   they're making transactions, so keys was kind of a normal

7   thing that a drug dealer would say.

8   Q    And at the end of the recording you could sort of hear

9   certain things slamming.

10         Where are you going at the end of the recording?

11  A    I don't recall.

12  Q    Well, I guess I'll say that you say, Bye, dude.  I'll see

13  you next time.

14         What happened after you said I'll see you next time?

15  A    I believe I got out of the vehicle.  We didn't have any

16  more interaction at that specific time.

17         MS. KASSNER:  If we can pull up what has been

18  previously admitted as Government's Exhibit 3 and publish it

19  to the jury.

20         THE COURT:  All right.

21                (Exhibit published.)

22  Q    Do you recognize Government's Exhibit 3?

23  A    I do.  This is, again, the photograph of the

24  cryptocurrency wallet transaction receipt.

25  Q    In total, how much did you transfer to the defendant on

1  December 11, 2018?

2  A    5.86191089 Bitcoin.

3         MS. KASSNER:  Permission to publish what has been

4  previously admitted as Government's Exhibit 611 to the jury.

5         THE COURT:  Go right ahead.

6                    (Exhibit published.)

7  Q    Do you recognize Government's Exhibit 611?

8  A    Yes.  That is cash that I received from the defendant.

9  Q    Did you have any further dealings with the defendant

10 after December 11, 2018?

11 A    Yes.

12        MS. KASSNER:  If we could pull up what has been

13 previously admitted as Government's Exhibit 505 and publish it

14 to the jury and turn it Page 2.

15 Q    So beginning on January 23, 2019, could you read your

16 messages in the light gray on the right into the record and

17 I'll read the defendant's messages in the dark gray to the

18 left?

19 A    Sure.

20        When did you want me to start?

21 Q    At 12:55 p.m. on January 23rd in the middle?

22 A    Okay.  Hey, tomorrow at 1:00 work for you?

23 Q    Hi there.  How much?

24 A    Hey, 100 still.

25 Q    Oh, was blocking chat history to find you dude.  I got

1   big last week via gold deal rate.  Sorry, I can't handle.

2        MS. KASSNER:  And if we can continue onto the next

3   page, which is Page 3 of the exhibit.  If you could continue

4   reading your messages.

5   A    What?

6   Q    Tried to contact you, but couldn't find chat history.

7        So when the defendant says that tried to contact you

8   but couldn't find chat history, what did you understand that

9   to mean?

10  A    Yeah.  Tough to say.  I think one of options that came to

11  mind was he deleted our chat history before so he couldn't

12  find the contact and that's why he was -- I think he was

13  uncertain.  He said he couldn't find where I was, so -- but

14  tough to tell.

15       MS. KASSNER:  If we can continue onto Page 4.

16  Q    Here you ask, What happened to you being able to do 100

17  every other week?

18       And the defendant responds, someone offer a big BTC

19  with percent ten.  I get all amount full of BTC, no cash.

20       What did you understand this discussion to mean?

21  A    So the defendant, instead of committing the $100,000

22  transaction with me, he told me that he found someone with a

23  better offer.  He made the transaction with another individual

24  and it was for a 10 percent fee.  So he gave all of his cash

25  to this individual for Bitcoin, so now the defendant only had

Patrick O'Kain - Direct - Ms. Kassner          322

1   Bitcoin.

2          MS. KASSNER:  If we could continue onto Page 5.

3   Q    At the bottom of Page 5 of Government's Exhibit 505, the

4   defendant says at 3:06p.m., I have 25K today, but really don't

5   know for future in and outs.  I have 8 percent guy ready.

6   Will give him if you don't want it.

7          What did you understand that to mean?

8   A    I understood that the defendant had $25,000 worth of cash

9   at this time and he also was able -- he was potentially able

10  to transact with that $25,000 with another individual that

11  could offer him 8 percent in fees.

12         MS. KASSNER:  If we can continue onto Page 8 of

13  Government's Exhibit 505.

14  Q    At the top you say, I'll do the 25K.  You sure that's all

15  you can get today?  Can you do at least 50 or LWAST 50.

16         And defendant responds, No, sorry.  Max today 25K.

17         What did you understand that to mean?

18  A    I asked the defendant if he could do $50,000.  If he

19  could transact with $50,000.  He said, no.  That he only had

20  $25,000.

21         MS. KASSNER:  And turning to Page 10 of Government's

22  Exhibit 505.

23  Q    At 2:13 p.m. you write, pulling in.  And then, 2:19 you

24  write behind you.

25         And then, the defendant responds, okay.

SG       OCR       RPR

Patrick O'Kain - Direct - Ms. Kassner          323

1          What happens, if anything, right after you wrote

2     behind you at 2:19 p.m. on January 24, 2019?

3     A    I meet up with the defendant again.

4          MS. KASSNER:  If we could pull up what has been

5     previously admitted Government's Exhibit 305.

6     Q    Using Government's Exhibit 305, can you point out to the

7     jury where you met the defendant on January 24, 2018?

8     A    At the Wendys in the blue pin.

9     Q    Were other members of the DEA in the vicinity for the

10    transaction?

11    A    Yes.  The DEA surveillance team was present.

12    Q    Was the transaction audio recorded?

13    A    Yes.

14         MS. KASSNER:  Permission to play portions of

15    Government's Exhibit 806, which has been admitted into

16    evidence for the jury.

17         THE COURT:  You may.

18         MS. KASSNER:  And I'm going to turn to the tap 806R

19    in the transcript to correspond what we're playing.

20         THE COURT:  Just remember to read slowly if you're

21    reading parts to the Agent.

22         MS. KASSNER:  Noted, Your Honor.

23         Thank you.

24         If we can start at timestamp 08:52 and play until

25    timestamp 10:55.

1          (Audio recording played.)

2          (Audio recording stopped.)

3   Q    What's happening during the portion of the audio

4   recording that we just listened to?

5   A    We start to make a Bitcoin for currency transaction.  We

6   talk about why the defendant didn't have the $100,000 that we

7   previously agreed upon.

8   Q    The defendant says, Scary man.  It's every time.  This

9   place is not good.  Every time someone here.  Too fucking four

10  black tinted cars there.

11         What did you understand him to be saying here?

12  A    The defendant was -- I guess he noticed two cars with

13  dark tinted windows and he was calling them out to me.  I'm

14  actually not sure whether they were surveillance cars or just

15  generally car with black tinted windows.  I can't say.  Again,

16  at the time, I noted that again the defendant was cognizant

17  about the potential for law enforcement to be there and

18  showing concern about it.  He said this place was no good

19  because he assumed that there were potentially law enforcement

20  vehicles in the area.

21

22          (Continued on the following page.)

23

24

25

O'Kain - direct - Kassner                    325

1   BY MS. KASSNER: (Continuing.)

2   Q    The defendant also says towards the end of the segment,

3   "Most finks become trouble.  They keep calling, hey, where is

4   the money coming from?"

5        What did you understand him to be saying here?

6   A    I guess he was implying to me that the banks were giving

7   him a hard time and asking him where he was getting his money

8   and that was causing problems for him.

9        MS. KASSNER:  If we can continue playing at

10  timestamp 19:55 to 20:36.

11       (Audio played/audio paused.)

12  Q    The defendant here says he has money in Turkey.  If I

13  withdraw that it's going to take two or three days at least.

14       What do you understand him to be saying here?

15  A    I understood that the defendant was telling me he had

16  funds in Turkey.  I'm not sure where, if it was a bank or

17  whatnot, but if he wanted to try to withdraw that to use for

18  our transactions, it would take some time.

19       MS. KASSNER:  If we can play timestamp 21:26 to

20  21:52.

21       (Audio played/audio paused.)

22  Q    You say here, "These college kids cannot get enough."

23  Why do you say that?

24  A    I was bringing that up because I was saying we, meaning

25  me and my undercover group in this role that I was playing, we

SG        OCR        RPR

1    were selling a lot, making a ton of money.  I was saying these

2    college kids cannot get enough.  I didn't specify what, but

3    the intent of that was to let him know that I'm selling

4    something to college kids and opening the door because at this

5    time we've exchanged quite a bit of money, tens, if not

6    100,000 at this point, and getting him to ask what are you

7    selling, and what can't the college kids get enough of.  That

8    was my intent in saying, "These college kids cannot get

9    enough."

10            THE COURT:  All right.

11            MS. KASSNER:  If we can continue playing from

12   timestamp 22:15 through 23:25.

13            (Audio played/audio paused.)

14   Q    So at the beginning of the section we just listened to

15   the defendant says, "Actually I'm exposing myself" and later

16   he says, "I'm visible right now.  If something goes wrong,

17   they can catch your history and say, hey, let me see your

18   wallet."

19            What did you understand him to be saying here?

20   A    I understood that he was implying it's something that he

21   was doing on the phone.  If law enforcement saw it, they would

22   be able to tell that that was his wallet.  I think -- this was

23   quite a long time ago, but I think if you search a wallet

24   address in the browser, that would be in your search history

25   and if the defendant was searching a specific wallet address

O'Kain - direct - Kassner                    327

1    that would show up in the search history and that would be

2    easy for law enforcement to say you searched this address that

3    must be your wallet so that's how I think I interpreted it.

4    Q    Later the defendant said, "Nothing would happen.  They

5    would seize your money.  It's happened to one guy I know."

6    And you respond, "Yeah, yeah, you told me that."

7          What are you two talking about here?

8    A    So, continuing the conversation about being exposed, the

9    defendant -- why he was concerned was if something went wrong

10   and when I asked, what would go wrong, he told me that it

11   could be seized so at that time it was another indicator that

12   the defendant was fully aware that what he was doing was not

13   legal and that money could be seized by law enforcement.  And

14   then he referenced a person that he knew that had money seized

15   and I assumed he was referring to his business partner or

16   partner from one of the previous interactions that we had.

17   Q    You say, "Well, if I get seized with this, I'm going to

18   get my fucking head chopped off or something."

19          Why do you say that?

20   A    Again, just part of my cover story; letting the defendant

21   know that the people that I was interacting with were not good

22   people; in fact, people that could potentially kill me if I

23   did not pay them their money.

24   Q    And why did you do that?

25   A    Well, I mean, it's part of the cover.  I was posing as an

1  online drug dealer and I was letting him -- letting the

2  defendant know that all of these things that I'm telling him

3  and doing with this money are coming from not great places and

4  it was just another part of my story to let the defendant know

5  that, hey, this money and what we're doing here, this is not

6  coming from a legitimate place.

7          MS. KASSNER:  If we could play from timestamp 23:55

8  to 24:10.

9          (Audio played/audio paused.)

10  Q    Why did you say that you definitely want to keep this

11  under the table?

12  A    I say that to let the defendant know that I'm concerned

13  about my privacy in transacting this money.  So I don't want

14  anyone to be alerted of this.  So keeping it under the table,

15  meaning this is -- what I'm doing needs to stay secret.

16          MS. KASSNER:  If we could play from timestamp 25:35

17  to 26 minutes.

18          (Audio played/audio paused.)

19  Q    What are you and the defendant discussing here?

20  A    I asked him where -- who he gave the $100,000 that he and

21  I previously agreed to transact, I asked him who that went to

22  and, you know, partly to keep the conversation going but also

23  to hopefully get identifying information for another potential

24  individual that was conducting illegal transactions that the

25  DEA could then pivot or extend the investigation to rather.

O'Kain - direct - Kassner                    329

1          MS. KASSNER:  If we could play from timestamp 30:55

2    to 32:15.

3          (Audio played/audio paused.)

4    Q    Here you say, "I'm not touching the Coinbase.  I can't

5    touch the Coinbase."  Why do you say that?

6    A    Coinbase is a commercial exchange.  It has licenses to

7    operate and do business and reporting requirements and it's

8    pretty common knowledge that Coinbase is a legitimate

9    business.  So when I tell the defendant that I'm not touching

10   Coinbase, I can't touch Coinbase, that's reiterating the fact

11   that this needs to stay anonymous so I can't interact with a

12   legitimate cryptocurrency exchange.

13   Q    The defendant tells you, "I mean, don't pass $100,000

14   toward the Coinbase.  They're not going to question you.  But

15   one person, one year, no more than 99, they're not going to

16   question you."

17          What did you understand that to mean?

18   A    I understood that the defendant believed if you

19   transacted up to $99,000 on Coinbase, they would not -- you

20   would not draw attention to yourself, but if you went over

21   $100,000, then the people at Coinbase would become alerted to

22   what you're doing and to a higher volume and then they would

23   start asking questions.  So that's how I interpreted that

24   statement.

25          MS. KASSNER:  If we could play from 31 -- excuse me

O'Kain - direct - Kassner                    330

1    41:35 to timestamp 43:30.

2            (Audio played/audio paused.)

3    Q    Can you explain for the jury what you and the defendant

4    are discussing here?

5    A    We start discussing actually where I'm getting the money

6    from for the first time.  So, at the beginning of this segment

7    talking about those, those little ones, that's in reference to

8    marijuana -- I don't think part of that conversation was in

9    this segment, but the defendant and I -- he mentioned that he

10   did a transaction with somebody that was selling marijuana.

11           So that's when I started to get more comfortable in

12   talking about -- being more explicit in the drug discussions.

13   So this conversation was coming off of that.  So the little

14   ones and all of that is in reference to marijuana.  And then

15   moving forward -- actually, I'll pause there.  Does that

16   answer part of your question?

17   Q    Sure, I can follow up with additional questions.

18   A    Okay.

19   Q    So, what do you tell the defendant about your business?

20   A    I tell him that I sell oxycodone and Adderall.

21   Q    What is oxycodone?

22   A    Oxycodone is an opiate.  It's a controlled substance.  It

23   is a prescription medication that is only allowed to be sold

24   by a licensed -- well, prescribed by a licensed physician and

25   sold by a licensed pharmacist to somebody that has a valid

1  prescription for it.

2          But it is -- oxycodone and also Adderall are

3  common -- while there are prescription medications they are

4  common recreational street drugs and sold illegally and

5  they're often sold online.  So a lot of the marketplaces that

6  sells -- the illegal marketplaces that sell illegal drugs

7  online, a lot of a portion of their sales are in Adderall,

8  oxycodone and prescription medications like that.

9  Q    Does the DEA investigate people who are involved in the

10  illegal sale of oxycodone?

11  A    Yes, they do.

12  Q    You also mentioned -- well, when you say, "I got that.  I

13  can get you some oxys if you like that shit."  The defendant

14  says, "What's oxys?"  You say, "It's, like, oxycodone, that

15  stuff."  And the defendant responds, "Don't bring those.  Just

16  bring regular street things."

17          What did you understand him to be saying?

18  A    I understood that he didn't want me to bring him any

19  oxys, oxycodones, but he wanted other street drugs and

20  specifically I think he was referring to marijuana in this

21  instance.

22  Q    And you say in response, "Oh, like Adderall?  That's what

23  all the college kids are taking," and you mentioned Adderall

24  earlier.  What is Adderall?

25  A    Adderall is a stimulant.  It's a prescription drug

O'Kain - direct - Kassner                    332

1    prescribed for ADD, ADHD, but, again, it's a controlled

2    substance.  You have to have -- physicians have to have a

3    license to prescribe it and it has to be distributed by a

4    licensed pharmacist to those individuals with a valid

5    prescription.

6    Q    Does the DEA investigate cases involving the illegal sale

7    of Adderall?

8    A    They do.

9    Q    And then you say later, "You seriously want that stuff

10   because that's what we do.  We do all of that."

11            What do you mean by that?

12   A    I said that to -- in the attempt to make it very clear

13   that that was my business, selling illegal drugs.

14   Q    After you disclosed to the defendant that you were

15   selling Adderall and oxys, does the defendant finish the

16   transaction?

17   A    Yes.

18   Q    Does he at any point say that he, for some reason, would

19   refuse to transact money with you?

20   A    No.

21            MS. KASSNER:  If we could play from timestamp 44:50

22   to 46:38.

23            (Audio played/audio paused.)

24   Q    Who were you speaking to during this segment of the

25   recording?

SG       OCR       RPR

1  A    That was Special Agent Alan Liefke.

2  Q    And you asked Special Agent Liefke -- well, did the

3  defendant hear this conversation to the best of your

4  knowledge?

5  A    Yes.

6  Q    And you ask the other undercover agent, "Can you put him

7  off?"  Why do you ask that?

8  A    Just sort of, again, playing the role of online drug

9  dealer, putting off the people that we owe, because the

10  defendant was not able to deliver the money at the time he

11  said he said he would.  It was part of the color story where I

12  said I needed to pay these bad people.

13            THE COURT:  Go a little slower.  Enunciate more.

14  That will slow you down.

15            MS. KASSNER:  If we could play from 48:51 to

16  timestamp 50:20.

17            (Audio played/audio paused.)

18  Q    And what happens during this segment we just listened to?

19  A    We sort of talk about the next interaction, the next

20  transaction and the defendant was just talking about the

21  difficulties or what he has to go through to get the cash,

22  whether it's Bitcoin or cash, to make those transactions.

23            MS. KASSNER:  If we could pull up just briefly

24  what's previously been admitted as Government Exhibit 4 and

25  publish to the jury.

1          (Exhibit published.)

2     BY MS. KASSNER:

3     Q     According to Government Exhibit 4, in total how much

4     Bitcoin did you send to the defendant on January 24, 2019?

5     A     7.15946367 Bitcoin.

6          MS. KASSNER:  If we could pull up what's been

7     previously admitted at Government Exhibit 612.

8          (Exhibit published.)

9     Q     What is Government Exhibit 612?

10    A     This is a photograph of the cash that I received from the

11    defendant.

12    Q     Did you have further dealings with the defendant?

13    A     Yes.

14         MS. KASSNER:  If we could publish what's been

15    previously admitted as Government Exhibit 506 to the jury?

16         (Exhibit published.)

17    BY MS. KASSNER:

18    Q     And if we could turn to page six.  On page six of

19    Government Exhibit 506, you write at 3:02 p.m., "Okay, I'm

20    close."  And then you later write, "Okay, five minutes."

21         What, if anything, is happening when you're sending

22    these messages?

23    A     I was traveling to the next meeting location with the

24    defendant.

25    Q     And prior to sending this message about your location,

1    had you arranged to conduct another transaction with the

2    defendant?

3    A    Correct.

4    Q    What, if anything, happened after you wrote "five

5    minutes" or "five min"?

6    A    I had met up with the defendant.

7            MS. KASSNER:  If we could publish for the jury

8    Government Exhibit -- apologies, this hasn't been admitted.

9            If we could show the witness Government Exhibit 301.

10           (Exhibit published to witness only.)

11   Q    Do you recognize Government Exhibit 301?

12   A    Yes.  This is an aerial image of Manhattan right where

13   the defendant and I met on this occasion.  Again, very busy

14   area, large skyscrapers, very commercial.

15           MS. KASSNER:  If we could -- Your Honor, the

16   Government moves at this time to admit Government Exhibit 301

17   into evidence and publish it for the jury.

18           THE COURT:  Any objection?

19           MR. SINGER:  No, Your Honor.

20           THE COURT:  All right.  It's admitted.

21           (Government Exhibit 301 received in evidence.)

22           THE COURT:  And you may publish it.  Just so you

23   know, we're going to stop after this exhibit is shown because

24   I need to take up an issue with the lawyers before we break

25   for the day.

O'Kain - direct - Kassner                    336

1          (Exhibit published.)

2   BY MS. KASSNER:

3   Q    Could you point out to the jury where either transaction

4   with the defendant occurred on January 30, 2019?

5   A    The transaction occurred essentially where that red pin

6   is placed.

7          THE COURT:  Thank you very much.

8          Ladies and gentlemen, as I just said we're going to

9   stop a few minutes early.  It's about ten of 1.  There's a

10  matter I want to take up with the lawyers.

11         So, remember, we're not sitting tomorrow.  So the

12  next time you should come back is on Thursday and, as

13  Ms. Gonzalez told you because she is really the power behind

14  the throne here, she said you need to be here by 9 or aim for

15  9 a.m. so that way if there are any unexpected delays, which

16  certainly happens as we discussed, if you ride the subways

17  especially, you'll get here on time.  So disregard what I said

18  about being here at 9:30 and listen to Ms. Gonzalez always.

19         Have a wonderful day and a half off.  Do not talk

20  about the case with anyone.  Don't do any kind of research.

21  Don't send out any messages about the case to anyone.  Don't

22  talk to each other about anything involving this case or any

23  of the individuals involved in this case.  Just have a

24  wonderful day and a half off and keep an open mind.  We'll see

25  you on Thursday.

1            THE COURTROOM DEPUTY:  All rise.

2            (Jury exits.)

3            THE COURT:  You may step down.  The agent is free to

4    go or Mr. Okaying is free to go.

5            So, the issue I wanted to discuss with the parties

6    is about something that occurred at the last break.  As you

7    remember, Alternate No. 1 was late this morning because of a

8    problem with the subway.  He unfortunately feels so badly

9    about it he's been apologizing profusely to Ms. Gonzalez.  In

10   particular, he said to Ms. Gonzalez, but in the presence of

11   the other jurors, that he was sure that I was mad at him and

12   also believed that the defendant was shooting mean looks at

13   him or giving him mean looks about being late.  He further

14   made a comment that he was sure the defendant was mad because

15   here he was paying his lawyer $2,000 an hour and the alternate

16   was late.

17           So those were the comments he made.  Now, I will say

18   this; the other jurors, some of whom apparently heard these

19   comments, did try to assure Alternate No. 1 that nobody was

20   mad at him and that certainly I wasn't mad at him and that he

21   should -- the other jurors assured him that no one was mad at

22   him and they knew that it wasn't his fault that he was late.

23   So they seem, and this is based on the conversation as relayed

24   to me and I think Ms. Gonzalez's perception is the jurors

25   think he's a little sensitive and I think perhaps a little

O'Kain - direct - Kassner                338

1   less mature, for lack of a better word than other members of

2   the jury.  They certainly didn't take seriously his concern

3   about him being late and everyone being mad at him.

4           So what I propose at a minimum right now is bring

5   him out here because, of course -- and I asked Ms. Gonzalez to

6   keep him here for a moment.  I want to explain to him that he

7   cannot make any statements about anyone involved in the case

8   or about the case itself in front of the other jurors.  I

9   don't think he believed he was violating the general rule of

10  not discussing the case, but, again, I'm not sure about his

11  level of maturity, for lack of a better way to explain it,

12  given how he's interacted even with my chambers.

13          He called, which was a responsible thing to do to

14  let us know he was late, but he has an overdeveloped sense of

15  guilt or something, somewhat childlike is the only way I can

16  describe our perception of him.  So I do want to reinforce

17  that with him and also that he shouldn't be speculating about

18  what any lawyer makes in this room and that it's really

19  important that he not make any comments to other jurors at all

20  during the course of this trial.

21          Now, I want you folks -- obviously I wanted to raise

22  it so you folks can consider whether you want me to take any

23  other measures vis-à-vis the rest of the jurors.  I

24  certainly -- I personally think especially with the passing of

25  a day or so this will all fade away as something that was just

O'Kain - direct - Kassner                    339

1    inconsequential blech if you will and I am concerned with

2    raising it with the jurors again because I think it

3    exaggerates or focuses on a nonevent, but consider whether or

4    not you want me to give some general instruction to the jury

5    simply to say, to the extent that you may have heard from

6    other members of the jury any comments about anyone involved

7    in this litigation, or even about how much the lawyers may be

8    making in connection with this lawsuit, you obviously should

9    disregard those and they're completely irrelevant to your

10   consideration.  Something very neutral like that, perhaps.

11   But I think the preferred course is just to let it lie because

12   I don't think the jurors are taking any of it seriously, given

13   the source as I mentioned.

14             MR. SINGER:  Can I have one brief moment with my

15   client?

16             THE COURT:  Certainly.  Talk amongst yourselves.  I

17   think Ms. Kassner wants to say something.

18             (Pause in proceedings.)

19             MR. SINGER:  Judge, I don't think that any

20   discussion with the entire jury is necessary.  Obviously I

21   will leave it to your discretion but I don't believe it's

22   necessary and I'm certainly not requesting it.  Did I

23   understand that you're going to bring the first alternate out

24   now?

25             THE COURT:  Yes, to emphasize with him that he

O'Kain - direct - Kassner                    340

1    shouldn't be talking to the jurors about anyone involved in

2    the case at all.

3              MR. SINGER:  I would ask if you feel comfortable

4    doing this, that you can indicate that defense has discussed

5    this with you and nobody at the defense table has -- is

6    blaming him for anything or has any concerns about it.

7              THE COURT:  Absolutely.  I will actually say

8    everyone, including the defendant and his lawyers, are not mad

9    at him and we all understand that it was circumstances beyond

10   his control and then just say; just to remind you, you should

11   not be talking with anyone else or in front of any other

12   jurors or with other jurors.

13             MR. SINGER:  Or that we discussed it with you, our

14   concern.

15             THE COURT:  I will do that.  Government, do you

16   agree with that approach to talk to Alternate No. 1 but

17   otherwise not talk about this issue or raise it again with the

18   rest of the jury?

19             MS. KASSNER:  Yes, Your Honor.  That's fine.

20             THE COURT:  We'll do that.

21             (Off the record.)

22             (The alternate juror enters the courtroom.)

23             THE COURT:  Don't worry, this is not bad.  Have a

24   seat, Juror.

25             I understand this morning that you may have made

1  some comments to Mrs. Gonzalez that were made in front of the

2  rest of the jurors in the jury room and that you were

3  concerned that I or any of the parties or the lawyers or the

4  defendant, for example, might have been mad at you because you

5  were late today.

6            THE ALTERNATE JUROR:  It was partially a joke.

7            THE COURT:  Okay, good, because I want to assure you

8  and I think I told you this directly when you came out here

9  with the rest of the jury.  I certainly am not mad.

10           THE ALTERNATE JUROR:  It was out of my control.

11           THE COURT:  Exactly.

12           THE ALTERNATE JUROR:  I made sure to be earlier and

13 then unfortunately the announcer, the conductor, said that

14 there was all 7 trains -- they were all halted.

15           THE COURT:  I understand.  And so --

16           THE ALTERNATE JUROR:  My first thing to do was, "oh

17 my God, is everyone waiting for me?"

18           THE COURT:  Just listen for a moment.  You needn't

19 explain anything, trust me.  I just wanted to tell you and

20 relieve you of any fear or guilt that you had that anyone

21 is -- was upset with you.  We all understood that it was out

22 of your control and specifically, I have talked with the

23 defense attorneys and they have talked with their client.  IT

24 he is not at all up set with you at all.

25           THE ALTERNATE JUROR:  It was a joke.

1          THE COURT:  It was a joke.

2          THE ALTERNATE JUROR:  Yes.

3          THE COURT:  I do not want you to think for a moment

4    that the defendant was upset with you and nobody here is.  So

5    that's good to know.

6          The other thing is it's important for you not to

7    speculate how much any of lawyers in this room make.  And,

8    again, you may have been making a joke but y ou know that

9    that's irrelevant to your consideration.

10         THE ALTERNATE JUROR:  Okay.

11         THE COURT:  And the last thing be very mindful of

12   things you say around the other jurors.  Now, you were making

13   a joke about your personal situation and feeling, you know,

14   the perception maybe that people were mad at you, but,

15   remember, you shouldn't be talking about any of the parties or

16   anything relating to the case in front of or with your fellow

17   jurors.

18         So I understand that you didn't necessarily think

19   that that is contrary to what I had asked or told you to do,

20   but it does cross the line a bit because you're making jokes

21   about people involved in this case and suggesting maybe

22   certain thoughts they may be having.  Just don't do that.

23   Just remember, talk about baseball or the weather --

24         THE ALTERNATE JUROR:  Anything except.

25         THE COURT:  Anything except what's happening here.

O'Kain - direct - Kassner                    343

1    Or anything even related to us.  I know it would be easy to

2    make jokes about me or of Ms. Gonzalez, but avoid doing that

3    to your fellow jurors.

4              THE ALTERNATE JUROR:  I personally felt very, very

5    bad and I wanted to make light of the situation.

6              THE COURT:  Thank you.  You are a super, A-plus

7    juror, calling us.  We got around the problem and you weren't

8    in any danger at least on a smoking train.  You did what you

9    were supposed to do.  Don't feel bad at all but just don't

10   about it with anybody else at all, okay.

11             THE ALTERNATE JUROR:  I understand.

12             THE COURT:  Have a wonderful couple of days.  See

13   you on Thursday bright and early.  Thank you.  And remember to

14   send your bill to our chambers.

15             THE ALTERNATE JUROR:  Okay.

16             (Alternate juror exits.)

17             THE COURT:  Let me confirm with anyone if there is

18   any objection to what I just did with alternate Juror No. 1.

19             MS. KASSNER:  No, Your Honor.

20             THE COURT:  I hope your fast goes well.  Have a

21   smooth holiday.

22             ALTERNATE JUROR 1:  Thank you, Your Honor.

23             MR. SINGER:  Judge, you had indicated yesterday that

24   you were hoping to get the charges out to us.  Are we any

25   closer to that?

O'Kain - direct - Kassner                    344

1          THE COURT:  So that's what's going to happen.  We'll

2   e-mail them to you later today.

3          MR. SINGER:  Thank you.

4          MR. NAVARRO:  You're anticipating the charge

5   conference Thursday after the jury leaves?

6          THE COURT:  Yes, thank you.

7

8   (Matter adjourned until Thursday, October 6, 2022, 9:30 a.m. )

9

10                       - ooOoo -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    SG       OCR       RPR

345

1                                    <u>I N D E X</u>

2

3   <u>WITNESS</u>                                                     <u>PAGEG</u>

4   PATRICK O'KAIN

5       CONTINUED DIRECT EXAMINATION BY MS. KASSNER      267

6

7

8                       <u>E X H I B I T S</u>

9

10      Government Exhibits 501 through 507              270

11      Government Exhibit 302                           274

12      Government Exhibits 801 through 809              276

13      Government Exhibits Exhibit 1 through 5 and
        7                                                285

14      Government Exhibits 602 and 607 through 614      287

15      Government Exhibit 601                           289

16      Government Exhibit 604                           290

17      Government Exhibit 305                           294

18      Government Exhibit 301                           335

19

20

21

22

23

24

25