346

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,      : 19CR386(PKC)
 4                                  :
              Plaintiff,            :
 5                                  :
         -against-                  : United States Courthouse
 6                                  : Brooklyn, New York
     MUSTAFA GOKLU,                 :
 7                                  :
              Defendant.            : Thursday, October 6, 2022
 8                                  : 9:00 a.m.
                                    :
 9                                  :
                                    :
10
     - - - - - - - - - - - - - X
11
         TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12           BEFORE THE HONORABLE PAMELA K. CHEN
                UNITED STATES DISTRICT JUDGE
13
                    A P P E A R A N C E S:
14
     For the Government: United States ATTORNEY'S OFFICE
15                        Eastern District of New York
                          271 Cadman Plaza East
16                        Brooklyn, New York 11201
                     BY:  GILLIAN KASSNER, ESQ.
17                        MARIETOU E. DIOUF, ESQ.
                          FRANCISCO NAVARRO, ESQ.
18                        Assistant United States Attorneys

19   For THE DEFENDANT:   MURRAY E. SINGER, ESQ.
                          14 Vanderventer Avenue, Suite 147
20                        Port Washington, New York 11050
                         SAHLI LAW PLLC
21                        195 Broadway, 4th Floor
                          New York, New York  11211
22                       BY:EMILEE SAHLI, ESQ.

23
     Court Reporter:   SOPHIE NOLAN
24                     225 Cadman Plaza East/Brooklyn, NY 11201
                       NolanEDNY@aol.com
25   Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Aided Transcription
```

1            (In open court.)

2            (The Hon. PAMELA K. CHEN, presiding.)

3            (Defendant present.)

4            THE COURT:  So I understand we have an issue.

5            MR. NAVARRO:  We do have an issue, but Ms. Kassner

6   just ran to the restroom.  Judge, when she is back, the

7   intention is to have the charge conference this evening after

8   the jury leaves.

9            THE COURT:  Correct.  Because I'm guessing that

10  we're going to be done with the Government's presentation of

11  evidence today, right.

12           MR. NAVARRO:  We expect to be resting at the end of

13  the day, but it's possible it spills over but our best guess

14  is today.

15           THE COURT:  And obviously there's the unknown

16  question about whether the defendant intends to testify, but

17  we'll address that at the end of the day as well, but it seems

18  best to me to have our charge conference this evening.  And,

19  thankfully, our court reporter, our stellar court reporter, is

20  willing to stay on.

21           So now that Ms. Kassner has returned, tell me what

22  the issue is.

23           MS. KASSNER:  Yes, Your Honor, very briefly, and I

24  spoke with defense counsel about this before beginning today

25  so I don't think there is going to be a dispute.  I just want

Proceedings                                             348

1    to put on the record that -- and this will come up, I expect

2    at the charging conference -- that under the 1960 charge Count

3    Two, we want to make clear that Bitcoin qualifies as a fund

4    under the statute.  So we want to make sure that there is no

5    dispute that if you are transmitting Bitcoin that it qualifies

6    as transmitting money and the reason that this came to the

7    Government's attention was that there was some

8    cross-examination of Special Agent Infante about whether or

9    not Bitcoin was a currency, whether or not it was treated as a

10   currency for tax purposes.

11         So we just want to make sure that there's no jury

12   confusion about that issue which we view as a legal issue and

13   not an issue for the jury to decide.

14         THE COURT:  And either she said she didn't know or I

15   sustained an objection.  But I think she said she didn't know

16   without even any objection from the Government, right?

17         MS. KASSNER:  That's right.  We're not worried about

18   any prejudice or anything having to do with her testimony, but

19   that's what prompted us to think about this issue and we

20   wanted it to be clear.  We understand from defense counsel

21   that there will be no argument that because this is Bitcoin it

22   doesn't qualify as transmitting money but we wanted the record

23   to be clear that our position is that that argument should not

24   be raised.  It's a legal argument and not a factual argument.

25         THE COURT:  Mr. Singer, and use your microphone

O-Kain - direct - Kassner                          349

1   please.

2          MR. SINGER:  Judge, that is correct that under my

3   understanding of the law that this Bitcoin has been

4   interpreted by, I think, courts around the country as being

5   funds --

6          THE COURT:  For purposes of the unlicensed money

7   transmitting statute?

8          MR. SINGER:  Yes.  So I don't intend to argue that

9   it's not.

10          THE COURT:  Great.  Those are my favorite issues,

11   non-issues.  So, you folks can go around preparing for the

12   rest of the day.

13          (Pause in proceedings.)

14          (Jury enters.)

15          THE COURT:  Have a seat, everyone.  Good to see you

16   again.  I hope you had a restful day and a half off and thank

17   you all, again, for being so punctual.  I really appreciate

18   it.

19          We're going to resume now with the questioning of

20   Agent O'Kain may resume.

21          I will remind you -- I don't know if you're still an

22   agent -- Mr. O'Kain, you are still under oath.

23   **PATRICK O'KAIN,**

24      called as a witness, having been previously duly

25      sworn, was examined and testified as follows:

1    CONTINUED DIRECT EXAMINATION

2    BY MS. KASSNER:

3              THE COURT:  Go ahead, Ms. Kassner.

4              MS. KASSNER:  Thank you, Your Honor.

5              At this time if we could show the witness what has

6    previously been marked as Government Exhibit 622, and --

7              Apologies, Your Honor, one moment.

8              (Pause in proceedings.)

9    Q    Can you see that image on the screen?

10   A    Not yet.

11             (Exhibit published to witness only.)

12   Q    Just let us know when you can see it on the screen.

13   A    I can see it now.

14   Q    Do you recognize what has been marked as Government

15   Exhibit 622?

16   A    I do.

17   Q    What is this?

18   A    This is a photograph of the Starbucks where I met the

19   defendant.

20   Q    And it is a fair and accurate depiction of the Starbucks

21   where you met the defendant on September 21, 2018?

22   A    Yes.

23             MS. KASSNER:  Your Honor, permission to admit

24   Government Exhibit 22 into evidence and publish it to the

25   jury.

O-Kain - direct - Kassner                    351

1           THE COURT:  Any objection?

2           MR. SINGER:  No, Your Honor.

3           THE COURT:  622 is admitted and you may publish it.

4           (Government Exhibit 622 received in evidence.)

5    Q    And you also mentioned that on other dates you met the

6    defendant at a Wendy's also in Sunnyside, Queens; is that

7    correct?

8    A    That's correct.

9           MS. KASSNER:  Your Honor, permission to show the

10   witness what's previously marked as Government Exhibit 621.

11          THE COURT:  All right.

12          (Exhibit published to witness only.)

13   Q    And please let us know when you can see it.

14   A    I see 623 right now.

15          THE COURT:  Did you say 621?

16          MS. KASSNER:  One moment Your Honor, yes, 621.

17   A    Okay, I can see 621 now.

18   Q    Do you recognize Government Exhibit 621?

19   A    I do.

20   Q    What --

21   A    That is the Wendy's in which I met the defendant at.

22   Q    And is it a fair and accurate depiction of where you met

23   the defendant on November 27, 2018, December 11, 2018 and

24   January 24, 2019?

25   A    Yes.

O-Kain - direct - Kassner                    352

1          MS. KASSNER:  At this time the Government would move

2    to admit Government Exhibit 621 into evidence and publish it

3    on the jury.

4          THE COURT:  Any objection?

5          MR. SINGER:  No, Your Honor.

6          THE COURT:  621 is admitted and you my publish.

7          (Exhibit published.)

8    BY MS. KASSNER:

9    Q    Thank you.  So, when we left off on Tuesday, we were

10   discussing a further transaction that you had with the

11   defendant on January 30, 2019.  Do you remember that?

12   A    Yes, I do.

13   Q    And we had just shown you an image of the corner 1 East

14   33rd Street in Manhattan.  Do you recall that as well?

15   A    Yes.

16   Q    And, so that transaction, is it fair to say was in

17   midtown Manhattan?

18   A    That's correct.

19   Q    Was that transaction recorded?

20   A    Yes.

21          MS. KASSNER:  Your Honor, at this time the

22   Government would seek permission to play portions of

23   Government Exhibit 807 for the jury.

24          THE COURT:  All right.

25          MS. KASSNER:  I'm going to turn to tab marked 807 R

1    in the transcript per.

2            THE COURT:  And again, ladies and gentlemen, these

3    transcripts are just an aid to listening to the audio but what

4    you hear, as opposed to what's on the page, governs.

5            MS. KASSNER:  If we could play from timestamp 9:05

6    to timestamp 9:47.

7            (Audio played/audio paused.)

8            MS. KASSNER:  If we could pause here.

9    Q    Can you describe for the jury what's happening during the

10   segment of the audio recording we just listened to?

11   A    Yes, I met with the defendant and got into his vehicle.

12   Q    And if we can continue playing from timestamp 11:27 to

13   timestamp 12:10 and if we could turn the volume up just a bit.

14           (Audio played/audio paused.)

15   Q    Can you describe to the jury what is happening during the

16   recorded segment that we're listening to?

17           THE COURT:  Ms. Kassner, you may want to point the

18   jury to what page of the transcript you are on and I think the

19   audio skipped mayb7e a page or two, at least by my reckoning.

20   I think we're on page three of 807R where it says "35"?

21           MS. KASSNER:  So, I think we're on page two.

22           THE COURT:  Okay.

23           MS. KASSNER:  So it starts "335, put it in the bag."

24   Does everyone have that?

25           THE COURT:  Maybe I'm crazy.  I'm looking at page

1   two of 807jR?

2            MS. KASSNER:  Your Honor it's -- so there's the

3   cover page and then there's one page.  That was the segment we

4   listened to last and I believe the next page at the top says

5   335.

6            THE COURT:  It's numbered at the bottom two.  Am I

7   the only one that's having this issue?  Maybe it's just me.

8   So just to confirm we're on 807R; correct?

9            MS. KASSNER:  Yes, Your Honor.

10           THE COURT:  And the date is January 30, 2019?

11           MS. KASSNER:  Yes, Your Honor.

12           THE COURT:  And if you look at page two, you're

13   saying at the top it says 35?

14           MS. KASSNER:  So, there should be a page, there's

15   the cover page and then there's one page on the left and then

16   a page on the right.

17           THE COURT:  No, but they're numbered.  It says page

18   two.  Do we that I have different books?

19           MS. KASSNER:  Your Honor, may we approach?

20           THE COURT:  Absolutely.  Maybe I don't have the same

21   book as everyone else.  I was in a different section of the

22   binder.  My apologies, everybody, and especially you,

23   Ms. Kassner.  Please continue.

24   BY MS. KASSNER:

25   Q    So Mr. O'Kain if you could explain what we were just

1   listening to?

2   A    The defendant was running cash through the money counter

3   so that was the sound that you heard with the paper flipping.

4   Q    Okay.  And turning to the next page of the transcript.

5           MS. KASSNER:  And if we could play timestamp 16:17

6   to 17:16.

7           (Audio played/audio paused.)

8   Q    Can you explain for the jury what you and the defendant

9   were discussing here?

10  A    We were discussing another transaction for the remaining

11  30 K, 30,000 and the defendant was talking about who he would

12  get that $30,000 from.

13  Q    And the defendant here says, "That idiot, my friend,

14  maybe one time, yeah, he has the money.  I have a lot of money

15  with him but lazy motherfuckers here.  His job is hookers."

16          What did you understand that to mean?

17  A    So I understood that the defendant was saying his friend

18  and where he was going to get that money, his -- he was

19  getting that money from hookers and prostitution.

20          MS. KASSNER:  If we could continue playing at time

21  stamp 24:24 to 24:52.

22          (Audio played/audio paused.)

23  Q    So here the defendant says that the car is bulletproof.

24  What did you understand him to mean by that?

25  A    Just that the defendant was telling me that his vehicle

O-Kain - direct - Kassner                    356

1   was bulletproof and, frankly, I don't recall why he brought

2   that up, but he was trying to imply that his vehicle was

3   bulletproof.

4   Q    And you say, "Who is going to be shooting at us, it's the

5   guy that is back in California who wants the rest of the 100,

6   that's who."  Why did you say that?

7   A    That was a reference to my cover story where I owed money

8   to people back in California.  And it's sort of a reference if

9   you recall I mentioned to him that I had people that I owed

10  money to and they would chop off of my head if I didn't pay

11  them so it was just a reference to those same fictitious

12  individuals in California.

13          MS. KASSNER:  If we could continue playing from

14  27:40, to 28:35.

15          (Audio played/audio paused.)

16  Q    Here the defendant mentions a partner and he says the

17  partner got the cash in the Hamptons and I sent Bitcoin from

18  here.

19          What did you understand that to mean?

20  A    I understood that the defendant was just describing an

21  individual with whom he's transacting with and getting cash

22  from and that's -- the defendant sent that individual

23  Bitcoins.

24  Q    And the defendant also says, "100 one time can we do

25  split?"  And then says, "It's that one is too much, man.  With

SN        OCR        RPR

1    100 bucks if we get -- if -- if we get in trouble we are both

2    fucked up."  Then he says, "40 is okay.  100, I told you.  You

3    don't tell me working that's --"

4              What did you understand that to be talking about?

5    A    I understood that -- again, the defendant believed that

6    transacting smaller amounts would -- it was safer than doing

7    100.  So I think 100 has come up a couple of times and that

8    was the defendant's belief that if -- if we were transacting

9    100 or larger, we would draw attention, but anything below

10   that the defendant felt safer.  And then to describe, you

11   know, at the time when I was a special agent investigating

12   this case that was just another indication that -- that I

13   believe that the defendant knew that he was doing something

14   elicit because otherwise there would be no talk of splitting

15   things up to avoid getting in trouble.

16   Q    And when you say -- when the defendant says "100," how

17   much money exactly did you understand that to be referring to?

18   A    $100,000.

19   Q    And when he says "40 is okay," how much money did you

20   understand 40 to be referring to?

21   A    $40,000.

22              MS. KASSNER:  If we could continue playing at time

23   scam 32:40 to 33:04, please.

24              (Audio played/audio paused.)

25   Q    Let's pause here.  Rather than playing that section can

O-Kain - direct - Kassner                    358

1    you tell us what happened with that?  What happened after you

2    had this conversation with the defendant?

3    A    If I recall correctly, the way Bitcoin works, you send

4    Bitcoin and it has to go through the block chain and there's a

5    series of several confirmations that ---- kind of the more

6    confirmations you get, the more trusted that the money

7    actually landed in that wallet and it was taking quite a while

8    for those confirmations to come through.  So that's what we

9    were waiting for.  Through that transaction it took quite a

10   while.  But once we determined that we were comfortable that

11   the transaction went through, I left the meeting.

12           MS. KASSNER:  If we could show you -- if we could

13   publish on the jury what's been previously been admitted as

14   Government Exhibit 5.

15           (Exhibit published.)

16   BY MS. KASSNER:

17   Q    Do you recognize Government Exhibit 5.

18   A    I do.  This is a photograph of the receipt from our

19   undercover cryptocurrency wallet.

20   Q    And how much Bitcoin did you provide to the defendant on

21   January 30, 2019?

22   A    13.67287 Bitcoin.

23           MS. KASSNER:  If we could pull up what's been

24   previously admitted as Government Exhibit 61 -- 613 and

25   publish it to the jury.

1             (Exhibit published.)

2    BY MS. KASSNER:

3    Q    What is Government Exhibit 613?

4    A    This is a photograph of the cash that the defendant gave

5    to me during the transaction.

6    Q    Did you meet with the defendant again after January 30,

7    2019?

8    A    Yes.

9             MS. KASSNER:  If we could pull up and publish to the

10   jury what's been previously admitted as Government Exhibit

11   507.

12            (Exhibit published.)

13   Q    And on page one of Government Exhibit 507 starting at

14   6:05 p.m. on April 1st, can you read your messages in light

15   gray to the right and I'll read the defendant's messages in

16   dark gray to the left?

17   A    "Hey."

18   Q    "Hi."

19   A    "Just seeing if you are going to be around next week or

20   the week after."

21   Q    "Yes.  I am around."

22   A    "How much could you do?"

23   Q    "Who is this?  Sorry, history deleted."

24            What did you understand the defendant's last message

25   to mean?

O-Kain - direct - Kassner                    360

1   A    I understood that the defendant deleted the Signal chat

2   history from our previous conversations.

3   Q    Turning to page two of Government Exhibit 507, at the

4   bottom on April 22, 2019, if you could continue reading your

5   messages to the right and I'll read the defendant's messages

6   on the left.

7   A    "Hey, dude.  Can you meet up next week?  I'm flying back

8   from L.A. Saturday or Sunday."

9   Q    "How much?"

10           And if we could continue on to the next page and

11  continue reading.

12  A    "I need 100.

13  Q    Dude, I can do 49,999.  I am a Bitcoin trader, not a

14  money laundering guy.  I refuse when I feel Bitcoin buyer is

15  drug guy.  Yup, real.  I don't care of income.  I refused a

16  lot because they look alike, dirty.  That's why limited.  Can

17  give you rest next day whatever you want.  No bad man here.

18  A    I can do 49,999.  Anything helps.  I know you don't like

19  to do more than 50 at a time.  Hey, man, are you good for next

20  week?

21  Q    Yes, good.  You Saturday or Sunday?"

22           So, I want to pause here.  Here you say "I need 100"

23  and the defendant says "Dude, I can do $49,999."  What did you

24  understand his response to mean?

25  A    I understood that he again felt that doing amounts up to

O-Kain - direct - Kassner                    361

1   100 were risky and he wanted to keep the amount under 50,000

2   or around 50,000.

3   Q    The defendant goes on to say, I am Bitcoin trader not

4   money laundering guy.  I refuse when I feel Bitcoin buyer is

5   drug guy.  And then he says that's why limited.  Can give you

6   rest next day whatever you want.

7            What did you understand him to be saying there?

8   A    I understood that he was implying that he is not doing

9   anything wrong and that's why he wands to do less than 100.

10  He says that he is not a drug guy.  But based on the

11  circumstances of the entire investigation up to this point, I

12  felt that he was just trying to imply that while his

13  actions --

14            MR. SINGER:  Objection, Your Honor.

15            THE COURT:  Sustained as to the last part of the

16  answer.

17  BY MS. KASSNER:

18  Q    After sending this message to you did the defendant

19  refuse to meet with you?

20  A    No.

21  Q    Did he ask for clarification about where your money was

22  coming from?

23  A    No.

24  Q    Did he ask you to confirm that you were not a drug

25  dealer?

O-Kain - direct - Kassner                    362

1    A    No.

2    Q    What did he do instead?

3    A    We set up more transactions.

4    Q    So turning to page four, the next page of this Government

5    Exhibit 507, if we could scroll down.  Here we are.  In the

6    middle of the page on April 26, 2019, the defendant asks:

7              "Do you want to sell?"  How did you respond?

8    A    "Yeah.  Can you do 50 on Tuesday?

9    Q    "Okay, text when ready."

10             And if we could turn to page seven of this exhibit,

11   here at 12:28 p.m. you write:

12             "Five out."  The defendant responds "coming Wendy."

13   You write "Okay where?"  The defendant responds backside.

14   What happened right after the defendant wrote backside on

15   April 30, 2019?

16   A    I believe I get into the -- meet up with the defendant

17   again.

18   Q    Was your interaction with the defendant recorded?

19   A    Yes.

20             MS. KASSNER:  Permission to play portions of

21   Government Exhibit 809.

22             THE COURT:  You may.

23             MS. KASSNER:  And I'm turning to the portion of the

24   transcript marked 809 with an R on top.  If we could start at

25   timestamp 13:05 and end at 15 minutes.

1          THE COURT:  In case anyone is concerned, I'm on the

2     same page.

3          (Audio played/audio paused.)

4          MR. NAVARRO:  Your Honor, one second.  We're just

5     having a technical problem.

6          THE COURT:  All right.

7          (Audio played/audio paused.)

8     BY MS. KASSNER:

9     Q    Can you tell the jury where you were seated during this

10    conversation?

11    A    I was inside the defendant's vehicle.  I can't recall if

12    I was in the back or the front seat though.

13    Q    When the defendant asked about your business, you say,

14    "booming.  I'm making tons of money, man."  Why did you say

15    that?

16    A    That was a continuation of my cover story that I was

17    selling drugs online and I was letting the defendant know that

18    I had consistent money coming into the business.

19    Q    The defendant asked about a cannabis farm and you

20    respond, "I don't make -- I don't make them as much as

21    cannabis."  You say, "I sell pounds of that in California but

22    the real money is in Adderall and the pills."  Why do you say

23    that?

24    A    I wanted to make it clear to the defendant again that the

25    money was not coming from just cannabis but also more of it

1  was coming from Adderall and the other pills.  The reason I

2  said that was because based on the uncertain legalities of

3  marijuana at the time in California I wanted to make sure that

4  this money was coming from Adderall and other controlled

5  substances.

6  Q    After you mentioned the Adderall and the pills, how does

7  the defendant respond?

8  A    He asks how much do I want, meaning how much money do I

9  want for this transaction to work.

10         MS. KASSNER:  If we can continue playing starting at

11  15 and ending at 16.

12  Q    What is happening during this section of the recording we

13  just listened to?

14  A    I'm clarifying with the defendant how much money we're

15  going to transact.  And the defendant again reiterates that he

16  doesn't like to do large amounts, like 100,000 and then we

17  start to count the money or send the money through the money

18  counter and there were some technical difficulties with the

19  money counter but ultimately it sounds like the money cycled

20  through the machine.

21  Q    And here you say "I always need the 100."  Why do you say

22  that?

23  A    Just to let the defendant know that I still need to

24  transact more money from my online drug business.

25  Q    And the defendants response is he's, scared from the

1  hundreds, man.  What did you understand that to mean in

2  particular?

3  A    Just again that he doesn't like to do $100,000 because he

4  believes that that is an amount that could potentially draw

5  attention and get him in trouble.

6          MS. KASSNER:  And if we could continue playing from

7  timestamp 18:50 to 19:33.

8          (Audio played/audio paused.)

9  Q    Here the defendant says, "Somebody told me you can buy

10  cannabis farm in California to do cannabis business."  You

11  respond and, "Say still risky though, my buddy got arrested

12  the other day."

13          What do you mean by that?

14  A    I made that part up.  That was just setting the stage to

15  let the defendant know that marijuana was illegal federally,

16  still.

17  Q    And the defendant asks, "Why is that and you say still

18  federally.  I mean, he got arrested by the feds."  Why did you

19  say that?

20  A    Just to let the defendant know that that marijuana was

21  illegal federally because part of what the defendant believed

22  I was selling was marijuana and I was letting him know that

23  that is illegal as well.

24  Q    Is marijuana a controlled substance under federal law?

25  A    It is.

1  Q    The defendant says, got to be in California.  If you go

2  out it's trouble, right?  What did you understand him to mean

3  there?

4  A    I understood that the defendant was aware that there were

5  different laws between California and outside of California.

6  And that if you sell marijuana outside of California, he knew

7  that you could get in trouble.

8  Q    If we could continue playing at timestamp 21:45 to 22:34.

9         (Audio played/audio paused.)

10  Q    What is happening during the segment of the recording we

11  just listened to?

12  A    The defendant is running money through the money counter

13  and, I believe he's offering more -- he had more money that he

14  was willing to transact with me at that time.

15  Q    So the defendant asks -- he says, that's 50, this is 25,

16  total 75.  How much did you understand that he was offering to

17  exchange in total?

18  A    $75,000.

19  Q    And is this -- just for clarity is this before or after

20  your conversation with the defendant about whether or not

21  marijuana is legal in California, out of California?

22  A    It's right afterwards.

23  Q    And if we could finish playing until timestamp 23:40.

24         (Audio played/audio paused.)

25  Q    So during the first half the recording, you are speaking

O-Kain - direct - Kassner                    367

1  to somebody other than the defendant.  Who are you talking

2  to?

3  A    That was a call to former Special Agent Allan Liefke.

4  Q    And what did you discuss with Special Agent Liefke?

5  A    So, prior to this specific transaction with the

6  defendant, myself and the entire investigative team working on

7  this case determined that that was going to be the time that

8  we arrested the defendant.  And prior to the meeting, we

9  agreed on a specific arrest Signal and when I called Special

10 Agent Liefke, what was when I gave him the arrest Signal and I

11 will pause there.

12 Q    What happened during the second portion of the

13 recording?

14 A    When you hear the yelling, is that -- so, yeah, that's --

15 there was an arrest team and the defendant and I were sitting

16 in the back of the defendant's vehicle and the DEA arrest team

17 came up and opened the car doors, announced police, and

18 arrested both the defendant and myself but that part of when I

19 was arrested that was still in an undercover capacity.

20 Q    Why did they arrest you?

21 A    We weren't -- depending on how the arrest of the

22 defendant went, I wasn't sure if it was going to be more

23 beneficial to the investigation if I remained as an undercover

24 and the defendant thought that I was under arrest with him or

25 if at that time I should let the defendant know that I was an

O-Kain - direct - Kassner                    368

1    undercover agent.  So we didn't know how that was going to

2    play out.  So initially I was just arrested, fictitiously

3    arrested, to convince the defendant that I was still a

4    criminal.

5    Q    Did you ever actually transfer Bitcoin to the defendant

6    on April 30, 2019?

7    A    No.

8    Q    And did you ever actually receive the cash from the

9    defendant?

10   A    Yes.

11   Q    -- well -- in exchange?

12   A    Not an exchange but we did sees that cash that was in

13   the car that the defendant planned to exchange to me for

14   Bitcoin.

15        MS. KASSNER:  If we could pull up just for the

16   witness what's been previously marked as Government Exhibit

17   304 published to witness only.

18   Q    Let me know when you see it?

19   A    I see it.

20   Q    What is Government Exhibit 304?

21   A    This is a map of the broader New York area and on it --

22   displayed on the map are the locations, the general locations

23   all of the transactions that we just went through with the

24   defendant.

25        MS. KASSNER:  Permission to admit Government Exhibit

O-Kain - direct - Kassner                          369

1   304 into evidence and publish to the jury.

2              THE COURT:  Any objection?

3              MR. SINGER:  No, Your Honor.

4              THE COURT:  304 is admitted.

5              (Government Exhibit 304 received in evidence.)

6              THE COURT:  And you may publish.

7              (Exhibit published.)

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O'KAIN - DIRECT - MS. KASSNER                370

1    BY MS. KASSNER:   (Continuing.)

2    Q    Are these all of the locations where you met the

3    defendant in 2018 and 2019?

4    A    Yes.

5            MS. KASSNER:  If we could show just to the witness

6    what has been previously marked as Government's Exhibit 1101.

7    Q    And if you could let us know when you see it on your

8    screen.

9    A    I see it.

10   Q    Do you recognize Government's Exhibit 1101?

11   A    I do.

12   Q    Did you review --

13           Let's start by asking, what is Government's

14   Exhibit 1101?

15   A    This is a summary chart of the transactions that I

16   conducted with the defendant and the amounts of BitCoin that I

17   provided.  The amount of cash that the defendant provided to

18   me and the commission that the defendant took for those

19   transactions.

20   Q    Did you review Government's Exhibit 1101 and ensure that

21   it accurately summarized the amounts you and the defendant

22   exchanged and the commissions that the defendant charged on

23   the listed dates in 2018 and 2019?

24   A    Yes.

25           MS. KASSNER:  Your Honor, I ask that Government's

1    Exhibit 1101 be admitted into evidence and published to the

2    jury.

3              THE COURT:  Any objection?

4              MR. SINGER:  No, Your Honor.

5              THE COURT:  1101 is admitted and you may publish.

6              (Exhibit published.)

     Q    In total, how much BitCoin -- how much cash -- I'll ask

7    it this way.

8              In total, how much cash did the defendant provide to

9    you in exchange for the BitCoin you sent to him?

10   A    $133,190.

11   Q    During all of the times that you met with the defendant,

12   did he ever ask for your name?

13   A    No.

14   Q    Did he ever ask for a form of identification?

15   A    No.

16   Q    Did he ever ask for your date of birth or a driver's

17   license number?

18   A    No.

19   Q    Your social security number?

20   A    No.

21   Q    Did he ever mention anything -- I guess, did he ever ask

22   where you got the money from?

23   A    No.

24   Q    The BitCoin from?

25   A    No.

1    Q    And did he ever ask you to confirm that you got the

2    BitCoin from legal transactions?

3    A    No.

4              MR. SINGER:  One moment, Your Honor.

5              THE COURT:  All right.

6              MR. SINGER:  No further questions.

7         Thank you.

8              THE COURT:  Thank you very much.

9              Mr. Singer, cross examination.

10   CROSS-EXAMINATION

11   BY MR. SINGER

12   Q    Mr. O'Kain, good morning, sir.

13   A    Good morning.

14   Q    We never met before, correct?

15   A    Correct.

16   Q    So you just testified about the meeting that you had with

17   Mr. Goklu on April 30th of 2019, the day that he was placed

18   under arrest, correct?

19   A    Yes.

20   Q    And you indicated that you had made some statements to

21   Mr. Goklu about Adderall or pills, then you said that part of

22   the reason for that was because of the, I think, you said the

23   uncertain legality of surrounding marijuana in California; is

24   that right?

25   A    Yeah.  That's what I said.

O'KAIN - CROSS - MR. SINGER                 373

1   Q     In 2018 and 2019, the growing and selling of marijuana in

2   licensed businesses was legal; was it not under California

3   law?

4   A     Under --

5   Q     California law.

6   A     California law.  You know, I know I knew this for certain

7   at one point.  I don't -- at this time, I don't exactly know

8   what the laws were.  I know there was some loosening of

9   restrictions on the sale of marijuana in the State of

10  California, but I do know that this was sold very legal

11  federally at that time.

12  Q     Thank you.  But that wasn't my question.  My question had

13  to do with the state laws in California.  There were legal

14  cannabis farms.  Farms where cannabis was being grown by

15  farmers for sale in state licensed dispensaries in California;

16  were they not?

17        Are you telling us that you are not aware of that?

18  A     I believe so.  I just explained my understanding.

19  Q     You believe that that is true, that farmers legally grew

20  marijuana on farms and sold it to licensed state licensed

21  dispensaries that were operating legally in the State of

22  California?

23  A     I believe that's correct.

24  Q     You know that's correct.  You were a DEA agent.  And you

25  know that was correct and you knew that it was correct in

O'KAIN -   CROSS - MR. SINGER                    374

1   April 30, 2019; didn't you?

2   A    It was several years sine I have been a DEA agent.  But

3   I'm sure at the time when I was a DEA Agent, I had a better

4   understanding of the intricacies of the legal status of

5   marijuana at that time.

6   Q    And, in fact, it's the same as what's happening now in

7   New York where the State is beginning to license dispensaries

8   for the legal sale of marijuana here, correct?

9   A    I have no idea what is happening with the status of

10   marijuana at this time.  Like I said, I'm not a special agent

11   anymore.

12   Q    You don't have to be a DEA Agent to read the news and be

13   aware of changes in the law.

14          Are you telling us that you're not aware of New

15   York State is in the process of licensing dispensaries of the

16   legal sale of marijuana in the State of New York?

17          THE COURT:  Sustained as to relevance.

18   Q    And today, it's still -- marijuana to your knowledge, if

19   you know this, it's still illegal federally, correct?

20   A    Yes.

21   Q    Are you aware that in many states that marijuana is sold

22   under state law legally?

23          MR. SINGER:  Objection, Your Honor.

24          THE COURT:  I'll allow this one question.

25          If you know.

1  A    I'm sorry, sir.  I don't follow the drug laws now.  I

2  clearly don't have time for that.

3  Q    So after -- well, after you told Mr. Goklu in this

4  April 30th meeting, that about marijuana is -- or that you

5  were selling pills or whatever, Mr. Goklu came back and asked

6  about buying a cannabis farm in California, correct?

7  A    Yes.

8  Q    Even after you told him that this was not -- that

9  federally it was illegal.  He's still talking about a legal --

10  what you understood him to mean was a legal cannabis farm in

11  California?

12  A    I would have to go back to the transcript to see the

13  sequence of the conversation.

14  Q    Then a little bit after that, Mr.-- you indicated to

15  Mr. Goklu something to the effect that there were different

16  laws in and out -- inside and outside of California regarding

17  marijuana; is that right?

18  A    I think I said that a friend of mine was arrested because

19  it was federally illegal and he was arrested by the Feds.

20  Q    Well, you told us in your testimony just a few moments

21  ago, that your understanding of what Mr. Goklu was saying to

22  you was that Mr. Goklu was aware that there were different

23  laws inside and outside of the State of California; is that

24  right?

25  A    I think more accurately, the defendant was letting me

1  know he was aware that it was -- you could get in trouble

2  outside of California.

3  Q     Selling marijuana, correct?

4  A     Yes.

5  Q     Was Mr. Goklu selling marijuana to you during any of

6  these transactions?

7  A     No.

8  Q     Were you selling marijuana to Mr. Goklu during any of

9  these transactions?

10  A     No.

11  Q     Was there any discussions about sale of marijuana outside

12  of California in any of these conversations?

13  A     I'd have to go back.  Again, I don't necessarily think it

14  was specifically stated that marijuana sales were occurring

15  outside of California.

16  Q     The discussions that you had with Mr. Goklu had do with

17  the growing and sale of marijuana in the State of California;

18  would you agree with that?

19  A     Part of our discussions were about that.

20  Q     All right.  So let me step back a bit.

21        Other than the text that have been introduced into

22  evidence and these are the signaled texts between you and

23  Mr. Goklu that led up to each one of the meetings that you had

24  with him.  And the recordings that were made of your meetings

25  with him.

O'KAIN  -  CROSS  -  MR. SINGER                377

1          There were no other communications with Mr. Goklu,
2    correct?
3    A    That's correct.
4    Q    And you had initially found Mr. Goklu on the
5    localbitcoins.com website, correct?
6    A    That's correct.
7    Q    And that site, localbitcoins.com, is it still operating
8    today?
9    A    I have not checked.
10   Q    Now, at the time that you determined that you were going
11   to reach out to Mr. Goklu, you did so because you suspected
12   that he might be involved in laundering drug money, correct?
13   A    Correct.
14   Q    That's why you selected him from other people that were
15   advertising on the localbitcoins site, correct?
16   A    That was -- the investigation started to identify if that
17   theory was correct.  Why we selected the defendant was because
18   of the larger amounts that he was advertising his ability to
19   transact that was sort of the primary reason.
20   Q    Okay.  But again, it was a suspicion that you had based
21   on the information you saw on the website?
22   A    Yeah.  So we -- like I testified to earlier, from other
23   unrelated DEA investigations, we became aware that money was
24   being laundered -- drug money was being laundered through
25   localbitcoins.com.

1  Q    Understood.  That's why you went looking at that website.

2         But at the time you and your fellow agents decided

3  on that you would focus some attention on Mr. Goklu, it was a

4  suspicion that you had; is that right?

5  A    Sure.

6  Q    You didn't have any affirmative evidence or proof that

7  Mr. Goklu was laundering drug money; did you?

8  A    No.

9  Q    So you went into your meetings with Mr. Goklu for the

10  purpose of determining whether the suspicions would be borned

11  out?

12  A    Correct.

13  Q    And if you had determined that, at any point, they were

14  not borned out, you would of dropped your interest in

15  Mr. Goklu and gone looking for someone else who you were

16  suspicious of?

17  A    That's correct.

18  Q    Now, each meeting that you had with Mr. Goklu, and there

19  were seven of them, right?

20  A    Correct.

21  Q    From August through April.  August of 2018 to August of

22  2019, there were seven meetings, right?

23         And each time the meeting was essentially the same

24  to the extent that Mr. Goklu brought cash, right?

25  A    Um-hmm --

1   Q    You have say yes or no for the record.  I'm sorry.

2   A    Yes.

3   Q    Mr. Goklu would count out the money.  You'd agree on an

4   amount and Mr. Goklu would count out the money, right?

5   A    Yes.

6   Q    You would agree on the fee that he was charging?

7   A    Yes.

8   Q    You would then initiate the transfer of BitCoin to

9   Mr. Goklu, correct?

10  A    Yes.

11  Q    And then, each time you had to wait for the BitCoin

12  transfer to take place; is that right?

13  A    Yes.

14  Q    And sometimes that transfer and the confirmation that you

15  would receive would happen quickly and sometimes it would drag

16  on for awhile?

17  A    Correct.

18  Q    Maybe a half an hour, 45 minutes, something like that?

19  A    Correct.

20  Q    But each time, I think the longest meeting would have

21  been up to an hour, you walked away with the cash and he

22  received the BitCoin, right?

23  A    Yes.

24  Q    And in each one of the transactions, the -- Mr. Goklu was

25  receiving a fee, right?

O'KAIN -  CROSS - MR. SINGER                    380

1    A    Yes.

2    Q    He was making money on each one of the transactions?

3    A    Yes.

4    Q    Now, the BitCoin that Mr. Goklu was receiving from you,

5    it varied in price from day-to-day, correct?

6    A    Yes.

7    Q    And in fact, the first meetings that you had the rate,

8    the BitCoin rate, exchange rate, was something over $7,000 per

9    BitCoin; is that right?

10   A    I would have to go back and check, but --

11   Q    Well, on the reports that you verified and are in

12   evidence.

13            THE COURT:  You want to pull up 1101.

14            MR. SINGER:  No.

15            THE COURT:  The summary of the docket.

16            MR. SINGER:  It doesn't have the information, Judge,

17   one moment.

18            THE COURT:  I'm sorry.  It didn't have the rate.

19            MR. SINGER:  We'll start with Government's Exhibit

20   -- I think it's one actually.

21            Ms. Sahli, if you could pull up Government's

22   Exhibit 1.  Actually, Government's Exhibit 7.  I think they're

23   not in date order.

24            THE COURTROOM DEPUTY:  Previously admitted.

25   Q    All right.  Mr. O'Kain, you see this is the -- you

O'KAIN - CROSS - MR. SINGER                381

1    indicated was the photo of the transaction receipt from

2    August 28th of 2018, correct?

3    A     Yes.

4    Q     And on that receipt it indicates the exchange rate at the

5    time?

6    A     Correct.

7    Q     That was the exchange rate for one BitCoin; is that

8    correct?

9    A     Yes, correct.

10   Q     It was $7,114.57?

11   A     Correct.

12         MR. SINGER:  Can we jump to the December 11th.  The

13   screen is not working.

14         THE COURTROOM DEPUTY:  Hold on.

15         Exhibit 3, previously admitted.

16   Q     Okay.  You are able to see this exhibit?

17   A     Yes.

18   Q     And this was from the photo of the transaction receipt

19   from December 11, 2018, correct?

20   A     Correct.

21   Q     And the exchange rate at this time was 3,000 --

22   $3,342.33, correct?

23   A     Correct.

24   Q     So less than half of the exchange rate in August?

25   A     Correct.

1   Q    And, in fact, Mr. Goklu indicated to you during the

2   course of some of these transactions that he had actually lost

3   money in the some of the transactions with you because of the

4   change in the price of BitCoin?

5   A    He did.

6   Q    But in each one of the transactions, each time you met

7   with him, he was making some money from the fee?

8   A    Correct.

9   Q    And losing money if the value of the BitCoin dropped?

10  A    Correct.

11          MR. SINGER:  Thank you, Ms. Sahli.  I don't need

12  that anymore.

13  Q    Now, you indicated that your cover story as an undercover

14  officer was that you were an online drug dealer selling drugs

15  online in exchange for BitCoin, correct?

16  A    Correct.

17  Q    Now, in the text, the Signal text messages that you sent

18  to Mr. Goklu, you never indicated to him that that's who you

19  were and what you were doing, correct?

20  A    Well, I --

21  Q    Did you ever tell him that you were selling drugs

22  directly?

23  A    Yes.

24  Q    In the text messages?

25  A    No, not in the text messages.

O'KAIN - CROSS - MR. SINGER                 383

1   Q    Okay.  So nothing ever came up in the text messages?

2   A    No.

3   Q    And when you first met with Goklu on -- Mr. Goklu on

4   August 28th of 2018, you didn't tell him that you were selling

5   drugs?

6   A    Correct.

7   Q    Or that your business was selling drugs and the BitCoin

8   that you were seeking to exchange was from the sale of drugs;

9   is that right?

10  A    That's correct.

11  Q    And you didn't tell him that on September 21st of 2018,

12  correct?

13  A    That's correct.

14  Q    And you didn't tell him that in November of 2018; did

15  you?

16  A    I did not.

17  Q    And you started to hint at it a little bit in December --

18  on December 11th of 2018?

19  A    Yes.

20  Q    And that was the first time?

21  A    Correct.

22  Q    So prior to the December 11th meeting, was there any

23  basis -- based on anything that you had told to Mr. Goklu, was

24  there any reason for him to believe that you were selling --

25  that the BitCoin that you were exchanging with him was from

O'KAIN -  CROSS - MR. SINGER                      384

1   the sale of illegal drugs?

2   A    Can you repeat that question?

3   Q    Well, I'll state it affirmatively.

4         There was no information that you had provided to

5   Mr. Goklu in those first four conversations that would lead

6   him to believe that the BitCoin had been obtained from selling

7   illegal drugs; isn't that correct?

8   A    Yeah.  Not necessarily.

9   Q    Not necessarily?

10  A    He would -- I think if you could state that a different

11  way.  Well, I guess, I did not specifically state anything

12  about drugs during those interactions, that's correct.

13  Q    Well, in fact, you testified -- I think it was yesterday

14  or maybe on Monday afternoon -- that Tuesday or Monday

15  afternoon, that people -- well, the prosecutor had asked you

16  whether you said anything in that first meeting about drugs

17  and your answer was that people that are involved in the drug

18  business don't talk about it openly; is that right?

19  A    That's correct.

20  Q    Right.  The first rule of fight club is that you don't

21  talk about fight club, right?

22  A    So the movie goes.

23  Q    So the movie goes.

24         And that's essentially is what your sayings, is the

25  cultural of people who are involved in buying or selling or

1   laundering money from drugs, that people involved in to don't

2   talk about it directly.

3           That's your experience as an undercover officer with

4   the DEA?

5   A    Yes.

6   Q    And is that -- it's not a rule.  Would it be fair to call

7   it a custom or practice of people who are involved in illegal

8   drug transactions?

9   A    Yeah.  I think it would be -- and this is based on my

10  experience when I was at the DEA.  It would be highly

11  irregular for two individuals that don't know each other to

12  openingly discuss any illegal things that they are doing.

13  Q    Well, I understand that.  That's what you testified to

14  and that is sort of a practice or custom that was understood

15  for people who are involved in the drug business, correct.

16  A    That's correct.

17  Q    Again, that's based on your experience that people in the

18  drug business kind of knew that you don't talk about it

19  openingly, right?

20  A    That's correct.

21  Q    And you said that's why you didn't talk about it or

22  didn't raise that in your first meeting with Mr. Goklu?

23  A    That's correct.  And also it would be -- it would just be

24  out of character.

25  Q    It would be out of character for someone who is involved

1   in the drug business?

2   A    That's correct.

3   Q    And people in the drug business know that, right?

4   A    I believe so, yes.

5   Q    And people that are not part of the drug business would

6   have no reason to know that, correct?

7   A    Perhaps.

8   Q    But in the first meeting with Mr. Goklu, on three

9   separate occasions Mr. Goklu started talking about drug

10  dealing, right?

11  A    Yes.

12  Q    Did that -- withdrawn.

13       He told you right when you got into the car and he

14  asked you to close the door, he says, we're not drug dealers,

15  right?

16  A    He did say that.

17  Q    And then, a short while later when referring to security

18  cameras on buildings that were nearby, he -- what he said was

19  what someone who was viewing the cameras if they came to the

20  car might say, Hey, are you a drug dealer, right?

21       That's what he said to you in that meeting?

22  A    I'm sorry, what's your question though?

23  Q    He said that to you, correct?

24  A    He said --

25  Q    Hey, are you a drug dealer?  Meaning, someone who would

1   view the security cameras and come over to the car?

2   A    Yeah.  Something to that effect.  Sure.

3   Q    And he also reference the money counting machine and said

4   that the police might view a money counting machine as being

5   evidence that you're a drug dealer, right?

6   A    Yes.

7   Q    So three times the person that -- Mr. Goklu, in your

8   first meeting with you references drug dealing, correct?

9   A    He references drug dealing.  I don't know if that was

10  three times.

11  Q    Yes.  He did three times.  Right?

12  A    I would have to go back.  I remember him saying it once

13  and then implying other things or not necessarily directly

14  implying.

15  Q    I'm not playing the tapes.  The jury can listen to the

16  recordings.

17        So didn't this -- I guess, the unusual aspect of

18  Mr. Goklu openingly referencing drug dealing to you in your

19  first meeting, didn't that offer you an opportunity to try to

20  hint to Mr. Goklu that in fact your business was selling

21  drugs?

22  A    At that time, no.

23  Q    It didn't offer you that opportunity?

24  A    No.

25  Q    You could have said something?  Was there anybody

1    muzzling you?

2            You could have suggested in some way to Mr. Goklu,

3    laughed about it, or something to try to convey to Mr. Goklu

4    that in fact that that's what you were involved with and you

5    chose not to?

6    A    I chose not to.

7    Q    Yes, but you could have.

8    A    I chose not to --

9    Q    But you could have.  Please listen to my question, not

10   what you want to say.

11           You could have?

12   A    I could have said a lot of things and I chose to say what

13   I did.

14   Q    Now, couldn't you have possibly saved you and your fellow

15   agents a lot of time if you would have somehow suggested to

16   Mr. Goklu when he raises the issue of drug dealing, if you

17   would have somehow suggested to him that's what you were

18   involved in and he either would have gone along, and in which

19   case you would have had a real solid ground for continuing

20   your investigation or made clear to you, I don't deal with

21   that, and you could have stopped your focus on him and gone

22   onto someone else.

23           You could have done that, correct?

24   A    That could potentially have out of the infinite scope of

25   things I could have said, sure, but at that time I --

O'KAIN -   CROSS - MR. SINGER                389

1   Q    You didn't.

2   A    The reason --

3   Q    Thank you.  You've answered my question, sir.

4          Now, Mr. Goklu repeated concerns to you about the

5   police?

6   A    Yes, correct.

7   Q    And he also told you why he was concerned about the

8   police; didn't he?

9   A    Yes.  He didn't want to get caught doing something

10  illegal.

11  Q    Well --

12  A    That's how I --

13  Q    That's not quite.

14  A    That's how I understood it.

15  Q    Okay.  I'm not interested in your interpretations, sir.

16  I'm interested in what he may have said to you.

17         Now, isn't it a fact that he expressed to you that

18  if police found two people in a car with a large amount of

19  cash and a money counting machine, they would -- the police

20  would believe that you are doing something illegal; whether

21  you are or not, correct?

22  A    That's what you understood, yes.

23  Q    And if the police saw something that they thought might

24  be illegal, they would seize first and ask questions later,

25  right?  Isn't that what he was expressing to you?

O'KAIN - CROSS - MR. SINGER                390

1  A    I don't think that I understood it that way at the time.

2  Q    Well, Mr. Goklu told you -- expressed to you at various

3  times that he understood that if money was seized from him

4  that he would get the money back; didn't he?

5  A    Yes.

6  Q    And that the police would seize the money, possibly the

7  money counting machine, and possibly even the BitCoin,

8  correct?

9  A    Correct.

10 Q    And that essentially it would be an enormous

11 inconvenience and you'd be without the money for sometime

12 until you were able to get it back, right?

13 A    I don't know if that ever was articulated.

14 Q    Well, do you recall him on November 27th of 2018, telling

15 you that he wasn't concerned about jail, we're not talking

16 about jail, but that the police would keep the money for days.

17 A    Yeah.

18 Q    Do you recall him telling you that?

19 A    He expressed concern about the money being seized.

20 Q    No.  That's not my question.

21       He told you that it's not jail.  He's not concerned

22 about jail.  He's concerned about the money being taken away

23 from him.  At that point he said for days.

24 A    Okay.  You know, I just want --

25 Q    You don't recall?

O'KAIN - CROSS - MR. SINGER                  391

1  A    I want to make sure I'm answering accurately.

2        MR. SINGER:  Ms. Sahli, could you play that portion

3  from November 27th.

4        THE COURTROOM DEPUTY:  Which exhibit?

5        MS. SAHLI:  803.

6        THE COURTROOM DEPUTY:  I'm sorry, which one?

7        THE COURT:  803.

8        Do you want to refer to the jury to the transcript?

9        MS. SAHLI:  Page 15 in the transcript.  The full

10  transcript at the back of your binder.

11        THE COURT:  Ladies and Gentlemen, if you note, which

12  is where I was before.  At the back of your binder, you have

13  the full transcripts or transcripts of the fuller portions of

14  the recordings and they don't have an R.  And so, if you look

15  at 803, apparently Ms. Sahli is saying that you should start

16  at Page 15; is that right?

17        Did you say, Ms. Sahli, 15?

18        MS. SAHLI:  Yes, Page 15.

19        THE COURT:  Of transcript 803.

20        And the timestamp is?

21        MS. SAHLI:  27:52.

22        THE COURT:  Starting at 27:52.  Thank you.

23                    (Audio recording played.)

24                    (Audio recording stopped.)
   Q    So Mr. O'Kain, Mr. Goklu in fact told you it's not jail,
25  correct?

Shernelle Griffith - Official Court Reporter

1    A    That's right.

2    Q    And the police are going to keep your money two or

3    three days?

4    A    That's correct.

5    Q    That's what he expressed to you as his concern about the

6    police seeing what the two of you were doing in the car,

7    right?

8    A    Correct.

9    Q    Okay.  And on January -- yes.

10             On January 24th of 2019, Mr. Goklu indicated to you

11   that it could take a year to get your money back; didn't he?

12             Do you remember that?

13   A    I recollect that.  I believe it.  I just want to -- when

14   I -- I just want to make sure I'm answering the questions

15   accurately.

16   Q    Well, the question is very specific.  Did Mr. Goklu tell

17   you on January 24th of 2019 in relation to the money being

18   seized by the police that they keep your money -- that it

19   could take a year to get your money back?

20   A    I believe so.

21   Q    You believe so.

22             MR. SINGER:  Ms. Sahli, could we play the segment

23   from January 24th and this is in -- what's the exhibit?

24             MS. SAHLI:  Government's Exhibit 806 already in

25   evidence.

1          MR. SINGER:  The full 806, not 806R.  The full 806

2     towards the back.

3          MS. SAHLI:  Starting at Page 10, 22:46.

4                    (Audio recording played.)

5                    (Audio recording stopped.)

6     Q    In fact, Mr. O'Kain, Mr. Goklu told you in relation to

7     the possible seizure of money by the police that it could take

8     a year to get it back; is that right?

9     A    That's correct.

10    Q    And he repeated essentially the same concern to you on a

11    number of occasions, that he was expressing to you, that's why

12    he did not want to transact -- do the transactions in

13    Manhattan and why he was concerned about other people that

14    might see what the two of you were doing in the car; is that

15    right?

16    A    Yeah, that's correct.

17    Q    Okay.

18    A    That's part --

19    Q    And it was again --

20    A    -- of the investigation.

21    Q    And I'm not talking about your belief?

22         THE COURT:  So you said you're not talking about his

23    belief.  Go on.

24    Q    We're talking about the -- these are things that

25    Mr. Goklu expressed to you as the reasons why he didn't want

1    to police to see what the two of you were doing in the car?

2    A    That's correct.

3    Q    All right.  And he never said to you, I don't want the

4    police to see what's going on in the car because I'm concerned

5    that I'm going to be arrested and get charged with some drug

6    offense.

7              He never said that to you or anything like that to

8    you, correct?

9    A    No.

10   Q    He was concerned about the seizure of the money for

11   whatever period of time it would take before he was able to

12   get it back; is that right?

13   A    Exactly.  He was concerned about the money being seized.

14   Q    Seized.

15   A    Um-hmm --

16   Q    And he never expressed concern that he would not be able

17   to get it back.  It would just take some time to do so, right?

18   A    I believe so.

19   Q    Now, you indicated that on Tuesday as you were on direct

20   examination, as you were going through each one of meetings

21   with Mr. Goklu, that you took opportunities to try to convey

22   or hint to Mr. Goklu what your business actually was in terms

23   of your cover story, right?

24   A    That's correct.

25   Q    And you testified, I believe, that the -- one of the

1  reasons that you did that was to try to get Mr. Goklu to ask

2  questions, correct?

3  A    That's correct.

4  Q    Which would give you an opportunity to more clearly state

5  what your cover story business was?

6  A    And to give the defendant an opportunity to have any sort

7  of inclination on whether this money was legitimate or

8  illegitimate.

9  Q    And repeatedly, Mr. Goklu simply did not respond; is that

10 right?

11 A    That's correct.  It did not seem that he cared one way or

12 cared.

13 Q    Well, again, you're not a mind reader; are you?  And what

14 you're giving us is just your opinion about his reaction.

15        I'm asking specifically, factually, he didn't

16 respond to these efforts that you were making to raise -- to

17 get him to raise questions?

18 A    No.  He didn't respond at all.

19 Q    Now, during the meetings, as soon as you would get in the

20 car with him, the recordings indicated that you immediately

21 started talking about the money, correct?

22 A    Correct.

23 Q    And Mr. Goklu would right at the beginning of your

24 meeting, take out the cash however he had it that day, bundles

25 tided up, envelopes, whatever it might be, correct?

O'KAIN -  CROSS - MR. SINGER                    396

1   A    Correct.

2   Q    And started running the money through the money counting

3   machine to make sure for both of you that the amount that was

4   being given to you was correct; is that right?

5   A    Correct.

6   Q    So the first part of the meeting is making sure that the

7   cash part was correct, right?

8   A    Typically, yes.

9   Q    Well, each time?

10  A    Yeah.

11  Q    Each time you did a transaction, August 28, September

12  21st, November 27th, December 11th, January 24th, January

13  30th --

14          THE COURT:  Hey.  Sorry.  Please, you got to listen

15  to me when I call out to you.  You got to go slower for the

16  court reporter.

17          Shernelle, where did you leave off?

18          MR. SINGER:  I'll withdraw it.

19          THE COURT:  You're withdrawing it.

20          MR. SINGER:  I'll withdraw that and state it again.

21  Q    In the six times that you conducted cash for BitCoin

22  transactions with Mr. Goklu, that's how the meeting started;

23  is that right?

24  A    That's correct.

25  Q    All right.  And then, I'm excluding the April 30th

1   because it was not actually an exchange of BitCoin on that

2   date?

3   A    Correct.

4   Q    All right.  So the meeting starts with Mr. Goklu focusing

5   on the cash, correct?

6   A    Correct.

7   Q    Focusing on the exchange rate, right?

8   A    Yes.

9   Q    How much BitCoin you had to sell that day?

10  A    Correct.

11  Q    How much cash that would convert into, correct?

12  A    Yes.

13  Q    And then, what the fee -- his percentage fee would be

14  seven or eight percent, whatever it was?

15  A    Yes.

16  Q    To make sure that the cash being provided to you was the

17  correct amount for the exchange that you were doing, right?

18  A    Correct.

19  Q    And so, the first part of the meeting, Mr. Goklu, is

20  focused on that and is engaged in doing that, correct?

21  A    Yes.

22  Q    And then, you would -- once that was resolved, you would

23  then initiate a transfer of BitCoin from the wallet in your

24  phone; is that right?

25  A    Correct.

1  Q    And there would be some discussion, and it's in the

2  recordings, you would discuss the transfer -- how much BitCoin

3  you were transferring, correct?

4  A    Correct.

5  Q    And then, you would stay in the car with Mr. Goklu until

6  that transactions was confirmed, right?

7  A    Yes.

8  Q    And the confirmation was not on your phone.  It was on

9  Mr. Goklu's phone; is that right?

10 A    That's not necessarily correct based on how the BitCoin

11 blockchain worked.  So the confirmations --

12 Q    Well, was Mr. Goklu looking at your phone to get

13 confirmation or was he looking at his own phone to get

14 confirmation that the BitCoin had been transferred to him?

15 A    He was looking at his phone.

16 Q    Okay.

17 A    But again.

18 Q    Well, I'm asking what he was doing.  He was looking at

19 his phone, correct?

20 A    That's correct.  He was looking at his phone.

21 Q    Okay.  And again, the -- we're talking about populating

22 the blockchain and all of that, right?  But those are the

23 electronic steps that had to happen, not in the car, but out

24 in the ether somewhere until the confirmation would come to

25 Mr. Goklu; is that right?

1  A    That -- yeah.  And -- yes.  That's for all intensive

2  purposes, that's right.

3  Q    Okay.  And you were not going to leave and he certainly

4  wanted you to stay in the car until the confirmation was

5  received, that he had received the BitCoin; is that right?

6  A    That's correct.  It was a certain number of -- there are

7  multiple confirmation.  And like I mentioned before, the more

8  confirmations that occur on the blockchain, the more

9  solidified that transaction is solid and the money is in his

10  account, so yes.

11  Q    So at that point, Mr. -- in each one of the transactions,

12  Mr. Goklu had given you the cash, right.

13  Q    Or it was sitting there for you to take?

14  A    Yeah.  Exactly.

15  Q    That it had been counted out and segregated from any

16  money he had and it was sitting there in the car for you to

17  take?

18  A    Correct.

19  Q    And the meeting that the -- you were not going to take

20  the cash until Mr. Goklu was satisfied by whatever

21  confirmations there were, however many there would have been,

22  you weren't going to leave until Mr. Goklu was satisfied that

23  the confirmations were sufficient for him?

24  A    That's correct.

25  Q    Okay.  (Continued on the following page.)

1   CROSS-EXAMINATION (Continued)

2   BY MR. SINGER:

3   Q    Okay.  And those confirmations, as I asked you a little

4   bit earlier, could come quickly or they could take some time,

5   correct?

6   A    Correct.

7   Q    And during the entire time while you're waiting,

8   Mr. Goklu is looking at his phone; is that right?

9   A    I can't recall specifics about how frequently he looked

10  at his phone.

11  Q    Well, the only place that Mr. Goklu was going to receive

12  the confirmations that he sought was by information that came

13  up on his phone; is that right?

14  A    Correct.

15  Q    And so whether he was staring at it 100 percent of the

16  time or whether he simply kept going back to it to see what

17  was going on or to refresh the phone, that's what he was

18  doing, correct?

19  A    Correct.

20  Q    And it was during that time that he's waiting for the

21  confirmations that you are talking to him about your cover

22  business; is that right?

23  A    Correct.

24  Q    You said you needed money for California and he didn't

25  ask any questions about that?

1   A    Correct.

2   Q    You said that, you know, the amount of money that -- or

3   the BitCoin that you'd be able to bring to him was depending

4   on how much we sell, and he never responded to that?

5   A    That's correct.

6   Q    You asked him about -- or you spoke on your cell phone

7   with your supposed partner about keys, correct?

8   A    That's correct.

9   Q    And Mr. Goklu didn't respond to that in any way?

10  A    That's correct.

11  Q    What's a key, what are you talking about, does this have

12  to do with me; he didn't say anything, right?

13  A    That's correct.  He said nothing.

14  Q    And you said that keys refer to cocaine and heroin.

15       That's how cocaine and heroin are sold?

16  A    Yes.  That's correct.

17  Q    Was there ever any discussion with Mr. Goklu about

18  cocaine or heroin?

19  A    No.  Outside of me referencing keys, no he did not

20  reference --

21  Q    Well, again, keys are something that someone in the drug

22  business would be expected to understand; is that right?

23  A    That is accurate.

24  Q    And someone who's not involved in the drug business would

25  not necessarily know what the heck you were talking about,

O'KAIN - CROSS - MR. SINGER                402

1   right?

2   A    Not necessarily.  I think it's pretty common, based on

3   movies and popular culture.

4   Q    So everybody knows that a key refers to cocaine and

5   heroin?

6   A    That a question?

7   Q    Is that what you're saying?

8   A    Does everyone know?  I'm not sure if everyone knows.

9   Q    Of course you don't.

10          You made a reference to getting your head chopped

11   off; he didn't respond?

12   A    No.

13   Q    You made a reference to not being able to touch CoinBase

14   and he didn't respond?

15   A    Not at all.

16   Q    Then on January 24th, you make some reference to oxy?

17   A    That's correct.

18   Q    And he did respond to that, right?

19          He asked you, what's oxy?

20          He didn't even know what you were talking about; is

21   that right?

22   A    He asked what oxy was.

23   Q    He said, what's oxy.

24          That's the specific words that he used to you,

25   what's oxy, right?

1   A    That's correct.

2   Q    And you simply gave him the full name, oxycodone, right?

3   A    That's correct.

4   Q    He didn't ask any other questions about that, what's

5   that, what are we talking about?

6   A    No.

7   Q    No indication that he knew what you were talking about?

8   A    He --

9   Q    You assumed that everybody should know what you're

10  talking about, but he never said anything; is that right?

11  A    He never asked any questions after I told him that it was

12  oxycodone.

13  Q    That's correct.

14          Now, you testified that on one of your earlier

15  meetings with Mr. Goklu that Mr. Goklu had said that he had

16  done a transaction with someone who was selling marijuana; is

17  that right?

18  A    That's correct.

19  Q    And that was actually on November 27th of 2018, where

20  Mr. Goklu raised that, correct?

21  A    I believe so, yes.

22  Q    And again, that wasn't in response to any hint or

23  suggestion from you that was trying to bring that information

24  out of him, this was something that he simply went into on his

25  own; is that right?

O'KAIN - CROSS - MR. SINGER                    404

1   A    That's correct.

2   Q    And is that all he said, that he was doing a transaction

3   with somebody selling marijuana?

4   A    I don't think that portion was played in court, so I'd

5   have to get the actual specifics -- I'd have to refresh my

6   memory.

7   Q    Well, why don't we do that.

8   A    Sure.

9   Q    All right.

10          MR. SINGER:  November 27th, Ms. Sahli.

11          MS. SAHIL:  Yes, it's Government Exhibit 803, the

12  full transcript at Page 26, and then to play from timestamp

13  43:24.

14          THE COURTROOM DEPUTY:  43:24?

15          MS. SAHIL:  Yes, 43:24.

16          (Exhibit published.)

17          (Audio recording played.) (Audio recording stopped.)

18  Q    So Mr. Goklu, didn't simply reference that someone that

19  was selling marijuana in California, he said more than that,

20  didn't he?

21  A    Yes.

22  Q    In fact, what he said to you -- you had -- you responded

23  by indicating that you didn't understand what he was saying to

24  get him -- and he responded to that; is that right?

25  A    That's correct.

1    Q    And he said, it's a licensed marijuana thing in

2    California, right?

3              We just heard it.  Did you hear that?

4              Did you hear him say that it's a licensed marijuana

5    thing?

6    A    Yes.

7    Q    Okay.  And did you hear Mr. Goklu say that it was legal?

8    A    He did say that.

9    Q    And did you hear Mr. Goklu say that you pay taxes?

10   A    Yes.

11             THE COURT:  Mr. Singer, just so you know, we'll take

12   our morning break in about a couple of minutes.

13             MR. SINGER:  I will be done in about a couple of

14   minutes, so the timing will be perfect.

15             THE COURT:  Okay.  Thank you.

16   Q    You responded to Mr. Goklu that marijuana was also part

17   of your business, didn't you?

18   A    Yes.

19   Q    And that was immediately after Mr. Goklu referenced what

20   he stated was a licensed marijuana thing in California that

21   was legal and pays taxes, and you said that's part of my

22   business too?

23   A    Marijuana was part of my business, that's what I told

24   him.

25   Q    That's what the conversation was about, marijuana.

O'KAIN - CROSS - MR. SINGER                    406

1          You said, that's part of my business too, right?

2    A    Correct.

3    Q    And then on April 30th, the day of the arrest, when you

4    first got into the car, there was -- this was not the seventh

5    time that you were meeting with him, right?

6    A    Correct.

7    Q    And were certainly more comfortable with each other?

8    A    Yes.

9    Q    And he -- Mr. Goklu begins by asking you, how's business,

10   right?

11   A    Yes.

12   Q    You told him it was booming?

13   A    Correct.

14   Q    And Mr. Goklu responds, like, you know, hey, I should get

15   into that, right?

16          If your business is booming, maybe I should get into

17   that, right?

18   A    Correct.

19   Q    And you answered, oh, you want a cut, you want to get

20   into it, right?

21   A    Correct.

22   Q    And then the business that he referenced that he wanted

23   to get into with you was a cannabis farm; is that right?

24          He asked you how much is a cannabis farm?

25   A    That's correct, and that's why I referenced --

O'KAIN - CROSS - MR. SINGER                407

1   Q    Sir, you answered my question.

2        When you offered him a cut of the business, what he

3   indicated to you -- what Mr. Goklu indicated to you was how

4   much it would cost to buy part of a cannabis farm; isn't that

5   right?

6   A    That's correct.

7   Q    Thank you.

8        MR. SINGER:  I have nothing else.

9        THE COURT:  All right.  Thank you.

10       Timing is perfect.  Let's take our morning break,

11  folks.  It's 11:15, thereabout.  Let's be ready to go at 11:30

12  or a minute or two after.

13       Have a good break.  Keep an open mind.  Do not talk

14  about the case or don't do any research.

15       THE COURTROOM DEPUTY:  All rise.

16       (Jury exits the courtroom.)

17       THE COURT:  Thank you.  You can step down,

18  Mr. O'Kain.

19       Folks, you have 15 minutes, roughly for a break.

20       (A recess was taken.)

21       (Jury enters the courtroom.)

22       THE COURT:  So jurors -- by the way, you can sit.

23  We stand for you, but you can sit.

24       So welcome back.  Have a seat, everyone.

25       Ms. Kassner, your witness for redirect.

O'KAIN - REDIRECT - MS. KASSNER                408

1          MS. KASSNER:  Thank you, Your Honor.

2  REDIRECT EXAMINATION

3  BY MS. KASSNER:

4  Q    On cross-examination -- excuse me.

5          On cross-examination, defense counsel asked you a

6  few questions about the drug business.

7          Do you recall that?

8  A    Yes.  I do.

9  Q    Is money laundering part of the drug business?

10  A    Yes.

11  Q    And in your training and experience, as a former Drug

12  Enforcement Administration agent, is it possible to run a

13  successful drug operation without money laundering?

14  A    No.  Money laundering was typically always part of the

15  scope of circumstances around drug dealing.

16  Q    You were also asked some questions about marijuana.

17          Was marijuana a controlled substance under federal

18  law in 2018?

19  A    Yes, it was.

20  Q    Is it still a controlled substance under federal law

21  today?

22  A    It still is.

23  Q    Has marijuana ever been legal to distribute in the United

24  States under federal law?

25  A    Not to the best of my knowledge.

1  Q    You were also asked about selling marijuana outside the

2  State of California.

3         Do you remember that?

4  A    Yes.

5  Q    And I'd like to refer you to Jury Aid 801 which is the

6  full transcript, on Page 11.  And near the bottom of Page 11,

7  transcript 801 -- not the one with the R, but the full one at

8  the back -- you say that you have an online business.

9         Do you recall what you told the defendant about your

10 business?

11 A    At that time, I believe it was just generic, an online

12 business.

13 Q    And if we now turn to page -- transcript of 806.  It's a

14 few tabs over.  On Page 13?

15         MR. SINGER:  Your Honor, if I may, the jury aids are

16 not in evidence.

17         THE COURT:  I'm sorry, what's not in evidence?

18         MR. SINGER:  The jury aids are not in evidence.

19         THE COURT:  Right.  I'm sorry, so what was the

20 request, to have the jury just read the transcripts?

21         You do have to play the audio.  You can't just have

22 them read the transcripts.

23         Is that what's being proposed?

24         MR. SINGER:  That was my concern, Your Honor.

25         THE COURT:  So just play the audio again, because

1   remember, the transcripts are simply aids to what they hear on

2   the audio.

3           The audio is the evidence.

4           MS. KASSNER:  Yes, Your Honor.

5           For this question, I'm not asking to play the

6   transcripts.  I'm asking what the witness recalls saying to

7   the defendant based on reviewing the transcript.  But I can

8   also just ask him what he recalls.

9           THE COURT:  Ask him what he recalls.  If he has a

10  failure of memory, you can refer him to the transcript.  But

11  he would read it to himself then, and don't refer the jury to

12  look at it.

13          MS. KASSNER:  Okay.

14  Q    Mr. O'Kain, what, if anything, did you tell the defendant

15  about where you sold the product --

16          THE COURT:  Mr. O'Kain, close your binder, listen to

17  the question, do you recall, and then go ahead.

18  Q    Mr. O'Kain, do you recall telling the defendant where you

19  sold the products that your business was selling?

20  A    Vaguely.  It would help if I could refresh my memory.

21  Q    Would it refresh your recollection to look at a

22  transcript dated January 24, 2019?

23  A    Yes.

24  Q    Okay.  And if you could look at, in your binder, tab 806,

25  Page 13.

O'KAIN - REDIRECT - MS. KASSNER            411

1         THE COURT:  Just read it to yourself, and jurors,
2    don't open your binders.
3         Go ahead.  Just let the AUSA know what you're ready.
4    A    Can you please tell me the page number again.
5    Q    Page 13.
6    A    Okay.
7    Q    Did that refresh your recollection as to where you told
8    the defendant you sold your products?
9    A    Yes.  I told the defendant that we got our stuff from
10   California and brought it back here, meaning, New York.
11   Q    In your training and experience, do drug dealers usually
12   write in text messages, I'm selling drugs?
13   A    No.
14   Q    During your -- and in your training and experience, do
15   drug dealers typically call drugs, drugs?
16   A    No.  They typically don't.  They call them anything about
17   the actual name for the drugs.
18   Q    During your time as a Drug Enforcement Administration
19   agent, how many times did you see or hear anybody say, I'm
20   dealing drugs?
21   A    I can't remember any times that that happened.
22   Q    And earlier, it was -- there was a discussion of the fact
23   that you never said, I'm dealing drugs.
24        Why didn't you say that?
25   A    Because that would be completely out of character with

O'KAIN - REDIRECT - MS. KASSNER                    412

1   somebody that is selling drugs.  And as I was operating in an

2   undercover capacity with a cover story that I was selling

3   drugs, I hug to the cover story as best I could, and part of

4   that was not actually stating so bluntly that I'm selling

5   drugs.

6   Q    In January and April of 2019, did you tell the defendant

7   that you were selling Adderall?

8   A    Yes.

9   Q    And did you tell the defendant that you were selling

10  marijuana?

11  A    Yes.

12  Q    And did you tell you the defendant you were selling

13  oxycodone?

14  A    Yes.

15  Q    Now, I want to pull you up the section where you told --

16          MS. KASSNER:  So I want to play, if we could, a

17  portion of the transcript.  And this is Government

18  Exhibit 806.  And if we could play 41:35 until 43:30.

19          And this is going to be in the binders, 806, Page

20  25, in the long version of the transcript.  It might go a bit

21  before and a bit after.

22  A    I'm sorry, before that plays, can you give the page

23  number one more time.

24  Q    Yes.  It's Page 27 of tab 806, the full tab that has the

25  page numbers at the bottom.  And the recording may start a bit

O'KAIN - REDIRECT - MS. KASSNER            413

1    before this page.

2              (Audio recording played.)

3              MS. KASSNER:  If we could pause here.

4              (Audio recording stopped.)

5    Q    So earlier there was a discussion about whether or not

6    the defendant responded when you said that oxies refer to

7    oxycodone.

8              Did the defendant respond when you said that?

9    A    Yes, he did.

10   Q    And what did he say?

11   A    He said don't bring those expensive things.

12   Q    Did he say anything else?

13   A    And he said then just bring regular street things.

14   Q    After you told the defendant that you sold Adderall,

15   oxycodone, and marijuana, did the defendant refuse to exchange

16   your BitCoin?

17   A    No.

18   Q    Now, I want to turn back to one last thing.

19             Do you recall being asked questions about the

20   defendant not wanting money to be seized?

21   A    Yes.

22   Q    Now, earlier, we listened to Government Exhibit 803, and

23   I believe we stopped at timestamp 28:02.

24             MS. KASSNER:  If we could continue playing where we

25   had left off on cross at 28:02 of Government Exhibit 803.

O'KAIN - REDIRECT - MS. KASSNER          414

1    Q     And before we do that, I just want to refer you to the

2    transcript, tab 830, and it's -- it begins, I believe, on Page

3    15 of tab 803 in the back of the binder.  So this is just

4    starting where we left off.

5                (Audio recording played.)

6                MS. KASSNER:  If we could pause here.

7                (Audio recording stopped.)

8    Q     Based on your discussion with the defendant on -- in this

9    section of the recording which was an November 27th, 2018, do

10   you have an understanding -- what was your understanding of

11   why the defendant's partner's money was seized?

12   A     My understanding was that his partner's money was seized

13   because he was effectively laundering drug money and it was

14   seized because of that.

15   Q     And in your training and experience, can you explain --

16   do you have an understanding of when the police typically

17   seize money?

18               MR. SINGER:  Objection, Your Honor.

19               THE COURT:  Sustained.

20               MS. KASSNER:  No further questions, Your Honor.

21   Thank you.

22               THE COURT:  All right.  Mr. Singer.

23               MR. SINGER:  Nothing else.  Thank you, Judge.

24               THE COURT:  All right.  Thank you.  You may step

25   down, Mr. O'Kain.  Thank you very much.  You're excused.

1           (The witness steps down.)

2           THE COURT:  Next witness.

3           MS. DIOUF:  The Government calls former DEA Special

4    Agent Allan Liefke.

5           THE COURT:  Is it correct that it's also Mr. Liefke;

6    is that right?

7           MS. DIOUF:  Mr. Liefke, yes.

8           (The witness enters the stand.)

9           THE COURT:  If you'll remain standing for one minute

10   so you can be sworn in.

11          (The witness was sworn and/or affirmed in by the

12   courtroom deputy.)

13          THE WITNESS:  I do.

14          THE COURTROOM DEPUTY:  Thank you.  Have a seat.

15   Just speak directly into the microphone.

16          Please state and spell your name, for the record.

17          THE WITNESS:  Allan Liefke, A-L-L-A-N, L-I-E-F-K-E.

18          THE COURT:  All right.  You may inquire.

19   **ALLAN LIEFKE**, called as a witness, having been first duly

20          sworn/affirmed, was examined and testified as

21          follows:

22   DIRECT EXAMINATION

23   BY MS. DIOUF:

24   Q    Good morning, Mr. Liefke.

25          Can you see me in the back here?

LIEFKE - DIRECT - MS. DIOUF                416

1  A    Yes.

2  Q    Where were you employed in July 2018?

3  A    July 2018, I was employed at the DEA or Drug Enforcement

4  Administration.

5  Q    What does the DEA do?

6  A    They investigate violations of the United States Drug

7  Laws and also money laundering with respect to drug

8  trafficking.

9  Q    And what was your title at the DEA?

10  A    I was a special agent at the DEA.

11  Q    And how long were you a special agent at the DEA?

12  A    I was a -- for approximately 13 years, I was a special

13  agent.  I started my career in March of 2009, and I left in

14  this past June.

15        THE COURT:  Mr. Liefke, could we have you pull the

16  microphone closer to you.

17        THE WITNESS:  Sure.

18        THE COURT:  Good.  Thanks.

19        THE WITNESS:  You're welcome.

20  Q    What does a special agent at the DEA do?

21  A    A special agent, basically they run cases.  So they'll do

22  different things, like, surveillance, you know, write

23  affidavits.  They're basically in charge of cases.

24  Q    And in July 2018, were you partnered with anyone at the

25  DEA?

LIEFKE - DIRECT - MS. DIOUF                    417

1   A    Yes.  My partner at the time was Special Agent Patrick
2   O'Kain.
3   Q    And did you and Mr. O'Kain focus your investigations on
4   any particular area?
5   A    Yes.  We were focused mainly on cyber investigations to
6   include dark web investigations and also investigations
7   involving crytocurrency.
8           MR. SINGER:  Objection, Your Honor.
9           THE COURT:  Did you say something?
10          MR. SINGER:  Objection.
11          THE COURT:  Overruled.
12  Q    And Mr. Liefke, I'll remind you to speak slowly for the
13  court reporter, please.
14  A    Okay.
15  Q    Prior to becoming a DEA special agent, did you have any
16  other law enforcement jobs?
17  A    Prior to the DEA, I worked at the New York City Police
18  Department Crime Laboratory where initially I was in the
19  Controlled Substances Analysis Section where I would analyze
20  drug evidence, and then after that, I was assigned to the
21  Trace Evidence Section where my specialty was paint analysis.
22  Q    And can you describe your educational background prior to
23  working at the NYPD crime laboratory?
24  A    Yes.  I have a bachelor's degree in forensic science from
25  John Jay College, and a master's degree in forensic drug

LIEFKE - DIRECT - MS. DIOUF                418

1    chemistry from the University of Florida.

2    Q    Mr. Liefke, are you familiar with digital currency?

3    A    Yes, I am.

4    Q    How are you familiar with it?

5    A    Like I said, our investigations that myself and Special

6    Agent O'Kain were doing centered around crytocurrencies, and

7    currently, my job that I'm at now, that's my specialty, as

8    well.

9    Q    What is digital currency?

10   A    It's a currency that takes place on a decentralized

11   network.  It's a peer-to-peer network, so it's not like a

12   bank.  It's interconnected computers.

13   Q    And you mentioned crytocurrency.

14            Is digital currency also known as crytocurrency?

15   A    Yes.  They're synonyms.

16   Q    Can you give some examples of digital currency, please?

17   A    The main ones that people know about is BitCoin, and then

18   there's different ones as well like Ethereum or Monero.

19   Q    Is BitCoin also known as BTC?

20   A    Yes, that's the abbreviation for BitCoin.

21   Q    And through your role as a special agent at the DEA, did

22   you also work on investigations involving digital currency?

23   A    Yes, we did.

24   Q    And what sorts of investigations were those?

25   A    Those involved, you know, things pertaining to the dark

LIEFKE - DIRECT - MS. DIOUF                    419

1   web where we'd have to pay --

2             MR. SINGER:  Objection.

3             THE COURT:  Sustained.

4             Let's have a sidebar really quickly.

5             (Continued on the next page.)

6             (Sidebar conference.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    420

1           (The following occurred at sidebar.)

2           THE COURT:  So I presume everyone remembers as part

3    of the pretrial motions, there weren't supposed to be any

4    references to the dark web, so I'm going to give a curative

5    instruction to say that the jury should disregard any

6    references to the dark web which is completely irrelevant to

7    this case.

8           So just be very careful not to ask him, maybe, these

9    open-ended questions and guide him a little bit more.

10          MS. DIOUF:  I'm happy to lead him more through the

11   section.

12          THE COURT:  Yeah, I'll give you a little leeway so

13   we could avoid this, if possible.

14          MR. SINGER:  Wasn't he directed not to raise this?

15          THE COURT:  Let's not get into that.  It doesn't

16   matter.  It's really quite a de minimis harm, but I will cure

17   it by simply saying just disregard it.  You just try to keep

18   him away from that topic.

19          Hopefully, once he hears my instruction, he'll get

20   the hint.

21          (End of sidebar conference.)

22          (Continued on the next page.)

23

24

25

1          (In open court; Jury present.)

2          THE COURT:  So ladies and gentlemen, I just want to

3     give you an instruction that you should disregard any

4     references to the dark web.  That has no relevance at all to

5     this case and which is partly the reason I wanted to have this

6     quick sidebar.  So disregard any references you hear to the

7     dark web.  Not relevant to this case.

8          You may proceed Ms. Diouf.

9     BY MS. DIOUF:

10    Q    Mr. Liefke, are you familiar with an investigation into

11    an individual named Mustafa Goklu?

12    A    Yes, I am.

13    Q    And how are you familiar with that investigation?

14    A    Myself and Patrick O'Kain were the case agents on that

15    investigation.

16         THE COURT:  I'm going to ask you to both go a little

17    slower.

18    Q    And what does the case agent do?

19    A    The case agent is responsible for running the case,

20    telling other agents when to do surveillance, when to, you

21    know, write different affidavits.  Basically, in charge of

22    running the case from the beginning to the end.

23    Q    Mr. Liefke, do you see Mustafa Goklu in the courtroom

24    today?

25    A    Yes, I do.

LIEFKE - DIRECT - MS. DIOUF                422

1      MS. DIOUF:  And with your permission, Your Honor,

2   I'd ask that everyone at defense table remove their mask,

3   please.

4      THE COURT:  Yes.

5   Q    Mr. Liefke, can you please identify Mr. Mustafa Goklu by

6   where he is sitting and an item of clothing he's wearing?

7   A    Yes.  He's sitting on the far right table and he's

8   wearing a red tie.

9      THE COURT:  Let the witness reflect that the witness

10  has identified the defendant, Mr. Goklu.

11     MS. DIOUF:  Thank you, Your Honor.

12  Q    Do you know Mustafa Goklu by any other names or aliases?

13  A    Yes.  He also goes by Michael Goklu and Mustangy.

14  Q    How did your investigation into the defendant begin?

15  A    We -- myself and Patrick -- Special Agent O'Kain was

16  looking on a website called localbitcoins.com and it's a

17  peer-to-peer website where people can look for other people

18  that are exchanging BitCoin for cash or cash for BitCoin.

19  Q    And when was this, approximately?

20  A    This was in July of 2018.

21  Q    And did the defendant have a profile on local BitCoins in

22  July of 2018?

23  A    Yes.  The defendant had a profile on localbitcoins.com

24  under the name Mustangy.

25  Q    And did this profile tell you how to contact Mustangy?

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

1  A    Yes.  On the profile, it said to contact him through

2  Signal Messaging app.

3  Q    What is Signal?

4  A    Signal is an encrypted messaging app.

5  Q    Have you used Signal before?

6  A    Yes, I have.

7  Q    And you said it's encrypted.

8       What does that mean?

9  A    That means the communications between both parties are

10 encrypted.  So even if a Government agency had a wiretap, they

11 wouldn't be able to read those messages because they're

12 encrypted.

13 Q    Did you contact the defendant on Signal?

14 A    Yes, we contacted the defendant on Signal.

15 Q    And when you say, "we," who are you referring to?

16 A    Myself and Special Agent O'Kain.

17 Q    And what happened next?

18 A    After some negotiations, eventually, a meeting was set up

19 in order to exchange BitCoin for cash.

20 Q    And what was your role in that meeting?

21 A    So during the meeting where Special Agent O'Kain met with

22 the defendants, I was there, as well, performing surveillance

23 and also providing safety cover for the undercover.

24 Q    And was then Special Agent O'Kain acting in an undercover

25 capacity?

LIEFKE - DIRECT - MS. DIOUF                    424

1    A    Yes, he was.

2    Q    Have you been involved in undercover operations before?

3    A    Yes, I have.

4    Q    What is the role of a surveillance agent in an undercover

5    operation?

6    A    Again, the role of a surveillance agent is to monitor the

7    meeting to see what takes place and also to provide security

8    for the undercover.

9    Q    Did you surveil the undercover meetings in this case?

10   A    Yes, all the meetings that the UC was present at was

11   surveiled.

12   Q    And did you do any other surveillance of the defendant in

13   this investigation?

14   A    Yes.  There are other times where the UC wasn't involved

15   where we did surveillance on the defendant.

16   Q    And when you say, "UC," are you referring to the

17   undercover?

18   A    Yes, I am.

19   Q    And can you describe that surveillance of the defendant

20   when the undercover wasn't involved?

21   A    So there was times where we would set up at the

22   defendant's residence and then follow his comings and goings

23   throughout the day to see who he was meeting up and what he

24   was doing.

25   Q    Did you observe the defendant meet with people other than

1    the undercover during this surveillance?

2    A    Yes, we did.

3    Q    And can you describe that?

4    A    In January of 2019, we observed the defendant meet up

5    with a female in Manhattan.  The female had what looked to be

6    a weighted bag that we thought she was carrying a large amount

7    of U.S. currency.  And at this same time, the undercover,

8    Special Agent O'Kain was also in communication with the

9    defendant.

10         We had a meeting set for the next day that was

11   supposed to be for $100,000, and after the defendant met up

12   with this female, he advised the undercover agent that he had

13   $25,000 to do a deal the next day.

14   Q    Did there come a time when you personally interacted with

15   the defendant?

16   A    Yes, there was.

17   Q    And when was that?

18   A    After his arrest in April of 2019, I was able to

19   interview the defendant.

20   Q    And what happened to the undercover agent during this

21   arrest?

22   A    During the arrest, we also arrested the undercover agent

23   so that the defendant didn't know he was working for the

24   Government at the time.

25   Q    Where did you interview the defendant?

LIEFKE - DIRECT - MS. DIOUF                    426

1    A    After we arrested the defendant, we took him back to his

2    residence and interviewed him in his dining room.

3    Q    And when you interviewed the defendant, did you inform

4    him that the person he was arrested with was a law enforcement

5    officer?

6    A    Initially, we did not advise the defendant that the

7    person he was arrested with was an undercover agent, no.

8    Q    Did you ask the defendant whether he had done BitCoin

9    exchanges with other people during this interview?

10   A    I did.  He said he did it on a few other occasions.

11   Q    And did you ask about any particular customers?

12   A    Yes.  I asked about the female that we observed him meet

13   up with in January of 2019.

14   Q    And how did the defendant respond?

15   A    Initially, he said he did not remember meeting up with

16   the female.  I then showed him a picture to try and jog his

17   memory, and at that time, he stated he did a small deal with

18   her for approximately 2- to $3,000.

19   Q    And did you ask the defendant what his typical

20   transaction amount was for?

21   A    Yes.  He said he usually only did a few thousand dollars,

22   smaller amounts.

23   Q    And did you ask the defendant how he communicated with

24   potential buyers and sellers of crytocurrency?

25   A    Yes.  He said he did it through Signal Messaging app and

LIEFKE - DIRECT - MS. DIOUF                    427

1    also WhatsApp.

2    Q    Mr. Liefke, did there come a time when you reviewed the

3    defendant's phone?

4    A    Yes.  After he was arrested, we had also obtained a

5    search warrant that gave us permission to search his house and

6    also his electronic devices.

7              MS. DIOUF:  And I want to show you now what's in

8    evidence as Government Exhibit 228 and also publish to the

9    jury, with permission.

10             THE COURT:  All right.  You may do so.

11             Was this previously admitted, Fida?

12             THE COURTROOM DEPUTY:  Yes.

13             THE COURT:  Okay.  All right.

14   Q    Mr. Liefke, what is this exhibit?

15   A    This is a download of the Signal messaging app messages

16   from the defendant's phone.

17   Q    Did you review the messages contained in this exhibit?

18   A    Yes, I did.

19   Q    And can you describe them, generally?

20   A    It was approximately 53 separate messages, messages

21   threads with different people.  It was just, you know, a bunch

22   of threads talking about meeting up and exchanging BitCoin for

23   cash.

24   Q    Did you review any messages in this exhibit on Government

25   Exhibit 228 where the person the defendant was communicating

1   with referenced the defendant's localbitcoins ad?

2   A    Yes, I did.

3   Q    I'd like to direct your attention to Page 50 in this

4   exhibit, and this is message thread 15.

5          Mr. Liefke, what is this?

6   A    This is a message between defendant and someone else

7   asking if he had any BitCoin for cash to sell and that he saw

8   his posting on localbitcoins.com.

9   Q    And is this one of the message threads you viewed

10  pursuant to a search warrant?

11  A    Yes, it was.

12  Q    And which text bubbles here belong to the defendant?

13  A    The bubbles on the right-hand side.

14  Q    And can you read the first message on the left-hand side

15  starting with, hi.

16         And I'll read the defendant's response.

17  A    Hi.  I'm looking to sell BTC for cash.  Saw your post on

18  local BitCoins.

19  Q    Hi.  How much.

20  A    Depends on the rate, but would like to do .5 to 1 BTC.

21  Q    Percent eight CoinBase.

22         Mr. Liefke, directing your attention now to Page 66

23  of this exhibit which is message thread 21.

24         What's the date on this exchange?

25  A    April 17, 2019.

LIEFKE - DIRECT - MS. DIOUF                    429

1  Q    And can you read the message the customer sends starting

2  with, hello.

3  A    Hello.  I'm a buyer of BTC.  Do I fill out the form

4  online through localbitcoins first.

5  Q    Directing your attention now to Page 228 in this exhibit,

6  Government Exhibit 228.  And this is message thread 54.

7         What's the date on this exchange?

8  A    October 13, 2018.

9  Q    And can you read the customer message, and I'll read the

10 defendant.

11 A    Hey, I saw your ad on localbitcoins.  I'm looking to buy

12 about $2,000 worth in BitCoin or BitCoin cash.  I was

13 wondering what your fees were.

14 Q    Please check price at localbitcoin page.

15        Mr. Liefke, were these just some of message threads

16 you reviewed in this exhibit where the customer or defendant

17 mentions his localbitcoins page?

18 A    Yes.  It's just a select few.

19 Q    Did you review any messages in this exhibit that appear

20 to reference prior transactions with the defendant?

21 A    Yes, there were a number of those.

22 Q    And directing your attention in this exhibit, Government

23 Exhibit 228, Page 67, which is message thread 22.

24        Mr. Liefke, how many pages long is this message

25 thread?

LIEFKE - DIRECT - MS. DIOUF                    430

1    A    Twenty-six pages.

2    Q    And can you start reading as the customer at the top and

3    I'll read the defendant.

4    A    Hey, what's good, William.  Looking for the BTC.

5    Q    Where?

6    A    What's good homie.

7    Q    And Starbucks.  46/09 Queens Boulevard Sunnyside, New

8    York.

9         And can you skip ahead to the response.

10   A    I'm headed there now.  I'll be there at 8:57.

11   Q    Okay.

12        And what does the customer say?

13   A    I'm here.

14   Q    Mr. Liefke, are you familiar with the Starbucks on Queens

15   Boulevard the defendant references?

16   A    Yes.  This was also the location that Undercover Agent

17   O'Kain did a deal with the defendant at, as well.

18   Q    And turning to the next page of this thread which is Page

19   68 in this exhibit.

20        The defendant says, we're inside.  Come to front

21   door.

22   A    Grabbing my coffee quick.  Way.

23   Q    Okay.

24   A    I'm right in front.

25   Q    And what does the customer next say after December 25,

AVERY N. ARMSTRONG, RPR OFFICIAL COURT REPORTER

LIEFKE - DIRECT - MS. DIOUF                    431

1   2018?

2   A    Hey what's up homey.

3   Q    How much?

4   A    Not sure.  I just wanted to reach out.  I'll be in the

5   city Friday or Saturday.

6   Q    Turning to the next page in this thread which is Page 69

7   of this exhibit.

8        Can you start reading as the customer at the top?

9   A    Will you able to meet in Friday.

10  Q    Yes.  Text before heading.

11  A    I'll be in the city at 3:00 p.m. tomorrow.  Where do you

12  want to meet?  I'm guessing we could meet around four or five.

13  Will that work.

14  Q    Sorry.  Cleared texted.  How much and buying or selling?

15  A    Buying, 15 or 16,000.

16  Q    Same place.  Sunnyside Starbucks.

17       And skipping ahead to Page 6 in this thread which is

18  page 72 of this exhibit.

19       The defendant says, when I text you, go anywhere

20  Upper East Side, I'm going Manhattan.

21       Can you read the customer starting with, I'm not too

22  familiar.

23  A    I'm not too familiar with Upper East Side.  Can you give

24  me a place to meet so I can be in the right area.

25  Q    And can you read the last thing the customer says on this

LIEFKE - DIRECT - MS. DIOUF                432

1   page?

2   A    I'm going to the Starbucks on Lexington Avenue.

3   Q    And turning to the next page, page seven of this thread

4   and Page 73 in this exhibit.

5         Can you start reading the customer message starting

6   with, cool.

7   A    Cool.  I'm here.

8   Q    Five min.

9   A    Okay.  I'm going to use the bathroom quick.

10  Q    Go ahead.  Here at corner.

11        And then turning to the next page of this thread

12  which is Page 74 in this exhibit.

13        Can you start reading as the customer at the top?

14  A    Hey what's up homey.  Was looking to take a trip down to

15  see you on Saturday.  I'm buying some BitCoin, around 10 15

16  USD worth.

17  Q    And the said BitCoin, but the text says BTC.

18        Is that the also Bitcoin?

19  A    Yes.  That's correct.

20  Q    And the defendant says, okay.  Text me.

21        What does the customer say next?

22  A    Hey what's up man?

23  Q    Hi.  I'm at Queens if are you driving it is easier to

24  you?

25  A    I'll be in Queens.  Can meet -- can you meet me around

LIEFKE - DIRECT - MS. DIOUF                    433

1  eight.  I have to go there any way.  That's perfect.

2  Q    Skipping ahead to Page 10 of this thread which is Page 76

3  in this exhibit.

4         The defendant says, on the way?

5         How does the customer respond?

6  A    Yeah, I'm already in Queens in Ridgewood.

7  Q    Give me an ETA when heading Starbucks at.

8         And he provides the address at 46-09 Queens

9  Boulevard.

10         And moving to the next page, Page 11 of the same

11  thread and Page 77 in this exhibit.

12         Can you read the customer starting with, I'm here,

13  in the middle of the page.

14  A    I'm here.  Just ordering a coffee and using the bathroom.

15  I got a spot right out in front.

16  Q    Okay.  In front, says the defendant.

17  A    Okay.  Cool.  Be right out.

18

19         (Continued on the following page.)

20

21

22

23

24

25

1   BY MS. DIOUF:  (Continuing.)

2   Q    And moving to the next page, page 12 of this thread which

3   is page 78 in this exhibit, can you start reading as the

4   customer at the top?

5   A    "Hey.  What's up Homie?"

6   Q    "How much you want $$$ or how BTC you have," says the

7   defendant?

8   A    "I'm going to bring around 60K.  Just had a huge music

9   event and want to buy more BTC."

10  Q    "You are a seller, right?  Sorry, I delete history for

11  effect reasons.  How many BTC you have?

12  A    "No, I'm to buy BTC again.  You should remember me.  We

13  met a couple of times now, Starbucks."

14  Q    And the defendant says, "How many BTC you want?"

15        And then skipping ahead to page 24 of this thread

16  which is page 90 of this exhibit, can you read as the customer

17  starting at the top?

18  A    "Where?"

19  Q    And the defendant replies, "Starbucks, 4609 Queens

20  Boulevard, Sunnyside, New York.  How far to here?"

21        What does the customer say?

22  A    "45 minutes, tops.  I should be there by 9:55.  I'm

23  getting to my Lyft now."

24  Q    "Okay."

25  A    "I'm here getting a coffee."

Liefke - direct - Diouf                    435

1  Q    "Okay, come out when have coffee."

2       Switching now to a different thread in this exhibit,

3  message thread two on page 23 of this exhibit, Mr. Liefke

4  what's the date at the top of this page?

5  A    July 29, 2018.

6  Q    And can you start reading as the customer at the top?

7  A    "Hey, can you do 65K?  Seller here."

8  Q    And I'll read the defendant.  "Yes, I can.  Sorry, just

9  saw MSG."

10 A    "You've dealt for 20K, Asian guy with glasses.  I'll let

11 you know when I need it."

12 Q    "Okay."

13 A    "I'm still thinking RN.  I will let you know by

14 tomorrow."

15 Q    "Okay."

16       Mr. Liefke, when you interviewed the defendant, what

17 did he say the typical size of his transactions were?

18 A    Between one and $5,000.

19 Q    Mr. Liefke, were these only some of the message threads

20 you reviewed in this exhibit where the defendant talked about

21 meeting customers more than once?

22 A    Yes.

23 Q    And you mentioned earlier that the defendant told you

24 when you interviewed him that he only did small transactions

25 around a few thousand dollars.  In addition to the

Liefke - direct - Diouf                              436

1    conversations with Signal user William, which we reviewed, did

2    you come across other Signal conversations where the defendant

3    discussed amounts larger than a few thousand dollars?

4    A    Yes, there were multiple messages discussing amounts

5    larger than $5,000.

6    Q    And directing your attention to page 237 of this exhibit

7    which is message thread 58, can you start reading as the

8    customer starting with, "Your price"?

9    A    "Your price does not suit us."

10   Q    "This is high VOL man.  Not one BTC.  If you get 50K,

11   then we talk.  20K 7, 50K 6."

12              Mr. Liefke -- withdrawn.

13              Mr. Liefke was this only one of the message threads

14   in this exhibit you reviewed where the defendant and customer

15   talked about exchanging more than a few thousand dollars?

16   A    Yes, that is correct.

17   Q    Did you review messages where the defendant mentioned the

18   NYPD or New York City Police Department?

19   A    Yes, there was mention of NYPD.

20   Q    And directing your attention to page 96 in this exhibit

21   which is message thread 23, how many pages long is this

22   thread?

23   A    Eight pages.

24   Q    And what page are we on?

25   A    Page four.

Liefke - direct - Diouf                    437

1   Q    Can you start reading the customer starting with "meet

2   me" and I'll read the defendant?

3   A    "Meet me inside Starbucks, please."

4   Q    "No, bye."

5   A    "Dot dot dot."

6   Q    "I'm not going to count money in Starbucks, sorry."

7         Moving to the next page, page five on this thread,

8   and page 97 in this exhibit, can you read the customer's

9   response starting with "Why not."

10  A    "Why not?  I'm sitting at a corner table.  That's the

11  whole point of meeting somewhere public.  It's safe for both

12  parties."

13  Q    "Two MIN you COMR, or I leave.  Sorry, not risking for

14  2K."

15  A    "There's no risk for you to come inside.  There is a risk

16  for me to get in your car."

17  Q    "I am double-parked.  Okay, bye, man, good luck."

18        And skipping to page seven of this thread which is

19  page 99 in this exhibit, can you start reading the customer at

20  the top.

21  A    "I don't know if you're going to pull out a weapon and

22  threaten me after I made the transaction.  That's why meet at

23  public places.  You are acting shady AF."

24  Q    And the defendant says, "Middle of street in crowd,

25  question mark."

SN      OCR     RPR

Liefke - direct - Diouf                          438

1   A    "You're a joke."

2   Q    "Dude, sorry, try ATMs.  As I said, I did many trades.

3   First time cancelled.  Really are you worked for NYOD or

4   what?"

5         Mr. Liefke, what is your understanding of what AF

6   typically means?

7   A    As fuck.

8   Q    And does NYOD appear to be a typo for NYPD?

9   A    Yes, it does.

10  Q    Mr. Liefke, are these only some of the messages you

11  reviewed in this exhibit where the defendant talks about the

12  police?

13  A    Yes, that is correct.

14  Q    During your investigation did the defendant make any

15  statements to the undercover agent about the police?

16  A    Yes, he did.  He said he didn't like to go into Manhattan

17  to do video --

18        MR. SINGER:  I object to this.  He was not present

19  for the conversation.  We've already --

20        THE COURT:  Overruled.  Why don't you just establish

21  that this was made to him and are you going to be using the

22  overhead again?  I'm wondering about the lights.

23        MS. DIOUF:  Yes, I have a few more to go.

24        THE COURT:  Okay, go ahead.

25  Q    Mr. Liefke, did you listen to the conversations between

Liefke - direct - Diouf                    439

1   the undercover and the defendant?

2   A    Yes.  So while the deals were being made I was listening

3   in real time and also I reviewed the recordings afterwards as

4   well.

5   Q    And what statements, if any, did the defendant make to

6   the undercover about the police?

7              MR. SINGER:  Your Honor, I object to this.

8              THE COURT:  Overruled.

9   A    One of the reasons the defendant did not like to go to

10  Manhattan is he said that there was lots of NYPD in Manhattan

11  and also lots of different surveillance cameras that the NYPD

12  uses.  Also he mentioned that the NYPD likes to dress their

13  officers as bums so you don't know they're officers and they

14  walk around to do surveillance like that.

15  Q    Mr. Liefke, did you review any messages in this Exhibit

16  228, Government Exhibit 228, where the defendant expressed

17  opinions about doing business in Manhattan?

18  A    Yes, I did.

19  Q    Directing your attention to page 242 of Government

20  Exhibit 228 and this is message thread 60.  Mr. Liefke, how

21  many pages long is this thread?

22  A    13 pages.

23  Q    And starting with the customer at the top, can you start

24  reading and I'll read as the defendant?

25  A    "Hey Mustang, wanted to trade coin for 1160 cash."

Liefke - direct - Diouf                                440

1   Q      "Hey Trade, what you are buying BTC or seller?"

2   A      "Looking to sell BTC."

3   Q      "Okay.  I can do at Starbucks 47 S Street and Queens

4   Boulevard."

5   A      "Can you do somewhere in Manhattan by any chance?"

6   Q      "No, sorry.  Manhattan sucks, LOL."

7   A      "LOL, what makes it suck?"

8   Q      Turning to the next page, page 243 in this exhibit, the

9   defendant replies, "Traffic, safety, et cetera, hard to meet."

10          And how does the customer respond?

11  A      "You can only do Queens or you'll do Brooklyn too?"

12  Q      "If you coming from Jersey, Queens is easier, George

13  Washington Bridge to Triboro.  I am Brooklyn, but going

14  Queens."

15  A      "I mean solo right now.  Was going to head to Brooklyn

16  around Prospect Avenue stop."

17  Q      And skipping ahead to page eight of the same thread, page

18  249 of this exhibit, can you read the customer starting with

19  "think we can meet" in the middle of the page?

20  A      "Think we can meet downtown somewhere?"

21  Q      And the defendant says, "No, sorry, Manhattan at all."

22          Mr. Liefke was this only one of the messages in this

23  thread where the defendant expressed an opinion about doing

24  business in Manhattan?

25  A      Yes, it was.

Liefke - direct - Diouf                                              441

1   Q    Did you review any message threads where someone mentions

2   washing money?

3   A    Yes.

4   Q    Based on your training and experience, what do you

5   understand "wash to" typically mean with respect to money?

6   A    Washing money is -- it's another term for money

7   laundering or they're trying to hide or obfuscate the origin

8   of the funds.

9   Q    And directing your attention to message thread one in

10  Government Exhibit 228 which is page 12 in this exhibit, is

11  this another message you reviewed pursuant to the search

12  warrant?

13  A    Yes, it was.

14  Q    What is the date at the top of this thread?

15  A    April 26, 2019.

16  Q    And how many pages long is this thread?

17  A    12 pages.

18  Q    Can you read the customer starting with "Hi"?

19  A    "Hi.  Trying to buy BTC, ready now.  10 percent over

20  spot?  Asking 3,600 for 3,960."

21  Q    And the defendant says, "Hi, can meet tomorrow afternoon

22  on Queens Boulevard and 47 Street Starbucks."

23        And turning now to the next page, page 13 in this

24  exhibit, can you start reading as the customer at the top?

25  A    "Can we move this conversation to Telegram?  I will text

1   you exactly two only BC I am late on this transaction.  Sorry

2   to put a rush on you."

3   Q    The defendant says, "Okay.  Michi 340634, Telegram."

4   A    "Thanks.  You rock.  Wait, you're the same person who

5   blew me off today."

6   Q    "Question mark, what do you mean?"

7        Mr. Liefke are you familiar with Telegram?

8   A    Yes.  Telegram is another encrypted messaging app.

9   Q    Skipping ahead to page 10 of the thread, page 20 of the

10  exhibit, can you read the customer at the top?

11  A    "Yes, yeah, sure.  Asshole for calling out, for wasting

12  my time for catching you in a lie."

13  Q    And the defendant says, "Go ahead.  What's wrong with

14  you?  I'll report you to NYPD."

15  A    "And when I approached you, you cry like a bitch.  Dude,

16  you are a liar, liar.  Your IP even matches the Telegram."

17  Q    And the defendant says, "As I am contacted by NYPD to

18  mark drug dealers, you will be reported, son of a bitch."

19       Mr. Liefke, when you interviewed the defendant did

20  he tell you that the NYPD asked him to report drug dealers?

21  A    No, he did not.

22  Q    Did he try to report any drug dealers to you?

23  A    Not that I'm aware of.

24  Q    And turning to the next page, page 21 in this exhibit,

25  can you start reading as the customer starting at the top?

Liefke - direct - Diouf                                443

1   A     "Good luck with your scams.  Yeah, yeah, sure, good luck

2   good luck.  You don't have my name.  All you have is a burner

3   cellphone number.  Ha ha."

4   Q     Mr. Liefke, based on your training and experience are you

5   familiar with burner cellphone numbers?

6   A     Yes, burner cellphone numbers are just numbers that

7   people get through various places like Metro PCS or they don't

8   require you to actually give a real name for you to get a

9   phone.

10  Q     And turning to the next page, page 22 of this exhibit,

11  can you start reading the customer starting with, "This is why

12  I split."

13  A     "This is why I split my transactions, you fool.  I did

14  eight transactions all over 3,000 and still got to wash

15  another 29K, lame liar.  Only a matter of time before you

16  snitch on the wrong person and get killed."

17  Q     And can you remind us of what your understanding of what

18  washing means with respect to money?

19  A     Washing with respect to money is the process of money

20  laundering where you're trying to hide the origin of the funds

21  that you have.

22         MS. DIOUF:  Thank you.  You can take this down now.

23  BY MS. DIOUF:

24  Q     Mr. Liefke, did you review any other of the defendant's

25  electronics recovered during the search?

SN        OCR        RPR

Liefke - direct - Diouf                    444

1    A    Yes, I also reviewed a computer that belonged to him.

2    Q    And can you describe generally what you found in the

3    computer?

4    A    There was different things related to Bitcoins, different

5    shipping labels and some banking documents as well.

6    Q    I want to show you what's in evidence as Government

7    Exhibit 753.

8              (Exhibit published.)

9              MS. DIOUF:  And publish to the jury with permission,

10   please.

11             THE COURT:  You may, go ahead.

12   BY MS. DIOUF:

13   Q    Mr. Liefke, can you see this document?

14   A    Yes.

15   Q    What is it?

16   A    It's a TD Bank statement for a business checking account

17   under the name Mustangy Corp. USA.

18   Q    And are you familiar with Mustangy Corp. during --

19             Did become familiar with Mustangy Corp. during the

20   course of your investigation?

21   A    Yes.  This was a corporation that the defendant started.

22   Q    And what is the address under Mustangy Corp. USA?

23   A    It's 5030 39th Street, second floor, Sunnyside, New York.

24   This is also the residence where the defendant was living.

25   Q    I want to show you what's in evidence and publish to the

1    jury Government Exhibit 754?

2              (Exhibit published.)

3    A    This is also a TD Bank statement for a convenience

4    checking account under the name Michael Goklu at that same

5    address.

6    Q    And showing you now what's in evidence as Government

7    Exhibit 711 and 712 and hopefully we can pull these upside by

8    side.

9              THE COURT:  Previously admitted.

10              MS. DIOUF:  Previously admitted.

11              (Exhibit published.)

12   BY MS. DIOUF:

13   Q    Mr. Liefke, can you see these documents?

14   A    Yes.

15   Q    What are these?

16   A    These are shipping labels that were sent from Mustangy

17   Corp. at that same address in Sunnyside.

18   Q    And showing you now what's in evidence as Government

19   Exhibit 716 and 718, previously admitted.

20              (Exhibit published.)

21   Q    And what are these?

22   A    Again, these are more shipping labels with the return

23   address of Mustangy Corp. at the Sunnyside address.

24              MS. DIOUF:  Thank you.  You can take those down now.

25              Switching gears a bit, at this time the Government

Liefke - direct - Diouf                          446

1   would like to offer Government Exhibit 104 into evidence under

2   Federal Rule of Evidence 902-4.

3            THE COURT:  Any objection?

4            MR. SINGER:  Can I see what it is?

5            THE COURTROOM DEPUTY:  You don't have a copy?

6            MR. SINGER:  No objection.

7            THE COURT:  104 is admitted pursuant to Rule 902

8   certified as a business record.

9            MS. DIOUF:  Permission to publish both to the jury

10  and the witness.

11           THE COURT:  You may.

12           (Government Exhibit 104 received in evidence.)

13           (Exhibit published.)

14  Q    And this is page two of the exhibit.  Mr. Liefke what is

15  this document?

16  A    This is a certificate of incorporation for Mustangy Corp.

17  USA that was issued by New York State.

18  Q    And if you can look at the bottom of the page, what name

19  do you see there?

20  A    Mustafa Goklu.

21  Q    And --

22           MS. DIOUF:  Just a moment, please, Your Honor.

23           THE COURT:  All right.

24           (Pause in proceedings.)

25           MS. DIOUF:  Nothing further.

Liefke - cross - Singer                                447

1          THE COURT:  All right, thank you very much.

2          Your witness, Mr. Singer.

3     CROSS-EXAMINATION

4     BY MR. SINGER:

5     Q     Good afternoon, sir.

6     A     Good afternoon.

7     Q     Now, you referenced Signal messages that you indicated

8     had been downloaded from Mr. Goklu's phone?

9     A     Correct.

10    Q     All right.  In fact, they were not able to download them

11    but there was a series of photographs taken of each of the

12    messages; correct?

13    A     It was sent to our digital evidence laboratory and that's

14    what they produced to us.

15    Q     Okay.  So 228 is what was produced to you from the

16    technicians that were getting information off of the phone?

17    A     Correct.

18    Q     Okay.  Now, you indicated that you had obtained a search

19    warrant for Mr. Goklu and for his home?

20    A     That is correct.

21    Q     And you executed that search warrant on April 30, 2019

22    shortly after Mr. Goklu's arrest; correct?

23    A     Yes.

24    Q     And at the time of the interview -- withdrawn.

25          You indicated that you interviewed Mr. Goklu in his

1   dining room I think you said.

2   A     Yes.

3   Q     At his home?

4   A     Correct.

5   Q     So he was taken into custody by various agents including

6   you; correct?  You were part of the arrest team?

7   A     I was, yes.

8   Q     So Mr. Goklu was taken into custody and at some point was

9   taken back to his residence; correct?

10  A     Yes.

11  Q     And when he was back in the residence, was the search

12  already underway?

13  A     Yes, he started the search, yes.

14  Q     So you had -- you or the members of the team that were

15  working on this case that day had gone into the home and had

16  started the search before you returned to the home with

17  Mr. Goklu?

18  A     That is correct.

19  Q     So when you got -- when you -- were you the person who

20  transported Mr. Goklu back to his house?

21  A     Yes, I was.

22  Q     Or you were in the car with him?

23  A     Correct.

24  Q     And when you got back to Mr. Goklu's house with Mr. Goklu

25  and you went inside, there were agents going through the

Liefke - cross - Singer                    449

1    house; correct?

2    A    Yes, there were.

3    Q    And would it be fair to say that Mr. Goklu was unaware of

4    the fact that there were going to be multiple federal agents

5    searching his house at the -- until he arrived at the home and

6    saw it happen?

7    A    I believe when I arrested him I told him we had the

8    search warrant for his residence and his electronic devices so

9    I believe he was aware prior to arriving at his house.

10   Q    And when you got him to his house, you took him inside to

11   the dining room and sat down to interview him?

12   A    Correct.

13   Q    And the interview that took place took place while the

14   agents were in the house searching?

15   A    Correct.

16   Q    Looking in drawers, looking under -- looking everywhere;

17   correct?

18   A    Correct.

19   Q    And as a result of the search, you ant you meaning the

20   team, recovered approximately 20 or more electronic devices?

21   A    I don't remember the exact amount but it was --

22   Q    There were a number of them?

23   A    A number of different electronic devices, yes.

24   Q    Computers, phones, various flash drives or external hard

25   drives, things of that nature?

Liefke - cross - Singer                    450

1    A    Yes.

2    Q    And all of these items were sent to a lab to be reviewed

3    by technicians?

4    A    Yes, they were.

5    Q    All right, so the last -- you just offered some testimony

6    about various Signal threads that were recovered from the

7    phone and these were Signal threads from Mr. Goklu's phone

8    with other people; correct?

9    A    Correct.

10   Q    And you -- I think the last one that you referenced was

11   the -- were the messages where the term washed was mentioned;

12   is that right?

13   A    Yes.

14   Q    Okay.  And this was with a person whose identification

15   along with the phone number on the top of the thread also says

16   the name Big Apple; is that right?

17   A    I don't know who -- I don't know if it was labeled or

18   not.

19          MR. SINGER:  Ms. Sahli, can we put up one page of

20   that.

21          MS. SAHLI:  This is Government Exhibit 228 in

22   evidence starting at page 12, message thread with Big Apple.

23          MR. SINGER:  Yes.

24   BY MR. SINGER:

25   Q    Mr. Liefke, you're able to see that on your screen?

Liefke - cross - Singer                    451

1    A     Yes, I am.

2    Q     And let me direct your attention to the top of the page,

3    right, there's a phone number listed, correct; 1201 with some

4    other numbers, is that --

5    A     Correct.

6    Q     All right.  And that would be the phone number of the

7    person who was communicating with Mr. Goklu?

8    A     Yes.

9    Q     And underneath that there's the name Big Apple; right?

10   A     Yes.

11   Q     Would that be a nickname of some kind for the person who

12   is using that phone?

13   A     Correct.

14         MR. SINGER:  Thank you, Ms. Sahli.

15   Q     So I guess just to -- for clarity sake when we're talking

16   about this thread we're talking about Big Apple, okay?

17   A     Okay.

18   Q     So Mr. Goklu has a conversation with Big Apple a text

19   message conversation on Signal; correct?

20   A     Correct.

21   Q     And you reviewed the entire -- the entire thread?

22   A     Yes.

23   Q     Okay.  Meaning the entire text history that's on the

24   phone between those two people?

25   A     Whatever was still present on the phone, yes.

Liefke - cross - Singer                         452

1  Q    And there was a lot of ugliness on there, would it be

2  fair to say?

3  A    Yes.

4  Q    Name calling, threats, things of that nature?

5  A    Correct.

6  Q    Between the two -- between the Big Apple and Mr. Goklu?

7  A    Yes.

8  Q    Okay.  And the Reference to the term wash, that they

9  needed to wash some additional money, that reference was made

10 by Big Apple, is that correct, not by Mr. Goklu?

11 A    That is correct.

12 Q    And, in fact, the message, the bubble, I guess, that

13 is -- that contains the word wash in it, is the last bubble or

14 message in the entire thread with Big Apple; is that correct?

15 A    I don't recall off the top of my head.

16        MR. SINGER:  Ms. Sahli, if you can pull that up

17 please.

18        MS. SAHLI:  Government Exhibit 228 in evidence page

19 22.

20        (Exhibit published.)

21 BY MR. SINGER:

22 Q    I'm sorry, it was the third from the left.  This page

23 that's on the screen now is the -- is the end of the thread

24 that appears who Mr. Goklu's phone is that correct?

25 A    Yes.

Liefke - cross - Singer                     453

1   Q    And the series, I think there's one, two, three, four,

2   five, six bubbles -- six separate bubbles that have the dark

3   background.  Those were texts made by Big Apple; correct?

4   A    Yes, correct.

5   Q    Not by Mr. Goklu?

6   A    Not by the defendant, no.

7   Q    All right.  And, again, the third to the last where it

8   says I still got to wash another 29K and then two others after

9   that, that is the end of the thread between Big Apple and

10  Mr. Goklu that was recovered from the phone; is that right?

11  A    Yes.

12          MR. SINGER:  Thank you, Ms. Sahli.

13  BY MR. SINGER:

14  Q    And from your investigation, you have no evidence that

15  Mr. Goklu and Big Apple ever engaged in any transaction; is

16  that correct?

17  A    I do not know.

18  Q    Okay.  And that is the -- that one mention by Big Apple

19  of the term wash, is the only reference in the 350 or so pages

20  in Government Exhibit 228 of anything suggesting drugs; is

21  that correct, or money laundering?

22  A    Yes.

23  Q    And in your investigation of Mr. Goklu and I guess based

24  on review of all the -- all of his electronics, in various

25  forms, from the surveillance that you conducted, from the

Liefke - redirect - Diouf                    454

1   interview that you had with Mr. Goklu after he was arrested,

2   you have no other evidence that Mr. Goklu engaged in any

3   transaction that you know involved money laundering or drug

4   money; is that correct?

5   A    I, I did not witness any other transactions besides the

6   ones I spoke about, no.

7   Q    Well, the ones that you spoke about, the various threads

8   that you testified about, the only one that references even

9   obliquely money laundering is the one with Big Apple; is that

10  correct?

11  A    I believe so, that --

12  Q    Okay.  Well, you know so, there were no other

13  communications or text messages referencing either directly or

14  by implication drug money; is that correct?

15  A    Correct.

16         MR. SINGER:  Thank you, sir, I have nothing else.

17         THE COURT:  Redirect?

18         MS. DIOUF:  Just very briefly.

19  REDIRECT EXAMINATION

20  BY MS. DIOUF:

21  Q    Mr. Liefke, in your training and experience, do people in

22  text messages usually explicitly reference drugs?

23  A    No, they do not.

24  Q    What about drug money?

25  A    No.

1    Q     What about money laundering?

2    A     No, they're trying to hide what their true intentions

3    are.

4              MS. DIOUF:  Thank you, nothing further.

5              THE COURT:  Any recross?

6              MR. SINGER:  No, Your Honor, thank you.

7              THE COURT:  Thank you very much you may step down

8    and you are excused.

9              (Witness excused.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                              456

1          THE COURT:  Let me ask the government, do you have

2     another witness here?

3          MS. DIOUF:  We're checking, Your Honor.

4          THE COURT:  You know what folks, we're going to take

5     an early lunch break.  It's about quarter of 1 so be ready to

6     go again at 1:45 and we'll start again with the next witness,

7     might as well take our break now.  Enjoy your lunch.  Remember

8     don't talk about the case even with each other.  Don't do any

9     research and keep an open mind.  Have a good lunch everyone.

10         THE COURTROOM DEPUTY:  All rise.

11         (Jury exits.)

12         THE COURT:  Thanks, sorry about that quick change of

13    mind my deputy whispered to me.  I have a 1 o'clock civil

14    conference so this is perhaps better for me.  So folks be

15    ready to go as quarter to 2 and we'll start with your next

16    witness.

17         How many more, two more I think you said.

18         MS. DIOUF:  Yes, Your Honor two more and they are, I

19    expect, going to be very brief.  FinCEN witness and a

20    Department of Financial Services person and that's it.

21         THE COURT:  Okay.  In the interim my law clerk also

22    will give you a copy of the draft verdict sheet which won't

23    seem all that earth shattering I don't think, okay?

24         MS. DIOUF:  Thank you, Your Honor.

25         (Luncheon recess taken.)

SN      OCR      RPR

1          AFTERNOON SESSION

2          (Time noted 1:45 p.m.)

3          THE COURTROOM DEPUTY:  All rise.

4          (Jury enters the courtroom.)

5          THE COURT:  Have a seat everyone.  I hope you had a

6    good lunch Ladies and Gentlemen, and maybe got outside and

7    enjoyed the weather.

8          Okay.  So we'll have the Government call their next

9    witness.

10          MS. KASSNER:  Thank you, Your Honor.

11          The Government calls Robert Tarwacki of the New

12    York State Department of Financial Services to the stand.

13          THE COURT:  All right.  Mr. Tarwacki, if you will

14    approach the witness stand up here and remain standing for a

15    moment so that you can be sworn in.

16          THE COURTROOM DEPUTY:  Please raise your right hand.

17          Do you solemnly swear or affirm the testimony you

18    are about to give will be the truth, the whole truth, and

19    nothing, but the truth?

20          THE WITNESS:  I do.

21          THE COURTROOM DEPUTY:  State and spell your name for

22    the record.

23          THE WITNESS:  Robert Tarwacki; T-A-R-W-A-C-K-I.

24          THE COURT:  You may inquire.

25          (Continued on the next page.)

TARWACKI - DIRECT - MS. KASSNER                    458

1   **ROBERT TARWACKI**,

2       called as a witness, having been duly

3       sworn, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. KASSNER:

6   Q   Good afternoon.  Mr. Tarwacki.

7           Where do you currently work?

8   A   I work for the New York State Department of Financial

9   Services.

10  Q   What is your job title?

11  A   I am a criminal investigator.

12  Q   What geographic area does your office cover?

13  A   Our office covers the entire State of New York.

14  Q   Are you assigned to a particular unit or section?

15  A   Yes.  The Criminal Investigations Bureau.

16  Q   How long have you worked at the Criminal Investigations

17  Bureau?

18  A   Since March of 2008.

19  Q   What are your current job responsibilities as the -- at

20  the Criminal Investigations Bureau?

21  A   We investigate any violations of the banking law as well

22  as any violations of the superintendent regulations related to

23  the money services businesses throughout the state.

24          THE COURT:  You have to go slower.

25          THE WITNESS:  Sorry.

TARWACKI - DIRECT - MS. KASSNER                459

1          THE COURT:  Remember, court reporter.

2          THE WITNESS:  Sorry.

3          THE COURT:  Yes.

4   Q    Have you obtained any certifications in connection with

5   your role as a criminal investigator?

6   A    I am a certified fraud examiner.

7   Q    Based on your training and experience, are you familiar

8   with the requirements for people and companies to engage in

9   the business of transmitting money in the State of New York?

10  A    Yes.

11  Q    Generally speaking, what is required to conduct a money

12  transmitting business in the State of New York?

13  A    You must be vetted by the Department of Financial

14  Services as well as your owners and operators.  You must

15  submit filings for a license and pay a fee.

16  Q    What is the purpose of the license and all of these

17  steps?

18  A    The license generally serves to protect the consumers of

19  the State of New York from practices that maybe harmful to

20  them.

21  Q    Does that licensing requirement apply to the exchange of

22  cryptocurrency for cash?

23  A    Yes.

24  Q    And move specifically, do you need a license to engage in

25  a business of exchanging BitCoin for cash in exchange for a

TARWACKI - DIRECT - MS. KASSNER                    460

1   fee in the State of New York?

2   A    Yes.

3   Q    And if you wanted to exchange BitCoin for cash in New

4   York State, can you briefly explain to the jury what exactly

5   you need do to get that license?

6   A    You would need to first apply with the Department of

7   Financial Services and then you would have to submit to a KYC

8   information for your customers as well as your owners and

9   principles for your organization.  The Department would then

10  vet that personnel as well as do background checks on both the

11  institutions and the individuals.  And then, examiners will do

12  a bi-yearly exam of the organization to make sure you maintain

13  those principles.

14  Q    You used the term "KYC."  What is KYC?

15  A    Know your customer.  It's general information about the

16  customers that are going to use your services.

17  Q    Is it in the regular practice of The New York State

18  Department of Financial Services to maintain records of

19  entities and individuals that are licensed to conduct the

20  business of money transmitting money?

21  A    Yes.

22  Q    Are you familiar with those records?

23  A    Yes.

24  Q    Are the records made and kept in the regular course of

25  business?

TARWACKI - DIRECT - MS. KASSNER                    461

1   A    Yes.

2   Q    Are they saved in realtime?

3   A    Yes.

4   Q    Is the New York State Department of Financial Services is

5   under a duty to accurately record and maintain such records?

6   A    Yes.

7   Q    Is it the regular practice of members of the New

8   York State Department of Financial Services to search for and

9   retrieve licenses of individuals and companies engaged in the

10  business of transmitting money?

11  A    Yes.

12  Q    Have you personally conducted those searches?

13  A    Yes, I have.

14  Q    Were you asked to conduct a search of official records in

15  connection with this case?

16  A    Yes.

17  Q    Were you otherwise involved in the investigation of this

18  case?

19  A    No.

20  Q    Did you perform that search?

21  A    Yes, I did.

22  Q    Did you document the results of your search?

23  A    Yes.

24         MS. KASSNER:  So, with permission from Your Honor,

25  I'd like to show just the witness Government's Exhibit --

TARWACKI - DIRECT - MS. KASSNER                462

1   first what's been marked as Government's Exhibit 102.

2               THE COURT:  Yes, you may.  If you look on the screen

3   in front of you.

4               THE WITNESS:  Okay.

5   Q    And if you can just let us know when you can see it?

6   A    It's here.

7   Q    And let's start with Government's Exhibit 102 alone.

8               What is Government's Exhibit 102?

9   A    If you could just go back.  I have 103 on the screen.

10  Thank you.

11              Exhibit 102 is a certification from the Department

12  of Financial Services signed by myself stating that Mustafa

13  Goklu is not licensed to perform money service businesses in

14  the State of New York.

15              MS. KASSNER:  If we could also show just the witness

16  what has been previously marked as Government's Exhibit 103.

17  Q    Do you recognize Government's Exhibit 103?

18  A    I do.

19  Q    What is it?

20  A    Exhibit 103 is also a certification from the New

21  York State Department of Financial Services signed by myself

22  stating that Mustangy Corp. USA is not licensed to conduct

23  money service business in the New York State.

24  Q    How do you recognize Government's Exhibit 102 and 103?

25  A    I created them.

TARWACKI - DIRECT - MS. KASSNER                 463

1          MS. KASSNER:  At this time, the Government would

2     move to admit Government's Exhibit 102 and 103 into evidence

3     and publish them to the jury.

4          THE COURT:  Any objection?

5          MR. SINGER:  No, Your Honor.

6          THE COURT:  All right.  102 is admitted and you may

7     publish them.

8                    (Exhibit published.)

9          MS. KASSNER:  If we could first pull up

10    Government's Exhibit 102.

11    Q    What were the conclusions of your search of Mustafa Goklu

12    also known as Michael Goklu, with the listed date of birth and

13    social security number on Government's Exhibit 102?

14    A    When we conducted the search there were not results in

15    our licensing database for Michael Goklu or that social

16    security number.

17    Q    And Mustafa Goklu?

18    A    The same.  There were no results for Mustafa Goklu

19    either.

20         MS. KASSNER:  If you could pull up

21    Government's Exhibit 103 for the jury, please.

22    Q    What were the conclusions of your search with respect to

23    Mustangy Corp. USA with the listed identification number in

24    Government's Exhibit 103?

25    A    For Mustangy Corp. USA and the ID number provided, there

TARWACKI - DIRECT - MS. KASSNER                    464

1  were no results in the licensing database.

2  Q    What, if anything, are you able to conclude based on your

3  search about whether Michael Goklu or Mustafa Goklu or

4  Mustangy Corp. USA is licensed to exchange BitCoin for cash in

5  the State of New York?

6  A    The Department of Financial Services does not recognize

7  the license for any of these entities or individuals.

8           MS. KASSNER:  Thank you, Your Honor.

9           No further questions.

10          THE COURT:  All right.  Thank you.

11          Your witness, Mr. Singer.

12          MR. SINGER:  I have no questions.

13          Thank you, judge.

14          THE COURT:  All right.  Thank you.

15          You are free to go.

16          Thank you very much, Mr. Tarwacki.

17          Does the Government have another witness?

18          MS. KASSNER:  Yes, Your Honor.

19          At this time the Government calls Theodore Vlahakis

20  of the U.S. Department of Treasury to the stand.

21          THE COURT:  All right.  Mr. Vlahakis, if you will

22  approach the witness stand and remain standing for one moment

23  so we can swear you in.

24          THE WITNESS:  Thank you.

25          THE COURTROOM DEPUTY:  Please raise your right hand.

TARWACKI - DIRECT - MS. KASSNER                465

1          Do you solemnly swear or affirm that the testimony

2   you are about to give is the truth, the whole truth and

3   nothing, but the truth?

4          THE WITNESS:  Yes, I do.

5          THE COURTROOM DEPUTY:  Thank you.

6          You can have a seat.

7          THE WITNESS:  Thank you.

8          THE COURTROOM DEPUTY:  Just speak into the

9   microphone.

10          Please state and spell your name for the record.

11          THE WITNESS:  Theodore Vlahakis.  T-H-E-O-D-O-R-E.

12          V-L-A-H-A-K-I-S.

13          THE COURT:  All right.  You may inquire.

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

VLAHAKIS - DIRECT - MS. KASSNER                466

1   **THEODORE VLAHAKIS**,

2        called as a witness, having been duly

3        sworn, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MS. KASSNER

6   Q    Good afternoon.

7   A    Good afternoon.

8   Q    Where do you currently work?

9   A    U.S. Department of Treasury Financial Crimes Enforcement

10  Network commonly known as FinCEN.

11  Q    How long have you worked at FinCEN?

12  A    Since March of 2009.

13  Q    When you started working at FinCEN, what was your role?

14  A    Bank Secrecy Act Specialist.

15  Q    What is the bank secrecy act?

16  A    The Bank Secrecy Act is a federal antimoney laundering

17  statute.

18  Q    What did your role as a Bank Secrecy Act Specialist

19  entail?

20  A    I address regulatory inquiries regarding the Bank Secrecy

21  Act for financial institutions, regulators, and law

22  enforcement via email and telephone.

23           THE COURT:  You can pull that microphone closer to

24  you.

25           THE WITNESS:  Oh.

VLAHAKIS - DIRECT - MS. KASSNER                 467

1          THE COURT:  Yeah, it moves.  There you go.

2          THE WITNESS:  Thank you.

3          THE COURT:  That's wonderful.  Okay.

4     Q    Are you currently assigned to a particular unit or

5     division at FinCEN?

6     A    Yes, I am.

7     Q    What is your current job title?

8     A    Senior Compliance Officer.

9     Q    What are your job responsibilities as a Senior Compliance

10    Officer?

11    A    I help to ensure that financial institutions understand

12    the requirements under the Bank Secrecy Act and I also provide

13    training to internal and external institutions.

14    Q    How long have you been doing that work?

15    A    Since July of 2017.

16    Q    Can you tell the jury a little bit about what FinCEN

17    does?

18    A    Sure.

19          FinCEN is a bureau of the U.S. Department of

20    Treasury tasked with protecting the financial system from

21    money laundering and other types of elicit financial activity.

22    Q    How does FinCEN accomplish that mission?

23    A    FinCEN accomplishes that mission by requiring certain

24    type of financial institutions to file reports with us and to

25    keep certain types of records and to have an antimoney

VLAHAKIS - DIRECT - MS. KASSNER                    468

1   laundering program.

2   Q    What is an antimoney laundering program?

3   A    An antimoney laundering program has as its purpose to

4   help ensure that a financial institution is not laundering

5   money wittingly or unwittingly.  And so, the purpose is to

6   help protect the financial institution -- to help protect the

7   financial system.

8   Q    Earlier and several times now you've mentioned financial

9   institutions.

10           What are some kinds of financial institutions that

11  FinCEN regulates?

12  A    Okay.  So when we think of as a depository institution,

13  so a bank or a credit union, but also a casino, a broker

14  dealer, a hedge fund, what is known as a money services

15  business, and various types of financial institutions.  We

16  require them to file certain reports with us and keep records

17  and have a money laundering program.

18  Q    Is there a minimum size of a business that FinCEN

19  regulates?

20  A    No.

21  Q    Could it be as small as one person?

22  A    Yes.

23  Q    You mentioned money service businesses.  What is a money

24  service business?

25  A    So we characterize a money service business based on the

VLAHAKIS - DIRECT - MS. KASSNER                    469

1   type of activity, financial activity, that they conduct.  And
2   so, money service business is defined as, for example, a check
3   cashers a money transmitter, /-FPLT ers and/-S sellers of
4   money /PHUPB s, or /-RBGS paid access, U.S. Postal Service.
5   /S-FS are some example/K-FRPL .
6   Q    You mentioned money transmitters.  What is a money
7   transmitter?
8   A    Money transmitter is an entity that is engaged in money
9   transmission. And money transmission is defined as the
10  acceptance of currency funds or its equivalent from one person
11  or the location and the transmission of the currency funds or
12  its equivalent to another person or location by any means.
13  Q    Would that include somebody that engages in the business
14  of exchanging cryptocurrency, specifically BitCoin, for cash?
15  A    Yes.
16  Q    In exchange for a fee?
17  A    Sure.  Yes.
18  Q    Based on your training and experience, are you familiar
19  with the requirements for people and companies to engage in
20  the business of transmitting money in the United States?
21  A    Yes, I am.
22  Q    Generally speaking, what is required to conduct a money
23  transmitting business in the United States?
24  A    Number one, the money transmitter, since they are a money
25  services business, must register with FinCEN by completing

1    what's called a registration of money services business form,

2    FinCEN 107, within 180 days of establishing their business or

3    conducting the first qualifying transaction.  And since

4    they're there financial institutions, they have to file

5    certain reports with us, including reports of suspicious

6    transactions, keep certain records and have an antimoney

7    laundering program.

8    Q    You mentioned a Form 107, what is the purpose of

9    requiring that registration, that Form 107?

10   A    When a money services business, a money transmitter

11   completes that form, it provides valuable information

12   regarding the type of business, the owner information, the

13   address, identifying information such as taxpayer

14   identification number, location supporting documents, primary

15   transaction account where the bank account is held.  And so,

16   that provides valuable information for FinCEN and law

17   enforcement officials to follow the paper trial.

18              MS. KASSNER:  If we could please show the witness

19   what has been previously marked as Government's Exhibit 105.

20              THE COURT:  Just the witness?

21              MS. KASSNER:  Just the witness.

22              THE COURT:  All right.

23              MS. KASSNER:  Thank you.

24   Q    If you could let us know when you see it on the screen.

25   A    I see it.

VLAHAKIS - DIRECT - MS. KASSNER                471

1   Q     Do you recognize Government's Exhibit 105?

2   A     Yes, I do.

3   Q     What is it?

4   A     FinCEN Form 107, Registration of Money Service Business.

5   Q     How do you recognize Government's Exhibit 105?

6   A     This form was created and maintained in the ordinary

7   course of business.

8   Q     And is this a form that you use in your role at FinCEN?

9   A     Yes.

10            MS. KASSNER:  At this time, the Government would

11  move to admit Government's Exhibit 105 into evidence and

12  publish it to the jury.

13            THE COURT:  Any objection?

14            MR. SINGER:  No, Your Honor.

15            THE COURT:  All right.  105 is admitted and you may

16  publish.

17            (Exhibit published.)

18            MS. KASSNER:  So if we could turn to Page 2 of

19  Government's Exhibit 105.  And blow up the section that says

20  part two, registrant information.

21  Q     Can you please explain to the jury what a registrant is

22  required to fill out as part of part two of the Form 107?

23  A     Sure.

24            So this is information relating to --

25            THE COURT:  You may want to wait.  I can't read it

VLAHAKIS - DIRECT - MS. KASSNER                472

1    on the large screen.

2              MS. KASSNER:  If we can just blow up the top part.

3              Is that clearer?

4              THE COURT:  No.  This screen is terrible.  It is so

5    washed out is the problem.  There we go.  Much better.

6              Thank you.

7    Q    So according to this part of the Form 107, what is a

8    registrant required to provide in terms of information?

9    A    So in part two, a registrant is providing very basic

10   information about their business and their identity.  So their

11   name, their address, taxpayer identification number.  And if

12   it's a corporate entity, they'd indicate that and they would

13   input the corporate information, such as the business name,

14   business address.  And so, that's what we want to know.  Also

15   website, you can see email, compliance contact.  So just very

16   basic information that we would expect the business would have

17   on file.

18             MS. KASSNER:  Moving to Page 3 of

19   Government's Exhibit 105.

20   Q    There's a section at the top that says, part three, owner

21   or controlling person.

22             What is a registrant required to provide here in

23   terms of information?

24   A    So this is the person who owns or controls the money

25   services business.  And especially when we're talking about

Shernelle Griffith - Official Court Reporter

1   entities, corporate entities, in part two.  Here in part

2   three, we want to know the person behind the entities.  We

3   don't just want the business information names and identifying

4   information, we want to know the person who is actually

5   controlling it.  The individual identifying with the business.

6   Q    Why does FinCEN request this information?

7   A    It's the theme of the paper trial.  So it allows FinCEN

8   and law enforcement to understand who is conducting this

9   business.  And these businesses are required to file certain

10  reports with us so we can cross reference the information in

11  the reports with the information in this form.

12          MS. KASSNER:  Moving to the bottom of this, there's

13  a section part four that says, money services and product

14  information.  And perhaps we can just blow up the very top

15  with the heading so everyone can see it.

16  Q    What kind of information is a registrant required to

17  provide as part of part four?

18  A    Okay.  In part four, FinCEN is requesting information

19  relating to the types of activities the money service business

20  is engaged.  So that could be, money transmission, as I

21  mentioned earlier. It could be check cashing, issue or sale of

22  money orders, prepaid access and product information. And also

23  we're requesting information relating to the location where

24  they are conducting business.  Is it in one or more states,

25  all states, territories.  And they would check the

VLAHAKIS - DIRECT - MS. KASSNER                474

1  corresponding boxes relating to both geographical and product

2  services information.

3           MS. KASSNER:  If we could turn to the next page of

4  Government's Exhibit 105, which I believe is Page 5. At the

5  top there is a section that says part five.

6           Moment.

7  Q    Part five, primary transaction account for MSB

8  activities.

9           What is an MSB?

10 A    Money services business.

11 Q    At a high level, what kind of information is the form

12 asking for?

13 A    Just where they keep their bank account.  So which

14 financial institutions holds their account.

15 Q    Why does FinCEN request this information?

16 A    So I go back to the paper trial theme.  And in this case,

17 we would like to know the financial institution name and

18 information because financial institutions, including

19 depository institutions, can file reports, including reports

20 of suspicious activity on money services businesses.  And

21 also, this is very helpful for foreign located MSBs.  So those

22 are MSBs that are not physically located in the United States,

23 but are availing themselves of this jurisdiction.  Maybe they

24 have U.S. based customers.  And, if so, we would like to know

25 where the primary transaction account is.

VLAHAKIS - DIRECT - MS. KASSNER                475

1        MS. KASSNER:  Turning to the second part of this

2   form.  There is a section that says part six.  If we can blow

3   that up.

4   Q    Part six says, location of supporting

5   documentation/address of agent for service of process.

6        What is part six requesting?

7   A    Okay.  So part six, just building off of my previous

8   point relating to foreign MSBs.  If the MSB is in a foreign

9   country, we would like to know where are they keeping their

10  supporting documentation.  So information relating to the type

11  of business, you know,business volumes, and also their

12  investment agent service process since they're using this

13  jurisdiction to conduct activity.  So that's all that's asking

14  for.

15        MS. KASSNER:  Okay.  If we can take this exhibit

16  down.

17        Thank you.

18  Q    In addition to registering with the U.S. Secretary of

19  Treasury by filing a Form 107.

20        What, if anything, else is a money transmitting

21  business required to do to transmit money in the United

22  States?

23  A    Okay.  So they are required to have what's known as a

24  antimoney laundering program and they also are required to

25  file certain reports with FinCEN.  And by reports,I'm

1  referring to reports possibly related to suspicious

2  transactions and also reports of transactions in currency over

3  $10,000.  And they also required to keep certain records,

4  internal records.  So they're not filing reports of those

5  records.  They're just keeping them internally.

6  Q     Are all these requirements setout in a place that is

7  available to the public?

8  A     Yes.

9  Q     Where is it available?

10 A     On the FinCEN public website.  If you go to

11 www.FinCEN.gov there is a special pretty visible tab for money

12 services business.  And anyone can click on that tab and we

13 have FAQ documents that describe what a money services

14 business is in far more detail than I have just described,

15 what qualifies as an MSB.  What an antimoney laundering

16 program is.  We have materials in English, and I believe,eight

17 foreign languages. And, you know,if someone reads over those

18 materials and are still confused, they can contact the

19 regulatory helpline, which I mentioned I was working in that

20 helpline for almost nine years, and pose their questions via

21 email or telephone and it is answered within 24-hours.

22 Q     Does FinCEN maintain a database of all of the registered

23 money transmitting businesses?

24 A     Yes.

25 Q     Are you familiar with the contents of those records?

VLAHAKIS - DIRECT - MS. KASSNER                477

1   A    Yes.

2   Q    Are the records made and kept in the regular course of

3   FinCEN's business and activities?

4   A    Yes.

5   Q    Are they saved in realtime?

6   A    Yes.

7   Q    Is FinCEN under a duty to accurately record and maintain

8   such records?

9   A    Yes.

10  Q    Is it the regular practice of FinCEN employees to search

11  for or retrieve registrations of individuals and companies

12  engaged in the business of transmitting money?

13  A    Yes.

14  Q    Have you personally conducted searches of registrations

15  and records pertaining to money transmitters?

16  A    Yes.

17  Q    On approximately how many occasions?

18  A    I would say at least 30.

19  Q    Was FinCEN asked to conduct a search of official records

20  in connection with this case?

21  A    Yes.

22  Q    Did FinCEN perform that search?

23  A    Yes.

24  Q    Did you personally review the results of that search and

25  confirm that they were accurate?

VLAHAKIS - DIRECT - MS. KASSNER                478

1   A    Yes, I did.

2   Q    Were you otherwise involved in the underlining

3   investigation of this case?

4   A    No.

5   Q    Did FinCEN document the results of its search?

6   A    Yes.

7         MS. KASSNER:  At this time, I would request to show

8   just the witness what has been previously marked for

9   identification as Government's Exhibit 101.

10        THE COURT:  All right.

11  Q    Do you recognize Government's Exhibit 101?  And you can

12  let us know when you see it.

13  A    Sure.  I'm still waiting for it.

14  Q    It might take a moment.

15  A    I see it now.

16  Q    What is Government's Exhibit 101?

17  A    Government's Exhibit 101 is the records of our certified

18  search for BSA records and this is just a cover letter.

19        MS. KASSNER:  If we could turn to Page 2 and then

20  also show this Page 3.

21  Q    What are those pages?

22  A    These pages document the results of our search for the

23  entities named in the report.

24  Q    How do you recognize Government's Exhibit 101?

25  A    This is a record that is created and maintain in the

1    ordinary course of business by FinCEN.

2    Q    And have you reviewed it before?

3    A    Yes.

4         MS. KASSNER:  At this time, the Government would

5    move to admit Government's Exhibit 101 into evidence and

6    publish it to the jury beginning with Page 2.

7         THE COURT:  Any objection?

8         MR. SINGER:  No, judge.

9         THE COURT:  All right.  101 is admitted and you may

10   publish.

11            (Exhibit published.)

12   Q    While we're pulling that up, you mentioned BSA.

13        Just for clarity, what does BSA stand for?

14   A    BSA stands for Bank Secrecy Act and that's the antimoney

15   laundering statute that requires financial institutions to

16   have certain recording keeping and reporting obligations.

17   Q    So just looking at just Page 2 of

18   Government's Exhibit 101, what were the results of the search

19   for a FinCEN registration for Mustafa Goklu AKA Michael Goklu

20   with the listed date of birth and social security number on

21   Government's Exhibit 101?

22   A    This indicates that a diligent search was not able to

23   reveal any registrations or FinCEN Form 107 registrations.

24        THE COURT:  Oh, I'm sorry.  It's not legible on this

25   overhead.

VLAHAKIS - DIRECT - MS. KASSNER                480

1          MS. KASSNER:  Your Honor, perhaps we could use the

2   Elmo.  I don't know if that would help.

3          THE COURT:  You know, it is really the projector.  I

4   gather the jury is looking at the screen in front of them.  I

5   don't know if you want to pivot that one over there a little

6   bit more.  At least some people will be able to see that one.

7

8                (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VLAHAKIS - REDIRECT - MS. KASSNER                 481

1    MS. KASSNER:  (Continuing)

2         THE COURT:  Don't get it too far from the wall.  I

3    think you might be pulling the cord out.  Be careful.

4         I shouldn't have you moving furniture.  Why don't

5    you just go back to what you were doing.

6    BY MS. KASSNER:

7    Q    So you were just explaining what this second page of

8    Government Exhibit 101 indicates?

9    A    Correct.  It indicates that FinCEN has conducted a

10   diligent search for FinCEN 107, registration of money services

11   businesses and for these entities, and we were able to find no

12   such records for the dates ranging from January 1st, 2001

13   through July 20th, 2020.

14   Q    And turning to the third page of Government Exhibit 101.

15        What, if anything, is indicated by this page?

16   A    This page indicates the same information for a different

17   subject, Mustangy Corp USA.  We were able to after diligent

18   search, not able to locate any FinCEN Form 107 registration of

19   money service business forms for the dates January 1st, 2001

20   through July 20, 2020.

21   Q    Based on your search or FinCEN search, what, if anything,

22   are you able to conclude about whether Mustafa Goklu, also

23   known as Michael Goklu, or Mustangy Corp. USA registered a

24   money transmitting business with the U.S. Department of

25   Treasury.

PROCEEDINGS                    482

1  A     There was no such registration submitted by or behalf of

2  either of those entities.

3           MS. KASSNER:  Just one moment, Your Honor.

4           THE COURT:  All right.

5           MS. KASSNER:  Nothing further, Your Honor.  Thank

6  you.

7           THE COURT:  Thank you.  Your witness.

8           MR. SINGER:  I have no questions.  Thank you.

9           THE COURT:  Okay.  Thank you very much Mr. Tarwacki.

10  You're free to do.

11           THE WITNESS:  Thank you very much.

12           (The witness steps down.)

13           THE COURT:  Government.

14           MS. KASSNER:  Your Honor, at this time, the

15  Government rests.

16           THE COURT:  All right.  So ladies and gentlemen,

17  since the Government has rested with respect to its

18  presentation of evidence, I do need a few minutes to discuss

19  some matters with the parties.  I'm going to give you an

20  early, but slightly shorter break.  So hopefully, you'll be

21  ready to go at 35 after 2:00.  Okay.

22           THE COURTROOM DEPUTY:  All rise.

23           (Jury exits the courtroom.)

24           (In open court; Jury not present.)

25           THE COURT:  Have a seat.

1           So Mr. Singer, first of all, I want to ask you if

2     you've decided how you wanted to proceed, if, at all, with the

3     defense case.

4           MR. SINGER:  Your Honor we intend to rest.

5           THE COURT:  All right.

6           MR. SINGER:  I've discussed with Mr. Goklu his

7     constitutional right to testify in his own behalf, and he has

8     indicated that he will not be testifying.

9           THE COURT:  All right.  So Mr. Goklu, as you just

10    heard your lawyer, Mr. Singer, has confirmed for me that you

11    do not intend to testify in your own defense at this trial.

12          THE DEFENDANT:  Correct, Your Honor (in English).

13          THE COURT:  Okay.  I want to make sure that you feel

14    you've had sufficient time to discuss with your attorneys

15    whether or not to testify.

16          Do you feel like you've had enough time to discuss

17    that decision with them?

18          THE DEFENDANT:  Your Honor, I decided I'm not going

19    to testify, yes (in English).

20          THE COURT:  But do you feel like you've had enough

21    time to make that decision.

22          You have to speak a little slower and clearer for

23    our court reporter.  Say that again.

24          THE DEFENDANT:  This morning I am not going to

25    testify in this court, Judge (in English).

PROCEEDINGS                    484

1          THE COURT:  And you feel you've had enough time to

2    discuss that decision with your attorneys?

3          THE DEFENDANT:  Yes, Your Honor.  I have enough

4    time.  I discussed with my attorney (in English).

5          THE COURT:  Okay.  And you understand that you have

6    the write to testify, but as importantly, you have the right

7    not to testify, and the jury cannot consider the fact that you

8    did not testify in deciding whether you're guilty or not.

9          Do you understand that, right?

10         THE DEFENDANT:  Correct, Your Honor (in English).

11         THE COURT:  Okay.  And it's entirely up to you

12   whether you want to testify or not.

13         Do you understand that?

14         THE DEFENDANT:  Yes, Your Honor (in English).

15         THE COURT:  All right.  Thank you very much,

16   Mr. Goklu.

17         THE DEFENDANT:  Your Honor, thank you (in English).

18         THE COURT:  All right.  So we'll bring the jury back

19   in here.

20         Let me ask, also, is there any motion at this time

21   from the defense?

22         MR. SINGER:  Judge, the defense motion at this time

23   would be to dismiss the two counts of the indictment on the

24   ground that the evidence, even when viewed in the light most

25   favorable to the Government does not establish beyond a

PROCEEDINGS                              485

1   reasonable doubt each and ever element of the two crimes

2   charged.

3            THE COURT:  All right.  Do you want to elaborate any

4   further on that with respect to either count, just to preserve

5   the record?

6            MR. SINGER:  No, Your Honor.  I will rest on the

7   record.

8            THE COURT:  All right.  So let me say I am denying

9   that request, which obviously can be renewed later.  But I'm

10  denying that because I do find that the evidence is sufficient

11  for the jury to find, beyond a reasonable doubt, that the

12  defendant is guilty of both the money laundering and the

13  unlicensed money transmitting crime.  The second crime is,

14  obviously, more straightforward in terms of the elements,

15  because it doesn't require a showing of intent of any kind or

16  even knowledge beyond knowing that he is engaging in what is

17  unlicensed money transmitting.  But the evidence has been

18  submitted by the Government and that is sufficient for the

19  jury to find that Mr. Goklu is engaged in the business of

20  exchanging BitCoin for money, and it appears also may be

21  selling BitCoin himself, based on the last bit of testimony

22  that came in through former DEA agent -- and I forgot --

23  Vlahakis I think his name was.

24            MS. KASSNER:  Liefke, Your Honor.

25            THE COURT:  Oh, Mr. Liefke.  That's right, Liefke.

PROCEEDINGS                              486

1          And so then it's a question of whether he had a

2    license or not, and the evidence we just heard established

3    that he neither had a license, as required by the State of New

4    York, nor was he registered as required by the Department of

5    Treasury.

6          With respect to the money laundering, I think the

7    real issue in dispute is the knowledge about the illegal

8    source of the funds or any intent to conceal or disguise the

9    source or assist with that.  And there has been testimony,

10   quite honestly, on both issues -- I mean, on both sides of

11   this issue that a jury can consider, but I do find that

12   there's enough that they could find beyond a reasonable doubt

13   that Mr. Goklu was aware, at least, that the undercover was

14   involved in the drug trade, and that the money that Mr. Goklu

15   was exchanging for him via these BitCoin transactions was

16   proceeds from that drug business, the illegal drug business.

17   And I know much was made of marijuana farms or cannabis farms

18   being legal in California.

19         And just to cite some of this evidence so the record

20   is clear, in conversation 804, there was this -- and I say

21   804, meaning Government Exhibit 804 which happened on

22   December 11, 2018.  The undercover pointedly referenced keys,

23   K-E-Y-S, trying to introduce the idea to Mr. Goklu that the

24   undercover was purportedly involved in drug trafficking.

25   There were several references made by the undercover to

PROCEEDINGS                    487

1   dealing with college kids, his head being chopped off by his

2   people in California that he was working with, again, in an

3   effort to build this narrative or profile as a drug dealer

4   with Mr. Goklu.  That came from Government Exhibit 806.  The

5   UC also mentioned in that conversation that he couldn't touch

6   CoinBase.  Again, trying to suggest that the source of his

7   money was illegal.

8            There were, of course, many references to the

9   defendant himself being very law enforcement conscious,

10  concerned about being detected by the NYPD in particular.  The

11  defense has obviously offered a counter narrative about that.

12  Namely, that Mr. Goklu simply believed that the police would

13  always act first, take his money, and then figure out later

14  whether or not there was any illegality, and that Mr. Goklu

15  was simply concerned about these spurious activities by law

16  enforcement, and not about -- and not being -- or rather not

17  being concerned that he was, himself, engaging in anything

18  illegal, and certainly, not engaging in drug dealing, which he

19  said on numerous occasions.

20           In Government Exhibit 806, the undercover made clear

21  that he could get Mr. Goklu oxy and Adderall, A-D-D-E-R-A-L-L,

22  besides marijuana.  Specifically saying, that's what we do.

23  Mr. Singer, of course, brought out the fact that Mr. Goklu had

24  no idea what oxy was, so it seemed, and that in general,

25  Mr. Goklu never bit, if you will, on any of these leads about

PROCEEDINGS                          488

1  drug dealing or expressed any interest or one might argue,

2  even that it registered what the undercover was talking about.

3  But again, that's for the jury to decide, what all of those

4  conversations mean or if they reflect Mr. Goklu's

5  understanding that the money he was -- or that the BitCoin he

6  was getting from the undercover was proceeds of drug activity,

7  illegal drug activity.

8           And then just a couple of other notes.  In

9  Government Exhibit Number 807, the UC again made pointed

10 remarks about his partner getting money -- oh, I'm sorry, the

11 defendant made a remark about his partner getting money from

12 hookers.  Again, potentially, some reflection of Mr. Goklu's

13 own understanding that the financial transactions he and his

14 partner were involved in were from individuals who engaged in

15 criminal activity.

16          There were also references to the car being

17 bullet-proof, and also a number of conversations about

18 Mr. Goklu's desire to keep the amount of the transactions

19 below $100,000 and closer to $40,000.  Again, suggesting, but

20 it's for the jury to decide, whether or not those indicate

21 Mr. Goklu's understanding and knowledge that he was doing

22 something illegal.  And again, that inference could go either

23 to the unlicensed money transmitting or the alleged money

24 laundering.

25          And then in Government Exhibit 507, there is, of

PROCEEDINGS                              489

1    course, the defendant's statement that he is not a drug guy,

2    and suggesting further that he wouldn't deal with drug

3    dealers, so I think even recognizing those statements, there

4    is enough for a jury to discredit that in some way, because as

5    the Government then pointed out, via conversation, Government

6    Exhibit 809, despite Mr. O'Kain, the undercover making clear

7    that he was selling illegal drugs, Mr. Goklu didn't, at that

8    moment say I don't want to deal with you.

9            So as I said at the outset, there is obviously

10   evidence that the parties will argue both ways on the issue of

11   intent to conceal or disguise money from illegal activities

12   for purposes of the money laundering charge, but nonetheless I

13   think the jury could find, as the Government argues, that

14   Mr. Goklu he is guilty of that.  So I will let this case go

15   forward to them.

16           All right.  So we'll bring the jury back in, we will

17   have the defense rest, and then I guess we could just go ahead

18   with our jury charge conference, because rather than wait

19   until 5:30, we have the luck luxury of more time, all right.

20           MS. KASSNER:  Yes, Your Honor.  And I'm not sure

21   what Your Honor's preference is, but we are -- we expect the

22   charging conference will be quite brief.  The Government has

23   one suggested edit and otherwise no comments, and so we are

24   prepared to close today if Your Honor would prefer to proceed.

25           THE COURT:  Well, that would be preferable.

1             Mr. Singer.

2             MR. SINGER:  Are you asking my preference or if I

3    could --

4             THE COURT:  Can you close today?

5             MR. SINGER:  If Your Honor directs me to close

6    today, I will.  I would prefer to do it in the morning.  It's

7    not -- it was not clear to me until Agent Liefke briefly got

8    on the stand, until we finished the direct of Mr. O'Kain,

9    exactly the extent to which the Government was going to be

10   introducing various pieces of evidence or what the testimony

11   would be.  And so I --

12            THE COURT:  I find that --

13            MR. SINGER:  I would appreciate the time to process

14   that so that I can make a, I think, fuller and more coherent

15   closing argument.

16            THE COURT:  All right.  Well, let's first see where

17   we end up with the charge conference.  My priority, of course,

18   is the jury's time, because I don't really want to delay it

19   unnecessarily, and it seems that we could finish this charge

20   conference within an hour, and it's just 2:30 now.  So I

21   really want to void having them come back unnecessarily or to

22   have their deliberation time shortened because tomorrow is

23   Friday.  And so the sooner they get the case, the more time

24   they have and won't feel rushed to end their deliberations so

25   that they finish by Friday.  That's my concern.

PROCEEDINGS                                    491

1          MR. SINGER:  But the alternative, Your Honor, is to

2     have them sitting around waiting for an hour, perhaps, and

3     then perhaps staying later this evening.

4          I understand we want to be finished this tomorrow.

5          THE COURT:  But do you have any objections to the

6     jury charge, because this could take all of 10 minutes?

7          MR. SINGER:  I have some.

8          THE COURT:  But realistically, do you think this is

9     going to take more than a half an hour?

10         MR. SINGER:  Probably not.

11         THE COURT:  All right.

12         MR. SINGER:  But again, it's a matter of my

13    processing the information that came in at the end, both,

14    certainly, with Mr. O'Kain, as well as with Mr. Liefke's

15    testimony.

16         THE COURT:  Yeah.

17         MR. SINGER:  And being able to process that to make

18    a coherent argument on behalf of my client, and I would

19    appreciate the time to do that.

20         THE COURT:  I understand that.  But please

21    understand what this means, though, because this has some

22    consequence for your client, and I certainly don't want to

23    hear any complaint that somehow the jurors are going to be

24    rushed because it's Friday and they'll get the case by maybe

25    mid morning tomorrow because we won't use the two hours or so

PROCEEDINGS                               492

1    we have today.  So what will happen is tomorrow the Government

2    will open -- do their initial closing, you will give your

3    closing, and then the Government will rebut, and then I have

4    to give them instructions.  So we'll probably not give them

5    the case until noon, maybe, I would guess.  That's two and a

6    half hours from when we start.  Yeah.

7             MR. SINGER:  I understand that.  And they have the

8    day that they'll have certainly a number of hours in the

9    afternoon to deliberate, and if they doesn't finish their

10   deliberations by the end of the day, it'll goes over.  There's

11   nothing unusual about that.

12            THE COURT:  No.  But a very standard argument I hear

13   then is, oh, the jury felt pressured to be done by Friday

14   because they didn't want to come back on Monday.  I just want

15   to make sure you understand and appreciate that.  Listen, I'm

16   willing to give you more time --

17            MR. SINGER:  I --

18            THE COURT:  Hang on.  Please let me finish.

19            If your preference is to put off closings and

20   summations until tomorrow, you will let you do that, but I

21   want you to, sort of, understand that one potential

22   consequence is the jury will have less time on a Friday

23   afternoon to reach a decision, and sometimes, attorneys

24   believe that that puts pressure on the jury to reach a

25   decision more hastily so they don't have to come back in on

PROCEEDINGS                    493

1    Monday.

2              MR. SINGER:  I'm not concerned about that, Judge.

3              THE COURT:  All right.  So I'll let them go early

4    today and then they don't have to sit around for the jury

5    charge conference and then you'll sum up first thing in the

6    morning, starting at 9:30.  So I'll bring them back in solely

7    for the purpose of letting the defense rest and then letting

8    them go early.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury enters the courtroom.)

11             THE COURT:  All right.  So Mr. Singer, does the

12   defense intend to present any evidence?

13             MR. SINGER:  No, we do not.  The defense rests, Your

14   Honor.

15             THE COURT:  All right.  Thank you very much,

16   Mr. Singer.

17             So ladies and gentlemen, today has ended somewhat

18   unexpectedly earlier than I thought, so I'm going to let you

19   go today right now, because there are some other matters that

20   I need to address with the lawyers before they give their

21   closing statements to you tomorrow.  So that's going to happen

22   first thing tomorrow morning as soon as all of you get here,

23   so again, follow Ms. Gonzalez's instructions and aim for

24   9:00 a.m., and then we'll start promptly at 9:30.  So you'll

25   hear both sides' closing statements, Government, then the

CHARGE CONFERENCE                                494

1  defense, and then the Government again, I'll give you the

2  instructions on the law, and then you'll begin your

3  deliberations right after that.  Okay.

4          So have a wonderful evening, enjoy the rest of the

5  afternoon, don't talk about the case, don't do any research,

6  and keep an open mind, all right.

7              THE COURTROOM DEPUTY:  All rise.

8              (Jury exits the courtroom.)

9              THE COURT:  Okay.  Have a seat, everyone.  Give me

10  one second to pull up something on my computer.

11          All right.  So I understand that the Government has,

12  at least, one comment about the draft charges that you

13  received yesterday.  And tell me what page that's on.

14              MS. KASSNER:  Yes, Your Honor.  It's on Page 25.

15              THE COURT:  All right.

16              MS. KASSNER:  Count Two.  It's the first element.

17  Actually, I believe it's 24.

18              THE COURT:  Twenty-four, yup.

19              MS. KASSNER:  So this is related to what the

20  Government raised at the beginning of the day where it says,

21  in the middle of the first paragraph, a money transmitting

22  business is a business which, for a fee, accepts currency for

23  transfer within or outside the United States.

24          I think the proposal is to change this to, funds,

25  and then to note, I instruct you that BitCoin qualifies as

CHARGE CONFERENCE                                 495

1    funds under the statute.

2            Alternatively, another option would be to write

3    currency, funds, or other value that substitutes for currency.

4    I'm not sure if that makes anything easier.  But I think the

5    purpose of this is to clarify that courts have held that

6    BitCoin qualifies as funds for purposes of this 1960 charge.

7            THE COURT:  So the proposal is simply to add a

8    sentence at the end of that paragraph and after the sentence

9    that defines conducted controlled, et cetera, as having their

10   plain meanings.

11           MS. KASSNER:  I would do it right after.  So I would

12   put it right after the sentence we're discussing.

13           So it would read, A money transmitting business is a

14   business which, for a fee, accepts funds for transfer within

15   or outside the United States.  I instruct you that BitCoin

16   qualifies as funds under the statute.  And then continue the

17   term, money transmitting includes transferring funds on behalf

18   of the public.

19           THE COURT:  Actually, let me look at what your --

20           MS. KASSNER:  And I confess, Your Honor, it's very

21   possible that the Government is responsible for using the term

22   currency in the first instance.  I will note that the

23   Government wasn't aware that there would be any argument that

24   BitCoin would not qualify as currency until Special Agent

25   Infante's testimony.

CHARGE CONFERENCE                          496

1          THE COURT:  And hence the issue you raised this

2     morning.

3          MS. KASSNER:  Yes.

4          THE COURT:  And I know that you, Mr. Singer, don't

5     dispute that.

6          Do you have any objection to including that

7     language?  Because I do think we ought to put that issue to

8     rest and not have the jury speculate.  Even though there was

9     some testimony from the witness, I don't want the jury to

10    erroneously think that funds won't or don't include BitCoin,

11    as a legal matter.

12         MR. SINGER:  Judge, I think there's actually an

13    easier way of doing this that is consistent with the law on --

14    under this charge and the definition of a money transmitting

15    business, rather than changing the definition of money

16    transmitting business.

17         I would suggest leaving this sentence as is, that a

18    money transmitting business is a business which, for a fee,

19    accepts currency for transfer within or outside the United

20    States, and then you could add, for purposes of this statute,

21    BitCoin constitutes currency.  That solves the problem that

22    the Government is rasing, but leaves the definition consistent

23    with what the law is on this statute.

24         THE COURT:  Right.  It doesn't sound like a bad

25    suggestion.  I just want to -- let me take one look.

CHARGE CONFERENCE                              497

1          MR. SINGER:  And I do not intend to argue the point

2   that BitCoin is not currency under the statute.

3          MS. KASSNER:  And Your Honor, just very briefly, the

4   reason for the preference for the term, funds, is because

5   that's actually the word used in the statute.

6          THE COURT:  That's what I was thinking.  I think

7   it's actually not currency, right, and that's what I wanted to

8   look up just now.  We don't recite that part of 1960, but that

9   is correct, that the words funds and not currency is used,

10  correct?

11         MS. KASSNER:  Yes, Your Honor.  I believe it's under

12  XXXI U.S.C. 5330(d)(1).

13         THE COURT:  Right.

14         MS. KASSNER:  Which defines money transmitting

15  business.  And it uses the term, Any person who engages as a

16  business in the transmission of funds.

17         THE COURT:  And did you say 5331?

18         MS. KASSNER:  5330(d)(1), I believe.  Of Title XXI

19  which I confess is not a Title I often consult.

20         THE COURT:  Right.  You probably don't stray outside

21  of Title XVIII.

22         Okay.  Here we go, 5330.

23         And did you say it was -- which subpart of 5330?

24         MS. KASSNER:  I believe it's (d)(1).

25         THE COURT:  Oh, here it is.  Yes, it is.

1          Okay.  So it uses all these words, transmission of

2    currency, funds, or value that substitutes for currency.  I

3    mean, so I actually don't know why we just don't do that.  But

4    your preference, I guess -- and I'm referring to the

5    Government -- is just to use the word fund instead of

6    currency, even though all of them are included?

7          Why don't we use the whole definition.

8          MS. KASSNER:  Yeah, that's the other suggestion.  I

9    think either one is fine.

10          The other suggestion would be currency, funds, or

11   other value that substitutes for currency or some variant on

12   that.  I think any of that that will be fine, Your Honor.

13          THE COURT:  Yeah, Mr. Singer, I think if we want to

14   stay true to the statute, why don't we just use what's in 31

15   United States Code, Section 5330(d)(1)(A), and that it

16   literally refers to currency, funds, or value that substitutes

17   for currency, and then add a sentence that BitCoin qualifies

18   as -- here's the question, currency or funds.

19          MR. SINGER:  I'm sorry, which section of 53 --

20          THE COURT:  5330(d)(1)(A), definitions.  And

21   specifically, the definition of money transmitting business,

22   subpart A which basically says a money transmitting business

23   provides -- it has a number of different things -- but

24   currency exchange or money transmitting or remittent services,

25   et cetera, et cetera.

1          MR. SINGER:  So how much of the language of

2    (d)(1)(A) would you include?

3          THE COURT:  So if you look just midway through the

4    subpart A paragraph where it says, and starts, Any other

5    person who engages as a business in the transmission of

6    currency, funds, or value that substitutes for currency.

7          So all I'm proposing is that we insert after,

8    currency, in our current instruction, the terms, funds or

9    value that substitutes for currency.

10         MR. SINGER:  Okay.  So the instruction would read --

11         THE COURT:  So while you're looking at that up --

12         MR. SINGER:  So a money transmitting business is a

13   business which, for a fee.  Is that still how it's going to

14   read?

15         THE COURT:  Yes.  Accepts, currency, funds, or the

16   value that substitutes for currency or value that substitutes

17   for currency.  No, the.

18         MR. SINGER:  For transfer within or outside the

19   United States?

20         THE COURT:  Correct.

21         MR. SINGER:  That's fine.

22         THE COURT:  Then the additional sentence will read

23   something to the effect of, I advise you that BitCoin

24   qualifies under the law as, and then the question is currency

25   or funds or both?  I'm asking you, folks.

1          In the case law, does it say that BitCoin is

2    considered currency, as you suggested, Mr. Singer, or funds,

3    as the Government has suggested.

4          MS. KASSNER:  Your Honor, the case law cause

5    discusses it in the context of funds because 18 U.S.C. Section

6    1960 only uses the word funds, and so I think it's fine to be

7    over-inclusive, but I think it's accurate to say that BitCoin

8    qualifies as a fund.

9          THE COURT:  Okay.  So the proposal would be then, I

10   advise you -- and this is a new sentence after the one we were

11   just discussing -- I advise you that BitCoin qualifies under

12   the law as a fund or funds?

13         MS. KASSNER:  Funds.

14         THE COURT:  Funds, plural.

15         Mr. Singer any objections to that?

16         MR. SINGER:  No.

17         THE COURT:  All right.  So we'll make those two

18   additions.

19         Does the Government have anything else?

20         MS. KASSNER:  No, Your Honor.

21         THE COURT:  Okay.  Mr. Singer, you said you had a

22   few objections.

23         MR. SINGER:  I do.  And some are repeating

24   objections that I've put in my earlier letter to the Court

25   objecting to some of the Government's language.

1          THE COURT:  All right.

2          MR. SINGER:  And the jury was not here, so I took my

3     mask off.

4          THE COURT:  That's fine.  I did the same.

5          I mean, if you're worried about, whatever, exposure,

6     that's still --

7          MR. SINGER:  Worry, I worry all the time.  We all

8     worry.  But I'm willing to take that risk.

9          THE COURT:  Tell me the first page.

10         MR. SINGER:  Page 13, section O.

11         THE COURT:  Section O, undercover agent.

12         MR. SINGER:  The first sentence reads that, you have

13    heard testimony from an undercover agent from --

14         THE COURT:  Yup.  We'll correct that typo.

15         MR. SINGER:  From undercover agent.  And then this

16    is a part that I'm objecting to, who were employed by the

17    Government to investigate the defendant.

18         That's not accurate.  They were employed by the

19    Government to conduct investigations.  The way this reads --

20         THE COURT:  Hold on.  Why don't we just change it to

21    employed by the DEA?

22         So you have heard testimony from an undercover agent

23    who was employed by the DEA, period.

24         MR. SINGER:  Actually, it's more accurate undercover

25    agents -- actually, there was only one uncover.

1          THE COURT:  Right.

2          MR. SINGER:  From an uncover who was employed by the

3    DEA.

4          THE COURT:  Yes.  I don't think I need to --

5          MR. SINGER:  -- to investigate the defendant.

6          THE COURT:  Yeah.  I don't think I need to say that.

7    The Government, certainly, is going to make that argument,

8    because there was testimony that they did -- and I think,

9    Mr. Singer, you want to argue this too -- target your client

10   in particular, based on his advertisements.  But that's

11   argument.  So I don't need to say that.

12         MR. SINGER:  I get that.  My concern, as I read it,

13   is it sounds as though the specific reason that they were

14   employed by the Government was to investigate the defendant,

15   and that simply is not accurate.  That's part of their job,

16   conducting investigations.  They did investigate the

17   defendant, but it's a subtle difference.

18         THE COURT:  They have other responsibilities, okay.

19         So we'll say that you have heard testimony from an

20   undercover agent who was employed by the Drug Enforcement

21   Administration.

22         MS. KASSNER:  So the Government has no objection to

23   that.  I would just keep it plural because they sometimes were

24   on the phone, Special Agent Liefke and Special Agent O'Kain,

25   and when they were on the phone, Special Agent O'Kain was

1    acting uncover.  It's up to Your Honor --

2         THE COURT:  But to be clear, only O'Kain was the

3    undercover.  Liefke was his team member and did surveillance,

4    right?

5         MS. KASSNER:  Yes.  Except for when Special Agent

6    O'Kain called him on the phone, and said that comment, the

7    other three keys --

8         THE COURT:  He's not acting, really, as an

9    undercover or representing himself.  I don't want to confuse

10   the jury, because the only one who said I was working

11   undercover was O'Kain.

12        This strikes me as a very minor sentence.

13        MS. KASSNER:  Whatever Your Honor thinks is clearer.

14   It's not a legal objection, it's just whatever you think is

15   clearer.

16        THE COURT:  Let's just stick with the one because

17   really I think we're referencing O'Kain acting in this

18   undercover capacity.  I understand what you're saying that

19   Liefke played a part on the other end of the phone, but he

20   wasn't technically acting undercover.

21        And I actually don't know or don't remember if it

22   was testified to by O'Kain that the defendant could hear.

23        MS. KASSNER:  It was --

24        THE COURT:  It was, on speaker as opposed to --

25   because I know he heard the undercover as part of the

CHARGE CONFERENCE                                   504

1   conversation.

2        MS. KASSNER:  Special Agent O'Kain did say he

3   thought the defendant could hear.  I don't think that's really

4   that relevant.  I think the bigger part is how the jury

5   perceives the undercover.  I think it if you think it's easier

6   to say Special Agent O'Kain, that's fine.

7        THE COURT:  Or just one undercover.  Let's just

8   refer to the uncover in the singular.

9        Okay.  What else, Mr. Singer, about that paragraph

10  or anywhere else?

11       MR. SINGER:  Nothing else with regard to that

12  paragraph.

13       I will move to Page 15, letter R, evidence pursuant

14  to lawful procedure.  I object to that charge.  I think it's

15  unnecessary.  It's not an argument that has been or that I

16  intend to make on behalf of the defendant, and I think that

17  all it does is pats the Government on the back for following

18  rules.  I don't think the Court should be engaged -- there's

19  no need for the Court to give this instruction.  Why would

20  anybody think that there was anything improper about the

21  procedures used that the Government records matters, uses

22  undercover.  It's not an issue here and they highlight it

23  simply to say, Government, you did everything according to the

24  law, I don't think the Court should be taking sides in that

25  way.

1           THE COURT:  All right.  You feel like it's an

2   attaboy?

3           MR. SINGER:  Yes.

4           THE COURT:  I'm not going to remove of that.  I

5   think it's good to avoid people's concerns about privacy and

6   whether or not the Government was allowed to do what they did.

7   So mostly, as a preventive measure, I'm going to give that

8   instruction, which is pretty standard and dispels any notion

9   or hidden concern the juror numbers might have about whether

10  the Government was spying on people unlawfully.

11          I mean, I understand that you're not going to

12  arguing it, but I think in this day and age, it's not

13  unrealistic to think that people do have that concern.  So I

14  overrule that objection, but you've preserved it.

15          MR. SINGER:  I will move to Page 21.

16          THE COURT:  All right.

17          MR. SINGER:  The second paragraph at the top that

18  begins, In order to sustain its burden of proof.

19          THE COURT:  Right.

20          MR. SINGER:  I object to the inclusion of that

21  paragraph.

22          I think the elements of the charge and the

23  description of those elements is sufficient to inform the jury

24  of what the Government is required to prove, and the examples

25  that the Court puts into this proposed charge, is -- should be

1   argument by the Government and should not be part of the

2   Court's charge.

3           Not required that you make any express affirmative

4   statement to the defendant.  I mean, you're telling them that

5   what is required is that the defendant believed that the

6   property was the proceeds of illegal activity.  That's what

7   the element is, that's what the statute calls for, and that's

8   what the element is, and then to break that down further, to

9   say, well, the Government doesn't have to do this, but they

10  could do this, it's invading their province.  It's a place for

11  the Government -- that the Government can properly and

12  appropriately make argument about that.  But again, it's the

13  Court inserting itself into the issue, and this is truly one

14  of the critical issues in the case.  I don't think it's the

15  Court's job to do that.

16          THE COURT:  So I'm going to overrule that objection

17  also.  This particular instruction is similar to what is

18  instructed with respect to conspiracy, for example, where we

19  often say to the jury, conspiracies are often secretive,

20  there's rarely a written agreement, or words to that effect,

21  because the jury has never encountered these sort of matters

22  before, so illegal conspiracies are, by their nature, secret

23  which is one of the things they always tell the jury, but

24  rather, they can, as they often do in their formal life, infer

25  from circumstances and actions of people that some agreement

1   has been reached.  I think this is very similarly.  And quite

2   honestly, I think in that paragraph, the only potentially

3   unnecessary or invasive, as you say, sentence, is the first

4   one, because the latter part of that paragraph really states

5   what they do need to know.  And I don't suggest to them

6   specifically what they consider, but I tell them that they

7   have -- that they should decide whether, from all the

8   circumstances, a reasonable person would make the inference

9   that the proceeds were from illegal activity.  But I think

10  it's important to dispel the notion that the jury might have

11  that somehow there has to be some express affirmation or

12  affirmative statement, as this instruction says, that hey,

13  this is proceeds of illegal activity.  So I do find it's akin

14  to other instructions we give to the jurors who don't normally

15  deal with, somewhat, illicit conduct that isn't spoken about

16  explicitly or overtly so that they understand that they can

17  still find that the defendant had the requisite knowledge,

18  even if it wasn't stated to him in express terms.

19          So I'm going to leave that in, but again, your

20  objection is noted.

21          MR. SINGER:  Well, can I ask the Court to, perhaps,

22  consider removing the first sentence, then and simply

23  instructing the jury that in order to sustain its burden of

24  proof on this element, and then jump to the second sentence,

25  the Government must prove that the law enforcement made the

1  defendant aware of circumstances from which a reasonable

2  person would infer and on and on, and that just takes the

3  first sentence out.  That is, informing the jury fully as

4  you've indicated what needs to be done here.

5          THE COURT:  No.  I mean that's, I guess, what I was

6  trying to say to you, that I think that first sentence would

7  be the potentially objectionable one, if there is one.  But I

8  said I think for the reasons I've said before is that because

9  this is an area that the jury is less familiar with, they may

10  well wonder whether or not it's required that the plaintiff

11  say -- plaintiff, sorry -- that the undercover say, I'm

12  involved in drug dealing and these are my proceeds.

13          So again, I think it is necessary, just as we do in

14  other context, especially when it comes to illegal

15  conspiracies, to say some kind of explicit expression of the

16  illegality is not necessary with respect to the proceeds.

17          So I am denying even that request.  Okay.  But

18  again, you have your objection.

19          MR. SINGER:  We've moved to Page 22.

20          THE COURT:  Mm hm.

21          MR. SINGER:  I scrolled pass myself.

22          The first full paragraph beginning, In determining

23  whether the defendant believed that the property.

24          I am objecting to that paragraph.  Again, I think it

25  is invading the province of the jury.  I think it's certainly

1  appropriate for argument by the Government if they choose to

2  make that argument.  But I don't think it's for the Court to

3  inject itself into that issue.

4          THE COURT:  Right.  Now this is a little trickier

5  because I think it's really a legal question.  It's a

6  conscious avoidance instruction.

7          In other words, again, it's letting the jury know

8  that they may not necessarily have to find that he knew that

9  the proceeds were from narcotics trafficking, but rather,

10  whether or not he deliberately closed his eyes to it.  So if

11  you're objecting that the standard is not appropriate, namely

12  a conscious avoidance kind of standard, that, I would want to

13  see some case law on.  But I don't recall that this was

14  raised -- and let me take a quick look.  I know it was the

15  Government's proposed instruction.

16          This is an instruction that has been used before, to

17  be sure, in the case -- and it was approved by the Second

18  Circuit in United States versus *Nektalov*, N-E-K-T-A-L-O-V, 461

19  F.3d 309, a decision from 2006.  But it is the Conscious

20  Avoidance Doctrine.  So I don't know if you're objecting to

21  the application of that doctrine or simply how that's worded.

22  But the doctrine itself has been upheld as appropriate in

23  cases like this involving guilty knowledge.

24          So what are you arguing, Mr. Singer?

25          Do you believe that it's not appropriate to give a

CHARGE CONFERENCE                               510

1   conscious avoidance instruction?

2          MR. SINGER:  Well, the element is not so much

3   knowledge, as what the defendant actually believed.  The

4   Government has to establish that the defendant actually

5   believed that the purported proceeds were from narcotics

6   trafficking.

7          THE COURT:  But do you have a case?  Because as I

8   said, *Nektalov* actually approved this kind of conscious

9   avoidance instruction.

10         MR. SINGER:  I do not have a case to present to the

11  Court at this time, no.

12         THE COURT:  All right.  So does the Government want

13  to be heard on this?

14         MS. KASSNER:  Very briefly, Your Honor.  The

15  Government is relying on the *Nektalov* case which was approved

16  by the Second Circuit in 2008.  And it deals specifically

17  with --

18         THE COURT:  I think it's 2006, but it doesn't

19  matter.

20         MS. KASSNER:  I think the original case was 2006,

21  but I believe -- regardless, Your Honor.  I think that it

22  talks about money, conducting financial transactions with the

23  proceeds of narcotics trafficking and deliberately and

24  consciously avoiding confirming that fact.  I think it's

25  almost identical to the situation we're discussing here.  So I

1    think it's appropriate to include it and I think it's

2    consistent with the current case law.

3              THE COURT:  Right.  Let me also note that *Nektalov*

4    made the point of saying this instruction would be appropriate

5    only when a defendant asserts the lack of some specific aspect

6    of knowledge required for conviction, and secondly, the

7    appropriate factual predicate for the charge exists.  IE, that

8    there is evidence such that a rational juror could reach that

9    conclusion beyond a reasonable doubt that the defendant was

10   aware of a high probability of the fact in dispute and

11   consciously avoided confirming the fact, and that is precisely

12   the situation we have here.  So I am going to include the

13   instruction based on *Nektalov* and the plain applicability of

14   that decision to this case and to the defense in this case.

15   So it's both as to the requirements for money laundering and

16   the defense that's being asserted here which is lack of

17   knowledge or belief.

18             MR. SINGER:  Okay.  So let me now dig into that

19   paragraph and get a bit pickier.

20             THE COURT:  All right.  Give it a go.

21             MR. SINGER:  The next to last sentence beginning,

22   however, if you find that the defendant actually believed that

23   the proceeds involved in the charge transactions were not the

24   proceeds of narcotics trafficking, he may not be convicted.

25             While that is a true statement, it is not

1   sufficient.  It's not the defendant doesn't need to establish

2   that he actually believed that the proceeds were not the

3   proceeds of narcotics trafficking.  The Government has to

4   prove the opposite.  And so the way this is worded it suggests

5   that the defense has some burden of establishing that he

6   actually believed, I would suggest adding, however, if you

7   find that the defendant actually believed that the proceeds

8   involved in the charge transactions were not the proceeds of

9   narcotics trafficking, or if you are not convinced beyond a

10  reasonable doubt that he actually believed that the proceeds

11  involved were not the proceeds of narcotics trafficking, he

12  may not be convicted.  I think it more accurately states what

13  the law is otherwise --

14                    (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1    (Continued.)

2         THE COURT:  Now, it misstates it.  The problem is

3    you are now making an affirmative requirement that you find

4    actually believed as opposed to consciously avoided.  That's

5    the whole point.  The paragraph says, If you find they

6    consciously avoided knowing the truth.  And I know that

7    knowledge and belief, there's some daylight in between them or

8    if you say that second part or I added that that would be very

9    confusing or directly conflicting with the first part.

10        Now, I understand what you're saying about that

11   particular sentence, the "however" sentence suggesting that

12   the defendant has an affirmative duty to prove that he

13   actually believed, but I think when read in context, it's

14   really trying to say you can find he had the requisite

15   knowledge based on conscious avoidance, but if you find that

16   he actually believed that the proceeds were not from narcotics

17   trafficking, you cannot convict him.

18        MR. SINGER:  Can't both things be true?  Can't you

19   actually believe and also a finding be made that you

20   consciously avoided which should have been obvious to you?

21        THE COURT:  No.

22        MR. SINGER:  If he avoided learning it and as a

23   result of consciously avoiding it, he actually believed --

24        THE COURT:  No, no.  You're thinking of consciously

25   avoiding as I put my fingers in my ears and pretend I don't

1   hear you, as opposed to he actually had reason to believe it

2   and he chose not to accept or -- I don't know how to explain

3   it, but there isn't really a difference between believing it

4   and consciously avoiding it.

5          In other words, conscious avoidance suggests that he

6   understood it to be true, but still acted with -- it's

7   interestingO.

8          MR. SINGER:  What if the jury is uncertain on this

9   issue.  What if the jury is uncertain on whether he

10  consciously avoided it.  This language would suggest that to

11  find the defendant not guilty you have to find that he

12  actually believed --

13         THE COURT:  Well, we can re-word it this way:

14  However, if you find that the Government has failed to prove

15  beyond a reasonable doubt that the defendant consciously

16  avoided -- now here is a tricky word, consciously avoided,

17  believing or -- consciously avoided and learning I guess is

18  the best way to say it that the proceeds involved in the

19  charged transactions were the proceeds of narcotics

20  trafficking he may not be convicted.

21         MS. KASSNER:  Your Honor, I will point out -- I'm

22  scratching my head because the sentences do appear earlier in

23  the paragraph.  It says, Guilty knowledge may not be

24  established by demonstrating the defendant was merely

25  negligent, foolish or mistaken.  However, if you find beyond a

1   reasonable doubt that the defendant acted with a conscious

2   purpose to avoid learning about the source of the proceeds

3   involved in the charged transactions, then this element may be

4   satisfied.

5           I feel like if we just reword that sentence and put

6   it in the negative and then also the negative, I'm not sure

7   what more we're adding if that makes sense.

8           THE COURT:  I understand what you're saying.  The

9   weird thing that has been made clear to me is the word

10  consciously avoiding because I -- conscious avoiding --

11  consciously avoiding learning about something to me suggests

12  something akin to putting your fingers in your ears as opposed

13  to hearing the words and still intellectually not wanting to

14  believe it or draw the conclusion that's obvious.  And that's

15  what I think conscious avoidance is about; because the

16  defendant deliberately closed his eyes to what would otherwise

17  have been obvious to him.

18          The Government is going to argue, yes, he heard the

19  undercover say all of these things that were indicative of the

20  drug -- the money being drug proceeds, yet he chose not to

21  believe it.  That's essentially what conscious avoidance

22  means.

23          That's why I'm saying, Mr. Singer, you can't

24  actually say he didn't believe it.  You can't actually say one

25  believes it yet consciously avoided it.  The point is if

1   you're consciously avoiding it, you're refusing to believe it

2   in some way.

3           So that's why I think we can't add the sentence that

4   you want -- how about this:  However, if you find beyond a

5   reasonable doubt that the defendant acted with a conscious

6   purpose to avoid learning about or believing that the source

7   of the proceeds involved in the charged transaction -- wait,

8   that doesn't actually help them.  Wait a second.

9           MS. KASSNER:  I think the sentence before it really

10  does answer this, Your Honor; guilty knowledge may not be

11  established by demonstrating the defendant was merely

12  negligent, foolish or mistaken as to his belief.  We could add

13  that?  That's really the point.  It's saying it -- a mistaken

14  belief, you would not be guilty of conscious avoidance.  It's

15  if you -- after the conscious purpose to avoid learning, then

16  you are guilty I think?  Maybe it belongs there.  Guilty

17  knowledge may not be established by demonstrating that the

18  defendant was merely negligent, foolish or mistaken as to his

19  belief about the source of the proceeds, something like that.

20          THE COURT:  And then --

21          MS. KASSNER:  And then it would mirror the sentence

22  that follows because it says, to avoid learning about the

23  source of the proceeds.

24          So if we put that part in the sentence before maybe

25  we could strike the sentence that's been flagged later all

Charge Conference                                    517

1    together.

2         THE COURT:  Right, but I think then it creates a

3    gross imbalance because there's really only one sentence that

4    suggests a contrary narrative, if you will, because you have

5    then three sentences dedicated to explaining how conscious

6    avoidance could satisfy this element and only one phrase or

7    one sentence that says how it wouldn't.  I do agree that we

8    should say it was merely negligent, foolish or mistaken as to

9    his belief, although it's really as to his nonbelief, isn't

10   it?

11        So why would you add the word believe to that

12   sentence?  Guilty knowledge may be not be established by

13   demonstrating that the defendant was merely negligence,

14   foolish or mistaken as to his belief.

15        MS. KASSNER:  Belief about the source of the

16   proceeds.

17        THE COURT:  Well, no, believe that the proceeds were

18   not from drug trafficking.  I don't actually even like that

19   sentence now that I'm looking at it further.  I do think maybe

20   we could change this a bit, at least to shorten it.  What I

21   would suggest almost is take out the sentence that begins

22   guilty knowledge and the next sentence -- because the learning

23   about part suggests to me that you just exempted yourself from

24   the room or something as opposed to -- I think what this does

25   really get at is he had all the evidence before him but chose

1   to ignore it as opposed to I left the room every time they

2   talked about something illegal.

3           So the conscious learning about it is poorly phrased

4   to me.  Or conscious avoidance of learning about something

5   because I think it suggests, like I said, a different concept

6   and then, maybe if we jump then to the next sentence -- if you

7   find beyond a reasonable doubt that he was aware of a high

8   probability that the charged transactions involved the

9   proceeds of narcotics trafficking, et cetera, et cetera and

10  acted with deliberate disregard.  And then we just have to

11  find a better sentence for the "however" sentence.  And then

12  end with that.  And delete the last sentence.  I think there's

13  almost too much discussion about an arguably watered down --

14          MR. SINGER:  And I would also --

15          THE COURT:  An arguably watered down knowledge

16  requirement.

17          Go ahead, Mr. Singer.

18          MR. SINGER:  I also think that narcotics trafficking

19  should be illegal narcotics trafficking.

20          THE COURT:  Well, narcotics trafficking is used

21  throughout and I think it's presumptively illegal.  I don't

22  think we have to keep saying that.  It's used in this entire

23  instruction.  You know, I don't think the jury for a moment

24  will be confused because we say earlier on that the specified

25  unlawful activity is narcotics trafficking.  That's what it

1    is, what is alleged so I don't think there's going to be any

2    confusion on that.  I want a replacement sentence for the

3    however sentence:  However, if you find that the Government

4    has failed to prove beyond a reasonable doubt.  And then just

5    recite the same language that the defendant deliberately

6    closed his eyes to what would have been obvious to him, then

7    he may not be convicted or would have been obvious to a

8    reasonable person or something like that.

9          I think we need to address what is a legitimate

10   concern that the defendant has an obligation to prove that he

11   believed it or just maybe that he acted with conscious

12   avoidance.

13         We could say this:  However, if you find that the

14   Government has failed to prove by a preponderance of the

15   evidence that the defendant consciously avoided -- no, that

16   the defendant acted with conscious avoidance of the high

17   probability that the charged transaction involved the proceeds

18   of narcotics trafficking, he may not be convicted.  I think

19   that -- it's the flip side of the sentence beforehand.

20         Government?

21         MS. KASSNER:  So I'm having a little bit of a hard

22   time following what's in and what's out.

23         THE COURT:  So here is how it would work.  First

24   sentence in determining remains the same.  Next sentence

25   guilty knowledge comes out.  The next sentence after that,

1   however, if you find beyond a reasonable doubt comes out.  We

2   then jump down to the sentence if you find beyond a reasonable

3   doubt that the defendant was aware of a high probability that

4   the charged transactions involved the proceeds of narcotics

5   trafficking and that the defendant acted with deliberate

6   disregard of the facts, you may find that the defendant acted

7   with the belief necessary to satisfy this element.

8           However, if you find that the Government has failed

9   to prove beyond a reasonable doubt that the defendant acted

10  with conscious avoidance of the high probability that the

11  charged transactions involved the proceeds of narcotics

12  trafficking, you -- he may not be convicted.  And the only

13  hesitation I have is because obviously they could find that he

14  knew and this conscious avoidance stuff is not relevant so, I

15  would hope that they understand that if they find that he just

16  knew that this wouldn't undercut that finding.

17          But I think that that sort of balances out the

18  instruction and then we would delete the last sentence as well

19  just as unnecessary:  I mean we could word it shorter.  We

20  could say, failed to prove beyond a reasonable doubt that the

21  defendant closed his eyes to the high probability, et cetera,

22  et cetera.

23          MR. NAVARRO:  Your Honor, I had a little bit of a

24  hard time following it as well but one concern is that when

25  you read it just now you used the term conscious avoidance and

Charge Conference                    521

1   I'm not sure that term is defined above.

2        THE COURT:  That is true.  Consciously avoided.  We

3   could not do that.  That's why I suggest just maybe closed his

4   eyes to the high probability or we could say that the

5   defendant was not aware of the high probability.  So if the

6   Government has failed to prove beyond a reasonable doubt that

7   the defendant was aware of a high probability and then go from

8   there.

9        MR. NAVARRO:  Your Honor, would this make sense to

10  see this in writing and send you something later tonight with

11  the proposed language and we can resolve it tomorrow because

12  it is a little hard to follow on our end.

13       THE COURT:  I do not find it hard but then again I'm

14  thinking about it in my head.  We can do it very easily.  I

15  think I've landed on the last iteration which is that that

16  sentence which is now going to be the last sentence that

17  begins however, the one that Mr. Singer is concerned about;

18  the actually believed sentence, okay.  Instead of that, it

19  will read however, if you find that the Government has failed

20  to prove beyond a reasonable doubt that the defendant was

21  aware of a high probability that the charged transactions

22  involve the proceeds of narcotics trafficking -- so this is

23  mirroring the language in the sentence before -- then he may

24  not be convicted.

25       I mean, I left out the part about deliberately

Charge Conference                      522

1    disregarded, I guess.  That's what I would propose but if you

2    guys have another proposal, that's fine.

3              Mr. Singer.  I'm not sure if you're following --

4              MR. SINGER:  No, I am, Judge, I've objected to the

5    whole charge and I will wait to see the final language that

6    the Court puts together.

7              THE COURT:  Listen, we'll just put it into a revised

8    charge.  You'll have time to look at it in the morning and let

9    me know what you think.  We'll come up with something that

10   addresses the concern that Mr. Singer raises, but I know it

11   doesn't resolve your objection to this entire instruction, but

12   just to break this down into two parts which is if you're

13   objecting as I think you are, Mr. Singer and Ms. Sahli to the

14   conscious avoidance instruction overall.  I overrule that

15   objection based on *Nektalov*.

16             But if you're objecting to particular language in

17   the instruction, I am partially agreeing with you and trying

18   to come up with some other language and am going to propose a

19   revised version of this instruction so as not to suggest any

20   burden on the defendant to prove that he actually believed

21   that the proceeds were not from narcotics trafficking and also

22   to create a more balanced instruction that's also shorter.

23   Okay?

24             MR. SINGER:  Next, Your Honor, a very minor point on

25   page 23 --

1          THE COURT:  So my law clerk actually has written it

2     out so we'll print it out for you and you can take a look and

3     we can discuss it tonight if you want.

4          Go ahead, Mr. Singer.

5          MR. SINGER:  On page 23, again this is very minor it

6     says, in order for you to find the defendant guilty of the

7     crime charged in Count Two, the Government must prove beyond a

8     reasonable doubt each of the following four elements but

9     there's only three.

10         THE COURT:  Okay, yes.  That was a change we made,

11    yes, three elements.  We've corrected that on page 23.

12    Anything else?

13         MR. SINGER:  On page 24 of the first element money

14    transmitting business.

15         THE COURT:  Is this different than what we already

16    fixed?

17         MR. SINGER:  Yes.

18         THE COURT:  Okay.

19         MR. SINGER:  A business -- the sentence the third

20    sentence, a business is a commercial enterprise that is

21    regularly carried on for a fee or profit.  I think that

22    accurately it is a commercial enterprise that is regularly

23    carried on for a profit.  A fee is one matter -- one manner in

24    which a company may have earned a profit, but there are others

25    and I think the correct definition is that it's a commercial

1   enterprise carried on for a profit and by adding "fee" to it

2   because the term "fee" is in the term money transmitting

3   business as well, I think you're adding --

4              THE COURT:  Redundancy.

5              MR. SINGER:  Well, it's a redundancy because yes,

6   fee is -- fee is one way that a company earns a profit.  There

7   are otherwise.  It can be by speculation.  It can be by

8   markups on goods that are being sold.  There's a variety of

9   ways to make a profit.  A fee is just one of them and you're

10  highlighting the one that's in your next definition and that's

11  relevant to the facts of this case.  And so I think it's

12  not -- it doesn't properly belong there.  It should read

13  simply it's a commercial enterprise that is regularly carried

14  on for a profit.

15             THE COURT:  Does the Government's object to removing

16  fee in that sentence?

17             MS. KASSNER:  Yes, Your Honor.  We're searching now

18  for the source of the definition, but I think that it's

19  misleading to say it's regularly carried on for a profit.  You

20  can lose money and still run a business.  I think it's

21  misleading and I think the term "fee," these were, I believe,

22  from the Sands instructions but also we're searching now to

23  see where in the United States Code this definition is from.

24             Your Honor, we're concerned it adds this extra

25  requirement that the Government shows in business was carried

1    on for a profit or to make a profit.  I think it's misleading

2    and confusing for the jury.

3            MR. SINGER:  Well, the fact that a business is

4    attempting to make a profit doesn't necessarily mean that it's

5    going to, but a commercial enterprise is one that's operating

6    to make a profit.  That's the idea behind it.  It's not done

7    to earn a fee.  It's done to earn a profit.

8            MS. KASSNER:  I think the idea is that it charges

9    money for its services.  I think that's what the fee is

10   referring to.

11           THE COURT:  Honestly I think the only reason I would

12   consider removing it is because the next definition for money

13   transmitting involves charging a fee.  I don't know which way

14   it cuts it because it suggests to me that the jury is going to

15   have to address that issue no matter what.  But I do think

16   it's not entirely correct, Mr. Singer that a business should

17   be described -- I mean, I understand what you're saying that a

18   fee is one way to make a profit, but I don't know if it's

19   accurate to simply say businesses are operated to make a

20   profit and that's how you define a business.  It does

21   introduce some motion of intend to make money, you know,

22   about -- above your costs, I guess, and that's irrelevant for

23   this definition because even a failing business or even one

24   when -- the intent to actually make money is irrelevant to

25   whether it's a business or not and I think that's the most

1   salient part of this discussion because under the statute, you

2   know, I think in theory they don't care what your intent is in

3   running it.  The point is you conduct regularly something

4   that's commercial because you make people pay for the service.

5   You know, whether you do it to make a profit or because you

6   enjoyed money transmitting is not really what makes it a

7   business.

8               MR. SINGER:  That is a definition of a business --

9               THE COURT:  You say that, but I don't think the

10  statute defines it unfortunately.  Maybe people in business

11  don't anticipate making a profit.  That's why you say it's --

12  that defines a business, I'm not sure that's true.  What makes

13  something a commercial business?  It's certainly something

14  offered to the public and in exchange -- it could be a

15  bartering system, I guess, right and I think that was sort of

16  your point which is fee is not the only way one operates but

17  I'm not sure making a profit is the definition of a commercial

18  business.

19              MR. SINGER:  Well, the Government's request to the

20  Court included this language a business is a commercial

21  enterprise that is regularly carried on for profit.

22              THE COURT:  But fee for profit.

23              MR. SINGER:  No, just fee.

24              THE COURT:  No, fee was added by the Court at the

25  Government's request.

Charge Conference                             527

1          MS. KASSNER:  Your Honor, he's correct.

2          MR. SINGER:  For a profit on page 13 of their

3   requested changes.

4          THE COURT:  Government, should we take it out

5   because since at the time you didn't think it was necessary

6   either.

7          MS. KASSNER:  So, Your Honor, the defense is correct

8   in the Government's proposal it does say a business is a

9   commercial enterprise that is regularly carried on for a

10  profit.  I will say now that the topic has been raised,

11  though, I am concerned a bit about the confusion that's

12  possible if any argument is going to be made that because he

13  didn't profit, it's not a business.

14         THE COURT:  Again, its intent to profit or set up

15  for that purpose.  We're going to take out fee or from that.

16  I don't think quite honestly this matters at all.  The idea is

17  that it's a regularly carried out activity that has a

18  commercial purpose and I think you can argue to the jury that

19  clearly the defendant was trying to make money and a lot has

20  been made by your agents about how much more he charged than

21  other, more publicly available services like this.

22         So we're going to take out fee or in that

23  instruction.

24         Mr. Singer, anything else?

25         MR. SINGER:  I've run out.  That's it.

1           THE COURT:  All right, good.  Fida, can we give

2    copies of that one instruction --

3           THE COURTROOM DEPUTY:  I did already.

4           THE COURT:  Folks, take a quick look at that and see

5    if that resolves the issue.  Although I note that the defense

6    still has their objection to it wholesale.

7           MS. KASSNER:  Your Honor, the Government reviewed

8    the proposed change to the paragraph on the top of page 22.

9    This looks fine from the Government's perspective.

10          THE COURT:  Okay.

11          Mr. Singer, aside from your standing objection to

12   the instruction as a whole about conscious avoidance.

13          MR. SINGER:  I would agree that this language is

14   better than the way it was originally draft testified.

15          THE COURT:  Are you objecting to the language at all

16   because you can preserve your objection.

17          MR. SINGER:  No, no.

18          THE COURT:  But you're still objecting to the

19   inclusion of a conscious avoidance in this instruction?

20          MR. SINGER:  Yes.

21          THE COURT:  I think that resolves everything.  We

22   will send out a track change revised version and a clean copy

23   so you can take a look and make sure we've transcribed

24   everything correctly.  As I said to the jury, you will start

25   your closings at 9:30 and then I will instruct them right

1   afterwards and I imagine they'll get the case before noon.  Do

2   you have a sense of how long your summations will be?

3           MS. KASSNER:  I'm going to try to speak slow, Your

4   Honor, so I'm hoping maybe 45 or 50 minutes, but --

5           THE COURT:  Are you doing the initial closing and

6   rebuttal?

7           MS. KASSNER:  No, Your Honor.  Ms. Diouf is doing

8   the rebuttal so she can advise.

9           MS. DIOUF:  Of course it will be contingent on

10  defense counsel's closing, but probably not more than 20

11  minutes.

12          THE COURT:  You'll try to speak lower too.

13          MS. DIOUF:  Absolutely.

14          THE COURT:  Mr. Singer, do you have any estimate

15  now.

16          MR. SINGER:  How long was my opening?

17          THE COURT:  You said 20 minutes and it was about 20

18  minutes.

19          MR. SINGER:  That's all.

20          THE COURT:  I don't recall --

21          MR. SINGER:  30, 40 minutes, I would think that's.

22          THE COURT:  I would think at least.  Fair enough.

23  So I was trying to get some sense of when we'll expect the

24  jury to get the case.  Ms. Gonzalez will ask them what they

25  want for lunch and I will ask them assume they get the case

Charge Conference                                    530

1   before lunch they can deliberate over lunch or not but they

2   have to agree on whether or not they want to do that.

3           MR. SINGER:  Is it your practice to provide a

4   written copy of the instructions to the jury?

5           THE COURT:  One issue, yes.  So let me explain what

6   is going to go back to the jury.  All of the exhibits that

7   have been admitted will go back to the jury along with a set

8   of the instructions, which I will tell them as I'm reading

9   them to them so they don't try to furiously try to take notes.

10          We will also project on the overhead, as crummy as

11  it is, the instructions as I read them so they can follow

12  along.  I will advise the jury as I did before or I will

13  remind them as you see in the instructions that they can have

14  portions of the transcript sent back to them.  I did tell

15  them, though, I think that any charts that you folks use in

16  closing and I don't know if you plan to that weren't admitted

17  as evidence won't go back with them.  The Government made the

18  request to have the indictment sent back to the jury and I'm

19  not going to do that.

20          I never do because as I tell them it's just a

21  charge.  It's not evidence and I recapitulate for them the

22  portions of the indictment that they need to know so you folks

23  had requested that in your jury charges.  Maybe that is a

24  leftover from someone else's charges.

25          MS. KASSNER:  I think that's a standard request,

Charge Conference                       531

1    Your Honor, but we didn't focus on it so that's fine.

2         THE COURT:  You didn't have your heart set on it,

3    but I'm denying it anyway.  I think that's what we need to

4    know.  What will happen as soon as you're done closing and

5    before we send everything back to the jury, Ms. Gonzalez is

6    going to go over each side's exhibit list -- the defense

7    doesn't have one, and make sure you both agree on which

8    exhibits are admitted and what's going back to the jury.  You

9    will have to look at it and agree with her before she sends it

10   back.

11        MR. NAVARRO:  Your Honor, in light of the issue with

12   the projector, is it possible to on hand the hard copy to the

13   jurors and ask them not turn the page until you're ready?

14        THE COURTROOM DEPUTY:  I think it's only the

15   computer not the paper.

16        THE COURT:  You're talking about the jury charge?

17        MR. NAVARRO:  Yes.

18        THE COURT:  Fida is right it seems when we use the

19   ELMO and bad when we use the computer.

20        MR. NAVARRO:  When I put the stips on the ELMO the

21   first day it was difficult zoomed into even read them.  I can

22   try it now.

23        THE COURT:  Let's try it right now.  We'll go off

24   the record.

25        MR. SINGER:  How do you want to deal with the

1   transcripts -- not the transcripts, the recordings?

2            THE COURT:  Good question.  We do need to send back

3   a computer with them, a laptop.

4            We'll send a laptop back with them but somebody

5   should have it to a flash drive or a USB or CD.  I'll see if

6   we still have a CD player.  Can't you guys put it on to  a

7   flash drive.

8            MR. SINGER:  It's 2022.  It's hard to find a

9   computer with a disk drive.

10           MS. KASSNER:  In our office we are still a fan of

11  CDs but we will bring a flash drive.

12           THE COURT:  We're done.  We'll see you tomorrow.

13  You can leave your stuff here if you want.

14

15           (Matter adjourned.)

16                        - ooOoo -

17

18

19

20

21

22

23

24

25

533

I N D E X

WITNESS                                             PAGE

PATRICK O'KAIN,

     CONTINUED DIRECT EXAMINATION

     BY MS. KASSNER                                 350

     CROSS-EXAMINATION  BY MR. SINGER               372

     REDIRECT EXAMINATION BY MS. KASSNER

                                                    408

   ALLAN LIEFKE                                     415

       DIRECT EXAMINATION BY MS. DIOUF              415

       CROSS-EXAMINATION BY MR. SINGER              447

       REDIRECT EXAMINATION BY MS. DIOUF            454

ROBERT TARWACKI

     DIRECT EXAMINATION BY MS. KASSNER              458

THEODORE VLAHAKIS

     DIRECT EXAMINATION BY MS. KASSNER              466

           E X H I B I T S

  Government Exhibit 622                            351

  Government Exhibit 304                            369

  Government Exhibit 104                            446

VB      OCR      CRR

## ALL WORD INDEX

1

### $

**$10,000** [1] - 476:3
**$100,000** [4] - 357:18, 365:3, 425:11, 488:19
**$133,190** [1] - 371:10
**$2,000** [1] - 429:12
**$25,000** [1] - 425:13
**$3,000** [1] - 426:18
**$3,342.33** [1] - 381:22
**$30,000** [1] - 355:12
**$40,000** [2] - 357:21, 488:19
**$49,999** [1] - 360:23
**$5,000** [2] - 435:18, 436:5
**$7,000** [1] - 380:8
**$7,114.57** [1] - 381:10
**$75,000** [1] - 366:18

### /

**/-FPLT** [1] - 469:3
**/-RBGS** [1] - 469:4
**/PHUPB** [1] - 469:4
**/S-FS** [1] - 469:5

### 1

**1** [5] - 352:13, 380:22, 428:20, 456:5, 456:13
**10** [6] - 393:3, 432:15, 433:2, 441:19, 442:9, 491:6
**100** [14] - 356:5, 356:24, 357:1, 357:2, 357:7, 357:9, 357:16, 360:12, 360:22, 361:1, 361:9, 364:21, 400:15
**100,000** [1] - 364:16
**101** [11] - 478:9, 478:11, 478:16, 478:17, 478:24, 479:5, 479:9, 479:18, 479:21, 481:8, 481:14
**102** [9] - 462:1, 462:7, 462:8, 462:11, 462:24, 463:2, 463:6, 463:10, 463:13
**103** [8] - 462:9, 462:16, 462:17, 462:20, 462:24, 463:2, 463:21, 463:24
**104** [4] - 446:1, 446:7, 446:12, 533:21
**105** [8] - 470:19, 471:1, 471:5, 471:11, 471:15, 471:19, 472:19, 474:4
**107** [10] - 470:2, 470:8, 470:9, 471:4, 471:22, 472:7, 475:19, 479:23, 481:10, 481:18
**11** [6] - 351:23, 381:19, 409:6, 433:10, 486:22
**1101** [7] - 370:6, 370:10, 370:14, 370:20, 371:1, 371:5, 380:13
**11050** [1] - 346:20
**11201** [2] - 346:16, 346:24
**11211** [1] - 346:21
**1160** [1] - 439:25
**11:15** [1] - 407:11
**11:27** [1] - 353:12
**11:30** [1] - 407:11

**11th** [4] - 381:12, 383:18, 383:22, 396:12
**12** [4] - 434:2, 441:10, 441:17, 450:22
**1201** [1] - 451:3
**12:10** [1] - 353:13
**12:28** [1] - 362:11
**13** [9] - 409:14, 410:25, 411:5, 416:12, 429:8, 439:22, 441:23, 501:10, 527:2
**13.67287** [1] - 358:22
**13:05** [1] - 362:25
**14** [1] - 346:19
**147** [1] - 346:19
**15** [12] - 362:25, 364:11, 391:9, 391:16, 391:17, 391:18, 407:19, 414:3, 428:4, 431:15, 432:15, 504:13
**16** [1] - 364:11
**16,000** [1] - 431:15
**16:17** [1] - 355:5
**17** [1] - 428:25
**17:16** [1] - 355:6
**18** [1] - 500:5
**180** [1] - 470:2
**18:50** [1] - 365:7
**195** [1] - 346:21
**1960** [4] - 348:2, 495:6, 497:8, 500:6
**19:33** [1] - 365:7
**19CR386(PKC** [1] - 346:3
**1:45** [2] - 456:6, 457:2
**1st** [3] - 359:14, 481:12, 481:19

### 2

**2** [6] - 426:18, 456:15, 471:18, 478:19, 479:6, 479:17
**20** [6] - 442:9, 449:20, 481:20, 529:10, 529:17
**2001** [2] - 481:12, 481:19
**2006** [3] - 509:19, 510:18, 510:20
**2008** [2] - 458:18, 510:16
**2009** [2] - 416:13, 466:12
**2017** [1] - 467:15
**2018** [26] - 350:21, 351:23, 370:3, 370:23, 373:1, 378:21, 381:2, 381:19, 383:4, 383:11, 383:14, 383:18, 390:14, 403:19, 408:18, 414:9, 416:2, 416:3, 416:24, 422:20, 422:22, 429:8, 431:1, 435:5, 486:22
**2019** [25] - 351:24, 352:11, 354:10, 358:21, 359:7, 360:4, 362:6, 362:15, 368:6, 370:3, 370:23, 372:17, 373:1, 374:1, 378:22, 392:10, 392:17, 410:22, 412:6, 425:4, 425:18, 426:13, 428:25, 441:15, 447:21
**2020** [2] - 481:13, 481:20
**2022** [2] - 346:7, 532:8
**20K** [2] - 435:10, 436:11
**20th** [1] - 481:13
**21** [4] - 350:21, 428:23, 442:24, 505:15
**21:45** [1] - 366:8

**21st** [2] - 383:11, 396:12
**22** [7] - 350:24, 360:4, 429:23, 443:10, 452:19, 508:19, 528:8
**225** [1] - 346:24
**228** [13] - 427:8, 427:25, 429:5, 429:6, 429:23, 439:16, 439:20, 441:10, 447:15, 450:21, 452:18, 453:20
**22:34** [1] - 366:8
**22:46** [1] - 393:3
**23** [5] - 435:3, 436:21, 522:25, 523:5, 523:11
**237** [1] - 436:6
**23:40** [1] - 366:23
**24** [5] - 351:24, 410:22, 434:15, 494:17, 523:13
**24-hours** [1] - 476:21
**242** [1] - 439:19
**243** [1] - 440:8
**249** [1] - 440:18
**24:24** [1] - 355:21
**24:52** [1] - 355:21
**24th** [5] - 392:10, 392:17, 392:23, 396:12, 402:16
**25** [4] - 366:15, 412:20, 430:25, 494:14
**26** [3] - 362:6, 404:12, 441:15
**27** [2] - 351:23, 412:24
**271** [1] - 346:15
**27:40** [1] - 356:14
**27:52** [2] - 391:21, 391:22
**27th** [6] - 390:14, 391:3, 396:12, 403:19, 404:10, 414:9
**28** [1] - 396:11
**28:02** [2] - 413:23, 413:25
**28:35** [1] - 356:14
**28th** [2] - 381:2, 383:4
**29** [1] - 435:5
**29K** [2] - 443:15, 453:8
**2:00** [1] - 482:21
**2:30** [1] - 490:20
**2K** [1] - 437:14

### 3

**3** [3] - 381:15, 472:18, 478:20
**3,000** [2] - 381:21, 443:14
**3,600** [1] - 441:20
**3,960** [1] - 441:20
**30** [11] - 352:11, 354:10, 355:11, 358:21, 359:6, 362:15, 368:6, 374:1, 447:21, 477:18, 529:21
**30,000** [1] - 355:11
**304** [6] - 368:17, 368:20, 369:1, 369:4, 369:5, 533:20
**309** [1] - 509:19
**30th** [2] - 372:17, 375:4, 396:13, 396:25, 406:3
**31** [1] - 498:14
**32:40** [1] - 357:23
**335** [2] - 353:23, 354:5

ALL WORD INDEX _____2

**33:04** [1] - 357:23
**33rd** [1] - 352:14
**340634** [1] - 442:3
**35** [3] - 353:20, 354:13, 482:21
**350** [2] - 453:19, 533:6
**351** [1] - 533:19
**369** [1] - 533:20
**372** [1] - 533:7
**39th** [1] - 444:23
**3:00** [1] - 431:11

### 4

**40** [4] - 357:2, 357:19, 357:20, 529:21
**408** [1] - 533:9
**415** [2] - 533:10, 533:11
**41:35** [1] - 412:18
**43:24** [3] - 404:13, 404:14, 404:15
**43:30** [1] - 412:18
**446** [1] - 533:21
**447** [1] - 533:12
**45** [3] - 379:18, 434:22, 529:4
**454** [1] - 533:13
**458** [1] - 533:15
**46-09** [1] - 433:8
**46/09** [1] - 430:7
**4609** [1] - 434:19
**461** [1] - 509:18
**466** [1] - 533:17
**47** [2] - 440:3, 441:22
**49,999** [2] - 360:13, 360:18
**4th** [1] - 346:21

### 5

**5** [4] - 358:14, 358:17, 428:20, 474:4
**50** [5] - 360:19, 362:8, 366:15, 428:3, 529:4
**50,000** [2] - 361:1, 361:2
**5030** [1] - 444:23
**507** [5] - 359:11, 359:13, 360:3, 362:5, 488:25
**50K** [2] - 436:10, 436:11
**53** [2] - 427:20, 498:19
**5330** [2] - 497:22, 497:23
**5330(d)(1)** [1] - 497:18
**5330(d)(1)** [1] - 497:12
**5330(d)(1)(A** [2] - 498:15, 498:20
**5331** [1] - 497:17
**54** [1] - 429:6
**58** [1] - 436:7
**5:30** [1] - 489:19

### 6

**6** [3] - 346:7, 431:17, 436:11
**60** [1] - 439:20
**60K** [1] - 434:8
**61** [1] - 358:24

**613** [2] - 358:24, 359:3
**621** [7] - 351:10, 351:15, 351:16, 351:17, 351:18, 352:2, 352:6
**622** [5] - 350:6, 350:15, 351:3, 351:4, 533:19
**623** [1] - 351:14
**65K** [1] - 435:7
**66** [1] - 428:22
**67** [1] - 429:23
**68** [1] - 430:19
**69** [1] - 431:6
**6:05** [1] - 359:14

### 7

**7** [2] - 380:22, 436:11
**711** [1] - 445:7
**712** [1] - 445:7
**716** [1] - 445:19
**718** [1] - 445:19
**72** [1] - 431:18
**73** [1] - 432:4
**74** [1] - 432:12
**75** [1] - 366:16
**753** [1] - 444:7
**754** [1] - 445:1
**76** [1] - 433:2
**77** [1] - 433:11
**78** [1] - 434:3

### 8

**801** [2] - 409:5, 409:7
**803** [8] - 391:5, 391:7, 391:15, 391:19, 404:11, 413:22, 413:25, 414:3
**804** [3] - 486:20, 486:21
**806** [10] - 392:24, 393:1, 409:13, 410:24, 412:18, 412:19, 412:24, 487:4, 487:20
**806R** [1] - 393:1
**807** [3] - 352:23, 352:25, 488:9
**807jR** [1] - 354:1
**807R** [2] - 353:20, 354:8
**809** [3] - 362:21, 362:24, 489:6
**830** [1] - 414:2
**8:57** [1] - 430:10

### 9

**90** [1] - 434:16
**902** [1] - 446:7
**902-4** [1] - 446:2
**96** [1] - 436:20
**97** [1] - 437:8
**99** [1] - 437:19
**9:00** [2] - 346:8, 493:24
**9:05** [1] - 353:5
**9:30** [3] - 493:6, 493:24, 528:25
**9:47** [1] - 353:6

**9:55** [1] - 434:22

### A

**a.m** [2] - 346:8, 493:24
**abbreviation** [1] - 418:20
**ability** [1] - 377:18
**able** [19] - 381:16, 390:12, 394:11, 394:16, 401:3, 402:13, 423:11, 425:18, 431:9, 447:10, 450:25, 464:2, 479:22, 480:6, 481:11, 481:17, 481:18, 481:22, 491:17
**absolutely** [2] - 354:20, 529:13
**accept** [1] - 514:2
**acceptance** [1] - 469:10
**Accepts** [1] - 499:15
**accepts** [3] - 494:22, 495:14, 496:19
**access** [2] - 469:4, 473:22
**accomplish** [1] - 467:22
**accomplishes** [1] - 467:23
**according** [2] - 472:7, 504:23
**account** [9] - 399:10, 444:16, 445:4, 470:15, 474:7, 474:13, 474:14, 474:25
**accurate** [9] - 350:20, 351:22, 401:23, 477:25, 500:7, 501:18, 501:24, 502:15, 525:19
**accurately** [8] - 370:21, 375:25, 391:1, 392:15, 461:5, 477:7, 512:12, 523:22
**Act** [6] - 466:14, 466:16, 466:18, 466:21, 467:12, 479:14
**act** [2] - 466:15, 487:13
**acted** [9] - 514:6, 515:1, 516:5, 518:10, 519:11, 519:16, 520:5, 520:6, 520:9
**acting** [6] - 423:24, 437:23, 503:1, 503:8, 503:17, 503:20
**actions** [2] - 361:13, 506:25
**activities** [5] - 473:19, 474:8, 477:3, 487:15, 489:11
**activity** [13] - 467:21, 469:1, 474:20, 475:13, 488:6, 488:7, 488:15, 506:6, 507:9, 507:13, 518:25, 527:17
**actual** [2] - 404:5, 411:17
**ad** [2] - 428:1, 429:11
**add** [6] - 495:7, 496:20, 498:17, 516:3, 516:12, 517:11
**added** [2] - 513:8, 526:24
**Adderall** [8] - 363:22, 364:1, 364:4, 364:6, 372:21, 412:7, 413:14, 487:21
**ADDERALL** [1] - 487:21
**adding** [4] - 512:6, 515:7, 524:1, 524:3
**addition** [2] - 435:25, 475:18
**additional** [2] - 452:9, 499:22
**additions** [1] - 500:18
**address** [14] - 347:17, 433:8, 444:22, 445:5, 445:17, 445:23, 466:20, 470:13, 472:11, 472:14, 493:20, 519:9, 525:15
**addresses** [1] - 522:10
**adds** [1] - 524:24

ALL WORD INDEX                                                               3

**adjourned** [1] - 532:15
**Administration** [4] - 408:12, 411:18, 416:4, 502:21
**admit** [6] - 350:23, 352:2, 368:25, 463:2, 471:11, 479:5
**admitted** [21] - 351:3, 352:6, 358:13, 358:24, 359:10, 369:4, 371:1, 371:5, 380:24, 381:15, 427:11, 445:9, 445:10, 445:19, 446:7, 463:6, 471:15, 479:9, 530:7, 530:16, 531:8
**advertisements** [1] - 502:10
**advertising** [2] - 377:15, 377:18
**advise** [6] - 426:6, 499:23, 500:10, 500:11, 529:8, 530:12
**advised** [1] - 425:12
**AF** [2] - 437:23, 438:5
**affidavits** [2] - 416:23, 421:21
**affirm** [2] - 457:17, 465:1
**affirmation** [1] - 507:11
**affirmatively** [1] - 384:3
**affirmed** [1] - 415:11
**afternoon** [12] - 384:14, 384:15, 441:21, 447:5, 447:6, 457:1, 458:6, 466:6, 466:7, 492:9, 492:23, 494:5
**afterwards** [3] - 366:22, 439:3, 529:1
**age** [1] - 505:12
**agency** [1] - 423:10
**Agent** [24] - 348:8, 349:20, 367:3, 367:4, 367:10, 374:3, 374:12, 415:4, 417:1, 418:6, 422:15, 423:16, 423:21, 423:24, 425:8, 430:16, 490:7, 495:24, 502:24, 502:25, 503:5, 504:2, 504:6
**agent** [32] - 349:22, 357:11, 368:1, 373:24, 374:2, 374:10, 408:12, 411:19, 416:10, 416:11, 416:13, 416:20, 416:21, 417:15, 418:21, 421:18, 421:19, 424:4, 424:6, 425:12, 425:20, 425:22, 426:7, 438:15, 475:5, 475:12, 485:22, 501:11, 501:13, 501:15, 501:22, 502:20
**agents** [10] - 378:2, 388:15, 421:14, 421:20, 448:5, 448:25, 449:4, 449:14, 501:25, 527:20
**ago** [1] - 375:21
**agree** [8] - 376:18, 379:3, 379:6, 517:7, 528:13, 530:2, 531:7, 531:9
**agreed** [1] - 367:9
**agreeing** [1] - 522:17
**agreement** [2] - 506:20, 506:25
**ahead** [16] - 350:3, 410:17, 411:3, 430:9, 431:17, 432:10, 433:2, 434:15, 438:24, 440:17, 442:9, 442:13, 444:11, 489:17, 518:17, 523:4
**aid** [1] - 353:3
**Aid** [1] - 409:5
**Aided** [1] - 346:25
**aids** [3] - 409:15, 409:18, 410:1
**aim** [1] - 493:23
**AKA** [1] - 479:19
**akin** [2] - 507:13, 515:12

**aliases** [1] - 422:12
**alike** [1] - 360:16
**ALLAN** [3] - 415:17, 415:19, 533:10
**Allan** [3] - 367:3, 415:4, 415:17
**alleged** [2] - 488:23, 519:1
**allow** [1] - 374:24
**allowed** [1] - 505:6
**allows** [1] - 473:7
**almost** [4] - 476:20, 510:25, 517:21, 518:13
**alone** [1] - 462:7
**alternative** [1] - 491:1
**Alternatively** [1] - 495:2
**AMERICA** [1] - 346:3
**amount** [12] - 361:1, 365:4, 370:17, 379:4, 389:18, 396:3, 397:17, 401:2, 425:6, 426:20, 449:21, 488:18
**amounts** [9] - 357:6, 360:25, 364:16, 370:16, 370:21, 377:18, 426:22, 436:3, 436:4
**Analysis** [1] - 417:19
**analysis** [1] - 417:21
**analyze** [1] - 417:19
**and/-S** [1] - 469:3
**announced** [1] - 367:17
**answer** [16] - 384:16, 384:17, 516:10
**answered** [4] - 389:3, 406:19, 407:1, 476:21
**answering** [2] - 391:1, 392:14
**ant** [1] - 449:19
**anticipate** [1] - 526:11
**antimoney** [8] - 466:16, 467:25, 468:2, 468:3, 470:6, 475:24, 476:15, 479:14
**anyway** [1] - 531:3
**apologies** [2] - 350:7, 354:22
**app** [5] - 423:2, 423:4, 426:25, 427:15, 442:8
**appear** [3] - 429:19, 438:8, 514:22
**Apple** [13] - 450:16, 450:22, 451:9, 451:16, 451:18, 452:6, 452:10, 452:14, 453:3, 453:9, 453:15, 453:18, 454:9
**applicability** [1] - 511:13
**application** [1] - 509:21
**apply** [2] - 459:21, 460:6
**appreciate** [4] - 349:17, 490:13, 491:19, 492:15
**approach** [3] - 354:19, 457:14, 464:22
**approached** [1] - 442:15
**appropriate** [7] - 509:1, 509:11, 509:22, 509:25, 511:1, 511:4, 511:7
**appropriately** [1] - 506:12
**approved** [3] - 509:17, 510:8, 510:15
**April** [16] - 359:14, 360:4, 362:6, 362:15, 368:6, 372:17, 374:1, 375:4, 378:21, 396:25, 406:3, 412:6, 425:18, 428:25, 441:15, 447:21
**area** [5] - 368:21, 417:4, 431:24, 458:12, 508:9

**arguably** [2] - 518:13, 518:15
**argue** [7] - 349:8, 488:1, 489:10, 497:1, 502:9, 515:18, 527:18
**argues** [1] - 489:13
**arguing** [2] - 505:12, 509:24
**argument** [16] - 348:21, 348:23, 348:24, 490:15, 491:18, 492:12, 495:23, 502:7, 502:11, 504:15, 506:1, 506:12, 509:1, 509:2, 527:12
**arrest** [14] - 367:9, 367:10, 367:15, 367:16, 367:20, 367:21, 367:24, 372:18, 406:3, 425:18, 425:21, 425:22, 447:22, 448:6
**arrested** [17] - 365:11, 365:18, 367:8, 367:18, 367:19, 368:2, 368:3, 375:18, 375:19, 394:5, 425:22, 426:1, 426:4, 426:7, 427:4, 449:7, 454:1
**arrived** [1] - 449:5
**arriving** [1] - 449:9
**articulated** [1] - 390:13
**Asian** [1] - 435:10
**aside** [1] - 528:11
**aspect** [2] - 387:17, 511:5
**asserted** [1] - 511:16
**asserts** [1] - 511:5
**asshole** [1] - 442:11
**assigned** [3] - 417:20, 458:14, 467:4
**assist** [1] - 486:9
**Assistant** [1] - 346:18
**assume** [1] - 529:25
**assumed** [1] - 403:9
**ATMs** [1] - 438:2
**attaboy** [1] - 505:2
**attempting** [1] - 525:4
**attention** [13] - 348:7, 357:9, 365:5, 378:3, 428:3, 428:22, 429:5, 429:22, 436:6, 436:20, 439:19, 441:9, 451:2
**attorney** [1] - 484:4
**ATTORNEY'S** [1] - 346:14
**attorneys** [3] - 483:14, 484:2, 492:23
**Attorneys** [1] - 346:18
**audio** [7] - 353:3, 353:10, 353:19, 409:21, 409:25, 410:2, 410:3
**Audio** [21] - 353:7, 353:14, 355:7, 355:22, 356:15, 357:24, 363:3, 363:7, 365:8, 366:9, 366:24, 391:23, 391:24, 393:4, 393:5, 404:17, 413:2, 413:4, 414:5, 414:7
**August** [5] - 378:21, 381:2, 381:24, 383:4, 396:11
**AUSA** [1] - 411:3
**available** [3] - 476:7, 476:9, 527:21
**availing** [1] - 474:23
**Avenue** [3] - 346:19, 432:2, 440:16
**avoid** [7] - 357:15, 420:13, 505:5, 515:2, 516:6, 516:15, 516:22
**avoidance** [19] - 509:6, 509:12, 510:1, 510:9, 513:15, 514:5, 515:15, 515:21, 516:14, 517:6, 518:4, 519:12, 519:16, 520:10, 520:14, 520:25, 522:14,

ALL WORD INDEX _____ 4

528:12, 528:19
**Avoidance** [1] - 509:20
**avoided** [12] - 511:11, 513:4, 513:6, 513:20, 513:22, 514:10, 514:16, 514:17, 515:25, 519:15, 521:2
**avoiding** [8] - 510:24, 513:23, 513:25, 514:4, 515:10, 515:11, 516:1
**aware** [19] - 366:4, 373:17, 374:13, 374:14, 374:21, 375:22, 376:1, 377:23, 442:23, 449:9, 486:13, 495:23, 508:1, 511:10, 518:7, 520:3, 521:5, 521:7, 521:21
**awhile** [1] - 379:16

# B

**bachelor's** [1] - 417:24
**background** [3] - 417:22, 453:3, 460:10
**backside** [2] - 362:13, 362:14
**bad** [3] - 360:17, 496:24, 531:19
**bag** [2] - 353:23, 425:6
**balanced** [1] - 522:22
**balances** [1] - 520:17
**Bank** [8] - 444:16, 445:3, 466:14, 466:16, 466:18, 466:20, 467:12, 479:14
**bank** [5] - 418:12, 466:15, 468:13, 470:15, 474:13
**banking** [2] - 444:5, 458:21
**bartering** [1] - 526:15
**based** [20] - 361:10, 364:2, 377:20, 383:23, 385:9, 385:17, 398:10, 402:2, 410:7, 441:4, 443:4, 453:23, 464:2, 468:25, 474:24, 485:21, 502:10, 511:13, 513:15, 522:15
**Based** [4] - 414:8, 459:7, 469:18, 481:21
**basic** [2] - 472:9, 472:16
**basis** [1] - 383:23
**bathroom** [2] - 432:9, 433:14
**BC** [1] - 442:1
**became** [1] - 377:23
**become** [1] - 444:19
**becoming** [1] - 417:15
**BEFORE** [1] - 346:12
**beforehand** [1] - 519:19
**begin** [2] - 422:14, 494:2
**beginning** [8] - 347:24, 374:7, 395:23, 421:22, 479:6, 494:20, 508:22, 511:21
**begins** [5] - 406:9, 414:2, 505:18, 517:21, 521:17
**behalf** [5] - 482:1, 483:7, 491:18, 495:17, 504:16
**behind** [2] - 473:2, 525:6
**belief** [12] - 357:8, 393:21, 393:23, 511:17, 513:7, 516:12, 516:14, 516:19, 517:9, 517:14, 517:15, 520:7
**believe,eight** [1] - 476:16
**believes** [2] - 365:4, 515:25

**belong** [2] - 428:12, 524:12
**belonged** [1] - 444:1
**belongs** [1] - 516:16
**below** [2] - 357:9, 488:19
**beneficial** [1] - 367:23
**best** [5] - 347:13, 347:18, 408:25, 412:3, 514:18
**better** [5] - 374:3, 456:14, 472:5, 518:11, 528:14
**between** [12] - 366:5, 376:22, 423:9, 428:6, 435:18, 438:25, 451:24, 452:6, 453:9, 513:7, 514:3
**beyond** [18] - 484:25, 485:11, 485:16, 486:12, 511:9, 512:9, 514:15, 514:25, 516:4, 518:7, 519:4, 520:1, 520:2, 520:9, 520:20, 521:6, 521:20, 523:7
**bi** [1] - 460:12
**bi-yearly** [1] - 460:12
**Big** [13] - 450:16, 450:22, 451:9, 451:16, 451:18, 452:6, 452:10, 452:14, 453:3, 453:9, 453:15, 453:18, 454:9
**bigger** [1] - 504:4
**binder** [6] - 354:22, 391:10, 391:12, 410:16, 410:24, 414:3
**binders** [2] - 411:2, 412:19
**birth** [3] - 371:16, 463:12, 479:20
**bit** [19] - 353:13, 375:14, 376:20, 383:17, 400:4, 412:20, 412:21, 412:25, 420:9, 445:25, 467:16, 480:6, 485:21, 487:25, 511:19, 517:20, 519:21, 520:23, 527:11
**bitch** [2] - 442:15, 442:18
**Bitcoin** [79] - 348:3, 348:5, 348:9, 348:21, 349:3, 356:17, 358:3, 358:4, 358:20, 358:22, 360:13, 360:14, 361:3, 361:4, 368:5, 368:14, 370:16, 371:6, 371:9, 371:24, 372:2, 379:8, 379:11, 379:22, 380:4, 380:8, 380:9, 381:7, 382:4, 382:9, 382:15, 383:7, 383:25, 384:6, 390:7, 396:21, 397:1, 397:9, 397:23, 398:2, 398:10, 398:14, 399:5, 401:3, 413:16, 418:17, 418:19, 418:20, 422:18, 423:19, 426:8, 427:22, 428:7, 429:12, 432:15, 432:17, 432:18, 459:25, 460:3, 464:4, 469:14, 485:20, 485:21, 486:15, 488:5, 494:25, 495:6, 495:15, 495:24, 496:10, 496:21, 497:2, 498:17, 499:23, 500:1, 500:7, 500:11
**Bitcoins** [3] - 356:23, 422:21, 428:18, 444:4
**blew** [1] - 442:5
**block** [1] - 358:4
**blockchain** [3] - 398:11, 398:22, 399:8
**blow** [4] - 471:19, 472:2, 473:14, 475:2
**bluntly** [1] - 412:4
**book** [1] - 354:21
**books** [1] - 354:18
**booming** [3] - 363:14, 406:12, 406:16

**borned** [2] - 378:10, 378:14
**bottom** [6] - 354:6, 360:4, 409:6, 412:25, 446:18, 473:12
**Boulevard** [6] - 430:7, 430:15, 433:9, 434:20, 440:4, 441:22
**boxes** [1] - 474:1
**break** [9] - 405:12, 407:10, 407:13, 407:19, 456:5, 456:7, 482:20, 506:8, 522:12
**Bridge** [1] - 440:13
**brief** [2] - 456:19, 489:22
**briefly** [6] - 347:23, 454:18, 460:4, 490:7, 497:3, 510:14
**bring** [9] - 401:3, 403:23, 413:11, 413:13, 434:8, 484:18, 489:16, 493:6, 532:11
**broader** [1] - 368:21
**Broadway** [1] - 386:21
**broker** [1] - 468:13
**Brooklyn** [5] - 346:6, 346:16, 440:11, 440:13, 440:15
**brought** [4] - 356:1, 378:24, 411:10, 487:23
**BSA** [4] - 478:18, 479:12, 479:13, 479:14
**BTC** [15] - 418:19, 428:17, 428:20, 429:3, 430:4, 432:17, 434:6, 434:9, 434:11, 434:12, 434:14, 436:10, 440:1, 440:2, 441:19
**bubble** [2] - 452:12, 452:13
**bubbles** [4] - 428:12, 428:13, 453:2
**bucks** [1] - 357:1
**buddy** [1] - 365:11
**build** [1] - 487:3
**building** [1] - 475:7
**buildings** [1] - 386:18
**bullet** [1] - 488:17
**bullet-proof** [1] - 488:17
**bulletproof** [3] - 355:23, 356:1, 356:3
**bums** [1] - 439:13
**bunch** [1] - 427:21
**bundles** [1] - 395:24
**burden** [4] - 505:18, 507:23, 512:5, 522:20
**bureau** [1] - 467:19
**Bureau** [3] - 458:15, 458:17, 458:20
**burner** [3] - 443:2, 443:5, 443:6
**business** [114] - 363:13, 363:18, 364:24, 365:10, 383:7, 384:18, 385:15, 385:18, 386:1, 386:3, 386:5, 387:20, 394:22, 395:5, 400:22, 401:22, 401:24, 405:17, 405:22, 405:23, 406:1, 406:9, 406:16, 406:22, 407:2, 408:6, 408:9, 409:8, 409:10, 409:12, 410:19, 439:17, 440:24, 444:16, 446:8, 459:9, 459:12, 459:25, 460:20, 460:25, 461:10, 462:23, 468:15, 468:18, 468:24, 468:25, 469:2, 469:13, 469:20, 469:23, 469:25, 470:1, 470:2, 470:10, 470:12,

471:7, 472:10, 472:13, 472:14,
472:16, 472:25, 473:3, 473:5, 473:9,
473:19, 473:24, 474:10, 475:11,
475:21, 476:12, 476:14, 477:3,
477:12, 479:1, 481:19, 481:24,
485:19, 486:16, 494:22, 495:13,
495:14, 496:15, 496:16, 496:18,
497:15, 497:16, 498:21, 498:22,
499:5, 499:12, 499:13, 523:14,
523:19, 523:20, 524:3, 524:20,
524:25, 525:3, 525:16, 525:20,
525:23, 525:25, 526:7, 526:8, 526:10,
526:12, 526:13, 526:18, 526:20,
527:8, 527:13
**Business** [1] - 471:4
**businesses** [9] - 373:2, 458:23,
462:13, 468:23, 473:9, 474:20,
476:23, 481:11, 525:19
**buy** [6] - 365:9, 407:4, 429:11, 434:9,
434:12, 441:19
**buyer** [3] - 360:14, 361:4, 429:3
**buyers** [1] - 426:24
**Buying** [1] - 431:15
**buying** [5] - 375:6, 384:25, 431:14,
432:15, 440:1
**BY** [34] - 346:16, 350:2, 352:8, 354:24,
358:16, 359:2, 361:17, 363:8, 370:1,
372:11, 400:2, 408:3, 415:23, 421:9,
434:1, 443:23, 444:12, 445:12, 447:4,
450:24, 452:21, 453:13, 454:20,
458:5, 466:5, 481:6, 533:6, 533:7,
533:8, 533:11, 533:12, 533:13,
533:15, 533:17
**BY:EMILEE** [1] - 346:22
**bye** [2] - 437:4, 437:17

## C

**Cadman** [2] - 346:15, 346:24
**California** [36] - 356:5, 356:8, 356:12,
363:21, 364:3, 365:10, 366:1, 366:5,
366:6, 366:21, 372:23, 373:2, 373:5,
373:6, 373:10, 373:13, 373:15,
373:22, 375:6, 375:11, 375:16,
375:23, 376:2, 376:12, 376:15,
376:17, 400:24, 404:19, 405:2,
405:20, 409:2, 411:10, 486:18, 487:2
**cameras** [4] - 386:18, 386:19, 387:1,
439:11
**cancelled** [1] - 438:3
**cannabis** [13] - 363:19, 363:21,
363:25, 365:10, 373:14, 375:6,
375:10, 406:23, 406:24, 407:4, 486:17
**cannot** [2] - 484:7, 513:17
**capacity** [4] - 367:19, 412:2, 423:25,
503:18
**car** [20] - 355:23, 367:17, 368:13,
386:13, 386:20, 387:1, 389:18, 392:6,
393:14, 394:1, 394:4, 395:20, 398:5,
398:23, 399:4, 399:16, 406:4, 437:16,

448:22, 488:16
**care** [2] - 360:15, 526:2
**cared** [2] - 395:11, 395:12
**career** [1] - 416:13
**careful** [2] - 420:8, 481:3
**carried** [9] - 523:21, 523:23, 524:1,
524:13, 524:19, 524:25, 526:21,
527:9, 527:17
**carrying** [1] - 425:6
**case** [43] - 357:12, 363:1, 367:7,
388:19, 407:14, 420:7, 421:5, 421:7,
421:14, 421:18, 421:19, 421:22,
424:9, 448:15, 456:8, 461:15, 461:18,
474:16, 477:20, 478:3, 483:3, 489:14,
490:23, 491:24, 492:5, 494:5, 500:1,
500:4, 506:14, 509:13, 509:17, 510:7,
510:10, 510:15, 510:20, 511:2,
511:14, 524:11, 529:1, 529:24, 529:25
**cases** [3] - 416:21, 416:23, 509:23
**cash** [33] - 355:2, 356:17, 356:21,
359:4, 368:8, 368:12, 370:17, 371:6,
371:8, 378:24, 379:21, 389:19,
395:24, 396:7, 396:21, 397:5, 397:11,
397:16, 399:12, 399:20, 422:18,
423:19, 427:23, 428:7, 428:17,
429:12, 439:25, 459:22, 459:25,
460:3, 464:4, 469:14
**cashers** [1] - 469:3
**cashing** [1] - 473:21
**casino** [1] - 468:13
**catching** [1] - 442:12
**caught** [1] - 389:9
**CAUSE** [1] - 346:11
**CD** [2] - 532:5, 532:6
**CDs** [1] - 532:11
**cell** [1] - 401:6
**cellphone** [3] - 443:3, 443:5, 443:6
**centered** [1] - 418:6
**certain** [11] - 373:6, 399:6, 467:23,
467:25, 468:16, 470:5, 470:6, 473:9,
475:25, 476:3, 479:16
**certainly** [9] - 399:3, 406:7, 487:18,
491:14, 491:22, 492:8, 502:7, 508:25,
526:13
**certificate** [1] - 446:16
**certification** [2] - 462:11, 462:20
**certifications** [1] - 459:4
**certified** [3] - 446:8, 459:6, 478:17
**cetera** [8] - 440:9, 495:9, 498:25,
518:9, 520:21, 520:22
**chain** [1] - 358:4
**chance** [1] - 440:5
**change** [8] - 382:4, 456:12, 494:24,
501:20, 517:20, 523:10, 528:8, 528:22
**changes** [2] - 374:13, 527:3
**changing** [1] - 496:15
**character** [3] - 385:24, 385:25, 411:25
**characterize** [1] - 468:25
**charge** [24] - 347:7, 347:18, 348:2,
416:23, 421:21, 489:12, 489:18,

490:17, 490:19, 491:6, 493:5, 495:6,
496:14, 504:14, 505:22, 505:25,
506:2, 511:7, 511:23, 512:8, 522:5,
522:8, 530:21, 531:16
**charged** [13] - 370:22, 394:5, 485:2,
514:19, 515:3, 516:7, 518:8, 519:17,
520:4, 520:11, 521:21, 523:7, 527:20
**charges** [4] - 494:12, 525:8, 530:23,
530:24
**charging** [4] - 348:2, 379:6, 489:22,
525:13
**chart** [1] - 370:15
**charts** [1] - 530:15
**chat** [1] - 360:1
**check** [5] - 380:10, 429:14, 469:2,
473:21, 473:25
**checked** [1] - 377:9
**checking** [3] - 444:16, 445:4, 456:3
**checks** [1] - 460:10
**chemistry** [1] - 418:1
**CHEN** [2] - 346:12, 347:2
**choose** [1] - 509:1
**chop** [1] - 356:10
**chopped** [2] - 402:10, 487:1
**chose** [7] - 388:5, 388:6, 388:8,
388:12, 514:2, 515:20, 517:25
**Circuit** [2] - 509:18, 510:16
**circumstances** [5] - 361:11, 408:15,
506:25, 507:8, 508:1
**cite** [1] - 486:19
**City** [2] - 417:17, 436:18
**city** [2] - 431:5, 431:11
**civil** [1] - 456:13
**clarification** [1] - 361:21
**clarify** [1] - 495:5
**clarifying** [1] - 364:14
**clarity** [3] - 366:19, 451:15, 479:13
**clean** [1] - 528:22
**clear** [11] - 348:3, 348:20, 348:23,
363:24, 388:20, 486:20, 487:20,
489:6, 490:7, 503:2, 515:9
**Cleared** [1] - 431:14
**clearer** [4] - 472:3, 483:22, 503:13,
503:15
**clearly** [3] - 375:2, 395:4, 527:19
**clerk** [2] - 456:21, 523:1
**click** [1] - 476:12
**client** [3] - 491:18, 491:22, 502:9
**close** [5] - 386:14, 410:16, 489:24,
490:4, 490:5
**closed** [5] - 509:10, 515:16, 519:6,
520:21, 521:3
**closer** [3] - 416:16, 466:23, 488:19
**closing** [9] - 490:15, 492:2, 492:3,
493:21, 493:25, 529:5, 529:10,
530:16, 531:4
**closings** [2] - 492:19, 528:25
**clothing** [1] - 422:6
**club** [2] - 384:20, 384:21

**cocaine** [4] - 401:14, 401:15, 401:18, 402:4
**Code** [2] - 498:15, 524:23
**coffee** [4] - 430:22, 433:14, 434:25, 435:1
**coherent** [2] - 490:14, 491:18
**coin** [1] - 439:25
**CoinBase** [3] - 402:13, 428:21, 487:6
**college** [1] - 487:1
**College** [1] - 417:25
**comfortable** [2] - 358:10, 406:7
**coming** [7] - 361:22, 362:12, 363:18, 363:25, 364:1, 364:4, 440:12
**comings** [1] - 424:22
**comment** [2] - 494:12, 503:6
**comments** [1] - 489:23
**commercial** [11] - 523:20, 523:22, 523:25, 524:13, 525:5, 526:4, 526:13, 526:17, 526:20, 527:9, 527:18
**commission** [1] - 370:18
**commissions** [1] - 370:22
**common** [1] - 402:2
**commonly** [1] - 466:10
**communicated** [1] - 426:23
**communicating** [2] - 427:25, 451:7
**communication** [1] - 425:8
**communications** [3] - 377:1, 423:9, 454:13
**companies** [4] - 459:8, 461:9, 469:19, 477:11
**company** [2] - 523:24, 524:6
**complaint** [1] - 491:23
**completely** [2] - 411:25, 420:6
**completes** [1] - 470:11
**completing** [1] - 469:25
**Compliance** [2] - 467:8, 467:9
**compliance** [1] - 472:15
**computer** [7] - 444:1, 444:3, 494:10, 531:15, 531:19, 532:3, 532:9
**Computer** [1] - 346:25
**Computer-Aided** [1] - 346:25
**computers** [2] - 418:12, 449:24
**COMR** [1] - 437:13
**conceal** [2] - 486:8, 489:11
**concept** [1] - 518:5
**concern** [12] - 390:19, 392:5, 393:10, 394:16, 409:24, 490:25, 502:12, 505:9, 505:13, 519:10, 520:24, 522:10
**concerned** [16] - 363:1, 389:7, 390:15, 390:21, 390:22, 393:13, 394:4, 394:10, 394:13, 487:10, 487:15, 487:17, 493:2, 521:17, 524:24, 527:11
**concerns** [2] - 389:4, 505:5
**conclude** [2] - 464:2, 481:22
**conclusion** [2] - 511:9, 515:14
**conclusions** [2] - 463:11, 463:22
**conduct** [11] - 459:11, 460:19, 461:14, 462:22, 469:1, 469:22, 475:13, 477:19, 501:19, 507:15, 526:3

**conducted** [8] - 370:16, 396:21, 453:25, 461:12, 463:14, 477:14, 481:9, 495:9
**conducting** [5] - 470:3, 473:8, 473:24, 502:16, 510:22
**CONFERENCE** [1] - 346:11
**conference** [11] - 347:7, 347:18, 348:2, 419:6, 420:21, 456:14, 489:18, 489:22, 490:17, 490:20, 493:5
**confess** [2] - 495:20, 497:19
**confirm** [4] - 354:8, 361:24, 372:1, 477:25
**confirmation** [7] - 379:14, 398:8, 398:13, 398:14, 398:24, 399:4, 399:7
**confirmations** [10] - 358:5, 358:6, 358:8, 398:11, 399:8, 399:21, 399:23, 400:3, 400:12, 400:21
**confirmed** [2] - 398:6, 483:10
**confirming** [2] - 510:24, 511:11
**conflicting** [1] - 513:9
**confuse** [1] - 503:9
**confused** [2] - 476:18, 518:24
**confusing** [2] - 513:9, 525:2
**confusion** [3] - 348:12, 519:2, 527:11
**connection** [3] - 459:4, 461:15, 477:20
**conscious** [25] - 487:9, 509:6, 509:12, 510:1, 510:8, 513:15, 514:5, 515:1, 515:10, 515:15, 515:21, 516:5, 516:14, 516:15, 517:5, 518:3, 518:4, 519:11, 519:16, 520:10, 520:14, 520:25, 522:14, 528:12, 528:19
**Conscious** [1] - 509:19
**consciously** [18] - 510:24, 511:11, 513:4, 513:6, 513:20, 513:23, 513:24, 514:4, 514:10, 514:15, 514:16, 514:17, 515:10, 515:11, 515:25, 516:1, 519:15, 521:2
**consequence** [2] - 491:22, 492:22
**consider** [5] - 484:7, 486:11, 507:6, 507:22, 525:12
**considered** [1] - 500:2
**consistent** [4] - 363:18, 496:13, 496:22, 511:2
**conspiracies** [3] - 506:19, 506:22, 508:15
**conspiracy** [1] - 506:18
**constitutes** [1] - 496:21
**constitutional** [1] - 483:7
**consult** [1] - 497:19
**consumers** [1] - 459:18
**contact** [5] - 422:25, 423:1, 423:13, 472:15, 476:18
**contacted** [2] - 423:14, 442:17
**contained** [1] - 427:17
**contains** [1] - 452:13
**contents** [1] - 476:25
**context** [3] - 500:5, 508:14, 513:13
**contingent** [1] - 529:9
**continuation** [1] - 363:16
**continue** [13] - 353:12, 354:23,

355:20, 356:13, 357:22, 360:4, 360:10, 360:11, 364:10, 365:6, 366:8, 413:24, 495:16
**Continued** [11] - 369:8, 399:25, 400:1, 419:5, 420:22, 433:19, 455:10, 465:14, 480:8, 512:14, 513:1
**CONTINUED** [2] - 350:1, 533:5
**continued** [1] - 457:25
**continuing** [2] - 388:19, 434:1
**Continuing** [2] - 370:1, 481:1
**contrary** [1] - 517:4
**controlled** [5] - 364:4, 365:24, 408:17, 408:20, 495:9
**Controlled** [1] - 417:19
**controlling** [2] - 472:21, 473:5
**controls** [1] - 472:24
**convenience** [1] - 445:3
**conversation** [13] - 358:2, 363:10, 366:20, 375:13, 405:25, 438:19, 441:25, 451:18, 451:19, 486:20, 487:5, 489:5, 504:1
**conversations** [9] - 360:2, 376:12, 384:5, 436:1, 436:2, 438:25, 488:4, 488:17
**convert** [1] - 397:11
**convey** [2] - 388:3, 394:21
**convict** [1] - 513:17
**convicted** [7] - 511:24, 512:12, 514:20, 519:7, 519:18, 520:12, 521:24
**conviction** [1] - 511:6
**convince** [1] - 368:3
**convinced** [1] - 512:9
**cool** [1] - 432:6
**Cool** [2] - 432:7, 433:17
**copies** [1] - 528:2
**copy** [5] - 446:5, 456:22, 528:22, 530:4, 531:12
**cord** [1] - 481:3
**corner** [3] - 352:13, 432:10, 437:10
**Corp** [13] - 444:17, 444:18, 444:19, 444:22, 445:17, 445:23, 446:16, 462:22, 463:23, 463:25, 464:4, 481:17, 481:23
**corporate** [3] - 472:12, 472:13, 473:1
**corporation** [1] - 444:21
**correct** [140] - 347:9, 349:2, 351:7, 351:8, 352:18, 354:8, 372:14, 372:18, 373:23, 373:24, 373:25, 374:8, 374:19, 375:6, 376:3, 377:2, 377:3, 377:5, 377:6, 377:12, 377:15, 377:17, 378:17, 379:9, 380:5, 381:2, 381:8, 381:9, 381:19, 381:22, 382:15, 382:19, 383:10, 383:12, 383:13, 384:7, 384:12, 384:19, 385:15, 385:16, 385:20, 385:23, 386:2, 386:6, 386:23, 387:8, 388:23, 389:6, 389:21, 390:8, 391:25, 392:4, 393:9, 393:16, 394:2, 394:8, 394:24, 395:2, 395:3, 395:11, 395:21, 395:25, 396:4, 396:7, 396:24, 397:5, 397:11, 397:17,

397:20, 398:3, 398:10, 398:19,
398:20, 399:6, 399:24, 400:5, 400:18,
401:5, 401:7, 401:8, 401:10, 401:13,
401:16, 402:17, 403:1, 403:3, 403:13,
403:18, 403:20, 404:1, 404:25,
406:25, 407:6, 415:5, 432:19, 436:16,
438:13, 447:9, 447:12, 447:17,
447:20, 447:22, 448:4, 448:6, 448:9,
448:18, 448:23, 449:1, 449:12,
449:15, 449:17, 449:18, 450:8, 450:9,
451:3, 451:5, 451:13, 451:19, 451:20,
452:5, 452:10, 452:11, 452:14,
452:24, 453:3, 453:4, 453:16, 453:21,
454:4, 454:10, 454:14, 454:15, 497:9,
497:10, 501:14, 523:25, 525:16,
527:1, 527:7
**Correct** [42] – 372:15, 377:13, 378:12,
378:20, 379:17, 379:19, 381:6,
381:11, 381:20, 381:23, 381:25,
382:8, 382:10, 382:16, 383:6, 383:21,
390:9, 392:8, 395:22, 396:1, 396:5,
397:3, 397:6, 397:10, 397:18, 397:25,
398:4, 399:18, 400:6, 400:14, 400:19,
400:23, 401:1, 406:2, 406:6, 406:13,
406:18, 406:21, 481:9, 483:12,
484:10, 499:20
**corrected** [1] – 523:11
**correctly** [2] – 358:3, 528:24
**corresponding** [1] – 474:1
**cost** [1] – 407:4
**costs** [1] – 525:22
**counsel** [3] – 347:24, 348:20, 408:5
**counsel's** [1] – 529:10
**count** [5] – 364:17, 379:3, 379:4,
437:6, 485:4
**Count** [3] – 348:2, 494:16, 523:7
**counted** [1] – 399:15
**counter** [5] – 355:2, 364:18, 364:19,
366:12, 487:11
**counting** [5] – 387:3, 387:4, 389:19,
390:7, 396:2
**country** [2] – 349:4, 475:9
**counts** [1] – 484:23
**couple** [5] – 357:7, 405:12, 405:13,
434:13, 488:8
**course** [12] – 382:2, 402:9, 444:20,
460:24, 471:7, 477:2, 479:1, 487:8,
487:23, 489:1, 490:17, 529:9
**COURT** [255] – 346:1, 347:4, 347:9,
347:15, 348:14, 348:25, 349:6,
349:10, 349:15, 350:3, 351:1, 351:3,
351:11, 351:15, 352:4, 352:6, 352:24,
353:2, 353:17, 353:22, 353:25, 354:6,
354:10, 354:12, 354:17, 354:20,
361:15, 362:22, 363:1, 363:6, 369:2,
369:4, 369:6, 371:3, 371:5, 372:5,
372:8, 374:17, 374:24, 380:13,
380:15, 380:18, 391:7, 391:11,
391:19, 391:22, 393:22, 396:14,
396:19, 405:11, 405:15, 407:9,

407:17, 407:22, 409:17, 409:19,
409:25, 410:9, 410:16, 411:1, 414:19,
414:22, 414:24, 415:2, 415:5, 415:9,
415:18, 416:15, 416:18, 417:9,
417:11, 419:3, 420:2, 420:12, 420:15,
421:2, 421:16, 422:4, 422:9, 427:10,
427:13, 438:20, 438:24, 439:8,
444:11, 445:9, 446:3, 446:7, 446:11,
446:23, 447:1, 454:17, 455:5, 455:7,
456:1, 456:4, 456:12, 456:21, 457:5,
457:13, 457:24, 458:24, 459:1, 459:3,
462:2, 463:4, 463:6, 464:10, 464:14,
464:21, 465:13, 466:23, 467:1, 467:3,
470:20, 470:22, 471:13, 471:15,
471:25, 472:4, 478:10, 479:7, 479:9,
479:24, 480:3, 481:2, 482:4, 482:7,
482:9, 482:13, 482:16, 482:25, 483:5,
483:9, 483:13, 483:20, 484:1, 484:5,
484:11, 484:15, 484:18, 485:3, 485:8,
485:25, 489:25, 490:4, 490:12,
490:16, 491:5, 491:8, 491:11, 491:16,
491:20, 492:12, 492:18, 493:3,
493:11, 493:15, 494:9, 494:15,
494:18, 495:7, 495:19, 496:1, 496:4,
496:24, 497:6, 497:13, 497:17,
497:20, 497:25, 498:13, 498:20,
499:3, 499:11, 499:15, 499:20,
499:22, 500:9, 500:14, 500:17,
500:21, 501:1, 501:4, 501:9, 501:11,
501:14, 501:20, 502:1, 502:4, 502:6,
502:18, 503:2, 503:8, 503:16, 503:24,
504:7, 505:1, 505:4, 505:16, 505:19,
506:16, 508:5, 508:20, 509:4, 510:7,
510:12, 510:18, 511:3, 511:20, 513:2,
513:21, 513:24, 514:13, 515:8,
516:20, 517:2, 517:17, 518:15,
518:20, 519:23, 521:2, 521:13, 522:7,
523:1, 523:10, 523:15, 523:18, 524:4,
524:15, 525:11, 526:9, 526:22,
526:24, 527:4, 527:14, 528:1, 528:4,
528:10, 528:15, 528:18, 528:21,
529:5, 529:12, 529:14, 529:17,
529:20, 529:22, 530:5, 531:2, 531:16,
531:18, 531:23, 532:2, 532:12
**Court** [13] – 346:23, 500:24, 504:18,
504:19, 504:24, 505:25, 506:13,
507:21, 509:2, 510:11, 522:6, 526:20,
526:24
**court** [11] – 347:1, 347:19, 396:16,
404:4, 417:13, 421:1, 459:1, 482:24,
483:23, 483:25
**Court's** [2] – 506:2, 506:15
**Courthouse** [1] – 346:5
**courtroom** [8] – 407:16, 407:21,
415:12, 421:23, 457:4, 482:23,
493:10, 494:8
**COURTROOM** [21] – 380:24, 381:14,
391:4, 391:6, 404:14, 407:15, 415:14,
427:12, 446:5, 456:10, 457:3, 457:16,
457:21, 464:25, 465:5, 465:8, 482:22,

493:9, 494:7, 528:3, 531:14
**courts** [2] – 349:4, 495:5
**cover** [13] – 354:3, 354:15, 356:7,
363:16, 382:13, 394:23, 395:5,
400:21, 412:2, 412:3, 423:23, 458:12,
478:18
**covers** [1] – 458:13
**crazy** [1] – 353:25
**create** [1] – 522:22
**created** [3] – 462:25, 471:6, 478:25
**creates** [1] – 517:2
**credit** [1] – 468:13
**Crime** [1] – 417:18
**crime** [4] – 417:23, 485:13, 523:7
**Crimes** [1] – 466:9
**crimes** [1] – 485:1
**CRIMINAL** [1] – 346:11
**Criminal** [3] – 458:15, 458:16, 458:20
**criminal** [4] – 368:4, 458:11, 459:5,
488:15
**critical** [1] – 506:14
**CROSS** [4] – 400:1, 447:3, 533:7,
533:12
**cross** [7] – 348:8, 372:9, 372:10,
408:4, 408:5, 413:25, 473:10
**CROSS-EXAMINATION** [4] – 400:1,
447:3, 533:7, 533:12
**cross-examination** [4] – 348:8,
372:10, 408:4, 408:5
**crowd** [1] – 437:24
**crummy** [1] – 530:10
**cry** [1] – 442:15
**cryptocurrency** [3] – 358:19, 459:22,
469:14
**crytocurrencies** [1] – 418:6
**crytocurrency** [4] – 417:7, 418:13,
418:14, 426:24
**cultural** [1] – 384:25
**culture** [1] – 402:3
**curative** [1] – 420:4
**cure** [1] – 420:16
**currency** [40] – 348:9, 348:10, 418:2,
418:9, 418:10, 418:14, 418:16,
418:22, 425:7, 469:10, 469:11, 476:2,
494:22, 495:3, 495:22, 495:24,
496:19, 496:21, 497:2, 497:7, 497:9,
498:2, 498:6, 498:10, 498:11, 498:16,
498:17, 498:18, 498:24, 499:6, 499:8,
499:9, 499:15, 499:16, 499:17,
499:24, 500:2
**current** [4] – 458:19, 467:7, 499:8,
511:2
**custody** [2] – 448:5, 448:8
**custom** [1] – 385:7, 385:14
**customer** [31] – 429:1, 429:9, 429:16,
430:2, 430:12, 430:25, 431:8, 431:21,
431:25, 432:5, 432:13, 432:21, 433:5,
433:12, 434:4, 434:16, 434:21, 435:6,
436:8, 436:14, 437:1, 437:19, 439:23,
440:10, 440:18, 441:18, 441:24,

442:10, 442:25, 443:11, 460:15
**customer's** [1] - 437:8
**customers** [5] - 426:11, 435:21, 460:8, 460:16, 474:24
**cut** [2] - 406:19, 407:2
**cuts** [1] - 525:14
**cyber** [1] - 417:5
**cycled** [1] - 364:19

# D

**d)(1)** [1] - 497:24
**d)(1)(A** [1] - 499:2
**dark** [8] - 359:16, 417:6, 418:25, 420:4, 420:6, 421:4, 421:7, 453:2
**database** [3] - 463:15, 464:1, 476:22
**date** [10] - 354:10, 371:16, 380:23, 397:2, 428:24, 429:7, 435:4, 441:14, 463:12, 479:20
**dated** [1] - 410:22
**dates** [3] - 351:5, 370:23, 481:12, 481:19
**day-to-day** [1] - 380:5
**daylight** [1] - 513:7
**days** [4] - 390:16, 390:23, 392:3, 470:2
**de** [1] - 420:16
**DEA** [23] - 367:16, 373:24, 374:2, 374:3, 374:12, 377:23, 385:4, 385:10, 415:3, 416:3, 416:5, 416:9, 416:10, 416:11, 416:20, 416:25, 417:15, 417:17, 418:21, 485:22, 501:21, 501:23, 502:3
**deal** [8] - 388:20, 425:13, 426:17, 430:17, 489:2, 489:8, 507:15, 531:25
**dealer** [7] - 361:25, 382:14, 386:20, 386:25, 387:5, 468:14, 487:3
**dealers** [7] - 386:14, 411:11, 411:15, 442:18, 442:20, 442:22, 489:3
**dealing** [12] - 386:10, 387:8, 387:9, 387:18, 388:16, 408:15, 411:20, 411:23, 487:1, 487:18, 488:1, 508:12
**deals** [2] - 439:2, 510:16
**dealt** [1] - 435:10
**December** [9] - 351:23, 381:12, 381:19, 383:17, 383:18, 383:22, 396:12, 430:25, 486:22
**decentralized** [1] - 418:10
**decide** [4] - 348:13, 488:3, 488:20, 507:7
**decided** [3] - 378:2, 483:2, 483:18
**deciding** [1] - 484:8
**decision** [7] - 483:17, 483:21, 484:2, 492:23, 492:25, 509:19, 511:14
**dedicated** [1] - 517:5
**defendant** [210] - 346:7, 347:16, 350:19, 350:21, 351:6, 351:21, 351:23, 352:11, 353:11, 355:2, 355:8, 355:11, 355:13, 355:17, 355:23, 355:25, 356:16, 356:20, 356:22, 356:24, 357:5, 357:10, 357:13,

357:16, 358:2, 358:20, 359:4, 359:6, 360:1, 360:23, 361:3, 361:18, 362:6, 362:12, 362:13, 362:14, 362:16, 362:18, 363:13, 363:17, 363:19, 363:24, 364:7, 364:14, 364:15, 364:23, 365:9, 365:15, 365:17, 365:20, 365:21, 366:1, 366:4, 366:12, 366:15, 366:20, 367:1, 367:6, 367:8, 367:15, 367:18, 367:22, 367:24, 367:25, 368:3, 368:5, 368:9, 368:13, 368:24, 370:3, 370:16, 370:17, 370:18, 370:21, 370:22, 371:8, 371:11, 375:25, 377:17, 395:6, 409:9, 410:7, 410:14, 410:18, 411:8, 411:9, 412:6, 412:9, 412:12, 413:6, 413:8, 413:14, 413:15, 413:20, 414:8, 422:10, 422:14, 422:21, 422:23, 423:13, 423:14, 424:12, 424:15, 424:19, 424:25, 425:4, 425:9, 425:11, 425:15, 425:19, 425:23, 425:25, 426:1, 426:3, 426:6, 426:8, 426:14, 426:19, 426:23, 427:25, 428:6, 428:12, 429:10, 429:16, 429:20, 430:3, 430:15, 430:17, 430:20, 431:19, 432:20, 433:4, 433:16, 434:7, 434:14, 434:19, 435:8, 435:16, 435:20, 435:23, 436:2, 436:14, 436:17, 437:2, 437:24, 438:11, 438:14, 439:1, 439:5, 439:9, 439:16, 439:24, 440:9, 440:21, 440:23, 441:21, 442:3, 442:13, 442:17, 442:19, 444:21, 444:24, 453:6, 485:12, 487:9, 488:11, 501:17, 502:5, 502:14, 502:17, 503:22, 504:3, 504:16, 506:4, 506:5, 507:17, 508:1, 508:23, 510:3, 510:4, 511:5, 511:9, 511:22, 512:1, 512:7, 513:12, 514:11, 514:15, 514:24, 515:1, 515:16, 516:5, 516:11, 516:18, 517:13, 519:5, 519:10, 519:15, 519:16, 520:3, 520:5, 520:6, 520:9, 520:21, 521:5, 521:7, 521:20, 522:20, 523:6, 527:19
**Defendant** [1] - 347:3
**DEFENDANT** [8] - 346:19, 483:12, 483:18, 483:24, 484:3, 484:10, 484:14, 484:17
**defendant's** [14] - 357:8, 359:15, 359:24, 360:5, 363:11, 367:16, 414:11, 424:22, 427:3, 427:16, 428:1, 428:16, 443:24, 489:1
**defendants** [2] - 364:25, 423:22
**defense** [21] - 347:24, 348:20, 408:5, 422:2, 483:3, 483:11, 484:21, 484:22, 487:11, 489:17, 493:7, 493:12, 493:13, 494:1, 511:14, 511:16, 512:5, 527:7, 528:5, 529:10, 531:6
**define** [1] - 525:20
**defined** [3] - 469:2, 469:9, 521:1
**defines** [1] - 495:9, 497:14, 526:10, 526:12

**definition** [13] - 496:14, 496:15, 496:22, 498:7, 498:21, 523:25, 524:10, 524:18, 524:23, 525:12, 525:23, 526:8, 526:17
**definitions** [1] - 498:20
**degree** [2] - 417:24, 417:25
**delay** [1] - 490:18
**delete** [3] - 434:10, 518:12, 520:18
**deleted** [2] - 359:23, 360:1
**deliberate** [4] - 492:9, 518:10, 520:5, 530:1
**deliberately** [5] - 509:10, 510:23, 515:16, 519:5, 521:25
**deliberation** [1] - 490:22
**deliberations** [3] - 490:24, 492:10, 494:3
**demonstrating** [4] - 514:24, 516:11, 516:17, 517:13
**denying** [4] - 485:8, 485:10, 508:17, 531:3
**Department** [19] - 417:18, 436:18, 456:20, 457:12, 458:8, 459:13, 460:6, 460:9, 460:18, 461:4, 461:8, 462:11, 462:21, 464:6, 464:20, 466:9, 467:19, 481:24, 486:4
**depiction** [2] - 350:20, 351:22
**depository** [2] - 468:12, 474:19
**DEPUTY** [21] - 380:24, 381:14, 391:4, 391:6, 404:14, 407:15, 415:14, 427:12, 446:5, 456:10, 457:3, 457:16, 457:21, 464:25, 465:5, 465:8, 482:22, 493:9, 494:7, 528:3, 531:14
**deputy** [2] - 415:12, 456:13
**describe** [7] - 353:9, 353:15, 357:10, 417:22, 424:19, 425:3, 427:19, 444:2, 476:13
**described** [2] - 476:14, 525:17
**describing** [1] - 356:20
**description** [1] - 505:23
**desire** [1] - 488:18
**despite** [1] - 489:6
**detail** [1] - 476:14
**detected** [1] - 487:10
**determined** [4] - 358:10, 367:7, 377:10, 378:13
**determining** [3] - 378:10, 508:22, 519:24
**devices** [4] - 427:6, 449:8, 449:20, 449:23
**difference** [2] - 502:17, 514:3
**different** [19] - 354:18, 354:21, 366:5, 375:15, 375:22, 384:10, 416:22, 418:18, 421:21, 427:21, 435:2, 439:11, 444:4, 449:23, 481:16, 498:23, 518:5, 523:15
**difficult** [1] - 531:21
**difficulties** [1] - 364:18
**dig** [1] - 511:18
**digital** [6] - 418:2, 418:9, 418:14, 418:16, 418:22, 447:13

**diligent** [3] - 479:22, 481:10, 481:17
**dining** [3] - 426:2, 448:1, 449:11
**DIOUF** [30] - 346:17, 415:3, 415:7, 415:23, 420:10, 421:9, 422:1, 422:11, 427:7, 438:23, 443:22, 443:23, 444:9, 444:12, 445:10, 445:12, 445:24, 446:9, 446:22, 446:25, 454:18, 454:20, 455:4, 456:3, 456:18, 456:24, 529:9, 529:13, 533:11, 533:13
**diouf** [2] - 434:1, 529:7
**Diouf** [1] - 421:8
**direct** [5] - 394:19, 428:3, 451:2, 458:4, 490:8
**DIRECT** [7] - 350:1, 415:22, 466:4, 533:5, 533:11, 533:15, 533:17
**directed** [1] - 420:14
**directing** [6] - 428:22, 429:22, 436:6, 436:20, 439:19, 441:9
**Directing** [1] - 429:5
**directly** [6] - 382:22, 385:2, 387:13, 415:15, 454:13, 513:9
**directs** [1] - 490:5
**dirty** [1] - 360:16
**discredit** [1] - 489:4
**discuss** [8] - 367:4, 385:12, 398:2, 482:18, 483:14, 483:16, 484:2, 523:3
**discussed** [2] - 436:3, 483:6, 484:4
**discusses** [1] - 500:5
**discussing** [7] - 352:10, 355:9, 355:10, 436:4, 495:12, 500:11, 510:25
**discussion** [2] - 398:1, 401:17, 411:22, 413:5, 414:8, 518:13, 526:1
**discussions** [3] - 376:11, 376:16, 376:19
**disguise** [2] - 486:8, 489:11
**disk** [1] - 532:9
**dismiss** [1] - 484:23
**dispel** [1] - 507:10
**dispels** [1] - 505:8
**dispensaries** [4] - 373:15, 373:21, 374:7, 374:15
**displayed** [1] - 368:22
**dispute** [5] - 347:25, 348:5, 486:7, 496:5, 511:10
**disregard** [6] - 420:5, 420:17, 421:3, 421:6, 518:10, 520:6
**disregarded** [1] - 522:1
**distribute** [1] - 408:23
**DISTRICT** [3] - 346:1, 346:1, 346:12
**District** [1] - 346:15
**division** [1] - 467:5
**docket** [1] - 380:15
**Doctrine** [1] - 509:20
**doctrine** [2] - 509:21, 509:22
**document** [5] - 444:13, 446:15, 461:22, 478:5, 478:22
**documentation** [1] - 475:10
**documentation/address** [1] - 475:5
**documents** [4] - 444:5, 445:13,

470:14, 476:13
**dollars** [4] - 426:21, 435:25, 436:3, 436:15
**done** [11] - 347:10, 388:23, 403:16, 405:13, 426:8, 492:13, 508:4, 525:6, 525:7, 531:4, 532:12
**door** [2] - 386:14, 430:21
**doors** [1] - 367:17
**dot** [3] - 437:5
**double** [1] - 437:17
**double-parked** [1] - 437:17
**doubt** [17] - 485:1, 485:11, 486:12, 511:9, 512:10, 514:15, 515:1, 516:5, 518:7, 519:4, 520:1, 520:3, 520:9, 520:20, 521:6, 521:20, 523:8
**down** [16] - 362:5, 407:17, 414:25, 415:1, 432:14, 443:22, 445:24, 449:11, 455:7, 475:16, 482:12, 506:8, 518:13, 518:15, 520:2, 522:12
**download** [2] - 427:15, 447:10
**downloaded** [1] - 447:8
**downtown** [1] - 440:20
**draft** [3] - 456:22, 494:12, 528:14
**drag** [1] - 379:15
**draw** [3] - 357:9, 365:4, 515:14
**drawers** [1] - 449:16
**dress** [1] - 439:12
**drive** [4] - 532:5, 532:7, 532:9, 532:11
**driver's** [1] - 371:16
**drives** [2] - 449:24, 449:25
**driving** [1] - 432:23
**dropped** [2] - 378:14, 382:9
**Drug** [5] - 408:11, 411:18, 416:3, 416:6, 502:20
**drug** [60] - 360:15, 361:5, 361:10, 361:24, 364:24, 375:1, 377:12, 377:24, 378:7, 382:14, 384:17, 385:8, 385:15, 385:18, 386:1, 386:3, 386:5, 386:9, 386:14, 386:20, 386:25, 387:5, 387:8, 387:9, 387:18, 388:16, 394:5, 401:21, 401:24, 408:6, 408:9, 408:13, 408:15, 411:11, 411:15, 414:13, 416:7, 417:20, 417:25, 442:18, 442:20, 442:22, 454:3, 454:14, 454:24, 486:14, 486:16, 486:24, 487:3, 487:18, 488:1, 488:6, 488:7, 489:1, 489:2, 508:12, 515:20, 517:18
**drugs** [24] - 363:17, 382:14, 382:21, 383:5, 383:7, 383:8, 384:1, 384:7, 384:12, 384:16, 385:1, 387:21, 411:12, 411:15, 411:17, 411:20, 411:23, 412:1, 412:3, 412:5, 453:20, 454:22, 489:7
**dude** [4] - 360:7, 360:13, 438:2, 442:15
**Dude** [1] - 360:23
**duly** [4] - 349:24, 415:19, 458:2, 466:2
**During** [4] - 371:11, 411:14, 411:18, 425:22
**during** [23] - 353:9, 353:15, 359:5,

363:9, 364:12, 366:10, 366:25, 367:12, 376:5, 376:8, 382:1, 384:12, 395:19, 400:7, 400:20, 423:21, 425:1, 425:20, 426:9, 438:14, 443:25, 444:18, 444:19
**duty** [3] - 461:5, 477:7, 513:12

**E**

**early** [4] - 456:5, 482:20, 493:3, 493:8
**earn** [2] - 525:7
**earned** [1] - 523:24
**earns** [1] - 524:6
**ears** [2] - 513:25, 515:12
**earth** [1] - 456:23
**easier** [5] - 432:3, 440:12, 495:4, 496:13, 504:5
**easily** [1] - 521:14
**East** [4] - 346:15, 352:13, 431:20, 431:23
**East/Brooklyn** [1] - 346:24
**EASTERN** [1] - 346:1
**Eastern** [1] - 346:15
**edit** [1] - 489:23
**educational** [1] - 417:22
**effect** [5] - 375:15, 387:2, 434:11, 499:23, 506:20
**effectively** [1] - 414:13
**effort** [1] - 487:3
**efforts** [1] - 395:16
**eight** [6] - 397:14, 428:21, 433:1, 436:23, 440:17, 443:14
**either** [9] - 348:14, 388:18, 454:13, 463:19, 482:2, 485:4, 488:22, 498:9, 527:6
**elaborate** [1] - 485:3
**electronic** [5] - 398:23, 427:6, 449:8, 449:20, 449:23
**electronics** [2] - 443:25, 453:24
**element** [10] - 485:1, 494:16, 506:7, 506:8, 507:24, 510:2, 515:3, 517:6, 520:7, 523:13
**elements** [5] - 485:14, 505:22, 505:23, 523:8, 523:11
**elicit** [2] - 357:14, 467:21
**Elmo** [1] - 480:2
**ELMO** [2] - 531:19, 531:20
**email** [3] - 466:22, 472:15, 476:21
**employed** [9] - 416:2, 416:3, 501:16, 501:18, 501:21, 501:23, 502:2, 502:14, 502:20
**employees** [1] - 477:10
**encountered** [1] - 506:21
**encrypted** [5] - 423:4, 423:7, 423:10, 423:12, 442:8
**end** [14] - 347:12, 347:17, 362:25, 421:22, 452:23, 453:9, 490:17, 490:24, 491:13, 492:10, 495:8, 503:19, 518:12, 521:12

**End** [1] - 420:21
**ended** [2] - 420:9, 493:17
**ending** [1] - 364:11
**enforcement** [8] - 417:16, 426:4, 466:22, 470:17, 473:8, 487:9, 487:16, 507:25
**Enforcement** [5] - 408:12, 411:18, 416:3, 466:9, 502:20
**engage** [3] - 459:8, 459:24, 469:19
**engaged** [10] - 397:20, 453:15, 454:2, 461:9, 469:8, 473:20, 477:12, 485:19, 488:14, 504:18
**engages** [3] - 469:13, 497:15, 499:5
**engaging** [3] - 485:16, 487:17, 487:18
**English** [1] - 476:16
**English)** [7] - 483:12, 483:19, 483:25, 484:4, 484:10, 484:14, 484:17
**enjoy** [2] - 456:7, 494:4
**enjoyed** [2] - 457:7, 526:6
**enormous** [1] - 390:10
**ensure** [3] - 370:20, 467:11, 468:4
**entail** [1] - 466:19
**enterprise** [7] - 523:20, 523:22, 524:1, 524:13, 525:5, 526:21, 527:9
**enters** [5] - 349:14, 407:21, 415:8, 457:4, 493:10
**entire** [10] - 361:11, 367:6, 400:7, 451:21, 451:23, 452:14, 458:13, 518:22, 522:11
**entirely** [2] - 484:11, 525:16
**entities** [8] - 460:19, 464:7, 473:1, 473:2, 478:23, 481:11, 482:2
**entity** [2] - 469:8, 472:12
**envelopes** [1] - 395:25
**equivalent** [2] - 469:10, 469:12
**erroneously** [1] - 496:10
**ers** [1] - 469:3
**especially** [3] - 354:22, 472:25, 508:14
**ESQ** [5] - 346:16, 346:17, 346:17, 346:19, 346:22
**essentially** [5] - 378:23, 384:24, 390:10, 393:10, 515:21
**establish** [4] - 438:20, 484:25, 510:4, 512:1
**established** [5] - 486:2, 514:24, 516:11, 516:17, 517:12
**establishing** [2] - 470:2, 512:5
**estimate** [1] - 529:14
**et** [8] - 440:9, 495:9, 498:25, 518:9, 520:21, 520:22
**ETA** [1] - 433:7
**ether** [1] - 398:24
**Ethereum** [1] - 418:18
**evening** [4] - 347:7, 347:18, 491:3, 494:4
**event** [1] - 434:9
**eventually** [1] - 423:18
**everywhere** [1] - 449:16
**evidence** [47] - 347:11, 350:24, 351:4,

352:2, 369:1, 369:5, 371:1, 376:22, 378:6, 380:12, 387:5, 392:25, 409:16, 409:17, 409:18, 410:3, 417:20, 427:8, 444:6, 444:25, 445:6, 445:18, 446:1, 446:12, 447:13, 450:22, 452:18, 453:14, 454:2, 463:2, 471:11, 479:5, 482:18, 484:24, 485:10, 485:17, 486:2, 486:19, 489:10, 490:10, 493:12, 504:13, 511:8, 517:25, 519:15, 530:17, 530:21
**Evidence** [2] - 417:21, 446:2
**exact** [1] - 449:21
**exactly** [5] - 357:17, 373:7, 442:1, 460:4, 490:9
**Exactly** [2] - 394:13, 399:14
**exam** [1] - 460:12
**examination** [5] - 348:8, 372:9, 394:20, 408:4, 408:5
**EXAMINATION** [17] - 350:1, 372:10, 400:1, 408:2, 415:22, 447:3, 454:19, 458:4, 466:4, 533:5, 533:7, 533:8, 533:11, 533:12, 533:13, 533:15, 533:17
**examined** [4] - 349:25, 415:20, 458:3, 466:3
**examiner** [1] - 459:6
**examiners** [1] - 460:11
**example** [2] - 469:2, 506:18
**example/K** [1] - 469:5
**example/K-FRPL** [1] - 469:5
**examples** [2] - 418:16, 505:24
**Except** [1] - 503:5
**exchange** [26] - 366:17, 368:11, 368:12, 368:13, 371:9, 380:8, 381:4, 381:7, 381:21, 381:24, 382:15, 383:8, 397:1, 397:7, 397:17, 413:15, 423:19, 428:24, 429:7, 459:21, 459:25, 460:3, 464:4, 469:16, 498:24, 526:14
**exchanged** [1] - 370:22
**exchanges** [1] - 426:9
**exchanging** [8] - 383:25, 422:18, 427:22, 436:15, 459:25, 469:14, 485:20, 486:15
**excluding** [1] - 396:25
**excuse** [1] - 408:4
**excused** [3] - 414:25, 455:8, 455:9
**executed** [1] - 447:21
**exempted** [1] - 517:23
**Exhibit** [110] - 350:6, 350:11, 350:15, 350:24, 351:4, 351:10, 351:12, 351:18, 352:2, 352:7, 352:23, 358:14, 358:15, 358:17, 358:24, 359:1, 359:3, 359:10, 359:12, 359:13, 360:3, 362:5, 362:21, 368:16, 368:20, 368:25, 369:5, 369:7, 370:6, 370:10, 370:14, 370:20, 371:1, 371:6, 380:19, 380:22, 381:15, 392:24, 404:11, 404:16, 412:18, 413:22, 413:25, 427:8, 427:25, 429:6, 429:23, 439:15, 439:16, 439:20, 441:10, 444:7, 444:8,

445:1, 445:2, 445:7, 445:11, 445:19, 445:20, 446:1, 446:12, 446:13, 450:21, 452:18, 452:20, 453:20, 461:25, 462:1, 462:7, 462:8, 462:11, 462:16, 462:17, 462:20, 462:24, 463:2, 463:8, 463:10, 463:13, 463:21, 463:24, 470:19, 471:1, 471:5, 471:11, 471:17, 471:19, 472:19, 474:4, 478:9, 478:11, 478:16, 478:17, 478:24, 479:5, 479:11, 479:18, 479:21, 481:8, 481:14, 486:21, 487:4, 487:20, 488:9, 488:25, 489:6, 533:19, 533:20, 533:21
**exhibit** [41] - 362:10, 381:16, 391:4, 392:23, 427:14, 427:17, 427:24, 428:4, 428:23, 429:5, 429:16, 429:19, 429:22, 430:19, 431:7, 431:18, 432:4, 432:12, 433:3, 433:11, 434:3, 434:16, 435:2, 435:3, 435:20, 436:6, 436:14, 436:20, 437:8, 437:19, 438:11, 440:8, 440:18, 441:10, 441:24, 442:10, 442:24, 443:10, 446:14, 475:15, 531:6
**exhibits** [2] - 530:6, 531:8
**exists** [1] - 511:7
**exits** [4] - 407:16, 456:11, 482:23, 494:8
**expect** [6] - 347:12, 348:1, 456:19, 472:16, 489:21, 529:23
**expected** [1] - 401:22
**expensive** [1] - 413:11
**experience** [12] - 385:3, 385:10, 385:17, 408:11, 411:11, 411:14, 414:15, 441:4, 443:4, 454:21, 459:7, 469:18
**explain** [7] - 354:25, 355:8, 414:15, 460:4, 471:21, 514:2, 530:5
**explained** [1] - 373:18
**explaining** [2] - 481:7, 517:5
**explicit** [1] - 508:15
**explicitly** [2] - 454:22, 507:16
**exposure** [1] - 501:5
**express** [3] - 506:3, 507:11, 507:18
**expressed** [9] - 389:17, 390:2, 390:19, 392:5, 393:25, 394:16, 439:16, 440:23, 488:1
**expressing** [2] - 389:25, 393:11
**expression** [1] - 508:15
**extent** [2] - 378:24, 490:9
**external** [2] - 449:24, 467:13
**extra** [1] - 524:24
**eyes** [5] - 509:10, 515:16, 519:6, 520:21, 521:4

**F**

**F.3d** [1] - 509:19
**fact** [20] - 374:6, 380:7, 382:1, 384:13, 387:20, 388:4, 389:17, 391:24, 393:6, 404:22, 411:22, 447:10, 449:4, 452:12, 484:7, 487:23, 510:24, 511:10, 511:11, 525:3

**facts** [2] - 520:6, 524:11
**factual** [2] - 348:24, 511:7
**factually** [1] - 395:15
**failed** [7] - 514:14, 519:4, 519:14, 520:8, 520:20, 521:6, 521:19
**failing** [1] - 525:23
**failure** [1] - 410:10
**fair** [7] - 350:20, 351:22, 352:16, 385:6, 449:3, 452:2, 529:22
**familiar** [16] - 418:2, 418:4, 421:10, 421:13, 430:14, 431:22, 431:23, 442:7, 443:5, 444:18, 444:19, 459:7, 460:22, 469:18, 476:25, 508:9
**fan** [1] - 532:10
**FAQ** [1] - 476:13
**far** [4] - 422:7, 434:20, 476:14, 481:2
**farm** [7] - 363:19, 365:10, 375:6, 375:10, 406:23, 406:24, 407:4
**farmers** [2] - 373:15, 373:19
**farms** [3] - 373:14, 373:20, 486:17
**Farms** [1] - 373:14
**favorable** [1] - 484:25
**favorite** [1] - 349:10
**Federal** [1] - 446:2
**federal** [6] - 365:24, 408:17, 408:20, 408:24, 449:4, 466:16
**federally** [7] - 365:15, 365:18, 365:21, 373:11, 374:19, 375:9, 375:19
**Feds** [1] - 375:19
**feds** [1] - 365:18
**fee** [31] - 379:6, 379:25, 382:7, 397:13, 459:15, 460:1, 469:16, 494:22, 495:14, 496:18, 499:13, 523:21, 523:23, 524:1, 524:2, 524:6, 524:9, 524:16, 524:21, 525:7, 525:9, 525:13, 525:18, 526:16, 526:22, 526:23, 526:24, 527:15, 527:22
**fees** [1] - 429:13
**fellow** [2] - 378:2, 388:14
**felt** [4] - 357:10, 360:25, 361:12, 492:13
**female** [5] - 425:5, 425:12, 426:12, 426:16
**few** [12] - 375:20, 408:6, 409:14, 426:10, 426:21, 429:18, 435:25, 436:3, 436:15, 438:23, 482:18, 500:22
**fictitious** [1] - 356:11
**fictitiously** [1] - 368:2
**Fida** [3] - 427:11, 528:1, 531:18
**fight** [2] - 384:20, 384:21
**figure** [1] - 487:13
**file** [7] - 467:24, 468:16, 470:4, 472:17, 473:9, 474:19, 475:25
**filing** [2] - 475:19, 476:4
**filings** [1] - 459:15
**fill** [2] - 429:3, 471:22
**final** [1] - 522:5
**Financial** [12] - 456:20, 457:12, 458:8, 459:13, 460:7, 460:18, 461:4, 461:8, 462:12, 462:21, 464:6, 466:9

**financial** [19] - 466:21, 467:11, 467:20, 467:21, 467:24, 468:4, 468:6, 468:7, 468:8, 468:10, 468:15, 469:1, 470:4, 474:14, 474:17, 474:18, 479:15, 488:13, 510:22
**FinCEN** [35] - 456:19, 466:10, 466:11, 466:13, 467:5, 467:16, 467:19, 467:22, 467:23, 468:11, 468:18, 469:25, 470:2, 470:16, 471:4, 471:8, 473:6, 473:7, 473:18, 474:15, 475:25, 476:10, 476:22, 477:7, 477:10, 477:19, 477:22, 478:5, 479:1, 479:19, 479:23, 481:9, 481:10, 481:18, 481:21
**FinCEN's** [1] - 477:3
**fine** [9] - 498:9, 498:12, 499:21, 500:6, 501:4, 504:6, 522:2, 528:9, 531:1
**fingers** [2] - 513:25, 515:12
**finish** [5] - 366:23, 490:19, 490:25, 492:9, 492:18
**finished** [2] - 490:8, 491:4
**first** [42] - 366:25, 380:7, 383:3, 383:20, 384:5, 384:16, 384:20, 385:22, 386:8, 387:8, 387:19, 389:24, 396:6, 397:19, 406:4, 415:19, 428:14, 429:4, 438:3, 460:6, 462:1, 463:9, 470:3, 483:1, 487:13, 490:16, 493:5, 493:22, 494:16, 494:21, 495:22, 501:9, 501:12, 507:3, 507:22, 508:3, 508:6, 508:22, 513:9, 519:23, 523:13, 531:21
**five** [6] - 362:12, 431:12, 437:7, 453:2, 474:5, 474:7
**Five** [1] - 432:8
**fixed** [1] - 523:16
**flagged** [1] - 516:25
**flash** [4] - 449:24, 532:5, 532:7, 532:11
**flip** [1] - 519:19
**flipping** [1] - 355:3
**Floor** [1] - 346:21
**floor** [1] - 444:23
**Florida** [1] - 418:1
**flying** [1] - 360:7
**focus** [4] - 378:3, 388:21, 417:3, 531:1
**focused** [2] - 397:20, 417:5
**focusing** [1] - 397:4
**Focusing** [1] - 397:7
**folks** [8] - 349:11, 407:11, 456:4, 456:14, 499:25, 528:4, 530:15, 530:22
**Folks** [1] - 407:19
**follow** [6] - 375:1, 424:22, 470:17, 493:23, 521:12, 530:11
**following** [12] - 369:8, 399:25, 420:1, 433:19, 465:14, 480:8, 504:17, 512:14, 519:22, 520:24, 522:3, 523:8
**follows** [5] - 349:25, 415:21, 458:3, 466:3, 516:22
**fool** [1] - 443:13
**foolish** [5] - 514:25, 516:12, 516:18, 517:8, 517:14
**FOR** [1] - 346:11

**foreign** [4] - 474:21, 475:8, 476:17
**forensic** [2] - 417:24, 417:25
**forgot** [1] - 485:22
**form** [9] - 371:14, 429:3, 470:1, 470:11, 471:6, 471:8, 473:11, 474:11, 475:2
**Form** [8] - 470:8, 470:9, 471:4, 471:22, 472:7, 475:19, 479:23, 481:18
**formal** [1] - 506:24
**former** [4] - 367:3, 408:11, 415:3, 485:22
**forms** [2] - 453:25, 481:19
**forward** [1] - 489:15
**four** [10] - 362:4, 384:5, 431:12, 436:25, 453:1, 473:13, 473:17, 473:18, 494:18, 523:8
**FRANCISCO** [1] - 346:17
**frankly** [1] - 356:1
**fraud** [1] - 459:6
**free** [2] - 464:15, 482:10
**frequently** [1] - 400:9
**Friday** [7] - 431:5, 431:9, 490:23, 490:25, 491:24, 492:13, 492:22
**friend** [3] - 355:13, 355:17, 375:18
**front** [7] - 363:12, 430:20, 430:24, 433:15, 433:16, 462:3, 480:4
**FRPL** [1] - 469:5
**fuck** [1] - 438:7
**fucked** [1] - 357:2
**full** [10] - 391:9, 391:13, 393:1, 403:2, 404:12, 409:6, 409:7, 412:24, 508:22
**fuller** [2] - 391:13, 490:14
**fully** [1] - 508:3
**fund** [5] - 348:3, 468:14, 498:5, 500:8, 500:12
**Funds** [2] - 500:13, 500:14
**funds** [29] - 349:5, 441:8, 443:20, 469:10, 469:11, 486:8, 494:24, 495:1, 495:3, 495:6, 495:14, 495:16, 495:17, 496:10, 497:4, 497:9, 497:16, 498:2, 498:10, 498:16, 498:18, 499:6, 499:8, 499:15, 499:25, 500:2, 500:5, 500:6, 500:12
**furiously** [1] - 530:9
**furniture** [1] - 481:4

# G

**gather** [1] - 480:4
**gears** [1] - 445:25
**general** [3] - 368:22, 460:15, 487:24
**Generally** [1] - 459:11, 469:22
**generally** [3] - 427:19, 444:2, 459:18
**generic** [1] - 409:11
**Gentlemen** [2] - 391:11, 457:6
**gentlemen** [4] - 353:2, 421:2, 482:16, 493:17
**geographic** [1] - 458:12
**geographical** [1] - 474:1

George [1] - 440:12
GILLIAN [1] - 346:16
given [2] - 396:4, 399:12
glasses [1] - 435:10
goings [1] - 424:22
Goklu [128] - 372:17, 372:21, 375:3, 375:5, 375:15, 375:21, 375:22, 376:5, 376:8, 376:16, 376:23, 377:1, 377:4, 377:11, 378:3, 378:7, 378:9, 378:15, 378:18, 378:24, 379:3, 379:4, 379:9, 379:24, 380:4, 382:1, 382:18, 383:3, 383:23, 384:5, 385:22, 386:8, 386:9, 387:7, 387:18, 387:20, 388:2, 388:3, 388:16, 389:4, 390:2, 391:24, 392:10, 392:16, 393:6, 393:25, 394:21, 394:22, 395:1, 395:9, 395:23, 396:22, 397:4, 397:19, 398:5, 398:12, 398:25, 399:12, 399:20, 399:22, 400:8, 400:11, 401:9, 401:17, 403:15, 403:20, 404:18, 405:7, 405:9, 405:16, 405:19, 406:9, 406:14, 407:3, 421:11, 421:23, 422:5, 422:10, 422:12, 422:13, 445:4, 446:20, 447:19, 447:25, 448:8, 448:17, 448:20, 448:24, 449:3, 451:7, 451:18, 452:6, 452:10, 453:5, 453:10, 453:15, 453:23, 454:1, 454:2, 462:13, 463:11, 463:12, 463:15, 463:17, 463:18, 464:3, 479:19, 481:22, 481:23, 483:6, 483:9, 484:16, 485:19, 486:13, 486:14, 486:23, 487:4, 487:12, 487:14, 487:21, 487:23, 487:25, 489:7, 489:14
GOKLU [1] - 346:6
Goklu's [10] - 398:9, 447:8, 447:22, 448:24, 450:7, 452:24, 488:4, 488:12, 488:18, 488:21
Gonzalez [2] - 529:24, 531:5
Gonzalez's [1] - 493:23
goods [1] - 524:8
government [3] - 456:1, 519:20, 527:4
Government [120] - 346:14, 348:16, 350:6, 350:14, 350:24, 351:4, 351:10, 351:18, 352:1, 352:2, 352:22, 352:23, 358:14, 358:17, 358:24, 359:3, 359:10, 359:13, 360:3, 362:4, 362:21, 368:16, 368:20, 368:25, 369:5, 404:11, 412:17, 413:22, 413:25, 415:3, 423:10, 425:24, 427:8, 427:24, 429:6, 429:22, 439:16, 439:19, 441:10, 444:6, 445:1, 445:6, 445:18, 445:25, 446:1, 446:12, 450:21, 452:18, 453:20, 457:8, 457:11, 463:1, 464:17, 464:19, 471:10, 479:4, 481:8, 481:14, 482:13, 482:15, 482:17, 484:25, 485:18, 486:21, 487:4, 487:20, 488:9, 488:25, 489:5, 489:13, 489:22, 490:9, 492:1, 492:3, 493:25, 494:1, 494:11, 494:20, 495:21, 495:23, 496:22, 498:5, 500:3, 500:19,

501:17, 501:19, 502:7, 502:14, 502:22, 504:17, 504:21, 504:23, 505:6, 505:10, 505:24, 506:1, 506:9, 506:11, 507:25, 509:1, 510:4, 510:12, 510:15, 512:3, 514:14, 515:18, 519:3, 519:14, 520:8, 521:6, 521:19, 523:7, 524:25, 528:7, 530:17, 533:19, 533:20, 533:21
Government's [45] - 347:10, 348:7, 370:6, 370:10, 370:13, 370:20, 370:25, 380:19, 380:21, 380:22, 392:24, 461:25, 462:1, 462:7, 462:8, 462:16, 462:17, 462:24, 463:2, 463:10, 463:13, 463:21, 463:24, 470:19, 471:1, 471:5, 471:11, 471:19, 472:19, 474:4, 478:9, 478:11, 478:16, 478:17, 478:24, 479:5, 479:18, 479:21, 500:25, 509:15, 524:15, 526:19, 526:25, 527:8, 528:9
governs [1] - 353:4
Grabbing [1] - 430:22
gray [2] - 359:15, 359:16
great [1] - 349:10
grew [1] - 373:19
gross [1] - 517:3
ground [2] - 388:19, 484:24
growing [2] - 373:1, 376:17
grown [1] - 373:14
guess [15] - 347:13, 371:21, 384:11, 387:17, 451:15, 452:12, 453:23, 489:17, 492:5, 498:4, 508:5, 514:17, 522:1, 525:22, 526:15
guessing [2] - 347:9, 431:12
guide [1] - 420:9
guilty [13] - 484:8, 485:12, 489:14, 509:23, 514:11, 516:10, 516:14, 516:16, 517:12, 517:22, 519:25, 523:6
Guilty [1] - 514:23
guy [8] - 356:5, 360:14, 360:15, 361:4, 361:5, 361:10, 435:10, 489:1
guys [2] - 522:2, 532:6

**H**

half [6] - 349:16, 366:25, 379:18, 381:24, 491:9, 492:6
Hamptons [1] - 356:17
hand [5] - 428:13, 428:14, 457:16, 464:25, 531:12
Hang [1] - 492:18
happy [1] - 420:10
hard [8] - 440:9, 449:24, 519:21, 520:24, 521:12, 521:13, 531:12, 532:8
harm [1] - 420:16
harmful [1] - 459:19
hastily [1] - 492:6
head [7] - 356:10, 402:10, 440:15, 452:15, 487:1, 514:22, 521:14
headed [1] - 430:10
heading [3] - 431:10, 433:7, 473:15

hear [15] - 353:4, 367:14, 405:3, 405:4, 405:7, 405:9, 410:1, 411:19, 421:6, 491:23, 492:12, 493:25, 503:22, 504:3, 514:1
heard [10] - 355:3, 405:3, 483:10, 486:2, 501:13, 501:22, 502:19, 503:25, 510:13, 515:18
hearing [1] - 515:13
hears [1] - 420:19
heart [1] - 531:2
heck [1] - 401:25
hedge [1] - 468:14
held [22] - 470:15, 495:5
hello [1] - 429:2
Hello [1] - 429:3
help [7] - 410:20, 467:11, 468:4, 468:6, 480:2, 516:8
helpful [1] - 474:21
helpline [2] - 476:19, 476:20
helps [1] - 360:18
hence [1] - 496:1
heroin [4] - 401:14, 401:15, 401:18, 402:5
hesitation [1] - 520:13
hi [3] - 359:18, 428:15, 441:19
Hi [5] - 428:17, 428:19, 432:23, 441:18, 441:21
hidden [1] - 505:9
hide [3] - 441:7, 443:20, 455:2
high [12] - 436:10, 474:11, 511:10, 518:7, 519:16, 520:3, 520:10, 520:21, 521:4, 521:5, 521:7, 521:21
highlight [1] - 504:22
highlighting [1] - 524:10
highly [1] - 385:10
himself [5] - 410:11, 485:21, 487:9, 487:17, 503:9
hint [5] - 383:17, 387:20, 394:22, 403:22, 420:20
history [4] - 359:23, 360:2, 434:10, 451:23
hm [1] - 508:20
hmm [2] - 378:25, 394:15
Hold [2] - 381:14, 501:20
holds [1] - 474:14
home [5] - 447:19, 448:3, 448:15, 448:16, 449:5
homey [2] - 431:2, 432:14
Homie [1] - 434:5
homie [1] - 430:6
Hon [1] - 347:2
honestly [4] - 486:10, 507:2, 525:11, 527:16
Honor [84] - 347:23, 350:4, 350:7, 350:23, 351:2, 351:9, 351:16, 352:5, 352:21, 354:2, 354:9, 354:11, 354:19, 361:14, 363:4, 369:3, 370:25, 371:4, 372:4, 374:23, 408:1, 409:15, 409:24, 410:4, 414:18, 414:20, 417:8, 422:1, 422:11, 439:7, 446:22, 455:6, 456:3,

456:18, 456:24, 457:10, 461:24,
463:5, 464:8, 464:18, 471:14, 480:1,
482:3, 482:5, 482:14, 483:4, 483:12,
483:18, 484:3, 484:10, 484:14,
484:17, 485:6, 485:24, 489:20,
489:24, 490:5, 491:1, 493:14, 494:14,
495:20, 497:3, 497:11, 498:12, 500:4,
500:20, 503:1, 503:13, 510:14,
510:21, 514:21, 516:10, 520:23,
521:9, 522:24, 524:17, 524:24, 527:1,
527:7, 528:7, 529:4, 529:7, 531:1,
531:11
**Honor's** [1] - 489:21
**HONORABLE** [1] - 346:12
**hookers** [3] - 355:15, 355:19, 488:12
**hope** [3] - 349:16, 457:5, 520:15
**Hopefully** [1] - 420:19
**hopefully** [2] - 445:7, 482:20
**hoping** [1] - 529:4
**hour** [5] - 379:18, 379:21, 490:20,
491:2, 491:9
**hours** [3] - 491:25, 492:6, 492:8
**house** [8] - 427:5, 448:20, 448:24,
449:1, 449:5, 449:9, 449:10, 449:14
**hug** [1] - 412:3
**huge** [1] - 434:8
**hundreds** [1] - 365:1

## I

**ID** [1] - 463:25
**idea** [6] - 374:9, 486:23, 487:24, 525:6,
525:8, 527:16
**identical** [1] - 510:25
**identification** [6] - 371:14, 450:14,
463:23, 470:14, 472:11, 478:9
**identified** [1] - 422:10
**identify** [2] - 377:16, 422:5
**identifying** [3] - 470:13, 473:3, 473:5
**identity** [1] - 472:10
**idiot** [1] - 355:13
**IE** [1] - 511:7
**ignore** [1] - 518:1
**illegal** [29] - 365:15, 365:21, 365:23,
374:19, 375:9, 375:19, 384:1, 384:7,
385:7, 385:12, 389:10, 389:20,
389:24, 486:7, 486:16, 487:7, 487:18,
488:7, 488:22, 489:7, 489:11, 506:6,
506:22, 507:9, 507:13, 508:14, 518:2,
518:19, 518:21
**illegality** [1] - 487:14, 508:16
**illegitimate** [1] - 395:8
**illicit** [1] - 507:15
**image** [2] - 350:9, 352:13
**imagine** [1] - 529:1
**imbalance** [1] - 517:3
**immediately** [2] - 395:20, 405:19
**implication** [1] - 454:12
**imply** [2] - 356:2, 361:12
**implying** [3] - 361:8, 387:13, 387:14

**important** [1] - 507:10
**importantly** [1] - 484:6
**improper** [1] - 504:20
**inclination** [1] - 395:7
**include** [6] - 417:6, 469:13, 496:10,
499:2, 511:1, 511:12
**included** [2] - 498:6, 526:20
**includes** [1] - 495:17
**including** [5] - 448:5, 470:5, 474:18,
474:19, 496:6
**inclusion** [2] - 505:20, 528:19
**inclusive** [1] - 500:7
**income** [1] - 360:15
**inconvenience** [1] - 390:11
**incorporation** [1] - 446:16
**indicate** [2] - 472:12, 488:20
**indicated** [17] - 372:20, 375:14, 381:1,
382:1, 382:13, 382:18, 392:10,
394:19, 395:20, 407:3, 447:7, 447:18,
447:25, 481:15, 483:8, 508:4
**indicates** [5] - 381:4, 479:22, 481:8,
481:9, 481:16
**indicating** [1] - 404:23
**indication** [2] - 357:12, 403:7
**indicative** [1] - 515:19
**indictment** [3] - 484:23, 530:18,
530:22
**individual** [4] - 356:21, 356:22,
421:11, 473:5
**individuals** [8] - 356:12, 385:11,
460:11, 460:19, 461:9, 464:7, 477:11,
488:14
**Infante** [1] - 348:8
**Infante's** [1] - 495:25
**infer** [2] - 506:24, 508:2
**inference** [2] - 488:22, 507:8
**infinite** [1] - 388:24
**inform** [2] - 426:3, 505:23
**information** [36] - 377:21, 380:16,
384:4, 400:12, 403:23, 447:16, 460:8,
460:15, 470:11, 470:12, 470:13,
470:16, 471:20, 471:24, 472:8,
472:10, 472:13, 472:16, 472:23,
473:3, 473:4, 473:6, 473:10, 473:11,
473:14, 473:16, 473:18, 473:22,
473:23, 474:2, 474:11, 474:15,
474:18, 475:10, 481:16, 491:13
**informing** [1] - 508:3
**initial** [2] - 492:2, 529:5
**initiate** [2] - 379:8, 397:23
**inject** [1] - 509:3
**input** [1] - 472:13
**inquire** [3] - 415:18, 457:24, 465:13
**inquiries** [1] - 466:20
**insert** [1] - 499:7
**inserting** [1] - 506:13
**inside** [8] - 363:11, 375:16, 375:23,
430:20, 437:3, 437:15, 448:25, 449:10
**instance** [1] - 495:22

**instead** [3] - 362:2, 498:5, 521:18
**institution** [4] - 468:4, 468:6, 468:12,
474:17
**institutions** [13] - 460:11, 466:21,
467:11, 467:13, 467:24, 468:9,
468:10, 468:15, 470:4, 474:14,
474:18, 474:19, 479:15
**instruct** [3] - 494:25, 495:15, 528:25
**instructed** [1] - 506:18
**instructing** [1] - 507:23
**instruction** [27] - 420:5, 420:19, 421:3,
499:8, 499:10, 504:19, 505:8, 506:17,
507:12, 509:6, 509:15, 509:16, 510:1,
510:9, 511:4, 511:13, 518:23, 520:18,
522:11, 522:14, 522:17, 522:19,
522:22, 527:23, 528:2, 528:12, 528:19
**instructions** [9] - 492:4, 493:23,
494:2, 507:14, 524:22, 530:4, 530:8,
530:11, 530:13
**intellectually** [1] - 515:13
**intend** [7] - 349:8, 483:4, 483:11,
493:12, 497:1, 504:16, 525:21
**intends** [1] - 347:16
**intensive** [1] - 399:1
**intent** [6] - 485:15, 486:8, 489:11,
525:24, 526:2, 527:14
**intention** [1] - 347:7
**intentions** [1] - 455:2
**interacted** [1] - 425:14
**interaction** [1] - 362:18
**interactions** [1] - 384:12
**interconnected** [1] - 418:12
**interest** [2] - 378:14, 488:1
**interested** [2] - 389:15, 389:16
**interesting0** [1] - 514:7
**interim** [1] - 456:21
**internal** [2] - 467:13, 476:4
**internally** [1] - 476:5
**interpretations** [1] - 389:15
**interpreted** [1] - 349:4
**interview** [7] - 425:19, 425:25, 426:9,
447:24, 449:11, 449:13, 454:1
**interviewed** [6] - 426:2, 426:3, 435:16,
435:24, 442:19, 447:25
**intricacies** [1] - 374:4
**introduce** [2] - 486:23, 525:21
**introduced** [1] - 376:21
**introducing** [1] - 490:10
**invading** [2] - 506:10, 508:25
**invasive** [1] - 507:3
**investigate** [6] - 416:6, 458:21,
501:17, 502:5, 502:14, 502:16
**investigating** [1] - 357:11
**investigation** [16] - 361:11, 367:23,
377:16, 388:20, 393:20, 421:10,
421:13, 421:15, 422:14, 424:13,
438:14, 444:20, 453:14, 453:23,
461:17, 478:3
**Investigations** [3] - 458:15, 458:16,
458:20

## ALL WORD INDEX
14

**investigations** [10] - 377:23, 417:3, 417:5, 417:6, 418:5, 418:22, 418:24, 501:19, 502:16
**investigative** [1] - 367:6
**investigator** [2] - 458:11, 459:5
**investment** [1] - 475:12
**involve** [1] - 521:22
**involved** [31] - 377:12, 384:17, 384:25, 385:1, 385:7, 385:15, 385:25, 388:4, 388:18, 401:24, 418:25, 424:2, 424:14, 424:20, 454:3, 461:17, 478:2, 486:14, 486:24, 488:14, 508:12, 511:23, 512:8, 512:11, 514:18, 515:3, 516:7, 518:8, 519:17, 520:4, 520:11
**involves** [1] - 525:13
**involving** [3] - 417:7, 418:22, 509:23
**IP** [1] - 442:16
**irregular** [1] - 385:11
**irrelevant** [3] - 420:6, 525:22, 525:24
**issue** [23] - 347:4, 347:5, 347:22, 348:12, 348:13, 348:19, 354:7, 388:16, 473:21, 486:7, 486:11, 489:10, 496:1, 496:7, 504:22, 506:13, 509:3, 514:9, 525:15, 528:5, 530:5, 531:11
**issued** [1] - 446:17
**issues** [4] - 349:10, 349:11, 486:10, 506:14
**it'll** [1] - 492:10
**item** [1] - 422:6
**items** [1] - 450:2
**iteration** [1] - 521:15
**itself** [3] - 506:13, 509:3, 509:22

### J

**jail** [5] - 390:15, 390:16, 390:21, 390:22, 391:24
**January** [18] - 351:24, 352:11, 354:10, 358:21, 359:6, 392:9, 392:10, 392:17, 392:23, 396:12, 402:16, 410:22, 412:6, 425:4, 426:13, 481:12, 481:19
**Jay** [1] - 417:25
**Jersey** [1] - 440:12
**job** [8] - 355:15, 418:7, 458:10, 458:19, 467:7, 467:9, 502:15, 506:15
**jobs** [1] - 417:16
**jog** [1] - 426:16
**John** [1] - 417:25
**joke** [1] - 438:1
**judge** [4] - 347:6, 349:2, 464:13, 479:8
**Judge** [7] - 380:16, 414:23, 483:25, 484:22, 493:2, 496:12, 522:4
**JUDGE** [1] - 346:12
**July** [9] - 416:2, 416:3, 416:24, 422:20, 422:22, 435:5, 467:15, 481:13, 481:20
**jump** [4] - 381:12, 507:24, 518:6, 520:2
**June** [1] - 416:14
**jurisdiction** [2] - 474:23, 475:13

**juror** [2] - 505:9, 511:8
**jurors** [5] - 407:22, 411:1, 491:23, 507:14, 531:13
**jury** [84] - 347:8, 348:11, 348:13, 349:14, 350:25, 352:3, 352:23, 353:9, 353:15, 353:18, 355:8, 358:13, 358:25, 359:10, 363:9, 369:1, 371:2, 387:15, 391:8, 409:15, 409:18, 409:20, 410:11, 420:5, 427:9, 444:9, 445:1, 446:9, 460:4, 463:3, 463:21, 467:16, 471:12, 471:21, 479:6, 480:4, 484:7, 484:18, 485:11, 485:19, 486:11, 488:3, 488:20, 489:4, 489:13, 489:16, 489:18, 491:6, 492:13, 492:22, 492:24, 493:4, 496:8, 496:9, 501:2, 503:10, 504:4, 505:23, 506:19, 506:21, 506:23, 507:10, 507:23, 508:3, 508:9, 508:25, 509:7, 514:8, 514:9, 518:23, 525:2, 525:14, 527:18, 528:24, 529:24, 530:4, 530:6, 530:7, 530:12, 530:18, 530:23, 531:5, 531:8, 531:16
**Jury** [10] - 407:16, 407:21, 409:5, 421:1, 456:11, 457:4, 482:23, 482:24, 493:10, 494:8
**jury's** [1] - 490:18

### K

**KASSNER** [123] - 346:16, 347:23, 348:17, 350:2, 350:4, 350:23, 351:9, 351:16, 352:1, 352:8, 352:21, 352:25, 353:5, 353:8, 353:21, 353:23, 354:2, 354:9, 354:11, 354:14, 354:19, 354:24, 355:5, 355:20, 356:13, 357:22, 358:12, 358:16, 358:23, 359:2, 359:9, 361:17, 362:20, 362:23, 363:8, 364:10, 365:6, 368:15, 368:25, 370:1, 370:5, 370:25, 408:1, 408:3, 410:4, 410:13, 412:16, 413:3, 413:24, 414:6, 414:20, 457:10, 458:5, 461:24, 462:15, 463:1, 463:9, 463:20, 464:8, 464:18, 466:5, 470:18, 470:21, 470:23, 471:10, 471:18, 472:2, 472:18, 473:12, 474:3, 475:1, 475:15, 478:7, 478:19, 479:4, 480:1, 481:1, 481:6, 482:3, 482:5, 482:14, 485:24, 489:20, 494:14, 494:16, 494:19, 495:11, 495:20, 496:3, 497:3, 497:11, 497:14, 497:18, 497:24, 498:8, 500:4, 500:13, 500:20, 502:22, 503:5, 503:13, 503:23, 504:2, 510:14, 510:20, 514:21, 516:9, 516:21, 517:15, 519:21, 524:17, 525:8, 527:1, 527:7, 528:7, 529:3, 529:7, 530:25, 532:10, 533:6, 533:8, 533:15, 533:17
**Kassner** [6] - 347:5, 347:21, 350:3, 353:17, 354:23, 407:25
**Keep** [1] - 407:13
**keep** [15] - 361:1, 390:16, 392:2,

392:18, 420:17, 456:9, 467:25, 468:16, 470:6, 474:13, 476:3, 488:18, 494:6, 502:23, 518:22
**keeping** [3] - 475:9, 476:5, 479:16
**kept** [3] - 400:16, 460:24, 477:2
**key** [2] - 401:11, 402:4
**KEYS** [1] - 486:23
**keys** [6] - 401:7, 401:14, 401:19, 401:21, 486:22, 503:7
**kids** [1] - 487:1
**killed** [1] - 443:16
**kind** [9] - 358:5, 385:18, 451:11, 473:16, 474:11, 485:15, 508:15, 509:12, 510:8
**kinds** [1] - 468:10
**know,business** [1] - 475:11
**know,if** [1] - 476:17
**knowing** [2] - 485:16, 513:6
**knowledge** [19] - 374:18, 408:25, 485:16, 486:7, 488:21, 507:17, 509:23, 510:3, 511:6, 511:17, 513:7, 513:15, 514:23, 516:10, 516:17, 517:12, 517:22, 518:15, 519:25
**known** [7] - 418:14, 418:19, 463:12, 466:10, 468:14, 475:23, 481:23
**knows** [2] - 402:4, 402:8
**KYC** [3] - 460:7, 460:14

### L

**L-I-E-F-K-E** [1] - 415:17
**L.A** [1] - 360:8
**lab** [1] - 450:2
**labeled** [1] - 450:17
**labels** [3] - 444:5, 445:16, 445:22
**Laboratory** [1] - 417:18
**laboratory** [2] - 417:23, 447:13
**lack** [2] - 511:5, 511:16
**Ladies** [2] - 391:11, 457:6
**ladies** [4] - 353:2, 421:2, 482:16, 493:17
**lame** [1] - 443:15
**landed** [2] - 358:7, 521:15
**language** [13] - 496:7, 499:1, 500:25, 514:10, 519:5, 521:11, 521:23, 522:5, 522:16, 522:18, 526:20, 528:13, 528:15
**languages** [1] - 476:17
**laptop** [2] - 532:3, 532:4
**large** [4] - 364:16, 389:18, 425:6, 472:1
**larger** [4] - 357:9, 377:18, 436:3, 436:5
**last** [15] - 354:4, 359:24, 361:15, 413:18, 431:25, 450:5, 450:10, 452:13, 453:7, 485:21, 511:21, 518:12, 520:18, 521:15, 521:16
**late** [2] - 442:1
**latter** [1] - 507:4
**laughed** [1] - 388:3

**laundered** [2] - 377:24
**laundering** [32] - 360:14, 361:4, 377:12, 378:7, 385:1, 408:9, 408:13, 408:14, 414:13, 416:7, 441:7, 443:20, 453:21, 454:3, 454:9, 455:1, 466:16, 467:21, 468:1, 468:2, 468:3, 468:4, 468:17, 470:7, 475:24, 476:15, 479:15, 485:12, 486:6, 488:24, 489:12, 511:15
**LAW** [1] - 346:20
**law** [32] - 349:3, 365:24, 373:3, 373:5, 373:6, 374:13, 374:22, 408:18, 408:20, 408:24, 417:16, 426:4, 456:21, 458:21, 466:21, 470:16, 473:8, 487:9, 487:15, 494:2, 496:13, 496:23, 499:24, 500:1, 500:4, 500:12, 504:24, 507:25, 509:13, 511:2, 512:13, 523:1
**lawful** [1] - 504:14
**laws** [6] - 366:5, 373:8, 373:13, 375:1, 375:16, 375:23
**Laws** [1] - 416:7
**lawyer** [1] - 483:10
**lawyers** [1] - 493:20
**lazy** [1] - 355:15
**lead** [2] - 384:5, 420:10
**leads** [1] - 487:25
**learning** [10] - 513:22, 514:17, 515:2, 515:11, 516:6, 516:15, 516:22, 517:22, 518:3, 518:4
**least** [7] - 353:19, 477:18, 480:6, 486:13, 494:12, 517:20, 529:22
**leave** [4] - 396:17, 399:3, 399:22, 437:13, 507:19, 532:13
**leaves** [2] - 347:8, 496:22
**leaving** [1] - 496:17
**led** [1] - 376:23
**leeway** [1] - 420:12
**left** [12] - 352:9, 354:15, 358:11, 359:16, 360:6, 413:25, 414:4, 416:13, 428:14, 452:22, 518:1, 521:25
**left-hand** [1] - 428:14
**leftover** [1] - 530:24
**legal** [19] - 348:12, 348:24, 366:21, 372:2, 373:2, 373:10, 373:13, 374:4, 374:8, 374:16, 375:9, 375:10, 405:7, 405:21, 408:23, 486:18, 496:11, 503:14, 509:5
**legalities** [1] - 364:2
**legality** [1] - 372:23
**legally** [3] - 373:19, 373:21, 374:22
**legible** [1] - 479:24
**legitimate** [2] - 395:7, 519:9
**less** [4] - 361:9, 381:24, 492:22, 508:9
**letter** [3] - 478:18, 500:24, 504:13
**letting** [6] - 363:17, 365:22, 375:25, 493:7, 509:7
**level** [1] - 474:11
**Lexington** [1] - 432:2
**liar** [3] - 442:16, 443:15

**license** [10] - 371:17, 374:7, 459:15, 459:16, 459:18, 459:24, 460:5, 464:7, 486:2, 486:3
**licensed** [11] - 373:2, 373:15, 373:20, 405:1, 405:4, 405:20, 460:19, 462:13, 462:22, 464:4
**licenses** [1] - 461:9
**licensing** [4] - 374:15, 459:21, 463:15, 464:1
**lie** [1] - 442:12
**LIEFKE** [2] - 415:19, 533:10
**Liefke** [48] - 367:3, 367:4, 367:10, 415:4, 415:5, 415:7, 415:17, 415:24, 416:15, 417:12, 418:2, 421:10, 421:23, 422:5, 427:2, 427:14, 428:5, 428:22, 429:15, 429:24, 430:14, 435:3, 435:16, 435:19, 436:12, 436:13, 438:5, 438:10, 438:25, 439:15, 439:20, 440:22, 442:7, 442:19, 443:4, 443:24, 444:13, 445:13, 446:14, 450:25, 454:21, 485:24, 485:25, 490:7, 502:24, 503:3, 503:19
**Liefke's** [1] - 491:14
**life** [1] - 506:24
**light** [3] - 359:14, 484:24, 531:11
**lights** [1] - 438:22
**limited** [2] - 360:16, 361:5
**list** [1] - 531:6
**listed** [5] - 370:23, 451:3, 463:12, 463:23, 479:20
**Listen** [1] - 492:15
**listen** [6] - 387:15, 388:9, 396:14, 410:16, 438:25, 522:7
**listened** [5] - 353:10, 354:4, 364:13, 366:11, 413:22
**listening** [4] - 353:3, 353:16, 355:1, 439:2
**literally** [1] - 498:16
**living** [1] - 444:24
**local** [2] - 422:21, 428:18
**localbitcoin** [1] - 429:14
**localbitcoins** [5] - 377:15, 428:1, 429:4, 429:11, 429:17
**localbitcoins.com** [6] - 377:5, 377:7, 377:25, 422:16, 422:23, 428:8
**locate** [1] - 481:18
**located** [2] - 474:21, 474:22
**location** [6] - 430:16, 469:11, 469:12, 470:14, 473:23, 475:4
**locations** [2] - 368:22, 370:2
**LOL** [2] - 440:6, 440:7
**longest** [1] - 379:20
**look** [19] - 354:12, 360:16, 391:14, 410:12, 410:21, 410:24, 422:17, 446:18, 462:2, 495:19, 496:25, 497:8, 499:3, 509:14, 522:8, 523:2, 528:4, 528:23, 531:9
**looked** [2] - 400:9, 425:5
**Looking** [1] - 430:4

**looking** [21] - 353:25, 378:1, 378:15, 398:12, 398:13, 398:15, 398:18, 398:20, 400:8, 422:16, 428:17, 429:11, 432:14, 440:2, 449:16, 479:17, 480:4, 499:11, 517:19
**looks** [1] - 528:9
**loosening** [1] - 373:8
**lose** [1] - 524:20
**losing** [1] - 382:9
**lost** [1] - 382:2
**lower** [1] - 529:12
**luck** [5] - 437:17, 443:1, 443:2, 489:19
**lunch** [7] - 456:5, 456:7, 456:9, 457:6, 529:25, 530:1
**Luncheon** [1] - 456:25
**luxury** [1] - 489:19
**Lyft** [1] - 434:23

## M

**machine** [6] - 364:20, 387:3, 387:4, 389:19, 390:7, 396:3
**main** [1] - 418:17
**maintain** [6] - 460:12, 460:18, 461:5, 476:22, 477:7, 478:25
**maintained** [1] - 471:6
**man** [8] - 356:25, 360:17, 360:19, 363:14, 365:1, 432:22, 436:10, 437:17
**Manhattan** [13] - 352:14, 352:17, 393:13, 425:5, 431:20, 438:16, 439:10, 439:17, 440:5, 440:6, 440:21, 440:24
**manner** [1] - 523:23
**map** [2] - 368:21, 368:22
**March** [3] - 416:13, 458:18, 466:12
**MARIETOU** [1] - 346:17
**Marijuana** [1] - 405:23
**marijuana** [41] - 364:3, 365:15, 365:20, 365:22, 365:24, 366:6, 366:21, 372:23, 373:1, 373:9, 373:20, 374:5, 374:8, 374:10, 374:16, 374:18, 374:21, 375:4, 375:17, 376:3, 376:5, 376:8, 376:11, 376:14, 376:17, 403:16, 404:3, 404:19, 405:1, 405:4, 405:16, 405:20, 405:25, 408:16, 408:17, 408:23, 409:1, 412:10, 413:15, 486:17, 487:22
**mark** [3] - 437:25, 442:6, 442:18
**marked** [11] - 350:6, 350:14, 351:10, 352:25, 362:24, 368:16, 370:6, 462:1, 462:16, 470:19, 478:8
**markups** [1] - 524:8
**mask** [2] - 422:2, 501:3
**master's** [1] - 417:25
**matches** [1] - 442:16
**materials** [2] - 476:16, 476:18
**Matter** [1] - 532:15
**matter** [7] - 420:16, 443:15, 491:12, 496:11, 510:19, 523:23, 525:15
**matters** [5] - 482:19, 493:19, 504:21,

506:21, 527:16
**mayb7e** [1] - 353:19
**mean** [25] - 355:16, 355:24, 356:19, 359:25, 360:24, 365:1, 365:13, 365:18, 366:2, 375:10, 423:8, 440:15, 441:5, 442:6, 486:10, 488:4, 498:3, 501:5, 505:11, 506:4, 508:5, 520:19, 521:25, 525:4, 525:17
**meaning** [5] - 364:8, 411:10, 449:19, 451:23, 486:21
**Meaning** [1] - 386:25
**meanings** [1] - 495:10
**means** [6] - 423:9, 438:6, 443:18, 469:12, 491:21, 515:22
**measure** [1] - 505:7
**mechanical** [1] - 346:25
**meet** [20] - 359:6, 360:7, 361:19, 362:16, 424:25, 425:4, 426:12, 431:9, 431:12, 431:24, 432:25, 437:1, 437:3, 437:22, 440:9, 440:19, 440:20, 441:21
**meeting** [31] - 358:11, 367:8, 372:16, 375:4, 378:18, 378:23, 379:20, 383:22, 384:16, 385:22, 386:8, 386:21, 387:8, 387:19, 395:24, 396:6, 396:22, 397:4, 397:19, 399:19, 406:5, 423:18, 423:20, 423:21, 424:7, 424:23, 425:10, 426:15, 427:22, 435:21, 437:11
**meetings** [10] - 376:23, 376:24, 378:9, 378:22, 380:7, 394:20, 395:19, 403:15, 424:9, 424:10
**member** [1] - 503:3
**members** [2] - 448:14, 461:7
**memory** [4] - 404:6, 410:10, 410:20, 426:17
**mention** [3] - 371:21, 436:19, 453:18
**mentioned** [17] - 351:5, 356:9, 364:6, 399:7, 418:13, 435:23, 436:17, 439:12, 450:11, 468:8, 468:23, 469:6, 470:8, 473:21, 476:19, 479:12, 487:5
**mentions** [3] - 356:16, 429:17, 441:1
**merely** [5] - 514:24, 516:11, 516:18, 517:8, 517:13
**message** [27] - 359:24, 361:18, 428:4, 428:6, 428:9, 428:14, 428:23, 429:1, 429:6, 429:9, 429:15, 429:23, 429:24, 432:5, 435:3, 435:19, 436:7, 436:13, 436:21, 439:20, 441:1, 441:9, 441:11, 450:22, 451:19, 452:12, 452:14
**messages** [26] - 359:14, 359:15, 360:5, 382:17, 382:24, 382:25, 383:1, 411:12, 423:11, 427:15, 427:17, 427:20, 427:24, 429:19, 436:4, 436:17, 438:10, 439:15, 440:22, 447:7, 447:12, 450:11, 454:13, 454:22
**Messaging** [2] - 423:2, 426:25
**messaging** [3] - 423:4, 427:15, 442:8
**met** [14] - 350:18, 350:21, 351:5, 351:21, 351:22, 353:11, 370:2, 371:11, 372:14, 382:6, 383:3, 423:21,

425:11, 434:13
**Metro** [1] - 443:7
**Michael** [7] - 422:13, 445:4, 463:12, 463:15, 464:3, 479:19, 481:23
**michi** [1] - 442:3
**microphone** [5] - 348:25, 415:15, 416:16, 465:9, 466:23
**mid** [1] - 491:25
**Middle** [1] - 437:24
**middle** [4] - 362:6, 433:13, 440:19, 494:21
**midtown** [1] - 352:17
**midway** [1] - 499:3
**might** [13] - 377:12, 386:20, 387:4, 389:23, 393:14, 395:25, 412:20, 456:7, 478:14, 481:3, 488:1, 505:9, 507:10
**MIN** [1] - 437:13
**min** [1] - 432:8
**mind** [5] - 395:13, 407:13, 456:9, 456:13, 494:6
**mine** [1] - 375:18
**minimis** [1] - 420:16
**minimum** [1] - 468:18
**minor** [3] - 503:12, 522:24, 523:5
**minute** [2] - 407:12, 415:9
**minutes** [13] - 362:25, 379:18, 405:12, 405:14, 407:19, 434:22, 482:18, 491:6, 529:4, 529:11, 529:17, 529:18, 529:21
**mirror** [1] - 516:21
**mirroring** [1] - 521:23
**misleading** [3] - 524:19, 524:21, 525:1
**mission** [2] - 467:22, 467:23
**misstates** [1] - 513:2
**mistaken** [6] - 514:25, 516:12, 516:13, 516:18, 517:8, 517:14
**moment** [12] - 350:7, 351:16, 372:4, 380:17, 446:22, 457:15, 464:22, 474:6, 478:14, 482:3, 489:8, 518:23
**moments** [1] - 375:20
**Monday** [4] - 384:14, 492:14, 493:1
**Monero** [1] - 418:18
**money** [178] - 348:6, 348:22, 349:6, 355:2, 355:14, 355:18, 355:19, 356:7, 356:10, 357:17, 357:19, 358:6, 360:14, 361:4, 361:21, 363:14, 363:18, 363:22, 363:25, 364:4, 364:8, 364:14, 364:17, 364:19, 364:24, 366:12, 366:13, 371:22, 377:12, 377:23, 377:24, 378:7, 379:3, 379:4, 380:2, 382:3, 382:7, 382:9, 385:1, 387:3, 387:4, 389:19, 390:3, 390:4, 390:6, 390:7, 390:11, 390:16, 390:19, 390:22, 392:2, 392:11, 392:17, 392:18, 392:19, 393:7, 394:10, 394:13, 395:7, 395:21, 396:2, 399:9, 399:16, 400:24, 401:2, 408:9, 408:13, 413:20, 414:11, 414:12, 414:13, 414:17, 416:7, 437:6, 441:2, 441:5,

441:6, 443:18, 443:19, 452:9, 453:21, 454:3, 454:4, 454:9, 454:14, 454:24, 455:1, 458:23, 459:9, 459:11, 460:20, 461:10, 462:13, 462:23, 467:21, 468:5, 468:14, 468:17, 468:23, 468:25, 469:2, 469:3, 469:4, 469:6, 469:8, 469:9, 469:20, 469:22, 469:24, 470:1, 470:10, 472:24, 473:13, 473:19, 473:20, 473:22, 474:20, 475:20, 475:21, 476:11, 476:13, 476:23, 477:12, 477:15, 481:10, 481:19, 481:24, 485:12, 485:13, 485:17, 485:20, 486:6, 486:14, 487:7, 487:13, 488:5, 488:10, 488:11, 488:23, 489:11, 489:12, 494:21, 495:13, 495:17, 496:14, 496:15, 496:18, 497:14, 498:21, 498:22, 498:24, 499:12, 510:22, 511:15, 515:20, 523:13, 524:2, 524:20, 525:9, 525:12, 525:21, 525:24, 526:6, 527:19
**Money** [4] - 408:14, 469:8, 471:4, 474:10
**monitor** [1] - 424:6
**morning** [12] - 372:12, 372:13, 405:12, 407:10, 415:24, 483:24, 490:6, 491:25, 493:6, 493:22, 496:2, 522:8
**most** [2] - 484:24, 525:25
**mostly** [1] - 505:7
**motherfuckers** [1] - 355:15
**motion** [3] - 484:20, 484:22, 525:21
**motions** [1] - 420:3
**move** [8] - 352:1, 441:25, 459:24, 463:2, 471:11, 479:5, 504:13, 505:15
**moved** [1] - 508:19
**moves** [1] - 467:1
**movie** [2] - 384:22, 384:23
**movies** [1] - 402:3
**moving** [4] - 433:10, 434:2, 437:7, 481:4
**Moving** [2] - 472:18, 473:12
**MR** [138] - 347:5, 347:12, 349:2, 349:8, 351:2, 352:5, 361:14, 363:4, 369:3, 371:4, 372:4, 372:6, 372:11, 374:23, 380:14, 380:16, 380:19, 381:12, 382:11, 391:2, 392:22, 393:1, 396:18, 396:20, 400:2, 404:10, 405:13, 407:8, 409:15, 409:18, 409:24, 414:18, 414:23, 417:8, 417:10, 419:2, 420:14, 438:18, 439:7, 446:4, 446:6, 447:4, 450:19, 450:23, 450:24, 451:14, 452:16, 452:21, 453:12, 453:13, 454:16, 455:6, 463:5, 464:12, 471:14, 479:8, 482:8, 483:4, 483:6, 484:22, 485:6, 490:2, 490:5, 490:13, 491:1, 491:7, 491:10, 491:12, 491:17, 492:7, 492:17, 493:2, 493:13, 496:12, 497:1, 498:19, 499:1, 499:10, 499:12, 499:18, 499:21, 500:16, 500:23, 501:2, 501:7, 501:10, 501:12, 501:15, 501:24, 502:2, 502:5, 502:12, 504:11,

505:3, 505:15, 505:17, 505:20, 507:21, 508:19, 508:21, 510:2, 510:10, 511:18, 511:21, 513:18, 513:22, 514:8, 518:14, 518:18, 520:23, 521:9, 522:4, 522:24, 523:5, 523:13, 523:17, 523:19, 524:5, 525:3, 526:8, 526:19, 526:23, 527:2, 527:25, 528:13, 528:17, 528:20, 529:16, 529:19, 529:21, 530:3, 531:11, 531:17, 531:20, 531:25, 532:8, 533:7, 533:12

**MS** [161] - 347:23, 348:17, 350:2, 350:4, 350:23, 351:9, 351:16, 352:1, 352:8, 352:21, 352:25, 353:5, 353:8, 353:21, 353:23, 354:2, 354:9, 354:11, 354:14, 354:19, 354:24, 355:5, 355:20, 356:13, 357:22, 358:12, 358:16, 358:23, 359:2, 359:9, 361:17, 362:20, 362:23, 363:8, 364:10, 365:6, 368:15, 368:25, 370:1, 370:5, 370:25, 391:5, 391:9, 391:18, 391:21, 392:24, 393:3, 404:11, 404:15, 408:1, 408:3, 410:4, 410:13, 412:16, 413:3, 413:24, 414:6, 414:20, 415:3, 415:7, 415:23, 420:10, 421:9, 422:1, 422:11, 427:7, 434:1, 438:23, 443:22, 443:23, 444:9, 444:12, 445:10, 445:12, 445:24, 446:9, 446:22, 446:25, 450:21, 452:18, 454:18, 454:20, 455:4, 456:3, 456:18, 456:24, 457:10, 458:5, 461:24, 462:15, 463:1, 463:9, 463:20, 464:8, 464:18, 466:5, 470:18, 470:21, 470:23, 471:10, 471:18, 472:2, 472:18, 473:12, 474:3, 475:1, 475:15, 478:7, 478:19, 479:4, 480:1, 481:1, 481:6, 482:3, 482:5, 482:14, 485:24, 489:20, 494:14, 494:16, 494:19, 495:11, 495:20, 496:3, 497:3, 497:11, 497:14, 497:18, 497:24, 498:8, 500:4, 500:13, 500:20, 502:22, 503:5, 503:13, 503:23, 504:2, 510:14, 510:20, 514:21, 516:9, 516:21, 517:15, 519:21, 524:17, 525:8, 527:1, 527:7, 528:7, 529:3, 529:7, 529:9, 530:25, 532:10, 533:6, 533:8, 533:11, 533:13, 533:15, 533:17

**MSB** [4] - 474:7, 474:9, 475:8, 476:15
**MSBs** [3] - 474:21, 474:22, 475:8
**MSG** [1] - 435:9
**multiple** [3] - 399:7, 436:4, 449:4
**MURRAY** [1] - 346:19
**music** [1] - 434:8
**must** [5] - 459:13, 459:14, 469:25, 507:25, 523:7
**Mustafa** [12] - 421:11, 421:23, 422:5, 422:12, 446:20, 462:12, 463:11, 463:17, 463:18, 464:3, 479:19, 481:22
**MUSTAFA** [1] - 346:6
**Mustang** [1] - 439:25
**Mustangy** [16] - 422:13, 422:24,

422:25, 444:17, 444:18, 444:19, 444:22, 445:16, 445:23, 446:16, 462:22, 463:23, 463:25, 464:4, 481:17, 481:23
**muzzling** [1] - 388:1

# N

**name** [19] - 371:12, 403:2, 411:17, 415:16, 422:24, 443:2, 443:8, 444:17, 445:4, 446:18, 450:16, 451:9, 452:4, 457:21, 465:10, 472:11, 472:13, 474:17, 485:23
**named** [2] - 421:11, 478:23
**namely** [1] - 509:11
**Namely** [1] - 487:12
**names** [2] - 422:12, 473:3
**narcotics** [1] - 509:9, 510:5, 510:23, 511:24, 512:3, 512:9, 512:11, 513:16, 514:19, 518:9, 518:18, 518:19, 518:20, 518:25, 519:18, 520:4, 520:11, 521:22, 522:21
**narrative** [2] - 487:3, 487:11, 517:4
**nature** [3] - 449:25, 452:4, 506:22
**NAVARRO** [9] - 346:17, 347:5, 347:12, 363:4, 520:23, 521:9, 531:11, 531:17, 531:20
**near** [1] - 409:6
**nearby** [1] - 386:18
**necessarily** [9] - 376:13, 384:8, 384:9, 387:13, 398:10, 401:25, 402:2, 509:8, 525:4
**necessary** [4] - 508:13, 508:16, 520:7, 527:5
**need** [21] - 360:12, 360:22, 364:21, 364:23, 382:11, 435:11, 459:24, 460:5, 460:6, 482:18, 493:20, 502:4, 502:6, 502:11, 504:19, 507:5, 512:1, 519:9, 530:22, 531:3, 532:2
**needed** [2] - 400:24, 452:9
**needs** [1] - 508:4
**negative** [2] - 515:6
**negligence** [1] - 517:13
**negligent** [4] - 514:25, 516:12, 516:18, 517:8
**negotiations** [1] - 423:18
**Nektalov** [6] - 509:18, 510:8, 510:15, 511:3, 511:13, 522:15
**NEKTALOV** [1] - 509:18
**Network** [1] - 466:10
**network** [2] - 418:11
**never** [12] - 372:14, 382:18, 394:3, 394:7, 394:16, 401:4, 403:10, 403:11, 411:23, 487:25, 506:21, 530:20
**NEW** [1] - 346:1
**new** [1] - 500:10
**New** [33] - 346:6, 346:15, 346:16, 346:20, 346:21, 368:21, 374:7, 374:14, 374:16, 411:10, 417:17, 430:7, 434:20, 436:18, 444:23,

446:17, 457:11, 458:8, 458:13, 459:9, 459:12, 459:19, 460:1, 460:3, 460:17, 461:4, 461:7, 462:14, 462:20, 462:23, 464:5, 486:3
**news** [1] - 374:12
**next** [41] - 354:4, 355:4, 359:19, 360:7, 360:10, 360:17, 360:19, 361:6, 362:4, 419:5, 420:22, 423:17, 425:10, 425:13, 430:18, 430:25, 431:6, 432:3, 432:11, 432:21, 433:10, 434:2, 437:7, 440:8, 441:23, 442:24, 443:10, 455:10, 456:6, 456:15, 457:8, 457:25, 474:3, 511:21, 517:22, 518:6, 519:24, 519:25, 522:24, 524:10, 525:12
**Next** [1] - 415:2
**nickname** [1] - 451:11
**nine** [1] - 476:20
**NOLAN** [1] - 346:23
**NolanEDNY@aol.com** [1] - 346:24
**non** [1] - 349:11
**non-issues** [1] - 349:11
**nonbelief** [1] - 517:9
**nonetheless** [1] - 489:12
**noon** [2] - 492:5, 529:1
**normally** [1] - 507:14
**note** [5] - 391:11, 494:25, 495:22, 511:3, 528:5
**noted** [2] - 457:2, 507:20
**notes** [2] - 488:8, 530:9
**nothing** [9] - 383:1, 401:13, 407:8, 446:25, 454:16, 455:4, 457:19, 465:3, 492:11
**Nothing** [3] - 414:23, 482:5, 504:11
**notion** [2] - 505:8, 507:10
**November** [8] - 351:23, 383:14, 390:14, 391:3, 396:12, 403:19, 404:10, 414:9
**number** [23] - 371:17, 371:19, 393:11, 399:6, 411:4, 412:23, 429:21, 443:3, 449:22, 449:23, 450:15, 451:3, 451:6, 463:13, 463:16, 463:23, 463:25, 470:14, 472:11, 479:20, 488:17, 492:8, 498:23
**Number** [2] - 469:24, 488:9
**numbered** [2] - 354:6, 354:17
**numbers** [6] - 412:25, 443:5, 443:6, 451:4, 505:9
**numerous** [1] - 487:19
**NY** [1] - 346:24
**NYOD** [2] - 438:3, 438:8
**NYPD** [1] - 417:23, 436:18, 436:19, 438:8, 439:10, 439:11, 439:12, 442:14, 442:17, 442:20, 487:10

# O

**o'clock** [1] - 456:13
**O'Kain** [34] - 349:20, 349:22, 354:25, 372:12, 380:25, 391:24, 393:6, 407:18, 410:14, 410:16, 410:18,

414:25, 417:2, 417:3, 418:6, 421:14, 422:15, 423:16, 423:21, 423:24, 425:8, 430:17, 489:6, 490:8, 491:14, 502:24, 502:25, 503:2, 503:6, 503:11, 503:17, 503:22, 504:2, 504:6
**O'KAIN** [2] - 349:23, 533:4
**oath** [1] - 349:22
**obfuscate** [1] - 441:7
**object** [5] - 438:18, 439:7, 504:14, 505:20, 524:15
**objected** [1] - 522:4
**objecting** [9] - 500:25, 501:16, 508:24, 509:11, 509:20, 522:13, 522:16, 528:15, 528:18
**objection** [23] - 348:15, 348:16, 351:1, 352:4, 369:2, 371:3, 446:3, 446:6, 463:4, 471:13, 479:7, 496:6, 502:22, 503:14, 505:14, 506:16, 507:20, 508:18, 522:11, 522:15, 528:6, 528:11, 528:16
**Objection** [6] - 361:14, 374:23, 414:18, 417:8, 417:10, 419:2
**objectionable** [1] - 508:7
**objections** [4] - 491:5, 500:15, 500:22, 500:24
**obligation** [1] - 519:10
**obligations** [1] - 479:16
**obliquely** [1] - 454:9
**observe** [1] - 424:25
**observed** [2] - 425:4, 426:12
**obtained** [4] - 384:6, 427:4, 447:18, 459:4
**obvious** [5] - 513:20, 515:14, 515:17, 519:6, 519:7
**obviously** [6] - 347:15, 485:9, 485:14, 487:11, 489:9, 520:13
**occasions** [5] - 386:9, 393:11, 426:10, 477:17, 487:19
**occur** [1] - 399:8
**occurred** [1] - 420:1
**occurring** [1] - 376:14
**October** [2] - 346:7, 429:8
**OF** [3] - 346:1, 346:3, 346:11
**offense** [1] - 394:6
**offer** [3] - 387:19, 387:23, 446:1
**offered** [4] - 407:2, 450:5, 487:11, 526:14
**offering** [2] - 366:13, 366:16
**office** [3] - 458:12, 458:13, 532:10
**OFFICE** [1] - 346:14
**officer** [3] - 382:14, 385:3, 426:5
**Officer** [2] - 467:8, 467:10
**officers** [2] - 439:13
**official** [2] - 461:14, 477:19
**officials** [1] - 470:17
**often** [4] - 497:19, 506:19, 506:24
**once** [5] - 358:10, 387:12, 397:22, 420:19, 435:21
**One** [1] - 372:4
**one** [86] - 350:7, 351:16, 354:3, 354:7,

354:15, 355:14, 356:24, 356:25, 359:13, 363:4, 373:7, 374:24, 376:23, 379:24, 380:2, 380:17, 380:20, 381:7, 382:6, 391:6, 394:20, 394:25, 395:11, 399:11, 403:14, 409:7, 412:23, 413:18, 415:9, 428:9, 435:18, 436:10, 436:13, 439:9, 440:22, 441:9, 450:10, 450:19, 453:1, 453:18, 454:8, 454:9, 464:22, 468:21, 469:10, 469:24, 473:24, 480:5, 480:6, 482:3, 488:1, 489:23, 492:21, 494:10, 494:12, 496:25, 498:9, 500:10, 501:25, 503:10, 503:16, 504:7, 506:13, 506:23, 507:4, 508:7, 515:24, 517:3, 517:6, 517:7, 520:24, 521:17, 523:23, 524:6, 524:9, 524:10, 525:5, 525:18, 525:23, 526:16, 528:2, 530:5, 531:7
**ones** [4] - 418:17, 418:18, 454:6, 454:7
**online** [7] - 363:17, 364:24, 382:14, 382:15, 409:8, 409:11, 429:4
**ooOoo** [1] - 532:16
**open** [9] - 347:1, 407:13, 411:2, 420:9, 421:1, 456:9, 482:24, 492:2, 494:6
**open-ended** [1] - 420:9
**opened** [1] - 367:17
**opening** [1] - 367:16
**openingly** [3] - 385:12, 385:19, 387:18
**openly** [1] - 384:18
**operated** [1] - 525:19
**operates** [1] - 526:16
**operating** [4] - 373:21, 377:7, 412:1, 525:5
**operation** [2] - 408:13, 424:5
**operations** [1] - 424:2
**operators** [1] - 459:14
**opinion** [2] - 395:14, 440:23
**opinions** [1] - 439:17
**opportunities** [1] - 394:21
**opportunity** [4] - 387:19, 387:23, 395:4, 395:6
**opposed** [7] - 353:4, 503:24, 513:4, 514:1, 515:12, 517:24, 518:1
**opposite** [1] - 512:4
**option** [1] - 495:2
**order** [5] - 380:23, 423:19, 505:18, 507:23, 523:6
**ordering** [1] - 433:14
**orders** [1] - 473:22
**ordinary** [2] - 471:6, 479:1
**organization** [2] - 460:9, 460:12
**origin** [2] - 441:7, 443:20
**original** [1] - 510:20
**originally** [1] - 528:14
**otherwise** [7] - 357:14, 461:17, 478:2, 489:23, 512:13, 515:16, 524:7
**ought** [1] - 496:7
**outset** [1] - 489:9
**Outside** [1] - 401:19
**outside** [14] - 366:5, 366:6, 375:16, 375:23, 376:2, 376:11, 376:15, 409:1,

457:6, 494:23, 495:15, 496:19, 497:20, 499:18
**over-inclusive** [1] - 500:7
**overall** [1] - 522:14
**overhead** [3] - 438:22, 479:25, 530:10
**overrule** [3] - 505:14, 506:16, 522:14
**Overruled** [1] - 417:11
**overruled** [2] - 438:20, 439:8
**overtly** [1] - 507:16
**owed** [2] - 356:7, 356:9
**own** [5] - 398:13, 403:25, 483:7, 483:11, 488:13
**owner** [2] - 470:12, 472:20
**owners** [2] - 459:14, 460:8
**owns** [1] - 472:24
**oxies** [1] - 413:6
**oxy** [7] - 402:16, 402:19, 402:22, 402:23, 402:25, 487:21, 487:24
**oxycodone** [5] - 403:2, 403:12, 402:13, 413:7, 413:15

**P**

**p.m** [4] - 359:14, 362:11, 431:11, 457:2
**Page** [38] - 391:9, 391:16, 391:18, 393:3, 404:12, 409:6, 409:14, 410:25, 411:5, 412:19, 412:24, 414:2, 428:3, 428:22, 429:5, 429:23, 430:18, 431:6, 431:17, 432:4, 432:12, 433:2, 433:10, 433:11, 471:18, 472:18, 474:4, 478:19, 478:20, 479:6, 479:17, 494:14, 501:10, 504:13, 505:15, 508:19
**PAGE** [1] - 533:3
**page** [102] - 353:4, 353:18, 353:19, 353:20, 353:21, 353:25, 354:3, 354:4, 354:12, 354:14, 354:15, 354:16, 354:17, 355:4, 359:13, 360:3, 360:10, 362:4, 362:6, 362:10, 363:2, 369:8, 399:25, 409:13, 411:4, 412:22, 412:25, 413:1, 419:5, 420:22, 429:14, 429:17, 430:18, 431:6, 431:18, 432:1, 432:3, 432:11, 433:10, 433:13, 433:19, 434:2, 434:3, 434:15, 434:16, 435:3, 435:4, 436:6, 436:20, 436:24, 436:25, 437:7, 437:8, 437:18, 437:19, 439:19, 440:8, 440:17, 440:19, 441:10, 441:23, 442:9, 442:24, 443:10, 446:14, 446:18, 450:19, 450:22, 451:2, 452:18, 452:22, 455:10, 457:25, 465:14, 474:3, 480:8, 481:7, 481:14, 481:15, 481:16, 494:13, 501:9, 512:14, 522:25, 523:5, 523:11, 523:13, 527:2, 528:8, 531:13
**pages** [11] - 429:24, 430:1, 436:21, 436:23, 439:21, 439:22, 441:16, 441:17, 453:19, 478:21, 478:22
**paid** [1] - 469:4
**paint** [1] - 417:21
**PAMELA** [2] - 346:12, 347:2

**paper** [5] - 355:3, 470:17, 473:7, 474:16, 531:15
**paragraph** [15] - 494:21, 495:8, 499:4, 504:9, 504:12, 505:17, 505:21, 507:2, 507:4, 508:22, 508:24, 511:19, 513:5, 514:23, 528:8
**parked** [1] - 437:17
**Part** [3] - 376:19, 474:7, 475:4
**part** [52] - 361:15, 365:14, 365:21, 367:18, 372:21, 386:5, 393:18, 396:6, 396:7, 397:19, 405:16, 405:21, 405:23, 406:1, 407:4, 408:9, 408:14, 412:3, 420:2, 448:6, 471:20, 471:22, 472:2, 472:7, 472:9, 472:20, 473:1, 473:13, 473:17, 473:18, 474:5, 475:1, 475:2, 475:6, 475:7, 497:8, 501:16, 502:15, 503:19, 503:25, 504:4, 506:1, 507:4, 513:8, 513:9, 516:24, 517:23, 521:25, 526:1
**partially** [1] - 522:17
**particular** [10] - 365:2, 417:4, 426:11, 458:14, 467:4, 487:10, 502:10, 506:17, 513:11, 522:16
**parties** [4] - 423:9, 437:12, 482:19, 489:10
**partly** [1] - 421:5
**partner** [7] - 356:16, 356:17, 401:7, 417:1, 488:10, 488:11, 488:14
**partner's** [2] - 414:11, 414:12
**partnered** [1] - 416:24
**parts** [1] - 522:12
**pass** [1] - 508:21
**past** [1] - 416:14
**PATRICK** [2] - 349:23, 533:4
**Patrick** [3] - 417:1, 421:14, 422:15
**pats** [1] - 504:17
**Pause** [3] - 349:13, 350:8, 446:24
**pause** [6] - 353:8, 357:25, 360:22, 367:11, 413:3, 414:6
**paused** [11] - 353:7, 353:14, 355:7, 355:22, 356:15, 357:24, 363:3, 363:7, 365:8, 366:9, 366:24
**pay** [5] - 356:10, 405:9, 419:1, 459:15, 526:4
**pays** [1] - 405:21
**PCS** [1] - 443:7
**peer** [4] - 418:11, 422:17
**peer-to-peer** [2] - 418:11, 422:17
**people** [33] - 356:8, 356:9, 377:14, 384:15, 384:17, 384:25, 385:1, 385:7, 385:15, 385:17, 386:3, 386:5, 389:18, 393:13, 418:17, 422:17, 424:25, 426:9, 427:21, 443:7, 450:8, 451:24, 454:21, 459:8, 469:19, 480:6, 487:2, 505:10, 505:13, 506:25, 526:4, 526:10
**people's** [1] - 505:5
**per** [2] - 353:1, 380:8
**perceives** [1] - 504:5
**percent** [3] - 397:14, 400:15, 441:19
**Percent** [1] - 428:21

**percentage** [1] - 397:13
**perfect** [3] - 405:14, 407:10, 433:1
**perform** [3] - 461:20, 462:13, 477:22
**performing** [1] - 423:22
**perhaps** [6] - 456:14, 473:14, 480:1, 491:2, 491:3, 507:21
**Perhaps** [1] - 386:7
**period** [2] - 394:11, 501:23
**permission** [11] - 350:23, 351:9, 352:22, 362:20, 368:25, 422:1, 427:5, 427:9, 444:9, 446:9, 461:24
**person** [23] - 387:7, 426:4, 426:7, 427:25, 442:4, 443:16, 448:19, 450:14, 451:7, 451:11, 456:20, 468:21, 469:10, 469:12, 472:21, 472:24, 473:2, 473:4, 497:15, 499:5, 507:8, 508:2, 519:8
**personally** [4] - 425:14, 461:12, 477:14, 477:24
**personnel** [1] - 460:10
**perspective** [1] - 528:9
**pertaining** [2] - 418:25, 477:15
**phone** [32] - 397:24, 398:8, 398:9, 398:12, 398:13, 398:15, 398:19, 398:20, 400:8, 400:10, 400:13, 400:17, 401:6, 427:3, 427:16, 443:9, 447:8, 447:16, 450:7, 450:15, 451:3, 451:6, 451:12, 451:24, 451:25, 452:24, 453:10, 502:24, 502:25, 503:6, 503:19
**phones** [1] - 449:24
**photo** [2] - 381:1, 381:18
**photograph** [3] - 350:18, 358:18, 359:4
**photographs** [1] - 447:11
**phrase** [1] - 517:6
**phrased** [1] - 518:3
**physically** [1] - 474:22
**pickier** [1] - 511:19
**picture** [1] - 426:16
**pieces** [1] - 490:10
**pills** [5] - 363:22, 364:1, 364:6, 372:21, 375:5
**pivot** [1] - 480:5
**place** [10] - 379:12, 400:11, 418:10, 424:7, 431:16, 431:24, 449:13, 476:6, 506:10
**placed** [1] - 372:17
**places** [2] - 437:23, 443:7
**plain** [2] - 495:10, 511:13
**plaintiff** [3] - 346:4, 508:10, 508:11
**plan** [1] - 530:16
**planned** [1] - 368:13
**play** [13] - 352:22, 353:5, 355:5, 362:20, 368:2, 391:2, 392:22, 404:12, 409:21, 409:25, 410:5, 412:16, 412:18
**played** [7] - 391:23, 393:4, 404:4, 404:17, 413:2, 414:5, 503:19
**played/audio** [1] - 353:7, 353:14, 355:7, 355:22, 356:15, 357:24, 363:3,

363:7, 365:8, 366:9, 366:24
**player** [1] - 532:6
**playing** [11] - 353:12, 355:20, 356:13, 357:22, 357:25, 364:10, 365:6, 366:8, 366:23, 387:15, 413:24
**plays** [1] - 412:22
**Plaza** [2] - 346:15, 346:24
**PLLC** [1] - 346:20
**plural** [2] - 500:14, 502:23
**point** [18] - 353:17, 361:11, 373:7, 378:13, 390:23, 399:11, 437:11, 448:8, 475:8, 497:1, 511:4, 513:5, 514:21, 515:25, 516:13, 522:24, 526:3, 526:16
**pointed** [2] - 488:9, 489:5
**pointedly** [1] - 486:22
**police** [20] - 367:17, 387:4, 389:5, 389:8, 389:18, 389:19, 389:23, 390:6, 390:16, 392:2, 392:6, 392:18, 393:7, 394:1, 394:4, 414:16, 438:12, 438:15, 439:6, 487:12
**Police** [2] - 417:17, 436:18
**poorly** [1] - 518:3
**popular** [1] - 402:3
**populating** [1] - 398:21
**port** [1] - 346:20
**portion** [5] - 362:23, 367:12, 391:2, 404:4, 412:17
**portions** [5] - 352:22, 362:20, 391:13, 530:14, 530:22
**pose** [1] - 476:20
**position** [1] - 348:23
**possible** [7] - 347:13, 393:7, 408:12, 420:13, 495:21, 527:12, 531:12
**possibly** [4] - 388:14, 390:6, 390:7, 476:1
**post** [1] - 428:17
**Postal** [1] - 469:4
**posting** [1] - 428:8
**potential** [2] - 426:24, 492:21
**potentially** [5] - 365:4, 388:24, 488:12, 507:2, 508:7
**pounds** [1] - 363:21
**practice** [6] - 385:7, 385:14, 460:17, 461:7, 477:10, 530:3
**practices** [1] - 459:19
**precisely** [1] - 511:11
**predicate** [1] - 511:7
**prefer** [2] - 489:24, 490:6
**preferable** [1] - 489:25
**preference** [5] - 489:21, 490:2, 492:19, 497:4, 498:4
**prejudice** [1] - 348:18
**prepaid** [1] - 473:22
**prepared** [1] - 489:24
**preparing** [1] - 349:11
**preponderance** [1] - 519:14
**present** [8] - 347:3, 421:1, 424:10, 438:18, 451:25, 482:24, 493:12, 510:10

Case 1:19-cr-00386-PKC   Document 80   Filed 12/01/22   Page 207 of 216 PageID #: 1038

Case 1:19-cr-00386-PKC Document 80 Filed 12/01/22 Page 208 of 216 PageID #: 1039

**presentation** [2] - 347:10, 482:18
**preserve** [2] - 485:4, 528:16
**preserved** [1] - 505:14
**presiding** [1] - 347:2
**pressure** [1] - 492:24
**pressured** [1] - 492:13
**presume** [1] - 420:2
**presumptively** [1] - 518:21
**pretend** [1] - 513:25
**PRETRIAL** [1] - 346:11
**pretrial** [1] - 420:3
**pretty** [3] - 402:2, 476:11, 505:8
**preventive** [1] - 505:7
**previous** [2] - 360:2, 475:7
**Previously** [1] - 380:24
**previously** [16] - 349:24, 350:6, 351:10, 358:13, 358:24, 359:10, 368:16, 370:6, 381:15, 427:11, 445:9, 445:10, 445:19, 462:16, 470:19, 478:8
**price** [4] - 380:5, 382:4, 429:14, 436:8, 436:9
**primary** [4] - 377:19, 470:14, 474:7, 474:25
**principles** [2] - 460:9, 460:13
**print** [1] - 523:2
**priority** [1] - 490:17
**privacy** [1] - 505:5
**probability** [10] - 511:10, 518:8, 519:17, 520:3, 520:10, 520:21, 521:4, 521:5, 521:7, 521:21
**problem** [4] - 363:5, 472:5, 496:21, 513:2
**procedure** [1] - 504:14
**procedures** [1] - 504:21
**proceed** [3] - 421:8, 483:2, 489:24
**Proceedings** [1] - 346:25
**proceedings** [3] - 349:13, 350:8, 446:24
**proceeds** [34] - 486:16, 488:6, 506:6, 507:9, 507:13, 508:12, 508:16, 509:9, 510:5, 510:23, 511:23, 511:24, 512:2, 512:3, 512:7, 512:8, 512:10, 512:11, 513:16, 514:18, 514:19, 515:2, 515:20, 516:7, 516:19, 516:23, 517:16, 517:17, 518:9, 519:17, 520:4, 520:11, 521:22, 522:21
**process** [6] - 374:15, 443:19, 475:5, 475:12, 490:13, 491:17
**processing** [1] - 491:13
**produced** [3] - 346:25, 447:14, 447:15
**product** [4] - 410:15, 473:13, 473:22, 474:1
**products** [2] - 410:19, 411:8
**profile** [5] - 422:21, 422:23, 422:25, 423:1, 487:3
**profit** [24] - 523:21, 523:23, 523:24, 524:1, 524:6, 524:9, 524:14, 524:19, 525:1, 525:4, 525:6, 525:7, 525:18, 525:20, 526:5, 526:11, 526:17, 526:21, 526:22, 527:2, 527:10,

527:13, 527:14
**program** [7] - 468:1, 468:2, 468:3, 468:17, 470:7, 475:24, 476:16
**project** [1] - 530:10
**projector** [2] - 480:3, 531:12
**prompted** [1] - 348:19
**promptly** [1] - 493:24
**proof** [4] - 378:6, 488:17, 505:18, 507:24
**properly** [2] - 506:11, 524:12
**property** [2] - 506:6, 508:23
**proposal** [5] - 494:24, 495:7, 500:9, 522:2, 527:8
**propose** [2] - 522:1, 522:18
**proposed** [5] - 409:23, 505:25, 509:15, 521:11, 528:8
**proposing** [1] - 499:7
**prosecutor** [1] - 384:15
**Prospect** [1] - 440:16
**prostitution** [1] - 355:19
**protect** [3] - 459:18, 468:6
**protecting** [1] - 467:20
**prove** [14] - 505:24, 507:25, 512:4, 513:12, 514:14, 519:4, 519:10, 519:14, 520:9, 520:20, 521:6, 521:20, 522:20, 523:7
**provide** [8] - 358:20, 371:8, 424:7, 467:12, 472:8, 472:22, 473:17, 530:3
**provided** [5] - 370:17, 384:4, 397:16, 463:25
**provides** [4] - 433:8, 470:11, 470:16, 498:23
**providing** [2] - 423:23, 472:9
**province** [2] - 506:10, 508:25
**public** [6] - 437:11, 437:23, 476:7, 476:10, 495:18, 526:14
**publicly** [1] - 527:21
**publish** [20] - 350:24, 351:3, 352:2, 352:6, 358:13, 358:25, 359:9, 369:1, 369:6, 371:5, 427:8, 444:9, 444:25, 446:9, 463:3, 463:7, 471:12, 471:16, 479:6, 479:10
**published** [20] - 350:11, 351:12, 352:7, 358:15, 359:1, 359:12, 368:17, 369:7, 371:1, 371:6, 404:16, 444:8, 445:2, 445:11, 445:20, 446:13, 452:20, 463:8, 471:17, 479:11
**pull** [14] - 358:23, 359:9, 368:15, 380:13, 380:21, 412:15, 416:15, 437:21, 445:7, 452:16, 463:9, 463:20, 466:23, 494:10
**pulling** [2] - 479:12, 481:3
**punctual** [1] - 349:17
**purported** [1] - 510:5
**purportedly** [1] - 486:24
**purpose** [12] - 378:10, 459:16, 468:3, 468:5, 470:8, 493:7, 495:5, 515:2, 516:6, 516:15, 527:15, 527:18
**purposes** [6] - 348:10, 349:6, 399:2, 489:12, 495:6, 496:20

**pursuant** [4] - 428:10, 441:11, 446:7, 504:13
**put** [14] - 348:1, 353:23, 442:2, 450:19, 492:19, 495:12, 496:7, 500:24, 513:25, 515:5, 516:24, 522:7, 531:20, 532:6
**puts** [3] - 492:24, 505:25, 522:6
**putting** [1] - 515:12

## Q

**qualifies** [10] - 348:3, 348:5, 476:15, 494:25, 495:6, 495:16, 498:17, 499:24, 500:8, 500:11
**qualify** [2] - 348:22, 495:24
**qualifying** [1] - 470:3
**quarter** [2] - 456:5, 456:15
**Queens** [13] - 351:6, 430:7, 430:14, 432:23, 432:25, 433:6, 433:8, 434:19, 440:3, 440:11, 440:12, 440:14, 441:22
**questioning** [1] - 349:19
**questions** [17] - 372:6, 389:24, 392:14, 395:2, 395:17, 400:25, 403:4, 403:11, 408:6, 408:16, 413:19, 414:20, 420:9, 464:9, 464:12, 476:20, 482:8
**quick** [6] - 421:6, 430:22, 432:9, 456:12, 509:14, 528:4
**quickly** [3] - 379:15, 400:4, 419:4
**quite** [8] - 358:7, 358:9, 389:13, 420:16, 486:10, 489:22, 507:1, 527:16

## R

**raise** [6] - 385:22, 395:16, 395:17, 420:14, 457:16, 464:25
**raised** [4] - 348:24, 403:20, 494:20, 496:1, 509:14, 527:10
**raises** [2] - 388:16, 522:10
**ran** [1] - 347:6
**ranging** [1] - 481:12
**rarely** [1] - 506:20
**rasing** [1] - 496:22
**rate** [10] - 380:7, 380:8, 380:18, 381:4, 381:7, 381:21, 381:24, 397:7, 428:20
**rather** [6] - 357:25, 487:16, 489:18, 496:15, 506:24, 509:9
**rational** [1] - 511:8
**re** [1] - 514:13
**re-word** [1] - 514:13
**reach** [5] - 377:11, 431:4, 492:23, 492:24, 511:8
**reached** [1] - 507:1
**reaction** [1] - 395:14
**read** [38] - 359:14, 359:15, 360:5, 374:12, 409:20, 409:22, 410:11, 411:1, 423:11, 428:14, 428:16, 429:1, 429:9, 430:3, 431:21, 431:25, 433:12, 434:16, 435:8, 437:2, 437:8, 439:24, 440:18, 441:18, 442:10, 471:25,

495:13, 499:10, 499:14, 499:22, 502:12, 513:13, 520:25, 521:19, 524:12, 530:11, 531:21
**reader** [1] - 395:13
**reading** [16] - 360:4, 360:11, 430:2, 431:8, 432:5, 432:13, 434:3, 435:6, 436:7, 437:1, 437:19, 439:24, 441:24, 442:25, 443:11, 530:8
**reads** [3] - 476:17, 501:12, 501:19
**ready** [8] - 362:9, 407:11, 411:3, 441:19, 456:5, 456:15, 482:21, 531:13
**real** [6] - 360:15, 363:22, 388:19, 439:3, 443:8, 486:7
**realistically** [1] - 491:8
**really** [20] - 349:17, 419:4, 420:16, 438:3, 480:3, 490:18, 490:21, 503:8, 503:17, 504:3, 507:4, 509:5, 513:14, 514:3, 516:9, 516:13, 517:3, 517:9, 517:25, 526:6
**realtime** [2] - 461:2, 477:5
**reason** [12] - 348:6, 364:1, 372:22, 377:19, 383:24, 386:6, 389:2, 421:5, 497:4, 502:13, 514:1, 525:11
**reasonable** [20] - 485:1, 485:11, 486:12, 507:8, 508:1, 511:9, 512:10, 514:15, 515:1, 516:5, 518:7, 519:4, 519:8, 520:1, 520:2, 520:9, 520:20, 521:6, 521:20, 523:8
**reasons** [5] - 393:25, 395:1, 434:11, 439:9, 508:8
**rebut** [1] - 492:3
**rebuttal** [2] - 529:6, 529:8
**recapitulate** [1] - 530:21
**receipt** [4] - 358:18, 381:1, 381:4, 381:18
**receive** [3] - 368:8, 379:15, 400:11
**received** [7] - 351:4, 369:5, 379:22, 399:5, 446:12, 494:13
**receiving** [2] - 379:25, 380:4
**recess** [2] - 407:20, 456:25
**recite** [2] - 497:8, 519:5
**reckoning** [1] - 353:19
**recognize** [11] - 350:14, 351:18, 358:17, 370:10, 462:17, 462:24, 464:6, 471:1, 471:5, 478:11, 478:24
**recognizing** [1] - 489:3
**recollect** [1] - 392:13
**recollection** [2] - 410:21, 411:7
**record** [14] - 348:1, 348:22, 379:1, 415:16, 446:8, 457:22, 461:5, 465:10, 477:7, 478:25, 485:5, 485:7, 486:19, 531:24
**recorded** [4] - 346:25, 352:19, 353:16, 362:18
**recording** [18] - 353:10, 364:12, 366:10, 366:25, 367:13, 391:23, 391:24, 393:4, 393:5, 404:17, 412:25, 413:2, 413:4, 414:5, 414:7, 414:9, 479:16
**recordings** [7] - 376:24, 387:16,

391:14, 395:20, 398:2, 439:3, 532:1
**records** [20] - 460:18, 460:22, 460:24, 461:5, 461:14, 467:25, 468:16, 470:6, 476:3, 476:4, 476:5, 476:25, 477:2, 477:8, 477:15, 477:19, 478:17, 478:18, 481:12, 504:21
**recovered** [4] - 443:25, 449:20, 450:6, 453:10
**recross** [1] - 455:5
**red** [1] - 422:8
**redirect** [2] - 407:25, 454:17
**REDIRECT** [4] - 408:2, 454:19, 533:8, 533:13
**redundancy** [2] - 524:4, 524:5
**refer** [8] - 391:8, 401:14, 409:5, 410:10, 410:11, 413:6, 414:1, 504:8
**reference** [14] - 356:7, 356:8, 356:11, 387:3, 401:20, 402:10, 402:13, 402:16, 404:18, 429:20, 452:9, 453:19, 454:22, 473:10
**Reference** [1] - 452:8
**referenced** [7] - 405:19, 406:22, 406:25, 428:1, 447:7, 450:10, 486:22
**references** [11] - 387:8, 387:9, 420:4, 420:6, 421:4, 421:6, 430:15, 454:8, 486:25, 487:8, 488:16
**referencing** [4] - 387:18, 401:19, 454:13, 503:17
**referring** [8] - 357:17, 357:20, 386:17, 423:15, 424:16, 476:1, 498:4, 525:10
**refers** [2] - 402:4, 498:16
**reflect** [2] - 422:9, 488:4
**reflection** [1] - 488:12
**refresh** [5] - 400:17, 404:5, 410:20, 410:21, 411:7
**refuse** [4] - 360:14, 361:4, 361:19, 413:15
**refused** [1] - 360:15
**refusing** [1] - 516:1
**regard** [1] - 504:11
**regarding** [3] - 375:16, 466:20, 470:12
**regardless** [1] - 510:21
**register** [1] - 469:25
**registered** [4] - 476:22, 481:23, 486:4, 488:2
**registering** [1] - 475:18
**registrant** [6] - 471:20, 471:21, 472:8, 472:9, 472:22, 473:16
**registration** [6] - 470:1, 470:9, 479:19, 481:10, 481:18, 482:1
**Registration** [1] - 471:4
**registrations** [4] - 477:11, 477:14, 479:23
**regular** [6] - 413:13, 460:17, 460:24, 461:7, 477:2, 477:10
**regularly** [8] - 523:21, 523:22, 524:13, 524:19, 526:3, 526:21, 527:9, 527:17
**regulates** [2] - 468:11, 468:19
**regulations** [1] - 458:22
**regulators** [1] - 466:21

**regulatory** [2] - 466:20, 476:19
**reiterates** [1] - 364:15
**related** [4] - 444:4, 458:22, 476:1, 494:19
**relating** [6] - 471:24, 473:19, 473:23, 474:1, 475:8, 475:10
**relation** [2] - 392:17, 393:6
**relevance** [2] - 374:17, 421:4
**relevant** [4] - 421:7, 504:4, 520:14, 524:11
**relying** [1] - 510:15
**remain** [3] - 415:9, 457:14, 464:22
**remained** [1] - 367:23
**remaining** [1] - 355:10
**remains** [1] - 519:24
**remark** [1] - 488:11
**remarks** [1] - 488:10
**remember** [11] - 352:11, 387:12, 392:12, 409:3, 410:1, 411:21, 426:15, 434:12, 449:21, 456:7, 503:21
**Remember** [1] - 459:1
**remembers** [1] - 420:2
**remind** [4] - 349:21, 417:12, 443:17, 530:13
**remittent** [1] - 498:24
**remove** [2] - 422:2, 505:4
**removing** [3] - 507:22, 524:15, 525:12
**renewed** [1] - 485:9
**repeat** [1] - 384:2
**repeated** [2] - 389:4, 393:10
**repeatedly** [1] - 395:9
**repeating** [1] - 500:23
**replacement** [1] - 519:2
**replies** [2] - 434:19, 440:9
**report** [4] - 442:14, 442:20, 442:22, 478:23
**reported** [1] - 442:18
**reporter** [6] - 347:19, 396:16, 417:13, 459:1, 483:23
**Reporter** [1] - 346:23
**reporting** [1] - 479:16
**reports** [13] - 380:11, 467:24, 468:16, 470:5, 473:10, 473:11, 474:19, 475:25, 476:1, 476:2, 476:4
**reports,I'm** [1] - 475:25
**representing** [1] - 503:9
**request** [10] - 409:20, 473:6, 474:15, 478:7, 485:9, 508:17, 526:19, 526:25, 530:18, 530:25
**requested** [2] - 527:3, 530:23
**requesting** [3] - 473:18, 473:23, 475:6
**require** [3] - 443:8, 468:16, 485:15
**required** [18] - 459:11, 469:22, 471:22, 472:8, 472:22, 473:9, 473:16, 475:21, 475:23, 475:24, 476:3, 486:3, 486:4, 505:24, 506:3, 506:5, 506:10, 511:6
**requirement** [4] - 459:21, 513:3, 518:16, 524:25
**requirements** [5] - 459:8, 467:12,

469:19, 476:6, 511:15
**requires** [1] - 479:15
**requiring** [2] - 467:23, 470:9
**requisite** [2] - 507:17, 513:14
**research** [3] - 407:14, 456:9, 494:5
**residence** [6] - 424:22, 426:2, 444:24, 448:9, 448:11, 449:8
**resolve** [2] - 521:11, 522:11
**resolved** [1] - 397:22
**resolves** [2] - 528:5, 528:21
**respect** [10] - 416:7, 441:5, 443:18, 443:19, 463:22, 482:17, 485:4, 486:6, 506:18, 508:16
**respond** [15] - 362:7, 363:20, 364:7, 365:11, 395:9, 395:16, 395:18, 401:9, 402:11, 402:14, 402:18, 413:8, 426:14, 433:5, 440:10
**responded** [5] - 401:4, 404:22, 404:24, 405:16, 413:6
**responds** [3] - 362:12, 362:13, 406:14
**response** [6] - 360:24, 364:25, 403:22, 428:16, 430:9, 437:9
**responsibilities** [3] - 458:19, 467:9, 502:18
**responsible** [2] - 421:19, 495:21
**rest** [9] - 349:12, 356:5, 360:17, 361:6, 483:4, 485:6, 489:17, 493:7, 494:4, 496:8
**rested** [1] - 482:17
**restful** [1] - 349:16
**resting** [1] - 347:12
**restrictions** [1] - 373:9
**restroom** [1] - 347:6
**rests** [2] - 482:15, 493:13
**result** [2] - 449:19, 513:23
**results** [8] - 461:22, 463:14, 463:18, 464:1, 477:24, 478:5, 478:22, 479:18
**resume** [2] - 349:19, 349:20
**retrieve** [2] - 461:9, 477:11
**return** [1] - 445:22
**returned** [2] - 347:21, 448:16
**reveal** [1] - 479:23
**review** [11] - 370:12, 370:20, 427:17, 427:24, 429:19, 436:17, 439:15, 441:1, 443:24, 453:24, 477:24
**reviewed** [13] - 427:2, 429:16, 435:20, 436:1, 436:14, 438:11, 439:3, 441:11, 444:1, 450:2, 451:21, 479:2, 528:7
**reviewing** [1] - 410:7
**revised** [3] - 522:7, 522:19, 528:22
**reword** [1] - 515:5
**Ridgewood** [1] - 433:6
**right-hand** [1] - 428:13
**rise** [7] - 407:15, 456:10, 457:3, 482:22, 493:9, 494:7
**risk** [3] - 437:15, 501:8
**risking** [1] - 437:13
**risky** [2] - 361:1, 365:11
**RN** [1] - 435:13

**Robert** [2] - 457:17, 457:23
**ROBERT** [2] - 458:1, 533:14
**rock** [1] - 442:4
**role** [8] - 418:21, 423:20, 424:4, 424:6, 459:5, 466:13, 466:18, 471:8
**room** [4] - 426:2, 448:1, 449:11, 517:24, 518:1
**roughly** [1] - 407:19
**rule** [2] - 384:20, 385:6
**Rule** [2] - 446:2, 446:7
**rules** [1] - 504:18
**run** [4] - 408:12, 416:21, 524:20, 527:25
**running** [6] - 355:2, 366:12, 396:2, 421:19, 421:22, 526:3
**rush** [1] - 442:2
**rushed** [2] - 490:24, 491:24

## S

**safe** [1] - 437:11
**safer** [2] - 357:6, 357:10
**safety** [2] - 423:23, 440:9
**SAHIL** [2] - 404:11, 404:18
**SAHLI** [10] - 346:20, 346:22, 391:5, 391:9, 391:18, 391:21, 392:24, 393:3, 450:21, 452:18
**Sahli** [12] - 380:21, 382:11, 391:2, 391:15, 391:17, 392:22, 404:10, 450:19, 451:14, 452:16, 453:12, 522:13
**sake** [1] - 451:15
**sale** [9] - 373:9, 373:15, 374:8, 374:16, 376:11, 376:17, 383:8, 384:1, 473:21
**sales** [1] - 376:14
**salient** [1] - 526:1
**Sands** [1] - 524:22
**sat** [1] - 449:11
**satisfied** [3] - 399:20, 399:22, 515:4
**satisfy** [2] - 517:6, 520:7
**Saturday** [4] - 360:8, 360:21, 431:5, 432:15
**saved** [3] - 388:14, 461:2, 477:5
**saw** [6] - 377:21, 389:23, 428:7, 429:11, 435:9, 449:6
**Saw** [1] - 428:17
**sayings** [1] - 384:24
**scam** [1] - 357:23
**scams** [1] - 443:1
**scared** [1] - 364:25
**science** [1] - 417:24
**scope** [2] - 388:24, 408:15
**scratching** [1] - 514:22
**screen** [12] - 350:9, 350:12, 370:8, 381:13, 450:25, 452:23, 462:2, 462:9, 470:24, 472:1, 472:4, 480:4
**scroll** [1] - 362:5
**scrolled** [1] - 508:21
**search** [33] - 427:5, 428:10, 441:11,

443:25, 447:18, 447:21, 448:11, 448:13, 448:16, 449:8, 449:19, 461:8, 461:14, 461:20, 461:22, 463:11, 463:14, 463:22, 464:3, 477:10, 477:19, 477:22, 477:24, 478:5, 478:18, 478:22, 479:18, 479:22, 481:10, 481:18, 481:21
**searches** [2] - 461:12, 477:14
**searching** [4] - 449:5, 449:14, 524:17, 524:22
**seat** [8] - 349:15, 363:12, 407:24, 415:14, 457:5, 465:6, 482:25, 494:9
**seated** [1] - 363:9
**Second** [2] - 509:17, 510:16
**second** [11] - 363:4, 367:12, 444:23, 475:1, 481:7, 485:13, 494:10, 505:17, 507:24, 513:8, 516:8
**secondly** [1] - 511:6
**Secrecy** [6] - 466:14, 466:16, 466:18, 466:20, 467:12, 479:14
**secrecy** [1] - 466:15
**secret** [1] - 506:22
**Secretary** [1] - 475:18
**secretive** [1] - 506:19
**section** [14] - 354:21, 357:25, 364:12, 412:15, 414:9, 420:11, 458:14, 471:19, 472:20, 473:13, 474:5, 475:2, 498:19, 501:10
**Section** [5] - 417:19, 417:21, 498:15, 500:5, 501:11
**security** [7] - 371:19, 386:17, 387:1, 424:7, 463:13, 463:16, 479:20
**see** [46] - 349:15, 350:9, 350:12, 350:13, 351:13, 351:14, 351:17, 368:18, 368:19, 370:7, 370:9, 375:12, 380:25, 381:16, 393:14, 394:1, 394:4, 400:16, 411:19, 415:25, 421:23, 424:7, 424:23, 432:15, 444:13, 445:13, 446:4, 446:19, 450:25, 462:5, 470:24, 470:25, 472:15, 473:15, 478:12, 478:15, 480:6, 490:16, 509:13, 521:10, 522:5, 524:23, 528:4, 530:13, 532:5, 532:12
**seeing** [2] - 359:19, 392:6
**seek** [1] - 352:22
**seeking** [1] - 383:8
**seem** [2] - 395:11, 456:23
**sees** [1] - 368:12
**segment** [5] - 353:10, 353:16, 354:3, 366:10, 392:22
**segregated** [1] - 399:15
**seize** [3] - 389:24, 390:6, 414:17
**Seized** [1] - 394:14
**seized** [8] - 390:3, 390:19, 392:18, 394:13, 413:20, 414:11, 414:12, 414:14
**seizure** [2] - 393:7, 394:10
**select** [1] - 429:18
**selected** [2] - 377:14, 377:17
**sell** [8] - 362:7, 363:21, 366:6, 397:9,

401:4, 428:7, 428:17, 440:2
**seller** [3] - 434:10, 435:7, 440:1
**sellers** [2] - 426:24, 469:3
**Selling** [1] - 376:3
**selling** [29] - 363:17, 365:22, 373:1, 375:5, 376:5, 376:8, 382:14, 382:21, 383:4, 383:7, 383:24, 384:6, 384:25, 387:20, 403:16, 404:3, 404:19, 409:1, 410:19, 411:12, 412:1, 412:2, 412:4, 412:7, 412:9, 412:12, 431:14, 485:21, 489:7
**send** [7] - 358:3, 364:17, 521:10, 528:22, 531:5, 532:2, 532:4
**sending** [1] - 361:18
**sends** [2] - 429:1, 531:9
**Senior** [2] - 467:8, 467:9
**sense** [4] - 515:7, 521:9, 529:2, 529:23
**sent** [9] - 356:17, 356:22, 371:9, 382:17, 445:16, 447:13, 450:2, 530:14, 530:18
**sentence** [48] - 495:8, 495:12, 496:17, 498:17, 499:22, 500:10, 501:12, 503:12, 507:3, 507:22, 507:24, 508:3, 508:6, 511:21, 513:11, 515:5, 516:3, 516:9, 516:21, 516:24, 516:25, 517:3, 517:7, 517:12, 517:19, 517:21, 517:22, 518:6, 518:11, 518:12, 519:2, 519:3, 519:19, 519:24, 519:25, 520:2, 520:18, 521:16, 521:18, 521:23, 523:19, 523:20, 524:16
**sentences** [2] - 514:22, 517:5
**separate** [3] - 386:9, 427:20, 453:2
**September** [3] - 350:21, 383:11, 396:11
**sequence** [1] - 375:13
**series** [3] - 358:5, 447:11, 453:1
**serves** [1] - 459:18
**Service** [2] - 469:4, 471:4
**service** [11] - 462:13, 462:23, 468:23, 468:24, 468:25, 469:2, 473:19, 475:5, 475:12, 481:19, 526:4
**Services** [11] - 456:20, 457:12, 458:9, 459:14, 460:7, 460:18, 461:4, 461:8, 462:12, 462:21, 464:6
**services** [17] - 458:23, 460:16, 468:14, 469:25, 470:1, 470:10, 472:25, 473:13, 474:2, 474:10, 474:20, 476:12, 476:13, 481:10, 498:24, 525:9, 527:21
**SESSION** [1] - 457:1
**set** [7] - 362:3, 423:18, 424:21, 425:10, 527:14, 530:7, 531:2
**setout** [1] - 476:6
**setting** [1] - 365:14
**seven** [6] - 362:10, 378:19, 378:22, 397:14, 432:3, 437:18
**seventh** [1] - 406:4
**several** [4] - 358:5, 374:2, 468:8, 486:25
**shady** [1] - 437:23

**shattering** [1] - 456:23
**sheet** [1] - 456:22
**Shernelle** [1] - 396:17
**shipping** [3] - 444:5, 445:16, 445:22
**shooting** [1] - 356:4
**short** [1] - 386:17
**shorten** [1] - 517:20
**shortened** [1] - 490:22
**shorter** [3] - 482:20, 520:19, 522:22
**shortly** [1] - 447:22
**show** [12] - 350:5, 351:9, 358:12, 370:5, 427:7, 444:6, 444:25, 461:25, 462:15, 470:18, 478:7, 478:20
**showed** [1] - 426:16
**showing** [3] - 445:6, 445:18, 485:15
**shown** [1] - 352:13
**shows** [1] - 524:25
**side** [4] - 428:13, 428:14, 445:8, 519:19
**Side** [2] - 431:20, 431:23
**side's** [1] - 531:6
**sidebar** [4] - 419:4, 420:1, 420:21, 421:6
**Sidebar** [1] - 419:6
**sides** [2] - 486:10, 504:24
**sides'** [1] - 493:25
**Signal** [18] - 360:1, 367:9, 367:10, 382:17, 423:2, 423:3, 423:4, 423:5, 423:13, 423:14, 426:25, 427:15, 436:1, 436:2, 447:7, 450:6, 450:7, 451:19
**signaled** [1] - 376:22
**signed** [2] - 462:12, 462:21
**similar** [1] - 506:17
**similarly** [1] - 507:1
**simply** [16] - 395:9, 400:16, 403:2, 403:24, 404:18, 410:1, 420:17, 487:12, 487:15, 495:7, 502:15, 504:23, 507:22, 509:21, 524:13, 525:19
**sine** [1] - 374:2
**singer** [1] - 529:14
**SINGER** [131] - 346:19, 349:2, 349:8, 351:2, 352:5, 361:14, 369:3, 371:4, 372:4, 372:6, 372:11, 374:23, 380:14, 380:16, 380:19, 381:12, 382:11, 391:2, 392:22, 393:1, 396:18, 396:20, 400:2, 404:10, 405:13, 407:8, 409:15, 409:18, 409:24, 414:18, 414:23, 417:8, 417:10, 419:2, 420:14, 438:18, 439:7, 446:4, 446:6, 447:4, 450:19, 450:23, 450:24, 451:14, 452:16, 452:21, 453:12, 453:13, 454:16, 455:6, 463:5, 464:12, 471:14, 479:8, 482:8, 483:4, 483:6, 484:22, 485:6, 490:2, 490:5, 490:13, 491:1, 491:7, 491:10, 491:12, 491:17, 492:7, 492:17, 493:2, 493:13, 496:12, 497:1, 498:19, 499:1, 499:10, 499:12, 499:18, 499:21, 500:16, 500:23,

501:2, 501:7, 501:10, 501:12, 501:15, 501:24, 502:2, 502:5, 502:12, 504:11, 505:3, 505:15, 505:17, 505:20, 507:21, 508:19, 508:21, 510:2, 510:10, 511:18, 511:21, 513:18, 513:22, 514:8, 518:14, 518:18, 522:4, 522:24, 523:5, 523:13, 523:17, 523:19, 524:5, 525:3, 526:8, 526:19, 526:23, 527:2, 527:25, 528:13, 528:17, 528:20, 529:16, 529:19, 529:21, 530:3, 531:25, 532:8, 533:7, 533:12
**Singer** [30] - 348:25, 372:9, 405:11, 414:22, 447:2, 464:11, 483:1, 483:10, 487:23, 490:1, 493:11, 493:16, 496:4, 498:13, 500:2, 500:15, 500:21, 502:9, 504:9, 509:24, 515:23, 518:17, 521:17, 522:3, 522:10, 522:13, 523:4, 525:16, 527:24, 528:11
**singular** [1] - 504:8
**sit** [3] - 407:22, 407:23, 493:4
**site** [2] - 377:7, 377:15
**sitting** [7] - 367:15, 399:13, 399:16, 422:6, 422:7, 437:10, 491:2
**situation** [2] - 510:25, 511:12
**six** [8] - 396:21, 430:1, 453:2, 475:2, 475:4, 475:6, 475:7
**size** [2] - 435:17, 468:18
**skip** [1] - 430:9
**skipped** [1] - 353:19
**Skipping** [1] - 433:2
**skipping** [5] - 431:17, 434:15, 437:18, 440:17, 442:9
**slightly** [1] - 482:20
**slow** [1] - 529:3
**slower** [4] - 396:15, 421:17, 458:24, 483:22
**slowly** [1] - 417:12
**small** [3] - 426:17, 435:24, 468:21
**smaller** [2] - 357:6, 426:22
**snitch** [1] - 443:16
**social** [4] - 371:19, 463:13, 463:15, 479:20
**sold** [9] - 373:10, 373:20, 374:21, 401:15, 410:15, 410:19, 411:8, 413:14, 524:8
**solely** [1] - 493:6
**solemnly** [2] - 457:17, 465:1
**solid** [2] - 388:19, 399:9
**solidified** [1] - 399:9
**solo** [1] - 440:15
**solves** [1] - 496:21
**someone** [13] - 378:15, 385:25, 386:19, 386:25, 388:22, 401:21, 401:24, 403:16, 404:18, 428:6, 441:1, 476:17, 530:24
**sometime** [1] - 390:11
**sometimes** [4] - 379:14, 379:15, 492:23, 502:23
**somewhat** [2] - 493:17, 507:15

**somewhere** [4] - 398:24, 437:11, 440:5, 440:20
**son** [1] - 442:18
**soon** [3] - 395:19, 493:22, 531:4
**sooner** [1] - 490:23
**SOPHIE** [1] - 346:23
**sorry** [23] - 359:23, 375:1, 379:1, 380:18, 386:22, 391:6, 409:17, 409:19, 412:22, 434:10, 435:8, 437:6, 437:13, 438:2, 440:6, 440:21, 442:1, 452:22, 456:12, 479:24, 488:10, 498:19, 508:11
**Sorry** [4] - 396:14, 431:14, 458:25, 459:2
**sort** [8] - 356:8, 377:19, 385:14, 395:6, 492:21, 506:21, 520:17, 526:15
**sorts** [1] - 418:24
**sought** [1] - 400:12
**sound** [2] - 355:3, 496:24
**sounds** [2] - 364:19, 502:13
**source** [9] - 486:8, 486:9, 487:6, 515:2, 516:6, 516:19, 516:23, 517:15, 524:18
**speaker** [1] - 503:24
**speaking** [3] - 366:25, 459:11, 469:22
**Special** [19] - 348:8, 367:3, 367:4, 367:9, 415:3, 417:1, 418:5, 422:15, 423:16, 423:21, 423:24, 425:8, 495:24, 502:24, 502:25, 503:5, 504:2, 504:6
**special** [10] - 357:11, 374:10, 416:10, 416:11, 416:12, 416:20, 416:21, 417:15, 418:21, 476:11
**Specialist** [2] - 466:14, 466:18
**specialty** [2] - 417:21, 418:7
**specific** [6] - 367:5, 367:9, 392:16, 402:24, 502:13, 511:5
**specifically** [8] - 376:14, 384:11, 395:15, 459:24, 469:14, 498:21, 507:6, 510:16
**Specifically** [1] - 487:22
**specifics** [2] - 400:9, 404:5
**specified** [1] - 518:24
**speculate** [1] - 496:8
**speculation** [1] - 524:7
**spell** [3] - 415:16, 457:21, 465:10
**spills** [1] - 347:13
**split** [3] - 356:25, 443:12, 443:13
**splitting** [1] - 357:14
**spoken** [1] - 507:15
**spot** [2] - 433:15, 441:20
**spurious** [1] - 487:15
**spying** [1] - 505:10
**stage** [1] - 365:14
**stamp** [1] - 355:21
**stand** [8] - 407:23, 415:8, 457:12, 457:14, 464:20, 464:22, 479:13, 490:8
**standard** [5] - 492:12, 505:8, 509:11, 509:12, 530:25
**standing** [4] - 415:9, 457:14, 464:22,

528:11
**stands** [1] - 479:14
**Starbucks** [13] - 350:18, 350:20, 430:7, 430:14, 431:16, 432:2, 433:7, 434:13, 434:19, 437:3, 437:6, 440:3, 441:22
**staring** [1] - 400:15
**start** [25] - 362:24, 364:17, 370:13, 380:19, 391:15, 412:25, 430:2, 431:8, 432:5, 432:13, 434:3, 435:6, 436:7, 437:1, 437:19, 439:23, 441:24, 442:25, 443:11, 456:6, 456:15, 462:7, 492:6, 493:24, 528:24
**started** [11] - 377:16, 383:17, 386:9, 395:21, 396:2, 396:22, 416:13, 444:21, 448:13, 448:16, 466:13
**Starting** [2] - 391:22, 393:3
**starting** [19] - 359:13, 364:10, 414:4, 428:15, 429:1, 431:21, 432:5, 433:12, 434:17, 436:8, 437:1, 437:9, 439:23, 440:18, 441:18, 442:25, 443:11, 450:22, 493:6
**starts** [3] - 353:23, 397:4, 499:4
**State** [26] - 373:9, 373:21, 374:7, 374:15, 374:16, 375:23, 376:17, 409:2, 446:17, 457:12, 457:21, 458:8, 458:13, 459:9, 459:12, 459:19, 460:1, 460:4, 460:17, 461:4, 461:8, 462:14, 462:21, 462:23, 464:5, 486:3
**state** [12] - 373:13, 373:15, 373:20, 374:22, 384:3, 384:10, 384:11, 395:4, 396:20, 415:16, 458:23, 465:10
**statement** [6] - 444:16, 445:3, 489:1, 506:4, 507:12, 511:25
**statements** [6] - 372:20, 438:15, 439:5, 489:3, 493:21, 493:25
**STATES** [3] - 346:1, 346:3, 346:12
**states** [5] - 374:21, 473:24, 473:25, 507:4, 512:12
**States** [16] - 346:5, 346:14, 346:18, 408:24, 416:6, 469:20, 469:23, 474:22, 475:22, 494:23, 495:15, 496:20, 498:15, 499:19, 509:18, 524:23
**stating** [3] - 412:4, 462:12, 462:22
**status** [2] - 374:4, 374:9
**statute** [14] - 348:4, 349:7, 466:17, 479:15, 495:1, 495:16, 496:20, 496:23, 497:2, 497:5, 498:14, 506:7, 526:1, 526:10
**stay** [4] - 347:20, 398:5, 399:4, 498:14
**staying** [1] - 491:3
**stellar** [1] - 347:19
**stenography** [1] - 346:25
**step** [4] - 376:20, 407:17, 414:24, 455:7
**steps** [4] - 398:23, 415:1, 459:17, 482:12
**stick** [1] - 503:16
**still** [30] - 349:21, 349:22, 364:23,

365:11, 365:16, 365:17, 367:19, 368:3, 374:18, 374:19, 375:9, 377:7, 408:20, 408:22, 435:13, 443:14, 451:25, 453:8, 476:18, 478:13, 499:13, 501:6, 507:17, 514:6, 515:13, 524:20, 528:6, 528:18, 532:6, 532:10
**stips** [1] - 531:20
**stop** [1] - 440:16
**stopped** [7] - 388:21, 391:24, 393:5, 404:17, 413:4, 413:23, 414:7
**story** [7] - 356:7, 363:16, 382:13, 394:23, 395:5, 412:2, 412:3
**straightforward** [1] - 485:14
**stray** [1] - 497:20
**street** [2] - 413:13, 437:24
**Street** [4] - 352:14, 440:3, 441:22, 444:23
**strike** [1] - 516:25
**strikes** [1] - 503:12
**stuff** [3] - 411:9, 520:14, 532:13
**subject** [1] - 481:17
**submit** [2] - 459:15, 460:7
**submitted** [2] - 482:1, 485:18
**subpart** [3] - 497:23, 498:22, 499:4
**substance** [3] - 365:24, 408:17, 408:20
**Substances** [1] - 417:19
**substances** [1] - 364:5
**substitutes** [8] - 495:3, 498:2, 498:11, 498:16, 499:6, 499:9, 499:16
**subtle** [1] - 502:17
**successful** [1] - 408:13
**suck** [1] - 440:7
**sucks** [1] - 440:6
**sufficient** [6] - 399:23, 483:14, 485:10, 485:18, 505:23, 512:1
**suggest** [8] - 487:6, 496:17, 507:5, 512:6, 514:10, 517:21, 521:3, 522:19
**suggested** [6] - 388:2, 388:15, 388:17, 489:23, 500:2, 500:3
**suggesting** [4] - 453:20, 488:19, 489:2, 513:11
**suggestion** [4] - 403:23, 496:25, 498:8, 498:10
**suggests** [7] - 512:4, 514:5, 515:11, 517:4, 517:23, 518:5, 525:14
**suit** [1] - 436:9
**Suite** [1] - 346:19
**sum** [1] - 493:5
**summarized** [1] - 370:21
**summary** [2] - 370:15, 380:15
**summations** [2] - 492:20, 529:2
**Sunday** [2] - 360:8, 360:21
**Sunnyside** [7] - 351:6, 430:7, 431:16, 434:20, 444:23, 445:17, 445:23
**superintendent** [1] - 458:22
**supporting** [3] - 470:14, 475:4, 475:10
**supposed** [3] - 401:7, 420:3, 425:11
**surrounding** [1] - 372:23

**surveil** [1] - 424:9
**surveiled** [1] - 424:11
**surveillance** [13] - 416:22, 421:20, 423:22, 424:4, 424:6, 424:12, 424:15, 424:19, 425:1, 439:11, 439:14, 453:25, 503:3
**suspected** [1] - 377:11
**suspicion** [2] - 377:20, 378:4
**suspicions** [1] - 378:10
**suspicious** [4] - 378:16, 470:5, 474:20, 476:1
**sustain** [2] - 505:18, 507:23
**Sustained** [3] - 374:17, 414:19, 419:3
**sustained** [2] - 348:15, 361:15
**swear** [3] - 457:17, 464:23, 465:1
**switching** [2] - 435:2, 445:25
**sworn** [6] - 349:25, 415:10, 415:11, 457:15, 458:3, 466:3
**sworn/affirmed** [1] - 415:20
**synonyms** [1] - 418:15
**system** [3] - 467:20, 468:7, 526:15

# T

**T-A-R-W-A-C-K-I** [1] - 457:23
**T-H-E-O-D-O-R-E** [1] - 465:11
**tab** [8] - 352:25, 410:24, 412:24, 414:2, 414:3, 476:11, 476:12
**table** [3] - 422:2, 422:7, 437:10
**tabs** [1] - 409:14
**talks** [2] - 438:11, 510:22
**tapes** [1] - 387:15
**target** [1] - 502:9
**Tarwacki** [6] - 457:11, 457:13, 457:23, 458:6, 464:16, 482:9
**TARWACKI** [2] - 458:1, 533:14
**tasked** [1] - 467:20
**tax** [1] - 348:10
**taxes** [2] - 405:9, 405:21
**taxpayer** [2] - 470:13, 472:11
**TD** [2] - 444:16, 445:3
**team** [7] - 367:6, 367:15, 367:16, 448:6, 448:14, 449:20, 503:3
**technical** [2] - 363:5, 364:18
**technically** [1] - 503:20
**technicians** [2] - 447:16, 450:3
**Telegram** [5] - 441:25, 442:3, 442:7, 442:8, 442:16
**telephone** [2] - 466:22, 476:21
**term** [14] - 441:6, 450:11, 452:8, 453:19, 460:14, 495:17, 495:21, 497:4, 497:15, 520:25, 521:1, 524:2, 524:21
**terms** [6] - 394:22, 472:8, 472:23, 485:14, 499:8, 507:18
**terrible** [1] - 472:4
**territories** [1] - 473:25
**testified** [13] - 349:25, 372:16, 377:22, 384:13, 385:13, 394:25, 403:14,
415:20, 454:8, 458:3, 466:3, 503:22, 528:14
**testify** [10] - 347:16, 483:7, 483:11, 483:15, 483:19, 483:25, 484:6, 484:7, 484:8, 484:12
**testifying** [1] - 483:8
**testimony** [15] - 348:18, 375:20, 450:5, 457:17, 465:1, 485:21, 486:9, 490:10, 491:15, 495:25, 496:9, 501:13, 501:22, 502:8, 502:19
**text** [16] - 362:9, 376:21, 382:17, 382:24, 382:25, 383:1, 411:12, 428:12, 431:19, 432:17, 441:25, 451:18, 451:23, 454:13, 454:22
**Text** [2] - 431:10, 432:20
**texted** [1] - 431:14
**texts** [2] - 376:22, 453:3
**thankfully** [1] - 347:19
**THE** [300] - 346:12, 346:19, 347:4, 347:9, 347:15, 348:14, 348:25, 349:6, 349:10, 349:15, 350:3, 351:1, 351:3, 351:11, 351:15, 352:4, 352:6, 352:24, 353:2, 353:17, 353:22, 353:25, 354:6, 354:10, 354:12, 354:17, 354:20, 361:15, 362:22, 363:1, 363:6, 369:2, 369:4, 369:6, 371:3, 371:5, 372:5, 372:8, 374:17, 374:24, 380:13, 380:15, 380:18, 380:24, 381:14, 391:4, 391:6, 391:7, 391:11, 391:19, 391:22, 393:22, 396:14, 396:19, 404:14, 405:11, 405:15, 407:9, 407:15, 407:17, 407:22, 409:17, 409:19, 409:25, 410:9, 410:16, 411:1, 414:19, 414:22, 414:24, 415:2, 415:5, 415:9, 415:13, 415:14, 415:17, 415:18, 416:15, 416:17, 416:18, 416:19, 417:9, 417:11, 419:3, 420:2, 420:12, 420:15, 421:2, 421:16, 422:4, 422:9, 427:10, 427:12, 427:13, 438:20, 438:24, 439:8, 444:11, 445:9, 446:3, 446:5, 446:7, 446:11, 446:23, 447:1, 454:17, 455:5, 455:7, 456:1, 456:4, 456:10, 456:12, 456:21, 457:3, 457:5, 457:13, 457:16, 457:20, 457:21, 457:23, 457:24, 458:24, 458:25, 459:1, 459:2, 459:3, 462:2, 462:4, 463:4, 463:6, 464:10, 464:14, 464:21, 464:24, 464:25, 465:4, 465:5, 465:7, 465:8, 465:11, 465:13, 466:23, 466:25, 467:1, 467:2, 467:3, 470:20, 470:22, 471:13, 471:15, 471:25, 472:4, 478:10, 479:7, 479:9, 479:24, 480:3, 481:2, 482:4, 482:7, 482:9, 482:11, 482:13, 482:16, 482:22, 482:25, 483:5, 483:9, 483:12, 483:13, 483:18, 483:20, 483:24, 484:1, 484:3, 484:5, 484:10, 484:11, 484:14, 484:15, 484:17, 484:18, 485:3, 485:8, 485:25, 489:25, 490:4, 490:12, 490:16, 491:5, 491:8, 491:11, 491:16,
491:20, 492:12, 492:18, 493:3, 493:9, 493:11, 493:15, 494:7, 494:9, 494:15, 494:18, 495:7, 495:19, 496:1, 496:4, 496:24, 497:6, 497:13, 497:17, 497:20, 497:25, 498:13, 498:20, 499:3, 499:11, 499:15, 499:20, 499:22, 500:9, 500:14, 500:17, 500:21, 501:1, 501:4, 501:9, 501:11, 501:14, 501:20, 502:1, 502:4, 502:6, 502:18, 503:2, 503:8, 503:16, 503:24, 504:7, 505:1, 505:4, 505:16, 505:19, 506:16, 508:5, 508:20, 509:4, 510:7, 510:12, 510:18, 511:3, 511:20, 513:2, 513:21, 513:24, 514:13, 515:8, 516:20, 517:2, 517:17, 518:15, 518:20, 519:23, 521:2, 521:13, 522:7, 523:1, 523:10, 523:15, 523:18, 524:4, 524:15, 525:11, 526:9, 526:22, 526:24, 527:4, 527:14, 528:1, 528:3, 528:4, 528:10, 528:15, 528:18, 528:21, 529:5, 529:12, 529:14, 529:17, 529:20, 529:22, 530:5, 531:2, 531:14, 531:16, 531:18, 531:23, 532:2, 532:12
**theme** [2] - 473:7, 474:16
**themselves** [1] - 474:23
**THEODORE** [2] - 466:1, 533:16
**Theodore** [2] - 464:19, 465:11
**theory** [2] - 377:17, 526:2
**thereabout** [1] - 407:11
**thinking** [4] - 435:13, 497:6, 513:24, 521:14
**thinks** [1] - 503:13
**third** [4] - 452:22, 453:7, 481:14, 523:19
**thousand** [4] - 426:21, 435:25, 436:3, 436:15
**thread** [36] - 428:4, 428:23, 429:6, 429:23, 429:25, 430:18, 431:6, 431:17, 432:3, 432:11, 433:2, 433:11, 434:2, 434:15, 435:2, 435:3, 436:7, 436:21, 436:22, 437:7, 437:18, 439:20, 439:21, 440:17, 440:23, 441:9, 441:14, 441:16, 442:9, 450:15, 450:22, 451:16, 451:21, 452:14, 452:23, 453:9
**threads** [10] - 427:21, 427:22, 428:9, 429:15, 435:19, 436:13, 441:1, 450:6, 450:7, 454:7
**threaten** [1] - 437:22
**threats** [1] - 452:4
**three** [13] - 353:20, 386:8, 387:7, 387:10, 387:11, 392:3, 453:1, 472:20, 473:2, 503:7, 517:5, 523:9, 523:11
**throughout** [3] - 424:23, 458:23, 518:21
**Thursday** [1] - 346:7
**tided** [1] - 395:25
**tie** [1] - 422:8
**timestamp** [12] - 353:5, 353:6, 353:12,

353:13, 355:5, 362:25, 365:7, 366:8, 366:23, 391:20, 404:12, 413:23
**timing** [1] - 405:14
**Timing** [1] - 407:10
**title** [3] - 416:9, 458:10, 467:7
**Title** [1] - 497:18, 497:19, 497:21
**today** [15] - 347:11, 347:14, 347:24, 374:18, 377:8, 408:21, 421:24, 442:5, 489:24, 490:4, 490:6, 492:1, 493:4, 493:17, 493:19
**together** [2] - 517:1, 522:6
**tomorrow** [12] - 431:11, 435:14, 441:21, 490:22, 491:4, 491:25, 492:1, 492:20, 493:21, 493:22, 521:11, 532:12
**tonight** [2] - 521:10, 523:3
**tons** [1] - 363:14
**took** [8] - 358:9, 370:18, 394:21, 426:1, 449:10, 449:13, 501:2
**top** [25] - 354:4, 354:13, 362:24, 430:2, 431:8, 432:13, 434:4, 434:17, 435:4, 435:6, 437:20, 439:23, 441:14, 441:24, 442:10, 442:25, 450:15, 451:2, 452:15, 472:2, 472:20, 473:14, 474:5, 505:17, 528:8
**topic** [2] - 420:18, 527:10
**tops** [1] - 434:22
**total** [4] - 366:16, 366:17, 371:6, 371:8
**touch** [2] - 402:13, 487:5
**towards** [1] - 393:2
**Trace** [1] - 417:21
**track** [1] - 528:22
**trade** [2] - 439:25, 486:14
**Trade** [1] - 440:1
**trader** [2] - 360:13, 361:3
**trades** [1] - 438:2
**Traffic** [1] - 440:9
**trafficking** [22] - 416:8, 486:24, 509:9, 510:6, 510:23, 511:24, 512:3, 512:9, 512:11, 513:17, 514:20, 517:18, 518:9, 518:18, 518:19, 518:20, 518:25, 519:18, 520:5, 520:12, 521:22, 522:21
**training** [10] - 408:11, 411:11, 411:14, 414:15, 441:4, 443:4, 454:21, 459:7, 467:13, 469:18
**transact** [5] - 364:15, 364:24, 366:14, 377:19, 393:12
**transacting** [3] - 356:21, 357:6, 357:8
**transaction** [26] - 352:10, 352:16, 352:19, 355:10, 358:9, 358:11, 359:5, 364:9, 367:5, 381:1, 381:18, 396:11, 399:9, 403:16, 404:2, 426:20, 437:22, 442:1, 453:15, 454:3, 470:3, 470:15, 474:7, 474:25, 516:7, 519:17
**transactions** [38] - 362:3, 368:23, 370:15, 370:19, 372:2, 376:6, 376:9, 379:24, 380:2, 382:2, 382:3, 382:6, 385:8, 393:12, 396:22, 398:6, 399:11, 429:20, 435:17, 435:24, 443:13,

443:14, 454:5, 470:6, 476:2, 486:15, 488:13, 488:18, 510:22, 511:23, 512:8, 514:19, 515:3, 518:8, 520:4, 520:11, 521:21
**transcribed** [1] - 528:23
**TRANSCRIPT** [1] - 346:11
**transcript** [21] - 346:25, 353:1, 353:18, 355:4, 362:24, 375:12, 391:8, 391:9, 391:10, 391:19, 404:12, 409:6, 409:7, 409:13, 410:7, 410:10, 410:22, 412:17, 412:20, 414:2, 530:14
**Transcription** [1] - 346:25
**transcripts** [9] - 353:3, 391:13, 409:20, 409:22, 410:1, 410:6, 532:1
**transfer** [10] - 368:5, 379:8, 379:12, 379:14, 397:23, 398:2, 494:23, 495:14, 496:19, 499:18
**transferred** [1] - 398:14
**transferring** [2] - 398:3, 495:17
**transmission** [7] - 469:9, 469:11, 473:20, 497:16, 498:1, 499:5
**transmit** [1] - 475:21
**transmitter** [5] - 469:3, 469:7, 469:8, 469:24, 470:10
**transmitters** [2] - 469:6, 477:15
**transmitting** [19] - 348:5, 348:6, 348:22, 349:7, 459:9, 459:12, 460:20, 461:10, 469:20, 469:23, 475:20, 476:23, 477:12, 481:24, 485:13, 485:17, 488:23, 494:21, 495:13, 495:17, 496:14, 496:16, 496:18, 497:14, 498:21, 498:22, 498:24, 499:12, 523:14, 524:2, 525:13, 526:6
**transported** [1] - 448:20
**Treasury** [6] - 464:20, 466:9, 467:20, 475:19, 481:25, 486:5
**treated** [1] - 348:9
**trial** [4] - 470:17, 473:7, 474:16, 483:11
**Triboro** [1] - 440:13
**trickier** [1] - 509:4
**tricky** [1] - 514:16
**trip** [1] - 432:14
**trouble** [6] - 357:1, 357:15, 365:5, 366:2, 366:7, 376:1
**true** [6] - 373:19, 455:2, 498:14, 511:25, 513:18, 514:6, 521:2, 526:12
**truly** [1] - 506:13
**trusted** [1] - 358:6
**truth** [7] - 457:18, 457:19, 465:2, 465:3, 513:6
**try** [14] - 387:19, 388:3, 394:21, 395:1, 420:17, 426:16, 438:2, 442:22, 529:3, 529:12, 530:9, 531:22, 531:23
**trying** [14] - 356:2, 361:12, 403:23, 441:7, 441:19, 443:20, 455:2, 486:23, 487:6, 508:6, 513:14, 522:17, 527:19, 529:23
**Tuesday** [4] - 352:9, 362:8, 384:14, 394:19

**turn** [9] - 352:25, 353:13, 362:10, 409:13, 413:18, 471:18, 474:3, 478:19, 531:13
**Turning** [2] - 431:6, 475:1
**turning** [12] - 355:4, 360:3, 362:4, 362:23, 430:18, 432:3, 432:11, 440:8, 441:23, 442:24, 443:10, 481:14
**Twenty** [2] - 430:1, 494:18
**Twenty-four** [1] - 494:18
**Twenty-six** [1] - 430:1
**two** [34] - 353:19, 353:21, 354:1, 354:6, 354:12, 354:18, 360:3, 385:11, 389:18, 392:2, 392:6, 393:14, 394:1, 407:12, 435:3, 437:13, 442:1, 446:14, 451:24, 452:6, 453:1, 453:8, 456:17, 456:18, 471:20, 471:22, 472:9, 473:1, 484:23, 485:1, 491:25, 492:5, 500:17, 522:12
**Two** [3] - 348:3, 494:16, 523:7
**type** [4] - 467:24, 469:1, 470:12, 475:10
**types** [4] - 467:21, 467:25, 468:15, 473:19
**typical** [2] - 426:19, 435:17
**Typically** [1] - 396:8
**typically** [6] - 408:14, 411:15, 411:16, 414:16, 438:6, 441:5
**typo** [2] - 438:8, 501:14

## U

**U.S** [8] - 425:7, 464:20, 466:9, 467:19, 469:4, 474:24, 475:18, 481:24
**U.S.C** [2] - 497:12, 500:5
**UC** [5] - 424:10, 424:14, 424:16, 487:5, 488:9
**ugliness** [1] - 452:1
**ultimately** [1] - 364:19
**Um-hmm** [2] - 378:25, 394:15
**unaware** [1] - 449:3
**uncertain** [4] - 364:2, 372:23, 514:8, 514:9
**uncover** [4] - 501:25, 502:2, 503:1, 504:8
**Under** [1] - 373:4
**under** [30] - 348:2, 348:4, 349:2, 349:22, 361:1, 365:24, 367:24, 372:18, 373:2, 374:22, 408:17, 408:20, 408:24, 422:24, 444:17, 444:22, 445:4, 446:1, 449:16, 461:5, 467:12, 477:7, 495:1, 495:16, 496:14, 497:2, 497:11, 499:24, 500:11, 526:1
**Undercover** [1] - 430:16
**undercover** [49] - 358:19, 367:19, 367:23, 368:1, 382:13, 385:3, 412:2, 423:23, 423:24, 424:2, 424:4, 424:8, 424:9, 424:17, 424:20, 425:1, 425:7, 425:12, 425:20, 425:22, 426:7, 438:15, 439:1, 439:6, 486:13, 486:22, 486:24, 486:25, 487:20, 488:2, 488:6,

489:6, 501:11, 501:13, 501:15,
501:22, 501:24, 502:20, 503:3, 503:9,
503:11, 503:18, 503:20, 503:25,
504:5, 504:7, 504:22, 508:11, 515:19
**undercut** [1] - 520:16
**underlining** [1] - 478:2
**underneath** [1] - 451:9
**Understood** [1] - 378:1
**understood** [14] - 355:17, 356:20,
357:5, 360:1, 360:25, 361:8, 366:4,
375:10, 385:14, 389:14, 389:22,
390:1, 390:3, 514:6
**underway** [1] - 448:12
**unexpectedly** [1] - 493:18
**unfortunately** [1] - 526:10
**union** [1] - 468:13
**unit** [2] - 458:14, 467:4
**UNITED** [3] - 346:1, 346:3, 346:12
**United** [16] - 346:5, 346:14, 346:18,
408:23, 416:6, 469:20, 469:23,
474:22, 475:21, 494:23, 495:15,
496:19, 498:15, 499:19, 509:18,
524:23
**University** [1] - 418:1
**unknown** [1] - 347:15
**unlawful** [1] - 518:25
**unlawfully** [1] - 505:10
**unlicensed** [4] - 349:6, 485:13,
485:17, 488:23
**unnecessarily** [2] - 490:19, 490:21
**unnecessary** [3] - 504:15, 507:3,
520:19
**unrealistic** [1] - 505:13
**unrelated** [1] - 377:23
**unusual** [2] - 387:17, 492:11
**unwittingly** [1] - 468:5
**up** [56] - 348:1, 353:13, 356:2, 357:2,
357:7, 357:15, 358:23, 359:9, 360:7,
360:25, 361:11, 362:3, 362:16,
365:14, 367:17, 368:15, 376:23,
379:21, 380:13, 380:21, 383:1,
395:25, 400:13, 412:15, 423:18,
424:21, 424:23, 425:4, 425:11,
426:13, 426:15, 427:22, 431:2,
432:14, 432:22, 434:5, 450:19,
452:16, 457:14, 463:9, 463:20,
471:19, 472:2, 473:14, 475:3, 479:12,
484:11, 490:17, 493:5, 494:10, 497:8,
499:11, 503:1, 522:9, 522:18, 527:14
**upheld** [1] - 509:22
**Upper** [2] - 431:20, 431:23
**upside** [1] - 445:7
**USA** [9] - 444:17, 444:22, 446:17,
462:22, 463:23, 463:25, 464:4,
481:17, 481:23
**USB** [1] - 532:5
**USD** [1] - 432:16
**user** [1] - 436:1
**uses** [5] - 439:12, 497:15, 498:1,
500:6, 504:21

## V

**V-L-A-H-A-K-I-S** [1] - 465:12
**Vaguely** [1] - 410:20
**valuable** [2] - 470:11, 470:16
**value** [9] - 382:9, 495:3, 498:2, 498:11,
498:16, 499:6, 499:9, 499:16
**Vanderventer** [1] - 346:19
**variant** [1] - 498:11
**varied** [1] - 380:5
**variety** [1] - 524:8
**various** [9] - 390:2, 443:7, 448:5,
449:24, 450:6, 453:24, 454:7, 468:15,
490:10
**vehicle** [5] - 353:11, 355:25, 356:2,
363:11, 367:16
**verdict** [1] - 456:22
**verified** [1] - 380:11
**version** [3] - 412:20, 522:19, 528:22
**versus** [1] - 509:18
**vet** [1] - 460:10
**vetted** [1] - 459:13
**via** [4] - 466:22, 476:20, 486:15, 489:5
**video** [1] - 438:17
**view** [3] - 348:12, 387:1, 387:4
**viewed** [2] - 428:9, 484:24
**viewing** [1] - 386:19
**violations** [3] - 416:6, 458:21, 458:22
**visible** [1] - 476:11
**VLAHAKIS** [2] - 466:1, 533:16
**Vlahakis** [4] - 464:19, 464:21, 465:11,
485:23
**void** [1] - 490:21
**VOL** [1] - 436:10
**volume** [1] - 353:13
**volumes** [1] - 475:11

## W

**wait** [7] - 379:11, 442:4, 471:25,
489:18, 516:7, 516:8, 522:5
**waiting** [5] - 358:9, 400:7, 400:20,
478:13, 491:2
**walk** [1] - 439:14
**walked** [1] - 379:21
**wall** [1] - 481:2
**wallet** [3] - 358:7, 358:19, 397:23
**wands** [1] - 361:9
**wants** [1] - 356:5
**warrant** [6] - 427:5, 428:10, 441:12,
447:19, 447:21, 449:8
**wash** [7] - 441:5, 443:14, 452:8, 452:9,
452:13, 453:8, 453:19
**washed** [2] - 450:11, 472:5
**washing** [4] - 441:2, 441:6, 443:18,
443:19
**Washington** [2] - 346:20, 440:13
**wasting** [1] - 442:11
**watered** [2] - 518:13, 518:15

**ways** [2] - 489:10, 524:9
**weapon** [1] - 437:21
**wearing** [2] - 422:6, 422:8
**weather** [1] - 457:7
**web** [6] - 417:6, 419:1, 420:4, 420:6,
421:4, 421:7
**website** [7] - 377:5, 377:21, 378:1,
422:16, 422:17, 472:15, 476:10
**week** [4] - 359:19, 359:20, 360:7,
360:20
**weighted** [1] - 425:6
**weird** [1] - 515:9
**welcome** [2] - 407:24, 416:19
**Wendy** [1] - 362:12
**Wendy's** [2] - 351:6, 351:21
**WhatsApp** [1] - 427:1
**whispered** [1] - 456:13
**whole** [7] - 437:11, 457:18, 465:2,
498:7, 513:5, 522:5, 528:12
**wholesale** [1] - 528:6
**William** [2] - 430:4, 436:1
**willing** [4] - 347:20, 366:14, 492:16,
501:8
**wiretap** [1] - 423:10
**withdraw** [2] - 396:18, 396:20
**withdrawing** [1] - 396:19
**withdrawn** [3] - 386:12, 436:12,
447:24
**WITNESS** [17] - 415:13, 415:17,
416:17, 416:19, 457:20, 457:23,
458:25, 459:2, 462:4, 464:24, 465:4,
465:7, 465:11, 466:25, 467:2, 482:11,
533:3
**witness** [41] - 349:24, 350:5, 350:11,
351:10, 351:12, 368:16, 368:17,
370:5, 407:25, 410:6, 415:1, 415:2,
415:8, 415:11, 415:19, 422:9, 446:10,
447:2, 454:5, 455:9, 456:2, 456:6,
456:16, 456:19, 457:9, 457:14, 458:2,
461:25, 462:15, 464:11, 464:17,
464:22, 466:2, 470:18, 470:20,
470:21, 478:8, 482:7, 482:12, 496:9
**wittingly** [1] - 468:5
**wonder** [1] - 508:10
**wonderful** [2] - 467:3, 494:4
**wondering** [2] - 429:13, 438:22
**word** [9] - 452:13, 497:5, 498:5, 500:6,
514:13, 514:16, 515:9, 517:11, 520:19
**worded** [2] - 509:21, 512:4
**words** [7] - 402:24, 497:9, 498:1,
506:20, 509:7, 514:5, 515:13
**works** [1] - 358:3
**worried** [2] - 348:17, 501:5
**Worry** [1] - 501:7
**worry** [2] - 501:7, 501:8
**worth** [2] - 429:12, 432:16
**write** [7] - 362:11, 362:13, 411:12,
416:22, 421:21, 484:6, 495:2
**writing** [1] - 521:10
**written** [3] - 506:20, 523:1, 530:4

ALL WORD INDEX                                                28

**wrote** [1] - 362:14
**www.FinCEN.gov** [1] - 476:11

## X

**XVIII** [1] - 497:21
**XXI** [1] - 497:18
**XXXI** [1] - 497:12

## Y

**year** [3] - 392:11, 392:19, 393:8
**yearly** [1] - 460:12
**years** [3] - 374:2, 416:12, 476:20
**yelling** [1] - 367:14
**yesterday** [2] - 384:13, 494:13
**YORK** [1] - 346:1
**York** [33] - 346:6, 346:15, 346:16,
346:20, 346:21, 368:21, 374:7,
374:15, 374:16, 411:10, 417:17,
430:8, 434:20, 436:18, 444:23,
446:17, 457:12, 458:8, 458:13, 459:9,
459:12, 459:19, 460:1, 460:4, 460:17,
461:4, 461:8, 462:14, 462:21, 462:23,
464:5, 486:4
**yourself** [2] - 411:1, 517:23
**Yup** [1] - 501:14
**yup** [2] - 360:15, 494:18

## Z

**zoomed** [1] - 531:21

VB          OCR          CRR