1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - X
3
     UNITED STATES OF AMERICA,      : 19CR386(PKC)
4                                   :
                Plaintiff,          :
5                                   :
          -against-                 : United States Courthouse
6                                   : Brooklyn, New York
     MUSTAFA GOKLU,                 :
7                                   :
                Defendant.          : Friday, October 7, 2022
8                                   : 9:00 a.m.
                                    :
9                                   :
                                    :
10
     - - - - - - - - - - - - - X
11
          TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
12             BEFORE THE HONORABLE PAMELA K. CHEN
                    UNITED STATES DISTRICT JUDGE
13
                         A P P E A R A N C E S:
14
     For the Government: UNITED STATES ATTORNEY'S OFFICE
15                         Eastern District of New York
                           271 Cadman Plaza East
16                         Brooklyn, New York 11201
                      BY:  GILLIAN KASSNER, ESQ.
17                         MARIETOU E. DIOUF, ESQ.
                           FRANCISCO NAVARRO, ESQ.
18                         Assistant United States Attorneys

19   For THE DEFENDANT:    MURRAY E. SINGER, ESQ.
                           14 Vanderventer Avenue, Suite 147
20                         Port Washington, New York 11050
                         SAHLI LAW PLLC
21                         195 Broadway, 4th Floor
                           New York, New York  11211
22                       BY:EMILEE SAHLI, ESQ.

23
     Court Reporter:   **SOPHIE NOLAN**
24                        225 Cadman Plaza East/Brooklyn, NY 11201
                          NolanEDNY@aol.com
25   *Proceedings recorded by mechanical stenography, transcript
     produced by Computer-Aided Transcription*


                         SN    OCR    RPR

1          (In open court.)

2          (The Hon. PAMELA K. CHEN, presiding.)

3          (Defendant present.)

4          (Jury enters the courtroom.)

5          THE COURT:  You may be seated, jurors.  Everyone may

6   be seated.

7          Good morning, ladies and gentlemen, and thank you

8   again for being so prompt and timely.

9          As I said yesterday we are going to hear summations

10  or closing arguments from the lawyers.  We'll start with the

11  Government.  Ms. Kassner.

12         MS. KASSNER:  Thank you, your Honor.

13         Members of the jury, good morning.

14         At the beginning of this trial Ms. Diouf told that

15  you the evidence would prove beyond a reasonable doubt that on

16  seven separate days the defendant, Mustafa Goklu, met a drug

17  dealer named Pat in his parked Mercedes Benz.  She told you

18  that in exchange for a hefty fee, the defendant took Pat's

19  drug money and converted it from Bitcoin into cash to conceal

20  what it was, who owned it, and where it came from.  But Pat

21  was an undercover agent with the DEA and the defendant's

22  transactions, his money laundering activities, were captured

23  on audio recordings.

24         Now that the trial is over, you've seen for

25  yourselves that that is exactly what the evidence in this case

 1    has shown.  You've also learned that the undercover agent was

 2    not the defendant's only customer.  He owned and operated a

 3    business under the name Mustangy Corp. U.S.A.  The defendant

 4    was not legally authorized to provide the money transmitting

 5    services that he was offering because he never registered his

 6    business or obtained a license from New York state or federal

 7    authorities as required by law.

 8              The defendant faces two charges in this case.  Count

 9    One charges him with money laundering.  Count Two charges him

10    with operating an unlicensed money transmitting business.

11              Now, as Judge Chen will instruct you, the burden

12    never shifts to a defendant in a criminal case.  It is always

13    on the Government to prove the defendant's guilt beyond a

14    reasonable doubt.  And the Government welcomes that burden.

15    So I want to take this opportunity to talk about everything

16    that you've seen and heard over the past few days and to walk

17    you through how that evidence proves both of these charges

18    beyond a reasonable doubt.

19              I'll note that when you're in the deliberation room,

20    you will have access to all the evidence in the case, that

21    includes the exhibits and the trial testimony.  One thing you

22    won't have is a copy of the slides that I'm about to go

23    through with you, but if you use the verdict sheet and follow

24    Judge Chen's instructions, you should be able to move through

25    the charges without much difficulty; especially in a case like

1    this, because while this is an important case, it's not a very

2    complicated one.

3              Let's start with Count One, money laundering.  In a

4    few minutes you'll hear from Judge Chen who will instruct you

5    on the law.  If anything that I say is different from what

6    Judge Chen says, listen to Judge Chen.  But I expect Judge

7    Chen will tell you that to establish the defendant committed

8    money laundering the Government needs to prove three things.

9              First, the defendant conducted or attempted to

10   conduct at least one financial transaction that affected

11   interstate or foreign commerce.

12             Two, that transaction involved property that law

13   enforcement represented and the defendant believed was

14   proceeds of, here, it's narcotics trafficking.

15             And three, that the defendant acted with the intent

16   to conceal or disguise the nature, location, source, ownership

17   or control of that property.

18             Let's start with that first element.  The question

19   is, did the defendant conduct at least one transaction that

20   affected interstate or foreign commerce in any way?  The

21   answer is yes.  This isn't really in dispute.  You've seen

22   tons of evidence of these transactions.  You listened to audio

23   recordings of the transactions as they happened in realtime,

24   and you heard from the agent who was there.

25             Based on those recordings and that testimony, you

1  know that between August 2018 and April 2019 the defendant and

2  the agent met seven times either at a street corner in Midtown

3  Manhattan or a Wendy's or Starbucks in Sunnyside, Queens.  You

4  also saw and heard about how much the defendant exchanged for

5  the undercover agent on each of those days.  You saw at first

6  the numbers were under $5,000 worth of Bitcoin, but over time

7  the numbers got higher and higher until the defendant was

8  exchanging more than $20,000, then more than $30,000, finally

9  more than $40,000 worth of Bitcoin at a time.  He charged a

10 seven or 8 percent fee for each of these transactions.  And in

11 total, he exchanged more than $130,000 worth of Bitcoin for

12 the agent.

13         You also saw that in April 2019 the defendant met

14 the agent again and was in the middle of exchanging another

15 $50,000 worth of Bitcoin and offered to exchange another

16 $25,000 worth of Bitcoin but he wasn't able to complete those

17 transactions because he was arrested.

18         In addition to that testimony and those recordings,

19 you saw plenty of other evidence that these transactions

20 occurred.  You saw encrypted messages between the undercover

21 agent and the defendant setting up the terms and locations of

22 each of these deals.  You saw screenshots of confirmations

23 showing that that Bitcoin successfully made its way into the

24 defendant's crypto currency wallet.  You saw photographs of

25 the cash that the defendant handed the undercover agent in

1    exchange for that Bitcoin.

2          Finally, you heard evidence that these transactions

3    all affected interstate and foreign commerce.  Here I expect

4    Judge Chen will tell you that all that is needed is that the

5    transaction affected interstate or foreign commerce in any way

6    or degree, no matter how small.  That requirement is met here

7    in multiple ways.

8          First, the defendant and the agent used blockchain

9    technology to carry out the transaction.  You heard from

10   crypto currency expert Special Agent Infante that the

11   blockchain is global, so every transaction on the blockchain

12   affects interstate and foreign commerce.

13         Second the defendant advertised his service on

14   LocalBitcoins.com, based in Finland overseas.

15         Finally, third, the defendant said on the recordings

16   that some of the cash that he provided to the agent came after

17   he wired that money from Turkey.  Based on all of this

18   evidence, the Government has overwhelmingly established the

19   first part of money laundering.

20         So I want to skip ahead to this third element.  The

21   relevant question here is, did the defendant intend for his

22   transactions to conceal the nature, source or ownership of

23   that Bitcoin?  The answer is yes.  You know this because

24   everything about these transactions was designed to be under

25   the table and off the grid, to leave no trace behind.

1        Recall the LocalBitcoins.com page, the thing that
2    attracted the attention of the DEA in the first place.
3    Special Agent Infante explained there are two ways to exchange
4    Bitcoin into cash primarily.  The first is through a
5    commercial exchange, like Coinbase, which is relatively quick
6    and easy to use.  You can access them on at application on
7    your phone or laptop from the privacy of your home.  And they
8    are also comparatively cheap.  Their fees were as low as under
9    2 percent.  But to use a commercial exchange, you had to
10   provide a name and a form of identification.
11       The other way to exchange Bitcoin into cash, was
12   through a peer-to-peer exchange, the kind of service the
13   defendant was offering here.  The defendant required people to
14   physically meet up with him in-person and his service was
15   expensive.  He charged fees of seven or 8 percent, which is
16   multiple times what Coinbase charged to do the exact same
17   transaction.  But unlike commercial exchanges, he didn't ask
18   for names, he didn't ask for IDs.  In exchange for those
19   higher fees, what the defendant offered his customers was the
20   ability to remain anonymous, to exchange tens or hundreds of
21   thousands of dollars at a time, no questions asked, and walk
22   away with cold, clean, untraceable cash.
23       Special Agent O'Kain told that you drug dealers who
24   operate on the Internet are usually paid in Bitcoin, but they
25   often have to convert it into cash to pay their suppliers.

1    Which means that businesses like the defendant's create a
2    market that make it easy for drug dealers to use their profits
3    to further their illegal businesses.  So right off the bat you
4    know the service the defendant was offering was designed to
5    appeal to a market of people who were looking to conceal or
6    disguise where their money, where their Bitcoin, was coming
7    from, including drug dealers.  That was the point.  And the
8    defendant knew that.  You can tell from the recordings.
9         For example, the undercover agent in January
10   explicitly told the defendant:  I definitely want to keep this
11   under the table.  The defendant responds:  Yeah, yes, I know.
12        In the same conversation, the defendant talks about
13   Coinbase and he explains why he can't use Coinbase for his
14   transactions.  He says:  I'm not touching the Coinbase.  I
15   can't touch the Coinbase.  And the defendant understands why.
16   He says:  As long as you don't pass $100,000 to the Coinbase,
17   they are not going to question you.  He knew that if you
18   exchange more than $100,000 in a given year on Coinbase, which
19   by the way the undercover agent was doing, Coinbase would
20   start asking questions, it would appear suspicious.  So the
21   defendant offered the agent an alternative so he could
22   exchange his Bitcoin without ever revealing it was drug money.
23        The defendant's intent to conceal the source of this
24   Bitcoin is also clear from how these transactions took place.
25   Take a step back and think about it.  How do these people

1    communicate?  The agent and the defendant exchanged encrypted

2    messages the defendant periodically deleted his message

3    history so they can't be cited as evidence against him.  Where

4    did the undercover and the defendant meet to exchange all of

5    this money?  In the back of a parked Mercedes Benz usually in

6    a Wendy's or Starbucks parking lot in Queens.  Not in an

7    office, or a cafe, or an apartment or any other public place.

8    No, they meet up in a car with the doors, closed out of sight

9    of the street cameras and the police.

10         You saw that the defendant didn't linger.  His

11   meetings with the agent lasted just long enough for that

12   Bitcoin confirmation to go through, so they could go their

13   separate ways.

14         Finally, you heard the defendant exchange more than

15   $130,000 without ever knowing the agent's real name or having

16   any way to track him down if something went wrong.  This

17   secrecy was by design.  It was done so the defendant could

18   exchange dirty money and later deny that he knew it was dirty.

19         So now that we've talked about the defendant's

20   business, let's talk about his dealings with the agent.  What

21   the Government has to prove is the undercover agent

22   represented his Bitcoin came from selling drugs and the

23   defendant believed him or deliberately ignored the obvious.

24   So first question is, did the undercover agent say or indicate

25   his Bitcoin came from drug dealing?  The answer to that is

1   yes, he did.  You heard this in the recordings.

2          The agent told the defendant multiple times that his

3   money came mostly from selling pills to college kids,

4   including Adderall and Oxys, which he explained referred to

5   oxycodone.  As Judge Chen will instruct, Adderall and

6   oxycodone are both controlled substances under federal law.

7          Here are some examples of the agent's statements

8   from January 27 and April 30, 2019.  The agent explains that

9   his business partners are in California and he brings it back

10  to Manhattan.  He says:  That's what we do.  We do all that,

11  Adderall, Oxy, all that stuff.  He says:  The real money is in

12  the Adderall and the pills.  He offers:  I can get you some

13  Oxy, which he says is short for oxycodone.  And also offers

14  the defendant some Adderall and says:  That's what all the

15  college kids are taking.

16         The agent also told the defendant that he earned

17  some money selling marijuana, which he explained was illegal

18  to sell federally.  As Judge Chen will instruct you, marijuana

19  is also a controlled substance under federal law.  Like

20  Adderall and oxycodone, it's a narcotic.

21         Here is a discussion from April 30.  The agent and

22  the defendant are talking about marijuana farms in California.

23  The agent says:  Lots of farms out there.  Still risky,

24  though, my buddy got arrested the other day.  The defendant

25  asked:  Why is that?  The agent explains:  Still federally, I

1    mean, he got arrested by the feds.  The agent later offers to

2    bring marijuana back to New York to give the defendant a cut

3    of the business if he's interested.

4            So you know that the agent said his Bitcoin was from

5    drug sales.  The remaining question is, did the defendant

6    believe the agent's Bitcoin came from selling drugs?  The

7    answer to that is, yes, he did.  How do you know?

8            Well, first of all, you know because that's what the

9    agent told him.  And the defendant had no problem hearing him

10   or understanding what he was saying.  He got it.  This

11   conversation is a great example of that.  The defendant

12   explicitly acknowledges that he understands selling marijuana

13   out of California is illegal.  In his own words:  Oh, you got

14   to be in California.  If you go out, it's trouble, right?  He

15   knows that one of the ways the agent is making his money is by

16   selling marijuana from California in New York.  But what does

17   the agent -- what does the defendant do right after this

18   conversation?  He agrees to exchange another $50,000 worth of

19   Bitcoin and offers to exchange another $25,000 more.  This

20   proves that the defendant knew the Bitcoin he exchanged was

21   drug money.

22           But the defendant is also guilty because in dealing

23   with the agent he knew there was a high probability that

24   Bitcoin came from drugs; but he deliberately ignored every red

25   flag he encountered.  Judge Chen will instruct you that

deliberately ignoring the obvious makes the defendant just as
guilty.  You can't just stick your head in the sand.  You
can't plug your fingers in your ears.  You cannot close your
eyes and ignore the obvious when it comes to drug proceeds.
But that is exactly what the defendant did, because what he
cared about was making money.

So let's take a look at some of the red flags the
defendant ignored.  First, look at the amount of money the
agent asked the defendant to exchange, money he said came from
shipments.  In December 2018 he said he might, the agent
might, need to exchange as much as $100,000 or $200,000 worth
of Bitcoin at a time, quote, "depending on how much we sell."
The following month he said:  You have no idea how much money
we have coming in.  It's insane.  It's insane.  These college
kids cannot get enough.

Again, where did the defendant agent meet to
exchange all this money?  In the back of a parked car, usually
behind a Wendy's or Starbucks in Queens.  The agent traveled
all the way from Manhattan to get there.  Normally if you're
exchanging that amount of money, tens or hundreds of thousands
of dollars, you do it in a public setting, you provide a form
of ID and your name, and you fill out paperwork.  People who
get that amount of money from legitimate sources do not
convert Bitcoin into cash in the back of a car in a Wendy's
parking lot.

1          The agent also explained why he had to convert all

2    that Bitcoin.  He said:  I have people to pay.  He said:  They

3    are not great people.  He explained he was going back to

4    California to pay them.

5          Who physically carries hundreds of thousands of

6    dollars in cash and travels with it across the country so they

7    can pay people?  Drug dealers.

8          The agent also warned about what would happen if he

9    didn't get all that money to pay all his people.  On

10   January 24 he said:  Well, if I get seized with this I'm going

11   to get my fucking head chopped off or something.  He later

12   says:  Who's going to be shooting at us?  It's the guy back in

13   California that wants the rest of the hundred, that's who.

14         What kind of person gets shot for not paying the

15   people they owe money to on time?  Drug dealers.

16         Finally, perhaps the strongest evidence of the

17   defendant's belief that Bitcoin came from selling drugs, is

18   the defendant's own words.  The defendant's own statements

19   proves he knew that drug dealers often turned to people like

20   him to exchange their Bitcoin for cash, and that exchanging

21   drug money was illegal and could get him arrested.  In fact,

22   he explained that's exactly what happened to his own business

23   partner.  He says that his partner was arrested in Manhattan

24   after he was caught exchanging $50,000 worth of Bitcoin for a

25   drug dealer.  These are his words.  The defendant says:

1  Actually they weren't tracking for Bitcoin.  They were

2  tracking some idiot guy who buys and sells drugs.  Because

3  they follow these guys almost always, and one of the, the

4  idiot sold or bought from him.  So when they tracked him, the

5  drug guy, the cop said bingo we caught something else.

6          The defendant was terrified that what happened to

7  his partner would happen to him.  That the police would follow

8  a drug dealer and eventually catch and prosecute him for

9  laundering the drug money.  He betrayed this fear time and

10  time again.

11          You heard it when the defendant explained he refused

12  do business in Manhattan, which is where his partner got

13  caught.  Here he says:  I don't want to count money in

14  Manhattan.  Manhattan sucks, man.  Again, I told him no deal

15  at fucking Manhattan.  Manhattan sucks.  People ask me can you

16  come to Manhattan, no.

17          Then he explains:  In Manhattan, this is why I don't

18  go to fucking Manhattan.  Even a homeless I saw he's, working

19  for the NYPD.

20          Again and again the defendant talks about all the

21  cameras and police who might being looking for drug dealers

22  and find their way to him.

23          Here are more quotes:  Close the door, man, the

24  cops, we're not drug dealers.  We're buying Bitcoin.  Then he

25  says:  Even if you're staying in here there is a fucking

1    camera on top.  It's watching traffic, but they are going to

2    say what is going on there.  Are these some drug guys?  Then

3    he explains:  I don't want to come here, these fucking malls

4    all have cameras.  They called me, hey, are you a drug dealer?

5    No.  That's why I try to stay in Queens.

6          The defendant also is afraid of cars with black

7    tinted windows because they might be the police.  Here he

8    talks about how the black windows scares me.  And he talks

9    about two fucking ford black tinted car is there.

10         The defendant also talks about all the ways the

11   police might build a case against him.  Here he talks about

12   searching for his Bitcoin wallet on his browser.  He says:

13   Actually I'm exposing myself.  I'm visible right now.  If

14   something goes wrong, they can catch your history and say hey

15   let me see your wallet.

16         Then the defendant also talks about his money

17   counter and the benefit and risks of using it.  On the one

18   hand he says he needs to make sure he's not getting money,

19   quote, "from somewhere, something bad, who knows," which shows

20   that he knows some of this money he's exchanging does not come

21   from legitimate sources.  But he also says having that counter

22   is a risk; in his own words:  The fucking machine, that

23   fucking machine is evidence that you're a drug dealer.

24         So again, the defendant is afraid of being caught in

25   the middle of laundering drug money because that's what he's

1  doing.  What all of this shows is the defendant believed the

2  Bitcoin he exchanged from the defendant was from drug dealing.

3  The fact that he deliberately ignored all the red flags that

4  he encountered, makes him just as guilty.

5          Together this all of this evidence proves the

6  defendant committed money laundering.

7          I want to turn to Count Two, operation of an

8  unlicensed money transmitting business.  I expect Judge Chen

9  will tell you that for this charge the Government has to prove

10  three things.

11          First, the defendant knowingly owned, controlled

12  managed, operated, et cetera, all or part of a money

13  transmitting business.

14          Two, that the defendant didn't have a license in New

15  York or failed to register with the Secretary of Treasury as

16  required.

17          And three that the business affected interstate and

18  foreign commerce.

19          Let's start with the first.  Element there is no

20  real dispute here.  You'll hear that a money transmitting

21  business is simply a business that transfers funds, including

22  Bitcoin, by any means in exchange for a fee.  That's exactly

23  what the defendant's business did.  He transferred Bitcoin

24  through cellphone application and transferred cash by hand in

25  exchange for a fee.

1          You know that the defendant owned or operated his

2    money transmitting business.  In fact, he went as far as to

3    incorporate that business, Mustangy on LocalBitcoins.com, but

4    he used the name Mustangy Corp. U.S.A. in his filing.  He

5    listed himself on some paperwork as the president of that

6    business.  He received mail for that business addressed to his

7    apartment in Sunnyside, Queens.  He maintained a corporate

8    bank account for that business.

9          And you learned that in addition into the agent, he

10   had other customers.  He even references to some of those

11   customers when he talked to the agent.  Here is one example of

12   that.  The undercover agent writes:  He needs cash fast.  And

13   the defendant says:  He has $25,000 today but that another

14   customer, who he calls the 8 percent guy, also wants it and

15   he'll give it that guy if the agent doesn't want it.

16         You also saw the defendant's messages with some his

17   other customers.  Many of them reference prior deals.  Here is

18   one example.  Someone, who says he's Asian guy with glasses

19   says:  We've dealt before at 10K and 20K and asked to do

20   another 65K.  Another example from a customer named Corey, who

21   described himself as the guy who met you at Starbucks all the

22   time, and asked to do another deal.  Another customer who

23   says, thanks for the easy trade the other day.  And expresses

24   interest in another Bitcoin transaction.

25         Finally, in some these messages the defendant

1    himself refers to his business as my biz.  Here he says Amex

2    charged my business 4.75 percent.  The defendant himself

3    considered this a business.

4           You've also seen that the messages that the

5    defendant exchanged with his other customers were very similar

6    to the ones he exchanged with the agent.  They had the percent

7    that he charged, which was similar.  He also met everyone at

8    what was effectively his office, this Starbucks in Sunnyside,

9    Queens.  Here is an example of how he direct his current and

10   perspective customers to the same Starbucks where he met the

11   undercover.

12          Finally the defendant had a sufficient volume of

13   customers that he drove around with an electronic money

14   counter in his car.  He had a tool of the trade.  What this

15   shows is that he had everything he needed to run a business.

16          And the defendant's business operated like any

17   other.  He had advertisements on LocalBitcoins.com.  He had an

18   established rate of seven or 8 percent, depending on the

19   volume.  He had an office, which for him was the back of his

20   car outside of Starbucks in Queens.  He had a robust client

21   base.

22          Let's turn to the second element.  I don't think

23   this is in dispute.  Judge Chen will instruct you that under

24   New York law, people who exchange in the business of

25   transmitting money need to get a license from the New York

1  State Department of Financial services.  But you all heard

2  testimony from Robert Tarwacki, of New York State Department

3  of Financial Services who told you that he conducted a

4  diligent search of New York State records, and confirmed the

5  defendant never registered himself or his business, or

6  obtained the required license to transmit money in New York.

7         Judge Chen will also tell you that under federal law

8  there is a separate requirement that money transmitting

9  businesses register with the United States Secretary of

10 Treasury within 180 days of the business being created or the

11 first transaction occurring.  But you heard testimony from

12 Theodore Vlahakis from the Department of Treasury who

13 confirmed he also conducted a diligent search and confirmed

14 that the defendant never registered himself or the business or

15 received a license from the United States Department of

16 Treasury.  You saw the official certifications showing the

17 results of those searches.

18         Finally, the last element is that the business

19 affected interstate or foreign commerce.  Again, I expect this

20 is not in dispute.

21         As you heard before, first, the defendant used

22 blockchain technology and Internet applications to conduct all

23 of these transactions.  And again, the blockchain is global,

24 which means any transaction that affects the blockchain

25 affects interstate and foreign commerce.

1          Second, you saw that at least some the defendant's

2    customers crossed state lines to meet the defendant to

3    exchange that Bitcoin for cash or cash for Bitcoin.  This is

4    just one example where a customer travels from New Jersey

5    across state lines to New York to finish that transaction.  So

6    the defendant's business affects interstate commerce in that

7    respect as well.

8          Viewed all together this evidence proves that the

9    defendant operated an unlicensed money transmitting business

10   and also committed money laundering.

11         Members of the jury, you will soon go back to

12   deliberate.  When you do, remember that what the judge brings

13   to this process is the authority of the court and the ability

14   to decide when and how a case proceeds.  What all of you bring

15   to this process, is your life experience and your common

16   sense.  You should use it, because that's what ensures that

17   cases are decided correctly.

18         Everyone is entitled to the presumption of

19   innocence.  Everyone is entitled to have their case heard

20   before a fair and impartial jury.  The defendant has had that.

21         But at the end of the day, the only thing that

22   matters is what the evidence says and where the evidence leads

23   you.  In this case, when you consider all the evidence and

24   apply your common sense, you will reach the only verdict

25   consistent with that evidence, the defendant is guilty on both

1    counts.  Thank you.

2              THE COURT:  Thank you, Ms. Kassner.

3              Mr. Singer, your summation.  And we need you to wear

4    the microphone, if only for the interpreters.

5              MR. SINGER:  Understood.  May I proceed?

6              THE COURT:  You may.

7              MR. SINGER:  Good morning, folks.

8              During my opening statement to you I talked about

9    the issues that I expected were going to be the central and

10   tipping point issues in this case.  The issue with regard to

11   the money laundering charge, whether the Government can prove

12   that Michael Goklu believed that the Bitcoin being brought by

13   the undercover officer were the proceeds of illegal unlawful

14   narcotics transactions.  Whether his intent and purpose was to

15   conceal or disguise the source of that money, where it was

16   coming from.  And whether he was operating a money

17   transmitting business, as the judge will define it.  Those, in

18   fact, are the tipping points.  That's what I'm going to be

19   focusing on in my remarks this morning.

20             I submit to you that each one of those issues are

21   open to interpretation.  That the evidence is not at all clear

22   as the Government, the prosecutor, seems to suggest.  That

23   there is a great deal of question about what Mr. Goklu

24   believed.

25             And it's important to understand that that's the

1    issue, what Mr. Goklu believed.  Not what the undercover

2    believed or remembered or what the undercover officer

3    interpreted.  Because you heard a lot of testimony about that.

4         The undercover said Mr. Goklu said XYZ to me and

5    this is what I believe that it meant.  Or this is the

6    information based on that, this is why I took whatever the

7    next steps are.  Essentially this is what I believe.

8         But it doesn't matter what the undercover officer

9    believes.  There is no element in the charge against Mr. Goklu

10   about what the prosecutors believe, or what inferences the

11   prosecutors draw from the evidence.  That's not the issue.

12        The issue isn't does federal law permit the sale of

13   marijuana.  That's not the issue.  The issue is, what

14   Mr. Goklu believed.

15        Because if Mr. Goklu believed that the proceeds,

16   that the Bitcoin that was being brought to him by the

17   undercover officer, if he believed that it was from some

18   lawful activity, then the Government hasn't proved their

19   charge.

20        Now, I stated it as an affirmative, Mr. Goklu

21   believed something, believed that the Bitcoin came from lawful

22   activity.  I'm going to discuss that, but that is not the

23   question for you as jurors.  The question for you as jurors

24   is, has the Government proved beyond a reasonable doubt that

25   he believed that it was the proceeds of unlawful activity.  I

1    submit to you that the evidence that you've seen in this case,

2    some of it just highlighted by the prosecutor, but that the

3    evidence brought to you in this case, you would be perfectly

4    reasonable and rational to determine and believe that

5    Mr. Goklu thought that this was coming from legal marijuana

6    farms and/or perhaps other sources, but certainly from legal,

7    tax-paying licensed marijuana farms in California; and not

8    from some illegal or unlawful narcotics activity, that that's

9    what his belief was.

10         There is evidence to support that; but as jurors

11   don't have to get there.  I submit that you could.  I'd argue

12   that you should.  But it's not necessary.

13         Because if as you think about it yourself as you

14   talk to each other back in the jury room, you come to a point

15   where, I'm not sure, then the prosecution hasn't proven an

16   essential element of the money laundering count and you have

17   to find Mr. Goklu not guilty of that count.  That's how this

18   works.

19         That is part and parcel of the presumption of

20   innocence.  Right.  The United States Government brings a

21   charge against an individual.  When the individual says, I

22   plead not guilty, that individual is saying:  Prove it.  You

23   made the accusation, prove it.

24         And your verdict is not guilty or innocent.  Your

25   verdict is guilty or not guilty.  Proven beyond a reasonable

1    doubt or not proven.  I submit to you they have not proven

2    this essential element.

3            Let's talk about sort of what the transactions were.

4    There are were seven of them, they met seven times.  Six

5    completed transactions, and an arrest before the seventh one

6    could be completed.

7            I've urged you in my opening to listen to the

8    recordings.  The recordings vary, their meetings vary from ten

9    to 11 minutes on the short side, up to 40 minutes on the long

10   side.  Each one of the recordings that you have, has some dead

11   air at the beginning before it gets to the conversation.

12   Because it had some recording devices on before the two of

13   them actually meet.  It picks up stuff that doesn't matter,

14   the only thing that matters is the conversation between the

15   two people.

16           I urge you to listen to these.  It can be perhaps a

17   little long and perhaps a little boring, but when you listen

18   to it, you get a flavor for what these interactions were about

19   and what Mr. Goklu was thinking about and doing.  Each one was

20   conducted essentially the same way.  We meet.  We talk the

21   cash.  We count of cash.  He uses a money counting machine not

22   because he's concerned where the money is coming from.  The

23   inability to see through and understand what they are talking

24   about is rather shocking.

25           You use a money counting machine that's got a sensor

1    on it that runs through because you're concerned that someone

2    may be feeding you counterfeit bills.  Not because you're

3    concerned about whether it's from a Craigslist sale or drug

4    transactions or anything else.  You're looking for, you're

5    concerned about counterfeit bills.  You've got people who will

6    pass counterfeit bills.  It's got nothing to do with this

7    case.

8          The Government thinks if he's got a money counter

9    the only possible explanation for anybody to have a money

10   counter in their car to conduct a transaction is because they

11   are a drug dealer.  Get an imagination.  There are so many

12   other things that go on in the world.

13         I guess if you're a prosecutor all you see is crime.

14   That's all you see, all you see is drug crimes, anything that

15   everybody does has got to be a drug crime.  Get an

16   imagination.

17         Think about it.  There are other things that people

18   engage in, other types of activity.  There are a lot of

19   Americans who, honest to God, want to be private.  Want to

20   conduct transactions without the police or the Government or

21   anybody else getting involved, or banks.  There are a lot of

22   Americans who don't want all their information to be going out

23   through social media accounts.  There are people that value

24   their privacy.

25         But somehow someone wants some privacy, doesn't want

1   to get the police involved, doesn't want to have their money

2   seized for a period of time, so the prosecutors' only possible

3   explanation is because it's drug dealing.  Again get an

4   imagination.  Open your mind a little bit.  There are other

5   things going on in the world.

6             So they get together.  They count the money.

7   Mr. Goklu is focused on the money.  He says both for me and

8   for you, because I want to make sure that the amounts are

9   correct.  This is the exchange rate.  This is the amount.

10  This is my fee.  This is how much cash I'm going to give you.

11  That's the first part of the transaction.

12            The second part of the transaction is the

13  transmission of the Bitcoin.  The only way for that to happen

14  is, first, the undercover officer initiates the trade from his

15  phone.  It's an app that goes through his wallet.  The details

16  of that are unimportant, but we know that it's initiated from

17  the undercover's phone and it goes to Mr. Goklu's phone.

18  You're doing a transaction, you make sure it's complete before

19  you walk away.

20            When you listen to these conversations, these

21  recordings, what you clearly pick up is that Mr. Goklu is

22  focused on his phone.  He's watching his phone.  He's

23  complaining about how long it is.  What is wrong with this

24  stuff.  And then the complaints go into everything else,

25  because he complains about a lot of things.  But he's clearly

1    watching the phone.

2          Some of the responses when the undercover officer

3    tries to initiate something, some of the responses are:  Why

4    is this taking so long.  Clearly he's looking at his phone.

5          He's not -- the prosecutors seem to think if two

6    people are sitting in a car and one person says something,

7    that it's just a given that the other person hears, is

8    listening, and processed it and isn't focused -- there is no

9    possibility that he's focused on anything else.  But when you

10   listen to the recordings, it's clear he's focused on other

11   things.

12         There is, I submit, a language issue.  Mr. Goklu

13   speaks English.  Obviously we've listened to him in the

14   recording.  He's got an accent.  It's clearly not his first

15   language.  He speaks English.  He can converse and do

16   transactions or whatever in English, but it's not his first

17   language.  If it's something important, he wants an

18   interpreter to assist him to make sure he's picking up

19   everything.  So it's partly the possibility that language came

20   into play.  A lot of what the undercover officer is using --

21   there is some slang things thrown in.  It's not simply a given

22   that Mr. Goklu would understand.

23         Does he understand it and process it and get what it

24   is that is being said?  That's part of it.  And part of it is,

25   is he hipped to the drug lingo?  The Government wants to have

1    it both ways here.  The undercover officer keeps saying, well,

2    you know drug dealers, people involved in drugs, know these

3    things.  And so if I said certain things, if I said keys,

4    well, people know that keys are involved in drugs.

5            Did every one of you know that?  Does everybody just

6    know these terms?  Does everybody just know what Oxy is?  Does

7    everybody just know what Adderall is?

8            Again, they start with the assumption that he's

9    involved, that Mr. Goklu, is involved in drugs; and,

10   therefore, understands what the undercover is saying when he

11   uses these terms.

12           But at the same time, at the very beginning of their

13   first meeting Mr. Goklu is violating the cardinal rule of

14   fight club, that you don't talk about fight club.  It may be a

15   reference that not everybody gets.  The idea is that, the

16   undercover expresses, that people who are involved in drugs --

17   buying, selling, the money part, whatever it is -- that people

18   involved in drugs don't talk about it.  Because that's just

19   not what you do.  Because you understand that what you're

20   involved with is illegal and so you don't talk openly about

21   it, you just don't.  You hint at it.  You work around the ends

22   if you're trying to get a point across, you hint it.

23           At their first meeting on the top of their first

24   meeting, when the undercover is getting into Mr. Goklu's car,

25   what is the first thing that Mr. Goklu says to him:  Come on,

1    man, close the door.  We're not drug dealers here.

2          He raises it immediately.  He violates the cardinal

3    rule.  If it's not violating the cardinal rule, what it

4    suggests is he's not even aware of such a thing.  He doesn't

5    know about this.

6          Is it possible, would it be reasonable to conclude

7    from that that he's not part of the drug world and, therefore,

8    doesn't know what things mean?  What you're supposed to say,

9    what you're not supposed to say?  Does he come into this with

10   no knowledge at all?  I submit that you could absolutely find

11   that from the evidence you've got here.

12         Why would somebody not use Coinbase?  Gee, the

13   prosecutors say why would Mr. Goklu be engaging in this

14   activity?  And why would customers be coming to him and not

15   use Coinbase, like it's the be-all and end-all.  Why not use

16   Coinbase, it's a lower fee?

17         I suppose they also argue that every check cashing

18   business in every neighborhood throughout New York City is

19   only for drug dealers?  People take their paychecks and go to

20   check cashing establishments who charge fees to cash the

21   paycheck.  You're giving part of your paycheck to a check

22   casher.  Is everybody who does that must be involved in drugs,

23   the money must be dirty?  Is it quick?  Is it easy?  Is it

24   necessary?  People pay fees for things all the time.  It

25   doesn't mean they are involved in this illegal activity.

1          And Coinbase, they tell you, it's quick and easy.

2    And then when you ask questions about it, it ain't so quick

3    and easy.  You have to set up an account.  You have to provide

4    various levels of verification.  Some people like privacy and

5    don't want to do that, but you have to set up the accounts,

6    you've got to go through the steps.

7          Once you get it set up, then you're there.  Then you

8    can conduct the transaction that way.

9          A couple of things came out from the testimony of

10   the crypto currency expert, Ms. Infante.  First we learned

11   that you link your Coinbase account to your bank account.  How

12   quickly does Coinbase send the money to your bank account?

13   You go with Bitcoin or go online, I got three Bitcoin here, I

14   want my cash.  Well, it gets sent electronically to your bank

15   account.  It goes through the same system that any other

16   transfers go through.  She acknowledges it can take several

17   days before the money hits your account.  So why might you not

18   use Coinbase?  Because it can take days, your money is sitting

19   for days.  They are getting the float.  Just like when you

20   write a check, somebody writes you a check, you deposit it in

21   your bank account, it takes several days before the money is

22   in your account to make use of it.  It's the same system.  So

23   it's not quick and easy.  It can take days before you get

24   access to your money.

25         And something else she acknowledges at the end,

1   Coinbase is not insured by the federal Government.  What does

2   that mean?  It means you've got money sitting in there for a

3   few days, it's not insured that if it disappears you're out of

4   luck.

5          Why might you not use Coinbase?  Because they are

6   not insured.  They could go out of business tomorrow and

7   you're out of luck.  There is reasons not to use them.

8          Whereas, in this transaction, within a half hour or

9   so you've got your cash and you walk away and you've got the

10  money.

11         Why would Mr. Goklu be trying to avoid the police?

12  The prosecutors make a big deal of this.  Well, the only

13  possible reason that their imagination allows for is that he

14  knows that he's involved in drug dealing and that's why he

15  doesn't want the police around.  Didn't they listen to the

16  recordings?  It's right in the recordings.  Mr. Goklu is

17  saying over and over again:  I'm not concerned about going to

18  jail.  That's not my concern.  I'm not concerned about going

19  to jail.  I'm not a drug dealer.  I'm not doing anything.

20         The police see a lot of money, they see a lot of

21  cash, they see a money counting machine.  The police who are

22  about law enforcement jump to conclusions.  They seize first,

23  and they ask questions later.  He doesn't want it to be

24  seized.  He doesn't want to go through the hassle of having

25  all this stuff taken from him.  He says, and expresses over

1  and over again, the belief that he's going to get it back.

2  He's not concerned about going to jail.  He's not concerned

3  about being charged with a crime.  Even when he talks about

4  the partner who got involved, the police are following some

5  drug guy.  It's not that he knows that a customer is involved

6  in selling drugs, it's just that the police come and grab you

7  and you don't know what the customer is involved in, and they

8  seize everything.  And then discover, or they know, the police

9  know, because they've been investigating the person, the

10  customer, they know that the person is involved in drugs.

11         The Government here, the prosecutors here, tell you

12  that you should assume that because it happened once to his

13  partner, that he should not -- that everybody out there is a

14  drug dealer.  That anybody he would be dealing with is a drug

15  dealer.  He should know that and believe that.

16         But it just doesn't follow.  When all you see is

17  crime; all you see is crime.  But there is other ways of

18  looking at and understanding what Mr. Goklu is thinking and

19  doing.

20         Each one of these transactions Mr. Goklu is making

21  money.  He's making his commission.  And the commission is

22  between seven and 8 percent.  Why would someone pay seven or

23  8 percent?  Well, Agent Infante told you that there is now

24  Bitcoin ATMs.  You can go to a ATM and exchange Bitcoin for

25  cash and pay up to 10 percent.  That was her testimony.  It

1  was on cross examination, of course, because the Government is

2  not going to bring that up, but it's part of her testimony.

3           Does anybody and everybody who goes to a Bitcoin ATM

4  and pay a fee to get their cash out a drug dealer?  Is that

5  what we are to conclude?

6           Because why would you do that?  You can exchange it

7  for a lot less.  Mr. Goklu expresses his belief to the

8  undercover officer.  He brings it up about the marijuana farms

9  in California.  He expresses his belief.  He tells the

10 undercover, and through him because it's recorded all of us,

11 what he believed.  And he says the words out loud:  It's a

12 licensed marijuana farm in California.

13          And the retired DEA agent comes in here and tells

14 you, gee, I don't know what the legal status of marijuana in

15 California is.  Really?  You believe that?

16          Mr. Goklu knows and believes that a cannabis farm in

17 California is legal.  He uses the term.  He's explaining it to

18 the undercover officer, it's legal, you pay taxes.  He

19 believes that a person operating a licensed cannabis farm in

20 California is operating a legal business, that's what he

21 expresses to the undercover officer.

22          And on April 30 when they get together, again this

23 is the seventh time they've gotten together, they are a little

24 more comfortable with each other and the conversation starts

25 with how is business right?  You get together with somebody,

1  how is business.  Oh, it's booming.  Then you make a
2  light-hearted comment back.  Well, your business is booming,
3  maybe I should get involved into that, maybe I should get
4  involved.  At that the undercover jumped at the opportunity.
5  You want a piece?  You want a cut?  It's like, do you,
6  Mr. Goklu, want to buy into my business?  Like, I can do that.
7  You can buy into my business.  And what does Mr. Goklu believe
8  his business is?  He asked how much; to get into a cannabis
9  farm?  A cannabis farm.
10            (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    (continuing.)

2         MR. SINGER:  He wasn't always being recorded.  He

3    doesn't know it's an undercover officer.  That's what he

4    believed.  The undercover officer told you I tried over and

5    over again to try and get Mr. Goklu to ask me questions, to

6    say something.  I kept dropping hints, I got bad guys in

7    California, they want their cash.  They're going to cut my

8    head off.  They're going to do they're going to do that.  All

9    thighs problems I've got.  I've got to take care of this

10   business.  He raises it over and over again and time and time

11   again, Mr. Goklu goes right past him.  He does not respond and

12   if you listen to the recordings you hear it.  He does not

13   respond.  And if you listen to the recordings you understand

14   why because he's not listening to this.  He's focused on his

15   phone and waiting for the Bitcoin transaction to clear and the

16   government says, well, if you didn't -- if you didn't

17   understand, it's because he was deliberately burying his head

18   in the sand.

19        Do any of you really believe that Mr. Goklu is

20   burying his head in the sand and not listening.  That that's

21   what it is he knows what's being said and he is deliberately

22   avoiding hearing things, listen to those conversations.  That

23   is simply not the case and you will see it and understand that

24   from listening to their interactions.

25        So on the money laundering charges, as the

1    prosecution pointed out, it requires under the second element

2    that the defendant, Mr. Goklu believed that the Bitcoin is

3    from unlawful narcotics activity and I submit to you as I said

4    before, it would be reasonable for you to conclude that he

5    believed that it was from legal marijuana activity, but, again

6    you don't have to get that from him the.  There is reason upon

7    reason upon reason to doubt that claim, what fluke believed it

8    to be the proceeds of unlawful activity.  Now, the intent and

9    purpose.  The intent to conceal or disguise the source of the

10   money.  They got together in August, August 28, 2018,

11   September 21 of 2018, November 27th of 2018, December 11th of

12   2018.  And they're conducting this transaction.  And three

13   those, the undercover officer never made clear, never said

14   anything about his Bitcoin coming from drug activity.  So

15   Mr. Goklu doesn't know who he is, doesn't know what his

16   business is.  The undercover hasn't even offer what his

17   business is, hasn't mentioned drugs, other than to say when

18   Mr. Goklu says it's a legal cannabis farm that pays taxes and

19   the undercover officer says to him, yeah that's a part of my

20   business too.  So the undercover tells him that he, too, is in

21   the legal marijuana business in California, but otherwise

22   there's no indication.  So what is Mr. Goklu's intent and

23   intended purpose on August 28 of 2018, is it to launder drug

24   money is it to conceal the source of the Bitcoin can why would

25   he have any incentive to do that.  There is no evidence that

1    he knew or anything -- or even should have known that there
2    was anything I don't know wrong with it and in the second
3    transaction and the third transaction he's making a fee.  He's
4    charging a fee and he's making money.  So why -- what's his
5    incentive or reason for doing the transaction?  Is it to help
6    the undercover officer conceal the source of the money?  Why?
7    There's no reason to.  There's no hint or suggestion or
8    statement that the money is illegal.  So, clearly that wasn't
9    Mr. Goklu's intent in the early transaction, but the
10   Government is here telling you, well, that became his purpose
11   by the end, did anybody say anything about that?  Did the
12   undercover say I need to get rid of this?  I need to clean it?
13   I need to get this out of my hands because I don't want
14   anybody to know where it's coming from?  He didn't say any of
15   those things.  And, in fact, the transactions operated, the
16   later ones, January 24, January 30th, operated in exactly the
17   same fashion as the first ones did.  There was nothing
18   different about this.  So where is there evidence because it
19   clearly didn't have the intent to conceal or disguise the
20   source of the money in the earlier transactions there's the
21   evidence that his intent and purpose changed by the end?
22   Nobody said or did anything any different.  Mr. Goklu is
23   making money, by conducting these transactions.  The
24   Government has not proven this intent to conceal or disguise
25   the source of the money.  It's simply not there.  Mr. Goklu

1   didn't know that it was coming from an illegal sours.  He

2   thought it was coming from a legal source.

3        Because of the evidence on those two elements that

4   the money laundering charge is lacking and again I submit to

5   you that you could find affirmatively that Mr. Goklu did not

6   have his beliefs and intentions but it's not necessary for you

7   as jurors to get there.  If you consider this and go I'm not

8   sure, maybe it's possible that what the Government says it's

9   true, but I'm not sure.  I'm not convinced beyond a reasonable

10  doubt.  By law you're required to find Mr. Goklu not guilty.

11  On the money transferring business, this is a matter of the

12  language and I'm going to encourage you folks to listen

13  carefully to the Judge as she gives the language of this

14  charge and you're going to have the written charge with you in

15  the jury room and you can look at the language as well.  A

16  money transmitting business is a business which for a fee

17  accepts currency for transfer.  That's the language that

18  you're being given.  And I submit to you under that definition

19  that the judge is giving to you and it's included in the

20  instruction that Mr. Goklu is not operating a money

21  transmitting business, that he is not -- that the evidence

22  does not prove beyond a reasonable doubt that he is accepting

23  currency for transfer.

24        Now, is he operating a business?  Well, you listen

25  to the recordings and you look through -- it wasn't shown to

1   you but it's all in evidence, all of this information that

2   they got off of his computer.  Mr. Goklu was a black car

3   driver, a taxi driver, driving a nice black Mercedes.  You've

4   seen the pictures of it.  He's a black car driver and, in

5   fact, in one of the recordings he's talking to the undercover

6   about the fact that one of his regular customers has been John

7   McCain, former senator some of you younger folks may not know

8   who John McCain is.  He ran for president in 2008.  He was a

9   prisoner of war during Vietnam.  He's generally regarded as an

10  American hero and he was a U.S. senator for many, many years.

11  And Mr. Goklu tells the officer, you know, he's got customers

12  he's driving that's why he is in different places all the time

13  and one of his customers is John McCain.

14          He's also got a business or engages to make money in

15  buying and telling these Bitcoin mining machines.  You may

16  have wondered why was I suggest the expert, agent Infante,

17  with the Bitcoin mining machines.  Well, these records are in

18  evidence and they're available if you want to see them.

19  There's a company in China called Bitname.  They manufacture

20  and sell machines that people use in an effort to mine Bitcoin

21  and the records that are -- that are in evidence show that

22  Mr. Goklu was sending -- wiring money, sending money to

23  Bitname for these machines.  These machines, the shipping

24  labels that you see that they point to, to show Mustangy Corp.

25  because because that's somehow mysterious.  Those shipping

1    labels that they show you are the machines being sent from
2    Bitname in China to Mr. Goklu and Mr. Goklu reselling those
3    machines on Ebay or PayPal and sending them -- the shipping
4    labels are sending the machines out.  That's a separate
5    business.  He's got a business driving.  He's got a business
6    buying and selling these mining machines and he has customers
7    that want to exchange cash and Bitcoin one way or the other
8    and here is something that I submit to you is significant, the
9    Government pulled up all of these Signal text messages that
10   Government Exhibit 228.  It's about 355 pages of text messages
11   they got off of Mr. Goklu's phone.  There was one customer,
12   one, in mid to late April of 2019 who says something about
13   washing money.  It's at the very end of the conversation after
14   they're calling each other names and Mr. Goklu is threatening
15   to report him to the police because he is a drug dealer and
16   the Government had -- they took all of his electronics out of
17   his home, right, they sat him down and questioned him while
18   agents are ripping his house apart and taking 20 or more
19   electronic devices.  They have all of this for years now, and
20   they reviewed all of it and they've got all of these text
21   messages and they've got bank records and everything else, all
22   of this information, is there a single reference directly or
23   indirectly to drugs in any of them, a single one?  No, not a
24   one.  Is that because Mr. Goklu knows that you don't talk
25   about it.  That's what they would have you believe.  He

1   doesn't talk about it because he knows that you don't talk

2   about it, but at the same time he's talking about it in his

3   first meeting with the undercover officer, we're not drug

4   dealers.  They can't have it both ways.

5          So folks I encourage you with regard to the second

6   count, read that legal language, read it.  It's the key to the

7   second count, a money transmitting business needs to have a

8   license and all of these other requirements kick in only if

9   it's a money transmitting business and if under that

10  definition you're not convinced that what Mr. Goklu was doing

11  was a money transmitting business, then it's your

12  responsibility to find him not guilty of that count as well.

13  I've been talking for too long.  I'm going to sit down.  I

14  know you're tired of hearing from me.

15         I urge you folks, take what time you need, take your

16  time.  You're going to be surprised when you go back into the

17  jury room when you start talking to each other for the first

18  time about the case about how everybody looked at the same

19  thing and saw or heard a different thing.  It's always a

20  remarkable experience I'm told by jurors.  I've never had the

21  pleasure of sitting on a jury.  I would love to but I don't

22  think I'm going to be picked.  Listen to each other.  Talk to

23  each other.  If you need to listen to the recordings, listen

24  to the recordings.  Be mindful at the beginning of them you're

25  going to hear some dead air and you can skip forward and find

1    the place it starts.  It's probably two hours ten minutes or

2    all of it.  If you don't want to listen to all of them, take a

3    couple of shorter ones, listen to the first one.  Listen to

4    something in the middle.  Get a sense of what the interaction

5    is.  But I urge you to take your time and consider and live up

6    to your oaths as jurors to do justice fairly and impartially

7    and hold the Government to the burden of proof because if the

8    Government -- they brought the accusation, they started this

9    ball rolling and they brought the accusation and if their

10   evidence does not satisfy the burden of proof beyond a

11   reasonable doubt, don't hesitate to find Mr. Goklu not guilty

12   of both counts.  Thank you very much.

13              THE COURT:  Thank you very much Mr. Singer.

14              THE COURT:  Ladies and gentlemen, what I would like

15   to do is just take a short break before we hear from the

16   Government on rebuttal.  Let's make it ten minutes and be

17   ready to go a few minutes after 11 especially I know some

18   people may need a nature break.  We'll hear from the

19   Government right after you have return.  Keep an open mind and

20   don't talk about the case.

21              THE COURTROOM DEPUTY:  All rise.

22        (Jury exits.)

23              THE COURT:  Have a seat, everyone.  The reason I

24   wanted to take a break before the rebuttal is I'm a little

25   concerned, Mr. Singer, about the argument you made about the

1    money transmitting charge.  You specifically told the jurors

2    to pay attention to the jury charge regarding the meaning of

3    transfer.  Now my concern is that you are suggesting some

4    legal argument that quite honestly should have been raised, I

5    think, during a motion to dismiss long before the trial, or

6    during the jury charge conference because you are suggesting

7    to the jury that what the Government alleges was illegal money

8    transmitting, which is the exchange of Bitcoin for cash

9    doesn't qualify as transferring funds or transmitting.  And I

10   have not heard that argument from you before, nor did we

11   address it in the charges that I'm going to give.  So you may

12   point the jury to my definition of transferring but it doesn't

13   really illuminate that issue and so I am concerned that you're

14   setting them up to question the instruction on a legal theory.

15          If you thought that the Government had miss charged

16   this case, namely that Bitcoin to cash transactions cannot be

17   transferring under the money -- unlicensed money transmitting

18   business statute you should have raised that before your

19   closing argument and certainly before we settled on the

20   charges.  So I feel that you've raised this issue a bit late

21   and I would like to make sure that the jury instruction

22   actually does address this issue.  Is there any legal argument

23   to be made that changing Bitcoin to dollars does not

24   constitute a transfer of funds that would require licensing or

25   constitute money transmitting under the statute?  Mr. Singer.

1          SKWRAO:  I can cite to Second Circuit case law.

2          THE COURT:  But, okay.  Then why not make an

3     argument that this should have been dismissed and are you

4     referring to your jury charges or your proposed charges?

5     Because you didn't suggest any change to the language.

6          SKWRAO:  I was satisfied about the language and

7     thought that it accurately stated the element.

8          THE COURT:  But you are arguing -- is your argument.

9     You didn't spell this out for jury you said look closely at

10    the definition, is your argument at least to me but not

11    expressly to the jury that the transaction -- sorry, the

12    conversion of Bitcoin to money does not constitute a transfer

13    of funds that would require -- sorry, that constitutes money

14    transmitting and then requires a license if done as a

15    business.

16         SKWRAO:  I think that it requires transfer to

17    someone else.

18         THE COURT:  What do you mean someone else?  If

19    someone gives you a Bitcoin and they give you cash who else --

20         SKWRAO:  That is not a money transmitting business

21    in my view and I press expressed that to Your Honor at the

22    beginning of the case.

23         THE COURT:  But you never moved to dismiss this

24    count or have it briefed.  Am I missing something?  A legal

25    argument like that ought to have been raised before.  This has

1   been the allegation all along.  Are you saying that you raised

2   this in the jury charge and I nus confess I don't remember you

3   raising this squarely during our conferences perhaps you

4   alluded to it but you never asked to brief a motion to dismiss

5   which would be the proper vehicle if you think the allegation

6   doesn't state a charge that violates -- that states facts,

7   that violate the statute, I feel and I'm concerned about a bit

8   of sandbagging here.  That's my concern.  You know, I guess

9   the question is how does the Government intend to argue this

10  on rebuttal because the instructions really don't lend any

11  support to either -- to help the jury I think on this issue.

12  I never defined what a transfer of funds means under the

13  statute in the instruction.

14       STPHAO:  Yes, Your Honor, that's right.  This is the

15  very first time the Government is hearing this argument.

16  Unless it was somehow missed which frankly -- the Government

17  was equally surprised when we heard that during the closing

18  argument.  You know, I agree this is really unfortunate that

19  it's coming to our attention now --

20       THE COURT:  Hold on one second I'm just remembering

21  now.  The Government submitted full blown jury instruction the

22  defense only submitted objection. I don't recall any objection

23  on the basis that the conduct doesn't constitute money

24  transmitting or a transfer is required or that I should advise

25  the jury that an actual transfer to a third party is requred

1    which is what you're suggesting Mr. Singer.  I think the

2    Government should be allowed to argue back which is P which is

3    why I wanted to take a break that to the extent that

4    Mr. Singer suggested that another transfer has to occur,

5    national government has to prove that the person who got the

6    cash here I guess the undercover was giving it to someone else

7    or gave it to someone else or that Mr. Goklu believed it was

8    going to be given to someone else.  That is not in the statute

9    per se and I don't think it's been litigated as to what the

10   word transfer means so I don't want the jury to be operating

11   under some misconception about the law that isn't fully

12   explicated in the jury charge they're going to get and I don't

13   want to tie the Governemnt's hands to be able to say that

14   that's just wrong as a matter of law.

15             MS. KASSNER:  Your Honor, I think the concern from

16   the Government -- there are two concerns.  I think what we

17   would really request is a curative instruction from Your Honor

18   because, I think what we don't want to do is heighten the

19   issue by having to do a lengthy explanation about why this is

20   transferring.  I think that in itself is going to draw red

21   flags and I think also we refer the jury to Your Honor for

22   legal matters.  I think that we really just -- we would ask

23   for a curative instruction that provides that exchanging

24   Bitcoin or cash or cash for Bitcoin maybe it could just be

25   that operating a money-transmitting business includes

1    exchanging Bitcoin for U.S. currency or U.S. currency for

2    Bitcoin.  I agree this is a legal argument.  I don't want to

3    be litigating a legal argument before the jury.

4            THE COURT:  What I would propose is adding language

5    to the first element of the money transmitting charge which is

6    on page entity four and it would be an additional sentence

7    which would say exchanging Bitcoin for U.S. currency can

8    qualify as a transfer within the meaning of the statute.  I

9    actually am concerned because we haven't had a chance to fully

10   explore this issue but that's really because the defense

11   hasn't raised this squarely as a legal question in any

12   context.

13           You may have mentioned it, Mr. Singer.  I do not

14   recall it.  The Government doesn't recall it, but mentioning

15   it in passing during a status conference doesn't qualify as

16   raising it properly so that we can resolve it and I'm going to

17   go out on a limb and say this is the Government's theory.  If

18   it turns out to be wrong legally I expect there could be some

19   plain error review of this because for now because we are in

20   the middle of closing statements, I'm going to make that

21   change to the jury charge which is to adding a sentence saying

22   exchanging Bitcoin for U.S. currency can qualify as a transfer

23   within the meaning of the statute.

24           MR. SINGER:  Your Honor, I can't object more

25   strongly.

1          THE COURT:  You can, but the time is before now.

2          MR. SINGER:  Judge, I didn't make this legal

3     argument to the jury.  I said read the charge and the conduct

4     that's alleged doesn't make out the charge.

5          THE COURT:  You want to suggest that the word

6     transfer is the key here and so --

7          MR. SINGER:  I didn't highlight the word transfer.

8     I read the language that you had indicated that you were going

9     to charge the jury and I was satisfied with that because I

10    believed that I could make my argument to the jury based on

11    that.

12         THE COURT:  I am going to go back and look but the

13    plane suggestion to me is that you're suggesting transfer to a

14    third party and I think you used the word third party is

15    required.  I'm going to go back and look.  You're going to try

16    to get the jury to read this instruction which doesn't discuss

17    another transfer to someone else is required to require that

18    the cash then be transferred to someone else and it leaves

19    this ambiguity; one that we did not have to have.  We had a

20    charge conference.

21         If you -- and we had a discussion about what

22    argument you were going to make and not and I understand

23    you're not required to disclose exactly all of your arguments

24    but if I ended up, which I have now, given a charge that

25    doesn't really answer what you claim is a critical question

1    about the money transmitting charge, that is a problem.  I

2    don't want to set up the jury to scratch their heads when

3    thinking what did the defense say about look at the meaning of

4    the word transfer in the charge.

5              MR. SINGER:  I didn't say that.

6              THE COURT:  You literally said look at the charge to

7    see how transfer is defined.

8              MR. SINGER:  No, I did not.

9              THE COURT:  I am going to go back and look.  I don't

10   want to misstate it.

11             What did you mean to suggest to the jury then,

12   Mr. Singer?  Read the language in the instruction, listen to

13   it and read it and you determine whether Mr. Goklu takes that

14   definition and I don't think it does.  That's what I said.

15             MS. KASSNER:  Your Honor, that's the problem.  I

16   think the question of whether this conduct qualifies as a

17   money transmitting business under that definition is a legal

18   question and so I think that implication was improper --

19             MR. SINGER:  First, it's a factual question for the

20   jury.  That's why we have given it to the jury to decide.

21   Otherwise, just direct a verdict on it.  The jury decides

22   that.  The jury decides whether the evidence supports the

23   accusation that -- they have to decide whether the facts that

24   have been established make out that element.  It's not for the

25   Court to tell them that what he did constitutes the element of

1    the crime.

2              THE COURT:  On the money transferring business, this

3    is a matter of the language and I'm going to encourage you

4    folks to listen carefully to the Judge as she defines the

5    language of this charge and you're going to have it before you

6    written down. A money transmitting business is a business

7    which for a fee accepts currency for transfer.  That's the

8    language that you're being given and I submit to you that

9    under the definition that the Judge is giving to you that

10   Mr. Goklu is not operating a money transmitting business; that

11   the evidence does not prove beyond a reasonable doubt that

12   he's accepting currency for transfer.

13             Accepting currency for transfer.

14             That's what I heard that made me think it's got to

15   be literally then transferred to someone else.  In other

16   words, the Government's theory is he accepted Bitcoin which is

17   currency for transfer to someone, like Western Union which you

18   did refer to, as I recall.  That is a misleading statement

19   about the law and so the Government ought to be able to say to

20   the jury, to the extent that you are thinking that some

21   other -- that Mr. Goklu then had to take the Bitcoin and give

22   it to someone else or that the customer had to take the cash

23   and give it to someone else, that is not what's required under

24   the statute.  That's what I'm addressing.

25             MR. SINGER:  I think you're reading too much into

1      that.  You're making inferences and assumptions about it and I

2      think it's for the jury to decide that.

3              THE COURT:  Mr. Singer, what exactly were you

4      arguing to the jury then?  Be candid.  What were you

5      suggesting?  Listen to whether he accepted currency for

6      transfer.  What did you want them to think?

7              MR. SINGER:  That's not what Mr. Goklu did.

8              THE COURT:  Right.  Why not?

9              MR. SINGER:  Because he didn't transfer the money.

10             THE COURT:  This is the problem.  Transfer what

11     money; the Bitcoin?

12             MR. SINGER:  Judge, the Second Circuit as far back

13     as 1999 has said that a money transmitting business receives

14     money from a customer and then for a fee paid by the customer

15     transmits that money  to a recipient.

16             THE COURT:  You know what, that may be a legitimate

17     argument to have made before we started this trial and before

18     I produced these jury charges.  It's a legal about whether

19     what the Government has alleged and has always alleged to be

20     the money transmitting crime is a crime.  I'm not saying you

21     might not have a legal argument, but the time to make it and

22     to then sandbag the jury and me, quite frankly, in terms of

23     the charges I was prepared to give, is not in the middle of

24     your closing.  That's my problem.

25             MR. SINGER:  I don't believe that I did that.  I'm

1    sorry if the Court reads it that way.  I was satisfied with

2    the legal language that you were including in the charge.  I

3    asked the jury to read the language and to consider the

4    conduct that was alleged to determine whether the conduct made

5    that out.  That's what the jury's job is.

6              THE COURT:  Mr. Singer, you've known all along that

7    the Government's theory about the money transmitting business

8    was that he was converting Bitcoin into cash.  That's what

9    they alleged.  So the question then why would you not have

10   raised this issue earlier saying that I don't think that that

11   states a crime under the statute because it's not a transfer,

12   and the problem right now is that we're dealing with a legal

13   issue that I am not equipped to deal with in this moment and

14   I'm going to instruct the jury that the exchange of Bitcoin

15   into cash does constitute a transfer for the purposes of the

16   statute.  If it turns out to be wrong, you may have an

17   argument before the Court of Appeals, but my concern is that

18   this wasn't properly raised before trial.

19             Maybe you'll get plain error review of that if he's

20   convicted, but this -- it's about process for me more so now.

21             MR. SINGER:  You're directing a verdict after you

22   provided us with a charge, after I made my closing argument.

23   You're now going to give them an instruction that essentially

24   directs a verdict and I don't think it's fair or appropriate.

25             THE COURT:  No I'm not you're making an argument

1    that I'm hearing for the first time.  I'm trying to advise the

2    jury coherently on a legal argument that you're essentially

3    making to them about what constitutes transfer.  It should at

4    a minimum be addressed in the jury charges or raised as an

5    issue.  What you did is you put it in front of the jury

6    without giving either me or the Government a chance to address

7    the legal argument that you're making.  That's pure and

8    simple.  You have acknowledged that you're trying to argue to

9    the jury that the conversion of Bitcoin to cash does not

10    constitute a transfer because the money --

11              MR. SINGER:  It doesn't -- it doesn't make what

12    Mr. Goklu did a money transmitting business.

13              THE COURT:  Because it doesn't mean he transferred

14    currency.  That's what you argued to them and that's the

15    problem I have.  Now, I guess the Government can come back and

16    say he transferred currency because he gave it to the Bitcoin

17    owner.

18              MS. KASSNER:  I don't think that's sufficient Your

19    Honor.  Frankly, I agree that the fact that -- we have never

20    heard this argument before.  We certainly could have presented

21    the evidence differently if we knew that this was an issue.  I

22    think this is a secondary issue, but the fact that the portion

23    of the jury instructions that defense counsel cited also refer

24    to accpeting currency for transfer and left no explanation --

25    the Government raised its concern about that, but I think

1    hopefully the Court's actual instructions addressed that

2    already.

3              THE COURT:  Let's do this:  Mr. Singer, you have

4    your objection.  I am going to add the language, one sentence

5    in the money transmitting business instruction on page 24 that

6    exchanging Bitcoin for U.S. currency can qualify as a transfer

7    within the meaning of the statute and then the Government make

8    its argument, but given will the circumstances and the late

9    disclosure of this legal theory, the legal insufficiency of

10   the alleged conduct, I feel that I have to just make a choice.

11             I suspect the other choice is to leave it alone and

12   see if the jury is confused.  That's the other way to deal

13   with it in which case I would instruct them that it qualifies,

14   but I don't think it makes sense.  Either the Government is

15   right that this is a viable theory or not, which if they're

16   wrong, then they'll lose on appeal if it's not a viable theory

17   and I've incorrectly instructed the jury.  And that's what I'm

18   going to do.

19             You have your objection, Mr. Singer.

20             MR. SINGER:  Thank you.

21             MS. DIOUF:  Your Honor, I was going to preview the

22   language on rebuttal.  So to the extent that defense counsel

23   has suggested that another transfer to a third party is

24   required for this count, that is not the law.  It's not in the

25   statute.  In fact, Judge Chen will instruct you on that.

1          THE COURT:  Yes, fine.

2          MR. SINGER:  I will note my objection now to that

3     argument.

4          THE COURT:  You can, absolutely.

5          (Recess taken.)

6          THE COURT:  Mr. Singer, I did want to address your

7     argument that I'm directing the verdict by adding this

8     instruction.  I don't think that that's correct because I do

9     say you can find it qualifies.  I'm not directing them or

10    telling them that they must find it qualifies which is

11    different from how other terms are defined in the instructions

12    or other instructions which say if you find the following, you

13    should convict him or you should not convict him.

14         So I think in that regard trying to add qualifying

15    language to address what I think will be a significant point

16    because of your argument during summation and to make clear to

17    the jury that they can find that the Bitcoin-to-cash

18    conversion qualifies as a transfer.  So just to make that

19    clear on the record.  We're going to get the jury now.

20         My law clerk is incorproationting that last change.

21    What you'll get is a track change version of what's changed

22    from yet to now and a clean version after the summations

23    because I will ask you to quickly let me know if the

24    instructions as revised are fine.

25         (Jury enters.)

1          THE COURT:  Please be seated, everyone.  My

2    apologies, ladies and gentlemen.  It took longer than I

3    thought.  So I didn't mean to keep you in the room for longer

4    than I said, but we are now ready to hear the rebuttal

5    statement of the Government.

6          Ms. Diouf, You may proceed.

7          MS. DIOUF:  Members of the jury, you heard my

8    colleague, Ms. Kassner, talk about the evidence today.  You

9    heard my colleague Ms. Kassner talk about the evidence today

10   and I'm not going to repeat what she said.  I just want to

11   take a few more minutes of your time to talk about what

12   defense counsel has told you.  Now, the Government has the

13   burden of proving its case beyond a reasonable doubt and we

14   embrace that burden, but when defense counsel makes arguments

15   about the evidence the Government presented, you should think

16   through those arguments and see if they actually make sense in

17   light of all of the evidence you have seen in this trial and

18   rather than focusing on what actually happened.  Defense

19   counsel is asking you to use your imagination, but you don't

20   need to because you have evidence.

21          I want to start with Count Two.  Defense counsel is

22   asking you to conclude that soliciting customers through an

23   online advertisement and meeting them sometimes multiple times

24   to exchange Bitcoin for a fee is not a business.  Members of

25   the jury, you know what a business is.  The defendant charged

1   a fee.  He exchanged money multiple times and the defendant

2   himself calls it a business.  And defense counsel talked to

3   you about the definition of a money transmitting business.

4   And this is important: To the extent that the defense counsel

5   suggested that what the defendant was doing wasn't a transfer,

6   Judge Chen will instruct you that exchanging Bitcoin for cash

7   is a transaction.

8           And you heard from the Department of Financial

9   Services and the Department of Treasury, those two witnesses,

10  who told you that a money transmitting business includes

11  people who regularly exchange Bitcoin for cash.  And defense

12  counsel says a lot of things; okay, he talked about how the

13  defendant drove around John McCain.  That's not relevant.  The

14  defendant had a money transmitting business.  This was not a

15  single, isolated transaction.  It's something he did

16  regularly.  That's it.  Welcome to Count One.

17          Now let's talk about money laundering.  Defense

18  counsel says that the defendant believed the Bitcoin he was

19  exchanging from the undercover came from lawful activity.

20  Well -- and that it wasn't from illegal drug sales.  Let's

21  take a step back and walk through a few things.  Let look at

22  what the defendant heard, what he did, what choices he made,

23  what he believed.  Let's look at the December 2018 meeting

24  between the defendant and the undercover.  They meet, they

25  start transacting.  They agree upon $20,000.  The undercover

1    tells the defendant that his inability to meet with him the
2    week before caused problems for the undercover and his
3    business.  The undercover has a lot of people to pay and
4    they're not great people.  The undercover asked the defendant
5    if he can exchange $100,000 in January, in the new year.  The
6    defendant has a choice here.  What does he do?  He responds,
7    okay, and he offers to launder $50,000 more for the undercover
8    in that same meeting.
9           On January 4, 2019 they meet again.  The undercover
10   says he has insane amounts of money coming in.  These college
11   kids can't get enough.  The undercover offers the defendant
12   oxycodone.  The defendant responds, don't bring those, just
13   bring regular street things, which by the way shows that even
14   if he didn't know exactly what oxycodone was, he knew it's
15   some kind of a drug.  Also Adderall, oxycodone, pills.  That
16   is not drug lingo.  He understands it.
17          Again, the defendant has a choice and what does he
18   do?  He agrees to meet the undercover again and launder more
19   of his drug money.  A few days later January 30th, the
20   defendant tells the undercover that he does not want to
21   convert $100,000 at a time.  He asks the undercover if they
22   can split the transaction.  The defendant says because with
23   100 if we get in trouble, we are both fucked up.  40 is okay.
24   The defendant isn't saying I won't launder $100,000 for you.
25   No he's saying $100,000 at one time is too much.  Let's break

1    it up.  Why?  To conceal where this money is coming from, to
2    launder it.
3            Defense counsel argues that the defendant didn't
4    know the undercover's business is illegal.  Well, let's look
5    at what else the undercover tells the defendant.  He tells the
6    defendant he's worried about people he knows in California
7    shooting at them in the car.  He tells the defendant he's
8    worried about having his head chopped off if he doesn't pay
9    people on time.  The people he works for arent' good people.
10   Does this sound like a legal business to you?  What type of a
11   person is worried about being killed by their colleagues?
12   Drug dealers.
13           And the defendant has a choice here too, but what
14   did he do?  He continued to launder the undercover's Bitcoin
15   and look at how the defendant describes his business partners.
16   He told the undercover that one of his partners was caught
17   laundering money for a drug dealer.  He told the undercover
18   that one of his partners gets money whose job is hookers.
19   He's a pimp.  And the defendant talks about the money counter.
20   The defendant tells the undercover he has a money counter in
21   case he is getting money from somewhere bad.  People who get
22   money from legitimate sources don't need to worry about
23   counterfeit bills.
24           And defense counsel's also argues that someone might
25   use the defendant's service because it's faster and more

1    convenient about cabe.  Nothing about the defendant's service

2    is quick or convenient.  Just look at the messages between the

3    defendant and the undercover.

4           Even after they had a relationship it took days,

5    days, to set up a meeting and sometimes when the undercover

6    got there, the defendant didn't have the agreed-upon amount.

7    And defense counsel talks about check cashing businesses and

8    Paychex, and how that's fast and convenient.  Yeah, they are.

9    But you know what they also have?  Your name on the paycheck.

10          The defendant's type of service wasn't cheap, it

11   wasn't fast, it wasn't reliable and it certainly wasn't

12   convenient.  And defense counsel also talks about how Coinbase

13   is insured.  Exchanging Bitcoin for cash in the back of a

14   parked car in a Wendy's parking lot is certainly not insured.

15   Legitimate exchangers do not operate out of Starbucks and a

16   Wendy's parking lot.  It's dangerous.

17          The only reason to use a service like the

18   defendant's is to conceal where the money was coming from and

19   who would do that?  Drug dealers.  And defense counsel makes a

20   big deal about the fact that the undercover agent didn't

21   explicitly talk about drugs at first and that the transactions

22   before that aren't illegal, but that doesn't matter.  And this

23   is really important, the only thing the Government needs to

24   prove that once, just once, the defendant knew that the money

25   he was converting came from illegal drug proceeds and that the

1    defendant did it anyway.

2          Judge Chen will instruct you that one way of knowing

3    is closing your eyes to what's around you.  That's enough for

4    the defendant to be guilty.  We just went over what the

5    defendant knew before the December and January transactions

6    and let's look at what the defendant definitely knew leading

7    up to the last transaction when he was arrested.  Let's look

8    at the text exchange between the undercover and the defendant

9    that took place in April 2019 and this is Government Exhibit

10   507 at page three.

11         (Exhibit published.)

12         MS. DIOUF:  April 22nd.  Pat tells the defendant he

13   needs $100,000.  The defendant responds with a speech.  I'm

14   not a money laundering guy.  The defendant is saying, I'm

15   worrying about being accused of money laundering if I exchange

16   that amount of money for you.  He knows the undercover is a

17   drug dealer, but he didn't walk away.  He responds: I can do

18   only $49,999.  This is a very specific amount.  Why?  Not

19   because he thought he wasn't laundering that amount of money,

20   but he didn't think he would get caught laundering a lower

21   amount.

22         The defendant is saying he knows what money

23   laundering is and is aware that people use his service to

24   launder money and conceal where it came from.  That was on

25   April 22, 2019.  And, now, let's look at Government Exhibit

1    228, the defendants signal messages at page 12.

2              (Exhibit published.)

3              MS. DIOUF:  This is message thread 12.  This thread

4    starts a few days after the defendant's speech to the

5    undercover.  This is on April 26th.  While the defendant is

6    arranging to meet the undercover, he's negotiating yet another

7    transaction with someone else who he also thinks is a drug

8    teller.  Remember what happens in this thread?  Let's skip

9    ahead to page 20 in this Government Exhibit.

10             (Exhibit published.)

11             MS. DIOUF:  The deal goes south.  They're fighting.

12   They're insulting each other.  Out of nowhere the defendant

13   says, I'll report you to NYPD.  I'm contacted by NYPD to mark

14   drug dealers.  You will be reported son of a bitch.  How does

15   the customer respond?  Let's look at page 21 of this exhibit:

16   Good luck.  You don't have my name.  All you have is my burner

17   cellphone number.

18             The defendant knows that people use his service to

19   remain anonymous, to conceal where their money is coming from.

20   And let's look at the last page of this thread, page 22 of

21   this exhibit.  This is why I split my transactions, you fool.

22   I did eight transactions, all over 3,000 and still got to wash

23   another 29K.  Only a matter of time before you snitch on the

24   wrong person and get killed.

25             These are the types of people that the defendant is

1    meeting in the parking lots of Wendy's and Starbucks.  He

2    knows that people use his business to launder drug money.  He

3    knows they use services like his to hide where their money is

4    coming from.  And, four days later, he meets the undercover to

5    launder their agreed-upon $49,999.  They get into the

6    defendant's car.  They start counting cash.  The defendant

7    asks how's business.  It's booming.  The undercover tells him

8    his real money is not from marijuana, but from Adderall and

9    pills.  The defendant responds.  He asks more about the

10   undercover's marijuana business.  The undercover tells him

11   it's risky; that his buddy was arrested by the feds just the

12   other day and the defendant responds: He says, oh, you got to

13   be in California.  You go out, it's trouble, right?

14            The defendant knows the undercover's business is

15   illegal and the defendant has another choice here.  What

16   choice does he make?  He offers to launder another $25,000 and

17   the defendant would have finished that deal except he was

18   arrested.

19            As jurors, the most important skill you bring with

20   you to this courtroom is your common sense.  Does defense

21   counsel's claim that the defendant didn't know he was

22   converting drug money make sense?  It doesn't.  I submit to

23   you that the evidence establishes beyond a reasonable doubt

24   that the defendant knew he was laundering drug money.  As I

25   said, Judge Chen will instruct you that one type of knowing is

1   closing your eyes to what's happening.  And that means the

2   defendant is guilty.

3            The defendant is charged with money laundering and

4   operating a money remitting business without a license and I

5   submit that is what we have proved beyond a reasonable doubt.

6   Defendant's counsel wants you to imagine away the overwhelming

7   evidence in this case.

8            At the beginning of this trial I stood before you

9   and I told you that there will come a time when I wil ask you

10  to return the only verdict that is consistent with the

11  evidence and your common sense.  That is where we are now.  We

12  ask that you find the defendant, Mustafa Goklu, guilty.  Thank

13  you.

14           THE COURT:  Thank you, very much.  Have a seat.  So

15  ladies and gentlemen, we're going to take and I promise, a

16  five-minute break because we need to get copies of the jury

17  instructions here in front of us.  So we'll give you five

18  minutes and so rather than have you sit here we'll let you go

19  back to the jury room, but as soon as you come back out I will

20  instruct you on the law and you can begin your deliberations.

21  Bear with us another minute and thank you.  Don't talk about

22  the case.

23           THE COURTROOM DEPUTY:  All rise.

24           (Jury exits.)

25           THE COURT:  Quickly take a look at the red line

1   version and let us know if there are any issues.  Everyone now

2   has a track change version as well as a clean version and I've

3   asked the parties to let me know if the current version is

4   fine for reading to the jury.

5           And noting the defense's objection to the language I

6   added about transfer.

7           MR. SINGER:  This is consistent -- these

8   instructions are consistent with the discussions that we had

9   of yesterday's part of the charge conference and this morning.

10  The objections that I previously noted about yesterday and

11  today stand, but otherwise I believe that this reflects the

12  rulings of the Court.

13          THE COURT:  Thank you, Mr. Singer.

14          MS. KASSNER:  This looks fine from the Government's

15  perspective.

16          THE COURT:  So we're going to go ahead and get the

17  jury.

18          (Pause in proceedings.)

19          (Jury enters.)

20          THE COURT:  Please be seated everyone.  I'm sure,

21  ladies and gentlemen, that you've now figured out that five

22  minutes in the courtroom is the like the last two minutes of a

23  basketball game.  It lasts a whole longer than the actual

24  time.  Thank you for your patience.

25          I'm going to now instruct you on the law.

1          Fida, I will give you a minute.

2          We're going to project it on the overhead so you can

3    follow along.  As I said to you earlier or actually I didn't,

4    I don't think, you will get a copy of the written instructions

5    for your deliberations so you don't need to worry about

6    writing down everything that's in these instructions but

7    obviously if you want to take notes you can do so.

8          All right.  Ladies and gentlemen -- I'm going to dim

9    the lights which everyone if everyone promises to stay awake.

10         Ladies and gentlemen of the jury, now that you have

11   heard all of the evidence in the case as well as the arguments

12   of the lawyers, it is my duty to give you instructions as to

13   the law applicable in this case.  We have are all grateful to

14   you for the close attention you have given to this case thus

15   far.  I ask that you continue to do so as I give you these

16   instructions.

17         As you know, the defendant Mustafa Goklu is charged

18   with money laundering and the operation of an unlicensed money

19   transmitting business.  The defendant has pleaded not guilty

20   to all charges, my instructions will be in three parts.

21   First, I will instruct you regarding the general rules that

22   define and govern the duties of a jury in a criminal case such

23   as this.

24         Second, I will instruct you as to the particular

25   crimes charged in this case and the specific elements that the

1   Government must prove with respect to each crime.  Third, I

2   will give you some general rules regarding your deliberations.

3   First, general instructions, role of the Court and jury.

4

5               (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing)

2          THE COURT:  Let me start by restating our respective

3    roles as judge and jury.  Your duties, as I mentioned in my

4    opening instructions, is to find the facts from all the

5    evidence in this case.  You are the sole judges of the facts

6    and it is for you and you alone to determine what weight to

7    give the evidence to resolve such conflicts as may have

8    appeared in the evidence and to draw such inferences as you

9    deem to be reasonable and warranted from the evidence.

10         My role is to instruct you on the law.  You must

11   apply the law in accordance with my instructions to the facts

12   as you find them.  I remind you of your sworn obligation to

13   follow the law as I describe it to you whether you agree with

14   it or not.  You should not be concerned about the wisdom of

15   any rule of law that I state regardless of any opinion you may

16   have about what the law may be or should be, it would be a

17   violation of your oaths as jurors to base your verdict upon

18   any other view of the law than the one given you to in these

19   instructions.

20         If any of the lawyers have stated a legal principle

21   that differs from any that I state to you in my instructions,

22   you must be guided solely by what I instruct you about the

23   law.  You should not single out any one instruction as alone

24   stating the law, but consider my instructions as a whole.

25   Because it is your role, not mine, to determine the facts.  I

1    did not state or imply any view about how you should decide

2    the facts of this case.  You should not conclude from anything

3    I have said or done during this trial, including these

4    instructions, that I have an opinion about the facts or the

5    merits of this case.

6            For example, occasionally I may have asked a witness

7    or a lawyer questions.  These questions were only intended for

8    clarification to expedite matters and not to suggest any

9    opinions on my part as to the verdict you should reach or

10   whether any of the witnesses may have been more credible than

11   any other witnesses.  You should not attach -- you should

12   attach no special significance to my question simply because I

13   asked them.

14           A.:  The quality of the Government and the Defense

15   Before the Court.

16           The fact that the Government is prosecuting this

17   case, on behalf of the United States of America, should not

18   affect your evaluation of the evidence and tasks before you.

19   The Government is entitled to no greater consideration than

20   the defendant.  By the same token, however, the Government is

21   entitled to no less consideration.  All parties, whether the

22   Government or individuals, are equal before the law and are

23   entitled to equal considerations.

24           I think there is an and missing there.

25           B.:  No Sympathy, Fear, Prejudice or Basis.

Shernelle Griffith

1          It is your responsibility to decide the facts with

2    complete fairness and impartiality and without any bias or

3    prejudice or sympathy for any party.  You must perform your

4    duties as jurors with complete fairness and impartiality.  You

5    must carefully and impartially consider the evidence.  Follow

6    the law as I've given it to you, or as I give it to you, and

7    reach a just verdict regardless of the consequences.  The

8    crucial question you must ask yourselves as you sit through

9    the evidence is, has the Government proven the guilt of the

10   defendant beyond a reasonable doubt.

11         It is fair for you alone to decide -- sorry.  It is

12   for you alone to decide whether the Government has met the

13   burden to prove each element of the crime charge solely on the

14   basis of the evidence before you and the law as I charge us.

15   If you should find that the Government has met its burden of

16   proving the defendant's guilt beyond a reasonable doubt, you

17   may render a verdict of guilty without concern for sympathy or

18   any other reason.

19         On the other hand, if you have a reasonable doubt as

20   to the defendant's guilt, you should not hesitate because of

21   sympathy, fear, prejudice, or basis for or against anyone to

22   find the defendant not guilty.  In reaching your decision as

23   to whether the Government has sustained the burden of proof,

24   you may not consider any personal feelings you may have about

25   the defendant's race, ethnicity, national origin, sex or age

1   or that of any witness or anyone else involved in this case.

2   All persons charged with a crime are entitled to the same

3   presumption of innocence.  The Government has the same burden

4   of proof with respect to all persons.

5              As with any other individual charged with a crime,

6   the issue is whether the Government has met its burden of

7   demonstrating each and every element of the offense beyond a

8   reasonable doubt as to the defendant.

9              C.:  Function of the Indictment and What Is Not In

10  Evidence.

11             The defendant has been charged in an indictment with

12  violating federal laws.  The Government -- the indictment is

13  merely a statement of the charges against the defendant.  The

14  indictment is not itself evidence.  Nor does it create an

15  inference of guilt.  It is an accusation and nothing more.

16             D.:  The Presumption of Innocence and Burden of

17  Proof.

18             As previously stated, the defendant has entered a

19  plea of not guilty as to all the charges against him in the

20  indictment.  The defendant is presumed to be innocent of the

21  charges against him.  And that presumption alone, unless over

22  come, is sufficient to acquit him.  The legal presumption of

23  innocence remains in force until such time, if ever, that you

24  as a jury is satisfied that the Government has proven the

25  guilt of the defendant as to each element of any particular

1   crime charged beyond a reasonable doubt.

2           The Government alone bears the burden to prove the

3   defendant's guilt as to each element of the charges beyond a

4   reasonable doubt.  The law never imposes upon a defendant in a

5   criminal case the burden or duty of calling any witnesses or

6   producing any evidence.  Your task in deliberations is not to

7   decide between guilty and innocence, it is to decide between

8   guilty and not guilty based on the evidence or lack of

9   evidence.

10          Indeed, the presumption of innocence alone requires

11  you to acquit the defendant of the charge you are considering

12  unless you are unanimously convinced that the Government has

13  met its burden to prove that is he guilty of the charged

14  beyond a reasonable doubt.

15          Now, let me pause for one moment.  Just because, as

16  I often say, the trip is always faster when you know where you

17  are going.  So we have 29 pages in total to get through and we

18  are now on Page 6.  So for those of you that like to count

19  pages, we have about 23 to go.

20          E.:  Reasonable Doubt.

21          You maybe wondering what is reasonable doubt.  The

22  words almost define themselves.  It is doubt based upon reason

23  and common sense.  It is a doubt that a reasonable person has

24  after carefully weighing all of the evidence or lack of

25  evidence.  It is a doubt that would cause a reasonable person

1  to hesitate to act in a matter of the highest importance in

2  his or her life.

3          Proof beyond a reasonable doubt must therefore be

4  proof of such a convincing character that a reasonable person

5  would not hesitate to rely and act upon it in the most

6  important of his own affairs.  A reasonable doubt is not

7  caprice or whim.  It is not speculation or suspicion.  It is

8  not an excuse to avoid the performance of an unpleasant duty.

9  And it is not sympathy.

10         The law does not require that the Government prove

11 guilt beyond all possible doubt.  Proof beyond a reasonable

12 doubt is sufficient to convict.  If after fair and impartial

13 consideration of the evidence you are satisfied beyond a

14 reasonable doubt of the guilt of the defendant as to a

15 particular charge, you should find defendant guilty of that

16 charge.  On the other hand, if after fair and impartial

17 consideration of the evidence or lack of evidence concerning a

18 particular charge, you have a reasonable doubt as to the

19 defendant's guilt, you must find the defendant not guilty of

20 the charge.

21         F.:  Punishment.

22         Under your oaths as jurors, you are not to consider

23 the question of the possible punishment the defendant may

24 receive if he is convicted.  The duty of imposing a sentence,

25 if necessary, rest exclusively on me.  You cannot allow

1   consideration of the punishment that may be imposed upon the

2   defendant, if he is convicted, to influence your verdict in

3   any way or to enter into your deliberations in any sense.

4   Your duties as jurors is to weigh the evidence in this case

5   and to determine whether or not the defendant is guilty beyond

6   a reasonable doubt solely upon the basis of the evidence

7   before you.

8           G.:  The Definition of Evidence and Meaning of

9   Objections.

10          I will now talk to you about what evidence is and

11  how you should consider it.  You must determine the facts in

12  this case based solely on the evidence presented and those

13  inferences which can be reasonably drawn from the evidence

14  presented.  The evidence in this includes the sworn testimony

15  from the witnesses and documentary exhibits that have been

16  received in evidence by me and the stipulations by the

17  parties.

18          As I explained at the beginning of the case, certain

19  things are not evidence and you should disregard them in

20  deciding what the facts are in this case.  As I have already

21  instructed, the indictment in this case is not evidence.  The

22  arguments and statements of the lawyers, including the opening

23  statements and closing arguments of the lawyers, are not

24  evidence.  If anything the lawyers said about the evidence in

25  their statements or arguments conflicts with your own memory

1  of the evidence, it is your recollection that governs.

2  Objections to questions or exhibits are not evidence.  Also

3  statements that attorneys make while objecting to questions

4  and exhibits are not evidence.

5          The lawyers have a duty to their clients to object

6  when they believe something is improper under the rules of

7  evidence.  You should not be influenced by any such objection.

8  If I sustained an objection, you must ignore the question or

9  exhibit, and must not try to guess what the answer might have

10  been or the exhibit might have contained.  If I overruled an

11  objection, treat the answer or exhibit like any other.

12          Anything you may have seen or heard outside of the

13  courtroom is not evidence.  Any testimony or exhibit that has

14  been excluded, stricken, or that you have been instructed to

15  disregard is not evidence.  Transcripts of audio recordings is

16  not evidence, as I told during the trial.  During the trial

17  you heard audio recordings and received written transcripts to

18  aid you in listening to these recordings.  The transcripts

19  themselves are not evidence.  Therefore, you may only consider

20  what you heard and understood the contents of the recording to

21  be.  If you perceived the difference between the recording and

22  the transcript, you must rely only on what you heard because

23  the transcripts are not evidence.

24          Finally, anything I have said or done during these

25  proceedings is not evidence or any indication as to the

Shernelle Griffith

1    defendant's innocence or guilt.

2                H.:  Direct and Circumstantial Evidence.

3                As I mentioned in my opening instructions, there are

4    generally speaking two types of evidence, direct and

5    circumstantial.  You may use both types of evidence in

6    reaching your verdict in this case.  The law makes no

7    distinction between the weight to be given to these two types

8    of evidence and it is for you to give weight to any such

9    evidence as you see appropriate.  You must base your verdict

10   on a reasonable assessment of the all of the evidence in the

11   case.

12               Direct evidence is testimony from a witness about

13   something he or she knows by virtue of his or her own senses.

14   Something he or she has seen, felt, touched, tasted, or heard.

15   Circumstantial evidence on the other hand is proof of a chain

16   of circumstances that point to the existence or nonexistence

17   of certain facts.

18               A simple example of circumstantial evidence is as

19   follows:  Suppose you came to court on a day when the weather

20   was clear, sunny and dry.  However, after several hours in the

21   courtroom where there are no windows, you observe a person

22   come in wearing a wet raincoat and another person shaking a

23   wet umbrella.  Without you ever looking outside you would not

24   have direct evidence that it rained, but you might infer from

25   these circumstances that while you were sitting in court it

1    rained out doors.  That is all there is to circumstantial

2    evidence.

3            On the basis of reason, experience, and common

4    sense, you infer the existence or nonexistence of a fact from

5    one or more established facts.  You are permitted to draw from

6    the facts that you find to have been proved such reasonable

7    inferences as would be justified in light of your experiences.

8    Inferences are deductions or conclusion that reason and common

9    sense lead you, the jury, to draw from the facts that have

10   been established by the evidence in this case.  Use your

11   common sense in drawing inferences.

12           However, you are not permitted to engage in mere

13   guesswork or speculation.  There are times when different

14   inferences maybe drawn from the facts whether proved by direct

15   or circumstantial evidence.  Perhaps the Government asked you

16   to draw one and the defendant asked you to draw another.  It

17   is for you and you alone to decide what inferences you will

18   draw, whether based on a -- whether based on direct or

19   circumstantial evidence or upon the logical, reasonable

20   inferences drawn from such evidence, you must be satisfied of

21   the guilt of the defendant beyond a reasonable doubt before

22   you may convict.

23           No significance should be attached to the fact that

24   a document or other exhibit or witness testimony was

25   introduced by one party rather than by the other.  Any party

1    is entitled to the benefit of any evidence tending to

2    establish its contentions, even though such evidence may have

3    come from witnesses or documents introduced by another party.

4              I.:  Witness Credibility.

5              In deciding what the facts are in this case, you

6    must consider all of the evidence that has been offered and

7    must decide which testimony to believe and which testimony not

8    to believe.  You are the sole judges of credibility of the

9    witnesses and the weight their testimony deserves.  There is

10   no one single way to determine credibility.

11             In your daily lives you make such decisions

12   regularly.  The same standards, as well as your common sense,

13   should guide you here.  Your determination of the issue of

14   credibility very largely must depend upon the impression that

15   a witness made upon you as to whether or not that witness was

16   telling the truth or giving an accurate -- giving you an

17   accurate version of what occurred.

18             You may choose to disbelieve all or part of any

19   witnesses testimony.  In deciding and to what extent to

20   believe a witnesses testimony, you may consider any number of

21   factors, including the following:

22             The witness's opportunity to see, hear, and know

23   about the events he or she described.  The witness's ability

24   to recall and describe those things accurately.  The witness's

25   way of testifying.  Was a witness candid and forthright or did

1    the witness seem if he or she was hiding something, being

2    evasive, or suspect in some way.  How the witness's testimony

3    on direct examination compared with how the witness testified

4    on cross examination.  The reasonableness of the witnesses

5    testimony in light of all the other evidence in this case.

6    Whether the witness had any possible bias, any relationship to

7    a party, any motivate to be untruthful, or any possible

8    interest in the outcome of the trial.  And whether the

9    witness's testimony was contradicted by his or her other

10   testimony by what that witness said or did on a prior

11   occasion, by the testimony of other witnesses or by other

12   evidence.

13            Inconsistencies or discrepancies in the testimony of

14   a witness or between the testimony of different witnesses may

15   or may not cause you to discredit such testimony.  In weighing

16   the effects of an inconsistency, you should consider whether

17   it relates to an important fact or an unimportant detail.  And

18   whether in your view, the inconsistency results from an

19   innocent error or an intentional falsehood.  If you find that

20   any statement made by a witness on the stand is false in whole

21   or in part, you may disregard the particular part you find to

22   be false or you may disregard his or her entire testimony as

23   not worthy of belief.

24            In evaluating the credibility of the witnesses, you

25   should take into account evidence that the witness who

1  testified may benefit in the some way from the outcome of this

2  case.  Such an interest in the outcome creates a motivate on

3  the part of witness to testify falsely and may sway the

4  witness to testify in a way that advances his own interest.

5  Therefore, if you find that any witness whose testimony you

6  are considering, may have an interest in the outcome of the

7  trial, then you should bear that factor in mind when

8  evaluating the credibility of his or her testimony and

9  evaluate it with great care.

10         This is not to suggest that ever witness who has an

11  interest in the outcome of the case will testify falsely.

12  There are many people who no matter what their interest in the

13  outcome of a case maybe would not testify falsely.  It is for

14  you to decide based on your own perceptions and common sense

15  to what extent, if at all, the witness's interest has affected

16  or colored his or her testimony.

17         J.:  Testimony of the Defendant Right Not To

18  Testify.

19         The defendant did not testify in this case.  Under

20  the Constitution, the defendant has no obligation to testify

21  or to present any other evidence because it is the

22  Government's burden to prove his guilt beyond a reasonable

23  doubt.  You may not attach any significance to the fact that

24  the defendant did not testify.  Nor may you draw any adverse

25  inference against the defendant because he did not take the

1  witness stand.  In your deliberations, in the jury room, you

2  may not consider this decision against the defendant in any

3  way.

4          K.:  Testimony of Law Enforcement Witnesses or

5  Officers.

6          During the trial you heard testimony from law

7  enforcement officers.  The fact that a witness is or was

8  employed as a law enforcement official does not mean that his

9  or her testimony is deserving of more or less consideration or

10 greater or lesser weight then that of any ordinary witness.

11         It is for you decide after weighing all the

12 evidence, and in light of the instructions I have given you

13 about the factors relevant to determining the credibility of

14 any witness, whether to accept the testimony of a law

15 enforcement witness and what weight, if any, it deserved.

16         I.:  Stipulations of Fact.

17         A stipulation is an agreement among the parties that

18 a certain fact is true.  The attorneys for the Government and

19 the attorneys for the defendant have entered into a number of

20 stipulations concerning facts that are relevant to this case.

21 As you may recall, those were read into the record during the

22 trial.  When the attorneys on both sides stipulate and agree

23 as to the existence of a fact, you must accept the stipulation

24 as evidence regard that fact as proved.

25         M.:  Interviewed Witnesses.

1          During the course of the trial you heard testimony

2     that the witnesses interviewed -- that the attorneys

3     interviewed witnesses when preparing for the trial.  You Must

4     not draw any unfavorable inference from that fact.  On the

5     contrary, attorneys are obliged to prepare their cases

6     thoroughly as possible and in the discharge of that

7     responsibility, properly interview witnesses in preparation

8     for the trial.

9          N.:  Summary Evidence

10         Some exhibits were admitted into evidence in the

11    form of charts and summaries.  Those charts and summaries were

12    admitted in order to save the time of reviewing voluminous

13    records and to avoid inconvenience.  You should consider these

14    charts and summaries the same way you would any other

15    evidence.  However, the charts and summaries used in closing

16    arguments are not in evidence unless specifically admitted

17    into evidence.  These charts and summaries were shown to you

18    in order to make the evidence more meaningful and to aid you

19    in considering the evidence.  They are no better than the

20    documents upon which they are based and are not themselves

21    independent evidence.

22         And let me just say, because those charts or the

23    PowerPoint, for example, used during the Government's

24    summation is not evidence.  It will not be sent back to you

25    along with the evidence to the jury room for your

1    deliberations.

2            Therefore, you are to give no greater consideration

3    to these charts or summaries than you would give to the

4    evidence upon which you are based.

5            And let me just say, also, there are some charts or

6    summaries that were introduced and those you can consider as

7    evidence.

8            It is for you to decide whether the charts,

9    schedules, or summaries correctly present the information

10   contained in the testimony and in the exhibits on which they

11   were based.  You are entitled to consider the charts,

12   schedules, and summaries if you find that they are of

13   assistance to you in analyzing the underlining evidence.

14           O.:  Undercover Agents.

15           You have heard testimony from an undercover agent

16   who is employed by the Drug Enforcement Administration.

17   Sometimes the Government uses undercover agents who may

18   conceal their true identities in order to investigate

19   suspected violations of the law.  There's nothing improper or

20   illegal about the Government using those techniques, so long

21   as the defendant's rights are not violated.  And the defendant

22   has not claimed that his rights were violated in this case.

23           Indeed certain types of evidence would be extremely

24   difficult to detect without the use of undercover agents and

25   informants.  Whether or not you approve of the use of an

1    undercover agent to detect unlawful activities is not to enter

2    into your deliberations in any way.

3            P.:  Particular Investigative Techniques.

4            You are instructed that there is no legal

5    requirement that the Government used any specific

6    investigative techniques or pursued every investigative lead

7    to prove its case.  As I have said before, your concern is to

8    determine whether or not based on the evidence admitted at

9    trial or the lack of evidence the defendant's guilt has been

10   proven beyond a reasonable doubt.

11           Expert Witnesses.

12           You have heard the testimony of -- and I think it

13   was an expert witness in this case.  Ordinarily, witnesses are

14   restricted to testifying concerning matters of fact.  There

15   are occasions, however, when there is some technical or other

16   specialized area of knowledge that will assist the jury in

17   deciding a disputed fact.  On those occasions, a witness who

18   is specially qualified by training, knowledge, experience, or

19   education, maybe called upon to testify about some evidence or

20   facts in issue in the form of an opinion.

21           And for you page counters, we are up to 14.  So we

22   are more than halfway through.

23           Your role in judging credibility applies to experts

24   as well as other witnesses.  You should judge this testimony

25   in the same way you judge the testimony of any other witness.

1   The fact that such a person has given an opinion does not mean

2   that you are required to accept it.  In weighing the

3   testimony, you should consider the factors that generally bear

4   upon the credibility of a witness as well as the expert

5   witness education, training, and experience.  The soundness of

6   the reasons given for the opinion and all other evidence in

7   the case.  You should consider the expert opinions which were

8   received in evidence in this case and give them as much or

9   little weight you think they deserve.

10          If you should decide that the opinion of an expert

11  was not based on sufficient education, experience, or

12  sufficient data, or if you should conclude that the trust

13  worthiness or credibility of an expert is questionable, for

14  any reason, then you may disregard the opinion of the expert.

15  Furthermore, if the opinion of the expert was outweighed in

16  your judgment by other evidence in the case, then you must

17  disregard the opinion of the expert entirely or in part.  On

18  the other hand, if you find the opinion of an expert is based

19  on sufficient data, education, training, and experience, and

20  the other evidence does not give you reason to doubt the

21  expert's conclusions, you would be justified in placing gray

22  line on the experts testimony.

23          R.:  Evidence Pursuant to Lawful Procedure.

24          You have heard testimony that interactions between

25  law enforcement agents and the defendant were audio recorded.

Shernelle Griffith

1   In addition, you have seen evidence obtained pursuant to a

2   search of a cellular telephone and laptop computer.  You have

3   also seen evidence obtained pursuant to hidden recording

4   devices.

5            I'm going to pause for a moment.

6            Government, is that correct, that there was such

7   evidence?

8            MS. KASSNER:  Yes, Your Honor.

9            THE COURT:  Okay.  Sorry.

10           This evidence was obtained lawfully.  The use of

11  these procedures to gather evidence is perfectly lawful and

12  the Government has the right -- of course, that's true.  I'm

13  so sorry.  I was thinking about it in a different context in

14  terms of hidden recording devices.  That is, of course,

15  correct.  The use of these procedures to gather evidence is

16  perfectly lawful and the Government's has a right to use such

17  evidence in this case.

18           The wisdom of the law and law enforcement policies

19  and procedures are not your concern.  Your job is to -- is

20  only to decide whether the Government has proved that the

21  defendant committed the crime charged in the indictment or the

22  crimes charged in the indictment.

23           S.:  Limiting Instructions.

24           You have seen and heard evidence that relates to

25  activities and transactions that the defendant conducted with

1  individuals other than the undercover law enforcement agent,

2  including text message communications between the defendant

3  and other individuals.  Testimony about surveillance conducted

4  of the defendant's interactions with other individuals and the

5  defendant's statements about his transactions with other

6  individuals.  You are to consider such evidence only with

7  respect to Count two, which charges the defendant with a crime

8  of operating an unlicensed money transmitting business.

9       However, to the extent that any of the defendant's

10  communications with other individuals relate to a concern of

11  being detected by law enforcement, you may properly consider

12  such communications with respect to both Count one, charging

13  the defendant with money laundering as well as Count two.

14       Okay.  Part II:  Instructions Relating to the

15  Alleged Crimes.

16       I will now turn to the second part of my

17  instructions and instruct you as to legal elements of the

18  criminal counts the Government has alleged.

19       A.:  Venue.

20       Venue refers to the location of the charged crimes.

21  As to each of the charged crimes, you must consider whether

22  any act in furtherance of the crime occurred within the

23  Eastern District of New York.  The Eastern District of New

24  York encompasses Brooklyn, Queens, and Staten Island in New

25  York City, and Nassau and Suffolk Counties on Long Island.  To

1    establish a venue for a charged crime is appropriate in the

2    Eastern District of New York, the Government must prove that

3    some act in furtherance of the crime occurred in this

4    district.

5         The Government need not prove that the entire crime

6    was committed in this district or that the defendant, himself,

7    was present in this district.  I note that on this issue and

8    only on this issue, the Government need not prove venue beyond

9    a reasonable doubt, but only by a preponderance of the

10   evidence.

11        A preponderance of the evidence means simply to

12   prove that the fact is more likely true than not true.  The

13   Government must prove that it is more likely than not that

14   some act in furtherance of the charge you are considering

15   occurred in the Eastern District of New York.  If the evidence

16   appears to be equally balanced or if you cannot say upon which

17   side it weighs heavier, you must resolve this question against

18   the Government.

19        Let me stress, the preponderance of the evidence

20   standard applies only to the question of venue.  As I have

21   instructed you, the Government alone must prove all other

22   elements of the crimes charged beyond a reasonable doubt.

23        B.:  Dates Approximate.

24        The indictment charges in or about and between

25   certain dates, the proof need not establish with certainty the

1    exact date of an alleged offense.  It is sufficient if the

2    evidence establishes beyond a reasonable doubt that an offense

3    was committed on a date reasonably near the dates alleged.

4              C.:  Knowledge and Intent.

5              Because each count in the indictment implicates the

6    concepts of knowledge and intent, I will instruct you at the

7    outset about these principles.  As a general rule, the law

8    holds persons accountable only for conduct they intentionally

9    engaged in.  Thus, before you can find a defendant guilty, you

10   must be satisfied that the defendant was acting knowingly and

11   voluntarily.

12             Knowingly:

13             A person acts knowingly when he contacts

14   intentionally and voluntarily and not because of ignorance,

15   mistake, accident, or carelessness.  Whether a defendant acted

16   knowingly may be proven by his words and conduct and by all of

17   the facts and circumstances surrounding the case.

18             II.: Intentionally.

19             A person acts intentionally when he acts

20   deliberately and purposefully.  That is, a defendant's acts

21   must have been the product of his conscious objective decision

22   rather than the product of a mistake or an accident.

23
               (Continued on the following page.)
24

25

Shernelle Griffith

1   (Continuing.)

2          THE COURT:  These issues of knowledge and intent

3   require you to make a determination about the defendant's

4   state of mind, something that rarely can be proven directly.

5   A wise and careful consideration of all the circumstances of

6   the case may, however, permit you to make such a determination

7   as to the state of mind of the defendant.

8          Indeed, in your every day affairs you are frequently

9   called upon to determine a person's state of mind from his or

10  her words and actions in a given circumstance.  You are asked

11  to do the same here.

12         D, the charges in the indictment.  The defendant,

13  Mustafa Goklu, is formally charged in an indictment.  As I

14  instructed you at the beginning of this case, an indictment is

15  a charge or accusation.  You will not be provided a copy of

16  the indictment during your deliberations because the

17  indictment is merely a statement of the charges and is not

18  itself evidence.  The indictment in this case contains two

19  separate counts against the defendant.  You must as a matter

20  of law consider each count of the indictment separately and

21  you must return a separate verdict for each count.

22         Count One of the indictment charges the defendant

23  with money laundering.  The second count in the indictment

24  charges the defendant with operating an unlicensed money

25  transmitting business.  Whether you find Mr. Goklu guilty or

1    not as to one should not affect your verdict as to the other

2    charge.  Remove the D from charged.

3            I will now explain to you the law that applies to

4    each count of the indictment.  Count One, money laundering,

5    Count One of the indictment charges the defendant with money

6    laundering, specifically it reads as follows:  On or about and

7    between August 28, 2018 and April 30, 2019, both dates being

8    approximate and inclusive within the Eastern District of New

9    York and elsewhere, the defendant Mustafa Goklu, also known as

10   Mustangy together with others did knowingly and intentionally

11   conduct and attempt to conduct one or more financial

12   transactions in and affecting interstate and foreign commerce

13   to wit:  The transfer and delivery of United States currency

14   which transactions involve property represented by a law

15   enforcement officer and by another person at the direction of

16   and with the approval of a federal official authorized to

17   investigate violations of Title 18 United States Code section

18   1956 to be the proceeds of specified unlawful activity; to

19   wit:  Narcotics trafficking in violation of Title 21, United

20   States Code sections 841 and 846 and to be property used to

21   conduct and facilitate such specified unlawful activity with

22   the intent to conceal and disguise the nature, location,

23   sours, ownership and control of property believed to be the

24   proceeds of such specified unlawful activity.

25           Count One charges the defendant with violating Title

1    18 United States Code section 1956-A-3-B which provides in

2    relevant part whoever with the in extent to disguise the

3    nature, location, source, ownership or control of property

4    believed to be the proceeds of specified unlawful activity

5    conducts or attempts to conduct a financial transaction

6    involving property represented to be the proceeds of specified

7    unlawful activity or property used to conduct or facilitate

8    specified unlawful activity shall be guilty of a crime.

9            For purposes of this paragraph, the term represented

10   means any representation by a law enforcement officer or by

11   another person at the direction of or with the approval of a

12   federal official authorized to investigate or prosecute

13   violations of this section.  To prove the crime of money

14   laundering, the Government must establish beyond a reasonable

15   doubt each of the following three elements:  First, that the

16   defendant conducted or attempted to conduct a financial

17   transaction that affected interstate or foreign commerce in

18   any way or degree.  Second, that the transaction involved

19   property represented by a law enforcement officer and believed

20   by the defendant to be the proceeds of specified unlawful

21   activity.  And, third, that the defendant acted with the

22   intent to conceal or disguise the nature, location, source,

23   ownership or control of the property.

24           The first element, financial transaction.  The first

25   element the Government must prove beyond a reasonable doubt is

1    that the defendant conducted or attempted to conduct a

2    financial transaction that affected interstate or foreign

3    commerce in any way or degree.  The term conducts includes

4    initiating, concluding or participating in initiating or

5    concluding a transaction.  A transaction includes a purchase,

6    sale, loan, pledge, gift, transfer, delivery or other

7    disposition of property.

8           The term financial transaction means a transaction

9    which itself affects interstate or foreign commerce in any way

10   or degree and which involves, A, a movement of funds by wire

11   transfer or other similar means, B, a monetary instrument such

12   as cash check money order or any other negotiable instrument.

13   Or, C, a transfer of title to any real property, vehicle,

14   vessel or aircraft.

15          I want to define interstate or foreign commerce for

16   you now.  The term interstate or foreign commerce means

17   commerce between any combination of states of the United

18   States or between the United States and a foreign country.

19   You must find the transaction affected interstate commerce in

20   some way, however minimal.  The second element:  Involving

21   property represented its proceeds as specified unlawful

22   activity.  The second element that the Government must prove

23   beyond a reasonable doubt is that the transaction the

24   defendant conducted or attempted to conduct involved property

25   represented by a law enforcement officer and believed by the

1   defendant to be the proceeds of specified unlawful activity.

2   For the purposes of this section, a law enforcement officer

3   includes federal law enforcement officers and any other person

4   acting under the direction or with the approval of a federal

5   official authorized to investigate or prosecute money

6   laundering.

7          I instruct you that for purposes of this case, the

8   individual known as Patrick O'Kain, who testified during this

9   trial, was a law enforcement officer during the time period

10  charged in the indictment.  The term proceeds means any

11  property derived from or obtained or retained directly or

12  indirectly through some form of unlawful activity including

13  the gross receipts of such activity.  Proceeds can be any kind

14  of property, not just money.

15         In order to sustain its burden of proof on this

16  element, the Government is not required to prove that the law

17  enforcement officer made an express affirmative statement to

18  the defendant that the property involved was the proceeds of

19  unlawful activity, in this case narcotics trafficking.

20  Instead, the Government must prove that the law enforcement

21  officer made the defendant aware of certain circumstances from

22  which a reasonable person would infer that the property was

23  the proceeds of illegal activity and that the defendant

24  believed that the property was the proceeds of illegal

25  activity.  You should consider all of the evidence in

1    determining whether the Government has satisfied this

2    standard.  The term specified unlawful activity is simply a

3    list of crimes set forth in the money laundering statute.  In

4    this case, the indictment charges the specified unlawful

5    activity of narcotics trafficking I instruct you that

6    narcotics trafficking means the manufacture, importation,

7    receiving, concealment, buying, selling or otherwise dealing

8    in a controlled substance or listed chemical under the

9    Controlled Substance Act.

10          I also instruct you that marijuana, oxycodone and

11   Adderall are controlled substances under the Controlled

12   Substances Act.  I further instruct you that narcotics

13   trafficking is a specified unlawful activity for the purposes

14   of the crime charged.  The Government is not required to prove

15   that the property actually was the proceeds of some form of

16   specified unlawful activity in this case, narcotics

17   trafficking.  The Government is not required to prove that any

18   narcotics trafficking actually took place or that the property

19   in the charged transactions actually constituted proceeds of

20   narcotics trafficking.  To sustain its burden of proof on this

21   element, the Government is required to prove that the charged

22   transactions involved property that was represented to the

23   defendant to be the proceeds of narcotics trafficking and that

24   the defendant believed that the property was the proceeds of

25   narcotics trafficking.

1          In determining whether the defendant believed that

2     the property was the proceeds of narcotics trafficking, you

3     may consider whether the defendant deliberately closed his

4     eyes as to what otherwise would have -- as to what otherwise

5     would have been obvious to him.  If you find beyond a

6     reasonable doubt that the defendant was aware of a high

7     probability that the charged transactions involved the

8     proceeds of narcotics trafficking and that the defendant acted

9     with deliberate disregard of the facts, you may find that the

10    defendant acted with the belief necessary to satisfy this

11    element.

12         However, if you find that the defendant has failed

13    to prove beyond a reasonable doubt that the defendant was

14    aware of a high probability that the charged transactions

15    involved the proceeds of narcotics trafficking he may not be

16    convicted.

17         Third element, attempt to conceal or disguise and

18    we're on page 22, everyone, out of 29.

19         The third element the Government must prove beyond a

20    reasonable doubt is that the defendant acted with the intent

21    to conceal or disguise the nature, location, source, ownership

22    or control of the property.  Here, Bitcoin is the alleged

23    property.  To satisfy this element, the Government must prove

24    that the defendant knew of the purpose of the particular

25    transaction in issue and that he intended that the transaction

1    conceal or disguise the nature, location, source, ownership or

2    control of the property in question.  I have previously

3    instructed you about the definitions of knowingly and

4    intentionally and the same definitions apply here.

5            F, Count Two, operation of an unlicensed money

6    transmitting business.  Count Two charges the defendant of

7    with the crime of operating an unlicensed money transmitting

8    business, specifically it reads as follows:  On or about and

9    between August 28, 2018 and April 30, 2019, both dates being

10   approximate and inclusive, within the Eastern District of New

11   York and elsewhere, the Defendant MUSTAFA GOKLU, also known as

12   "Mustangy," together with others, did knowingly conduct,

13   control, manage, supervise, direct and own all and part of an

14   unlicensed money transmitting business affecting interstate

15   and foreign commerce, to wit:  A digital currency exchange

16   business, which (a) operated without an appropriate money

17   transmitting license in the State of New York, where such

18   operation is punishable as a misdemeanor and a felony under

19   New York State law; and (b) failed to comply with the money

20   transmitting business registration requirements under Title

21   31, United States Code, Section 5330 and the regulations

22   prescribed thereunder.

23           Count Two charges the Defendant with violating Title

24   18, United States Code, Section 1960(a), which provides, in

25   relevant part:  Whoever knowingly conducts, controls, manages,

1   supervises, directs, or owns all or part of an unlicensed

2   money transmitting business, shall be guilty of a crime.  In

3   order for you to find the Defendant guilty of the crime

4   charged in Count Two, the Government must prove beyond a

5   reasonable doubt each of the following three elements:

6            First, that the Defendant knowingly controlled,

7   conducted, managed, supervised, directed, or owned all or part

8   of a money transmitting business; Second, that either the

9   money transmitting business was not licensed, and operated in

10  a state where the business was required to be licensed, or the

11  business failed to register as required with the Secretary of

12  the Treasury; and Third, that the money transmitting business

13  affected interstate or foreign Commerce.

14           I will now instruct you in more detail on each of

15  these three elements.  First element, money transmitting

16  business.

17           The first element the Government must establish

18  beyond a reasonable doubt is that Defendant knowingly

19  controlled, conducted, managed, supervised, directed, or owned

20  all or part of a "money transmitting business."

21           The Government is not required to prove that the

22  Defendant did all the things in that list, but only that he

23  did any one of them.  In order for you to evaluate this

24  element, let me define the following terms for you.  A

25  "business" is a commercial enterprise that is regularly

1    carried on for profit.  Thus, a single isolated transmitting

2    of money is not a business under this definition.  A "money

3    transmitting business" is a business which, for a fee, accepts

4    currency, funds, or value that substitutes for currency for

5    transfer within or outside the United States.  I instruct you

6    that Bitcoin qualifies as "funds" under the statute.  The term

7    "money transmitting" includes transferring funds on behalf of

8    the public by any and all means including but not limited to

9    transfers within this country or to locations abroad by wire,

10   check, draft, facsimile, or courier.  The terms "conducted,"

11   "controlled," "managed," "supervised," "directed," or "owned"

12   have their ordinary meanings.  A single isolated transmission

13   of money is not a business under this definition.  It is for

14   you to determine whether the quantity and nature of the

15   transmittals convert the transactions into a business.

16         To prove that the Defendant conducted, controlled,

17   managed, supervised, directed, or owned the money transmitting

18   business, the Government must establish that the Defendant was

19   involved in the management of the business and was not merely

20   an employee of that business.

21         To satisfy this element, the Government must prove

22   that the Defendant knowingly controlled, conducted, managed,

23   supervised, directed, or owned the money transmitting

24   business.  The Government must establish that Defendant was

25   involved in the management of the business and was not merely

1  an employee of that business.  I previously instructed you as

2  to the definition of knowingly, and the same definition

3  applies here.

4          Second Element, Unlicensed Money Transmitting

5  Business.  The second element the Government must prove beyond

6  a reasonable doubt is that the money transmitting business the

7  Defendant conducted was unlicensed.  An unlicensed money

8  transmitting business is a money transmitting business which

9  is either: (1) operating in a state without a required license

10  where operation without a license was punishable as a

11  misdemeanor or felony under state law, or (2) not registered

12  as required with the United States Secretary of the Treasury.

13  To satisfy this element, the Government needs to prove beyond

14  a reasonable doubt only that the money transmitting business

15  was unlicensed in one of these respects.  However, in order to

16  convict on this count, you must be unanimous that the

17  Government proved beyond a reasonable doubt that at least one

18  or the other of these two conditions was satisfied.

19          I will now explain these two licensing requirements.

20  Let me start with the state licensing requirement.  The

21  Government can satisfy this element by showing that the

22  Defendant operated his business without a required license in

23  a State where such operation was punishable as a misdemeanor

24  or felony under State law.  I instruct you that the term

25  "State" includes any State of the United States.  Therefore,

1    New York is a "State."  The only State at issue in this trial

2    is New York.  I instruct you that the laws of the State of New

3    York require that any person who engages in the business of

4    receiving money for transmission or of transmitting money to

5    be licensed as a money transmitter by the New York State

6    Department of Financial Services.  I also instruct you that

7    New York law also makes engaging in such a business without a

8    license punishable as a felony or a misdemeanor, depending on

9    factors that are not relevant here.

10           Let me start with the state licensing requirement.

11   The Government can satisfy this element by showing that the

12   defendant operated his business without a required license in

13   a state or such operation was punishable as a misdemeanor or

14   felony under state law.  I instruct you that the term state

15   includes any state of the United States.  Therefore, New York

16   is a state, in case you didn't know that.  The only state at

17   issue in this case is New York.

18           I instruct you that the laws of the State of New

19   York require that any person who engages in the business of

20   receiving money for transmission or of transmitting money to

21   be licensed as a money transmitter by the New York State

22   Department of Financial Services.  I also instruct you that

23   New York law also makes engaging in such a business without a

24   license punishable as a felony or a misdemeanor, depending on

25   factors that are not relevant here.

1         Let me now turn to the licensing requirement under

2    the laws of the United States with the Secretary of the

3    Treasury.  Federal law requires certain money transmitting

4    businesses to register with the Secretary of the Treasury

5    within 180 days after the business was established.

6    Specifically this registration requirement applies to any

7    money transmitting business, foreign or domestic, that engaged

8    in money transmitting functions in the United States.  It is

9    for you to determine whether the money transmitting business

10   in this case was licensed as required by law.

11        To prove this element, the Government must prove

12   that Defendant knew that the business was unlicensed.  The

13   Government does not have to prove that the Defendant knew that

14   New York law or federal law required the business to be

15   licensed.  The Government does not need to show that Defendant

16   knew that it is a crime under New York law to operate a money

17   transmitting business without a license.  I previously

18   instructed you as to the definition of knowingly, and the same

19   definition applies here.

20        The third element the Government must prove beyond a

21   reasonable doubt is that the money transmitting business

22   affected interstate or foreign commerce.  Interstate or

23   foreign commerce simply means the movement of goods, services,

24   money, or individuals between states or between the United

25   States and a foreign state or nation.  The Government must

1    prove that the money transmitting business affected interstate

2    or foreign commerce in any manner, no matter how minimal.  It

3    is not necessary for the Government to prove that the acts of

4    the Defendant himself affected interstate or foreign commerce

5    so long as the acts of the money transmitting business had

6    such effect.  In addition, it is not necessary for the

7    Government to show that the Defendant actually intended or

8    anticipated that his actions would have an effect on

9    interstate or foreign commerce.

10            Finally, the Government is not required to prove

11   that the Defendant knew he was affecting interstate or foreign

12   commerce.

13            All right, closing instructions, part three.  I have

14   now outlined for you the rules of law applicable to this case,

15   the process by which you weigh the evidence and determine the

16   facts, and the legal elements that must be proved beyond a

17   reasonable doubt.  In a few minutes you will retire to the

18   jury room for your deliberations.  I will now give you some

19   general rules regarding your deliberations.  Keep in mind that

20   nothing I have said in these instructions is intended to

21   suggest to you in any way what I think your verdict should be.

22   That is entirely for you to decide.

23            By way of reminder, I instruct you once again that

24   it is your responsibility to judge the facts in this case from

25   the evidence presented during the trial and to apply the law

1   as I have given it to you, and your verdict must be based

2   solely on this evidence and law, not on anything else.

3            I will turn to the role of the foreperson.  For your

4   deliberations to proceed in an orderly fashion, you must have

5   a foreperson.  The custom in this courthouse is for Juror No.

6   1 to act as the foreperson.  However, if, when you begin

7   deliberations, you decide that you want to elect another

8   foreperson, you are entitled to do so. The foreperson will be

9   responsible for signing all communications to the court and

10  for handing them to the Deputy Marshal during your

11  deliberations, but, of course, his or her vote is entitled to

12  no greater weight than that of any other juror.

13           Communication with the Court.  It is very important

14  that you not communicate with anyone outside the jury room

15  about your deliberations or about anything touching on this

16  case.  There is only one exception to this rule.  If it

17  becomes necessary during your deliberations to communicate

18  with me, you may send a note, through the Deputy Marshal,

19  signed by your foreperson.  No member of the jury should

20  attempt to communicate with me except by a signed writing, and

21  I will never communicate with any member of the jury on any

22  subject touching upon the merits of the case other than in

23  writing, or orally here in open court.

24  C. Right to see exhibits and read testimony.  Your

25  recollection governs.  Nobody else's. If, in the course of

1   your deliberations, your recollection of any part of the

2   testimony should fail, or you should find yourself in doubt

3   concerning my instructions to you on the law, you may request

4   that a witness's or witnesses' testimony, or portions thereof,

5   be sent back to you in the jury room.  If during your

6   deliberations you want to see any of the exhibits that are not

7   already available to you in the jury room, you may request

8   that as well.

9        You may make all these requests by a note to the

10  Deputy Marshal.  I suggest, however, that you be specific to

11  avoid receiving testimony or exhibit that you do not want or

12  need.  Describe as best and precisely as you can what you want

13  to hear and please be patient because it sometimes takes a

14  while to find the testimony or exhibit in the record.

15       Deliberations and unanimous verdict.  Your duty is

16  to reach a fair conclusion from the law as I have given it to

17  you and the evidence that has been presented in this case.

18  This duty is an important one.  When you are in the jury room,

19  listen to each other, and discuss the evidence and issues in

20  the case amongst yourselves.  It is the duty of each of you,

21  as jurors, to consult with one another, and to deliberate with

22  a view toward reaching agreement on a verdict, if you can do

23  so without violating your individual judgment and conscience.

24  While you should not surrender conscientious convictions of

25  what the truth is and of the weight and effect of the

1    evidence, and while each of you must decide the case for

2    yourself and not merely acquiesce in the conclusion of your

3    fellow jurors, you should examine the issues and the evidence

4    before you with candor and frankness, and with proper

5    deference to, and regard for, the opinions of your fellow

6    jurors.

7           You should not hesitate to reconsider your opinions

8    from time to time and to change them if you are convinced they

9    are wrong.  However, do not surrender an honest conviction as

10   to the weight and effect of the evidence simply to arrive at a

11   verdict.  The decision you reach must be unanimous; you must

12   all agree.

13          When you have reached a verdict, simply send me a

14   note signed by your foreperson that you have reached a

15   verdict.  Do not indicate what the verdict is.  In no

16   communication with the Court should you give a numerical count

17   of where the jury stands in its deliberations.

18          Remember in your deliberations that the Government's

19   charges against the Defendant are no passing matter.  The

20   parties and the Court rely upon you to give full and

21   conscientious deliberation and consideration to the issues and

22   evidence before you.  By so doing, you carry out to the

23   fullest your oaths as jurors—to well and truly try the issues

24   of this case and render a true verdict.

25          So if you will give me a moment I want to see the

1  lawyers at sidebar

2          (Sidebar held outside of the hearing of the jury.)

3          THE COURT:  So let me turn first to the Government,

4  anything that I misread or need to correct from the jury

5  instructions as I read them to the jury?

6          MS. DIOUF:  I did notice one thing actually.  So, on

7  page 22, I believe you might have said the defendant instead

8  of the Government.  I'm trying to find the actual page.  It's

9  on 20 would be at the bottom.  That's what I heard.

10         THE COURT:  So which sentence.

11         MS. DIOUF:  The last sentence however, if you find

12  that the Government has failed to prove beyond a reasonable

13  doubt that the defendant was aware of a high probability.

14         THE COURT:  So I read that the defendant has failed

15  to prove.

16         MS. DIOUF:  I thought I heard you say defendant.

17         THE COURT:  I will make sure that I.

18         MR. SINGER:  I think you did, but I think it is

19  clear from reading along and when the next sentence --

20         THE COURT:  Does anyone want --

21         MR. SINGER:  I don't have any request that you

22  correct it.

23         MS. KASSNER:  That's fine.  We just wanted to note

24  it for the record.

25         THE COURT:  Maybe I will make a general note that if

1   for some reason I read something incorrectly they obviously

2   have the written instructions in front of them.

3           Any objection to any instructions as read to the

4   jury?

5           MR. SINGER:  No.

6           THE COURT:  All right.  So we're going to send this

7   back there.  There were some small typographical errors that

8   I'm not going to fix because they're not consequential.

9           (End sidebar.)

10          THE COURT:  Ladies and gentlemen, thank you for your

11  patience.  Now we're going to let you retire for your

12  deliberations.  We're going to call for the if U.S. Marshal to

13  be sworn.  Your lunch will be arriving right about now and you

14  can deliberate while you have your lunch or not, but you must

15  decide amongst yourselves unanimously whether you're going to

16  do that because obviously everybody has to be involved in the

17  deliberations with the exception of our first alternate we're

18  going to keep you here but separate from the rest of the jury.

19  Things can happen it's possible that you may be called upon to

20  deliberate, so obviously the same rules apply to you that you

21  cannot speak to anyone about the case.  The jurors obviously

22  now can discuss the case with each other during deliberations.

23  Let's have the marshal come forward.

24          THE COURTROOM DEPUTY:  Do you solemnly swear or

25  affirm that you will keep the jurors sworn in this cause

1    together in some private and convenient place and shall let no

2    one speak to them nor shall you speak to them without

3    direction of the Court.

4              THE MARSHAL:  Yes, I do.

5              (U.S. Marshal, sworn.)

6              THE COURT:  The jury will now retire for their

7    deliberations and we will have the alternate remain here.

8    Have a good lunch, everyone.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury exits to begin deliberations at 12:55 p.m.)

11             THE COURT:  So our first alternate will be taken to

12   a separate room.  I hope you feel special because you get a

13   private room and sadly you have to have lunch by yourself.

14             (Alternate juror exits courtroom.)

15             THE COURT:  Everyone have a seat. When Ms. Gonzalez

16   comes back we'll mark the jury instructions as Court Exhibit

17   Number 1, the verdict sheet as Court Exhibit Number 2.  We

18   will send those back to the jury to the extent that they want

19   to use their lunch break to start deliberating, but then we

20   will very quickly assemble all the exhibits and you will

21   coordinate with Ms. Gonzalez to make sure that everybody

22   agrees on the list that goes back as well as the exhibits that

23   are being sent back, okay?

24             Then after that you are obviously free to get lunch

25   but leave your cellphones with us should we get a note and

1  don't leave the building.  That would be my recommendation.

2          So the record is clear, my law clerk is also handing

3  you the verdict sheet which we've now removed the reference to

4  draft on it, but it's the same one that was circulate

5  testified a couple of days ago.

6          (Pause in proceedings.)

7          (Court Exhibit 1 jury instructions received in

8  evidence.)

9          (Court Exhibit 2 verdict sheet received in

10  evidence.)

11          (Luncheon recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Time noted 3:56 p.m.)

2          (Court Exhibit 3, received in evidence.)

3          THE COURT:  So, we have a note which has been marked

4    as Court Exhibit 3 and it reads: "Hello.  May we have the

5    transcript from the first two witnesses?  Patrick O'Kain" and

6    it's spelled L-O-L-E-T-T-A.  "Thank you!"  Signed by the

7    foreperson.  So clearly Patrick O'Kain was the first witness

8    and the second one --

9          MR. SINGER:  Lilita Infante.

10         THE COURT:  Right.  So, folks --

11         MR. SINGER:  The answer would be yes.

12         THE COURT:  But rather than bringing them out here

13   we're just going to send the transcripts back to them once you

14   folks agree on what can go back.  You should pull all of the

15   sidebars and you should also redact testimony that was

16   excluded, if anything, a sustained objection, for example.

17         Do you folks have a computer copy?

18         MS. DIOUF:  Your Honor, we've already prepared

19   redacted transcripts, or Bridget did it for us.

20         THE COURT:  So show the original and the redacted

21   version to Mr. Singer and see if they agree to your

22   redactions.

23         MS. DIOUF:  Yes, Your Honor.

24         THE COURT:  Do you have an original copy, Mr. Singer

25   of the transcript with you?

1          MR. SINGER:  Yes.  I have the e-mail with the

2     transcript.

3          THE COURT:  I am not going to tell you how to double

4     check them, but you may want to read the entire transcripts

5     yourself to see if other portions should be redacted or you

6     can focus on what the Government redacted and see if that's

7     okay with you.

8          (Pause in proceedings.)

9          THE COURT:  If there's no dispute I'm going to go

10    back upstairs.

11         MS. KASSNER:  There's no dispute.

12         MR. SINGER:  We're good.  We've identified them.

13         THE COURT:  Once you folks are done with the

14    redactions and agree upon them, they will be sent back to the

15    jury and Fida I think we marked them as Court Exhibits.

16    Ms. Gonzalez will note which Court Exhibits they are.  I also

17    wanted to note that while I am here that after the jury

18    instructions and verdict sheet were sent back to the jury, the

19    parties also reviewed the exhibits that were being sent back

20    to the jury and agreed upon those; is that correct from the

21    Government's perspective?

22         MS. DIOUF:  Yes it is, Your Honor.

23         THE COURT:  Mr. Singer, you agreed on which exhibits

24    would go back.

25         MR. SINGER:  Yes.

1          THE COURT:  I will leave you folks to it.

2          (Time noted:  4:15 p.m.)

3          (Pause in proceedings.)

4          (Time noted:  4:43 p.m.)

5          THE COURT:  So we've received another note from the

6    jury which has been marked as Court Exhibit 5.

7          (Court Exhibit 4 received in evidence.)

8          (Court Exhibit 5 received in evidence.)

9          THE COURT:  It says, "The jury has reached a verdict

10   on Count Two but are undecided on Count One.  We are at a

11   standstill on Count One and haven't made any progress."

12          I note that we have yet to send them back the

13   transcripts that they had requested in their earlier note so

14   my proposal is that I bring them out here and explain to them

15   that we've received both of their notes now and I would like

16   them to go back and continue their deliberations on Count One

17   with the benefit of the transcripts that they had requested,

18   but took us a while to put together and I had or I think it

19   makes sense to give them kind of a general *Allen*-type charge

20   which in full it reads, "I am going to ask you to resume your

21   deliberations in an attempt to reach a verdict.  As I have

22   told you, each of you must agree in order to return a verdict.

23   While you are entitled to your own opinions, you should

24   consult with one another and listen carefully to each other.

25   As you deliberate, each of you should not hesitate to

1    reexamine your own views and your own opinions.  If you're

2    convinced that another opinion is correct, that doesn't mean

3    you should surrender an honest conviction, but it does mean

4    that your consideration of the evidence should be in

5    consultation with your fellow jurors."

6            Does anyone have any problem with me saying that to

7    the jury?

8            MS. KASSNER:  No objection, Your Honor.

9            MR. SINGER:  I think it's too early.

10           THE COURT:  You say just send it back.

11           MR. SINGER:  They've been deliberating for less than

12   four hours.  I say send them back and say keep working on it.

13           THE COURT:  I can certainly save this *Allen* charge

14   for later.  So let's have them out here and we have the

15   transcripts and we'll send those back to them when they

16   return.

17           THE COURT:  It's marked as Court Exhibit 4.

18           THE COURT:  Does anyone have a problem with

19   Ms. Gonzalez handing it to the foreperson?

20           MS. KASSNER:  No objection.

21           MR. SINGER:  No objection.

22           THE COURT:  Court Exhibit 4.

23           (Jury enters at 4:46 p.m.)

24           THE COURT:  So we received your last two notes.  So

25   your first note requested the transcript from the first two

1    witnesses, Patrick O'Kain and a person you identified as

2    Loletta but we think is Ms. Infante or Agent Infante.  So that

3    has been compiled for you and my apologies that it took some

4    time but we had to make some redactions.

5            Your second note reads, "The jury has reached a

6    verdict on Count Two but are undecided on Count One.  We are

7    at a standstill on Count One and haven't made any progress."

8            So what I would like to do is I'm going to send you

9    back to deliberate further with respect to Count One

10   especially now that you have the benefit of the transcripts

11   that you had requested, but that you haven't yet received.  So

12   Ms. Gonzalez is going to hand the transcript, which has been

13   marked as Court Exhibit 4 to our foreperson and I ask you to

14   return to your deliberations and resume deliberations on Count

15   One.  All I will say is you haven't really been deliberating

16   all that long in the scheme of things so I would like you to

17   go and give it a try to see if you can reach a unanimous

18   verdict.  So, thank you everyone.

19           THE COURTROOM DEPUTY:  All rise.

20           (Jury exits to continue deliberations at 4:48 p.m.)

21           THE COURT:  Thank you, everyone.  You can resume

22   what you were doing before but stay close by.

23           MR. SINGER:  Judge.  Do you have a sense on how late

24   you want to stay this evening?

25           THE COURT:  I am willing to let the jury stay as

1    late as they want to.  If they don't send a note out by

2    5:30 -- I'm going to just let them continue to deliberate but

3    I expect as we get close to 5:30 they may send a note out

4    asking whether they can continue or whether they can go home

5    but my inclination is to let them keep going.

6              THE COURT:  Thank you.

7              MS. KASSNER:  Thank you, Your Honor.

8              (Recess taken.)

9              (Time noted:  5:53 p.m.)

10             (Alternate juror enters.)

11             THE COURT:  Have a seat, Mr. Chang.

12             Here is what we're going to do.  It's well past 5:30

13   and the jury is still deliberating.  We're going to let you go

14   home because at this point even if, and this would be very,

15   very unlikely you were needed to substitute tonight, I would

16   probably tell the jury to come back on Tuesday rather than go

17   later.  So we're going to let you go home but you are still

18   our alternate and so you still need to observe all the rules.

19   Don't talk to anybody about the case because there hasn't been

20   a verdict yet and don't do any research and I guess keep an

21   open mind unless and until you are put into the jury to start

22   deliberating, but we will need you back here on Tuesday again.

23             But I am sorry to do this to you, but you serve a

24   very important role to ensure that we get a verdict in the

25   unlikely event that we lose one of our jurors and given that

1    the deliberations may carry over to Tuesday, that possibility

2    obviously grows greater, right, because we're talking about a

3    three-day break.  So we want you back here as well on Tuesday

4    by 9:30 and bring some things to occupy your time because you

5    will be sitting in a room again by yourself until we know

6    whether or not we need you, all right?

7         So, thank you again for your service and your

8    patience.  I know it's a difficult position to be in, but

9    trust me you are serving a tremendous service just by being

10   here and being willing to serve as our alternate.  Again,

11   don't talk to anyone about the case.  It's still open.  Okay,

12   have a wonderful weekend.

13        THE ALTERNATE JUROR:  Will there be any circumstance

14   such that I would not be coming at 9:30 or is 9:30 100

15   percent?

16        THE COURT:  We will advise you if for some reason

17   because the injury is still deliberating if they get a verdict

18   tonight you will get a call saying you don't need to come at

19   all.  It's possible we will have a late start so the expected

20   time if you are coming in on Tuesday would be 9:30.  That's

21   what you're asking about, right?

22        THE ALTERNATE JUROR:  So if it concludes today, I

23   will get a call over the weekend.

24        THE COURT:  Yes, not to come in at all, but if you

25   don't get any call come in on Tuesday and be here by 9:30.

1    Thank you so much.

2              THE ALTERNATE JUROR:  Please leave a message.

3              THE COURT:  We have your cell number from the time

4    from the subway.

5              THE ALTERNATE JUROR:  I also sent an e-mail.

6              THE COURT:  And we have that.  Thank you.  Have a

7    good weekend.

8              (Alternate juror exits the courtroom.)

9              THE COURT:  It's 5:56.  As I said, before we have

10   not gotten any further notes from the jury.  So I assume

11   they're continuing to deliberate.  As I said, I'm not going to

12   bring them out here to find out what they want to do or how

13   long they want to stay.

14             MS. KASSNER:  The Government would ask for a partial

15   verdict whenever they're next out.

16             THE COURT:  Mr. Singer, I can give them the

17   instruction on that, that the import of that is that they can

18   give their partial verdict, but that that portion is final and

19   cannot be revisited and then they can continue to deliberate

20   on the count, which is one that they're still considering.

21   Mr. Singer?

22             MR. SINGER:  I would oppose that.  There's no need

23   for it.  Again, they have not been deliberating that long and

24   I don't see any need or reason to just jump and grab something

25   because they said they have a verdict on one count.  Let them

1   continue to deliberate.  What's the point?

2          THE COURT:  Well, I mean it does create the record

3   and finalize their one verdict and the case law supports

4   accepting a partial verdict.  It doesn't stop them from

5   continuing to deliberate.  Is there concern that once they

6   announce the one verdict they will throw their hands up and

7   say we don't want to decide the remaining count?

8          MR. SINGER:  I don't know what effect it will have

9   and I understand you can find case law to support many things

10  but it's not necessarily the right thing to do under the

11  circumstances and I don't understand the reason for it.  If

12  they've reached a point where they said we've not reached a

13  verdict certainly I understand taking a partial, but to do it

14  now four or five hours in, I just don't understand what the

15  rush is.

16         THE COURT:  Ms. Kassner, is there any reason not to

17  just simply wait especially because I anticipate at this point

18  they may not come up for a little while now.  I don't think

19  they're going to be wanting to stick around to tell us what

20  their verdict is on Count One if they haven't resolved

21  everything.

22         MS. KASSNER:  I think the main reason is a practical

23  one, Your Honor.  We have a three-day weekend ahead of us and

24  I think we're all aware that sometimes people get sick,

25  sometimes things come up and so our thought is if they have

1   reached a unanimous verdict on one count, it may be pragmatic

2   to have the verdict that they've certain of and just have it

3   recorded.

4           THE COURT:  It raises an interesting question; I

5   suppose what if one of the jurors does not come back on

6   Tuesday, a verdict on one count will have already been

7   rendered and then the jury can reconvene with the alternate to

8   decide the other count.  That is a legitimate practical reason

9   to get the verdict on the record as to the count they've

10  already resolved.

11          MR. SINGER:  Actually, I thought you were going to

12  say that's a very practical reason not to get the verdict on

13  the record at this point because if one of the 12 was not able

14  to continue and you substituted the alternate in, you would be

15  instructing them to start over.

16          THE COURT:  No.  Only on the open count.

17          MR. SINGER:  Then you would have verdict on the two

18  counts by two different juries.

19          THE COURT:  I do not think it's prohibited under the

20  rules.  I think it's a reason to take a partial verdict.  We

21  have a fully constituted, legitimate jury that reached a

22  unanimous decision on Count Two.  We can take that verdict and

23  therefore guard against the possibility that a juror doesn't

24  come back on Tuesday.

25          MR. SINGER:  But then you've got -- then you would

1   have -- and if the newly constituted jury with the alternate

2   were to deliberate then on a two-count indictment in one

3   trial, you would have two verdicts by different juries.

4           THE COURT:  I understand that.  You can say it

5   again.  I still understand it.

6           MR. SINGER:  I just don't understand.

7           THE COURT:  I do not understand if there's any legal

8   infirmity of that, is what I'm saying.  I understand what the

9   situation could be.  The question is and I don't know if

10  anyone knows the answer, but I am going to take a look at this

11  with my law clerk now if there's any legal impediment to doing

12  that whether that would be improper as you said have verdicts

13  on different counts in the indictment rendered by different

14  constituted juries because of the absence or replacement of a

15  juror.  I don't think that that's unusual and if I can take a

16  partial verdict I assume that's the logical implication is

17  that that's nothing improper about that.

18          MS. KASSNER:  Your Honor, we'll take a look as well.

19  We haven't confronted this in our personal experience.  I

20  think the other concern is the Government has thought about

21  what if there's not just one juror out, but two jurors?  We

22  only have one alternate.  We risk not having a verdict at all.

23          THE COURT:  Let's do this.  Everyone sort of take

24  some time to research this very quickly while we can:  We'll

25  come right back if we find an answer.

SN       RPR       OCR

1              (Judge exits.)

2              (Time noted 6:02 p.m.)

3              (Court Exhibit 6 received in evidence.)

4              (Judge enters:  Time noted 6:31 p.m.)

5              THE COURT:  So, I don't know if the Government or

6      defense has come up with any case law on the particular issue

7      of whether or not I can take a partial verdict from the jury

8      but still direct them and -- still direct them to deliberate

9      and give them *Allen* charge let me tell but what this note says

10     which has been marked as Court Exhibit 6.  It says, "The jury

11     is still" -- I can't read this.  I think it's maybe apart on a

12     verdict -- "still split on a verdict for Count Number One.

13     After deliberating and reviewing evidence, all jurors are

14     remaining with their position and decision on the verdict."

15             Now, obviously I can give them an *Allen* charge

16     because I have yet to do that.  I can give them an *Allen*

17     charge, that's clear and have them come back on Tuesday.  The

18     question remains that I can tell them that they have the

19     option of delivering a partial verdict on the counts that

20     they're resolved on, but that would be final.

21             I can also tell them to continue to deliberate on

22     Tuesday.  Now, I will note that it was brought to my attention

23     that Judge Dearcy Hall in one of her cases took a partial

24     verdict but did not let the jury deliberate as to the other

25     count or counts as to the same defendant.  However, I found a

1    decision by Judge Buchwald, where, and this is *U.S. versus*

2    *Colombo*, it's reported at 2007 Westlaw 2438391, from August

3    27, 2007 where it appears that Judge Buchwald did take a

4    partial verdict and that deliberations continued, but I want

5    to double check and make sure I'm right about that.

6              MR. SINGER:  Judge, I found one case from the

7    Seventh Circuit in 2014 where the where a partial verdict was

8    taken and an alternate was substituted in and the Court

9    reversed that and sent it back for a new trial.

10              THE COURT:  Well, I mean that's a second question.

11    So I do tend to agree with you that even though other than the

12    case you cite which obviously I think does support that

13    proposition, even though I haven't found anything that holds

14    exactly that, namely if you have verdicts on two separate

15    counts by two separately constituted juries, that may be

16    problematic.  It seems to me at a minimum we should avoid

17    that.  But, there's two ways to view that.  One is I can

18    accept a partial verdict now, let them continue to deliberate,

19    but if the same jury does not return in full on Tuesday, then

20    that's the end of the deliberations, they cannot continue to

21    deliberate on the open count which would mean that there's no

22    possibility that they could return a verdict either way on

23    Count One, which seems to be the one that they're still

24    deadlocked on.

25              That -- you know, it's really up to the parties, but

1    I think I would not if we didn't have all the 12 jurors back

2    on Tuesday substitute the alternate and have them continue to

3    deliberate on an open count if I took a partial verdict today.

4    I think that would be dangerous to do, but I think it's still

5    possible to take a partial verdict, let them continue

6    deliberating, and then see what happens on Tuesday and I don't

7    think it would be infirm if they then returned.  If it was the

8    same jury returned a verdict after an *Allen* charge then on

9    Count One.  The only thing I will say is this, I have not yet

10   advised the jury about the option of a partial verdict which I

11   would have to do now and send them back to the jury room to

12   tell me if they wanted to give me a partial verdict

13   understanding that they still would be required to deliberate

14   and understanding that their verdict on Count Two would be

15   final.

16          What does the Government think?

17          MS. KASSNER:  The Government would prefer to ask the

18   jury if they are willing to exchange a partial verdict today

19   with the understanding that Your Honor -- that if for some

20   reason somebody in the three-day weekend doesn't return next

21   week and the jury composition would be different, we

22   understand that Your Honor then may not instruct them to

23   reconvene on Count One --

24          THE COURT:  No, here is the option that I'm

25   proposing.  I give them *Allen* charge and advise them of the

1  option of returning a partial verdict, right, because I want

2  to make clear to them that returning a partial verdict doesn't

3  avoid them having to return on Tuesday.  I won't say what

4  happens if everyone doesn't return on Tuesday, but you

5  understand I will not allow them to deliberate on the open

6  count.

7       MS. KASSNER:  I fully understand.  We would prefer

8  that you go ahead and do exactly that.

9       THE COURT:  Mr. Singer, what's your preference?

10      MR. SINGER:  The opposite.  My request is it's now

11  6:38 p.m.  I would ask that Your Honor send the jurors home

12  for the weekend, have them come back on Tuesday morning.  You

13  can either give them an *Allen* charge now or give them an *Allen*

14  charge when they return on Tuesday morning and let them

15  continue to deliberate.  If they are going to be permitted to

16  continue to deliberate then I don't understand the necessity

17  or the propriety of taking a partial verdict now.

18      So my request is to simply send them home for the

19  weekend give them an Allen charge either now or on Tuesday

20  morning.

21      THE COURT:  Well, it might avoid a retrial if we

22  don't get a full jury back or enough jurors back on Tuesday,

23  the Government may decide not to retry the case if there's

24  only one verdict.

25      MS. KASSNER:  Your Honor, the Government's concern

1    here is we're in the middle of both, you know, an ongoing

2    COVID pandemic which -- I think the bottom line is we're all

3    wearing masks because we recognize that it's possible that

4    people could be infected and if one juror tests positive I

5    don't know what would happen to our jury next week.   In

6    addition, there's also flu season.  I think we just believe it

7    would be practical to at least inform the jury of their option

8    if they desire to provide a partial verdict under the

9    circumstances.

10          THE COURT:  All right.  I am going to do that

11   because this is a somewhat unusual time.  I will make the

12   observation that even though I have required the jurors to be

13   masked in this courtroom, my understanding is that they're not

14   doing that in the jury room.  So our efforts to try to keep

15   them safe are only half the battle, quite honestly.  They've

16   obviously taken it upon themselves to be unmasked in a much

17   smaller room than here.  I'm going to bring them out, advise

18   them of the option of a partial verdict, if they want to

19   deliver one today, but advise them they still have to come

20   back on Tuesday to continue their deliberations and I will

21   give them further instructions on Tuesday regarding the

22   continuation of those and then see what they want to do.   I

23   won't give them the *Allen* charge until Tuesday.

24          MR. SINGER:  Can I clarify, you're going to ask them

25   if they want to render a partial verdict, you'll send them

1    back to determine yes or no, but otherwise tell them they're

2    going to be going only either way?

3            THE COURT:  Yes, I can tell them that they can ask

4    to render a partial verdict today or Tuesday.  I will still

5    give them that option if they want to do that.  They don't

6    have to make a decision now or do it now but that is an option

7    available to them, but they still have to come back in any

8    event on Tuesday.

9            I will note further for the record that the jury has

10   been deliberating or at least out to deliberate since 1:00.

11   We don't know whether they deliberated during the lunch break.

12   We don't know how long that was if they decided not to

13   deliberate but it's now about 6:30.  So at a maximum they've

14   been deliberating for about five and a half hours and that

15   would be the maximum.  If they stopped for lunch, it would be

16   some time less than five and a half hours.

17           (Jury enters at 6:41 p.m.)

18           THE COURT:  Ladies and gentlemen of the jury, I

19   received your most recent note indicating that the jury is

20   still, and I think the word is "split" on a verdict for Count

21   Number One.  After deliberating and reviewing evidence all

22   jurors are remaining with their position and decision on the

23   verdict.  So, I brought you out here to tell you a few things.

24   One is that you have the option available to you to render

25   what is called a partial verdict.

1      In an earlier note you had suggested that you might

2  have reached unanimity as to Count Two but not to Count One.

3  You don't need to tell me or confirm that one way or the other

4  but if you wanted to you had the option of delivering a

5  unanimous verdict that you have reached unanimity on.

6  However, that decision would be final and you could not then

7  change it or take it back or modify it.  And also it will not

8  eliminate the requirement that I am now about to impose that

9  you come back on Tuesday and resume your deliberations.

10      Now it's my intent on Tuesday when you are all back

11  here to meet very briefly with you, with the parties and give

12  you some very brief further instructions with respect to the

13  resumption of your deliberations and so I want you all to

14  think about what you would like to do with respect to

15  delivering a partial verdict, which you can do today or you

16  can do at any point.  It doesn't have to be today, knowing

17  that you will have to return on Tuesday in any event.  And my

18  apologies if it takes some time, but I want to be sure that I

19  have given ou a full opportunity to reach if you can a

20  unanimous verdict on both counts.

21      Let me let you go back now.  Talk amongst yourselves

22  let me know what you want to do with respect to today and with

23  respect to a partial verdict if you want to do that today or

24  at any point.  And obviously if you decide if you want to

25  defer the decision of course that is an option as well.  After

1  that, you will be free to go home but have to return on

2  Tuesday and start your deliberations at 9:30.  So, again,

3  we'll let you go now and thank you everyone.

4              (Jury exits at 6:45 p.m.)

5              THE COURT:  All right.  So let's give them a few

6  minutes and see what they say.

7              (Pause in proceedings.)

8              (Time noted 6:50 p.m.)

9              THE COURT:  So we have the next note from the jury,

10 which is Exhibit Number 7.

11             (Court Exhibit 7, received in evidence.)

12             THE COURT:  We will defer and continue deliberations

13 on Tuesday.  On Tuesday we will read both verdicts, signed by

14 the foreperson.  I'm going to have Fida tell the marshals that

15 they can leave and hopefully they'll be back at 9:30.  This

16 means you all can go home as well.  Have a good weekend.

17             Another note, Exhibit Number 8.

18             (Court Exhibit 8, received in evidence.)

19             THE COURT:  The jury asks do they leave the evidence

20 in the jury room and I told the marshal to tell them yes as

21 opposed to taking it home.

22             (Time noted:  6:55 p.m.)

23 (Matter adjourned until Tuesday, October 11, 2022, 9:30 a.m.)

24                         - ooOoo -

25

## <u>I N D E X</u>

<u>E X H I B I T S</u>

Court Exhibit 1                         644

Court Exhibit 2                         644

Court Exhibit 3                         645

Court Exhibit 4                         647

Court Exhibit 5                         647

Court Exhibit 6                         656

Court Exhibit 7                         663

Court Exhibit 8                         663