FJN:GK/MED
F. #2018R01809

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

        - against -                        Docket. No. 19-CR-386 (PKC)

MUSTAFA GOKLU,
    also known as "Mustangy"

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X


MEMORANDUM OF LAW IN OPPOSITION
TO THE DEFENDANT'S POST-TRIAL MOTION


BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Gillian A. Kassner
Marietou E. Diouf
Assistant U.S. Attorneys
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 1

I.    Relevant Procedural Background .......................................................................... 1

II.   The Government's Case as to Count Two ............................................................. 2

ARGUMENT ................................................................................................................ 7

I.    The Court Should Deny the Defendant's Motion for a Judgment of Acquittal on Count Two 7

      A.  Applicable Law ............................................................................................. 7

      B.  The Trial Evidence Proved Beyond a Reasonable Doubt that the Defendant is Guilty of
          Operating an Unlicensed Money Transmitting Business as Charged in Count Two ......... 9

CONCLUSION ............................................................................................................ 19

# TABLE OF AUTHORITIES

**CASES**

Kyles v. Chester, 457 F. App'x 780 (10th Cir. 2012) ................................................. 12

United Staets v. Singh, 995 F.3d 1069 (9th Cir. 2021) ............................................... 17

United States v. $215,587.22 in United States Currency, 306 F. Supp. 3d 213 (D.D.C. 2018) ... 13

United States v. Banki, 685 F.3d 99 (2d Cir. 2012) ........................................... 13, 16, 17

United States v. Budovsky, No. 13 Cr. 368 (DLC), 2015 WL 5602853 ..................................... 10

United States v. Delco Wire & Cable Co., 772 F. Supp. 1511 (E.D. Pa. 1991) .......................... 12

United States v. E-Gold, Ltd, 550 F. Supp. 2d 82 (D.D.C. 2008) ......................................... 10, 13

United States v. Faiella, 39 F. Supp. 3d 544 (S.D.N.Y. 2014) ..................................... 16

United States v. Guadagna, 183 F.3d 122 (2d Cir. 1999) ............................................... 8

United States v. Harmon, 474 F. Supp. 3d 76 (D.D.C. 2020) ............................................... 13, 15

United States v. Klein, 913 F.3d 73 (2d Cir. 2019) ................................................... 8, 9

United States v. Martoma, 894 F.3d 64 (2d Cir. 2017) .................................................. 8

United States v. Monica, 295 F.2d 400 (2d Cir. 1961) ................................................. 8

United States v. Murgio, 209 F. Supp.3d 698 (S.D.N.Y) ............................................... 17

United States v. Pugh, 945 F.3d 9 (2d Cir. 2019) ..................................................... 9

United States v. Rosa, 17 F.3d 1531 (2d Cir. 1994) ................................................... 9

United States v. Stetkiw, No. 18-20579, 2019 WL 417404, at *1 (E.D. Mich. Feb. 1, 2019) ..... 18

United States v. Talebnejad, 460 F.3d 563 (4th Cir. 2006) ........................................... 17

United States v. Velastegui, 199 F.3d 590 (2d Cir. 1999) ..................................... 16, 17

Weaver v. Graham, 450 U.S. 24 (1981) .................................................................. 12

**STATUTES**

18 U.S.C. § 1956(a)(3)(B) ............................................................................ 1, 2

18 U.S.C. § 1960 ................................................................... 1, 3, 2, 10, 11, 12, 17

31 U.S.C. § 310(b)(2) ................................................................................ 13

31 U.S.C. § 5330 .................................................................................. 13, 20

31 U.S.C. §§ 321(b), 5318 ........................................................................... 13

New York Banking Law § 641 .......................................................................... 12

**REGULATIONS**

31 C.F.R. § 1010.100(ff)(5)(i) ................................................................. 14, 15, 16, 17

31 C.F.R. § 1022.380(a)(1) ................................................................................. 13

Dep't of the Treasury FinCEN, *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001 (March 17, 2013)..................................................................................................................17

Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 13–14 (May 9, 2019) ................................................................................................................. 17

Treasury Order 180-01, Financial Crimes Enforcement Network, 67 Fed. Reg. 64697-01 (Oct. 21, 2002) ............................................................................................................. 13

William M. (Mac) Thornberry National Defense Authorization Act of 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4552–53 (Jan. 1, 2021) ........................................................ 12

The government respectfully submits this memorandum of law in opposition to the defendant's post-trial motion for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29").

## PRELIMINARY STATEMENT

On October 18, 2022, following a week-long trial, a jury convicted the defendant Mustafa Goklu of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B), and operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a). The defendant now moves under Rule 29 for the Court to overturn the jury's guilty verdict as to the 18 U.S.C. § 1960(a) charge based on his assertion that the government failed to prove that the business the defendant operated qualified as a money transmitting business. The defendant's motion relies on a faulty legal premise and ignores significant inculpatory evidence and reasonable inferences that the jury could have drawn from such evidence. Accordingly, the Court should deny the defendant's motion and the jury's verdict as to the 18 U.S.C. § 1960(a) charge should stand.

## BACKGROUND[1]

### I. Relevant Procedural Background

On October 28, 2020, a grand jury sitting in the Eastern District of New York returned a Superseding Indictment (the "Indictment") charging the defendant with: (1) money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B) (Count One) and (2) operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a) (Count Two). See ECF No. 28.

---

[1] References to the trial transcript are referred to as "Tr." References to government exhibits admitted at trial are referred to as "GX."

1

Jury selection began on October 3, 2022. The government presented its case-in-chief on October 3, 4, and 6, 2022. At the close of the government's case, defense counsel made a Rule 29 motion, which Your Honor denied. See Oct. 6, 2022 Tr. 484:22-489:15. The defendant did not present a case. See id. 493:13-14. On October 7, 2022, Your Honor submitted the case to the jury following summations by the parties and the jury charge. See Oct. 7. 2022 Tr. 643:6-8. On October 11, 2022, the jury unanimously found the defendant guilty on both counts of the Indictment. See ECF No. 72.

## II.    The Government's Case as to Count Two

Because the defendant challenges the sufficiency of the evidence as to only Count Two, the government sets forth the central evidence supporting this charge below.[2]

Count Two of the Indictment alleged that between August 28, 2018 and April 30, 2019, the defendant knowingly and intentionally conducted, controlled, managed, supervised, directed and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce; in particular, a digital currency exchange business which operated without an appropriate money transmitting license in the State of New York and which failed to comply with federal money transmitting registration requirements. ECF No. 28.

In order to prove a violation of 18 U.S.C. § 1960(a), the government was required to establish that the defendant (1) knowingly controlled, conducted, managed, supervised, directed, or owned all or part of a money transmitting business; (2) that either the money transmitting business was not licensed, and operated in a state where the business was required to be licensed,

---

[2]    During its case-in-chief, the government introduced testimony from five witnesses and admitted more than 100 exhibits. The evidence cited herein is only a summary of certain evidence supporting the relevant counts and does not include all the trial evidence that supported these counts.

or the business failed to register as required with the Secretary of Treasury; and (3) the money transmitting business affected interstate or foreign commerce.  See Oct. 7, 2022 Tr. 632:6-13.[3]

At trial, the government presented substantial evidence of all three requisite elements.  The evidence included, among other things, witness testimony; business records; audio recordings of some of the defendant's transactions; cryptocurrency transfer records; photographs of U.S. currency provided by the defendant; the defendant's encrypted communications with past, current, and prospective digital currency exchange customers; an electronic money counter; and records confirming the results of official searches conducted by relevant New York State and federal authorities.

The evidence collectively established that during the charged time period, the defendant owned and operated a peer-to-peer digital currency exchange business.  The defendant advertised his business under the name "Mustangy" on localBitcoins.com, where he offered to meet up with customers in person at various locations in New York and New Jersey and exchange up to $99,999 worth of Bitcoins ("BTC")[4] into U.S. currency for a fee.  GX 401.  The defendant also offered to exchange large sums of U.S. currency into Bitcoin for a fee.  See id.[5]

---

[3] The defendant agreed that these elements are the proper elements of a 18 U.S.C. § 1960(a) charge.  See, e.g., ECF Nos. 58 & 61.

[4] Bitcoin is a digital currency (also known as cryptocurrency) that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government).  See Oct. 3, 2022 Tr. 212:14-24.  Bitcoin transactions are recorded on a public ledger called the block chain, which is accessible via an internet connection.  See id. at 217:9-13.

[5] Individuals can acquire Bitcoin in a number of ways, including through a centralized or commercial exchange, such as Coinbase, or through a peer-to-peer exchange, such as the service the defendant offered.  See Oct. 3, 2022 Tr. 218:20 – 219:4.  Commercial exchanges typically have an identity verification process, which requires users to provide a driver's license, social security number, date of birth, real name, and proof of address.  See id. 219:13-21.  By contrast,

Business records admitted during trial established that the defendant was the owner and operator of his digital currency exchange business. Among other things, the defendant formally incorporated his business into a corporation under New York Law, Mustangy Corp. USA. GX 104. The defendant received mail for the business at his apartment in Sunnyside, Queens and listed himself as the president of Mustangy Corp. USA on official paperwork. See, e.g., GX 217 & 715. The defendant also maintained a corporate bank account for Mustangy Corp. USA. GX 763.

Evidence presented at trial also revealed that the defendant's business had a robust client base. One of the defendant's customers was an undercover agent with the Drug Enforcement Administration ("DEA") (the "UC"). From August 2018 through April 2019, the defendant met up with the UC on seven occasions, during which he exchanged $133,190 worth of Bitcoin into cash though six separate transactions.[6] See GX 501 – 505, 801 – 804, 806, 807, 809, 1101. The transactions all took place in the defendant's parked Mercedes-Benz at various locations in Manhattan and Queens, New York. See id. During each transaction, the UC transferred Bitcoin from the UC's cryptocurrency wallet to the defendant's cryptocurrency wallet[7], after which the

---

many peer-to-peer exchanges do not require users to provide identifying information. See id. 222:21-223:4.

[6] During the seventh meeting on April 30, 2019, the defendant was in the middle of exchanging approximately $50,000 worth of Bitcoin, and had offered to exchange $20,000 more, but he was arrested before he completed the transaction. See GX 809.

[7] The UC testified that he "would open up [his] cryptocurrency wallet" and "[t]he defendant would open up his cryptocurrency wallet and his QR code," after which the UC "would pull up the amount [he] wanted to send to [the defendant's] QR code and that would populate the recipient's address in [his] phone." Oct. 3, 2022 Tr. 281:2-7. The UC then hit "send" and the Bitcoin would be transferred to the defendant's Bitcoin address through the blockchain. Id. 281:6-7.

defendant retained a seven or eight percent commission fee, used an electronic money counter to count the remaining amount in cash, and provided the cash to the UC. See id. The UC audio recorded the transactions.[8] GX 801 – 804, 806, 807, 809.

In addition to the UC, the defendant's business had dozens of other customers. The defendant mentioned some of his other customers to the UC during their recorded transactions and in encrypted communications. See, e.g., GX 906 ("There was somebody who took 50,000 for 10" […] "This guy keeps buying from me. He's asking 10K so, no money."); GX 505 ("I have 8% guy ready will give him if you don't want it."). The defendant also exchanged encrypted messages with his current and prospective customers, some of which the government admitted into evidence at trial. GX 228. In the messages, the defendant and his customers discussed past, ongoing, and future Bitcoin transactions. Id. The defendant completed many of the transactions in a similar manner and during the same general timeframe as his transactions with the UC. Id.

Evidence presented during the trial demonstrated that the defendant obtained the funds that he used to carry out his Bitcoin exchanges from a variety of sources. For example, the defendant obtained some of the money from his business partner—a man based in the Hamptons who also exchanged Bitcoin for U.S. currency. See, e.g., GX 903 ("My partner is in judgment ... [t]hey caught him 50K … they weren't tracking for Bitcoins, they were tracking some idiot guy who buys and sells trugs'"); GX 907 ("He has the money. I have a lot of money with him." […] But usually he is in Hamptons … But these three or two days I keep texting him, 'Hey, bring money, bring money, bring money.'"). The defendant also obtained funds by transferring money

---

[8] As a result of technical issues, the audio recording for the September 21, 2018 transaction ended prematurely after the UC and the defendant exchanged greetings. See Oct. 4, 2022 Tr. 296:8-13.

from his other accounts, some of which were located in Turkey. See GX 803 ("I can give you some more tomorrow because bank is getting pissed when you withdraw … too much."); GX 806 (stating the defendant got the cash he gave the UC "from the Bank of America yesterday" and explaining, "I usually buy on the exchange in Turkey and transfer money to here … I have money in Turkey, if I withdraw that, it's going to take two or three days at least."). Finally, the defendant obtained some of the cash that he used to buy Bitcoin from his sale of Bitcoin to other customers. See, e.g., GX 909 ("UC: Where do you get all this cash? Goklu: I have a guy who takes Bitcoins only"). Former DEA Special Agent Allan Liefke testified that he observed one instance where this occurred during his surveillance of the defendant in January 2019. Oct. 6, 2022 Tr. 425:4-13. Specifically, Mr. Liefke testified that he observed the defendant meet up with a woman in Manhattan who had "what looked to be a weighted bag" containing U.S. currency, and that after the defendant and the woman parted ways, the defendant subsequently "advised the undercover agent that he had $25,000 to do a deal the next day." Id.

During the trial, representatives of state and federal authorities testified that, based on their training and experience, a digital currency exchange business, such as the business the defendant operated, qualified as a money transmitting business under both New York State and federal laws and regulations. Robert Tarwacki, a criminal investigator at the New York State Department of Financial Services, testified that the licensing requirements to engage in the business of transmitting money in the State of New York applied to individuals engaged in the exchange of cryptocurrency for cash. Oct. 6, 2022 Tr. 459:7-23. He further testified that individuals who engage in a business of exchanging Bitcoin for cash for a fee in New York State are required to obtain a license. Id. 459:24-460:13. Theodore Vlahakis, a compliance officer at the U.S. Department of Treasury Financial Crimes Enforcement Network ("FinCEN"), likewise

testified that a digital currency exchange business qualified as a money transmitter under federal laws and regulations.  Id. 466:8 – 482:6.  Specifically, Mr. Vlahakis stated that a money transmitter "is an entity that is engaged in money transmission.  And money transmission is defined as the acceptance of currency[,] funds, or its equivalent from one person [or location] and the transmission of the currency[,] funds, or its equivalent to another person or location by any means," and specified that the definition included "somebody that engages in the business of exchanging cryptocurrency, specifically Bitcoin, for cash."  Id. 469:8-15.

Mr. Tarwacki and Mr. Vlahakis additionally testified respectively that the defendant never obtained a license from the State of New York or registered his business with the U.S. Department of Treasury as required by law.  Oct. 6, 2022 463:9 – 464:7, 479:17 – 482:2; see also GX 101 – 103.

ARGUMENT

I.    The Court Should Deny the Defendant's Motion for a Judgment of Acquittal on Count Two

The defendant moves under Rule 29 for the Court to overturn the jury's unanimous verdict and enter a judgment of acquittal on Count Two, contending that the government's evidence was insufficient on this count as a matter of law.  As set forth below, the defendant misstates the relevant law.  Moreover, he ignores significant evidence and reasonable inferences that the jury was permitted to draw from that evidence.  Contrary to the defendant's contentions, the jury's verdict as to Count Two was well supported by the trial evidence, and the defendant's motion should be denied.

A.    Applicable Law

"If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal pursuant to Federal Rule of Criminal Procedure 29(c), but it may do so only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a

reasonable doubt." United States v. White, 7 F.4th 90, 98 (2d Cir. 2021) (internal quotation marks omitted). "A conviction must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," and the evidence must be viewed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." Id. (internal quotation marks omitted) (emphasis in original). "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (quoting United States v. White, 673 F.2d 299, 301 (10th Cir. 1982) ).

Thus, a defendant challenging a jury's guilty verdict "bears a heavy burden." United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) , cert. denied, 139 S. Ct. 2665 (2019) (internal quotation marks omitted). In assessing a Rule 29 motion under this standard, a reviewing court must consider the evidence as a whole, not in isolation. United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019). This is so because "each fact may gain color from others." Guadagna, 183 F.3d at 130 (citing United States v. Monica, 295 F.2d 400, 401 (2d Cir. 1961)).

In addition to resolving any issue regarding witness credibility in the government's favor, the Court must leave to the jury the task of choosing among permissible competing inferences that can be drawn from the evidence. See, e.g., United States v. Pugh, 945 F.3d 9, 19 (2d Cir. 2019). In deciding which inferences to draw, the jury is entitled to use its common sense, Klein, 913 F.3d) at 79, and "[t]he fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable," United States v. Rosa, 17 F.3d 1531, 1542 (2d Cir. 1994).

B.    The Trial Evidence Proved Beyond a Reasonable Doubt that the Defendant is Guilty of Operating an Unlicensed Money Transmitting Business as Charged in Count Two

In his motion, the defendant does not dispute that he owned and controlled a peer-to-peer digital currency exchange business, that he did not license his business with New York State authorities or register his business with the Unite States Secretary of Treasury, and that his business affected interstate and foreign commerce.  See Def. Mot.  The defendant limits his motion to a single argument: that his digital currency exchange business did not qualify as a money transmitting business because exchanging Bitcoin for cash does not constitute "transmitting" currency or funds.  Def. Mot. at 2-3.[9]  The defendant is incorrect.

1.    Relevant Statutes and Regulations Establish that A Digital Currency Exchange Business Is a Money Transmitting Business

Title 18, United States Code, Section 1960 establishes criminal liability for anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a).  Section 1960 broadly defines the term "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2).  The statute states that a business is an "unlicensed money transmitting business" if it is "a money transmitting business which affects interstate or foreign commerce in any matter or degree," 18 U.S.C. § 1960(b)(1), and

A.  "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under state law;"

B.  fails to comply with the "registration requirements under section 5330 of Title 31, United States Code, or regulations prescribed under such section;"

_____

[9] The defendant does not dispute that Bitcoin qualify as "funds" under the unlicensed money transmitting statute.  See Oct. 6, 2022 Tr. at 349:2-9.

C. "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."

18 U.S.C. § 1960(b)(1)(A), (B) & (C).

"In order to be guilty of a violation of Section 1960 . . . an entity must first, as a prerequisite, be a business that engages in 'money transmitting' as so defined in Section 1960(b)(2)," and "in addition . . . a defendant must also either operate without a state license, fail to comply with the registration requirements of Section 5330, or otherwise transmit funds that the defendant knows were derived from or intended to support an unlawful activity." United States v. E-Gold, Ltd, 550 F. Supp. 2d 82, 90 (D.D.C. 2008); see also United States v. Budovsky, No. 13 Cr. 368 (DLC), 2015 WL 5602853, at *6 (S.D.N.Y. Sept. 23, 2015) (describing statutory scheme of Section 1960).

The Indictment charged the defendant under the (A) and (B) provisions of 18 U.S.C. § 1960(b)(1), and asserted that he failed to adhere to the state licensing and federal registration requirements. The (A) provision of 18 U.S.C. § 1960(b)(1) relies on the application of New York State law, which provides, in relevant part, that "[n]o person shall . . . engage in the business of receiving money for transmission or transmitting the same, without a license." New York Banking Law § 641.

The (B) provision of 18 U.S.C. § 1960(b)(1) refers expressly to 31 U.S.C. § 5330, the Bank Secrecy Act ("BSA"), which provided at the time of the offense conduct:

(1) Money transmitting business.—The term "money transmitting business" means any business other than the United States Postal Service which—

(A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments *or any other person who engages as a business in the transmission of funds, including any person who engages as*

*a business in an informal money transfer system* or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;

[…]

(2) Money transmitting service.—The term "money transmitting service" includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, *by any means* through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.

31 U.S.C. § 5330(d) (2017) (emphasis added).[10]   Money transmitting businesses are required to register with the Secretary of the Treasury. 31 U.S.C. § 5330(a).

The Secretary of the Treasury is authorized by Congress to promulgate regulations under the BSA and to delegate duties and powers within the Treasury Department.  See 31 U.S.C. §§ 321(b), 5318.  One of the regulations prescribed under § 5330 is 31 C.F.R. § 1022.380, which requires "money services businesses" ("MSBs") to "register with FinCEN," a division of the Treasury Department. 31 C.F.R. § 1022.380(a)(1); see Treasury Order 180-01, Financial Crimes Enforcement Network, 67 Fed. Reg. 64697-01 (Oct. 21, 2002) (delegating authority to administer the BSA to FinCEN).  See also 31 U.S.C. § 310(b)(2) (delineating the duties and powers of the Director of FinCEN).  Subsection (e) of that regulation is explicit that 18 U.S.C. § 1960 is "a

_____

[10] The statute was recently amended to import certain regulatory definitions into the statute. See the William M. (Mac) Thornberry National Defense Authorization Act of 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4552–53 (Jan. 1, 2021).  18 U.S.C. § 1960 refers expressly to violation of the regulations prescribed under § 5330; accordingly, the amendment does not affect the legality of the defendant's conduct or present any ex post facto concerns in this case. See Weaver v. Graham, 450 U.S. 24, 29 (1981); Kyles v. Chester, 457 F. App'x 780, 783 (10th Cir. 2012); United States v. Delco Wire & Cable Co., 772 F. Supp. 1511, 1515 (E.D. Pa. 1991). Operating an unregistered Bitcoin exchanger was a crime pursuant to 18 U.S.C. § 1960(a) in 2018 and 2019, and it remains illegal today.  For clarity, the government addresses the operative statute and regulations at the time of the offense conduct in 2018 and 2019.

criminal penalty for failure to comply with the registration requirements of 31 U.S.C. § 5330 or this section." Further, "[m]oney services business" is defined in the regulations as including a "[m]oney transmitter." 31 C.F.R. § 1010.100(ff)(5).

A "[m]oney transmitter" is:

(A) A person that provides money transmission services. The term "money transmission services" means the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency *to another location or person by any means*. "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or *an informal value transfer system*; or

(B) *Any other person engaged in the transfer of funds*.

31 C.F.R. § 1010.100(ff)(5)(i) (emphasis added).

While these provisions contain multiple definitions related to "money transmitting," courts have generally construed them together, and broadly. See United States v. Banki, 685 F.3d 99, 113 (2d Cir. 2012) ("Section 1960 defines 'money transmitting' broadly[.]"); United States v. Harmon, 474 F. Supp. 3d 76, 101 (D.D.C. 2020) ("'[M]oney transmitting[]' . . . is broadly defined at § 1960(b)(2)." (first alteration in original)); United States v. $215,587.22 in United States Currency, 306 F. Supp. 3d 213, 219 (D.D.C. 2018) (noting that "[c]ourts have broadly construed the definition of both a 'money transmitting business' and a 'financial institution'"); United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 92 n.10 (D.D.C. 2008)("[T]here is virtually no substantive difference, nor did Congress intend there to be a substantive difference, between the terms 'money transmitting' in Section 1960 and 'money transmitting business' in Section 5330."); id. at 96 (citing statutory language as well as legislative history to confirm "the inclusiveness of the term 'money transmitting business' under Section 5330").

2.     The Government Proved the Defendant Operated a Money Transmitting
       Business

The government provided ample evidence at trial from which the jury could infer

that the defendant operated a business engaged in money transmitting.  The defendant's business

activities clearly qualify him as a "money transmitter" because there is no dispute that the

defendant's business transferred Bitcoin in exchange for cash and cash in exchange for Bitcoin,

and therefore engaged in "the acceptance of currency, funds, or other value that substitutes for

currency from one person and the transmission of currency, funds, or other value that substitutes

for currency to another location or person by any means," including through "an informal value

transfer system."  31 C.F.R. § 1010.100(ff)(5)(i).  As FinCEN stated in its 2013 guidance, "an

administrator or exchanger [of virtual currency] is an MSB under FinCEN's regulations,

specifically, a money transmitter, unless a limitation to or exemption from the definition applies

to the person."  Dep't of the Treasury FinCEN, *Guidance on the Application of FinCEN's

Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001

(March 17, 2013) (hereinafter "2013 FinCEN Guidance"), at 4; <u>see also</u> 31 C.F.R. §

1010.100(ff)(5)(i); 18 U.S.C. § 1960(b)(2) ("'[M]oney transmitting' includes transferring funds

on behalf of the public by any and all means . . ."); 31 U.S.C. § 5330(d) (2017) (money transmitting

can include transferring).

The operative phrase is transmission "to another location or person by any means."

31 C.F.R. § 1010.100(ff)(5)(i).  In furtherance of his business, the defendant necessarily transferred

funds to other locations and people.  As FinCEN and the <u>Harmon</u> court, among others, have

recognized, and as Special Agent Lilita Infante of the DEA testified at trial, Bitcoin is held at an

"address" on the blockchain, somewhat akin to an account, and digital currency exchangers like

the defendant send the Bitcoin to a different blockchain address as part of every transaction. 474 F. Supp. 3d at 103–09 ("FinCEN's analysis implicitly rejects defendant's position that the Bitcoin blockchain is a single location such that transfer between addresses on the blockchain is not transmission between locations. FinCEN's position is persuasive."); see also Oct. 3, 2022 Tr. 217:9–13. Accordingly, the transfer of Bitcoin from one address to another constitutes a means of transmission "to another location." And where a different person controls the receiving address, the same transaction can be said to transfer the Bitcoin "to another . . . person." See, e.g., Harmon, 474 F. Supp. 3d at 103 ("[C]ourts in other criminal cases have held that § 1960(b)(1)(B) reaches unlicensed operations reaping a commission from exchanging traditional for digital currency."); id. at 104 (rejecting argument that exchanging was not transmission because moving Bitcoin between addresses amounted to "transmission between locations" and sending Bitcoin to another person was "transmission between parties").

Department of Treasury guidance codifies this broad interpretation of a transmission of funds "to another location or person by any means." 31 C.F.R. § 1010.100(ff)(5)(i). "[A] person is an exchanger and a money transmitter if the person accepts such de-centralized convertible virtual currency from one person and transmits it to another person as part of the acceptance and transfer of currency, funds, or other value that substitutes for currency." 2013 FinCEN Guidance, at 5; accord Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 13–14 (May 9, 2019) (hereinafter "2019 FinCEN Guidance"), *available at* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf (stating that "[t]he 2013 VC Guidance also clarified that FinCEN interprets the term 'another location' broadly" to include

14

"transmission from [a] person's account at one location (e.g., a user's real currency account at a bank) to the [same] person's [Convertible Virtual Currency (CVC)] account with the exchanger");[11] see also United States v. Faiella, 39 F. Supp. 3d 544, 546-47 (S.D.N.Y. 2014) (observing that the defendant who ran a virtual currency exchange "clearly qualifie[d] as a 'money transmitter' for purposes of Section 1960" as FinCEN "issued guidance specifically clarifying that virtual currency exchangers constitute 'money transmitters' under its regulations.").

This conclusion also consistent with the trial testimony of representatives from FinCEN and the New York State Department of Financial Services, who both stated that exchanging Bitcoin for cash constituted money transmitting under New York State and federal law. See Oct. 6, 2022 Tr. at 468:18–469:17; Id. at 459:7–460:13.

Accordingly, the defendant's direct Bitcoin exchange transactions with the UC and his other customers all involved the requisite movement of money from one location to another to qualify as the transmission of money.

The cases cited by the defendant do not yield a different conclusion. See Def. Mot. at 3–5. The defendant primarily relies on two cases, United States v. Velastegui, 199 F.3d 590, 592 (2d Cir. 1999), and United States v. Banki, 685 F. 3d. 99 (2d. Cir. 2012), to support the defendant's narrow construction of the term "money transmitting business." In Velastegui, the Court stated, as general background, "[a] money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place

---

[11] Although the 2019 FinCEN Guidance post-dates the offense conduct here, it expressly did "not establish any new regulatory expectations or requirements. Rather, it consolidate[d] current FinCEN regulations, and related administrative rulings and guidance issued since 2011, and then applie[d] these rules and interpretations to other common business models involving CVC engaging in the same underlying patterns of activity." Id. at 1.

that the customer designates, usually a foreign country." In <u>Banki</u>, the Court recited the same description of a "money transmitting business," citing <u>Velastegui</u>. 685 F. 3d. 113. In both cases, the Court did not consider the issue of whether certain actions undertaken by the defendants constituted transmissions of money or funds. The Court also did not cite any statutory authority for its description of a "money transmitting business" or otherwise suggest the description was intended to be exclusive or carry precedential weight; to the contrary, the use of the word "usually" indicated that the Court was merely giving an example for explanatory purposes. Furthermore, both <u>Valastegui</u> and <u>Banki</u> predated the use of digital currency exchange services. Accordingly, the Court in both cases had no opportunity to consider the effect of its language on transactions in which Bitcoin is transferred from one crypto-currency wallet to another and paid for in cash.[12][13]

Indeed, courts that have considered the issue of whether exchanging digital currency for cash constitutes transferring funds have rejected the defendant's position. For example, in <u>United States v. Stetkiw</u>, No. 18-20579, 2019 WL 417404, at *1 (E.D. Mich. Feb. 1, 2019), the Court addressed a case similar to the defendant's where "a typical Bitcoin purchase

---

[12] The defendant's citations to <u>United States v. Talebnejad</u>, 460 F.3d 563, 565 (4th Cir. 2006) and <u>United Staets v. Singh</u>, 995 F.3d 1069, 1077 (9th Cir. 2021) are likewise inapposite because, like <u>Banki</u> those cases cite to the same description of a money transmitting business set forth in <u>Velastegui</u> without ever considering the issue of whether the exchange of digital currency for cash constitutes a transfer of funds.

[13] The defendant also cites to cites to <u>United States v. Murgio</u>, 209 F. Supp.3d 698 (S.D.N.Y) in support of his position, noting that the Court on a motion to dismiss observed that "'both parties acknowledge[d]' that transmission of Bitcoins 'to another location or person for its customers' would establish a business as a money transmitting business, and the government argued that defendant's company "did more than just sell Bitcoins 'to customers in two-party transactions.'" <u>Id.</u> at 711. However, neither the government nor the Court in <u>Murgio</u> ever stated that selling Bitcoins to customers in a two-party transaction would not constitute money transmitting.

from [the defendant] involved [the defendant] electronically transferring the Bitcoins to the purchaser's Bitcoin address or account after the purchaser pa[id] [the defendant] the value of the Bitcoins plus a commission/fee" and held that such conduct fell "within the plain meaning of 'transferring funds on behalf of the public *by any and all means*,' such that [the defendant's] Bitcoin transactions constitute[d] 'money transmitting' under 18 U.S.C. § 1960(b)(2)." 2019 WL 417404, at *2 (emphasis in original). The Court further noted that its holding was consistent with guidance promulgated by FinCEN. Id.

In sum, the defendant in advocating for his position misreads the plain language of 18 U.S.C. § 1960, 31 U.S.C. 5330 and FinCEN's 2013 interpretative guidance,[14] which make clear that a business that offers digital currency exchange services constitutes a money transmitting business under 18 U.S.C. § 1960(b)(2).

Finally, even if the Court were to conclude that isolated two-party Bitcoin exchanges were insufficient to constitute transmissions of funds, the trial record nonetheless reflects myriad examples of ways in which the defendant's business still transmitted funds within the meaning of the statute by moving both Bitcoin and cash in sequential transfers from their sources to his customers. Every transaction that the defendant completed required the movement of both Bitcoin and cash to and from multiple different locations and/or persons. For example, the government presented evidence that the defendant undertook the following acts which all required transfers of funds:

---

[14] The defendant also cites a page on FinCEN's website that lists "money transmitting business" separate from "currency dealer or exchanger." Def. Mot. at 3 (citing https://www.fincen.gov/money-services-business-definition). However, the web page does not support the defendant's position, particularly as it specifies that a money services business "includes any person doing business… *in one or more* of the following capacities."

- transmitted U.S. currency from various bank accounts and used those funds to purchase Bitcoin from customers, see, e.g., GX 803 (discussing transfers of funds from bank accounts); GX 806 (discussing transferring funds from a Bank of America account and accounts in Turkey);

- transmitted Bitcoin from online exchanges to his cryptocurrency wallet prior to transmitting it onward to his customers' cryptocurrency wallets, see, e.g., GX 228 at 77-78 (discussing pulling cryptocurrency out of Bitfinex, an online digital currency exchange, to fund a transaction);

- obtained cash from his partner to purchase Bitcoin from customers, see, e.g., Oct. 6, 2022 Tr. at 356:16-23, GX 909 (discussing obtaining money from business partner in the Hamptons); and

- received cash from customers from the sale of Bitcoin and subsequently used that cash to purchase Bitcoin from other customers, see, e.g., Oct. 6, 2022 Tr. at 425:4-13; GX 909 (discussing obtaining cash from a customer who "takes Bitcoins only"); see generally GX 228.

The facts established at trial show that the defendant regularly completed multiple transfers of both Bitcoin and U.S. currency to support his two-party Bitcoin exchange business. Each of these transfers involved a different location (i.e., a different Bitcoin address on the blockchain, or a different bank account) and/or a different person. Consequently, the defendant's business was engaged in transmitting funds.

The government presented ample evidence for a reasonable jury to find Goklu guilty under 18 U.S.C. § 1960(a). The defendant's motion to overturn the guilty verdict on Count Two should be denied.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that the Court

should deny the defendant's post-trial motion for a judgment of acquittal as to Count Two.

Dated:    Brooklyn, New York
           December 5, 2022

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    _____/s/_____
Gillian A. Kassner
Marietou E. Diouf
Assistant United States Attorneys
(718) 254-7000