**SABRINA P. SHROFF**
ATTORNEY AT LAW

80 BROAD STREET, 19TH FLOOR
NEW YORK, NEW YORK 10007
TELEPHONE: (646) 763-1490

January 15, 2024

**BY ECF**
Honorable Pamela K. Chen
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*United States v. Mustafa Goklu*, **19 Cr. 386 (PKC)**
**(Mr. Goklu's Sentencing Letter to the Court)**

Dear Judge Chen:

Michael (Mustafa) Goklu respectfully submits this Sentencing Memorandum in advance of his sentencing in this matter. For the reasons discussed below, Mr. Goklu respectfully requests that he be sentenced to a non-incarceratory sentence of three years of supervised release.

Mr. Goklu was convicted of operating an unlicensed money transmitting business and, as a part of that business, laundering the proceeds of narcotics trafficking. Specifically, between August 28, 2018 and April 30, 2019, ran a one-man operation in which he would convert Bitcoin to dollars, or dollars to Bitcoin, for a small fee. *See* Presentence Investigation Report ("PSR") ¶¶ 14-15.

This is Mr. Goklu's first and only offense. Since his arrest on May 6, 2019, 56 months ago, Mr. Goklu has not reoffended, and will not reoffend. He found work as an app-based driver and cook and lived quietly in Queens with his wife, Tugba, and his three-year-old son, Can. Despite the financial difficulty and stresses he has experienced as a new father trying to support his family – being a driver and a cook were both professions massively and negatively impacted by the COVID pandemic and attendant social restrictions – Mr. Goklu has remained entirely law-abiding. There is no better evidence of his lack of future risk than his behavior since 2019.

For this reason, and the others set forth herein, the Court should sentence Mr. Goklu to the requested non-guidelines sentence of three years supervised release. Such a sentence best accords with the parsimony principle that guides federal sentencing and is a proper and sufficient sentence for him.

## BACKGROUND

**Michael Goklu**[1]

Michael (Mustafa) Goklu was born on June 2, 1972, in Goklu, Turkey. PSR ¶ 44. His father, Ahmet, who worked as a teacher, died in 1996 in a car accident. *Id.* His mother, Pervin Halima, a homemaker aged 70, lives with Michael's brother, Mehmet, in Germany. *Id.* Michael is the oldest of seven children. His siblings all reside in Turkey or Germany, and they variously work as teachers, or in construction, or in textiles. *Id.* ¶ 45. Despite the geographic distance, Michael

---

[1] Mr. Goklu legally changed his name to Michael in 2014, upon becoming a U.S. citizen.

remains close with his family. Indeed, he is so ashamed by his arrest and conviction, and concerned about the effect the news may have on his mother who is in poor health, that he has not yet told most of his family about his legal situation and upcoming sentencing.

Michael grew up middle class in a solid and loving home. He attended school, made good grades, and attended college in Turkey, graduating with a Bachelor of Science degree, in business management, from Anadolu University in Eskisehir, Turkey in 2003. PSR ¶¶ 46, 56-59. In 2008, he legally immigrated to the United States in search of better economic opportunity, settling in Queens, New York. *Id.* ¶ 49. In New York, he began working full-time as a limo driver, a position he held until his arrest, and for a brief time sold electronics on eBay. *Id.* ¶¶ 62-63. Eventually, he began supplementing his income by exchanging bitcoins and dollars for others in exchange for a fee, the offense for which he faces sentencing. *See id.* ¶¶14-15. Since his arrest and release, he has worked as a driver for Door Dash and Uber Eats and as a cook at Captain's Cafe Bar and Grill in Manhattan. *Id.* ¶¶ 60-61. During the COVID pandemic, Michael was unable to work because of the social restrictions imposed in New York City, so he and his family had no choice but to survive as best they could on $750/month in unemployment benefits. *Id.* ¶ 61.

In 2013, Michael married the one true love of his life, Tugba Gunduz, after a 14-year relationship. They have been together for more than 23 years. PSR ¶ 47; *see also* Letter from Tugba Goklu to Court ("Tugba Letter") (attached as part of **Exhibit A** to the sentencing letter).[2] Tugba works in the code-share department of Turkish Airlines., although she is on leave as she is taking care of her eldest sister, who is dying of uterine cancer. PSR ¶ 47. In 2020, after years of trying and miscarriage, Michael and Tugba welcomed their son Can into the family. Can, a rambunctious and happy three-year-old toddler, is the apple of his father's eye.

Michael is a "kind and loving person" (PSR ¶ 48) who is deeply regretful for the consequences his actions have visited upon his family. He started transmitting money for others to help make more for his family and save enough for a down payment on a house. He now realizes that, in trying to support his family, he placed them at risk instead. Tugba does not speak English very well and is dependent upon Michael to manage matters and help navigate things outside the house. PSR ¶ 48. Can is just three years old and faces having to grow up in the next years without the help and support of his father. Plainly, any imprisonment would wreak havoc upon them. As Tugba explains:

> Michael's TLC license has been stripped, and there are no more cars for Black Taxi licenses. He has lost ten years' worth of served and faithful customers. We cannot survive in the United States without Michael. My son is in pre-k school and sometimes I have to take him to my work as the day care closes at 5:30 p.m. and I work until 11:30 p.m. If I start the day at 5:30 p.m. then I work until 8:30 a.m. and then I have to take him to office. My mother is 89 years old and cannot help me.
>
> We are drained to zero all our life savings. Michael's mother has cancer and she needs surgery. My sister also has uterine cancer and I am exhausted. The only

---

[2] Letters in support from Michael's family and friends are attached as **Exhibit A** for the Court's ready reference.

>person who can support me is Michael and I am very worried that he will not be with me to raise his son.

Tugba Letter at 2; *accord id.* at 1 ("Our lives will become very difficult without him, so I ask you not to send him to jail. I've already faced challenges as a single mom, changing houses three times in the last 18 months, and managing a job that requires 24-hour availability as I work for Turkish Airlines.").

Beyond his wife and child, Michael's situation has harmed his extended family as well. As the eldest son, Micheal has always been looked at to guide and lead his family, a responsibility that only increased with the unexpected and untimely passing of his father. *See*, *e.g.*, Letter from Michael's sister, Canan Goklu ("Canan Letter") (Ex. A) ("It was Michael who had to be responsible as that is our culture and he selflessly dedicated himself to supporting our family."); Letter from Michael's sister, Nevin Goklu Balci to Court ("Nevin Letter") (Ex. A) ("He [Michael] was kind of my father when we lost our father at traffic accident. … He was the one work long hours and spent all money to our education in both Germany and Turkey."). Michael has extended that sense of responsibility and concern to all those around him. As Tugba relates:

>During the time my brother had cancer, Michael did all he could for him and his family. Michael would talk to the doctors and the hospital staff and find out what was going on with my brother. He would rally my brother's friends to go and visit him and support him. When my brother was in a lot of pain, Michael searched for medicine that would help and save my brother. It did not work; My brother died when he was 35 years old.

Tugba Letter at 1. In addition, despite their straightened financial circumstances, Michael and his wife continue to "help anyone around us that need help." *Id.* For example, they shop and cook and run all the errands for Lia, their 102-year-old neighbor. *Id.*; *see also* Letter from friend and neighbor Soner Ozkan ("Soner Letter") (Ex. A) (discussing the help Michael provides himself and others, like Lia).

Soner Ozkan is a friend and neighbor who writes the Court to "provide you with some insights into his character" and how "losing his help will effect [Soner's] life also." Soner Letter at 1. As he recounts:

>I have a kidney failure and in dialysis everyday basis, Michael did a lot for me. First time when come to US at [beginning] Michael Helped me for almost everything, Getting a license, buying a car for working putting me on the road, setp [sic] by step from green card to to my us citizenship, I know it is not only me he help several common friends also, I'm having some sort help from [him] also today, Going to hospital and during my hard days due to my illness.

*Id.* Soner ends his letter by speaking of Michael's positive future as a responsible and contributing member of society:

>I firmly believe that Michael deeply regrets any actions that may have led to his current situation. He is committed to making amends and learning from this experience to become

> a better person. It is my sincere hope that Your Honor will consider these aspects of Michael's character when making decisions regarding his case. I believe in his capacity for positive change and rehabilitation, and I am confident that he will emerge from this experience as a more responsible and contributing member of society.

*Id.* at 2. Soner's words are echoed by Michael's sisters, Nevin and Canan. *See* Nevin Letter at 1-2; Canan Letter at 1.

As the foregoing demonstrates, Michael is at heart a kind, giving, and sensitive person. Sentencing him to jail will not only harm his wife and child, but will harm his extended family, neighbors, and community, each of whom have been helped without hesitation by Michael in the past.

If sentenced to supervised release, Michael will – just as he has in the last four plus years – continue to obey the law and support his family, friends, and neighbors the best he can. What he will never do again is look for a shortcut, and further risk those he loves:

> Michael works tirelessly, putting in at least 12-20 hours a day, 6-7 days a week as an Uber driver. Sometimes, he even sleeps in his car for a few hours between late fare drops from NYC and early airport pickups. Despite the challenges, he is a hardworking person who dedicates himself to providing for his family.

Tugba Letter at 1. Plainly, Michael has learned his lesson, and the Court should permit him to continue working hard and providing for his family outside of prison.

**<u>The Instant Offense and Mr. Goklu's
Objection to the Guidelines Calculation</u>**

Mr. Goklu was convicted of one count of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B), and one count of operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a). See PSR ¶¶ 1-3.

The government and Probation's guidelines calculation arrive at Total Offense Level of 24. PSR ¶¶ 21-36; Govt. Sentencing Letter [ECF Docket No. 91] at 3. They also recognize that this is Mr. Goklu's only offense and that he has zero criminal history points, resulting in Criminal History Category of I. PSR ¶¶ 37-42; Govt. Sentencing Letter at 3. Taken together, this results in a guidelines range of 51 to 63 months' imprisonment, with an additional one to three years of supervised release. *Id.* ¶¶ 71, 74. The government requests a sentence within that guidelines range.

While Mr. Goklu asks for a non-guidelines sentence, the Court should be aware that the guidelines range calculated by the government and Probation is incorrect and too high.

*First*, the November 1, 2023, edition of the Guidelines Manual created a retroactive reduction in the offense level for zero-point offenders like Mr. Goklu whose offense did not involve any of the specified aggravating factors set forth in that section – *e.g.*, violence, use of a weapon, terrorism, sexual offense. *See* U.S.S.G. § 4C1.1. Mr. Goklu is eligible for such a reduction and, as a result, the Total Offense Level calculated by the government should be reduced by two points, from 24 to 22. In turn, this reduces the applicable guidelines range to 41 to 51 months' imprisonment, instead of 51 to 63 months.

*Second*, the government and probation increase the base offense level by six points because Mr. Goklu purportedly "knew the laundered funds were the proceeds of narcotics trafficking." PSR ¶ 24. The undercover agent, however, provided the monies at issue to Mr. Goklu (totaling $133,190) in "six separate transactions." *Id.* ¶ 13. The government's proof at trial showed that transactions one to three with the agent, Mr. Patrick O'Kain, did not involve any discussion of, or reference to, those monies being narcotics proceeds. Agent Okain testified as follows:

> Q    Now, in the text, the Signal text messages that you sent to Mr. Goklu [to set up the first transaction], you never indicated to him that that's who you were [an online drug dealer] and what you were doing [selling drugs in exchange for bitcoin], correct?
>
> A    Well, I --
>
> Q    Did you ever tell him that you were selling drugs directly?
>
> A    Yes.
>
> Q    In the text messages?
>
> A    No, not in the text messages.
>
> Q    Okay. So nothing ever came up in the text messages?
>
> A    No.
>
> Q    And when you first met with Goklu on -- Mr. Goklu on August 28th of 2018, you didn't tell him that you were selling drugs?
>
> A    Correct.
>
> Q    Or that your business was selling drugs and the BitCoin that you were seeking to exchange was from the sale of drugs; is that right?
>
> A    That's correct.
>
> Q    And you didn't tell him that on September 21st of 2018, correct?
>
> A    That's correct.
>
> Q    And you didn't tell him that in November of 2018; did you?
>
> A    I did not.
>
> Q    And you started to hint at it a little bit in December -- on December 11th of 2018?
>
> A    Yes.
>
> Q    And that was the first time?

> A    Correct.
>
> * * *
>
> Q    Well, I'll state it affirmatively. There was no information that you had provided to Mr. Goklu in those first four conversations that would lead him to believe that the BitCoin had been obtained from selling illegal drugs; isn't that correct?
>
> A    Yeah. Not necessarily.
>
> Q    Not necessarily?
>
> A    He would -- I think if you could state that a different way. Well, I guess, I did not specifically state anything about drugs during those interactions, that's correct.

10/6/22 Trial Tr. at 382:17-383:21; 384:3-12 (attached hereto as **Exhibit B**).

The Agent expressly agreed and testified that Mr. Goklu had not been provided any information before or during those initial three transactions "that would lead him to believe that the BitCoin had been obtained from selling illegal drugs." 10/6/22 Trial Tr. at 384:3-12. Accordingly, the amounts from those three transactions – totaling $47,970, or over a third of the $133,190 at issue (*see* GX 1101) – should not be included by the Court when it considers Mr. Goklu's offense, or when it calculates the guideline range and/or the forfeiture number applicable to Mr. Goklu.[3]

## ARGUMENT

For the reasons discussed below, the appropriate sentence here is a non-guidelines sentence of three years supervised release.

### A.    The Legal Standards for Sentencing

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id.; see also, e.g., Pepper v. United States*, 562 U.S. 476, 493 (2011); *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the

---

[3] Application note 3 to U.S.S.G. § 2S1.1 states, in relevant part, that "[i]n a case in which a transaction, financial transaction, monetary transaction, transportation, transfer, or transmission results in the commingling of legitimately derived funds with criminally derived funds, the value of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived funds, not the total amount of the commingled funds[.]"

defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

While the sentencing guidelines comprise one factor for this Court to consider, they are only one such factor, and "truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009). Here, an individualized assessment of the record facts, the § 3553(a) factors, and application of the overarching parsimony clause that guides federal sentencing, all support the requested non-guidelines sentence of three years supervised release.

B. **The § 3553(a) Factors Strongly Support a Non-Guidelines Sentence of Three Years Supervised Release**

The sentencing goals of specific deterrence and rehabilitation support the requested non-guidelines sentence. Prior to this offense, Michael Goklu had no criminal history. *See* PSR ¶¶ 37-42. And, after his arrest and release in 2019 for the instant offense, Michael Goklu committed no other crime. As the Probation Department concedes: "The supervising Pretrial Services Officer advised that the defendant [Mr. Goklu] has complied with all Court-ordered conditions of release." *Id.* ¶ 6. This history demonstrates both Mr. Goklu's essential law-abiding nature and that he has been specifically deterred and poses no risk of any future criminal offense.

Unable to point to any continuing criminal activity of any kind, or any violation of the conditions of his release, in the last four plus years (approximately 56 months), the government desperately points to two things in a failed effort to contend that prison time is needed to specifically deter Mr. Goklu. First, the government points to a civil dispute between Mr. Goklu and his landlord arising from the landlord's attempts to improperly evict the Goklu family and violate the covenant of quiet enjoyment that is part of every rental agreement in New York. Govt. Letter at 4. Second, the government contends Mr. Goklu must be jailed because he exercised his fundamental, constitutional right to a trial. *Id.* Both these contentions are meritless on their face. If anything, the fact that the government can point to nothing else, and is reduced to making such empty arguments, conclusively demonstrates that Mr. Goklu is specifically deterred. There is no better evidence that Mr. Goklu has been specifically deterred and poses no risk of any future offense than his model behavior since May 2019 (and zero history points before his arrest in this matter). Moreover, and in any event, Congress properly has recognized that "imprisonment is *not* an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added). Here, correction and rehabilitation are best addressed not by incarcerating Mr. Goklu, but by allowing him to remain outside prison where he can continue being a positive influence in his community.

In addition to specific deterrence and rehabilitation, the sentencing goals of incapacitation/punishment and general deterrence also strongly support the requested sentence.

The sentencing goal of punishment is sufficiently met here by the three years of supervised release. In this regard, the United States Supreme Court expressly has recognized that supervised release "is not merely 'letting an offender off easily,'" and involves "substantial restrictions on freedom" that effectively deters and punishes in its own right. *Gall*, 552 U.S. at 48-49. Further, in addition to the three years of supervised release, the Court should bear in mind the "broad range of collateral consequences" Mr. Goklu now faces because of his conviction. *See* PSR ¶ 84 (listing some of those collateral consequences). Indeed, Michael already has suffered a material collateral consequence unique to his individual circumstances. Specifically, the Taxi and Limousine Commission (TLC) has stripped Michael of his TLC license, meaning he may no longer work as a limousine/black car driver and has lost over ten years' worth of hard-won experience and faithful customers. *See* Tugba Letter (Ex. A) at 2.

Likewise, the sentencing goal of general deterrence is also met here, as the requested sentence is sufficient to generally deter others who are considering committing the same offense for which Mr. Goklu was arrested. Studies have shown that it is the arrest that best deters, not the length of the sentence. *See, e.g.,* Valerie Wright, *The Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, 5-6 (2010), available at http://www.antoniocasella.eu/nume/Wright_2010.pdf. Mr. Goklu's neighbors and associates saw him arrested, have seen him suffer the emotional and mental stress resulting from these proceedings, and will see him having to live under substantial restrictions on freedom during his time in supervised release. Under these circumstances, prison time will not provide any greater general deterrence than the three years of supervised release respectfully proposed.

Finally, the Court should consider the undisputed harm prison time will cause to Mr. Goklu's friends and family, and particularly to his three-year-old Can. *See* PSR ¶ 85 (recognizing that Mr. Goklu's "incarceration may likely cause emotional distress in the defendant minor child's life"); Govt. Letter at 4 (acknowledging that Mr. Goklu "had a child after his arrest and that any period of incarceration would pose a hardship for his family"). For several reasons, including the fact that Tugba does not speak English, Tugba and Can are particularly and extraordinarily dependent, financially and emotionally, on Michael. Any interaction with the outside world – for example, doctor appointments for Can or arranging for Can's daycare and schooling – requires Michael's physical presence in their lives. As Tugba explains in her letter (Ex. A), there is no one who can step in if Mr. Goklu's is absent and supply the necessary financial and emotional support she and Can require. The extraordinary harm his family will suffer should Mr. Goklu be sentenced to prison further supports a non-incarceratory sentence for him. *See, e.g., United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding departure from guidelines sentence where defendant provided substantial support for two children and defendant's wife spoke limited English).

For each of these reasons, sentencing Mr. Goklu to three years of supervised release is sufficient, but not greater than necessary, to meet the sentencing goals, and fully accords with the parsimony principle underlying federal sentencing.

## **CONCLUSION**

An individualized assessment of the § 3553(a) factors in this case (and the parsimony principle) strongly support a non-guidelines sentence of three years supervised release. Accordingly, Mr. Goklu respectfully requests that the Court impose that sentence upon him.

Respectfully submitted,

/s/Sabrina P. Shroff
Counsel to Mr. Michael Goklu

SPS/
Exhibits A-B

cc: All counsel of record (by ECF)